Defendants' objections are meritless. The question asks merely whether advice was rendered, not what the client said to the attorney for the purposes of eliciting advice or what advice was given. In any event, defendants have failed to prove the facts necessary for invocation of any privilege.

> 6. Q. Was there any discussion on the Board of Trustees, while you sat on it and prior to February 16th, 1988, in which there was mention of the possibility of giving Mr. Rattner a code violation?
> MR. HANDLER: I want you to exclude from your answer any conversations in which counsel was in attendance, or any conversations in which legal advice was discussed with counsel.
> A. I decline to answer on that basis.
> MR. HANDLER: The witness is declining to answer on the grounds of attorney- client privilege.

(McConnell Dep. p. 255, l. 23 to p. 256, l. 12.)

Defendants waived any privilege on this subject matter in state court with respect to most of the time period. (Kittay March 24, 1989 Aff. at Exhs. J, N & S.) Furthermore in any event defendants have failed to establish that an answer could disclose either a confidential communication from the client to the attorney for the purpose of eliciting legal opinion or the substance of the legal advice. The mere fact that an attorney was present at a meeting in order to render legal advice does not demonstrate that everything said at the meeting is subject to the attorney-client privilege.

> *33 7. Q. I am now asking about executive sessions where counsel was not present. Was there discussion, while you were trustee, regarding the costs of the Rattner litigation to the Village prior to February 16th, 1988?
> MR. HANDLER: I don't believe that question seeks to discover conversations by the Board of Trustees in executive session with respect to Rattner's expressive or related activities.
> Therefore, I am standing on the executive privilege and asserting it.
> MR. KITTAY: You instruct him not to answer?
> MR. HANDLER: Yes, on the ground that those conversations are privileged. I also would like to add that to the extent that the conversations included information which was obtained from counsel, it may also implicate the attorney-client privilege as well.

(McConnell Dep. p. 258, l. 25 to p. 259, l. 22.)

The invocation of both the attorney-client privilege and the purported executive session privilege is baseless. The attorney-client privilege claim rests on the speculation that the conversation may have "included information which was obtained from counsel ...," (*id.*) but defendants fail even to attempt to prove this, and in any event the privilege does not extend to the transmission by an attorney to a client of information obtained elsewhere, *see, e.g., Standard Chartered Bank v. Ayala Int'l Holdings, 111 F.R.D. at 80* or to information relating to attorney's fees. *See, e.g., In re Shargel, 742 F.2d 61, 62 (2d Cir.1984).* As for the "executive session" argument, again it is wholly without basis in view of the Memorandum and order of this Court dated December 29, 1988. [FN13]

> 8. Q. At the March 14, 1988 meeting during which the issue of indemnification was discussed, was there anyone who advocated that Mr. Netburn should not be indemnified?
> A. Legal counsel was present at the entire discussion.
> Q. Do you decline to answer the question?
> A. Yes
> Mr. HANDLER: I have advised the witness not to testify to any conversations at the March 14 meeting which were based on conversations with counsel concerning the Village's rights and obligations and duties on the issue of indemnification.

(McConnell Dep. p. 287, l. 5-19.)

Confidentiality with respect to this subject matter is limited to any legal advice rendered by counsel or communications by the client to the attorney for the purpose of eliciting such advice. The question does not appear to seek such information and defendants fail to prove that an answer would in fact reveal confidential communications by the client to the attorney for the purpose of eliciting legal advice. The question is not objectionable merely on the basis that an attorney was present at the meeting.

> 9. Q. At the executive session portion of the meeting, was there any discussion about the Netburn letter?
> MR. HANDLER: Objection. I am not going to direct the witness to testify with respect to the substance of the discussions in executive session with counsel present. You know, because he has testified about the action that the board took in the public session on that day.
> *34 MR. KITTAY: Is there an instruction not to answer on that one?
> (Record read)
> MR. KITTAY: Is that a direction not to answer?
> MR. HANDLER: It sounds pretty clear.
> MR. KITTAY: I will assume it is and move on.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

(McConnell Dep. p. 289, 1. 17 to p. 290, 1. 11.)

This question seeks to determine whether a particular subject was discussed by the Board, and does not seek the substance of the discussion. In any event defendants have failed to prove the applicability of any privilege.

> 10. Q. Did the Board of Trustees make any inquiries prior to releasing this press release as to whether Mr. Netburn was involved in any way with a boycott?
> MR. MALDONADO: I object to the form.
> A. Any discussion concerning that subject would have been held in the executive session when legal counsel was present.
> Q. Is the answer yes or no?
> A. I am saying that everything you have asked me in the last five minutes would have been discussed in the executive session where legal counsel was present.
> MR. KITTAY: Do you direct him not to answer?
> MR. HANDLER: I am not going to let you question him about conversations he had with legal counsel.
> MR. KITTAY: I am not asking about conversations. I am asking whether the Board of Trustees made any inquiries prior to the release of the press release as to whether Mr. Netburn was involved with a boycott.
> MR. HANDLER: His response is that they had a meeting, a discussion with counsel present that he is not going to testify about the substance of that discussion.

(McConnell Dep. p. 303, 1. 23 to p. 305, 1. 4.)

The question does not seek disclosure of privileged communications. If the Village chose to make the inquiries that are the subject of the question, it cannot conceal such activities based upon the attorney-client privilege. Equally unavailing is any "litigation strategy" argument. The question does not seek litigation strategy, and in any event there is no showing by defendants that any inquiries about Netburn's involvement in a boycott were motivated by litigation.

> 11. Q. MR. KITTAY: I don't want him to read the whole thing. I just want to know--what I am getting at is whether the witness attended an executive session in late November or early December 1987 at which this decision was discussed.
> MR. HANDLER: I am not going to permit you to inquire as to any discussions that this witness may have had concerning the legal proceedings.
> MR. KITTAY: I have got your instruction. I will move on. On the ground of attorney-client privilege?
> MR. HANDLER: Attorney-client privilege and executive session and I am not conceding that there was such a meeting.

(McConnell Dep. p. 307, 1. 19 to p. 308, 1. 11.)

The question does not seek the substance of any privileged communications. It is plainly not improper.

> 12. Q. Have you ever seen Exhibit 110 before?
> MR. HANDLER: Before you proceed with this line, I would like to take a recess to study this document.
> MR. KITTAY: It is a paragraph long. There is a question pending and I don't think--
> MR. HANDLER: I am not going to consult with the witness. I will study it in private.
> *35 (Recess taken: 4:08 p.m.)
> (Time resumed: 4:10 p.m.)
> MR. HANDLER: Mr. Kittay, I have studied this document in private and in camera and it is clear to me from the face of the document that this is a privileged and confidential document. It so states on the top of the document.
> It was distributed, according to the face, from John St. Leger to three attorneys representing the Village at the time the document was prepared, myself, Lawrence Dittelman and Paul Martineau and I am going to object to your questioning the witness about the document on grounds of attorney-client privilege.
> I interpose that objection with full knowledge and understanding that the Village produced a copy of this document to you in the state court litigation where the attorney-client privilege was waived for certain limited purposes applicable only to that action and not to this action and by "this action," I mean the Netburn action, so therefore I am going to object to your questioning the witness about this document.

(McConnell Dep. p. 315, 1. 9 to p. 316, 1. 22.)

The waiver in state court by the Village with respect to specific documents cannot be undone in this forum. The plaintiff may therefore question the witness about documents produced in the other lawsuit.

> 13. Q. What material was circulated to the Board of Trustees regarding the Rattner/Pleasantville litigation while you were a trustee?
> MR. HANDLER: By whom? By counsel?
> MR. KITTAY: No, by anybody.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Q. By Mr. St. Leger?
MR. HANDLER: I object. Attorney-client privilege.
MR. KITTAY: You instruct him not to answer?
MR. HANDLER: Yes.

(McConnell Dep. p. 326, l. 5-16.)

Defendants waived any privilege by permitting testimony concerning this question by Mr. Farrington. (Farrington Dep. at 311-16.) In any event defendants do not even attempt to establish that an answer would disclose privileged communications.

> 14. Q. Let me break it down. Were court decisions in the Rattner/Pleasantville litigation circulated to the Board of Trustees while you were on the board?
> MR. HANDLER: Whatever communications Mr. McConnell and the other trustees had with respect to the pending litigations came from counsel. I am not going to permit you to inquire of this witness what my practice and procedure is with respect to keeping them abreast of developments or any communications. I consider that all privileged and part of attorney-client privilege and work product.
> MR. KITTAY: I think your interpretation is far too broad.
> MR. HANDLER: Fine.
> MR. KITTAY: In light of your instruction, I will move on.

(McConnell Dep. p. 326, l. 17 to p. 327, l. 12.)

Again, defendants fail to demonstrate any facts to support a privilege claim. It bears reemphasis in this regard that even if counsel supplied the Board with copies of court decisions, that fact would not be privileged since it would amount to a communication by counsel to the client of public facts. *See, e.g., Standard Chartered Bank v. Ayala Int'l Holdings, supra,* 111 F.R.D. at 80.

> 15. Q. Why did you say that?
> *36 A. It was a special executive meeting--
> MR. HANDLER: This was an executive session?
> THE WITNESS: Yes.
> MR. HANDLER: You have testified that it had nothing to do with Rattner. THE WITNESS: It had nothing to do with Rattner.
> MR. HANDLER: I will direct you not to answer the question. It is outside the scope of the magistrate's order.
> A. Definitely.
> MR. KITTAY: Are you invoking some privilege?
> MR. HANDLER: Executive session privilege, as determined by the magistrate.

(McConnell Dep. p. 199, l. 15 to p. 200, l. 8.)

Defendants entirely fail to establish that a completed answer would have revealed a privileged communication or legal strategy. The direction not to answer therefore cannot be sustained. [FN14]

> 16. Q. At any executive session where counsel was not present, did Mayor Farrington ever use profanity with respect to the Rattner litigation or Mr. Rattner?
> MR. HANDLER: Mr. Kittay, as the attorney for the witness, I have set forth my position on the record that--I think you made your record clear as you can. I have tried to assist you in that regard.
> To the extent that you are inquiring about conversations at executive session with respect to the Rattner state court litigation, you are implicating attorney-client privilege, executive session privilege, and going beyond the parameters of the magistrate's order which, as I understand, was limited to your being able to discover conversations at executive sessions with respect to Rattner's expressive activities.
> I think I have said it as clearly as I can.

(McConnell Dep. p. 215, l. 16 to p. 216, l. 14.)

Again, this inquiry is not precluded by a privilege. I note, as well, that defendants' invocation of the attorney-client privilege (see Defendants' McConnell Memorandum of Law at 19), is truly bizarre since the question excluded any meeting at which counsel was present.

> 17. Just tell me if your attorney will permit you to tell me what the topic was of the special executive session at which you made this remark?
> A. I decline to answer it. It has no bearing on this case.

(McConnell Dep. p. 200, l. 16-21.)

Even if the executive session privilege were a viable defense to discovery-- which it is not in this case-- plaintiffs would be entitled to inquire as to the general topic of the Board meeting in order to determine whether the calling of such a closed session was proper under the statute. [FN15]

> 18. Q. Was there any mention, at the February 16th meeting, regarding whether private citizens might respond to the Rattner ad?
> MR. MALDONADO: Objection. Asked and answered.
> MR. HANDLER: You have asked that question three times. What is the point in getting the same answer a fourth time, other than to delay?

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Q. Please give your answer.
A. I am on the record.
Q. What is the answer, yes or no?
*37 A. You can refer to the record.
Q. Where? A. In the record today and in the record here.
Q. Do you decline to answer?
MR. HANDLER: The witness stands on his prior answer. That is his testimony. You have got an answer.
MR. KITTAY: If you are right, then you are right. If you are wrong, we will pursue it.
MR. HANDLER: You have now managed to create a controversy.
The witness stands on his prior answer.

(McConnell Dep., p. 241, l. 12 to p. 242, l. 15.)

This question was answered at an earlier point in the deposition. (McConnell Dep. p. 233, l. 24 to p. 234, l. 4.) No further response is required.
19. Q. In your view, would that have been improper?
MR. MALDONADO: Objection.
MR. HANDLER: The witness has testified that he doesn't know of any such activities.
Therefore, how can he give you an opinion as to something he doesn't know whether it would be proper or improper?
MR. KITTAY: I would like an answer.
MR. HANDLER: You are not getting it. Take it up with the magistrate.
Would you like to terminate the examination right now?
I am giving you an opportunity to determine it, awaiting a ruling on that last question.
MR. KITTAY: No, I don't want to terminate.
MR. HANDLER: O.K., we will continue.
I am prepared to accommodate you by terminating the examination right now.
MR. KITTAY: But that would not accommodate me because I want the opportunity to ask my questions.

(McDonnell Dep. p. 254, l. 4 to p. 255, l. 6.)

The question was proper and did not elicit a responsive answer. Plaintiffs are entitled to one.
20. Q. Does the board of Trustees vote on every action taken by Mr. Farrington in his capacity as mayor?
MR. MALDONADO: I object to the form.
A. I stand on my testimony.

(McDonnell Dep. p. 277, l. 10-15.)

This question was clearly answered subsequently in the deposition.

(McDonnell Dep. p. 277, l. 23 to p. 279, l. 12.) No further response is required.
21. Q. Did the Board of Trustees on February 16 have at the meeting a copy of the Rattner ad?
A. I am on the record. i stand on the record.
Q. I mean a hard copy of the ad?
A. I stand on the record.

(McDonnell Dep. p. 290, l. 24 to p. 291, l. 5.)

This question was never answered. The testimony quoted by defendants in their Memorandum of Law refers solely to the topic of discussion, not whether the Board had a copy of the advertisement at its meeting. (*See* Defendants' McConnell Memorandum at 26, citing McConnell Dep. p. 264, l. 19 to p. 265, l.6.) Plaintiffs are entitled to a proper answer.

F. *Deposition of Richard Kersten*

In defending the privilege claims asserted at the deposition of Richard Kersten, the defendants rely upon an affidavit of the witness, which reiterates the same general allegations of the three preceding witnesses. The first question is objected to on the basis of the attorney-client privilege, and the second on the ground of the executive session privilege, while the rest involve assertedly incomplete answers resulting from counsel's limiting instructions to the witness.
1. Q. At the public session on March 14, was there any discussion with regard to the Netburn letter?
*38 MR. GOODMAN: You may answer.
A. At the public session there was a motion seconded and voted on to provide counsel for Mr. Netburn.
Q. Any other discussion about the Netburn letter?
A. I don't believe so.
Q. What about the executive session?
MR. GOODMAN: At the executive session, I'm going to instruct the witness not to answer because counsel was present and it would implicate the attorney- client privilege.
MR. KITTAY: You won't permit any testimony about that part of the meeting?
MR. GOODMAN: I'm not going to permit him to testify as to what was said at that meeting because counsel was present at that portion of the meeting, the executive session was subject to the attorney-client privilege.
MR. KITTAY: I think you waived that in a prior deposition, but that will be the subject of motion practice.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

(Kersten Dep. p. 94, l. 12 to p. 95, l. 14.)

Defendants invoke the attorney-client privilege, but Mr. Kersten's affidavit does not seek to establish that an answer would disclose a privileged communication. As was the case with the other witnesses' affidavits, Mr. Kersten's merely recites that an attorney was present at the meeting and that legal advice was either sought or given at the meeting. As previously noted, this does not demonstrate that an answer to the question at issue would disclose a privileged communication. Furthermore the question calls, at most, for the identification of the subject-matter of discussions concerning which defendants seek to invoke a privilege.

2. Q. Do you recall being aware of the act [surveillance] described in this memorandum?
A. No, I don't recall that.
I do recall, generally speaking, that John St. Leger would brief us on what use of the property was being made from time to time, but I can't tell you when it was, you know, when it was or in relation to that date.
Q. What do you mean by "what use was being made of the property" *
MR. GOODMAN: I am going to ask if Mr. St. Leger briefed you in executive session for litigation, if that is what it was, then you are entitled to an executive privilege session. THE WITNESS: Well, at this point, have we been sued? The suit goes back to 182, 183.
MR. GOODMAN: Sure.
THE WITNESS: I can't remember any briefing other than at the executive session.
MR. GOODMAN: O.K.
MR. KITTAY: Would you read back my last question, please.
(Record read)
MR. GOODMAN: I am going to object.
THE WITNESS: I would like to amend my answer, in executive session dealing with the matter under litigation.
MR. GOODMAN: I'm going to--
Q. What do you mean by what use was being made of the properties?
MR. GOODMAN: I am going to object and instruct the witness not to answer on the ground of executive session privilege.

(Kersten Dep. p. 202, l. 16 to p. 203, l. 18.)

The executive session argument is meritless, as noted before. Moreover, the question does not call for disclosure of privileged communications but rather seeks an explanation of a term previously used by the witness.

3. Q. At the February 16 executive session, was there some discussion about a proposed letter response by the Village or the mayor to the Rattner ad?
*39 A. The question--when did the ad come out? When was it available in the free mailing?
Q. The issue is dated February 11, 1988.
A. O.K. So then we can reasonably assume that I had gotten a copy of that at home in the mail at that time. I think that was my source of having seen it. The question was--THE WITNESS: Repeat the question, please.
MR. GOODMAN: Ms. Reporter, could you please reread the question?
(Record read)
THE WITNESS: We said that we would discuss anything that had to do with what the--what portion of executive session am I free to discuss and which should I not discuss?
MR. GOODMAN: You are entitled to testify as to the contents of the executive session of February 16, 1988, except to the extent that anybody might have been repeating legal advice given by Golenbock and Barell. You are not to repeat that legal advice because an attorney-client privilege is being asserted. But with respect to anything else that was said about the Rattner ad on February 16, 1988, you are entitled to testify to it.

(Kersten Dep. p. 84, l. 23 to p. 86, l. 7.)

Defendants assume but do not prove that an answer would disclose "legal advice" by the Village's counsel. Mr. Kersten's affidavit simply does not address this matter. Furthermore, to the extent that the attorneys may have drafted a proposed public announcement, that does not constitute legal advice in any event.

4. Q. At how many separate executive sessions was there any mention of the Rattner ad?
A. Well, two that I can recall, I guess. Well, there are probably three, as the calendar time goes on.
MR. GOODMAN: I just want to caution you that the Village is asserting the attorney-client privilege so please don't repeat anything that occurred in conversations with counsel.
Q. When was the third executive session?
A. Since I believe it was after March 9, when the suit was settled--
MR. GOODMAN: You mean when the suit was commenced?
THE WITNESS: Commenced.
THE WITNESS: What did I say?
MR. GOODMAN: Settled.
THE WITNESS: Oh, well, I wish it was.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

A. I am under advice--upon advice of counsel, I can't say anything more in that direction.
Q. That was the meeting at which indemnification was voted on for Netburn?
MR. GOODMAN: You may answer.
A. Which date?
Q. March 14.
A. I believe so.
Q. That was the third meeting?
A. It seems that probably it would be correct.

(Kersten Dep. p. 92, 1. 19 to p. 94, 1. 2.)

The cited excerpt does not reflect that plaintiffs were denied a response to any of their questions. Accordingly, no relief is warranted.
5. Q. Do you ever recall Mayor Farrington appearing angry about the Rattner litigation?
MR. MALDONADO: Objection as to form.
MR. GOODMAN: In what situation, counsel present, without counsel present?
MR. KITTAY: Any situation.
MR. GOODMAN: I instruct the witness to answer that question limited to situations where counsel was not present.

(Kersten Dep. p. 139, 1. 16-25.)

Neither the physical appearance of defendant Farrington nor his emotional state is privileged. The question must be answered.
*40 6. Q. Did Mayor Farrington ever say, in words or substance, that he blamed Mr. Rattner for the continuation of the litigation?
MR. GOODMAN: First of all, in whit context are you asking that question?
MR. KITTAY: When counsel wasn't present.
MR. GOODMAN: Even if when counsel wasn't present, you're asking for the details of conversations, which, if they took place in executive session, I think they would be cloaked by the executive session privilege.
MR. KITTAY: No.
MR. GOODMAN: So I would instruct you to limit your answer to situations where counsel was not present and where you were not in executive session discussing the Rattner litigation.
A. No.

(Kersten Dep. p. 140, 1. 8 to p. 141, 1. 3.)

Defendants' invocation of the attorney-client privilege (see Defendants' Kersten Memorandum at 8-9) is puzzling even on their own theory of this privilege, since the question was limited to communications where no attorney was present. In any event, the privilege obviously does not apply to statements by Farrington to his Board members blaming Rattner for continuation of the litigation. For the reasons previously stated, the fact that such statements may have been made in executive session is irrelevant to the discoverability of this information. Finally, a responsive answer would plainly not reveal litigation strategy, and defendants present no evidence to the contrary.
7. Q. Did Netburn ever appear angry regarding the Village's spending large sums of money with respect to the Rattner-Pleasantville litigation?
MR. MALDONADO: Objection as to form.
MR. GOODMAN: Are you talking about when he was campaigning in 1987?
MR. KITTAY: Any time.
MR. GOODMAN: outside the presence of counsel are you talking about?
MR. KITTAY: No.
MR. GOODMAN: I instruct you to limit your answer.
MR. KITTAY: This calls for a yes or no. It's directed to his appearance. I hardly think that would betray a [confidential] communication.
MR. GOODMAN: I am going to instruct you to limit your answer to outside the presence of counsel.

(Kersten Dep. p. 152, 1. 5-25.)

The invocation of a privilege with respect to defendant Netburn's appearance of anger is plainly baseless.
9. [FN16] Q. After February 8, 1988, did the subject of Marshall ever come up in any conversation between you and Mr. Netburn outside of the presence of counsel?
MR. GOODMAN: You can answer that yes or no.
MR. MALDONADO: Are you qualifying the question to in addition to testimony he has given already?
MR. KITTAY: Yes.
MR. GOODMAN: Do you understand the question at this point? THE WITNESS: Well, it's after February.
Q. Make it after March 14.
A. March 14?
Q. 1988. A. Did we cover that already before or no?
MR. GOODMAN: Yes. Answer that question outside the presence of counsel.
He is asking you--you answer the question but make sure you exclude conversations with counsel.
MR. KITTAY: Off the record. (Discussion off the record from 3:15 p.m. to 3:17
MR. KITTAY: Back on the record.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

A. I might have once or twice.
Q. What was said?
*41 MR. GOODMAN: Before we go into what was said, were those conversations at executive session?
THE WITNESS: Well, I excluded those from my answer.
MR. GOODMAN: You excluded what now?
THE WITNESS: The answer I gave had to do with had I ever talked to Malcolm out in the public.
MR. GOODMAN: O.K. fine. THE WITNESS: After March 14.
MR. GOODMAN: You may answer.
A. I am sorry. What was it about?
Q. Rattner.
A. Mr. Rattner. And I said I might have once or twice.

(Kersten Dep. p. 209, 1. 23 to p. 211, 1. 20.)

Defendants seek to invoke an "executive session" privilege. Discussions between the witness and Netburn about Rattner are not subject to a privilege unless they involved litigation strategy and were not about a topic concerning which the Village has waived confidentiality. Defendants offer no evidence that an answer to the question in dispute would reveal a confidential discussion about litigation strategy.

G. *The Depositions of Arthur Handler, Esq. and Robert Goodman, Esq.*

In December 1988, plaintiffs noticed the depositions of Messrs. Handler and Goodman, the two attorneys now appearing in this action on behalf of the Village and defendant Farrington. The basis for the subpoenas was not counsel's involvement in this case but rather certain of their dealings with the Village prior to the institution of this lawsuit, while they represented the Village in the state court litigation. Those subpoenas were enforced over the objection of counsel and the village, and the resultant depositions led to a number of disputes concerning the repeated invocation of the attorney-client privilege and the occasional invocation of the work-product rule. Plaintiffs challenge the factual premises for the invocation of these theories and contend as well that their protection should be set aside on the basis of a "crime- fraud-intentional tort" exception.

I address these issues in the context of the specific questions in dispute. The discussion follows the order in which the parties have briefed the questions.

Disposition of Arthur Handler, Esq.

1. Q. Did Golenbock and Barell give any legal advice to the Village as to whether the Village should respond to Mr. Rattner's advertisement?
MR. MEADVIN: It calls for a yes-or-no answer, I believe.
MR. TEITELBAUM: May I have the question?
(Question read)
MR. TEITELBAUM: I believe, to the extent that this affects Netburn, that the question that you are asking is overly specific as to the subject matter of the communication and invades the attorney-client privilege, possibly.
I would have no objection to it if you asked was there advice rendered with respect to the ad that appeared in the February llth edition of the Gazette. But once you start fine tuning it to a response, I believe that you are possibly invading the privilege. My objection is noted.
MR. KITTAY: That's the first time anyone has objected on the grounds of over-specificity. Usually, they say it is overly broad.
Q. My question stands. THE WITNESS: Can you read the question back, please?
*42 (Question read)
A. I am not going to testify as to the legal advice I rendered to the Village in my capacity as counsel to the village and the Village officials in the Rattner state court litigation.

(Handler Dep. P. 15, 1. 3 to P. 16, 1. 14.)

In the course of follow-up inquiry, the witness confirmed that the Rattner advertisement had been discussed with his clients. (Handler Dep. p. 45, 1. 12- 23.) Plaintiffs, however, seek more, in the form of an inquiry as to whether the Village asked counsel if it "should" respond to the Rattner ad.

Plaintiffs contend that their question seeks only "the subject matter" of the services performed by counsel. In fact it seeks more since it effectively requires the witness to confirm the precise issue assertedly posed to him by his clients. Such a response would thus disclose a communication by the client to the attorney seeking to elicit advice. If the advice sought was "legal" in nature, the privilege surely applies.

By affidavit and by deposition testimony, Mr. Handler has asserted that the client's request to him in this instance was for the rendition of legal advice. (*See, e.g.,* Affidavit of Arthur Handler, Esq. sworn to April 19, 1989 at ¶ ¶ 4, 5(b).) There is no specific contradiction of this representation, and plaintiffs do not directly challenge it. Although the Village's counsel may also have performed an additional

function--the preparation of a proposed press release--there is no reason to doubt that the village was seeking legal advice about the legal implications of a response to the Rattner ad and accordingly the privilege may be invoked to bar a description of the specific issue posed by the Village to its attorney, unless the privilege was waived.

A review of the pertinent deposition transcripts reflects, however, that such a waiver did take place. Specifically, defendant Netburn testified that, in view of the rumor that Rattner was about to place an advertisement in the local newspaper, the Board of Trustees agreed that Mr. St. Leger should consult the attorneys for the Village to seek their advice as to how to respond (Netburn Dep. p. 324, 1. 2-11), and St. Leger testified that he talked to the attorneys concerning whether the Village should respond. (St. Leger Dep. at 68-70; *see also id.* at 58-59.) Accordingly the disputed question was proper.

> 2. Q. Did you personally ever speak with any Village official regarding whether the Village should respond to Mr. Rattner's ad?
> MR. MEADVIN: i am going to assert the same objection as before.
> I believe that is an intertwined question, an answer to which may well divulge privileged communication, and I advise the witness to answer accordingly.
> A. It sounds to me like it is a rephrasing of your prior question, and I stand on my prior answer. Can you read the question back, please?
> (Question read)
> A. I will stand on my prior answer.

(Handler Dep. p. 20, 1. 18 to p. 21, 1. 9.)

Again, this question in effect seeks revelation of an apparently confidential communication by a client to its attorney seeking legal advice. Such a communication is privileged unless the privilege is waived, but the testimony of St. Leger and Netburn constituted such a waiver. [FN17]

> *43 3-4. Q. Did you ever speak with any Village official about Mr. Rattner's ad?
> A. I will stand on my prior answer.
> Q. In February, 1988, did you have any conversation with a Village official regarding Mr. Rattner's ad?
> A. In February of 1988?
> Q. Yes.
> A. I will stand on my prior answer. The only conversation that I ever had with village officials was in the course of my representation of those officials in the Rattner state court litigation. And to the extent that I had any such conversations, the only conversation I ever had with them was with respect to rendering legal advice on their rights and obligations.
> A. Mr. Handler, you are not being responsive.
> MR. MEADVIN: Mr. Kittay, let me see if I can make our position clear, for the record.
> It is possible, if you so choose, to ask a question which is not an intertwined question, as I have divulged it.
> For example, if a date of a communication were material to the action, you could ask whether a conversation occurred on a particular date, without importing into that conversation a question as to the nature or the substance of the communication.
> That is what is objectionable about the questions that you have been asking.
> MR. KITTAY: Well, so I can make it perfectly clear, there has been testimony from Mr. Netburn and from Mr. St. (Leger)--Mr. St. Leger's testimony given with Mr. Handler as counsel, Mr. Netburn Is testimony given with Mr. Handler present in the room--regarding the Village's consultation with the Golenbock and Barell firm regarding whether or how to respond to Mr. Rattner's advertisement.
> That testimony is in the record. It was given without an instruction not to answer.
> I think I am entitled to inquire, in those terms, regarding meetings and conversations between the Village and Golenbock and Barell.

(Handler Dep. p. 22, 1. 11 to p. 24, 1. 13.)

These questions were subsequently answered. (Handler Dep. p. 32, 1. 20 to p. 33, 1. 13; p. 45, 1. 12-23.)

> 5. A. I am fairly certain that the Rattner advertisement was implicated in the discussions that we were having in at least one of those meetings.
> Q. Perhaps you could explain to me what you mean by implicated?
> A. * * * And in February of 1988, I recall that I had a meeting in which I was giving them legal advice with respect to their rights and duties and obligations in the state court litigation, in which the Rattner ad was implicated.
> Q. Was the Rattner ad discussed at that meeting?
> MR. MEADVIN: I am going to object to that question on the attorney-client privilege ground.
> A. I have a recollection that--I have a recollection, but I am not going to share that recollection with you because I think it would cause me to divulge the subject of the legal advice that I was rendering in my course of representation of the clients in the state court litigation.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Q. It just calls for a yes or no, Mr. Handler.
A. I don't understand that.

(Handler Dep. p. 33, 1. 20 to p. 35, 1. 15.)

The question sought only an explanation by the witness of a word that he had used in the course of a prior answer. This inquiry does not invade any privilege, but in any event subsequent testimony by the witness answered it. (Handler Dep. p. 45, 1. 1223.)

> 6. Q. The question is: Was the Rattner discussed at that meeting?
> *44 A. I think that I am not going to divulge. The conversation, the conference, was one in which I was rendering legal advice. I am not going to go beyond that.

(Handler Dep. p. 35, 1. 16 to p. 35, 1. 21.

The question was ultimately answered by the witness. (See Handler Dep. p. 45, 1. 12-23.)

> 7. Q. Well, did you know that there was a rumor that Mr. Rattner was going to place an ad in the February 11 Pleasantville Gazette?
> MR. MEADVIN: You may answer to the extent your answer does not divulge attorney-client communication.
> THE WITNESS: I will have to consult with my counsel as a result of his suggestion of attorney client privilege.
> (Discussion off the record between the witness and Mr. Meadvin)
> A. Mr. Kittay, as I indicated previously in my testimony, I have no personal knowledge of any of the facts to which your inquiry is directed other than information which came to me from my clients in the course of my representation of them in the Rattner state court litigation, and therefore your question is asking me to divulge a communication which I had with the clients, and therefore I will have to decline to answer on the grounds of the attorney- client privilege.

(Handler Dep. p. 52, 1. 12 to p. 53, 1. 8.)

The Village has permitted questioning of Messrs. Netburn and St. Leger as to the decision of the Board to convey to the attorneys the rumor about Rattner's ad and a request for advice, as well as a report back to the Board about the advice that was given. [FN18] Under the circumstances, the attorney-client privilege cannot be invoked to block this question.

> 8. Q. When Mr. St. [Leger] came to your office on February 8, 1988, was he told that this memorandum was being worked on?
> A. I don't want to testify with respect to the conversation that we had on February 8 since the conversation dealt with legal advice, and the only purpose of the meeting was legal advice with respect to my representation of St. [Leger], the Village and other Village officials in the state court litigation. So I don't--I am going to decline to answer your question on the grounds of the attorney-client privilege.

(Handler Dep. p. 62, 1. 12-23.)

The question does not seek disclosure of a privileged communication. As originally defined, the attorney-client privilege covered only confidential communications from the client to the attorney seeking legal advice. In its expanded version it covers the substance of the legal advice rendered. The disputed question seeks neither. If a statement was made by counsel to the client that the "memorandum was being worked on," it does not constitute either a communication from the client or legal advice by the attorney. Finally, I note that the memorandum referred to is not privileged, *see* pp. 11-17, *supra,* and thus a factual statement by counsel concerning its existence or status cannot be privileged.

> 9. Q. Was Mr. St. [Leger] ever shown a draft of this memorandum prior to February 16, 1988, to your knowledge?
> MR. TEITELBAUM: i object to the form.
> *45 A. I said to you that Mr. St. [Leger] came in on February 8 seeking and receiving legal advice. I am not going to disclose what my communications were with Mr. St. [Leger] beyond that.

(Handler Dep. p. 62, 1. 24 to p. 63, 1. 9.)

Again, this question does not seek disclosure of a client's communication to an attorney or the attorney's rendition of legal advice. Defendants offer no other basis to withhold an answer, and accordingly their assertion of a privilege is not defensible.

> 10. Q. Was this memorandum requested by someone prior to its preparation?
> MR. MEADVIN: The witness will be advised not to answer on attorney-client privilege grounds.

(Handler Dep. p. 65, 1. 25 to p. 66, 1. 5.)

If the Village requested the preparation of the memorandum, it cannot be said that the request amounted to a communication designed to elicit legal advice. The preparation of the press release was not in itself the performance of a legal function, and thus a request for it cannot be protected by invocation of

the privilege. Although an accompanying request by the client for legal advice might well be privileged, the question is so worded as to call for only a "yes" or "no" answer and thus does not pose the danger of requiring a disclosure of privileged matters, whether they be the client's communication or the attorney's responding legal advice.

11-12. Q. Does the memorandum refer to Mr. Rattner's advertisement?
MR. MEADVIN: Same objection, same advice.
Q. Mr. Handler?
A. I am following the advice of counsel.
Q. You decline to answer the question?
A. You may assume that if I remain silent after my counsel objects, I am declining to answer, yes.
Q. Does this memorandum implicate the Rattner ad?
MR. MEADVIN: Same advice.

(Handler Dep. p. 66, 1. 6-18.)

The memorandum is being ordered produced. Accordingly, the questions are best answered by the text of the document and need not be further responded to by the witness.

13-14. Q. Does this memorandum address any topic apart from the Rattner ad?
A. I am not going to testify as to the contents of the memorandum on the grounds of attorney-client privilege.
Q. How many topics are addressed in the memorandum?
MR. MEADVIN: Same advice.

(Handler Dep. p. 66, 1. 19 to p. 67, 1. 2.)

Again, the content of the memorandum is appropriately gleaned from the document.

15. Q. Did you ever hear that this memorandum was distributed to the Pleasantville Board of Trustees at the February 16 session?
MR. MEADVIN: I am going to object to that question.
A. I am not going to testify to conversations I had with my clients concerning legal advice.

(Handler Dep. p. 67, 1. 19 to p. 68, 1. 2.)

This question could require disclosure of privileged information. Specifically, if the fact of distribution of the memorandum to the Board was conveyed to counsel as a part of a communication by the client seeking legal advice, it might conceivably be privileged. Defendants, however, make no such showing, choosing instead to assert in general terms that the question is objectionable because it calls for disclosure of the substance of "privileged communications." (Defendants' Handler & Goodman Memorandum at 22.) While this is true, defendants' failure to establish that the communication itself was privileged undercuts their claim of privilege.

*46 16. Q. When you made the memorandum available to Mr. St. (Leger), did you have the understanding that the memorandum was to be distributed at the executive session on February 16?
MR. MEADVIN: I don't believe that question can be severed from that which is privileged.
A. I testified about the general practice that we followed in communicating legal advice to the clients. Beyond that, I have no knowledge.

(Handler Dep. p. 68, 1. 3-14.)

As with the preceding question, it is conceivable that this question might call for disclosure of a privileged communication, but defendants have failed to establish that fact.

17. Q. And prior to February 16, 1988 when Mr. St. Leger picked up the memorandum, did you communicate to Mr. St. Leger any of the substance of the draft memorandum?
A. I am not going to testify with respect to the substance of the conversations I had with Mr. St. Leger which led to his picking up this legal memorandum on the 16th because I know for sure that we had a meeting on February 8 in which he requested and received legal advice.

(Handler Dep. p. 72, 1. 15-24.)

Again, the question could conceivably require disclosure of privileged information but defendants fail to carry their burden to prove that it does. The mere fact that it calls for disclosure of a communication by an attorney to a client does not establish the basis for a claim of privilege. Moreover, the particular inquiry, as framed by plaintiffs, seems quite unlikely to threaten a privilege since the document itself is not privileged.

18. Q. When did you first hear that a letter was written to various directors of the Chamber of Commerce regarding the February 11 Gazette?
A. I don't recall ever having heard about the Netburn letter prior to the time that I saw it.

(Handler Dep. p. 75, 1. 19-24.)

This question was adequately answered.
19. Q. In February 1988, did you discuss with any person the idea of writing a letter in response to Mr. Rattner's ad in the February 11 Gazette?

MR. MEADVIN: I will object on attorney-client privilege grounds.
A. In view of the objection, I will decline to answer on the substance of the legal advice that I gave to my clients which I have already testified about.

(Handler Dep. p. 77, 1. 17 to p. 78, 1. 2.)

The question appears to seek disclosure of a potentially privileged communication. If a client was contemplating the possibility of writing a letter and sought advice from counsel as to the legal implications of such a step, an affirmative answer to the question would disclose in part a confidential communication by a client seeking to elicit legal advice. Although the affidavit of the witness does not directly address this question, both it and the witness's quoted statement at the deposition appear to be adequate to establish the factual predicate for the privilege claim.

As an alternative argument plaintiffs suggest in their reply papers that even if otherwise privileged, the communications in question should be disclosed in accordance with a so-called "crime/fraud/intentional tort" exception to the privilege. I disagree.

*47 The exception in question has been more commonly characterized as a "crime/fraud" exception to both the attorney-client privilege and the work-product rule. *See, e.g., In re Grand Jury Subpoena Duces Tecum, supra,* 731 F.2d at 1038 (attorney-client privilege); *In re Murphy, supra,* 560 F.2d at 338 (work-product rule); Sup.Ct. St. 503(d)(1). [FN19] As interpreted by the Second Circuit, the privilege will be disregarded if the discovering party demonstrates that there is "probable cause to believe" that the client was engaged in the commission of a crime or fraud and that "the (otherwise protected) communications with counsel were intended in some way to facilitate or to conceal the criminal (or fraudulent) activity.... *In re Grand Jury Subpoena Duces Tecum,* 798 F.2d 32, 34 (2d Cir.1986). *Accord, In re Grand Jury Subpoena Duces Tecum, supra,* 731 F.2d at 1038-39. The Court of Appeals views the "probable cause" standard as equivalent to the "prima facie case" test used by other courts; in substance, the opponent of the privilege must demonstrate that there is a "reasonable basis" to conclude that the communication was in furtherance of a fraud or crime. *Id.* at 1039.

This standard has been applied in a number of cases not merely to the commission of crimes or fraud, but more generally to all intentional torts. *See, e.g.,* *Diamond v. Stratton,* 95 F.R.D 503, 505 (S.D.N.Y.1982); *accord, Horizon of Hope Ministry v. Clark County, Ohio,* 115 F.R.D. 1, 5-6 (S.D. Ohio.1986); *In re Heuwetter,* 584 F.Supp. 119, 127 (S.D.N.Y.1984); *Irving Trust Co. v. Gomez,* 100 F.R.D. 273, 277 (S.D.N.Y.1983). In so doing the courts have sensibly concluded

> that the consideration underlying the firmly established denial of the privilege for communications in furtherance of crime or fraud, viz., that the privilege's policy of promoting the administration of justice would be undermined if the privilege could be used as a cloak or shield, 2 Weinstein's Evidence ¶ 503(d)(1) [01], at 503-70, is equally compelling with regard to communications in furtherance of the intentional tort of which plaintiffs herein complain. To deny the protection of the privilege to communications in aid of fraud while granting it to communications in aid of another intentional tort would draw a too "crude boundary," as characterized by Wigmore, who also questions "how the law can protect a deliberate plan to defy the law and oust another person of his rights, whatever the precise nature of those rights may be." 8 Wigmore, Evidence § 2298, at 577 (McNaughton rev.1961).

*Diamond v. Stratton, supra,* 95 F.R.D. at 505.

In this case I need not reach the question of whether plaintiffs' recitation of the history of the Village's dealings with Rattner suffices to justify a reasonable belief that Town officials have committed intentional torts against him, or even committed crimes in that regard. [FN20] Plaintiffs' showing is deficient because it does not justify the conclusion that communications by the Village with its litigation attorneys were for the purpose of facilitating or concealing the commission of an intentional tort or crime.

*48 There is simply nothing in the record that supports the suggestion that the contacts of the Village with Golenbock and Barell were designed to accomplish an illegal act. [FN21] The natural inference from the record is that, as a party to ongoing litigation in which they were charged with illegal harassment, the Village officials were concerned that any actions they might take with respect to Rattner could have an adverse impact on their position in the lawsuit and that that they therefore consulted counsel to attempt to minimize this danger. In addition they may well have sought their attorney's active assistance in orchestrating a public relations effort to retain public support in the face of the rising legal costs of their battle with

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works