1989 WL 223059                                                                                    Page 35
(Cite as: 1989 WL 223059 (S.D.N.Y.))

Rattner. Whatever the motivations for their conduct vis-a-vis Rattner an issue ultimately to be addressed on the merits in this case their consultations with their counsel for these evident purposes have not been shown to bear the necessary indicia of impropriety to justify piercing the protection of the attorney-client privilege or the work-product rule. [FN22]

> 20. Q. Did you and Mr. St. Leger discuss on or before February 16, 1988 the writing of a letter in response to Mr. Rattner's ad in the February 11 Gazette?
> MR. MEADVIN: objection, privileged, advise the witness not to answer.
> A. I will follow my counsel's instruction.  I will not testify with respect to the substance of the legal advice that I rendered to Mr. St. Leger and my other clients with respect to the state court litigation.

(Handler Dep. p. 78, 1. 3-13.)

As was the case with the preceding question, I conclude that this inquiry has been shown to intrude on privileged attorney-client communications.

> 21. Q. Did the memorandum which Mr. St. Leger picked up on February 16 address the topic of whether a letter could or should be written in response to Mr. Rattner's ad in the February 11 Gazette?
> MR. MEADVIN:   Same objection and same advice.
> A. Let's move on.   I am going tO follow counsel's objection and abide the event.

(Handler Dep. p. 78, 1. 14-22.)

This question is adequately answered by the document referred to.   Since it is being ordered produced, the witness need not answer the question.

> 22. Q. Did you ever make any suggestions as to how a letter could or should be drafted in response to Mr. Rattner's advertisement in the February 11 Gazette?
> MR. MEADVIN:   Same objection, same advice and the same objection and same advice will be interposed in response to any questions which seek to invade the privileged communications between Mr. Handler and his clients.

(Handler Dep. p. 78, 1. 23 to p. 79, 1. 8.)

This question seeks the substance of advice rendered by the attorney to the client and implicitly calls for revelations of communications by the client to the attorney seeking the rendition of advice.   The issue,

then, is whether defendants have established that the advice being sought was legal in nature. Although defendants do not directly respond to this question, the affidavit of Mr. Handler and the testimony of the other witnesses provide a sufficient factual foundation for inferring that the client's inquiries to counsel were for legal advice.   Accordingly, the question need not be answered.

> *49 23. Q. Did that memorandum contain any suggestions regarding how a response to Mr. Rattner's ad should be framed?
> MR. MEADVIN: The witness will not disclose the content of a document as to which a claim of privilege has been asserted.
> Q. Are you going to follow your counsel's advice?
> A. Yes.

(Handler Dep. p. 80, 1. 7-16.)

Again the memorandum, when produced, will speak for itself.

> 24. Q. Did you ever make any oral suggestion to anyone regarding how a response to Mr. Rattner's ad in the February 11 Gazette should be framed?
> MR. MEADVIN: Objection, privileged.
> Q. Do you decline to answer, sir?
> A. Yes.

(Handler Dep. p. 80, 1. 17-23.)

This inquiry does not seek protected information.   It is apparent from the memorandum itself that counsel drafted a proposed response.   In asserting privilege based upon the claim that this memorandum was "part and parcel" of legal advice, the Village necessarily is asserting that oral advice was given about the nature of a response.   Although plaintiffs cannot obtain the substance of the advice--if it involved legal advice--the disputed question seeks only to confirm that such advice was given.   This is a proper inquiry.  [FN23]

> 25-26. Q. To your knowledge, did Mr. Goodman ever make any such suggestion?
> MR. MEADVIN: Same objection.
> A. You will have to put your question to Mr. Goodman.   I assume his answer will be the same but you will have an opportunity to put it to him.
> Q. Is your answer that you don't know?
> A. My answer is that I assume his answer would be the same as mine.

(Handler Dep. p. 81, 1. 17-25.)

The same ruling follows with respect to these questions.

> 27. Q. Did you ever draft or compose any actual or

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1989 WL 223059
(Cite as: 1989 WL 223059 (S.D.N.Y.))

proposed response to Mr. Rat tner's ad in the February 11 Gazette?
A. I think you have asked me that question.  I will stand on my prior answer.

(Handler Dep. p. 82, 1. 13-17.)

The memorandum is not privileged, and accordingly the witness may be asked about its authorship.
28. Q. Did that memorandum make any recommendations as to whether the Village should respond to Mr. Rattner's ad?
MR. MEADVIN:  The witness is advised not to disclose the substance of the content of the document in question on privileged grounds.
Q. Do you decline to answer, sir?
A. I also think you asked me that question a number of times before and I decline to answer it on privileged grounds.

(Handler Dep. p. 83, 1. 14-24.)

The memorandum, when produced, will speak for itself.
29. Q. Did you or Golenbock and Barell ever advise any Village official that a response to Mr. Rattner's ad in the Pleasantville Gazette should not be made by the Village but could be made by a private individual?
MR. MEADVIN:  I advise Mr. Handler not to give testimony which reveals legal advice which he gave to his clients.
A. I will respect that objection.

(Handler Dep. p. 83, 1. 25 to p. 84, 1. 9.)

This question calls for legal advice which, if it was given, would reflect plainly confidential communications from the client seeking to elicit such advice.  Accordingly, the invocation of privilege is proper.
*50 30. Q. Subsequent to the filing of the Rattner parties, service in the Rattner parties' motion for summary judgment, did you have a meeting with the Board of Trustees in which that motion was discussed?
MR. TEITELBAUM:  Can we have a point in time?
MR. MEADVIN:  I am going to object separate from the time frame on privileged grounds.  That is another intertwined question in my opinion which cannot be answered without disclosing privileged information.
Q. Do you decline to answer, Mr. Handler?
A. I am not going to testify about conversations I had with my clients with respect to the state court

litigation so I abide by my counsel's objection.

(Handler Dep. p. 108, 1. 3-21.)

The question does not seek the substance of any privileged communications, only the subject-matter of a meeting between client and attorneys, and defendants have not sought to show that an answer would reveal the substance of such communications. Accordingly the invocation of the privilege is not sustainable.
31-32. Q. And did either you or Mr. Goodman offer any legal advice at that meeting which implicated the Rattner ad?
Mr. TEITELBAUM:  Objection to form.
MR. MEADVIN:  Again, I believe that question necessarily impinges upon the attorney-client privilege.  I advise the witness accordingly.
A. we were acting as counsel in the state court litigation and advising the clients on their rights and obligations and duties.  Beyond that, I am not-- that was the purpose of the meeting, that is what occurred.  I am not going to discuss the substance of that, of what we said.
Q. I am not asking you, Mr. Handler, for the substance of what you advised Mr. St. Leger regarding the Rattner ad.  I am asking you whether you gave Mr. St. Leger at that meeting any legal advice regarding the Rattner ad, yes or no?
A. I told you that we gave--the purpose of the meeting was to render legal advice in connection with our representation of those parties of the village and the Village parties in the state court litigation, that was the purpose of the meeting.  I am not going to divulge to you the contents of what was discussed.

(Handler Dep. p. 114, 1. 24 to p. 115, 1. 25.)

These questions were previously answered by the witness. (See Handler Dep. p. 45, 1. 12-23.)
33. Q. Is there any reference in the documents which you have just been through to any communications or discussions regarding a proposed response or actual response to the advertisement?
MR. MEADVIN:  I am going to advise against answering that question.
A. I am not going to testify about the substance of these privileged documents.
MR. MEADVIN:  It is our judgment, Mr. Kittay, what is disclosed on the privileged list is all that can properly be disclosed by us acting as responsible attorneys.

(Handler Dep. p. 123, 1. 10-22.)

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

If the documents are privileged, then the question might be improper. Defendants fail, however, to offer any evidence to support the claim of privilege. indeed, the record is unclear as to what documents are being referred to.

**\*51** It appears from a reading of adjacent portions of the deposition transcript that Mr. Handler was reviewing time-sheets and computer summaries prepared by his firm, and there is no reason to conclude that they are privileged. [FN24] Moreover the fact that counsel was consulted by St. Leger as to whether and how to respond is already in the record, thus precluding any claim that that fact is confidential. In sum, there is no demonstrated basis for refusing an answer.

34-35. Q. Is there any portion of this memorandum which does not set forth legal advice?

MR. MEADVIN: I am going to object to the form of the question.

A. Mr. Kittay, I have testified about the meetings and conversations and the preparation of this memorandum. I am not going to testify with respect to its contents.

This is a document which was prepared by us in connection with our representation of the clients in the state court litigation.

We are lawyers. We are asked to do a job. We have done the job, and I am not going to divulge the contents of it.

I don't have a social relationship with these people. I don't have a business relationship. The only communications I have with them is that which is incident to my representation.

Q. It just calls for a yes-or-no answer.

A. I gave you a little more than you wanted, but that's my answer.

Q. Are there portions of the memorandum which set forth facts which were communicated to you by your clients in seeking legal advice?

MR. MEADVIN: I am going to object on the same grounds previously stated.

A. I am not going to dissect the memorandum.

The memorandum was produced as part and parcel of the ongoing rendition of legal advice to these clients at that particular point in time.

I have no independent knowledge of any facts.

(Handler Dep. p. 124, 1# 8 to p. 125, 1. 18.)

This inquiry was plainly addressed to the question of whether the memorandum was privileged. Since the memorandum must be produced, the question becomes unnecessary, and the document when produced, will speak for itself. [FN25]

36. Q. By the same token, are there portions of this memorandum which do not set forth facts communicated to you by your clients in seeking legal advice?

A. I am not going to testify about the contents of the memorandum. If you are entitled to look at the memorandum of law because it is not privileged, then you can look at it. If it is privileged, then you are not entitled to look at it, and you will not get the content through my lips.

Q. Will you agree to an in camera submission of this memorandum?

MR. MEADVIN: Mr. Kittay, I think there is an appropriate procedure to follow and I think you should follow it.

MR. KITTAY: I am just asking you if you will agree to it.

MR. MEADVIN: This is on the record. This is on the record. I don't think we are at that point. I think your question is premature.

Q. Let me direct your attention to the second item on the 46E Statement, which are the diary entries of Arthur M. Handler, Golenbock and Barell partner in charge of the Village of Pleasantville litigation, and there are four dates listed.

**\*52** Let's start with February 4th. Does that entry refer to any communications regarding the Rattner ad?

A. Yes.

Q. With whom?

A. Let me withdraw that, I misspoke. I will have to consult with counsel.

(Discussion off the record)

MR. MEADVIN: Mr. Shapiro, would you read back the prior question?

(Question read)

A. I misspoke, Mr. Kittay. I believe that the entire are sufficiently detailed as to preclude me testifying about their contents.

It would be a violation of the attorney-client privilege, in my view, to do so.

(Handler Dep. p. 125, 1. 19 to p. 127, 1. 15.)

The necessity for the first question in the colloquy will be mooted by production of the memorandum, although it was a proper question. The subsequent question concerning diary entries was answered before the witness belatedly invoked a privilege. The final question, about the identity of persons with whom counsel communicated, has not been shown by defendants to call for disclosure of the substance of any privileged communications or to reveal otherwise protected information.

37. Q. Just so I can make my record, with whom

1989 WL 223059
(Cite as: 1989 WL 223059 (S.D.N.Y.))

Page 38

were those meetings and conversations that are reflected in your February 4th, 1988 diary entry?
A. I am not going to testify further with respect to the contents of this document. If you are entitled to inspect it, you are entitled to inspect it. If it is privileged, it is privileged.

(Handler Dep. p. 128, 1. 12-20.)

It is not clear what privilege defendants seek to invoke. [FN26] If it is the attorney-client privilege, it plainly does not apply since the question seeks only the identity of the individuals with whom counsel communicated. If it is the work-product rule, the claim fails since defendant have not even attempted to prove the facts on which such a claim would be premised.

> 38-39. Q. Were those conversations and conferences reflected in your February 5, 1988 entry with Pleasantville officials?
> A. I am not going to further divulge the contents of what I did on that day, other than to say that the time entry describes what I did on that day.

(Handler Dep. P. 129, 1. 11-17.)

> Q. With Pleasantville officials?
> A. I am not going to further divulge the contents of the entry.

(Handler Dep. p. 130, 1. 3-5.)

These questions seek to determine whether counsel communicated with Village officials on this particular date. This line of questioning is proper since it does not seek disclosure of the substance of any assertedly privileged communications. Defendants' assertion that counsel's diary is "privileged" (Defendants I Handler & Goodman Memorandum at 38-39) is meaningless in this context both because they offer no evidence to support this claim and because, even if the diary contained data that was privileged, this fact would not preclude disclosure of non-privileged data in the same document. [FN27]

> 40. Q. Did you attend any Board of Trustees meeting between June 1, 1987 and February 16, 1988 where the level of expenditures that the Village was making on the Rattner-Pleasantville litigation was discussed?
> *53 MR. MEADVIN: I reiterate my advice. I think the witness has answered that question, to the extent he is able and permitted to answer the question, several times already.
> MR. TEITELBAUM: I would just like to add, for the record, that you are stretching the relevance of your questions beyond the breaking point.

> I understand that the witness cannot be instructed not to answer a question, except on grounds of privilege, but I cannot see how the question of the expenditure on litigation has anything to do with this litigation.
> A. Subject to all of the objections, I will say that I cannot remember the dates of any meetings that I attended with the Board of Trustees.
> And insofar as the contents, subject matter of the discussions I had with the Board of Trustees, I will not testify to the subject matter of those discussions because I believe that they are covered by the attorney-client privilege.

(Handler Dep. p. 158, 1. 23 to p. 160, 1. 3.)

The defendants have not shown that an answer to the question would reveal the substance of communications that are covered by the attorney-client privilege, or indeed any other privilege.

> 41. Q. Between June 1, 1987 and February 16, 1988, were you ever present at any Board of Trustees meeting where court decisions rendered in the Rattner- Pleasantville litigation were discussed?
> MR. MEADVIN: Same advice.
> A. Mr. Kittay, as I have testified previously and repeatedly, I cannot remember the date of any specific meetings I had with the Board of Trustees.
> However, as I indicated previously, there were a number of meetings that I had with the Board of Trustees in my capacity as litigation counsel in the Rattner state court litigation.
> The purpose of those meetings was to brief the Board of Trustees on the status of the action, to discuss strategy with respect to future litigation proceedings, and to render legal advice and advise the clients on their rights and obligations in the litigation. That was the only reason and purpose for my attendance at Board of Trustees meetings.
> My only relationship with the Board of Trustees was that, as trial counsel in the pending state court litigation, I enjoyed no other relationship with the Board of Trustees and have not had any other conversations with them.
> MR. MEADVIN: I want the record to reflect, by the way, that you stated you would be satisfied with a description of general subject matter. You have just received it. So I think we can now move on, Mr. Kittay, having been satisfied.

(Handler Dep. p. 161, 1. 3 to p. 162, p. 12.)

This question was previously answered with respect to the only decision issued during the stated period. (*See* Handler Dep. 107, 1. 4-18.)

> 42-43. Q. Did Mr. Netburn, at any of these

meetings you attended, ever express any opinion or view regarding the Rattner-Pleasantville litigation?
A. The purpose of my meeting with the board in executive session was to answer questions and to have an attorney-client discussion about the pending litigation.
That was the sole purpose of these meetings, and I don't feel it would be appropriate for me to divulge the statements made by any particular client, or by me, in pursuance of that meeting and purpose.
*54 Q. Just so the record is clear, I am not asking you to testify as to what Mr. Netburn said on any occasion, but I am simply asking you whether Mr. Netburn ever expressed a view or opinion at any of these meetings?
A. I don't understand the distinction.   I will stand on my prior answer.

(Handler Dep. p. 164, 1. 7 to p. 165, 1. 2.)

These questions were also answered. (see Handler Dep. p. 162, 1. 14 to p. 163, 1. 3.)

Deposition of Robert Goodman, Esq.
44.  Q. Did you speak to Mr. St. Leger about the Rattner advertisement?
MR. MEADVIN:  I'm going to advise the witness not to respond, to the extent a response implicates privileged information.
A. I spoke to Mr.--at what time?
Q. At any time prior to March 9, 1988.
A. certainly prior to March 9, 1988 I spoke to Mr. St. Leger in the course of the state court--the Rattner state court litigation.

(Goodman Dep. p. 14, 1. 18 to p. 15, 1. 3.)

The answer provided is somewhat ambiguous. Since the question does not call for revelation of privileged information and since Mr. St. Leger testified to the communication, plaintiffs are entitled to a responsive answer.
45. Q. During those conversations, was there a time or times when the Rattner ad was mentioned?
MR. MEADVIN:  Same advice to the witness.
THE WITNESS: I need to consult with counsel.
(Witness and counsel confer)
A.  As a general subject matter, I had a telephone conversation with Mr. St. Leger regarding the Rattner state court litigation, in which the Rattner ad may have been implicated.

(Goodman Dep. p. 15, 1. 4 to p. 15, 1. 14.)

The same ruling applies to this question.  Although the witness was unwilling to state whether the Rattner advertisement was discussed, rather than merely "implicated,11 in his discussion with St. Leger, both Mr. St. Leger and Mr. Handler have testified that it was discussed.   Moreover, an answer would disclose only the subject matter, and not the substance of the discussion. [FN28]
46-47.  Q. What do you mean by the Rattner ad may have been implicated?
MR. MEADVIN:  I think those were your words, were they not?
MR. KITTAY:  I think they were originally Mr. Goodman's words.
Q. What do you mean with those words?
A. Just as I say.   There is nothing more that I could say without violating the attorney-client privilege, which I will not do.

(Goodman Dep. p. 15, 1. 15-24.)

These questions seek an explanation of a word used by the witness.   Although defendants are apparently reluctant to have the witness confirm that the word "implicated" is in this context the equivalent of I'discussed,11 they offer no basis for that reluctance. An explanation would not violate any privilege, and the witness never provided such an explanation.
48. Q. Did you ever meet with Mr. St. Leger and discuss the Rattner ad?
MR. MEADVIN:  I'm going to advise the witness not to answer that question. Privilege grounds.
A. I'll abide by my counsel's instruction.

(Goodman Dep. p. 16, 1. 12-18.)

The same linguistic ambiguity persists in that the later response cited by defendants as an answer (see Defendants' Handler & Goodman Memorandum at 47) relies again on the unexplained notion that a subject was "implicated" in a discussion.   Plaintiffs are entitled to a responsive answer both because it does not disclose more than the subject of the discussion and because St. Leger has already testified as to this matter.
*55 49. Q. And at that time, did you discuss the Rattner ad with Mr. St. Leger?
MR. MEADVIN:   I'll advise you on privilege grounds not to answer.
A. I'll abide by my counsel's instructions.

(Goodman Dep. p. 17, 1. 9-14.)

The same ruling applies to this question.
50. Q. Please list for me the occasions on which you discussed the Rattner ad with Mr. St. Leger.
MR. MEADVIN:  I'm going to advise the witness not to answer on privileged grounds.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

A. I will abide by counsel's instructions.

(Goodman Dep. p. 19, 1. 21 to p. 20, 1. 4.)

This question was not answered, as defendants contend, by virtue of the witness's recounting of instances in which Rattner's ad was implicated. "(*See* Defendants' Handler & Goodman Memorandum at 48. Plaintiffs are entitled to a responsive answer since defendants have not shown that such an answer would intrude on any privilege.

> 51. Q. Did you discuss the Rattner advertisement with anyone after you saw it?
> MR. MEADVIN: I advise you to exclude from your answer communications with clients of Golenbock and Barell.
> THE WITNESS: Would you repeat the question, please?
> (Record read)
> A. I can't answer that question without breaching either attorney-client or work product privilege.

(Goodman Dep. p. 20, 1. 14-24.)

The question does not call for disclosure of the substance of privileged communications. The fact that an answer may "impinge[ ] upon the substance" of a communication (Defendants' Handler & Goodman Memorandum at 49), does not mean that an answer would disclose the substance, as opposed to the subject matter, of that communication.

> 52. Q. Did you discuss the ad with Mr. .9@. Leger on February 12, 1988? MR. MEADVIN: I'm going to advise the witness not to answer. A. I abide by counsel's instructions.

(Goodman Dep. p. 31, 1. 11-15.)

By indirection the witness may have answered the question since he denied that the Rattner ad was "implicated" during the discussion of February 12, 1988. (*See* Goodman Deposition p. 31, 1. 4-10.) Plaintiffs need not be left with this calculated obscurity, however, since an answer to the question of whether the ad was "discussed" would not reveal the substance of any communication.

> 53. Q. Did anyone ask you to prepare that memorandum?
> A. I think that--
> MR. MEADVIN: I'll advise you--
> A. I'm going to object to that question on the grounds that it would breach either the attorney-client or the work product privilege.
> MR. MEADVIN: I'll object.
> You decline to answer.
> I'm noting an objection, to the extent that the

question may implicate communications with clients of Golenbock and Barell.

(Goodman Dep. p. 37, 1. 23 to p. 38, 1. 11.)

The memorandum is not privileged, and an instruction by a client to an attorney to prepare a document that is not privileged is itself not privileged either. *See* p. 69, *supra.*

> 54. Q. And while you were in the process of preparing this memorandum, did you mention to Mr. St. Leger that YOU were preparing this memorandum?
> MR. MEADVIN: I don't think that this witness' communications with Mr. St. Leger, a client, are open for examination, and I so advise him.
> *56 A. I follow my counsel's advice.
> Q. I don't think that is privileged.
> MR. MEADVIN: Well, we have a difference of opinion.
> A. You asked me--
> MR. MEADVIN: You've answered the question. Let him pose the next one.

(Goodman Dep. p. 38, 1. 16 to p. 39, 1. 5.)

As noted, the memorandum is not privileged. The question seeks a communication by the attorney to the client that is not legal advice, and thus the attorney-client privilege is inapplicable. As, for the invocation of the work-product rule with respect to the question, defendants offer no evidence to support its applicability in this instance.

> 55. Q. Was the Rattner ad implicated in any way by this memorandum?
> A. I will follow my counsel's instructions.

(Goodman Dep. p. 40, 1. 5-11.)

The memorandum, when produced, will speak for itself.

> 56. Q. Does the memorandum embody the legal opinion of Golenbock and Barell?
> MR. MEADVIN: Same advice.
> A. I will follow my counsel's instruction.

(Goodman Dep. p. 40, 1. 12-16.)

The question was proper as it goes to the underlying basis for the defendants' claim of privilege. Since, however, the memorandum must be produced, there is no need to answer the question.

> 57. Q. Did you ever hear or learn in any other way that this memorandum was given to someone outside of Golenbock and Barell, other than Mr. St. Leger?

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

MR. TEITELBAUM:  I think the witness has now said twice--

MR. KITTAY:  Don't tell him how to testify.

A. To answer that question, I would probably have to violate the attorney- client privilege, so I can't do that.

MR. MEADVIN:  If that be the case, don't do it. Would you excuse us for a moment, please.

(Recess)

MR. MEADVIN:  Would you please read back what I think is the last question.

(Record read)

MR. MEADVIN:  with my objection asserted, we can go on to the next question-- my objection to the question.

(Goodman Dep. p. 42, 1. 3-25.)

This question was previously answered.  (*See* Goodman Deposition p. 40, 1. 17 to p. 41, 1. 24.)

58. Q. Prior to March 9, 1988, did any Village official ask you any question about your memorandum?

MR. MEADVIN:  I advise the witness not to answer on attorney-client privilege grounds.

A. I will abide by my counsel's instruction.

MR. KITTAY:  I'm not asking for the substance. I'm just asking for a yes or no.

MR. MEADVIN:  I believe it is one of those intertwined questions which cannot be severed into privileged and nonprivileged components.

(Goodman Dep. p. 43, 1. 14 to p. 44, 1. 4.)

It is difficult to conceive how a "yes" or "no" answer to the question would disclose some of the substance of a privileged communication.   In any event defendants have not attempted to carry their burden to proof that this is the case.

59. Q. Prior to March 9, 1988, did you have a discussion with any Village official regarding the subject or subjects of your memorandum?

MR. MEADVIN:  I'm going to render the same advice.

A. Same response.

(Goodman Dep. p. 44, 1. 5-10.)

The question seeks only the subject matter of discussions. moreover, defendants have made no effort to prove by competent evidence that a responsive answer would disclose the substance of a privileged communication.   The mere general assertion by counsel that they acted solely as attorneys in their dealings with the Village does not adequately address the matter, particularly in view of

the nature of the document.

*57 60. Q. Did you ever transmit the substance or any part of the substance of this memorandum orally to Mr. St. Leger prior to February 17th, 1988?

MR. MEADVIN:  Could I have that read back, please.

(Record read)

A. I'm going to consult with my counsel.

MR. MEADVIN:  I'm advising the witness not to answer on privilege grounds.

A. I will follow counsel's instructions.

(Goodman Dep. p. 44, 1. 11-21.)

Since the substance of the memorandum is not legal advice, the question is plainly proper.

61. Q. Did you ever draft any proposed response to Mr. Rattner's ad?

A. I have to consult with counsel on that question of privilege.

(Witness and counsel confer)

A. I can't answer that question without getting-- without violating the attorney-client privilege and the work product doctrine.

(Goodman Dep. p. 44, 1. 22 to p. 45, 1. 5.)

Since the drafting of the memorandum in itself was not the rendering of legal advice and is not work product, *see* pp. 10-17, *supra,* the question is proper.

62. Q. Did you ever give suggestions to any Village official regarding a proposed response to the Rattner ad?

MR. MEADVIN:  I advise the witness not to answer that question, same grounds.

A. Same response.

(Goodman Dep. p. 45, 1. 6-11.)

The same ruling follows with respect to this question.   To the extent that the attorney may have rendered legal advice in addition to providing the disputed memorandum, the substance of such advice is privileged.   The question, however, merely calls for a "yes" or "no" answer.

63. Q. Did you ever talk with any Pleasantville official prior to February 17, 1988 regarding the form of a response to the Rattner ad?

MR. MEADVIN:  Witness has been advised not to testify as to communications between him and clients.

A. I would have to decline to answer that question on the grounds that an answer might breach the attorney-client privilege.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1989 WL 223059                                                                    Page 42
(Cite as: 1989 WL 223059 (S.D.N.Y.))

(Goodman Dep. p. 45, 1. 12-21.)

The same ruling applies with respect to this question.
  64. Q. Did you ever have any discussions with any
  Village official regarding Mr. Rattner's sign that he
  posted on his property regarding the Rattner-
  Pleasantville litigation?
  MR. MEADVIN:  I advise you not to answer for
  the usual reason, privilege.
  A. I decline to answer.

(Goodman Dep. p. 50, 1, 13-19.)

The question does not ask whether counsel and client
discussed "the Rattner state court litigation,"
(Defendants' Handler & Goodman Memorandum at
58), but rather whether they ever discussed a sign that
Rattner had posted on his property.  That question, in
effect, seeks the subject matter of a discussion, not its
substance, and thus is not barred by the attorney-
client privilege.  *See, e.g., J.P. Foley & Co. v.
Vanderbilt, 65 F.R.D. 523, 526, 52728
(S.D.N.Y.1974)* (ordering answers to questions
concerning whether client had consulted attorney
about specific documents and contracts).
  65. Did you ever draft anything intended for
  publication as a Village response to something in
  the media regarding the Rattner-Village litigation?
  MR. MEADVIN:  I'm going to advise the witness,
  because it seems to me that the answer probably
  implicates a work product privilege.  And since I
  am at least unclear, I think the responsible thing to
  do would be not to answer.
  *58 MR. KITTAY:  Do you want to consult with
  your client and see if indeed such a privilege would
  attach?
  MR. MEADVIN:  If he has something to say to
  me, I will follow that.
  THE WITNESS:  I have no problem with his
  advice.

(Goodman Dep. p. 55, 1. 21 to p. 56, 1. 13.)

The question asks, in substance, whether the attorney
authored a public announcement for the client.  As
noted, an attorney's performance of the functions of a
publicist do not constitute work-product and his
transmission of a proposed press release to the client
is not a privileged communication.
  66. Q. What was your purpose in drafting this
  exhibit?
  MR. MEADVIN:  You may answer to the extent
  that you don't disclose work product strategy or
  similar privileged information.
  THE WITNESS:  Could you repeat the question,
  please?

(Record read)
  A.  I guess I don't know that I could answer that
  without possibly crossing the line on work product,
  so I'll have to decline.

(Goodman Dep. p. 57, 1. 19 to p. 58, 1. 5.)

The question could conceivably call for disclosure of
work-product--in the form of strategy about
litigation--or of attorney-client privileged
communications.  Defendants, however, have failed
to attempt to prove either proposition by competent
evidence.
  67. Q. Did you give the Village any legal advice
  related to the preparation or publication of this
  exhibit?
  MR. MEADVIN:  I'm going to advise the witness
  to not respond to that question on privilege
  grounds.  And also, if I may, David, we've now
  been proceeding for two hours out of the three,
  which I believe the magistrate--if he didn't order it,
  let's say he importuned us to go that long.
  I repeat what I said when Mr. Handler was being
  examined, and that is that I don't see that
  questioning about what members of Golenbock and
  Barell or anyone else did in October 1985 has to do
  with the purpose of your examination.  I've read
  the motion papers.  I've read the decision, and I
  think there is a relevancy issue here.
  MR. KITTAY:  Is there a pending question?
  MR. MEADVIN:  No. The witness has been
  advised not to answer the question that used to be
  pending.
  THE WITNESS:  On grounds of privilege, I take
  it?
  MR. MEADVIN:  Yes, I think I said that.

(Goodman Dep. p. 58, 1. 10 to p. 59, 1. 13.)

The question seeks to determine whether a
privileged communication occurred.  This does not
amount to an inquiry about the substance of the
communication, if there was one, and accordingly the
inquiry is proper.
  68. Q. Did Golenbock and Barell make any
  recommendations as to whether the Village should
  respond to the Rattner ad?
  MR. MEADVIN:  I advise you not to answer.
  That goes to the heart of legal advice rendered in
  confidence.
  A. I accept the advice and instruction of counsel.

(Goodman Dep. p. 63, 1. 9-16.)

The question seeks the subject matter of advice to
the client, not its substance.    Based on prior

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

deposition testimony of Mr. St. Leger, it is apparent that the Village raised this question with its counsel. Accordingly, that fact is not confidential, and thus an answer to the question would not disclose any information that is protected by a privilege.

> *59 69. Q. Did Golenbock give any oral advice on whether the Village should respond to the Rattner ad?
> MR. MEADVIN: That question is objectionable to the same extent as its predecessor.
> MR. KITTAY: Same direction?
> MR. MEADVIN: Yes, same advice.

(Goodman Dep. p. 63, 1. 17-24.)

The same ruling follows with respect to this question.

> 70. Q. To whom was such advice given?
> MR. MEADVIN: Could I have--you said, "To whom was such advice given?"
> MR. KITTAY: Yes.
> MR. MEADVIN: I'm going to interpose a form of objection for lack of a predicate, and I'm going to similarly advise the witness not to answer because of the high likelihood that it implicates a privilege.
> Q. And you'll follow the instruction?
> A. Yes, I do.

(Goodman Dep. p. 63, 1. 25 to p. 64, 1. 12.)

The identity of the person to whom a privileged communication was made is not ordinarily privileged. _See, e.g., In re Shargel, supra,_ 742 F.2d at 62. Defendants suggest no reason to conclude otherwise in this instance.

> 71. Q. Let me finish my question.    Is it your testimony that Mayor Farrington did not 1.earn ol the Golenbock advice regarding whether the Village should respond to the ad prior to February 16th at 10:43 a.m.?
> A. We are going to have to assert a privilege.    I am going to decline to answer on attorney-client privilege.

(Goodman Dep. p. 66, 1. 8-15.)

This question was previously answered.    (See Goodman Deposition p. 65, 1. 5- 22.)

> 72. Q. What I'm asking is, is it true that after Mr. Rattner's ad came out, you participated in a discussion with Mr. Handler and Mr. St. Leger regarding whether the Village should respond in any fashion to the ad?
> MR. MEADVIN: Mr. Kittay--
> Q. And I'm referring to page 68, line 25 through page 69 line 10 of the St. Leger transcript.

> MR. MEADVIN: Mr. Kittay, I'm going to advise the witness not to respond to the question.    You have asserted in Mr. Handler's deposition that pages 68 and 69 manifest a waiver of the attorney-client privilege in relation to that particular conversation or conversations.    I do not accept the characterization.
> As you know, the privilege is for the client to waive, if at all;  not for the lawyer to waive. mr. Goodman is not going to voluntarily testify.   If he is ordered to do so as a result of the Court concluding that the quoted material constitutes a waiver, that's a different story;  but it is not his place to make that judgment at this point in time.
> A. I concur with my counsel's instructions.

(Goodman Dep. p. 68, 1. 11 to p. 69, 1. 14.)

Any confidentiality with respect to this subject matter was waived when Mr. St. Leger testified about it.    Accordingly, the plaintiffs are entitled to an answer.

> 73. Q. Did you discuss the idea of sending a letter to the chamber of commerce in response to the Rattner ad with anyone prior to March 1, 1988?
> MR. MEADVIN:    As phrased, the question is objectionable on privilege grounds, and I advise the witness not to answer it.
> A. I will follow my counsel's instructions.

(Goodman Dep. p. 71, 1. 18 to p. 72, 1. 2.)

*60 To the extent that this question is directed to counsel's discussion with Mr. St. Leger, the testimony of the client has waived any privilege with respect to the subject of the discussion.    There is no basis, however, for inferring a waiver of privilege generally with respect to the substance of communications between the Village and counsel concerning requests for or the rendition of legal advice. [FN29]

The difficulty with defendants, position on this question, however, is that they have not attempted to demonstrate by competent evidence that a responsive answer would disclose the substance of a privileged communication, whether it be a confidential request by a client for legal advice or the responding legal advice.   This failing is particularly significant in this instance because the record reflects that the Golenbock attorneys appear to have played a dual role as legal counselors and ghost writer-publicists both in this very instance and on at least one prior occasion involving the Village's ongoing dispute with Rattner.   (_See_ Goodman Dep. at 56-57.)

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works