If there was a discussion about the writing of a letter to the Chamber of Commerce, it is certainly possible that the discussion involved principally nonlegal considerations and, if so, the discussion would of course not be privileged. *See, e.g.,* 2 *Weinstein's Evidence, supra,* ¶ 503(a)(1) [ 01] at 503-22; *In re Grand Jury Subpoenas Dated Dec. 18, 1981 and Jan. 4, 1982, supra,* 561 F.Supp. at 1261 (citing cases). Since defendants have not addressed this question except by conclusory assertions that all of their discussions with counsel are privileged, they have not carried their burden of proof.

74. Q. Did you discuss the idea of sending a letter to the chamber of commerce regarding a Rattner ad with any Village official prior to February 16, 1988?
MR. MEADVIN: The question as phrased is even more objectionable on privilege grounds that the one which preceded it. Same advice.
A. I will follow my counsel's instructions.

(Goodman Dep. P. 72, 1. 3-13.)

The same ruling follows with respect to this question.

75. Q. Did Mr. St. Leger, to your knowledge, know about the Netburn letter on or before February 16, 1988.
MR. MEADVIN: I'm going to object to form. I'm also going to object because it seems to me that the only way this witness could have knowledge of what Mr. St. Leger knew is if Mr. St. Leger communicated it to him. That would be privileged.
Q. Are you declining to answer the question on grounds of privilege, Mr. Goodman?
A. You want to repeat the question, please?
(Record read),.
A. You are asking me for what is in another person's mind. The only way of how I could obtain knowledge of what's in a person's mind is if he told me that. Since that man is my client, I decline to answer on the grounds of attorney-client privilege.

(Goodman Dep. p. 74, 1. 5-25.)

The defendants have failed to establish that an answer to the question would disclose the substance of a privileged communication. For example, if the witness did not know the answer, a response to that effect would reveal no confidential information. If, on the other hand, the witness did know, it is possible that he learned the information through a non-privileged communication. Defendants offer no evidence on this matter and appear simply to rely on the theory that since Mr. St. Leger was a client, or a representative of the client, any discussions with him are privileged in their entirety. This assumption is incorrect, and it necessarily follows that defendants have failed to meet their evidentiary burden on this point.

*61 76. Q. Would you give the same response as to Mayor Farrington?
A. I think that it's not appropriate for you to ask me what responses I would give. If you have a question to put, you put it to me.
MR. MEADVIN: I will tell you that if you ask the same question and substitute Farrington for (St.] Leger, I would give the same advice.
Q. And would you follow the same advice, Mr. Goodman?
A. Yes.

(Goodman Dep. p. 75, 1. 2-14.)

The same ruling applies to this question.

77. Q. Did Golenbock and Barell give the Village any legal advice with respect to the Rattner ad?
MR. MEADVIN: With respect to the Rattner ad?
MR. KITTAY: With respect to the Rattner ad.
MR. MEADVIN: I advise you not to answer on privilege grounds.
A. I will follow my counsel's advice.

(Goodman Dep. p. 75, 1. 15-24.)

This question does not seek the substance of any legal advice, and the fact that advice was sought on this topic was confirmed by the client in deposition testimony. Accordingly, the question is a proper one.

78. Q. How much time is indicated on the 13th for Rattner versus Pleasantville?
MR. MEADVIN: I don't think the witness will answer that question.
A. Grounds of privilege.
MR. MEADVIN: Grounds of privilege and work product.

(Goodman Dep. p. 89, 1. 8-14.)

This question seeks disclosure of a portion of a time record. Defendants do not suggest why the amount of time spent by counsel on a particular matter would be privileged, and they offer no competent evidence to support their legal theory. Accordingly, the question must be answered.

Documents Withheld by Messrs. Handler and Goodman

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Apart from the February 1988 memorandum previously discussed, the two witnesses have withheld from production on grounds of privilege five categories of documents listed on their Rule 46(e) privilege list. These encompass diary entries, time sheets, billing reports, and telephone logs concerning the state court litigation. These have been withheld on asserted grounds of attorney- client privilege and work-product.

The affidavits of the witnesses do not directly refer to these documents and do not indicate the specific basis on which these claims of confidentiality are made, although defendants' memorandum of law invokes the attorney-client privilege for them. At the same time defendants urge that the Court not view the documents *in camera,* suggesting instead that any relevant and useful information that might be gleaned from them has been disclosed in other forms. (*See* Handler & Goodman Memorandum at p. 70.)

Under the circumstances, the Court could not accept defendants' conclusory assertions as to the applicability of the privilege and of Rule 26(b)(3). Accordingly, by separate order the Court directed that the documents be submitted to it for *in camera* review. Having reviewed them, I find that none reveals any the substance of any privileged communications; rather they indicate that counsel met with their client and separately devoted some time to matters that have been testified to by the client. Accordingly there is no basis for withholding production of the documents. *See, e.g., In re Grand Jury Subpoenas Dated Dec. 18, 1981 and Jan. 4, 1982, supra,* 561 F.Supp. at 1261 (citing cases).

H. *Deposition of Malcolm Netburn*

*62 During the course of his deposition, defendant Netburn invoked the attorney-client privilege to block answers to ten questions. Most or all of the privilege claims were apparently asserted on behalf of the Village itself. He has since dropped his opposition to one question but still resists answering the remaining nine.
   1. Q. At the February 16, 1988 meeting, did Mr. St. Leger pass on to the board any recommendation which had been made by counsel with respect to the February 11, 1988 Gazette?

(Netburn Dep., p. 354, l. 7-10.)

This question does not seek disclosure of the substance of any advice, although it does refer to the subject of the advice--that is, the Rattner ad. The fact that Mr. St. Leger consulted counsel concerning the Rattner ad has been established by St. Leger's own testimony and thus this fact is certainly not confidential. The sought-after information--whether the advice was communicated by St. Leger to the Board--thus does not require disclosure of any information that is subject to a privilege.
   2. Q. What was the advice?

(Netburn Dep., p. 356, l. 13.)

Defendants have adequately established that some of the advice rendered to St. Leger concerning the Rattner ad was legal in nature and since this question calls for its disclosure, the privilege was properly invoked. [FN30]
   3. Q. Did the board of trustees at the February 16, 1988 meeting agree with the advice that had been given by counsel?

(Netburn Dep., p. 357, l. 2-4.)

Defendants have not shown that an answer to this question would reveal the substance of any legal advice rendered. Accordingly the objection is groundless.
   4. Q. Did the board of trustees take any action based upon the advice given by counsel?

(Netburn Dep. p. 357, l. 15-16.)

Again, this question has not been shown to require disclosure of the substance of any legal advice given by counsel.
   5. Q. At the February 16 executive session, was there any discussion about the litigation between Mr. Rattner and the Village?

(Netburn Dep. p. 735, l. 5-7.)

Defendant Netburn has now agreed to answer this question.
   6. Q. In connection with your request for the Village to obligate itself for your defense in this lawsuit, did you ever state to anyone that you wrote the letters as a private individual, rather than as a trustee?

(Netburn Dep. p. 791, l. 13-17.)

It is conceivable that an answer to this question might disclose a confidential communication made by Mr. Netburn to his attorney for the purpose of seeking legal advice. The difficulty with his position, however, is that he fails to offer any evidence to support this speculation. His assertion of the privilege must therefore be rejected for lack of

an evidentiary foundation.
  7. Q. Was what Mr. St. Leger reported to the board about his discussions with counsel consistent with what was set forth in the document?

(Netburn Dep. p. 1069, 1. 18-21.)

The document referred to--the so-called "Update" memorandum--must be disclosed since it constitutes essentially non-legal advice. If, as appears to be the case, all additional advice by counsel was legal in nature, the witness cannot be compelled to describe it, and thus St. Leger's discussion of it would be protected from inquiry.
  *63 8-9. Q. Did this document discuss any information that had been given to the attorneys by an Village official or employee?

(Netburn Dep. p. 1070, 1. 25 to p. 1071, 1. 3.)
  Q. Did the document contain counsel's advice with respect to whether the Village should respond to the material on the back page of the February 11th, 1988 executive session?

(Netburn Dep. p. 1071, 1. 20-23.)

The document, when produced, will speak for itself.
  10. Q. At the February 16th executive session, was the board of trustees seeking legal advice from counsel as to whether the Village should respond to the material on the back page of the February 11th Gazette?

(Netburn Dep. p. 1073, 1. 22 to p. 1074, 1. 2.)

The question seeks the substance of the client's request for advice to the attorney, rather than merely the general subject matter. As such it marginally invades an area of privilege, and the objection is therefore well- taken. [FN31]

I. *The Production of Documents by Lawrence Dittelman, Esq.*

Lawrence Dittelman, Esq. was litigation counsel to the Village in the state court actions until his disqualification in 1987. Pursuant to a deposition subpoena *duces tecum,* he has produced a quantity of documents. He has withheld a separate group on grounds of attorney-client privilege or work- product. [FN32]

The key issue posed by the motion papers is whether the defendants have waived their attorney-client privilege and the protection of the work-product rule in this case by virtue of their assertion of an "advice of counsel" defense in the state court litigation, and their consequent disclosure of otherwise protected material with regard to a host of subjects. For reasons previously discussed in connection with the deposition of mr. Mroczkowski, the decision of the Village to assert the "advice of counsel" defense in state court with a full awareness that such a defense entailed a waiver of the privilege, and the subsequent disclosure of otherwise privileged information by the Village waived any protection with respect to the same topics in this case. Accordingly, those documents withheld by Mr. Dittelman that relate to the subjects concerning which the Village asserted an "advice of counsel" defense in state court must be produced. [FN33]

If the witness believes that any of the documents on his privilege list do not come within the scope of the waiver as now defined, he may submit these documents to the Court for *in camera* review. The documents are to be provided within three days following the issuance of this Memorandum and order, and may be accompanied by an affidavit specifying the basis on which each such document is deemed to be beyond the scope of the state court waiver by the Village.

J. *The Deposition of Michael Testa*

Mr. Testa was the Building Inspector of the Village of Pleasantville. He is a witness in this case principally because he was allegedly directed by the Mayor to conduct surveillance of Rattner's property and to photograph it on a daily basis. These facts were disclosed both by Mr. Testa at his deposition and, apparently, by document production in the state court litigation.

*64 At his deposition, Mr. Testa was instructed not to answer a number of questions on the basis of the attorney-client privilege or the work-product rule. In addition, on the same grounds he withheld several documents the production of which had been called for in his deposition subpoena.
  1. Q. What did Mayor Farrington say to you and what did you say to Mayor Farrington?
  MR. GOODMAN: I object to further inquiry on this conversation because I believe that would implicate work product and would violate the work product doctrine for this witness to testify further on this conversation.
  Q. Let me ask you this: Did Mayor Farrington tell you why he was directing you to observe the premises on Manville Road.7
  MR. GOODMAN: I object to the details of the conversations on the ground of work product.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

(Testa Dep. p. 10, l. 15 to p. 11, l. 4.)

The invocation of the attorney-client privilege and work-product rule cannot be sustained.

Defendants proffer the affidavit of Village Administrator St. Leger, who asserts that answers to any of the questions posed to Mr. Testa "would disclose the substance of communications which [St. Leger] and defendant John B. Farrington had with counsel in which advice was sought and/or received regarding the New York state court litigation pending between the parties." (Affidavit of John St. Leger, sworn to April 14, 1989, at ¶ 2.) There are two problems with this showing. First, the question in dispute concerns a discussion between Farrington and Testa, at which St. Leger was apparently not present. Accordingly St. Leger is not competent to testify as to what was said there. Second, if Farrington's explanation to Testa disclosed attorney advice, this suggests a lack of the requisite confidentiality for the advice. Testa was an employee of the Village and a subordinate of Farrington and thus presumably had no need to know the details of the Village attorneys' litigation strategy in order to carry out the directive that he monitor the Rattner property. Accordingly, any disclosure of such legal strategy to him would be inconsistent with the claim of privilege. *See, e.g.,* 2 *Weinstein's Evidence, supra,* ¶ 503(b) [04] at 503-51 (corporation must show privileged communication "not disseminated beyond those with the need to know").

Finally, I note that the whole matter of surveillance was sufficiently disclosed in Mr. Testa's deposition to justify the conclusion that the Village has waived any claim of confidentiality for actions taken by its officials to carry it out, including their explanation of the reasons for it to their subordinates.

   2. Q. Was it your understanding that Mr. Rattner or one of his companies was the owner of the lot which Mayor Farrington directed you to observe?
   A. Yes.
   Q. Did you do as Mayor Farrington told you to do?
   MR. GOODMAN: I think you can answer that with a yes or no.
   A. Yes, I did.
   Q. What did you do?
   MR. GOODMAN: I will object on the grounds of work product and instruct the witness not to answer.

*65 (Testa Dep. p. 11, l. 15 to p. 12, l. 4.)

The witness ultimately answered the question. (*See* Testa Dep. p. 9, l. 15-19; p. 12, l. 5-10; p. 20, l. 11-18.)
   3. Q. What was the substance of your conversations with Mr. St. Leger regarding the observation of Mr. Rattner's premises?
   MR. GOODMAN: I object to the witness testifying about his conversations with Mr. St. Leger regarding this matter because I think it implicates the work product doctrine.

(Testa Dep. p. 15, l. 19 to p. 16, l. 2.)

The confidentiality, if any, of what Mr. Testa and others may have done in the course of surveilling Rattner's property was waived in state court and in deposition testimony in this proceeding. Furthermore, to the extent that Mr. Testa's discussion with Mr. St. Leger involved reporting on his activities, no privilege attaches. Finally, to the extent that Mr. St. Leger described the advice of counsel to Mr. Testa, the privilege governing such advice was waived by its disclosure to Mr. Testa.
   4-5. Q. What did you say to Mr. St. Leger and what did he say to you?
   MR. GOODMAN: I object to the contents of the conversation on the grounds that it breaches the work product doctrine. I instruct the witness not to answer.

(Testa Dep. p. 22, l. 25 to p. 23, l. 6.)
   Q. During the conversation with Mr. St. Leger, was there any mention of the litigation between Rattner and the Village?
   MR. GOODMAN: I object to the content of the conversation on the ground previously objected to, work product.

(Testa Dep. p. 23, l. 16-21.)

The same ruling applies with respect to these questions.
   6. Q. * * * When Mayor Farrington directed you to observe the Rattner property, did you understand that he was directing you to make observations on a regular basis?
   MR. GOODMAN: I object to what he understood because I think he gets into the content of the conversation, and I will object on the ground of work product and instruct the witness not to answer.
   Q. Can you tell me on how many separate occasions you observed Mr. Rattner's property pursuant to Mayor Farrington's directive?
   MR. GOODMAN: I object to that on the grounds of work-product.
   MR. KITTAY: I think you are way off base, Bob,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

but I will make my motion.

(Testa Dep. p. 26, 1. 14 to P. 27, 1. 5.)

These questions plainly do not invade any available privilege. Moreover, both the instructions of Mayor Farrington to Testa and his actions in carrying them out have been testified to by Testa and thus any confidentiality has been waived.
7. Q. Did you take any pictures?
A. Yes.
Q. Where are the pictures?
MR. GOODMAN: If you know.
(Discussion off the record between witness and his counsel)
A. They are in the village files.
MR. KITTAY: I would like to inspect those pictures, the originals. I believe they are called for by the subpoena, and I would also--
MR. GOODMAN: I don't believe they are called for by the subpoena. The subpoena was addressed to Mr. Testa individually. The village has fully responded to all document requests addressed to it.
MR. KITTAY: Mr. Goodman--
*66 MR. GOODMAN: You are making a request for the pictures; I will take it under advisement. I don't see why we have to argue the point.

\* \* \*

MR. KITTAY: But in any event, I request to inspect the originals of all photographs taken of Mr. Rattner's sign and all photographs taken of Mr. Rattner's property.

(Testa Dep. p. 38, 1. 2 to p. 40, 1. 13.)

The photographs in dispute may well constitute work-product in view of the representation by Mr. St. Leger in his affidavit that they were taken in contemplation of litigation. (St. Leger Affidavit at ¶ 2.) Plaintiffs have a sufficient need for them, however, to justify their production. As they note, the photographs are the best evidence of the degree of intrusiveness of the surveillance by the Village.
8. Q. For what purpose did you photograph vehicles?
MR. GOODMAN: I think he already testified.
MR. KITTAY: Come on, Mr. Goodman, let him answer the question.
MR. GOODMAN: I am going to let him answer the question.
A. For observation purposes.
Q. Had Mayor Farrington directed you to particularly observe vehicles?
MR. GOODMAN: I object to the details of the conversation with Mayor Farrington on the grounds of work product and attorney-client privilege.

(Testa Dep. p. 45, 1. 4-18.)

Again, the instructions of the Mayor to Testa concerning what to do are not subject to any unwaived privilege or other protection.
9. Q. Were you ever asked to do something regarding Mr. Rattner or his properties that you declined to do?
MR. GOODMAN: I will have to instruct the witness to not--
Q. It calls for a yes or no.
MR. GOODMAN: I am sorry. I don't believe that it does. I will have to instruct the witness that he may not answer the question to the extent it would implicate any attorney-client privilege, and with that exception he may answer the question.
THE WITNESS: Repeat the question.
Q. Were you ever asked to do anything with respect to Mr. Rattner or his Pleasantville properties that you declined to do?
MR. GOODMAN: My instruction stands. You may answer the question subject to that limitation.
A. No.

(Testa Dep. p. 47, 1. 20 to p. 48, 1. 16.)

In view of the limiting instruction, it is unclear whether any communications are being withheld. In any event, the question does not invade any privilege.
10. Q. When you reported regarding surveillance to Mr. St. Leger, did he say anything to you?
MR. GOODMAN: Objection to the form. You can answer yes or no.
A. No.
Q. He was just silent?
A. No.
Q. What did he say?
MR. GOODMAN: I object to his repeating the conversation on the ground that I have objected to before, work product and attorney-client privilege.
MR. KITTAY: You won't let him?
MR. GOODMAN: No, this is the same conversation that you have asked about before, and you are not--the question wasn't generally what he said, and that question in and of itself is also objectionable. The subject matter itself is on the record and I think--
Q. What was the subject matter of what Mr. St. Leger said when you reported to him regarding your observation?
*67 MR. GOODMAN: I object because the subject matter of the conversation is as much as you are entitled to in connection with the area of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

attorney-client privilege, and you know that.
MR. KITTAY: I think your interposition of work product is not well taken.
Q. Was any attorney present when you and Mr. St. Leger were discussing your observation of Mr. Rattner's property?
A. No.
MR. KITTAY: I think your objection is simply not well taken. I will make my motion.
MR. GOODMAN: I think the objection is appropriate.

(Testa Dep. p. 77, 1. 9 to p. 78, 1. 25.)

The only showing made by defendants in support of their objections is the assertion by St. Leger that an answer to any objected-to question would disclose the substance of communications between counsel and either St. Leger or Farrington. As noted with respect to earlier questions, if Testals reporting of the results of his surveillance led St. Leger to describe his discussions with the Village attorneys, then this description to Testa waived the privilege since there is no reason to believe that it was necessary for Testa to learn this information.

11. MR. KITTAY: Mr. Goodman has obtained from his office the documents that Mr. Testa took from the building department files about which he testified earlier.
A number of the documents are being produced and are being copied now, and they will be marked as exhibits.
There are several items that were withheld from production, and I will let Mr. Goodman explain his ground for withholding them, but as I understand it, the items that are being withheld are a letter dated May 8, 1986 from Mr. Dittelman to Mr. Handler, carbon copies to Mr. St. Leger and Edward M.
Lieberman and photographs dated December 12, 1985 and December 10, 1985 and other photographs which are undated.
MR. GOODMAN: The May 8, 1986 letter is being withheld on the ground of attorney-client privilege and work product.
I am also withholding a letter dated June 26, 1986 from Mr. Testa to Mr. Dittelman on the grounds of attorney-client privilege and work product.
And also I am withholding a list regarding the Rattner state court litigation prepared on various dates by Building Inspector Michael Testa on the ground of work product.
MR. KITTAY: Is there a date on the list?
MR. GOODMAN: Various.
MR. KITTAY: Would you tell me what the dates are?

MR. GOODMAN: They range from 12/9/85 to--
MR. KITTAY: Could you please give me the dates.
MR. GOODMAN: We would have to sit here for a half hour to do it.
MR. KITTAY: How many dates?
MR. GOODMAN: There must be about 50 dates.
MR. KITTAY: I would like you to give them to me.
MR. GOODMAN: I am not going to sit here and read 50 dates into the record. I will give you the first date and the last date. There are more than 50. The first date 12/9/85 and the last date is 8/22/86.

(Testa Dep. p. 118, 1. 12 to p. 120, 1. 15.)

Plaintiffs raise a question about the May 8, 1986 letter and the withheld list. Since the only question raised with regard to the letter is the fact that it was received by a Mr. Lieberman, defendants' response-- which identifies Lieberman as an attorney at the law firm then representing the Village (*see* Affidavit of Robert S. Goodman, Esq., sworn to April 19, 1989, at ¶ 3)--is an adequate explanation. As for the list, plaintiffs are entitled to see it since the activities actually engaged in by Testa in carrying out the surveillance are discoverable and defendants fail to demonstrate that production of the list would invade any cognizable privilege.

*68 12. Q. Did you take any notes in connection with your observation of Mr. Rattner's properties?
A. Yes.
Q. Generally what did you write down in connection with this activity?
MR. GOODMAN: I think the answer to that question would breach one or more privileges to which the client is entitled. The document itself is identified on the Rule 46(e) statement, I believe the last item. It is stated to be a letter. it should read "list".
I think that the nature of the document is such that for Mr. Testa to answer the question that you have just posed would in effect breach those privileges because it is so intertwined with the content of the document that he could not answer that question without breaching the privilege.

(Testa Dep. p. 131, 1. 22 to p. 132, 1. 17.)

Defendants fail to offer any evidence to sustain a claim of privilege with respect to Mr. Testals notes. I must infer, therefore, that they merely reflect his activities in carrying out the surveillance and presumably his observations. For the reasons already noted, this is not privileged information.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

[FN34]

K. *The Resumption of the Depositions*

In anticipation of the prospect that the Court would order that the various witnesses answer some of the disputed questions posed at their depositions, the parties have taken very different positions concerning the ground rules for such resumed deposition sessions.

In each instance, plaintiffs' counsel will be permitted to repose the questions that have been upheld in this Memorandum and order and to conduct reasonable follow-up inquiry with respect to the answers given in response to those questions. In view of the fact that plaintiffs have had an ample opportunity to question these witnesses on other areas, the depositions will be limited to the following durations:
   Mr. Mroczkowski: one day
   Mr. Farrington: one day
   Mr. Netburn: one day
   Mr. McConnell: four hours
   Mr. Kersten: two hours
   Mr. Testa: two hours
   Mr. Handler: two hours
   Mr. Goodman: two hours

To complete the depositions under these time constraints, counsel are to avoid extended colloquies, debates and speeches. Expansion of these time allocations will be made only for good cause shown on application by plaintiffs' counsel following completion of the allotted deposition sessions.

L. *Th Expenses of the Motion*

A review of the parties' motion papers suggests that some of defendants' privilege invocations were not so unreasonable as to call into question their attorneys' decision to contest the issues. In particular, the degree of specificity that an inquiring party may properly demand of a witness in describing the subject-matter of communications arguably subject to the attorney-client privilege is less than clearcut, and in view of the important role played by the privilege, a vigorous but reasonable defense of its applicability may be indulged without requiring the imposition of costs.

Notwithstanding the foregoing, it is apparent that a great many of the arguments advanced by defendants were meritless, and their assertion in court must therefore trigger the provisions governing an award of motion expenses under Rule 37(a)(4). [FN35] Indeed, they represent only the latest in a continuing pattern of obstructionist behavior that has served to waste the time of counsel and of the Court, not to mention the witnesses, many of whom must now return for third appearances. A rough allocation of fault yields the conclusion that plaintiffs are to be awarded three-quarters of their expenses on this motion. Plaintiffs may submit affidavits and appropriate documentation within seven (7) days, with responding papers to be served and filed three (3) days thereafter.

CONCLUSION

*69 One final thought, plagiarized from a recent decision in this Court, is quite apt:
> One would hope that in the future course of this litigation, more time can be spent addressing the merits and less time spent on totally non-productive exercises such as this.

*Langley v. Coughlin,* 84 Civ. 5431(LBS), Order at 2 (S.D.N.Y. June 8, 1989).

SO ORDERED.

FN1. Invoking *In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, defendants claim that the Second Circuit has found that attorney advice is protected by the attorney-client privilege. This is not entirely true. The closest to a clearcut holding on this issue by the Second Circuit is found in *United States v. Silverman,* 430 F. 2d 106, 122 (2d Cir.), mod., 439 F. 2d 1198 (2d Cir.1970), cert. denied, 402 U.S. 953 (1971). However, the relevant passage in the original panel opinion was withdrawn in the subsequent decision. As for *In re Grand Jury Subpoena Duces Tecum, supra,* it does not squarely address this issue and in fact the standard it quotes specifically covers only communications from the clients to the attorney. 731 F.2d at 1036. Moreover, although the Court discusses the nature of the advice offered by the attorneys in that case, that discussion appears designed principally to support its conclusion that various documents reflecting communications by the client to the attorney came within the quoted definition of the privilege. Nonetheless, several of its references to the disputed documents can fairly be read as suggesting that some of the documents do contain attorney advice and, by inference, that such advice is protected.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

See 731 F.2d at 1036-37. This reading has been endorsed by at least one court in this district. *See Radio Today v. Westwood One,* 87 Civ. 8299(MBM), Opinion at 1-2, 1989 U.S. Dist. LEXIS 184 (S.D.N.Y. Jan. 12, 1989). Moreover, dictum by the Supreme Court in *Upjohn Co. v. United States,* 449 U.S. 383, 390 (1981), supports the same conclusion.

FN2. To hold otherwise could protect from scrutiny a host of non-lawyer tasks if performed by a lawyer. Instead of having a non-lawyer prepare a non-legal document and then asking a lawyer to review it--thus protecting the advice but not the document-- the client could simply have the lawyer prepare the document and call it legal advice. This is not the law. *See, e.g., In re Arnold & McDowell,* 566 F.Supp. 752, 754-55 (D. Minn.1983); *Resnick v. American Dental Ass'n,* 95 F.R.D. 372, 375 (N.D. Ill.1982).

FN3. An argument could be made that Rule 26(b)(3) does not protect from disclosure documents that were prepared in anticipation of litigation other than the lawsuit in which the disclosure is sought. There is limited caselaw support for this view, which would dispose entirely of defendants' work-product argument. *See United States v. IBM Corp.,* 66 F.R.D. 154, 178 (S.D.N.Y.1974); *Honeywell, Inc. v. Piper Aircraft Corp.,* 50 F.R.D. 117, 119 (M.D. Pa.1970). The more common, and better reasoned, decisions hold that the rule affords protection at least in lawsuits that are related to the litigation for which the document was prepared. *See, e.g., In re Grand Jury Proceedings,* 604 F.2d 798, 803 (3d Cir.1979); *Republic Gear Co. v. Borg-Warner Corp.,* 381 F.2d 551, 557 (2d Cir.1967); *Midland Investment Co. v. Van Alstyne, Noel & Co.,* 59 F.R.D. 134, 138 (S.D.N.Y.1973); *Hercules Inc. v. Exxon Corp.,* 434 F.Supp. 136, 153 (D. Del.1977), and some cases have indicated that the work-product rule may be invoked in any litigation, whether or not related. *See, e.g., In re Murphy,* 560 F.2d 326, 334 & n.13 (8th Cir.1977)(citing cases); *cf. FTC v. Grolier, Inc.,* 462 U.S. 19, 26-27 (1983). Since this case is closely related to the state court litigation that defendants claim triggered the preparation of the disputed memorandum, I address the merits of the Village's work-product argument.

FN4. In view of my conclusion that the memorandum is not privileged, I need not address plaintiffs' separate theory that any privilege must be set aside under a so-called "crime/fraud/tort" exception. This theory is discussed, however, in connection with other discovery disputes resolved in this Memorandum and order. *See* pp. 121-25, *infra.*

FN5. Given the nature of the communication about which plaintiffs inquire, it is highly unlikely that it would have been part of any confidential advice by counsel.

FN6. Plaintiffs' alternative argument--that the question sought only the subject-matter of conversations and not their content (Plaintiffs' Memorandum at 15) is plainly wrong. The question sought confirmation that a specific comment had been made.

FN7. The scope of the waiver may be affected by whether the disclosure is made in a judicial proceeding or a non-judicial context. If the latter, the breadth of the waiver may be narrower. *See In re von Bulow,* 828 F.2d at 101-02.

FN8. The cases that defendants cite plainly do not stand for the proposition for which they are cited. Indeed, if anything, they support the contrary proposition. In *Shields v. Sturm, Ruger & Co.,* 864 F.2d 379, 381-82 (5th Cir.1989), the Court addressed the question of waiver of the work-product rule, finding no waiver of confidentiality of an expert's report based on prior court-ordered disclosure in a separate and unrelated lawsuit. In so holding, the Court made clear that the attorney-client privilege would be far more readily deemed waived, and in any event made it plain that the prior disclosure had truly been involuntary in that the party had resisted disclosure there and had been compelled to turn over the report

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

by court order. In contrast, here the issue is the attorney-client privilege and the two lawsuits are closely related. Moreover, in this case the prior disclosure was not based on a court decision finding that withheld information was not privileged, but rather it followed from a decision of the party to invoke a defense that necessitated such a disclosure. Furthermore, although a portion of the prior disclosure was ordered by the court, that order was not based on a determination that the information was not privileged, but rather was based on the conclusion that the Village had waived its privilege with respect to the information. As for *Transamerica Computer Co. v. IBM Corp., supra,* 573 F.2d 646, 650-51, the Court there simply applied the generally accepted rule that compelled disclosure is not deemed a waiver of a privilege. The opinion in *Teachers Ins. & Annuity Ass'n v. Shamrock Broadcasting Co., supra,* 521 F.Supp. 638, involved the question of whether voluntary disclosure of privileged documents to the SEC waived the attorney-client privilege, and the Court simply ruled that its decision would depend upon whether the disclosure had been made pursuant to a protective order or a reservation of the right to invoke the privilege in other circumstances against other parties. *Id.,* at 646. *Duplan Corp. v. Deering Milliken Inc.,* 397 F.Supp. 1146 (D.S.C.1974), simply suggests that if the court pressured a party to disclose a privileged document to the other side, no waiver should be found since this involves "implied coercion." *Id.,* at 1163.

FN9. Defendants seek to limit this holding to "discussions concerning [Rattner's] expressive or related activities...." (*Id.,* at 13.) The language quoted from the prior Memorandum and Order was not intended to restrict in any artificial manner the scope of relevance in this case.

FN10. In any event Fed.R.Evid. 408 would not bar discovery of the statements because (a) it is limited to communications from one party to another, (b) it is addressed solely to admissibility at trial and (c) it contemplates that settlement discussions may be admissible at trial for various purposes other than as to liability.

FN11. It is to be doubted, for example, that an investigation of whether parking of limousines on Rattner's property was causing street congestion would principally be for litigation purposes. In any event, the Village is silent on this matter.

FN12. The statement that no such defense has been asserted (Defendants' Farrington Memorandum at 15) is not tantamount to a waiver of the defense for purposes of this case.

FN13. In any event, Public Officers Law § 105(1)(d) appears to be addressed to discussion of litigation strategy, whereas the amount of taxpayers' money being spent by a public body is a fact that is not appropriately kept in secret.

FN14. Defendants' belated claim of irrelevance is impossible to evaluate since no follow-up was permitted. In any event, relevance objections are not a basis for imposing silence on a witness.

FN15. As noted in the December 29, 1989 Memorandum and order, the relevant provision of the Public Officers Law authorizes the calling of an executive session only for certain narrowly defined purposes. Thus, even if the statute were viewed as creating a privilege, the Village could not conceal the facts that would demonstrate whether the privilege was being properly invoked. *See, e.g., United States v. Kovel, supra,* 296 F.2d at 923-24.

FN16. The parties have skipped the number 8.

FN17. Defendants' contention that the question was answered later on is not quite correct. The witness did acknowledge that the Rattner ad was discussed but he never confirmed that the discussion touched upon whether the Village should respond.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works