UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2003 DEC 29  A 10: 25

U.S. DISTRICT COURT
HARTFORD, CT.

| | |
|---|---|
| LOU HADDOCK, as trustee of the Flyte Tool & Die, Incorporated Deferred Compensation Plan, PETER WIBERG, as trustee of the Crown Tool & Die Deferred Compensation Plan, ALAN GOUSE, as trustee of the Greater Hartford Easter Seal Rehabilitation Center Deferred Compensation Plan, RONALD SIMON as trustee of the Hartford Roofing, Inc. Deferred Compensation Plan, CARL ANDERSON for the Anderson & Ferdon Deferred Compensation Plan, <br><br>    PLAINTIFFS, <br><br> v. <br><br> NATIONWIDE FINANCIAL SERVICES INC., and NATIONWIDE LIFE INSURANCE CO., <br><br>    DEFENDANTS. | CIVIL ACTION NO. <br><br> 3:01CV1552(CFD) <br><br><br> **DECLARATION OF ERIC HENDERSON** |

Eric Henderson declares that the following is true under penalty of perjury:

1.      I am Associate Vice President, Variable Annuity Product Manager, of Nationwide Life Insurance Company ("Nationwide Life"). I submit this declaration to accompany the Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification.

2.      I have been with Nationwide Life since 1985 in a number of different capacities. After a year as an actuarial student in the life insurance area, I spent the next 10 years with variable and/or fixed annuities in the Actuarial department, performing a number of functions, including pricing and financial reporting. Following this I spent two years in an actuarial capacity with our Nationwide Retirement Solutions subsidiary, after which I moved into Variable Annuity Products Management, where I have been since that time, and was promoted to Product Manager about two years ago. In this role, I oversee product development and strategy

for the Variable Annuity line of business, as well as direct the management of the various projects undertaken by this line. I am a Fellow of the Society of Actuaries, and a member of the American Academy of Actuaries. Based on my experience, I have personal knowledge of the matters set forth in this affidavit.

**Nationwide Life's Individual Variable Annuity Contracts**

3.  Different retirement plans that qualified under Sections 401 and 403 of the Internal Revenue Service Code purchased different Nationwide Life "individual" variable annuity contracts over the last 15 years. Some of these contracts were purchased before the conduct challenged by Plaintiffs in this case; other contracts were purchased after the challenged conduct commenced

4.  An individual annuity contract covered an individual participant in a retirement plan. Each retirement plan or participant (depending on the plan) had the right to contribute money to the individual variable annuity contract in different amounts at different times, at their discretion, and that money accumulated tax-deferred over time. Nationwide Life only had the right to take action with respect to the money contributed to the variable annuity contracts to the extent agreed to or directed by the retirement plan or participant.

5.  Individual annuity contracts were issued to retirement plans and participants as well as to purchasers who were *not* retirement plans or participants.

6.  The individual variable annuity contracts over the last 15 years utilized different contract language and terms. Those different terms included different investment options and different charges, as described below.

2

**Different Investment Options In The Individual Variable Annuity Contracts**

7.  The individual contracts provided the retirement plans or their participants with the right to control and direct the investment of the money they contributed to their individual annuity contract. Some or all of that money could be invested in a variable account, which is an independent legal entity that keeps its assets separate from Nationwide Life. There were different variable accounts for different types of individual variable annuities. Some of those variable accounts received money from investors who were not 401(k) and 403(b) retirement plans or participants.

8.  Money invested in the variable account could be allocated by the retirement plans or their participants to one or more of the sub-accounts provided for in that particular individual contract. Each sub-account purchased and sold the shares of one of the investment options participating in connection with the contract. Those investment options were usually, but not always, "insurance" mutual funds that were created to participate in connection with variable annuity contracts and were not available to the general public.

9.  The individual annuity contracts typically had different sub-accounts that purchased or sold different insurance mutual funds over the years. Each retirement plan selected the insurance mutual funds that would be included in connection with its particular individual annuity contracts. Some retirement plans selected for their individual annuity contracts many of the insurance mutual funds that agreed to participate in connection with a particular contract. Other retirement plans owners selected a smaller subset of those participating mutual funds. In addition, retirement plans were free to change their selections over time, dropping some funds and adding others among those available at the time.

10. The sub-accounts available in the individual variable annuity contracts varied from contract to contract, and from time to time within an existing contract. Determining which sub-accounts were utilized by each individual annuity contract would require an individual review of the records relating to each annuity contract.

11. For example, a participant in the Plaintiff Easter Seal Plan in 1994 could allocate among sub-accounts that invested in the following investment options: Fidelity VIP Equity Income Portfolio, Fidelity VIP Growth Portfolio, Fidelity VIP II Asset Manager Portfolio, Nationwide Separate Account Trust Money Market Fund, Oppenheimer Bond Fund, Oppenheimer Global Securities Fund, Oppenheimer Multiple Strategies Fund, and the fixed account (described below in ¶ 15). *See* Easter Seal Contract (Ex. 4(3)) at N 227.

12. Then, in 1998, when the available mutual funds changed, a new participant could allocate among thirty-four (34) more sub-accounts. *See* Easter Seal Contract (Ex. 4(4)) at N 312. By contrast, a participant in the Plaintiff Anderson Plan could allocate among sub-accounts that invested in thirty-eight (38) different mutual funds, as well as the fixed account described below in ¶ 15. *See* Anderson Contract (Ex. 4(2)) at N 141.

13. Nationwide Life did not decide which mutual funds should be selected for any particular individual annuity contract or advise the retirement plans as to which mutual funds to select. Nor did Nationwide Life advise the retirement plans whether to invest in the variable account or where to allocate their money if they invested in the variable account.

14. The retirement plans or their participants received accumulation units of the variable accounts. Nationwide Life had no right under the contract to manage, dispose of, cancel, or transfer any accumulation units unless instructed to do so by the retirement plans or their participants.

**Different Re-Allocations of Investments**

15.     Retirement plans and their participants had the right under the individual contracts to re-allocate among the various sub-accounts of the variable account. They could re-allocate at any time by choosing to invest all or some of their money in different sub-accounts than the sub-accounts they had previously chosen. Exhibit 52 to Defendants' Opposition demonstrates how two individual participants in the Anderson Plan changed their allocations over time.

**The Fixed Account Investment Option**

16.     Some individual contracts also provided for retirement plans to control and direct some or all of the money they contributed to a fixed account. The fixed account did not purchase or sell mutual fund shares. Rather it invested in fixed income securities, and credited interest at a rate that did not vary according to the performance or costs of any mutual funds.

17.     Contract owners could invest in the fixed account at any time. They could also move the money they invested in the variable account over to the fixed account, or move money they invested in the fixed account over to the variable account. (The individual contracts had different limitations on how much money may be invested or moved between accounts.)

**Withdrawal of Investments**

18.     Retirement plans or their participants had the right to withdraw money in full or in part from their individual variable annuity contracts. Retirement plans or participants who withdrew money from their contracts could take some or all of any money they invested in the variable account, or some or all of any money they have invested in the fixed account, or both.

**Different Charges In The Individual Variable Annuity Contracts**

19. Some Nationwide Life individual variable annuity contracts contained a "mortality and expense" charge and a "contract" or "administration" charge. These charges changed over time in response to changing circumstances.

20. The costs of administering the individual variable annuity contracts varied by retirement plan. For example, the cost of administration varied significantly if the retirement plan permitted participants to take loans, or the plan selected a large number of mutual funds to participate in their contract, or the participants engaged in frequent transactions or inquiries.

**Disclosure Regarding The Individual Variable Annuity Contracts**

21. The investment options, re-allocation and withdrawal rights, and charges described above are described in the contracts, and in the prospectuses and Statements of Additional Information ("SAIs") that accompanied these contracts and that were filed with the SEC.

22. Two of the retirement plans, the Easter Seal and Anderson Plans, purchased the Best of America IV annuity contract. The prospectus for that contract included SAIs that contained two disclosures concerning the existence of mutual fund reimbursement payments to Nationwide entities For example, the May 1, 1998 SAI for Nationwide Variable Account - II stated:

> Nationwide, or affiliates of Nationwide, may have entered into agreements with either the investment adviser or distributer for several of the underlying mutual funds. The agreements relate to administrative services furnished by Nationwide or an affiliate of Nationwide and provide for an annual fee based on the average aggregate net assets of the variable account (and other separate accounts of Nationwide or life insurance subsidiaries of Nationwide) invested in particular underlying mutual funds.

Ex. 13 at N 014079. The SAI also stated:

6

> The Company performs various services on behalf of the Mutual Fund Companies in which the Account invests and may receive fees for the services performed. These services include, among other things, shareholder communications, preparation, postage, fund transfer agency and various other record keeping and customer service functions. These fees are paid to an affiliate of the Company.

Ex. 13 at N 014100.

**Disclosure Regarding The Insurance Mutual Funds**

23. When the retirement plans or participants allocated money to a particular sub-account, they received the prospectus for the insurance mutual fund in which that sub-account invested. The contract owner also had the right to request a Statement of Additional Information regarding the fund.

24. The prospectus and SAI for each mutual fund described the benefits and costs associated with the fund. For example, the prospectus and SAI described for the contract owner the different fees and charges that reduced the net asset value of the shares of the fund.

25. Each mutual fund's prospectus and SAI also described how the mutual fund's sponsor retained various advisors, managers, administrators, distributors, and/or agents to perform services for the mutual fund. These service providers, and the services they performed for the mutual funds, differed according to each mutual fund and each year, according to the reports of each mutual fund.

26. Some of the prospectuses and SAIs reported that the service providers had entered into service contracts with issuers of variable annuities, and that the variable annuity issuers received payments under those contracts. For example, the April 30, 2001 Prospectus of Fidelity Variable Insurance Service Class stated that

> [Fidelity Distributors Corporation] may reallow to intermediaries (such as insurance companies, broker-dealers, and other service providers), including its affiliates, up to the full amount of the Service Class 12b-1 fee, for providing

> services intended to result in the sale of Service Class shares and/or support services that benefit variable product owners.

Ex. 7 at N 003960. The May 1, 2001 Prospectus of the Dreyfus Stock Index Fund stated that the fund carried a 12b-1 fee

> paid to the funds' distributor for distributing Service shares, for advertising and marketing related to Service shares, and for providing account service and maintenance for holders of Service shares. The distributor may pay all or part of this fee to participating insurance companies and the broker-dealer acting as principal underwriter for their variable insurance products.

Ex. 9 at N 004707.

_Eric Henderson_
Eric Henderson