Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JEAN CLAY, et al., | ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) Case No. 97-cv-4167-JPG |
| THE AMERICAN TOBACCO COMPANY, INC., et al., | ) ) ) |
| Defendants. | ) ) |

## ORDER

**GILBERT, Chief Judge:**

This matter is before the Court on the defendants' motion to strike one of the plaintiffs' proposed experts on class certification, Professor Samuel Issacharoff. Doc. no. 162. The plaintiffs submitted a response, and the defendants replied. Doc. nos. 166 and 167.

Professor Isacharoff, according to his preliminary report and his deposition testimony, intends to testify about the legal requirements of Rule 23 and whether the facts surrounding this case fit within the rule's requirements. He also testifies as to the potential problems surrounding the manageability of this case given its tremendous scope.

The defendants argue that the testimony should be stricken because it is improper expert testimony on a legal issue. Expert testimony is generally admissible when, based on specialized knowledge, it is offered to "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. Whether a class should be certified is a question of law that does not require expert testimony specifically on that issue. Although expert testimony may be helpful

176

on related factual and scientific issues outside the Court's own expertise, it is unnecessary for the final determination of a legal issue. There is no need for expert testimony on this subject.

The motion to strike the testimony of Professor Samuel Issacharoff is **GRANTED**. Doc. no. 162. The Clerk of the Court is DIRECTED to STRIKE the "Expert Statement of Professor Samuel Issacharoff" filed as an exhibit to the plaintiffs' motion for class certification.

**IT IS SO ORDERED.**
**DATED:** 5-21-99

_____
J. PHIL GILBERT
CHIEF JUDGE

Exhibit B

1

```
               UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT

LOU HADDOCK, ET AL.,           .   Case No. 3:01-CV-01552
                               .   (CFD)
             Plaintiffs,       .
                               .   Bridgeport, Connecticut
    v.                         .   November 6, 2003
                               .
NATIONWIDE FINANCIAL           .
                               .
SERVICES, INC., ET AL.,        .
                               .
             Defendants.       .
. . . . . . . . . . . . . . .
```

MOTION HEARING
BEFORE THE HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          Koskoff, Koskoff & Beider, P.C.
                        By:  ANTONIO PONVERT, III, ESQ.
                        350 Fairfield Avenue, 5th Floor
                        Bridgeport, Connecticut 06604

                        Stanley, Mandel & Iola
                        By: ROGER L. MANDEL, ESQ.
                        3100 Monticello Avenue
                        Suite 750
                        Dallas, Texas 75250

For Defendant:          LeBoeuf, Lamb, Greene & McRae
                        By:  DENNIS KERRIGAN, JR., ESQ.
                             ERIC J. MOGILNICKI, ESQ.
                        Goodwin Square
                        225 Asylum Street
                        Hartford, Connecticut 06103

Court Monitor:          MS. MARIA CORRIETTE

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

---

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

1           He's a economist?
2           MR. MANDEL: Oh, we had a -- remember we only
3  had class certification experts --
4           THE COURT: Right.
5           MR. MANDEL: -- and we had a law professor
6  from Columbia University, Professor Samuel Izacaroff,
7  and what he talked about is --
8           THE COURT: Yeah.
9           MR. MANDEL: -- predominance and
10 manageability.
11          THE COURT: Right. He's written on this
12 stuff?
13          MR. MANDEL: He's written a lot --
14          THE COURT: Right.
15          MR. MANDEL: -- on this stuff, and he's been
16 counsel and he's been an expert on it, and they had
17 Professor Priest (phonetic) from Yale. So we have two
18 --
19          THE COURT: Right, know him too.
20          MR. MANDEL: -- two law professors and they
21 had diametrically opposing opinions based on
22 diametrically opposing views of the case and --
23          THE COURT: Is this a new thing, you know,
24 using law professors on -- as experts on the viability
25 of class certification? I mean, gee, isn't that what

1  you have judges for?
2          MR. MANDEL: Well, you know, that's
3  interesting. I mean, we -- we've learned that it is
4  the overwhelming practice that you do it, in part
5  because I think some of these people have a lot of
6  experience with the practicalities of managing class
7  litigation that some judges, not all, may not have, but
8  it seems to be overwhelmingly the trend, and because in
9  a class certification proceeding it's not based on
10 admissible evidence, it's materials, --
11         THE COURT: Right.
12         MR. MANDEL: -- judges generally don't worry
13 about whether this is, you know -- this is proper
14 expert testimony or Daubert, they take it into
15 consideration with everything else.
16         So that's been the trend. I mean, I've --
17 you know, we've done -- I've done fifty, sixty, seventy
18 class certification --
19         THE COURT: Yeah.
20         MR. MANDEL: -- hearings. Almost every one
21 of them had experts and no judges ever said, "Don't
22 need those guys." I mean, could happen.
23         THE COURT: Yeah. I mean, but different kind
24 of class -- I see more attempt at class certifications,
25 for example, in employment and you wouldn't really see

```
 1  those -- we're not seeing law professors come in, in
 2  employment.  Guess the next step, what, is get retired
 3  judges to be experts and advise the --
 4          MR. BIEDER:  Or retired magistrates.
 5          MR. MANDEL:  You know, it doesn't typically
 6  happen in securities cases 'cause they're more common
 7  like the employment, but it tends to happen in the
 8  consumer financial insurance arena.
 9          THE COURT:  Good money if you can get the
10  gig, as a expert on whether some judge should be doing
11  -- should be certifying a class.  The -- But, so --
12  Given who your expert is and the reasons that you used
13  him, your point is that asking him about, you know,
14  "Does your theory change because we're talking about
15  accumulation units or fruits of" --
16          MR. MANDEL:  "Instead of mutual fund shares,
17  does that change any of your opinion or testimony?
18  No."  But because that -- that in their former answer,
19  the defendants talked about why the payments are plan
20  assets, because they did it in terms of steps which,
21  without ever -- without actually ever saying "tracing,"
22  they assume what the steps meant was tracing.  That was
23  never our intent and it doesn't say tracing.
24          In any case, "Because they've changed the
25  language of this interrogatory answer about why it is
```

Exhibit C

                                                                    1

 1
 2
     UNITED STATES DISTRICT COURT
 3   DISTRICT OF CONNECTICUT

 4   - - - - - - - - - - - - - - - - -x

 5   LOU HADDOCK, as trustee of the
     Flyte Tool & Die, Incorporated
 6   Deferred Compensation Plan,
     PETER WIBERG, as trustee of the
 7   Crown Tool & Die Deferred Compensation
     Plan, ALAN GOUSE, as trustee of the
 8   Greater Hartford Easter Seal Rehabilitation
     Center Deferred Compensation Plan,
 9   RONALD SIMON as trustee of the
     Hartford Roofing, Inc. Deferred
10   Compensation Plan, CARL ANDERSON
     For the Anderson & Ferdon Deferred
11   Compensation Plan,
                              Plaintiffs,
12
            -against-                      Civ. No.
13                                         3:01 CV 1552(CFD)

14   NATIONWIDE FINANCIAL SERVICES
     INC., and NATIONWIDE LIFE
15   INSURANCE CO.,

16                        Defendants.
     - - - - - - - - - - - - - - - - -x
17

18

19        DEPOSITION of SAMUEL ISSACHAROFF, taken by

20   Defendants, at the offices of LeBoeuf, Lamb,

21   Greene & MacRae, 125 West 55th Street, New York,

22   New York, pursuant to Agreement, on April 4, 2003,

23   commencing at 10:12 a.m., before Jeffrey Benz, a

24   Registered Professional Reporter and Notary Public

25   within and for the State of New York.

14

1              Issacharoff

2              I was lead counsel in a case, whose
3      caption I can't remember, I don't remember the
4      plaintiff's name, I represented defendant, BRAC.
5      B-R-A-C was the defendant. I don't remember the
6      plaintiff -- the named plaintiff's name.
7              I was lead counsel in a case called
8      DC 37 versus Bradley. I was co-lead counsel in a
9      case called Vargas v. Calabrese.
10             The question is -- cases I was lead
11     counsel in that were class actions?
12     Q.    Yes.
13     A.    I was lead counsel in a case in Alaska
14     that I can't remember. It was a class action. I
15     can't remember the -- the caption of it anymore.
16     I don't remember how it was captioned. My client
17     was one of the native tribes in Alaska.
18             There may be more. I just don't
19     remember.
20     Q.    Were those all voting rights or civil
21     rights act cases?
22     A.    No.
23     Q.    How many of them were voting rights or
24     civil rights act cases?
25     A.    All but one.

```
 1                    Issacharoff
 2       Q.   Which one was not?
 3       A.   The ones I've listed for you, the BRAC
 4  case was not.
 5       Q.   What kind of a case was the BRAC case?
 6       A.   BRAC stands for Brotherhood of Railroad
 7  and Airline Clerks, if I remember correctly.  And
 8  as I recall the case, my client was sued in this
 9  massive duty of fair representation class action.
10       Q.   That was the labor case?
11       A.   Yes.
12       Q.   Did any of the class actions that you
13  were lead counsel or co-lead counsel in go to
14  trial?
15       A.   Yes.
16       Q.   How many?
17       A.   Maybe four, maybe five.
18       Q.   Were they jury trials?
19       A.   No.
20       Q.   Judge trials?
21       A.   Yes.
22       Q.   Have you ever tried a jury case?
23       A.   No.
24       Q.   After you finished practicing law at --
25  you went into academia.
```

```
                                                                29
     1                        Issacharoff
     2        Q.   You've lectured just separately on the
     3   subject of consumer fraud?
     4        A.   I've given a number of lectures on
     5   issues of private enforcement and the relationship
     6   between private enforcement and deregulation.  And
     7   the example of consumer fraud is one that I often
     8   use in those lectures, and sometimes it's -- we
     9   get into the subjects of specific forms of private
    10   enforcement, in which case aggregation of claims
    11   comes up, and sometimes it's more on a conceptual
    12   level on regulatory strategy.
    13        Q.   When you talk about private enforcement,
    14   are you talking about private litigation that
    15   claims under a particular consumer fraud statute,
    16   or --
    17        A.   Or common law.
    18        Q.   Common law.
    19        A.   Yes.  Or if it's out of the country,
    20   under various provisions of the civil code, in --
    21   in civil -- in civil law countries.
    22        Q.   Have any of those lectures involved
    23   consumer fraud involving retirement plans?
    24        A.   I don't know.
    25        Q.   Have you acted as a special master
```

146

```
 1                       Issacharoff
 2             MR. PONVERT:  Object, just because the
 3        complaint speaks for itself.
 4        Q.   Let me ask the question differently.  Is
 5   it your understanding that the second amended
 6   complaint refers to misrepresentations and
 7   nondisclosures in several of the allegations and
 8   in the claims for relief?
 9        A.   Yes.  I don't know why it does that.
10        Q.   But is it your understanding that those
11   allegations and those claims are made?
12        A.   Yes.  That they are in the complaint.  I
13   do not see a request for recovery on that basis,
14   so it's -- that's why I said, I don't understand
15   why it's there.  But I -- I have seen the
16   language, yes.
17        Q.   And misrepresentation and disclosure
18   issues in this ERISA case are common to the
19   misrepresentation and disclosure issues that would
20   be present in the consumer fraud case; is that
21   correct?
22        A.   They could be.  I mean, there is a
23   difference in consumer fraud between express and
24   implied warranty.  That's why consumer fraud has a
25   lot of different moving parts, as does this.
```

170

1                     Issacharoff
2           MR. GENNARDO: Why not?
3      Q.   Why not?
4      A.   Because the allegation in the complaint
5  is that the fact that your client selected the
6  basket of available mutual funds and constricted
7  the available choice, created obligations under
8  ERISA which are characterized as fiduciary
9  obligations, and that any recovery to your client
10 from these mutual funds -- well, I guess it would
11 have to go through -- I don't know the answer to
12 that.
13          Let me -- let me take that -- I actually
14 don't know. I have to think about that. That was
15 a good question, why not.
16     Q.   That's why they pay him the big bucks.
17     A.   I had to think about that. I hadn't
18 considered that issue. I don't know.
19     Q.   So just so the record is clear, you
20 don't know the answer as to whether plan
21 participants purchasing shares directly or
22 indirectly from mutual funds would affect your
23 class certification analysis.
24     A.   No. I have not thought about that
25 issue.

172

```
 1                    Issacharoff
 2      sets forth the action -- the facts and the
 3      legal allegations in the complaint.  And as I
 4      understand this line of questioning, you're
 5      not asking what are the plaintiffs asserting
 6      in the case.  You're asking --
 7           MR. PLATT:  No, sir.
 8           MR. PONVERT:  You're asking the witness
 9      what is your understanding of the complaints
10      and allegations made by the plaintiffs in the
11      case.
12           MR. PLATT:  That's absolutely true.
13      And, more specifically, I'm going to ask him
14      whether or not if he addressed any of these
15      questions in his class certification
16      analysis.
17      A.   No.  I did not focus on this, on how the
18 payments were made.  I assumed that -- and I'll
19 put forward my assumption.  My assumption was
20 that -- as I read the allegations, that moneys
21 were transferred to Nationwide from mutual fund
22 entities that were holding planned participant
23 assets.  I did not focus on the mechanism by which
24 the transfer was made, by what intermediaries were
25 involved, or by how the money got into the hands
```

```
 1                    Issacharoff
 2   have worked.
 3        Q.   Is it your understanding that the mutual
 4   funds were breaching some duty by taking the money
 5   out of the assets for purposes of paying that
 6   money to Nationwide?
 7        A.   I don't know the answer to that.
 8        Q.   Have you inquired into the reasons why
 9   the mutual funds took the money to begin with?
10        A.   I'm not sure I understand your question.
11   You mean the motivation?
12        Q.   Yes.  Were the mutual funds taking the
13   money out of the plan assets as fees or charges?
14        A.   I don't know what exactly they billed it
15   as, but I'm not sure I see why that's relevant in
16   this case.
17        Q.   Do you know whether the mutual funds
18   were taking the plan assets for fully disclosed
19   and perfectly legitimate fees and charges?
20        A.   Oh, the allegation is that they were
21   not.
22        Q.   The allegation is that in -- it's your
23   understanding that the allegation is that the
24   mutual funds were taking the money out of plan
25   assets for non-disclosed and illegitimate fees and
```