53

1                    Issacharoff

2    tell you about the kinds of proof that would be

3    introduced on various claims?

4         A.   We had at least one, and probably more

5    than one discussion about how you would prove the

6    substitution claim.  You had a different term for

7    it before, but I called it the substitution claim.

8         Q.   That was the self-dealing claim?

9         A.   That was your term.  Maybe that's their

10   term.  I understood it as a constriction of the

11   scope of available mutual funds.

12        Q.   The allegation was that Nationwide was

13   either adding or eliminating funds based on

14   whether or not they would make payments.

15        A.   That is correct.

16        Q.   And what did Mr. Stanley and Mr. -- or

17   Mr. Mandel tell you about the kinds of proof that

18   would be introduced on those, on that subject

19   point?

20        A.   There was a discussion about the use of

21   market performance of those plans versus other

22   plans, as the benchmark for the -- the -- both the

23   liability and the damages.

24        Q.   What specifically did Mr. Mandel or

25   Mr. Stanley say about the use of market

54

                              Issacharoff
1
2    performance as a benchmark for liability and
3    damage?
4         A.   I don't recall.
5         Q.   Was there any discussion about the need
6    for proof that Nationwide was, in fact, adding or
7    eliminating funds?
8         A.   There may have been.  That was not the
9    area that I was focussed on.
10        Q.   Why were you focussed on the use of
11   market performance as a benchmark?
12        A.   Because I've learned in my experience
13   that successful handling of class actions require
14   not just a theory of liability that is sensible in
15   the aggregate, but a measure of relief that
16   corresponds to the theory of liability and that
17   can be effectively handled in the aggregate.
18             And by handled in the aggregate, I don't
19   mean that it's not amenable to individual
20   calibration, but rather that the theory of the
21   harm is based upon the defendant's actual conduct,
22   rather than what any particular individual -- how
23   any particular individual experienced the harm.
24        Q.   And it was your thought that there was
25   not that connection between the measure of relief

55

```
 1                        Issacharoff
 2   and the theory of liability with respect to the
 3   so-called substitution claim.
 4        A.   I was concerned because the theory of
 5   liability and of damages turned on a
 6   counterfactual, and particularly, to my mind, the
 7   calculation of damages turned on a counterfactual
 8   assumption of what would have happened absent
 9   the -- the limitation of the scope of funds by the
10   conduct alleged by Nationwide.
11             And I expressed my reservation that I
12   did not understand how one could establish -- or
13   I -- not -- not that one could not, but that I was
14   very -- I had trouble thinking of cases in which
15   damages had been assessed on a counterfactual
16   basis.
17        Q.   What does it mean to make a
18   counterfactual assumption in a case such as this?
19        A.   What would have happened had the facts
20   been different.
21        Q.   So your concern was that the market
22   performance of the funds might have been the same
23   regardless of whether Nationwide added or
24   eliminated funds.  Is that essentially what you're
25   saying?
```

56

1                           Issacharoff

2        A.    No.

3        Q.    Okay.  What was your concern about the

4   counterfactual assumption?

5        A.    That one had to -- in order to prove

6   what the impact was, one would have to establish

7   what conduct would have been taken by the

8   individuals had a different basket of mutual funds

9   been offered, and then which ones they would have

10  gone into, each of which would have performed

11  differently because mutual funds do perform

12  differently, and how their risk preferences would

13  have matched up between the funds they had

14  selected, the funds they would have selected, and

15  whether they understood their risk preferences.

16            And we can keep going down this chain,

17  but the fundamental point is, that I had

18  difficulty seeing, even if a liability theory were

19  to survive, how this could be handled each on an

20  individual basis.

21       Q.    Were you also concerned that a class

22  could not be certified based on such a claim?

23       A.    I wasn't so much concerned about the

24  class issues at that point.  I was more concerned

25  that I did not understand the theory of the case

57

```
 1                    Issacharoff
 2  on that point.
 3      Q.   The theory of liability and damage?
 4      A.   Yes.
 5      Q.   When you had your first telephone
 6  conversation with Mr. Mandel, did he ask whether
 7  you were capable of giving a particular opinion?
 8      A.   I'm not sure in the first conversation,
 9  but at some point.
10      Q.   Did he explain to you why he wanted you
11  to look at certain materials in the case?
12      A.   Yes.
13      Q.   Was he looking for your -- just your
14  general thoughts, or was he looking for thoughts
15  on class certification?
16      A.   He wanted me to address the issues of
17  whether I thought this case could be managed as a
18  class action.
19      Q.   And when you responded about this
20  so-called substitution claim, were you responding
21  in the context of whether the case could be
22  managed as a class action?
23      A.   Well, I can't answer that question until
24  I understand the case.  And if I could not
25  understand the liability and damages theory, I
```

214

1                    Issacharoff

2    that the plans or the plan participants had, would

3    that affect your class certification analysis?

4         A.    I'm sorry, run that by me again?

5         Q.    Yes.  You were saying this wasn't a

6    reliance-type case; is that correct?

7         A.    Yes.

8         Q.    Could there nevertheless be a sufficient

9    level of information on the part of the plans or

10   the plan participants where the plans, or the plan

11   participants, would be deemed to have consented to

12   these contractual relationships between the mutual

13   fund entities and the Nationwide entities?

14        A.    The plaintiffs allege a standard of

15   fiduciary responsibility that implied consent is

16   not a legally valid defense.

17        Q.    So any differences in the amount of

18   information that plans or participants had, or the

19   amount of consent that plans or participants gave,

20   would be irrelevant to your class certification

21   analysis.  Is that correct?

22        A.    Yes, because I don't see this as a

23   misrepresentation claim.

24        Q.    Despite the allegation in the second

25   amended complaint?

215

1                    Issacharoff

2        A.   As I said earlier, I see that the words

3   are there, the allegations are there.  But I don't

4   see any claim for relief based upon

5   misrepresentation, so I think that this is a

6   vestigial organ.

7        Q.   Do you -- have you read the Priest

8   declaration?  I think you said you had.

9        A.   Yes.

10       Q.   Did you disagree with any of the

11  conclusions in that declaration?

12       A.   I disagree with the conclusion.

13       Q.   And did you disagree with any of the

14  reasoning that leads to the conclusion?

15       A.   Well, Priest takes on a number of issues

16  which I have not looked at, and frankly, I was

17  surprised to see an expert opine on, such as his

18  sense that the -- the class representatives were

19  too close in geography and knowledge to each

20  other, and of the fact that they had come together

21  to approach the plaintiffs' lawyers.  I don't see

22  why an expert is getting into that.

23            But if he wants to, I haven't looked at

24  anything regarding the individual plaintiffs, so

25  I'm not in a position to agree or disagree.  His

240

1

2                    UNITED STATES DISTRICT COURT

3                      DISTRICT OF CONNECTICUT

4   - - - - - - - - - - - - - - - - - - - - -x
    LOU HADDOCK, as trustee of the Flyte        :
5   Tool & Die, Incorporated Deferred
    Compensation Plan, PETER WIBERG, as
6   trustee of the Crown Tool & Die Deferred    :
    Compensation Plan, ALAN GOUSE, as
7   trustee of the Greater Hartford Easter
    Seal Rehabilitation Center Deferred
8   Compensation Plan, RONALD SIMON, as         :
    trustee of the Hartford Roofing, Inc.
9   Deferred Compensation Plan, CARL
    ANDERSON, as trustee of the Anderson &      :
10  Ferdon Deferred Compensation Plan,

11

12                  Plaintiffs,                 :

13                                              :
                 -against-                      Civil No.
14                                              3:01CV1552(CFD)
    NATIONWIDE FINANCIAL SERVICES, INC.,
15  and NATIONWIDE LIFE INSURANCE CO.,          :

16                  Defendants.
                                                :
17  - - - - - - - - - - - - - - - - - - - -x

18

19         DEPOSITION of SAMUEL ISSACHAROFF, taken by

20  Defendants, at the offices of Messrs. Wilmer, CUtler &

21  Pickering, 399 Park Avenue, New York, New York 10022,

22  on Wednesday, July 16, 2003, commencing at 12:35

23  o'clock p.m., before ANNETTE FORBES, a Certified

24  Shorthand (Stenotype) Reporter and Notary Public

25  within and for the State of New York.

272

1                         Issacharoff

2          Q    Do you know what the definition of

3    an ERISA fiduciary is?

4          A    At some point in my life, I did.  I

5    can't define it for you now.

6          Q    So do you have any idea what proof

7    would have to be presented in order to meet the

8    definition of an ERISA fiduciary under the ERISA

9    statute?

10         A    No, I don't.  But for my purposes

11   here, that's really quite irrelevant because that

12   goes to the nature of the defendants' role and

13   if -- unless there is some reason that there is

14   factual sensitivity to the condition of any

15   particular plan as to whether defendant plays a

16   fiduciary role, I just don't see why that would be

17   relevant.

18              It's possible that you could tell me

19   something that would change my opinion on that,

20   but I don't see that as a relevant concern.

21              So long as proof on that issue has

22   to do with the nature of what Nationwide's

23   responsibilities are in its role as a responsible

24   party for ERISA plans, then that's a question for

25   the Court and not one that has anything to do with

273

1                        Issacharoff

2    whether or not it's more or less manageable to do

3    that in an individual case as opposed to in an

4    aggregate case.

5            Q        Have you considered, in giving your

6    opinion, what factual issues might arise in

7    determining whether the Nationwide decisions were

8    or were not ERISA fiduciaries?

9            A        I have read the court transcripts

10   and I have read your arguments and I don't recall

11   your answer to the complaint.  But I just don't

12   recall any serious argument on that issue, so, no,

13   I have not given that any particular attention.

14           Q        You mentioned something about plan

15   assets.

16                    Do you know the definition of a plan

17   asset under ERISA?

18           A        I have seen it in the pleadings.   I

19   can't recall it offhand.  I believe, I mean, I

20   have seen it in the briefing.

21           Q        Do you know what proof would have to

22   be presented in order to show that the money at

23   issue here was or was not a plan asset?

24           A        There is a dispute obviously as to

25   whether it's a plan asset.  You have already moved

Issacharoff

1    up the definitions used in generally accepted

2    accounting principles, which I take to be the

3    thrust of Mr. Werblow's report, it is possible

4    that there may be a battle of experts as to what

5    the GAAP principles dictate in this circumstance.

6    I don't know.

7    

8        Q    Do you know whether that is the

9    definition for ERISA plan asset purposes?

10       A    I do not know.

11       Q    So you haven't considered what other

12   types of proof might be necessary to meet the

13   definition of plan assets; is that correct?

14            You can't know the level of proof

15   unless you know the definition, correct?

16       A    As an abstract matter, that's

17   correct.  But you asked a slightly different

18   question and then are tweaking it in a different

19   direction.

20            You are asking the question whether

21   I considered other possible definitions.  I have

22   read a lot of materials in this case at this

23   point, and I have focused on how the parties

24   presented the issues.

25            I have not sought to go out on my

284

Issacharoff

1    what the plaintiffs will be doing at this point,

2    as I read the case, is rebutting claims that for

3    some reason it is no longer ERISA covered.

4    

5         Q    Do you know anything about what

6    factual presentation the plaintiffs will offer at

7    trial as to whether or not the money was plan

8    assets in the event that they do not prevail as a

9    matter of law?

10        A    I do not know the factual elements

11   they will produce.

12             What I have considered is whether

13   the facts in question are individual specific or

14   would be aggregate in their nature.

15             On this question, whatever facts

16   there are, which right now I do not know, I do not

17   see any basis for believing that they would be

18   individual specific.

19        Q    Well, if you don't know what the

20   facts are, how can you tell whether they are going

21   to be generalized or individualized?

22        A    Taking that to be a serious

23   question, one can tell whether the dispute relies

24   upon something about the definition of the

25   individual or something about the nature of ERISA

286

1                     Issacharoff

2    there was a duty owed?

3           A      I believe that that is the case.

4           Q      Have you considered what proof would

5    have to be presented by the plaintiffs in order to

6    show that the Nationwide defendants exercise some

7    authority and control?

8           A      I haven't considered the specifics,

9    but my sense is that this will be done on a global

10   basis.

11          Q      What is the basis for that sense?

12          A      Just a common sense evaluation of

13   how I would think about these issues.

14          Q      Can you describe that any further?

15          A      No.

16          Q      What proof will the plaintiffs have

17   to present to show that the Nationwide defendants

18   breached an ERISA fiduciary duty?

19          A      They will have to show that

20   Nationwide profited from its association with

21   ERISA-covered plans and that the profits were not

22   contracted for.

23                 And under plaintiffs' theory, that

24   establishes liability.

25          Q      In your mind, is that all subject to

288

1                          Issacharoff

2                There's a variety of ways in which

3    they could establish this.

4         Q    Have you thought about how that

5    proof will be generalized or individualized?

6         A    I have read your 30(b)(6) designee

7    depositions and there is a description of a

8    companywide policy and a fairly broad attempt to

9    sympathize these policies.  That goes a long way

10   there.

11               There may be individual issues as to

12   some rather mutual funds in which case specifics

13   may have to be put in, evidence as to those

14   particular plans, those particular mutual funds.

15        Q    Have you considered which specific

16   mutual funds would be subject to that more

17   individualized proof?

18        A    I don't know that any would at this

19   point, but if there are, then they would be.

20        Q    Do you know which mutual funds were

21   taking part in this so-called skimming and which

22   weren't?

23        A    Not at this point, no.

24        Q    Do you know how many mutual funds

25   were taking part in the skimming?

292

Issacharoff

1

2      A    I have seen a claim by the

3  plaintiffs that these are fairly uniform, but

4  there could be outlier contracts.  I could not say

5  one way or the other.

6      Q    You have not looked into that issue?

7      A    No, I have not.

8      Q    Do you know whether any plans

9  amended their contracts to allow Nationwide to

10 receive money from the mutual funds?

11     A    I do not.

12     Q    Would that make any difference to

13 your class certification analysis?

14     A    It would require somewhat more work

15 by the trial court figuring out which ones were in

16 and which ones were not.

17     Q    Do you know whether any of the plans

18 ratified Nationwide's receipt of money from the

19 mutual funds?

20     A    I do not.

21     Q    Would that make any difference in

22 your class certification analysis?

23     A    I don't know whether post hoc

24 ratification is a legal defense under ERISA.  I do

25 not know.

294

1                        Issacharoff

2    what the plaintiffs are going to pursue at trial,

3    correct?

4             A    Yes.

5                  As I said earlier, the one

6    assumption I make is that the plaintiffs intend to

7    seek to certify a class and prosecute a case based

8    upon the third amended complaint.

9             Q    And it's your understanding that

10   when the plaintiffs pursue that claim, that they

11   are going to only be submitting proof that the

12   side payments, the so-called side payments were

13   not disclosed in the contracts?

14            A    Were not provided for in the

15   contract, correct.

16                 That is my understanding.

17            Q    Do you know whether there was any

18   other disclosure that was made by Nationwide to

19   the plans or the plan participants?

20            A    I do not.

21            Q    Would that make any difference to

22   your class certification analysis?

23            A    Not under the plaintiffs' theories

24   of the case as alleged.

25            Q    Are you also assuming in your

338

Issacharoff

1    this is one of these sentences that lawyers back

2    into when they are trying to cover all the bases

3    and ultimately it will have to speak or not speak

4    for itself.

5    Q    Is it your understanding that

6    plaintiffs are going to plead, try to plead and

7    prove that Nationwide performed no services for

8    the mutual funds?

9    A    I go back to my statement.

10         Plaintiffs allege, consistent with

11   your corporate representatives in their 30(b)(6)

12   deposition --

13   Q    No, I don't want that answer,

14   Professor, because that answer you have already

15   given me.  You have said it's a question of the

16   cost of the services.

17         Now I am asking you a different

18   question.

19         Is it your understanding that

20   plaintiffs are going to plead and prove in this

21   case that there were no services offered?

22   A    I don't know how the facts are going

23   to play out on this.  But plaintiffs' theory

24   doesn't turn on the necessity of proving that

351

Issacharoff

1   annuity contracts, the claim here or the

2   allegation here in Paragraph 28 is that there was

3   a false statement placed in the variable annuity

4   contract; is that correct?

5         A    That's interesting.  I had not

6   focused on that.

7          I don't know the answer to that.  If

8   that is, if the allegation here is that there is

9   something improper in the contract itself and that

10  the fees were disclosed, but mischaracterized in

11  the contracts themselves, then this doesn't belong

12  here.

13        Q    This would raise the individualized

14  issue, correct?

15        A    I suspect there will be a fourth

16  amended complaint which will drop this.  I hope

17  so.  This is just sloppiness.

18        You have scored like you did the

19  last time, very good.

20        Q    I'm not trying to score, Professor.

21  I'm just trying to find out what was going on

22  here.

23        A    Come on, we have been at this for

24  hours now.  You seem to be right.  This seems to

**120203-HADDOCK.txt**

**1**

1      UNPROOFREAD/UNCERTIFIED ROUGH DRAFT ONLY

2      Reporter's Name:  EILEEN MULVENNA, CSR/RMR
       ------------------------------------------------
3      REALTIME/INTERACTIVE ROUGH DRAFT TRANSCRIPT
       AND/OR UNCERTIFIED REALTIME ASCII DISCLAIMER
4      ------------------------------------------------
              IMPORTANT NOTICE:
5            - AGREEMENT OF PARTIES -
       PROCEEDING BEYOND THIS PAGE CONSTITUTES
6      ACCEPTANCE OF AND AGREEMENT WITH THE FOLLOWING
              TERMS AND CONDITIONS
7      ------------------------------------------------
       We, the party working with realtime and rough
8       draft transcripts and/or ASCII disks, understand
       that if we choose to use the realtime rough draft
9       screen, the rough printout, or the unedited ASCII
       disk, that we are doing so with the understanding
10      that all rough drafts are uncertified copies
       and...
11

       WE AGREE THEY WILL BE BILLED TO AND PAID FOR BY
12      US

13      We further agree not to comment in the record on,
       share, give, copy, scan, fax or in any way
14       distribute this realtime rough draft or ASCII in
       any form (written or computerized) to any party.
15       However, our own experts, co-counsel, and staff
       may have limited internal use of same with the
16       understanding that we agree to destroy our
       realtime rough drafts and/or any computerized
17       form, if any, and replace it with the final
       transcript/ASCII disk upon its completion.
18

**Page 1**

**120203-HADDOCK.txt**

25      A.    I see.


                            **24**


1    UNPROOFREAD ROUGH DRAFT/WORKING COPY ONLY

2          MR. STANLEY:  Objection to form.

3      A.     I understand your question, I think.

4    And I am not here to offer an opinion as to

5    whether or not the monies in question are plan

6    assets for purposes of ERISA.  Either they are or

7    they are not.  And if they are not, then that's

8    the end of the case.  I am not here to opine on

9    how the money flows through the various

10   Nationwide holding arrangements affect ERISA

11   duties.  I don't know that area.  I am not an

12   expert on it.  So if that is the nature -- if I

13   understand that to be the nature of your question

14   about whether the use of the term "variable

15   account accumulation unit" alters the claim with

16   regard to how the monies are held or how the

17   holding of the money affects ERISA duties, I'm

**Page 32**

**120203-HADDOCK.txt**

17    between legal damages and monies wrongfully

18    gained as a result of a breach of a trust

19    relationship.  And in so doing, says that the

20    question is not in the way that you have

21    structured it now.  What is the quantum of legal

22    damages -- though it may end up being the same in

23    this particular case, but the question is not

24    what is the quantum of legal damages, but how

25    much did you receive that you were not entitled

48

1        UNPROOFREAD ROUGH DRAFT/WORKING COPY ONLY

2    to.  And to my mind, that's an eminently simple

3    bookkeeping question.

4            MR. PLATT:  Move to strike as

5        nonresponsive.

6        Q.    On whose books will we look to see

7    whether the payments that the Nationwide

8    defendants received from the mutual funds caused

9    there to be less gain for the plans and their

**Page 64**

**120203-HADDOCK.txt**

13      three.

14          In fairness, when you're reading, if

15      you would just point out to the witness so

16      he knows what you're talking about.

17          MR. PLATT:  Well, I assume some

18      familiarity --

19      A.    I didn't get was the intro, was the

20  part --

21      Q.    The intro is are the payments that

22  are made by the mutual funds to the Nationwide

23  defendants --

24      A.    See, that's the part that's not

25  here.  The payments made --


                    **60**


1      **UNPROOFREAD ROUGH DRAFT/WORKING COPY ONLY**

2      Q.    That is in here.  It's just --

3          MR. STANLEY:  The sentence before.

4      Q.    It says those payments --

5      A.    That's what I'm trying to figure

                    **Page 80**

120203-HADDOCK.txt

18    not in a position to answer that one way or the

19    other.

20        Q.    I understand you're not here to

21    offer an opinion on whether the money that

22    allegedly was received by the Nationwide

23    defendants is a plan asset, but you are here

24    to --

25        A.    When you say use the term allegedly

25

1    UNPROOFREAD ROUGH DRAFT/WORKING COPY ONLY

2    you mean Nationwide did not receive money from

3    the plans?

4        Q.    That's going to be one of our

5    defenses, professor.  Nationwide did not receive

6    money from the plans through the mutual funds?

7        A.    Oh, through -- could you say that

8    again?

9        Q.    Yes.  It's going to be one of our

10    defenses that the Nationwide defendants did not

Page 33

120203-HADDOCK.txt

1     UNPROOFREAD ROUGH DRAFT/WORKING COPY ONLY

2     assets.  That's how I understand this.

3            MR. STANLEY:  We've been going about

4     an hour and fifteen minutes.  Let's take a

5     short break.

6            MR. PLATT:  Let's make it very short

7     so we don't use up --

8            MR. STANLEY:  Five-minute break.  If

9     we do five-minute breaks, we'll be out of

10     here by five.

11            (Recess from the record.)

12            MR. STANLEY:  For the record, we

13     took a five-minute break.

14     BY MR. PLATT:

15     Q.    Professor Issacharoff, did you talk

16     to Mr. Stanley about anything during our break?

17     A.    Yes.

18     Q.    What did you talk about?

19     A.    We talked about the definition of

20     this term fruits which I find to be meaning more

Page 74

# <u>CERTIFICATION</u>

This is to certify that true and correct copies of the foregoing Motion to Strike

Declarations and Preclude Opinions of Plaintiffs' Putative Class Certification Expert and

supporting Memorandum of Law were served by overnight mail on this 23 day of December,

2003, on the following counsel of record:

Richard A. Bieder, Esq.
Antonio Ponvert III, Esq.
Koskoff, Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

Gregory G. Jones, Esq.
Law Firm of Gregory G. Jones, P.C.
603 South Main Street, Suite 200
Grapevine, TX 76051

Marc R. Stanley, Esq.
Roger L. Mandel, Esq.
Stanley, Mandel & Iola
3100 Monticello Avenue
Suite 750
Dallas, TX 75205

Sam Broderick-Sokol