# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LOU HADDOCK, as trustee of the Flyte Tool & Die,
Incorporated Deferred Compensation Plan, PETER
WIBERG, as trustee of the Crown Tool & Die
Deferred Compensation Plan, ALAN GOUSE, as
trustee of the Greater Hartford Easter Seal
Rehabilitation Center Deferred Compensation Plan,
RONALD SIMON as trustee of the Hartford Roofing,
Inc. Deferred Compensation Plan, CARL
ANDERSON as trustee of the Anderson & Ferdon
Deferred Compensation Plan,

       PLAINTIFFS,

          v.

NATIONWIDE FINANCIAL SERVICES INC., and
NATIONWIDE LIFE INSURANCE CO.,

       DEFENDANTS.

CIVIL ACTION NO.:

3:01CV1552(CFD)

December 23, 2003

## DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## FIRST AMENDED MOTION FOR CLASS CERTIFICATION

Defendants respectfully submit this Memorandum of Law in Opposition to the First

Amended Motion for Class Certification of Plaintiff Trustees of The Greater Hartford Easter

Seal Rehabilitation Center Tax Sheltered Annuity Plan ("Easter Seal Plan"); the Anderson &

Ferdon Deferred Compensation Plan ("Anderson Plan"); the Flyte Tool & Die, Incorporated

Deferred Compensation Plan ("Flyte Tool Plan"); the Crown Tool & Die Deferred

Compensation Plan ("Crown Tool Plan"); and the Hartford Roofing, Inc. Deferred

Compensation Plan ("Hartford Roofing Plan") (collectively, the "Plans").

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

FACTUAL AND LEGAL BACKGROUND ...................................................................... 4

I.    THE SHIFTING ALLEGATIONS IN PLAINTIFFS' COMPLAINTS ..................... 4

    A.    The Allegations In Plaintiffs' Third Amended Complaint ..................................... 4

    B.    The New Allegations Made After The Close Of Discovery.................................... 6

II.   THE FACTS RELEVANT TO CLASS CERTIFICATION ........................................ 7

    A.    The Different Variable Annuity Contracts And Variable Accounts...................... 7

    B.    The Different Sub-Accounts In The Variable Accounts........................................ 9

    C.    The "Accumulation Units" That The Retirement Plans Received........................ 11

    D.    The Different Charges In The Variable Annuity Contracts.................................. 12

    E.    The Mutual Fund Entities' Different Service Payments To Nationwide
       Entities ................................................................................................................. 13

    F.    Disclosure Of The Nationwide Entities' Receipt Of Payments And The
       Plans' Ratification............................................................................................... 16

III.  THE ELEMENTS OF AN ERISA VIOLATION ..................................................... 18

ARGUMENT.......................................................................................................................... 23

I.    CLASS CERTIFICATION SHOULD BE DENIED BECAUSE THE
    ELEMENTS OF, AND DEFENSES TO, PLAINTIFFS' ERISA CLAIM
    RAISE COUNTLESS INDIVIDUAL ISSUES THAT CANNOT BE
    RESOLVED BY GENERALIZED PROOF ............................................................ 26

    A.    The Court Cannot Determine Whether Defendants Received Any "Fruits
       Of Plan Assets" Without Resolving Countless Individual Issues........................ 31

    B.    The Court Cannot Determine Whether Defendants Exercised "Authority
       And Control" Over The "Fruits Of Plan Assets" Without Resolving
       Countless  Individual Issues.................................................................................. 33

    C.    The Court Cannot Determine Whether Defendants Exercised "Authority
       And Control" Over The "Accumulation Units" Without Resolving
       Countless Individual Issues.................................................................................. 34

    D.    The Court Cannot Determine Whether Defendants Exercised "Authority
       And Control" Without Resolving Countless Individual Issues Regarding
       Agreement, Ratification, And Disclosure............................................................. 36

    E.    Individual Issues Predominate In Determining Whether Nationwide
       Violated Any Fiduciary Duty With Respect To The Payments for Services ....... 39

         1.    The Facts Relevant To Plaintiffs' Claim Of A Breach Of Fiduciary
            Duty Vary And So Create Individual Issues............................................. 40

         2.    Market Data And Expert Testimony Will Not Eliminate Individual
            Issues........................................................................................................ 41

3.    Alleging That ERISA Requires Per Participant Charges Does Not Eliminate Individual Issues ......................................................... 43

4.    Alleging that Costs Were Passed On To The Plans Does Not Eliminate Individual Issues .................................................................. 44

II.    **THE PROPOSED CLASS DOES NOT MEET THE SUPERIORITY REQUIREMENTS OF RULE 23(B)(3)** ................................................. **45**

III.    **THE PROPOSED CLASS DOES NOT MEET THE OTHER REQUIREMENTS OF RULE 23(B)(2)** ..................................................... **48**

A.    The "Equitable Monetary Relief" Sought By Plaintiffs Is Not Injunctive Relief .................................................................................................. 48

B.    Plaintiffs' Claims Are Not Certifiable Under Rule 23(b)(2) Because They Are Seeking Enormous Money Damages ............................................ 50

IV.    **PLAINTIFFS HAVE NOT PROVED THEY ARE ADEQUATE REPRESENTATIVES** .............................................................................. **53**

A.    The Presence Of Counterclaims Renders Plaintiffs Inadequate ........................... 53

B.    Plaintiffs Are Inadequate Because They Have Essentially No Knowledge About Their Own Plans, the Plans' Investments, This Lawsuit, Or The Actions Of Their Counsel ...................................................................... 54

C.    Plaintiffs Are Inadequate Because They Have Abandoned Claims Valuable to Some Class Members In Order To Increase The Chances For Certification Of Their Own Claims ........................................................ 56

# TABLE OF AUTHORITIES

## FEDERAL CASES

Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40 (3d Cir. 1993)................................................18

Abrams v. Interco, Inc., 719 F.2d 23 (2d Cir. 1983) ....................................................46

Adams v. Kansas City Life Ins. Co., 192 F.R.D. 274 (W.D. Mo. 2000).........................................37

Amchem Prods. v. Windsor, 521 U.S. 591 (1997) ........................................................43

Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp., 222 F.3d 52 (2d Cir. 2000)..........................54

Barreras Ruiz v. American Tobacco Co., 180 F.R.D. 194 (D. P.R. 1998)...................................34

Benner v. Becton Dickinson & Co., 214 F.R.D. 157 (S.D.N.Y. 2003) .........................................24

Bruner v. Boatmen's Trust Co., 918 F. Supp. 1347 (E.D. Mo. 1996)..........................................21

Caridad v. Metro-North Commuter R.R., 191 F.3d 283 (2d Cir. 1999)...................................23

Carpenters of Ariz. Pension Trust v. Citibank, 125 F.3d 715 (9th Cir. 1997)..............................20

Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir. 1996) ...........................................45, 47

Cohn v. Mass. Mut. Life Ins. Co., 189 F.R.D. 209 (D. Conn. 1999) .................................45, 47, 48

Coleman v. Nationwide Life Ins. Co., 969 F.2d 54 (4th Cir. 1992 (court must look to all aspects of the parties' relationship to assess fiduciary status)...................................29, 32

Cont'l Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y., Inc., 198 F.R.D. 41 (E.D.N.Y. 2000)..........................................................................26

Darvin v. Int'l Harvester Co., 610 F. Supp. 255 (S.D.N.Y. 1985)..................................................54

De Pace v. Matsushita Elec. Corp. of America, 257 F. Supp. 2d 543 (E.D.N.Y. 2003) ...............49

Dobson v. Hartford Fin. Servs., 196 F. Supp. 2d 152 (D. Conn. 2002) .......................................26

Donovan v. Bierwirth, 680 F.2d 263 (2d Cir. 1982)..................................................................21

Donovan v. Cunningham, 716 F.2d 1455 (5th Cir. 1983) .............................................................21

Dunnigan v. Metro. Life Ins. Co., 214 F.R.D. 125 (S.D.N.Y. 2003) .................................25, 30, 46

F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250 (2d Cir. 1987)...........................19

Feinstein v. Firestone Tire & Rubber Co., 535 F. Supp. 595 (S.D.N.Y. 1982).............................57

Felber v. Estate of Regan, 117 F.3d 1084 (8th Cir. 1997)........................................23, 44

Flacche v. Sun Life Assurance Co., 958 F.2d 730 (6th Cir. 1992)..............................20

Flanigan v. Gen. Elec Co., 242 F.3d 78 (2d Cir. 2001)............................................21

Flinchbaugh v. Chicago Pneumatic Tool Co., 531 F. Supp. 110 (W.D. Pa. 1982) ........22

Frank Russell Co. v. Wellington Mgmt. Co., 154 F.3d 97 (3d Cir. 1998) ....................20

Gen. Tele. Co. v. Falcon, 457 U.S. 147 (1982) ........................................................30

Gerosa v. Savasta & Co., Inc., 329 F.3d 317 (2d Cir. 2003) ......................................48

Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Securities, Inc., 93 F.3d 1171 (3d Cir. 1996) ........................................................................29

Great-West Life, 534 U.S. at 210 ....................................................................48, 49, 50

Health Care Service Corp. v. TAP Pharmaceutical Products. Inc., 274 F. Supp.2d 807 (E.D. Tex. 2003) ............................................................................................29

Horvath v. Keystone Health Plan East, Inc., 333 F.3d 450 (3d Cir. 2003)..................49

Hudson v. Delta Air Lines, Inc., 90 F.3d 451 (11th Cir. 1996) ..................................37

In re American Med. Sys., 75 F.3d 1069 (6th Cir. 1996) ..........................................27

In re Indus. Diamonds Antitrust Litig., 167 F.R.D. 374 (S.D.N.Y. 1996) ..................26

In re LILCO Secs. Litig., 111 F.R.D. 663 (E.D.N.Y. 1986).......................................53

In re Managed Care Litig., 209 F.R.D. 678 (S.D. Fla. 2002) ....................................28

In re Methyl Tertiary Butyl Ether ("MBTE") Prod. Liab. Litig., 209 F.R.D. 323 (S.D.N.Y. 2002)................................................................................24, 30, 57, 58

In re Monumental Life Ins. Co., 343 F.3d 331 (5th Cir. 2003) ..........................51, 52, 53

In re VISA Check/ MasterMoney Antitrust Litig., 280 F.3d 124 (2d Cir. 2001)..............25, 41, 42

Johnson v. Georgia Pacific Corp., 19 F.3d 1184 (7th Cir. 1994) ..............................19

Karen L. v. Physicians Health Servs., Inc., 202 F.R.D. 94 (D. Conn. 2001)................23

Kase v. Salomon Smith Barney, Inc., 218 F.R.D. 149, 2003 WL 22300013 (S.D. Tex. Aug. 22, 2003) ............................................................................................41

Katsaros v. Cody, 744 F.2d 270 (2d Cir. 1984)........................................................21

Kishter v. Principal Life Ins. Co., 186 F. Supp. 2d 438 (S.D.N.Y. 2003) ........................................50

Kline v. Wolf, 702 F.2d 400 (2d Cir. 1983) ............................................................53

Koenig v. Benson, 117 F.R.D. 330 (E.D.N.Y. 1987) ..................................................53, 54

Moore v. PaineWebber, Inc., 306 F.3d 1247 (2d Cir. 2003) ..........................................23, 26

N.Y. State Teamsters Council v. Centrus Pharmacy Solutions, 235 F. Supp. 2d 123
(N.D.N.Y. 2002) ..........................................................................................................20

Newton v. Merrill Lynch, Pierce, Fenner & Smith. Inc., 259 F.3d 154 (3d Cir. 2001) .........34, 41

O'Sullivan v. Countrywide Home Loans. Inc., 319 F.3d 732 (5th Cir. 2003)............................40

Panzirer v. Wolf, 663 F.2d 365 (2d Cir. 1981) ..........................................................54

Parker v. Time Warner Entm't. Co., 331 F.3d 13 (2d Cir. 2003) ....................................24

Pearl v. Allied Corp., 102 F.R.D. 921 (E.D. Pa. 1984)..................................................57

Pecere v. Empire Blue Cross & Blue Shield, 194 F.R.D. 66 (E.D.N.Y. 2000)......................23, 53

Pegram v. Herdrich, 530 U.S. 211 (2000) ..............................................................19, 21

Phillips v. Klassen, 502 F.2d 362 (D.C. Cir. 1974) ....................................................43, 44

Pickett v. IBP, Inc., 182 F.R.D. 647 (M.D. Ala. 1998) ................................................41

Plumb v. Fluid Pump Service, Inc., 124 F.3d 849 (7th Cir. 1997) ....................................29

Reese v. Arrow Financial Servs., LLC, 202 F.R.D. 83 (D. Conn. 2001) ..............................23

Rhodes v. Cracker Barrel Old Country Store, Inc., 213 F.R.D. 619 (N.D. Ga. 2003) ..............25

Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147 (2d Cir. 2001)..................50, 51, 52

Rossini v. Ogilvy & Mather, Inc., 798 F.2d 590 (2d Cir. 1986)....................................23

Savino v. Computer Credit, Inc., 173 F.R.D. 346 (E.D.N.Y. 1997)....................................55

Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co., 869 F. Supp. 278
(D.N.J. 1994)................................................................................................................29

Seaway Food Town Inc. v. Med. Mut. of Ohio, 347 F.3d 610 (6th Cir. 2003)............................20

Sirota v. Solitron Devices, Inc., 673 F.2d 566 (2d Cir. 1982) ........................................24

Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32 (1st Cir. 2003)............................25

Sprague v. General Motors Corp., 133 F.3d 388 (6th Cir. 1998) ...........................27

Stewart v. Winter, 669 F.2d 328 (5th Cir. 1982) ........................................27

Strom v. Goldman, Sachs & Co., 202 F.3d 138 (2d Cir. 1999).....................50

Thompson v. American Tobacco Co., Inc., 89 F.R.D. 544 (D. Minn. 1999) ...............57

Vartanian v. Monsanto Co., 131 F.3d 264 (1st Cir. 1997) ..........................18

Walker v. Asea Brown Boveri, Inc., 214 F.R.D. 58 (D. Conn. 2003).........................27

Western Sale Wholesale, Inc. v. Synthetic Indus. Inc., 206 F.R.D. 271 (C.D. Cal. 2002)............57

Windham v. American Brands, Inc., 565 F.2d 59 (4th Cir. 1977) ...............................41

Wsol v. Fund Asset Mgmt., 266 F.3d 654 (7th Cir. 2001)....................................22, 44

## DOCKETED CASES

Allshouse v. Firestone Tire & Rubber Co., No. 742-649 (Cal. Super. Ct. Aug. 28, 1981)...........57

Auto Ventures, Inc. v. Moran, No. 92-426-CIV-KEHOE, 1997 WL 306895 (S.D. Fla. Apr. 3, 1997)........................................................43

Bona v. Barasch, No. 01 Civ. 2289 (MBM), 2003 WL 1395932 (S.D.N.Y. March 20, 2003) ...........................................................18, 50, 51

Cokely v. N.Y. Convention Ctr. Operating Corp., No. 00 Civ. 4637 (CBM), 2003 WL 1751738 (S.D.N.Y. Apr. 2, 2003)...........................................24

Daniels v. Amerco, No. 81 Civ. 3801 (RLC), 1983 WL 1794 (W.D.N.Y. Mar. 10, 1983) ..........45

Grandon v. Merrill Lynch & Co., Inc., No. 95 Civ. 10742 (SWK), 2003 WL 22118979 (S.D.N.Y. Sept. 11, 2003)...........................................24, 45

In re WorldCom, Inc. Secs. Litig., No. 02 Civ. 3288 (DLC), 2003 WL 22420467 (S.D.N.Y. Oct. 24, 2003) ...........................................42

Lewis Tree Service, Inc. v. Lucent Technologies, Inc., No. 99 Civ. 8556, 2002 WL 31619022 (S.D.N.Y. Nov. 20, 2002)...........................................27

Miner v. Empire Blue Cross/Blue Shield, No. 97 Civ. 6490 (LAP) 2001 WL 96524 (S.D.N.Y. Feb. 5, 2001)...........................................27

Ossey v. Marolda, No. 96 ...........................................44

Valley Drug Co. v. Geneva Pharms., Inc., No. 02-10171, --- 3d -- 2003 WL 22682603 (11th Cir. Nov. 14, 2003)...........................................44

## STATUTES

29 C.F.R. 2510.3-101(a)(2)...............................................................................................32

29 C.F.R. 2550.408b-2(e) ...............................................................................................22


29 C.F.R. § 2509.75-8.....................................................................................................20

ERISA § 401(b)(1), 29 U.S.C. 1101(b)(1)......................................................................32

Fed. R. Civ. P. 23(a)(3)...................................................................................................41

Fed. R. Civ. P. 23(c)(1)(A) .............................................................................................24

Fed. R. Civ. P. 23(c)(1)(C) .............................................................................................23

## DOCKETED CASES

*In re Ski Train Fire,*2003 WL 22319577 (S.D.N.Y. Oct. 9, 2003)...................................51

1998 WL 67624 (N.D. Ill. Jan. 29, 1998)........................................................................44

*In re Enron,* 2003 WL 22245394.....................................................................................50

*Lewis Tree Service,* 2002 WL 31619022 .........................................................................27

*Street v. Diamond Offshore Drilling,* No. Civ. A. 00-1317, 2001 WL 568111 (E.D. La.
May 25, 2001).........................................................................................................46, 47, 48

## MISCELLANEOUS

Melissa A. Waters, Common Law Courts in an Age of Equity Procedure, 80 N.C. L.
Rev. 527, 598-99 (2002) .................................................................................................47

SH082 ALI-ABA 201, 251 (2002) ..................................................................................21

## **INTRODUCTION**

Plaintiffs in this case purport to represent a class of retirement plans that purchased different variable annuity contracts from Defendant Nationwide Life Insurance Company ("Nationwide Life"). Those retirement plans or their participants invested money in different accounts in connection with those contracts, and some of those accounts invested in turn in different mutual funds.

Plaintiffs claim that Defendants simultaneously became ERISA fiduciaries and breached their fiduciary duties when Defendants allegedly received payments from these different mutual funds or their separate affiliates under a variety of service contracts. Plaintiffs have conceded that these service payments allegedly received by Defendants were made with the money of the mutual funds or their affiliates, not with the retirement plans' money. Nevertheless, Plaintiffs' theory assumes that there was some *relationship* between these service payments and the retirement plans' investments that caused the service payments to become "plan assets" over which Defendants exercised some "authority or control" in violation of ERISA. This relationship existed, according to Plaintiffs, either because the service payments from the mutual funds were the "fruits of plan assets" that originated with the retirement plans' investments, or because the service payments directly reduced the value of the retirement plans' investments through higher mutual fund charges.

Defendants have moved for summary judgment on the narrow legal ground that they cannot have received any "plan assets" as a matter of law because the service payments were made only with money belonging to the mutual funds or their affiliates. That summary judgment motion eliminates any need to consider class certification in this case. However, even if

1

Plaintiffs' ERISA claim had legal merit, class certification should not be granted because

Plaintiffs have not met their burden under Rule 23 of the Federal Rules of Civil Procedure:

*First,* there is no generalized proof of any direct or uniform relationship between the

service payments and the retirement plans' investments that created and violated an ERISA

fiduciary duty to each proposed class member.  To the contrary, the evidence shows that there

would be countless variations in any relationships that may exist.  As described in the "relevant

facts" below, there are numerous material differences among the retirement plans' various

investments, the service payments that Defendants allegedly received, and the intermediary

mutual fund entities and transactions that separated those investments from the service payments.

For example, the evidence shows that some mutual funds never made any service payments, the

cost of service payments made by separate affiliates may never have been passed back to the

funds, and all the service payments were made with commingled money from other non-class

investors.

Any resolution of Plaintiffs' ERISA claim would require an individualized, plan-by-plan

review of each of these variations to determine whether, as Plaintiffs have alleged, any of the

service payments originated from (or were the "fruit" of) any "plan assets;" whether any service

payments led to a "diminishment in value" of any retirement plan's investments through

different mutual fund charges; and whether any retirement plan authorized the Defendants'

alleged "exercise of authority or control" over the service payments.

Moreover, even if Plaintiffs could show that some special relationship created an ERISA

fiduciary duty, there would be numerous individualized issues with respect to any alleged

breach.  Those individualized issues include (among many others) whether the alleged service

payments received were "reasonable," and whether the value of any plan assets was diminished

2

in any way even though most of the mutual fund charges actually *declined* after the service payments began. *See infra* at 34-36, 38-43.

*Second,* Plaintiffs have not met their burden of showing that a class action is a superior method of resolving this controversy, or that there is some manageable plan for trial. *See* Rule 23(b)(3). Plaintiffs have simply argued that their generalized allegations permits the Court to shortcut these individualized issues, and that they are entitled to try their "theory of the case." But regardless of whether plaintiffs have some overarching theory or some generalized allegations, class certification must be denied because their case will ultimately devolve into a vast series of individualized judgments required by the Court. *See infra* at 44-47.

*Third,* Plaintiffs cannot circumvent the Rule 23(b)(3) predominance requirements by insisting that their claim should be certified under Rule 23(b)(2). The United States Supreme Court has already rejected Plaintiffs' theory that ERISA claims for equitable relief are appropriate to Rule 23(b)(2) certification. Moreover, Plaintiffs' claim for billions of dollars in damages is clearly not "incidental," and fails even the most lenient *ad hoc* standard for certification under Rule 23(b)(2). *See infra* at 47-52.

*Fourth,* Plaintiffs have not proved that they are adequate class representatives who meet the requirements under Rule 23(a)(4). They have virtually no understanding of the factual and legal allegations of their complaints, and any understanding they did have is now inconsistent with their current theory. Plaintiffs have also significantly weakened their current claim by re-writing the "facts" of the case shortly before filing their current class motion, and essentially recanting their earlier sworn testimony. Finally, Plaintiffs have abandoned or altered their claims in this case for class certification purposes in a way that may significantly conflict with the interests of other class members. *See infra* at 52-57.

## FACTUAL AND LEGAL BACKGROUND

Plaintiffs' current allegations are not only inconsistent with their latest amended complaint, but also are the most recent version in a long line of different stories and legal theories. Those allegations are summarized below at pages 6-7.[1/] Plaintiffs' motion also presents an abridged set of facts. All the facts necessary and relevant to this class certification are set forth below at pages 7-17 and in more detail in the accompanying declarations of Gary Berndt, William Goslee, Eric Henderson, and Steven Rose. Finally, Plaintiffs have provided an incomplete account of the ERISA standards that their claims must meet. A more complete account is set forth below at pages 18-22.

## I.    THE SHIFTING ALLEGATIONS IN PLAINTIFFS' COMPLAINTS

### A.    The Allegations In Plaintiffs' Third Amended Complaint

The Plaintiffs purport to be trustees of the five retirement plans named in the Third Amended Complaint (Docket 95) ("Third Am. Compl."). Those plans and their participants (hereinafter "Plans") allegedly purchased variable annuity contracts from Nationwide Life between 1991 and 1998 to serve as "investment platforms" through which they could invest in separate mutual funds. *See* Third Am. Compl. ¶¶ 13-17.

Plaintiffs claim in their current complaint that Defendants violated ERISA by receiving payments from the mutual funds that were not provided for in Plaintiffs' variable annuity contracts. Defendants allegedly received these payments from the mutual funds or entities related to those mutual funds pursuant to separate service contracts between Defendants and the

---

[1/]    Defendants have pending before the Court a Motion for Summary Judgment (Docket 116) and an Objection to the Magistrate Judge's Order Denying Discovery into New Issues Raised by Plaintiffs' New Motion for Class Certification ("Defs.' Objection") (Docket 170). As set forth *infra*, Defendants believe both of those motions should be considered before class certification is evaluated.

4

funds. Nevertheless, Plaintiffs allege that these payments were made with "plan assets" that were "skimmed" by the mutual funds from the Plans' investments in those funds. Third Am. Compl. ¶22 ("Thus, the skimmed plan assets were deducted by the mutual funds directly from the amounts invested in them by the Plans and their participants and transferred by the mutual funds to Nationwide.").

According to Plaintiffs' complaint, Defendants simultaneously assumed and breached fiduciary duties under ERISA when they "exercised authority or control" over these "skimmed plan assets." *Id.* ¶ 42. This conduct was allegedly part of an overall "scheme," in which Defendants were said to have entered into "sham" service contracts with the mutual funds to receive the "skimmed plan assets." *Id.* ¶ 28. Plaintiffs concede that Defendants lowered their charges to the Plans under the variable annuity contracts when Defendants began receiving fees for the services they provided to the mutual funds or related entities, but insist that Defendants did so only to meet competition in the market. *Id.* ¶¶ 25, 28. According to Plaintiffs, if Defendants had not received these "skimmed plan assets" from the mutual funds, "simple economics" dictate that the mutual funds would have reduced the amounts "charged the Plans." *Id.* ¶ 23; First Amended Memorandum in Support of Plaintiffs' First Amended Motion for Class Certification (Docket 129) ("Pls.' Mem.") at 38.

Plaintiffs purport to represent in their complaint a class of similarly situated retirement plans. The complaint defines the proposed class as:

> All employee pension benefit plans covered by ERISA which had variable annuity contracts with Nationwide or whose participants had individual variable annuity contracts with Nationwide at any time from January 1, 1996, or the first date Nationwide began receiving payments from mutual funds based on a percentage of the assets invested in the funds by Nationwide, whichever came first, to the date of judgment.

Third Am. Compl. ¶34.

5

### B.    The New Allegations Made After The Close Of Discovery

Plaintiffs have substantially revised the facts alleged in their complaint for purposes of their latest class certification motion.  Their new story was only revealed when they served their "first amended supplemental interrogatory answers" after class certification discovery was closed, a few weeks before their class motion was filed.  Those new interrogatory answers recanted Plaintiffs' earlier sworn statements, and continued Plaintiffs' pattern in this case of changing their story to avoid dismissal of their case as a matter of law. [2/]

Plaintiffs' earlier sworn statements averred that plan assets were "skimmed" by the mutual funds, and had traveled from the Plans through the mutual funds to Defendants in a complicated eight-step process.  *See* Plaintiffs' Supplemental Response and Objections to Defendants' Third set of Interrogatories (Ex. 2).  But Plaintiffs recanted those sworn statements after Defendants moved for summary judgment on the ground that, as a legal matter, Plaintiffs could not possibly prove that the mutual funds held "plan assets" -- much less that such "plan assets" were eventually used to make service payments.[3/]

Plaintiffs' new story is that, contrary to the allegations of their current complaint, the Plans' money was *not* in fact transferred by the mutual funds to Defendants.  Indeed, Plaintiffs now concede that they will offer no evidence that might connect the money they invested in

---

[2/]     *See* Plaintiffs' First Amended Supplemental Responses and Objections to Defendants' Third Set of Interrogatories (Ex. 1).

[3/]     Plaintiffs have also dropped their original allegations in this case (claiming that ERISA was violated based on "kickbacks," "self-dealing," misrepresentations, and breach of contract) after arguing that those allegations should defeat Defendants' Motion to Dismiss.

variable annuity contracts to the service contract payments that Defendants allegedly received from various mutual funds and/or mutual fund advisors.[4/]

Instead, Plaintiffs allege for the first time that Defendants "exercised authority or control" over ERISA "plan assets" in two new ways.  *First,* Plaintiffs allege that Defendants managed and disposed of the "accumulation units" that the Plans received when they invested in their variable annuity contracts.  According to Plaintiffs' new sworn statements, those accumulation units decreased "in value on a one-to-one basis" when Defendants received payments "from the mutual funds and/or mutual fund advisors" that were "equal to a percentage of the daily accrued value of a Plan's [accumulation units]."[5/]  *Second,* Plaintiffs allege that Defendants received payments "from the mutual funds and/or mutual fund advisors" that were the "fruits of [Plaintiffs'] plan assets" because they constitute "a percentage of the daily accrued value of a Plan's Units . . . and Nationwide did not have the right . . . to retain such fruits."[6/]  Plaintiffs allege that these claims mean that Defendants breached their fiduciary duty when they received the service contract payments.[7/]

## II.    THE FACTS RELEVANT TO CLASS CERTIFICATION

### A.    The Different Variable Annuity Contracts And Variable Accounts

The proposed class includes thousands of different retirement plans that purchased different variable annuity contracts at different times.  Some of the retirement plans (including the Flyte Tool Plan, the Crown Tool Plan, and the Hartford Roofing Plan) purchased group

---

[4/]    *See* Ex. 1 at 3-4; *see also* Pls.' Mem. at 19.

[5/]    *Id.*

[6/]    *Id.* at 3; *see also* Pls.' Mem. at 13.

[7/]    Ex. 1 at 3-4.

annuity contracts that were utilized jointly by all the participants in the plan.[8] Other retirement plans (including the Anderson Plan) purchased individual annuity contracts that were each utilized by an individual plan participant.[9] Other retirement plans (including the Easter Seal Plan) purchased both over time.

The variable annuity contracts permitted the retirement plans to invest money in variable accounts that are separate legal trusts.[10] Not all the retirement plans invested in the same variable accounts during the proposed class period. The group variable annuity contracts permitted investments in a variable account called the "Nationwide Qualified Plans Variable Account," a unit investment trust formed under Ohio state law.[11] This variable account in turn purchased and sold shares of certain participating "retail" mutual funds.

By contrast, the individual annuity contracts permitted investment in different variable accounts, including the "Nationwide Variable Account-II," which was a unit investment trust formed pursuant to the Investment Company Act of 1940.[12] Those variable accounts in turn

---

[8]      *See* Flyte Tool & Die Company, Inc. Variable Annuity Contract ("Flyte Tool Contract") (Ex. 3(A)); Crown Tool & Die Co., Inc. Salary Deferral Profit Sharing Plan Trust Variable Annuity Contract ("Crown Tool Contract") (Ex. 3(B)); The Hartford Roofing Company Profit Sharing Plan Variable Annuity Contract ("Hartford Roofing Contract") (Ex. 3(C)).

[9]      *See* Anderson & Ferdon Deferred Compensation Plan Variable Annuity Contract ("Anderson Contract") (Ex. 4(1)); The Greater Hartford Easter Seal Rehabilitation Center Tax Sheltered Annuity Plan Contract ("Easter Seal Contract") (Ex. 4(3)).

[10]     *See, e.g.,* Flyte Tool Contract (Ex. 3(A)) at N 028; Easter Seal Contract (Ex. 4(3)) at N 325 ("The Owner elects to have the purchase payments allocated among the Fixed Account and the Sub-Accounts at the time of application.").

[11]     *See* Minutes of the June 6, 1984 meeting of the Board of Directors of Nationwide Life Insurance Company (Ex. 5).

[12]     *See* The Best of America IV Individual Deferred Variable Annuity Contracts Prospectus (May 1, 1991) (included with Anderson Contract) (Ex. 4(1)) at N 109.

purchased and sold shares of certain participating "insurance" mutual funds that were available only to variable annuity issuers.[13] The variable accounts established for the individual annuity contracts received money not only from the retirement plans, but also from other investors who are not members of the proposed class.

Different retirement plans invested different amounts of money at different times in the variable accounts.[14] Some invested in "fixed" annuity contracts or a "fixed account" that paid a guaranteed rate of interest and did not invest in mutual funds.[15] These differences in the amounts invested, and how they were invested, were compounded over time because some retirement plans (or the different participants within each plan)[16] moved the money they invested back and forth from the variable accounts.[17]

**B.      The Different Sub-Accounts In The Variable Accounts**

When the retirement plans invested in one of the different variable accounts, they allocated their money to one or more of the sub-accounts within that variable account. Each of the sub-accounts in turn purchased or sold shares of a designated mutual fund on a daily basis to reflect the net allocations in that sub account. Those net allocations included, with respect to

---

[13]      *See* Declaration of Eric Henderson ("Henderson Decl.") ¶¶ 8-9; Anderson Contract (Ex. 4(1)) at N 070; Easter Seal Contract (Ex. 4(3)) at N 227.

[14]      *See* Third Am. Compl. ¶¶ 13-17 (alleging that various Plans and participants "and the plan sponsor funded" variable accounts).

[15]      *See* Henderson Decl. ¶¶ 16-17.

[16]      For some, if not the majority of the retirement plans, investment decisions were made by plan participants rather than the plans themselves. This brief refers to the retirement plans only for the sake of convenience, but notes that individual choices by plan participants increase the variations among members of the proposed class by another degree of magnitude.

[17]      *See* Henderson Decl. ¶ 15; Declaration of Steven J. Rose ("Rose Decl.") ¶ 12.

some variable accounts, allocations by both the retirement plans and by other investors who are not members of the proposed class.[18] For example, as of November 30, 2003, approximately 84% of the money invested in the Nationwide Variable Account-II was contributed (and allocated to different sub-accounts) by investors who are not members of the proposed class.[19]

The sub-accounts available to the retirement plans differed over time depending on a number of different factors, including which "retail" or insurance" mutual funds participated with respect to that type of group or individual contract (different mutual funds participated with respect to different types of group or individual annuity contracts); which mutual funds participated with respect to a type of annuity contract in a particular year (the participating mutual funds changed over time); and which mutual funds the retirement plans selected[20] to be available through the sub-accounts for their particular variable annuity contracts (those selections could and did change over time).[21]

---

[18]    *See* Declaration of Gary Berndt ("Berndt Decl.") ¶ 7; Henderson Decl. ¶ 7; *see also* Flyte Tool Contract (Ex. 3(A)) at N 030; Anderson Contract (Ex. 4(1)) at N 081-82.

[19]    *See* Berndt Decl. ¶ 7.

[20]    *See* Confidential Appendix in Support of Plaintiffs' First Amended Motion for Class Certification (Docket 130) ("Pls.' Conf. App. Ex. K") Ex. Q (The Best of America Retirement Manager Variable Contract Profile) at N 010739 ("The Contractholder may select any of the funds offered to include in the Variable Contract, subject to any limitations imposed by a companion funding vehicle. Participants may then choose from among the selected funds.").

[21]    *See* Flyte Tool Contract (Ex. 3(A)) at N 021 (listing 18 mutual funds for selection); Crown Tool Contract (Ex. 3(B)) at N 001 (listing 18 mutual funds for selection); Hartford Roofing Contract (Ex. 3(C)) at N 045 (listing 37 mutual funds for selection and manually adding two additional funds); Anderson Contract (1991) (Ex. 4(1)) at N 073 (listing 21 mutual funds for selection); Anderson Contract (1998) (Ex. 4(2)) at N 145-46 (listing 38 mutual funds for selection); Easter Seal Contract (1994) (Ex. 4(3)) at N 230 (listing 8 mutual funds for selection); Easter Seal Contract (1998) (Ex. 4(4)) at N 316-17 (listing 42 mutual funds for selection).

As a result of these differences, the retirement plans allocated their money within their variable accounts in different ways. Those differences continued over time because the retirement plans could re-allocate their money within some or all of the sub-accounts available,[22] and even withdraw money from the variable accounts, without incremental costs.[23] Determining which retirement plans invested their money in which variable accounts, and how that money was allocated over time, would require an individual review of records relating to each variable annuity contract.[24]

## C.    The "Accumulation Units" That The Retirement Plans Received

The retirement plans did not own any of the mutual fund shares purchased by any of the sub-accounts.[25] Those shares were owned by the variable accounts.[26] The retirement plans received "accumulation units" from the variable accounts which reflected the amount of money that they invested in the variable accounts.[27] The accumulation units received by a particular retirement plan fluctuated in value depending on which sub-account(s) they allocated their money to within the variable account. Each sub-account fluctuated in value depending on the value of the mutual fund shares purchased and sold by that sub-account. The value of the

---

[22]    *See* Berndt Decl. ¶ 10; Henderson Decl. ¶ 15; Rose Decl. ¶ 12; *see also, e.g.,* Flyte Tool Contract (Ex. 3(A)) at N 032 ("The Contract holder may make an unlimited number of exchanges from a Fund to a Companion Contract or to another Fund.").

[23]    *See* Henderson Decl. ¶ 18; Rose Decl. ¶ 14.

[24]    *See* Berndt Decl. ¶ 11.

[25]    *See id.* ¶ 28.

[26]    *See id.; see also* Statement of Additional Information, Deferred Variable Annuity Contracts Issued by Nationwide Life Insurance Company Through Its Nationwide Variable Account-II (May 1, 1999) (Ex. 6) at N 014083.

[27]    *See* Berndt Decl. ¶ 28; Henderson Decl. ¶ 14; Rose Decl. ¶ 11.

underlying mutual fund shares varied in turn depending on the value of the securities and other investments held by that particular fund.

The mutual funds' documents confirm that the variable account owns the mutual fund shares.[28] These documents also confirm that when the mutual funds receive money from a variable account, that money is combined with the money of all the other investors in that variable account, including investors who are not proposed class members (or who are not even investors who utilized Nationwide Life variable annuity contracts). The mutual funds do not distinguish between money invested by a proposed class member from any other investor's money.[29]

### D.     The Different Charges In The Variable Annuity Contracts

Nationwide Life performed certain ministerial services for the owners of the variable annuity contracts. The type or level of services performed was different for different retirement plans.[30] Defendants normally did not perform discretionary services, such as giving investment

---

[28]     *See, e.g.*, Prospectus of Oppenheimer Aggressive Growth Fund/VA (May 1, 2001) (Ex. 8) at N 004362 ("Shares of the Fund are sold only as the underlying investment for variable life insurance policies, variable annuity contracts and other insurance company separate accounts.").

[29]     *See* Prospectus of Fidelity Variable Insurance Products Service Class (April 30, 2001) (Ex. 7) at N 003958 ("Each fund is a mutual fund, an investment that pools shareholders' money and invests it toward a specific goal."); *see also* Prospectus of Oppenheimer Aggressive Growth Fund/VA (May 1, 2001) (Ex. 8) at N 004370.

[30]     *See* Henderson Decl. ¶ 20; Rose Decl. ¶ 17; *see also* Study of 401(k) Plan Fees and Expenses ("Plaintiffs' Study"), tab 1 to Plaintffs' Appendix of Exhibits in Support of Plaintiffs' First Amended Motion for Class Certification at ¶¶ 2.7 ("Plan sponsors have adopted a variety of arrangements to provide 401(k) plan services to their employees.  The service delivery mechanisms they select may potentially affect the level of plan expenses; the extent to which they are charged to the plan, and the degree to which they are disclosed to sponsors and participants."); *id.* at ¶¶3.3-3.4 (listing various fees and expenses that vary according to choices made by different 401(k) plans).

advice, allocating money, or "managing or disposing of" any assets contributed to the contracts, without the agreement and the direction of the retirement plans.[31/]

Different variable annuity contracts contained different charges that changed over time and were fully disclosed.[32/] The group contracts assessed charges that were subject to negotiation and were often different for each plan as a result.[33/] Beginning in 1996, certain group variable annuity contracts provided for three different levels of charges depending on which sub-accounts money was allocated to within the variable account.[34/] None of the contracts put any limits on whether Nationwide could enter into contracts with other parties to perform services and receive compensation for doing so.

### E.    The Mutual Fund Entities' Different Service Payments To Nationwide Entities

Mutual funds have no employees. As a result, their sponsors utilize a variety of advisors, managers, distributors and administrators to provide a variety of different services or other resources, depending on the fund.[35/] To pay for these services, the different mutual funds

---

[31/]    *See* Berndt Decl. ¶¶ 4, 12, 18, 21, 25.

[32/]    *See* Henderson Decl. ¶¶ 19-21; Rose Decl. ¶ 15; *see also, e.g.,* Flyte Tool Contract (Ex. 3(A)) at N 037-38; Anderson Contract (Ex. 4(1)) at N 076.

[33/]    *See* Rose Decl. ¶¶ 15, 16.

[34/]    *See id.* ¶ 15.

[35/]    *See* Declaration of William Goslee ("Goslee Decl.") ¶ 14; Prospectus of Fidelity Variable Insurance Products Fund (April 30, 2001) (Ex. 7) at N 003959-61; Prospectus of Dreyfus Stock Index Fund (May 1, 2001) (Ex. 9) at N 004387; Prospectus of Janus Aspen Series (May 1, 2001) (Ex. 11) at N 004393 (describing investment advisor management with Janus Capital).

assessed different charges to shareholders over time. Those charges, which were fully disclosed, were deducted from each fund in a percentage set for all investors in that fund.[36]

Some of the mutual fund service providers are affiliated with the mutual funds; some are not. The agreements that mutual funds reach with these service providers vary based on the services required.[37] Some of the service providers enter into sub-contracts with various third parties to help them provide services to the mutual funds.[38] In this case, some (but not all) of the affiliated service providers entered into contracts with Defendants or other Nationwide entities to provide various services.[39]

The agreements between the Nationwide entities and the affiliated service providers were negotiated at arm's length, and entered into at different times over several years.[40] Moreover, the services provided by the Nationwide entities under these service contracts evolved and differed over time.[41] Many of the services that the Nationwide entities provided were services that the affiliated providers typically would otherwise provide to individual mutual fund shareholders. Typically, these services were different from any services that Nationwide Life agreed to provide in the variable annuity contacts.[42]

---

[36]    *See* Rose Decl. ¶ 19.

[37]    *See* Goslee Decl. ¶ 14.

[38]    *See id.* ¶ 15.

[39]    *See, e.g.*, Oct. 14, 1999 Service Agreement Between Nationwide Financial Services, Inc. and Janus Service Corporation (Ex. 21) at N 013417.

[40]    *See* Goslee Decl. ¶¶ 17-19; *see also* Transcript of February 25, 2003 Deposition of William S. Goslee (Pls.' Conf. App. Ex. K) ("Goslee Deposition") at 132:23-133:3.

[41]    *See* Goslee Decl. ¶ 19.

[42]    *See id.* ¶ 20.

The services that the Nationwide entities provided allowed some of the affiliated service providers to realize cost savings.[43] The affiliated service providers recognized that the services provided to them were of value, and therefore some of them agreed to pay different amounts to different Nationwide entities.[44] The amount and nature of these service payments varied widely depending on the affiliated service provider; and sometimes varied for the *same* affiliated service provider over the course of the service agreement.[45] Some of the service payments were calculated on a per-participant basis, but most were calculated on a quarterly basis using as a measure the amount of money that the variable accounts had invested in the particular mutual

---

[43]    *See* October 14, 1999 Service Agreement between Janus Service Corporation and Nationwide Financial Services, Inc. (Ex. 21) at N 013417 ("Janus recognizes substantial savings of administrative expenses as a result of [Nationwide] performing certain administrative services such as significant reductions in the postage expense and participant communications and recordkeeping, by virtue of maintaining an unallocated account for the Plans rather than multiple accounts for individual Plan participants . . . on behalf of the Funds.").

[44]    *See id.* at N 013417, N 013423; *see also* Transcript of March 10, 2003 Deposition of John J. Scranton at 43:11-17 (Pls.' Conf. App. Ex. K) ("Q: ... [Has] a mutual fund company ever complained that Nationwide didn't earn the reimbursements?" "A. No." "Q. has a mutual fund company ever said Nationwide wasn't performing the services it contracted to?" "A. No."). Generally, the agreements could be terminated at any time by either party.

[45]    *See* Goslee Deposition (Pls.' Conf. App. Ex. K) at 130:15-134:1 (recognizing that different charges occur because "it's a different fund, different structure for that fund, and it's a different product at Nationwide"); *see* April 30, 1997 Subadministration Agreement between Dreyfus Service Corporation and Nationwide Financial Services, Inc. (Ex. 22) at N 013412 (providing for quarterly fee of "25 basis points, (0.25%) per annum of the average aggregate amount invested" in that quarter by the Nationwide variable accounts); January 1, 2000 Agreement Between Nationwide Financial Services, Inc. and Villanova Mutual Fund Capital Trust (Ex. 23) at N 013433-34 (listing service payments ranging from 0 bps to 50 bps); September 30, 1999 Service Agreement Between Nationwide Financial Services, Inc. and Strong Capital Management, Inc. (Ex. 24) at N 013445-47 (listing service payments ranging from 15 basis points to 40 basis points).

funds.[46/] The service payments did *not* "equal a percentage of the daily accrued value of a

retirement plan's accumulation units," as Plaintiffs have alleged.[47/]

Whether the costs of those service payments were passed along to the mutual funds and,

if so, whether those costs were ever reflected in the mutual funds' charges to shareholders, would

require a case-by-case analysis of each affiliated service provider and mutual fund.[48/] Even if the

mutual funds did reflect those costs in charges to shareholders, those charges would have been

borne by *all* the investors in that mutual fund and would not have any "one-for-one" impact on

the accumulation units.[49/] In fact, *most mutual fund charges actually declined after the

Nationwide entities began entering into service agreements with mutual funds.* This is evident

by looking at the mutual funds charges to the variable account investors. *See* Ex. 20(B).

**F.     Disclosure Of The Nationwide Entities' Receipt Of Payments And The Plans'
        Ratification**

When the Nationwide entities negotiated service contracts with some of the mutual fund

service providers, Nationwide Life reduced the charges under its group variable annuity

contracts to retirement plans that allocated money to sub-accounts that in turn purchased or sold

---

[46/]     *See id.*; *see* Rose Decl. ¶ 19.

[47/]     *See id. See* Plaintiffs' First Amended Supplemental Responses and Objections to
Defendants' Third Set of Interrogatories (Ex. 1) at 3.

[48/]     *See* Goslee Decl. ¶¶ 17-21. *See also* Plaintiffs' Study at § 2.4.1.1 ("Expenses of retail
mutual funds vary widely according to investment objective, whether or not actively managed,
category of instruments held, sales commissions, and other criteria.");

[49/]     *See* Prospectus of The Best of America IV Individual Deferred Variable Annuity
Contracts (May 1, 1998) (Ex. 12) at N 013064 ("The Mutual Fund expenses shown above are
assessed at the Underlying Mutual Fund level and are not direct charges against Variable
Account assets or reductions from Contract Values. These Underlying Mutual Fund expenses
are taken into consideration in computing each Underlying Mutual Fund's Net Asset Value,
which is the share price used to calculate the unit values of the Variable Account.").

the shares of that mutual fund.[50/] Nationwide Life sought consent to this proposal from each

retirement plan holding a group contract that was affected.[51/]

The requests for consent to this proposal were communicated by Nationwide Life to

some plan trustees and authorized representatives of the retirement plans holding a group

contract, and included a proposed amendment to the variable annuity contract and an explanation

of the amendment where the contracts required a formal amendment.[52/] Other plan trustees and

authorized representatives received contractual endorsements.[53/] Similar disclosures were made

in the contract profiles that accompanied information that went to retirement plans that

purchased group variable annuity contracts after Nationwide began receiving service payments

from mutual fund service providers.[54/]

Nationwide also disclosed the service agreements with the mutual fund service providers

to the retirement plans holding individual variable annuity contracts in different ways at different

---

[50/]    *See* Rose Decl. ¶¶ 15, 21.

[51/]    *See id.* ¶ 22.

[52/]    *See id.* ¶¶ 23-28.

[53/]    *See id.* The amendments and endorsements are attached as follows:  Amendment to Crown Tool Contract (Ex. 25) at N 009756-61; Amendment to Flyte Tool Plan (Ex. 26) at N 009747-52; Endorsement to Hartford Roofing Contract (Ex. 27) at HR 00302-307. Additional disclosures are attached as follows:  October 25, 1996 Letter from Nationwide PPA Service Center to James H. Dean & Company, Inc. Regarding the Crown Tool Plan (N 009753) (Ex. 28); April 2, 1997 Letter from Nationwide PPA Service Center to The Heritage Group Regarding the Flyte Tool Plan (N 009744) (Ex. 29); June 3, 1997 Letter from Nationwide PPA Service Center to United Benefit Plans, Inc. Regarding Shayne, Dachs, Stanisci, Corker & Sauer 401(k) Plan (N 011130) (Ex. 30); October 25, 1996 Letter from Nationwide PPA Service Center to Crown Tool Plan Trustees (N 009754) (Ex. 31); April 2, 1997 Letter from Nationwide PPA Service Center to Flyte Tool Plan Trustees (N 009745) (Ex. 32).

[54/]    *See* Rose Decl. ¶¶ 27-28; The Best of America Retirement Advisor Group Variable Annuity Contract Profile (Ex. 33) at N 011139.

times.  The disclosures included Statements of Additional Information and annual reports of the

Nationwide Variable Account-II, provided to each individual contract owner who invested in

that variable account.[55/]  The retirement plans had different practices with regard to reviewing

this information.[56/]

## III.    THE ELEMENTS OF AN ERISA VIOLATION

ERISA was enacted to protect employee pension plans (and other employee benefit

plans) from wasteful, improvident, or dishonest plan management and administration by plan

fiduciaries.[57/]  Plaintiffs' shifting allegations reflect their varying efforts to find a way to

shoehorn the facts here into an ERISA claim, even though Defendant Nationwide Life acts only

as a "Custodian" with respect to the variable annuity contracts.[58/]

---

[55/]    *See* Statement of Additional Information of The Best of America IV Individual Deferred
Variable Annuity Contracts Prospectus (May 1, 1998) (Ex. 13) at N 014024 ("The Company, or
affiliates of the Company may have entered into agreements with either the investment adviser or
distributor for several of the underlying Mutual Funds.  The agreements relate to administrative
services furnished by the Company or an affiliate of the Company and provide for an annual fee
based on the average aggregate net assets of the Variable Account . . . invested in particular
underlying Mutual Funds."); *see* 1997 Annual Report of Nationwide Variable Account-II (Ex.
14) at 21 (Nationwide Life "performs various services on behalf of the Mutual Fund Companies
in which the [variable account] invests and may receive fees for the services performed.  These
services include, among other things, shareholder communications, preparation, postage, fund
transfer agency and various other record keeping and customer service functions.  These fees are
paid to an affiliate of the company.").

[56/]    *See infra*, n.83.

[57/]    *See Vartanian v. Monsanto Co.*, 131 F.3d 264, 271 (1st Cir. 1997) ("ERISA's primary
goal is to protect employee pensions and other benefits by setting forth certain general fiduciary
duties applicable to the management of both pension and nonpension benefit plans.") (brackets,
ellipsis, and quotation marks omitted); *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 n.5
(3d Cir. 1993) (explaining that the "purpose" of ERISA is "protecting plans from abusive
management"); *see also Bona v. Barasch*, No. 01 Civ. 2289 (MBM), 2003 WL 1395932
(S.D.N.Y. March 20, 2003).

[58/]    The Department of Labor ("DOL") recognizes that Defendants are mere "Custodians."
That conclusion is expressed in the Department of Labor's 1998 letter to Plaintiff Wiberg

The first element of an ERISA claim -- as Plaintiffs concede, *see* Pls.' Mem. at 12 -- is that the defendant must be an ERISA fiduciary. The conventional fiduciaries under ERISA are plan trustees or investment advisors who have discretionary authority regarding plans or their assets or who provide investment advice to plans. *See* ERISA § 3(21)(A).[59] However, the ERISA fiduciary definition states that "a person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting its management or disposition of its assets." ERISA § 3(21)(A)(i). Under this definition, "a person may be an ERISA fiduciary with respect to certain matters but not others. [He] has that status 'only to the extent' that he has or exercises the described authority or responsibility" with respect to the matters complained of in the lawsuit. *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987).[60]

---

regarding his breaches of fiduciary duties and participation in prohibited transactions affecting the Crown Tool Plan. *See* November 10, 1998 Letter from DOL to Peter Wiberg and Nils Wiberg (Ex. 34) (concluding that "you are each fiduciaries," but that the "Custodian is Nationwide Life Insurance Company").

[59]    Thus, Plaintiffs themselves are fiduciaries of their plans. The PPAs who "persuaded" retirement plans to purchase annuity products from Nationwide, Pls.' Mem. at 2, may also qualify as fiduciaries.

[60]    *See also Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) ("In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) *when taking the action subject to complaint*.") (emphasis added); *Johnson v. Georgia Pacific Corp.*, 19 F.3d 1184, 1188 (7th Cir. 1994) ("A person 'is a fiduciary to the extent that' he performs one of the described duties; people may be fiduciaries when they do certain things but be entitled to act in their own interests when they do others.").

Performing administrative acts regarding plan assets does not make a person a fiduciary.[61] Similarly, merely receiving or holding plan assets does not make that person a fiduciary.[62] Instead, the issue of whether or not an ERISA defendant acted as a fiduciary in connection with a particular transaction depends on the nature of the relationships between all the parties, the facts regarding the handling of any alleged plan assets, the nature of any services or duties performed, and any payments or compensation received therefore.[63]

ERISA liability also requires a breach of fiduciary duty. Plaintiffs' "one cause of action," Pls.' Mem. at 11, in fact is four separate claims of breach. *First*, Plaintiffs claim Defendants breached their duty of loyalty under ERISA § 404(a)(1)(A). This duty of loyalty claim requires Plaintiffs to prove that the challenged action was not a business activity unrelated to Defendants' alleged fiduciary status, not the "defraying [of] reasonable expenses," and not merely an incidental financial benefit in connection with a particular transaction. *See Frank Russell Co. v.*

---

[61]    *See* DOL Interpretative Bulletin 75-5, 29 C.F.R. § 2509.75-8 (Question 2); *see also Carpenters of Ariz. Pension Trust v. Citibank*, 125 F.3d 715, 722 (9th Cir. 1997) ("Having to make a decision in the exercise of a ministerial duty does not rise to the level of discretion required to be an ERISA fiduciary.").

[62]    *See* 29 C.F.R. § 2509.75-8 (Question 2) (noting that a person who "handles funds or other property of the plan" may not be a fiduciary, although the person may be subject to ERISA's bonding requirements); *see also* ERISA § 412 (same); *Carpenters of Ariz.*, 125 F.3d 715 (custodial bank that received, invested, and disbursed plan assets was not a fiduciary); *Flacche v. Sun Life Assurance Co.*, 958 F.2d 730 (6th Cir. 1992) (insurer that sold an annuity, and paid and adjusted the benefits over time per that policy was not a fiduciary); *Seaway Food Town Inc. v. Med. Mut. of Ohio*, 347 F.3d 610 (6th Cir. 2003) (health plan administrator that retained provider discounts as permitted by a contract was not a fiduciary).

[63]    *See N.Y. State Teamsters Council v. Centrus Pharmacy Solutions*, 235 F. Supp. 2d 123 (N.D.N.Y. 2002) (analyzing specific services provided by alleged fiduciary to determine if they were "ministerial"); DOL Advisory Opinion 97-16(A) (May 2, 1997) (Aetna) (whether a person is a fiduciary with respect to a plan requires an analysis of the types of functions performed and actions taken by the person on behalf of the plan to determine whether particular functions or actions are fiduciary in nature).

*Wellington Mgmt. Co.*, 154 F.3d 97, 104 (3d Cir. 1998) ("Section 404 exempts *any* fiduciary from the obligations when it is not acting 'with respect to a plan.' A fiduciary who is acting in a strictly business capacity is not acting 'with respect to a plan.'").[64]

*Second*, Plaintiffs allege that Defendants breached their duty of prudence under ERISA § 404(a)(1)(B). A prudence inquiry is fact-intensive and focuses on "the circumstances then prevailing." ERISA § 404(a)(1)(B); *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983) (explaining that "the prudent man rule as codified in ERISA is a flexible standard" and that fiduciary conduct must be "evaluated in light of the 'character and aims' of the particular type of plan he serves").[65]

*Third*, Plaintiffs claim that Defendants violated the self-dealing prohibition under ERISA § 406(b)(1). This provision is typically applied to cases of gross self-dealing and trustee abuse. *See, e.g.*, Wahle, et al., *Fiduciary Litigation Under ERISA*, SHO 82 ALI-ABA 201, 251 (2002) ("This section prohibits the most basic form of fiduciary self-dealing and has been applied in a

---

[64]    *See also Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982) ("accept[ing] the argument" that "officers and directors do not violate their [fiduciary] duties by following a course of action with respect to the plan which benefits the corporation as well as the beneficiaries"); *see also Pegram*, 530 U.S. at 225 ("Under ERISA, however, a fiduciary may have financial interests adverse to beneficiaries."); *cf. Flanigan v. Gen. Elec Co.*, 242 F.3d 78, 88 (2d Cir. 2001) (holding that ERISA rule that "assets of a plan shall never inure to the benefit of an employer" was not violated even though the employer "might have received some benefit, such as a higher sale price [in a transaction]" through its use of plan assets).

[65]    *See also Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (fiduciary conduct must be viewed "from the perspective of the 'time of the [challenged] decision rather than from the vantage point of hindsight'"); *Bruner v. Boatmen's Trust Co.*, 918 F. Supp. 1347, 1353-54 (E.D. Mo. 1996) ("[the] court must look a the circumstances prevailing at the time [defendant] made its decision and in light of available alternatives").

number of cases presenting obvious abuses."); DOL Advisory Opinion 97-15A (Frost) (May 22, 1997).[66]

*Fourth*, Plaintiffs assert that Defendants have violated ERISA's so-called "anti-kickback provision" under ERISA § 406(b)(3). The Department of Labor has concluded that if a fiduciary does not exercise any authority or control to cause a plan to invest in a mutual fund, the mere receipt by the fiduciary of a fee or other compensation from the mutual fund in connection with the plan's investment would not in and of itself be a "kickback." DOL Advisory Opinion 97-16(A) (May 2, 1997) (Aetna).[67]

Finally, to impose liability on any of these theories, a plaintiff must show a connection between the use of plan assets and harm to the plan or the earning of illicit profits by a fiduciary. ERISA §§ 502(a)(2), 409(a). There is no liability if the plaintiff has suffered no losses and the fiduciary has earned no more profit than it would have absent the breach. *See Wsol v. Fund*

[66]    Where a trustee "does not exercise any authority or control to cause a plan to invest in a mutual fund that pays a fee to the trustee in connection with the plan's investment, the trustee would not be dealing with the assets of the plan for its own interest or for its own account. *See* DOL Advisory Opinion 97-15A at 3. *See also Flinchbaugh v. Chicago Pneumatic Tool Co.*, 531 F. Supp. 110, 113 (W.D. Pa. 1982) (explaining that "mere attenuated or hypothetical conflicts of interest" do not necessarily amount to a breach of duty). The provision is not violated unless the fiduciary abuses the authority that makes it a fiduciary to benefit itself. *See* 29 C.F.R. 2550.408b-2(e) ("These prohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries.").

[67]    Thus, ERISA § 406(b)(3) is not violated when a fiduciary receives compensation from a third party in which the plan has invested and provides additional non-advisory services to the plan for such compensation. *See* DOL Advisory Opinion 93-12A (April 27, 1993). A violation also does not occur where the fee received from the third party is used to reduce or offset a fee that would otherwise have to be paid by the plan, *see* DOL Advisory Opinions 97-15A and 97-16A (May 22, 1997), or where the entity receiving the fee has not acted as the decision making or advisory fiduciary with respect to the plan's investment in the third party paying the fee. *See* DOL Advisory Opinion 2003-09 (June 25, 2003).

*Asset Mgmt.*, 266 F.3d 654 (7th Cir. 2001). If some but not all profits have been earned through use of plan assets, the plaintiff can recover only that portion attributable to use of plan assets. *See Felber v. Estate of Regan*, 117 F.3d 1084 (8th Cir. 1997).

## ARGUMENT

"Before certifying a class, a district court must be persuaded, 'after a *rigorous analysis,* that the prerequisites of Rule 23(a) have been satisfied.'" *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999) (quoting *Gen. Tele. Co. v. Falcon*, 457 U.S. 147, 161 (1982)) (emphasis added).[68/] Those four Rule 23(a) requirements are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2003).

Plaintiffs not only bear the burden of establishing each requirement under Rule 23(a), they must also show that the putative class is eligible for certification under Rule 23(b)(2) or (b)(3). "[F]ailure to meet any one of Rule 23's requirements destroys the alleged class action." *Pecere v. Empire Blue Cross & Blue Shield*, 194 F.R.D. 66, 69-70 (E.D.N.Y. 2000); *see also Reese v. Arrow Financial Servs., LLC*, 202 F.R.D. 83, 91 n.5 (D. Conn. 2001).

Rule 23(b)(2) provides that an action may be maintained as a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class,

---

[68/]    *See also Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 597-98 (2d Cir. 1986) ("In the wake of *Falcon*, courts have been generally strict in their application of the Rule 23(a) criteria[.] Some courts have recognized, as we do, that the primary thrust of *Falcon* was that satisfaction of Rule 23(a) requirements may not be presumed."). *See also Karen L. v. Physicians Health Servs., Inc.*, 202 F.R.D. 94, 99 (D. Conn. 2001) (Droney, J.). The "liberal construction" of Rule 23 urged by Plaintiffs has been tempered by the amendments to that rule that took effect on December 1, 2003. One amendment eliminated conditional class certification, signaling an overall tightening of class certification standards. *See* Fed. R. Civ. P. 23(c)(1)(C) (effective Dec. 1, 2003) Committee Note ("A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met.").

thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Parker v. Time Warner Entm't. Co.*, 331 F.3d 13, 18 (2d Cir. 2003) (quoting Fed. R. Civ. P. 23). Rule 23(b)(3) certification is appropriate where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'" *Id.* at 21 (quoting Fed. R. Civ. P. 23(b)(3)).

"[T]he court need not rely on bare allegations but 'may consider the range of proof necessary to support class certification.'" *Grandon v. Merrill Lynch & Co., Inc.*, No. 95 Civ. 10742 (SWK), 2003 WL 22118979, at *3 (S.D.N.Y. Sept. 11, 2003) (quoting *Daniels v. City of New York*, 198 F.R.D. 409, 413 n.5 (S.D.N.Y. 2001)). This analysis should take into account evidence and arguments presented by *both* parties in the briefs or in arguments before the Court as to how the case will be tried.[69] *See* Committee Note, Fed. R. Civ. P. 23(c)(1)(A) (it is appropriate to conduct controlled discovery into the "merits," limited to those aspects relevant to making the certification decision on an informed basis).[70] The Court should not accept

---

[69]    *See Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571 (2d Cir. 1982) ("[T]here can be no doubt that it is proper for a district court, prior to certification of a class, to allow discovery and to conduct hearings to determine whether the prerequisites of Rule 23 are satisfied."); *see also Cokely v. N.Y. Convention Ctr. Operating Corp.*, No. 00 Civ. 4637 (CBM), 2003 WL 1751738 at *3 (S.D.N.Y. Apr. 2, 2003).

The Court should not merely accept Plaintiffs' assurances that a class trial will prove manageable. *See, e.g., Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 168, 174 (S.D.N.Y. 2003) (Plaintiffs' "proposed trial plan highlights the management nightmare this Court would face if the putative classes were certified."); *In re Methyl Tertiary Butyl Ether ("MBTE") Prod. Liab. Litig.*, 209 F.R.D. 323, 328-29, 334 (S.D.N.Y. 2002) (denying class certification despite a "lengthy trial plan" prepared by Plaintiffs; the limitations and tailoring of the class proposed by Plaintiffs were still insufficient to persuade the Court that "class action is appropriate.").

[70]    As revised, Rule 23(c)(1)(A) postpones the time of certification from "[a]s soon as practicable after the commencement of an action," under the current Rule, to "an early

Plaintiffs' theory of the case at face value without any further inquiry, as Plaintiffs suggest. *See* Pls'. Mem. at 19-20, 37. In particular, the Court must consider the defenses proffered by Defendants in opposition to class certification. "[A] court must examine the relevant facts *and both the* claims *and defenses* in determining whether a putative class action meets the requirements of Rule 23(b)(3) . . . .") (emphasis added). *In re VISA Check/ MasterMoney Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001); *see also Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 128 (S.D.N.Y. 2003).[71/]

The Court should also evaluate the bases on which Plaintiffs assert there is common proof of their factual allegations. For example, Plaintiffs' "Statement of Facts" uses a six-year old study of 401(k) plans as the only support for support sweeping and inaccurate conclusions regarding the amount of variability in the facts regarding the putative class.[72/] This Study does

---

practicable time" in order to allow the Court more time for discovery and deliberation. Rule 23(c)(1)(A) (Dec. 1, 2003).

[71/]    The only case cited by Plaintiffs on this issue, *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32 (1st Cir. 2003), says nothing about accepting a plaintiff's theory without scrutiny. Rather, the *Smilow* court provided a legal interpretation of a Massachusetts consumer protection statute, specifically that a violation could be established by "conduct in disregard of known contractual arrangements." *Id.* at 42. Defendants in *Smilow* did not argue that the plaintiffs would have to prove their case through oral misrepresentations, precluding certification -- in fact, the Court was "doubt[ful] that Defendants will rely on oral representations." *Id.* at 42, n.10.

[72/]    *See* Pls.' Mem. at 2, n.5. Defendants object to any consideration of this Study. While it was apparently commissioned by the Department of Labor, its "opinions and conclusions are those of Economic Systems, Inc., and of the HayGroup . . . ." Plaintiffs' Study, introductory material (3rd unnumbered page). Moreover, "[t]he study is limited to a review of the available literature and secondary data sources, not original survey research." Plaintiffs' Study, 4th unnumbered page. Thus, the study is hearsay at least twice over, and Plaintiffs have provided no reason for the Court to accept the data or conclusions of its authors -- who were not identified prior to Plaintiffs' Memorandum, have not been offered as experts and who have not been subjected to deposition or other discovery. Such "evidence" is not admissible in support of class certification. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001) ("[a] district court must ensure that the basis of the expert opinion is not so flawed that it