not cover the substantial number of the putative class members -- including two of the named

Plaintiffs -- who purchased *individual* variable annuity contracts from Nationwide Life.

Moreover, the Study explains that "[t]he specific design features of 401(k) plans vary widely. . ."

and "[t]here are several factors complicating the attempt to draw reliable pictures of actual

investment of 401(k) plan assets. The available investment options vary widely from one plan to

the next . . . . [and] Employees' asset allocation decisions are constantly shifting over time."[73]

## I. CLASS CERTIFICATION SHOULD BE DENIED BECAUSE THE ELEMENTS OF, AND DEFENSES TO, PLAINTIFFS' ERISA CLAIM RAISE COUNTLESS INDIVIDUAL ISSUES THAT CANNOT BE RESOLVED BY GENERALIZED PROOF

To meet their burden under Rules 23(b)(2) and (b)(3), Plaintiffs must show that they will

offer generalized proof at trial common to all class members to establish each of the elements of

their ERISA claim, and to rebut any defenses raised by Defendants.[74] If the resolution of any

element of Plaintiffs' claim for relief will break down into individual legal and factual issues,

class certification must be denied. *See Dobson v. Hartford Fin. Servs.*, 196 F. Supp. 2d 152, 165

(D. Conn. 2002) (finding that "class treatment" of ERISA claim was "inappropriate" because of

---

would be inadmissible as a matter of law."); *Rhodes v. Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 619, 651 (N.D. Ga. 2003) (disregarding "conclusions, hearsay, and statements not based on personal knowledge" in making class certification analysis).

[73]     *See* Plaintiffs' Study §§ 2.3, 2.5.3.

[74]     *See Moore*, 306 F.3d at 1252 ("Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."); *Cont'l Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y., Inc.*, 198 F.R.D. 41, 46 (E.D.N.Y. 2000) (denying certification because "the Plaintiffs cannot offer common proof" of liability); *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 381 (S.D.N.Y. 1996) ("On a motion for class certification, Plaintiffs' burden is to establish that common or generalized proof will predominate at trial ….") (internal quotation marks and brackets omitted).

need for "individualized assessment" of multiple liability issues); *see also Walker v. Asea Brown Boveri, Inc.*, 214 F.R.D. 58, 65 (D. Conn. 2003) (denying certification of ERISA class because "a fact-specific inquiry will be necessary to determine whether either of the named Plaintiffs knowingly and voluntarily waived their rights to pension benefits under the Plan").[75/]

Plaintiffs' statement of common issues on page 18 of their Class Certification Memorandum simply parrots the relevant legal standards, and describes the issues as "common." That does not satisfy Plaintiffs' burden under Rule 23. *Cf. In re American Med. Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996) ("A class is not maintainable as a class action by virtue of its designation as such in the pleadings."). For example, when Plaintiffs assert as common such issues as "[w]hether Nationwide dealt with the Units and/or the skimmed plan assets in its own interest or for its own account," they are simply copying the language of ERISA § 406(b)(1). Likewise, the allegedly common issue of "[w]hether Nationwide generally constitutes a fiduciary as to the Units because of the authority or control respecting their management or disposition" simply quotes a portion of the fiduciary definition contained in ERISA § 3(21).[76/]

---

[75/]    *See also MBTE* ("[C]ourts deny certification where individualized issues of fact abound"); *Miner v. Empire Blue Cross/Blue Shield*, No. 97 Civ. 6490 (LAP) 2001 WL 96524, at *5 (S.D.N.Y. Feb. 5, 2001) (An ERISA class action is inappropriate when, as here, "'individualized evaluation of the facts, allegations and equities surrounding each case' must be made ...."); *Lewis Tree Service, Inc. v. Lucent Technologies, Inc.*, No. 99 Civ. 8556, 2002 WL 31619022, at *3 (S.D.N.Y. Nov. 20, 2002) ("A class should not be certified when there are no truly common questions of fact or law presented by the plaintiff's claims.").

[76/]    *See Sprague v. General Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998) (*en banc*) ("It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality."); *Stewart v. Winter*, 669 F.2d 328, 337 (5th Cir. 1982) ("A common question can be said to exist here only in the most abstract form .... If we were to hold that it was an abuse of discretion for the trial court to conclude that the presentation of this abstract issue did not raise a 'common' question within the meaning of Rule 23(a)(2), any allegation of a breach of legal duty by any class of Defendants -- no matter how vast or diverse -- could be impressed into a single case."); *Lewis Tree Service*, 2002 WL 31619022, at * 3 ("However, Lewis Tree has merely construed the factual basis of

27

Plaintiffs then claim that the answer to every allegedly common question will "be exactly the same for each and every Plan in the class." Pls.' Mem. at 19. Such an unsupported assertion is not sufficient to meet Plaintiffs' burden. *See In re Managed Care Litig.*, 209 F.R.D. 678, 690 (S.D. Fla. 2002) ("[P]laintiffs always bear the burden of proving, *rather than merely alleging*, all factual predicates for class certification.") (emphasis added). Moreover, Plaintiffs' vague allegations that Defendants engaged in a common "scheme" to "shore up competitiveness in the group annuity market" do not replace Plaintiffs' burden of showing generalized proof that Defendants received "plan assets," exercised "authority or control" over those assets, and breached their fiduciary duties with respect to *all* annuity contracts in the proposed class (group and individual). *See* Pls.' Mem. at 1-2, 8-10.

A more careful review of the elements of Plaintiffs' claim, the four separate legal theories underlying that claim, and the defenses to that claim, demonstrates that countless issues will require individualized inquiries at trial with respect to each proposed class member. Individualized proof will be required with respect to each class member's particular investments, each service payment received by Defendants, and whether and how there was any relationship between the two despite the many different transactions and entities that separated each of the investments from the service payments. There will also be individualized inquiries into, among other things, whether any proposed class member ratified the Defendants' alleged "exercise of authority or control over plan assets" and whether any of the service payments were unreasonable.

---

each class member's claim in the most general fashion. Lewis Tree cannot create a common factual predicate for the class members' claims by stating, in the most general terms, that all the cases involved Y2K defects.").

Plaintiffs simply ignore these many individualized issues, essentially arguing that their generalized allegations permit the Court to treat this like a typical ERISA claim. But this is not a typical ERISA case where Defendants are traditional ERISA fiduciaries (*e.g.*, trustees, plan administrators, or investment advisors), or exercised some recognized authority or control over plan assets (*e.g.*, they took money directly from any plan), or breached a fiduciary duty in some traditional way (*e.g.*, they received plan assets without benefit to the plan). Instead, Plaintiffs' ERISA claim raises the novel theory that "the payments constitute plan assets in the hands of Nationwide" even though Plaintiffs must concede that they are not plan assets a moment before, when held by mutual fund entities. Pls.' Mem. at 13.[77]

In order to assess Plaintiffs' unique claim, the Court will have to review facts and circumstances relating to each proposed class member for each year of the proposed class period to determine whether the extraordinary fiduciary duty alleged was created and breached as a result of some special relationship.[78] These individualized determinations mean that this

---

[77]    Plaintiffs cite no authority for their novel ERISA theory. The only case mentioned in the entire "Theory of the Case" Section of Plaintiffs' Class Certification Memorandum, *Health Care Service Corp. v. TAP Pharmaceutical Products, Inc.*, 274 F. Supp.2d 807 (E.D. Tex. 2003), does not support Plaintiffs' theory. In *TAP Pharmaceutical*, the plaintiffs alleged that drug companies overcharged a benefits plan for prescription drugs, and so were fiduciaries "of the plans from which they improperly obtained funds." *Id.* at 810. There was no allegation that the monies paid to the drug companies were not plan assets before payment, but became plan assets when received by the drug companies. To the contrary, the payments "were obviously made from those same self-funded plans." *Id.* at 812. Accordingly, *Tap Pharmaceutical* does not support Plaintiffs' theory that an entity that does not hold "plan assets" can make a payment that becomes "plan assets" when received.

[78]    *See, e.g., Plumb v. Fluid Pump Service, Inc.*, 124 F.3d 849 (7th Cir. 1997) (assessing "realities of the parties' relationship" to determine whether an insurer was an ERISA fiduciary in a particular set of circumstances); *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54 (4th Cir. 1992 (court must look to all aspects of the parties' relationship to assess fiduciary status); *Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Securities, Inc.*, 93 F.3d 1171, 1183 (3d Cir. 1996) (assessing whether fiduciary duty arose by looking at the

putative class action does not satisfy the requirements of Rule 23(a)(2) (the common issues requirement), Rule 23(b)(3) (the predominant common issues requirement), or the "cohesiveness" requirement of Rule 23(b)(2).[79/] The same diversity of factual circumstances means that Plaintiffs cannot satisfy the typicality prong of Rule 23(a)(3), which "tends to merge"[80/] with the core commonality requirement.[81/]

---

particular relationships between the parties); *see also Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*, 869 F. Supp. 278, 287 (D.N.J. 1994) ("Congress intended that the courts look to the totality of the relationship to determine whether an outside professional advisor is a fiduciary to an ERISA plan.").

[79/]     *See MTBE*, 209 F.R.D. at 342 ("[I]ndividualized issues among the named Plaintiffs and putative class members destroy Rule 23(b)(2)'s presumption of cohesiveness."); *Dunnigan*, 214 F.R.D. at 139 (certification of an ERISA class action is inappropriate where such "individualized evaluations" would be required).

[80/]     *See Gen. Tele. Co. v. Falcon*, 457 U.S. 147, 158 n.13 (1982) (explaining that both commonality and typicality "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence").

[81/]     Plaintiffs also cannot show that the class is "numerous" as required by Rule 23(a)(1) because their class definition does not identify which retirement plans were affected by the alleged ERISA violation, and they offer no poof that would identify those proposed absent class members. For example, Plaintiffs seek to represent a class of all retirement plans that owned variable annuity contracts for a certain period, but it is undisputed some of those plans had no relationship whatsoever with any mutual fund service payments (*e.g.*, because they invested in the fixed accounts, or they allocated money to sub-accounts that invested in mutual funds that never made any service payments). Similarly, Plaintiffs' proposed class includes variable annuity contracts issued pursuant to Section 403(b) of the Internal Revenue Code, even though many of those contracts are not part of a trust, have no relationship with any trustee, and could not be members of the trustee-represented class proposed here. These problems in identifying class members are compounded because each of the other proposed class members will have to prove, on an individualized basis, that a special relationship existed between their investments and the alleged service payments before they have a claim similar to that raised by Plaintiffs.

### A.    The Court Cannot Determine Whether Defendants Received Any "Fruits Of Plan Assets" Without Resolving Countless Individual Issues

Plaintiffs' ERISA claim will require first that they prove at trial that Defendants were ERISA fiduciaries.  That in turn will require that Plaintiffs offer common proof that there were some "plan assets" belonging to the proposed class members over which Defendants uniformly exercised "authority or control."  ERISA § 3(21)(A).

Plaintiffs have found it impossible to tell a straight story regarding what "plan assets" are at issue in this case.  Having discarded several theories, Plaintiffs have alighted on the allegation that the service payments that Defendants received from the mutual funds were the "fruits of plan assets."  This new theory fails to state a claim under ERISA, as it implicitly concedes that Plaintiffs will fall short of proving that "plan assets" themselves are at issue here.

In any event, Plaintiffs' "fruits of plan assets" claim makes class certification inappropriate.  If the term "fruits of plan assets" has any meaning, that meaning derives from the implication that the payments received by Defendants were "fruit" that somehow originates in a forest of plan asset "trees."  But proof of that special relationship would require Plaintiffs to trace these "fruits" from a plan into a variable account, into a mutual fund, into a mutual fund service provider, and then to Defendants.  That tracing simply cannot be done, as a factual matter, because of the sheer number of mutual funds, affiliates, and transactions that separate the retirement plans' investments from the service payment , and because the mutual funds (and some of the variable accounts) commingle money with many other investors who are not members of the proposed class.  Further, as a legal matter, retirement plans have no claim on

31

any assets of the mutual fund[82] -- much less on any funds expended by the fund's service providers. For these reasons, which were set forth in Defendants' Motion for Summary Judgment (Docket 116, 117), even Plaintiffs now concede that they will not even attempt to trace funds from the plans through the mutual funds. *See* Pls.' Mem. at 19.

Having eschewed tracing, Plaintiffs suggest that the service contract payments received by Defendants are the "fruits of plan assets" because the service contracts provided for those payments to be "equal to a percentage of the daily accrued value of a [Plans' accumulation units]." Pls.' Mem. at 13. This argument is incorrect as a factual matter because most (but not all) of the service contracts provide for payments that are based on the amounts invested by different *variable accounts* in the different mutual funds; the other contracts are based on a "per-participant" formula. *See* Rose Decl. ¶ 19. *None* of the service contracts are based on an amount equal to the "daily accrued value" of a Plan's accumulation units, as Plaintiffs suggest. Even Plaintiffs' own class definition recognizes this: They define the class as those who were affected when "Nationwide began receiving payments from mutual funds *based on a percentage of the assets invested in the funds by Nationwide ....*" Pls.' Mem. at 1 (emphasis added). The amounts invested by the different variable accounts in the different funds are *not* the same as the value of the accumulation units. The value of the accumulation units fluctuates according to the market, while the assets invested in the variable accounts were contributed by investors who were *not* proposed class members.

Even if the service contracts did provide for payments to be received by the Defendants based on the "daily accrued value of the accumulation units," that would not constitute proof that

---

[82]    ERISA § 401(b)(1), 29 U.S.C. 1101(b)(1); see also 29 C.F.R. 2510.3-101(a)(2) ("Generally, when a plan invests in another entity, the plans's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity.").

those payments were the "fruits of plan assets." That would only constitute proof that the

Defendants chose that value as an objective measure, without in any way showing that the

accumulation units were affected. The only way that Plaintiffs could prove that there was some

impact on the accumulation units would be to trace the effect of those payments back to the

retirement plans, which Plaintiffs refuse to do and which would raise the individualized issues

described above.[83/]

**B.**    **The Court Cannot Determine Whether Defendants Exercised "Authority And Control" Over The "Fruits Of Plan Assets" Without Resolving Countless Individual Issues**

If Plaintiffs could somehow prove that the service payments were "plan assets," they

would still be required to show that Defendants are fiduciaries with respect to the "fruits of plan

assets" by proving that Defendants "exercised authority or control" over the service payments

made by mutual fund entities. Plaintiffs have offered no common proof of such exercise of

"authority or control," and there can be no such proof. Some mutual fund service providers

made no payments, and other mutual fund service providers paid different amounts to different

Nationwide entities for different services. Any trial on this issue would devolve into individual

inquiries as to the relationship between Defendants and each mutual fund service provider,

whether that relationship was in the provider's interests and was voluntarily entered into, and

whether Defendants had some ability to require that each mutual fund service provider make

payments.

---

[83/]    Plaintiffs also make the circular argument that the service payments "constitute plan assets in the hands of Nationwide because they are the fruits of the Plan's assets which Nationwide did not have the right to retain under the annuity contracts, such that Nationwide should, in equity and good conscience, return them to the Plans." Pls.' Mem. at 13; *see also id.* at 19. Of course, equity has no claims on Nationwide until Plaintiffs provide some reason to believe that the payments to Nationwide entities by the mutual fund service providers are plan assets.

**C.    The Court Cannot Determine Whether Defendants Exercised "Authority And Control" Over The "Accumulation Units" Without Resolving Countless Individual Issues**

In addition to their "fruits of plan assets" theory, Plaintiffs allege that Defendants were ERISA fiduciaries because they "exercised authority and control" over the retirement plans' accumulation units when they managed and disposed of those accumulation units. *See* Pls.' Mem. at 12-13. However, Plaintiffs offer no common proof as to how Defendants exercised this authority or control in some uniform way with respect to all the proposed class members. Plaintiffs cannot offer any such proof because the allegations are simply incorrect. The variable accounts, not Defendants, held and controlled the accumulation units, and those variable accounts are separate trusts.

Moreover, the evidence shows that Defendants did not take any action to cancel or transfer any accumulation units, or otherwise "manage or dispose" of those units on a uniform basis except with the agreement of or at the direction of the retirement plans or their participants. *See* Berndt Decl. ¶ 25. As a result, Plaintiffs' allegations -- if not disposed of through summary judgment -- would require an individualized inquiry into whether Defendants were in fact engaged in that conduct with respect to any particular plan, and whether that conduct was purely "ministerial" at the direction of the Plans.[84] *Cf. Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191-92 (3d Cir. 2001) ("injury cannot be presumed, and Defendants have the right to raise individual defenses against each class member"); *Barreras Ruiz v.*

---

[84]    Even if Plaintiffs somehow could show through classwide proof that Defendants were fiduciaries regarding the accumulation units, that showing would in no way advance Plaintiffs' burden to show that Defendants were fiduciaries with respect to the separate service payment transactions Plaintiffs challenge in this lawsuit. The absence of a relationship between those service payments and the holding and administration of the accumulation units makes Plaintiffs' claims inappropriate for class certification.

*American Tobacco Co.*, 180 F.R.D. 194, 198 (D. P.R. 1998) ("due process provides Defendants with the right to a case-by-case determination" of unique issues bearing on their liability).

Plaintiffs also suggest that Defendants exercised authority and control over the accumulation units "by contractually arranging to receive and by accepting payments from mutual funds . . . which causes [sic] the Units to decline in value on a one-to-one basis." Pls.' Mem. at 13. Even if this theory were legally sufficient (which Defendants will dispute in an amended summary judgment motion), Plaintiffs have offered no common proof to show that in fact there was any diminishment in the value of any retirement plans' investments when Defendants received the service payments.

Plaintiffs cannot offer any such common proof of uniform "diminishment in value," because not every mutual fund (or related service provider) made service payments, and thus those mutual funds would never have charged any service payments back to the retirement plans in a way that would diminish the value of those plans' assets. With respect to the other mutual funds, Plaintiffs cannot meet their burden because they would have to show that each particular payment allegedly received by Defendants from a particular mutual fund or its affiliated service provider was in fact charged back by the affiliate to the mutual fund and by the mutual fund to the variable account in the form of some higher charges or costs, which in turn caused the retirement plans' investments to decline in value. Since Plaintiffs concede that they will offer no evidence that would trace the money *forward* from the retirement plans through the mutual funds to Defendants, it is hard to imagine how Plaintiffs could offer any common proof that would trace the money *backward* through the mutual funds to the retirement plans in the form of higher charges or costs.

At the same time, the individualized issues that will be raised by Plaintiffs' "diminishment in value" allegations are clear from even a brief review of the facts in this case. There were hundreds of different services contracts between some (but not all) of the mutual funds or their service providers and Defendants or the Nationwide entities. There were also separate contracts between most (but not all) of the mutual funds and their service providers. As a result, there will be individual issues as to which mutual funds or service providers were making service payments in a particular year; whether Defendants or some other Nationwide entity received those payments; whether any service payments made by an service provider were charged back to a mutual fund; and whether any service contract payments were included in a mutual funds' costs and charges to the retirement plans.

These individualized issues would in turn require sifting through the accounts of each mutual fund and its service providers, the varying charges of each mutual fund, and the records of each sub-account of each variable account to determine what, if any, impact the payment for services had on each proposed class members' accumulation units in each year of the proposed class period. Without such individualized inquiries Plaintiffs cannot show that Defendants received any "plan assets" that would make them an ERISA fiduciary with respect to each particular putative class member.

**D.      The Court Cannot Determine Whether Defendants Exercised "Authority And Control" Without Resolving Countless Individual Issues Regarding Agreement, Ratification, And Disclosure**

Plaintiffs' allegations regarding Defendants' exercise of "authority or control" simply assume that none of the thousands of different plans agreed to or ratified Defendant's receipt of payments made by mutual fund providers. But Plaintiffs offer no common proof on this issue, or any common proof that they are not estopped from raising their ERISA claim based on

36

disclosures they received. Without such common proof, Plaintiffs cannot show that Defendants uniformly exercised any "authority and control" under ERISA.

Plaintiffs cannot offer common proof on these issues, because the issue of whether there was agreement, ratification, or estoppel (and thus whether Defendants exercised any discretionary authority or control) will depend on the individual circumstances of each Plan. Different retirement plans received different disclosures at different times. Some retirement plans (including the Plaintiff Plans) purchased their variable annuity contracts and invested money before any service payments were made, and so before any disclosures about those service payments were made. Other retirement plans purchased their contracts and made their investments after the service payments and disclosures were already in place. Some retirement plans provided written consent or otherwise ratified the service payments in return for lower charges; others accepted the service payments as part of their variable annuity contracts.[85] Individualized factual determinations would have to be made to establish the absence of ratification in these circumstances. *See Adams v. Kansas City Life Ins. Co.*, 192 F.R.D. 274, 282 (W.D. Mo. 2000) (breach of contract claims requiring consideration of evidence outside the contact document was "individualized and not reasonably susceptible to class action treatment"); *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 457 (11th Cir. 1996) (ERISA misrepresentation case could not be certified as a class action).

---

[85]    *See* Rose Decl. ¶¶ 23-28; Declaration of Professor George L. Priest (Ex. 15) at 7; Transcript of Feb. 24, 2003 Deposition of Hector "Lou" Haddock ("Haddock Deposition") (Ex. 35) at 73:8-16 (stating he did not request copies of mutual fund prospectuses); Transcript of March 4, 2003 Deposition of Peter Wiberg ("Wiberg Deposition") (Ex. 36) at 12:16-17 (acknowledging review of plan documents); Transcript of Feb. 13, 2003 Deposition of Allen Gouse ("Gouse Deposition") (Ex. 37) at 96:1-7, 120:1-18 (stating that he read all documents provided to him regarding the plans).

Similarly, Plaintiffs' allegations of some overall "scheme to give the appearance of reduced pricing," and their allegations of "sham" service contracts and of "false" portrayals, all necessarily include elements of non-disclosure or misrepresentation that defeat any certification of the class.[86] Even Plaintiffs' putative class certification expert recognizes that the claims of misrepresentation, non-disclosure, and breach of contract that formed the heart of their original motion for class certification were not suitable for class certification. *See, e.g.*, Transcript of April 3, 2003 Deposition of Samuel Issacharoff ("Issacharoff April Deposition") (Ex. 38) at 204:12-205:3 (stating that adequate disclosures could defeat liability and that, "if that is the case, there will be differences from plan to plan"); *id.* at 145 ("There are issues that if he disclosed completely, and it was contractually agreed to, that this would be a permissible behavior, yes."); Transcript of July 16, 2003 Deposition of Samuel Issacharoff ("Issacharoff July Deposition") (Ex. 38(B)) at 275:15-19 (stating that "when there were breaches of contract claims still alive in this case, that did make it more complicated because that made it look like there were issues of individual [reliance], there were issues about who knew what, when").[87]

---

[86]     *See, e.g.*, Third Am. Compl. ¶ 28 (alleging that Defendants deceptively drafted the contracts and/or disclosures to include "sham" discounts); ¶ 30 ("Nationwide structured its contracts with the mutual funds so as to portray the 'revenue sharing' in a false light."); Pls.' Mem. at 9 (noting that Defendants obtained signed amendments from group Plans and describing disclosures and omissions that accompanied those amendments).

[87]     While Professor Issacharoff is correct in this instance that "differences from plan to plan" on issues such as disclosure and ratification make class certification impossible, his opinions on that point, as well as all of his other opinions, are not admissible expert evidence under Federal Rule of Evidence 702. Accordingly, Defendants have filed a motion to strike those opinions simultaneously with this brief. *See* Defendants' Motion to Strike Declarations and Preclude Opinions of Plaintiffs' Putative Class Certification Expert.

### E.    Individual Issues Predominate In Determining Whether Nationwide Violated Any Fiduciary Duty With Respect To The Payments for Services

Even if there were common proof that Defendants became ERISA fiduciaries when they "exercised authority or control" over the "fruits of plan assets" or the "accumulation units," Plaintiffs would also have to offer common proof that Defendants breached that fiduciary duty. Once again, the variations among the hundreds of different mutual funds or service providers that paid the Nationwide entities for services would make it impossible for Plaintiffs to offer generalized proof that this same conduct amounted to any breach of fiduciary duty by Defendants.

Moreover, each of the four separate ERISA sections that Plaintiffs claim were breached raise separate legal issues that require individualized judgments by the Court. For example, proof of a "breach" under ERISA § 404(a) requires a showing that Defendants were not merely "defraying reasonable expenses." An analysis of that issue in turn requires the Court to look at the services provided and the charges -- both of which vary from fund to fund, plan to plan, and year to year. Similarly, proof of a "breach" under ERISA § 404(b) requires analysis of Defendants' "care, skill, prudence and diligence *under the circumstances then prevailing*" which will obviously differ over thousands of transactions over seven years. The prohibitions of ERISA § 406(b) are likewise subject to conditions and exceptions that require an analysis of facts that vary from retirement plan to retirement plan.[88]

---

[88]    For example, a violation of Section 406(b)(1) does not occur when another fiduciary authorizes a particular transaction. Nationwide will show that at least some Pension Plan Administrators and plan trustees authorized Nationwide to receive payments from mutual fund entities. Furthermore, Nationwide will show that other plans in the putative class began doing business with Nationwide only after Nationwide had publicly disclosed and begun receiving such payments for services.

1.    **The Facts Relevant To Plaintiffs' Claim Of A Breach Of Fiduciary Duty Vary And So Create Individual Issues**

Plaintiffs do not offer any common proof that the service payments made by hundreds of different mutual funds or affiliated providers to the many different Nationwide entities were all unreasonable for the different services provided.  Indeed, Plaintiffs' allegation that some of these services overlap with those provided to the retirement plans or PPAs only serves to underscore the individualized inquiries that will be necessary to resolve each proposed class member's claims.[89/]

Plaintiffs cannot offer the needed common proof because the reasonableness of any service payments will necessarily require an individual analysis of the amount of the payment and the type and level of service for that payment, as well as the amount of the payments that were returned to the retirement plans through lower prices.  *See O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003) (abuse of discretion to certify a class because establishing liability would require the court "to examine the reasonableness of payments for goods and services," an inquiry that must be "performed on a transaction-by-transaction basis ....").  There is no dispute that different funds and fund entities paid different amounts for different services at different times, that those funds utilized different levels of services, and that

---

[89/]    *See* Third Am. Compl. ¶ 21; Pls.' Mem. at 34 (arguing in the alternative); Plaintiffs' Supplemental Objections and Responses to Defendants' Second Set of Interrogatories (Ex. 16) No. 5(ii) (asserting only that services to funds "largely" overlap with services to Plans); Issacharoff July Deposition (Ex. 38(B)) at 339:3-6 ("Plaintiffs' theory is that that portion of the payment which was not in compensation for services was impermissible under ERISA.").

Plaintiffs' "fruits of plan assets" theory seeks to short-circuit all these inquiries by asserting that receiving payments for services simultaneously renders a party an ERISA fiduciary and creates a breach of that fiduciary duty.  If that were the law, every person who provided services to a plan -- from an accountant to a janitor -- would have fiduciary duties.  Plaintiffs cite no authority for their claim and in fact, the authorities are clear that merely receiving payments for services does not impose fiduciary obligations on the service provider.  *See supra* at 19-20.

the market for such services was different at different times, and in connection with different

investments. *See* Goslee Decl. ¶¶ 19, 21. Even if *Plaintiffs* were to change their story again, and

allege that the service contract payments were made in exchange for *no* services, *Defendants*

certainly will defend themselves by showing that the payments are reasonable payments for

services rendered. This defense will be based on facts relating to each transaction, and will

require individualized determinations. *See In re Visa*, 280 F.3d at 138 ("a court must examine

the relevant facts and *both the claims and defenses* in determining whether a putative class meets

the requirements of Rule 23(b)(3)") (emphasis added); Fed. R. Civ. P. 23(a)(3) (noting that

"claims and defenses" of class plaintiffs must be typical of "claims and defenses" of class as a

whole).

**2.    Market Data And Expert Testimony Will Not Eliminate Individual Issues**

Plaintiffs argue that "market data" and "expert testimony" will create common proof that

the service payments received by Defendants were not reasonable. Pls.' Mem. at 35, 36.

However, Plaintiffs do not describe that data or testimony or otherwise provide the Court with

any basis for concluding that there is a single or uniform reasonable payment established by the

market that will sweep away the individualized issues. Rule 23 requires that Plaintiffs offer

more than a prediction that unidentified evidence will appear and create common proof. *See*

*Newton*, 259 F.3d at 191 ("Plaintiffs maintain their expert can devise a formula for calculating

injury and damages that will allay manageability concerns. Yet we are hesitant to rely on a

formulaic nostrum given the consequences if it fails to meet expectations.").[90]

---

[90]    *See also Windham v. American Brands, Inc.*, 565 F.2d 59, 70 (4th Cir. 1977) (a class with
apparent manageability problems should not be certified "merely on the assurance of counsel
that some solution will be found"); *Kase v. Salomon Smith Barney, Inc.*, 218 F.R.D. 149, 160,
2003 WL 22300013, at *10 (S.D. Tex. Aug. 22, 2003) ("[Plaintiff] has suggested that many of

41

Plaintiffs' failure to provide any information whatsoever about their "market data" and "expert economic testimony" made their assurances inherently suspect, and these doubts were justified when Plaintiffs revealed during discovery that *they do not have any market data and they do not have any experts*. *See* Plaintiffs' Opposition to Defendants' Motion For Interim Extension (Docket 154) at 13-16.[91/] This failure, which prevents the Court from assessing the alleged testimony and data, should preclude any consideration of Plaintiffs' claim that such data or testimony will assist the Court. *See In re Visa,* 280 F.3d at 134 (at class certification stage, court must evaluate expert testimony to ensure "that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law" and that "is sufficient to demonstrate common questions of fact warranting certification of the proposed class"); *In re WorldCom, Inc. Secs. Litig.*, No. 02 Civ. 3288 (DLC), 2003 WL 22420467, at *25 (S.D.N.Y. Oct. 24, 2003) (court must assess "whether the expert evidence demonstrates the existence or absence of common questions of fact warranting class certification").

---

the individual liability and damages issues in this case will not involve significant factual disputes and can be resolved by consulting readily available documents and by deciding on a formula for calculating damages. . . . In the present case, [plaintiff] has offered no specifics for how such a formula would be calculated and the mere supposition that a damages formula could be achieved is insufficient to support class certification."); *Pickett v. IBP, Inc.*, 182 F.R.D. 647, 654 (M.D. Ala. 1998) ("Because the Plaintiffs' theory hinges on their ability to prove the issue of liability separately from the individual questions of damages, the court is hesitant to certify a class based on the assurance that experts who will be consulted in the future will be able to provide the framework of analysis for assessing the total amount of damages at the liability stage.").

[91/]    This startling admission only demonstrates the benefit to the Court of full and fair discovery -- which has not been afforded to date. *See* Defs.' Objection (Docket 170) at 16-17.

### 3.    Alleging That ERISA Requires Per Participant Charges Does Not Eliminate Individual Issues

Similarly, Plaintiffs seek to avoid individualized inquiries into the reasonableness of the service contract payments actually charged by asserting that a "per participant per annum" charge for services would be more reasonable than an asset-based charge. *See* Pls.' Mem. 35. This unsupported assertion raises individualized issues because there is no one "reasonable" way to charge for services, and ERISA does not govern how such payments must be computed. *See* Supplemental Declaration of Professor George Priest (Ex. 15(B)) ¶ 11. That is particularly true in this case, where different mutual funds (or their service providers) obtained different services and paid different amounts to different Nationwide entities.

Moreover, Plaintiffs' implicit assertion that Defendants must charge on a per participant basis in the future creates conflicts within the class. Retirement plans with many participants but few assets will benefit from an allocation of service payments based on assets. Conversely, retirement plans with relatively few participants and higher levels of assets would prefer that service payments be assessed on a per participant basis. Thus, the putative class has competing interests on this issue, and the class should not be certified on that basis.[92]

---

[92]    *See Amchem Prods. v. Windsor*, 521 U.S. 591, 626-27 (1997) (class cannot be certified where "adversity among subgroups" precludes adequate representation" and the "the interests of those within the single class are not aligned"); *Phillips v. Klassen*, 502 F.2d 362, 367 (D.C. Cir. 1974) ("When as here, there is complaint as to injury from an allegedly invalid action . . . and the action may be taken as conferring economic benefits or working economic harm, depending on the circumstances of the individual, the foundations of maintenance of a class action are undermined."); *Auto Ventures, Inc. v. Moran*, No. 92-426-CIV-KEHOE, 1997 WL 306895, at *5 (S.D. Fla. Apr. 3, 1997) (denying certification because "the class collapses into distinct groups of winners and losers").

### 4. Alleging that Costs Were Passed On To The Plans Does Not Eliminate Individual Issues

Plaintiffs' allegation that the retirement plans' investments suffered some diminishment in value, which in turn caused a breach of fiduciary duty, creates additional individual issues. As described above, any such allegation would require some individualized tracing of the money paid to Defendants under the service contracts back through particular mutual funds and then on to the proposed class members.

The best indication that there is no common proof of any "diminishment in value" is that very few of the relevant mutual funds increased their charges after they began making service payments to Defendants. To the contrary, most of the mutual funds *decreased* their charges over time. *See supra* at 16; *see also* Exhibit 20(B). As a result, Plaintiffs' theory that the decline in value caused a breach would require an analysis of whether any (and which) mutual funds would have charged still less if they had obtained Defendants' services for free.[93]

Even if Plaintiffs could establish that some portion of the challenged service payments were unreasonable and violated ERISA because they were charged back to the retirement plans, Plaintiffs could recover only that portion of the payments.[94] Quantifying the improper service payments would require individualized inquiries that defeat class certification.

---

[93] *Cf. Valley Drug Co. v. Geneva Pharms., Inc.*, No. 02-10171, --- F.3d ---, 2003 WL 22682603 (11th Cir. Nov. 14, 2003) (district court abused its discretion in denying discovery into defendants' theory that some class plaintiffs enjoyed economic benefit from challenged actions); *Phillips*, 502 F.2d at 367 ("When as here, there is complaint as to injury from an allegedly invalid action . . . and the action may be taken as conferring economic benefits or working economic harm, depending on the circumstances of the individual, the foundations of maintenance of a class action are undermined.").

[94] *Wsol v. Fund Asset Management*, 266 F.3d 654 (7th Cir. 2001); *see also Felber v. Estate of Regan*, 117 F.3d 1084 (8th Cir. 1997) (where plan assets were used in real estate transaction, plan could recover only that portion of profits attributable to use of its assets, with burden on the fiduciary to show what portion of the profit was not attributable to the breach of duty); *Ossey v.*

## II.    THE PROPOSED CLASS DOES NOT MEET THE SUPERIORITY REQUIREMENTS OF RULE 23(B)(3)

In addition to forbidding certification of a class action where individualized issues can be expected to predominate, Rule 23(b)(3) also forbids certification of a class action if the Plaintiff has not shown that class litigation would be "superior" to individual litigation. The proposed class action is not superior here because this case is unmanageable, the claims are untested, and individual litigation is feasible.

A class action is not superior to individual litigation when the need to determine individualized issues of liability and damages would render the class action unmanageable. *See Cohn v. Mass. Mut. Life Ins. Co.*, 189 F.R.D. 209, 218 (D. Conn. 1999) (agreeing that "that the superiority requirement cannot be satisfied [if] the predominance of individual issues would render a class action unmanageable").[95] For the reasons set forth in the preceding sections, a class action based on Plaintiffs' allegations could not manageably be tried because of the abundance of individualized issues regarding, among other things, whether there is any special

---

*Marolda*, No. 96 C 296, 1998 WL 67624 (N.D. Ill. Jan. 29, 1998) (where investment manager made profits on business obtained by paying kickbacks out of plan assets, "the most Plaintiffs could recover would be the profits earned [on the trades involving the kickbacks and the defendant] would have the opportunity to prove that some of those profits were attributable solely to its efforts, rather than to its improper conduct").

[95]    *See also Daniels v. Amerco*, No. 81 Civ. 3801 (RLC), 1983 WL 1794 (W.D.N.Y. Mar. 10, 1983) (proposed class action was not superior because of manageability problems arising from need for individualized examination of particular transactions); *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n.19 (5th Cir. 1996) ("[t]he greater the number of individual issues, the less likely superiority can be established"); *Grandon v. Merrill Lynch & Co., Inc.*, No. 95 Civ. 10742 (SWK), 2003 WL 22118979, at *10 (S.D.N.Y. Sept. 11, 2003) ("If a class were to be certified here, the Court would be required to conduct a series of mini-trials in order to determine ... whether [the defendant] charged an undisclosed, excessive markup. Under these circumstances, a class action is not a feasible, let alone superior, method for the fair, efficient, and manageable adjudication of the putative class's claims.") (internal quotation marks omitted).

relationship between each retirement plan's investments and the separate service payments.[96]
The same facts also require individualized assessment of damages, which cannot be avoided by
vague and unexplained references to some generalized "mechanical calculations." [97] *Cf. Abrams
v. Interco, Inc.*, 719 F.2d 23, 31 (2d Cir. 1983) (denying certification because of a "serious
problem of manageability relate[d] to damages").

Plaintiffs have offered no plan for how these individualized issues could ever manageably
be tried. Nor have Plaintiffs explained how they would try the many other broad allegations in
their complaint. For example, Plaintiffs allege in the complaint that Defendants' conduct was
part of some overall scheme that was driven by competitive market forces. They also complain
that some of the "insurance" mutual funds available to the individual annuity contracts were
inferior to the "retail" funds available to the group contracts. *See* Third Am. Compl. ¶ 32. If
Plaintiffs intend to pursue these sweeping allegations (which themselves raise significant
individual issues regarding different competitive forces and different types of funds), they must

---

[96]    Plaintiffs advert to the absence of a jury or some possible role for a special master as
solving the manageability problem. But those assertions are unavailing in view of the enormous
complexity of this action and the sheer scope of task of determining liability and damages as to
the members of the putative class. To resolve Plaintiffs' class claims, *someone* will be obligated
to undertake a Plan-by-Plan and fund-by-fund analysis of hundreds of thousands of transactions
to determine liability and damages. The case is unmanageable regardless of whether the
overburdened factfinder is a jury, a special master, or this Court.

[97]    Plaintiffs assert that they know of no case in which a court has denied certification on
manageability grounds where a jury was not requested. There are, however, many such cases.
*See, e.g., Dunnigan*, 214 F.R.D. at 139 (denying certification in an ERISA case, where no jury is
permitted) ("Because MetLife's liability on each class member's claim cannot be established
without individualized inquiries, individualized issues predominate and class certification is
improper."); *Street v. Diamond Offshore Drilling*, No. Civ. A. 00-1317, 2001 WL 568111, at *9
(E.D. La. May 25, 2001) (denying certification in case where no jury was requested) ("Having
weighed the common issues presented by this suit against those issues that require an
individualized analysis, it becomes evident that this case is not one that lends itself to resolution
through a class action.").

explain how they can be tried based on generalized proof, or they must be dropped from the case. The fact that these presumably very serious allegations have simply been left "hanging" underscores how Plaintiffs have not met their burden of showing manageability.

The serious problems of manageability arise in substantial part because Plaintiffs' allegations are so novel, and untested by individual litigation. Plaintiffs can point to no reported decision case that imposes ERISA liability on a defendant on the basis of allegations comparable to those made in this action. *See Castano*, 84 F.3d at 747 (explaining that a case should not be certified "without a prior track record of trials from which the district court can draw the information necessary to make the predominance and superiority analysis required by Rule 23"); Declaration of Professor George Priest (Ex. 15) ¶ 34 ("The term 'maturity' refers to the increasing belief by class action practitioners that, prior to class certification, it is essential to have had some experience trying individual claims similar to those alleged on behalf of the class in order to determine exactly how class proof will proceed.").[98]

Finally, there is no need for a class action here. Where the class claims are of allegedly substantial value and where attorneys' fees are available to a prevailing litigant, a class action is not superior to traditional litigation. "[T]he most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit." *Street v. Diamond Offshore Drilling*,

---

[98]    The concept of maturity developed in the context of mass torts, which raise many of the same concerns as Plaintiffs' mass-breach-of-duty allegations here. *See* Melissa A. Waters, *Common Law Courts in an Age of Equity Procedure*, 80 N.C. L. Rev. 527, 598-99 (2002). However, the logic of the maturity doctrine is not limited to that arena. *See Cohn v. Massachusetts Mut. Life Ins. Co.*, 189 F.R.D. 209, 218 n.35 (D. Conn. 1999) ("The Defendants also argue that a class action would not be a superior form of adjudication because the case presents immature or novel theories and because, based on the outcomes of comparable cases, the Plaintiffs' claims are likely to be unsuccessful. Because the court concludes on other grounds that a class action would not be a superior method of adjudication, it is unnecessary to address these arguments.").

No. Civ. A. 00-1317, 2001 WL 568111, at *12 (E.D. La. May 25, 2001). Here, where even

Plaintiffs say that individual plans could seek substantial monetary recovery as well as statutory

attorneys fees, Pls.' Mem. at 11, and thus "there is no financial barrier that makes individual

lawsuits unlikely or infeasible, ... the factors necessary to certify this class under Rule 23(b)(3)

are absent." *Street*, 2001 WL 568111, at *12. Indeed, even where the alleged claims are of

relatively small value, the availability of fees weighs heavily against class certification. *See*

*Cohn*, 189 F.R.D. at 219 ("although the small size of any loss suffered might deter suits by many

members of the proposed class, the cost of litigation will not be an insurmountable obstacle to

those who wish to pursue claims, given the availability of attorneys' fees").

## III.    THE PROPOSED CLASS DOES NOT MEET THE OTHER REQUIREMENTS OF RULE 23(B)(2)

Plaintiffs try to avoid the strict standards under Rule 23(b)(3) by insisting that their

ERISA claim should be certified under Rule 23(b)(2), like a claim for an injunction or "back

pay." This effort is unavailing.

### A.    The "Equitable Monetary Relief" Sought By Plaintiffs Is Not Injunctive Relief

"In determining the propriety of a remedy, we must look to the real nature of the relief

sought, not its label." *Gerosa v. Savasta & Co., Inc.*, 329 F.3d 317, 321 (2d Cir. 2003) (rejecting

money sought as reimbursement from plan losses as "appropriate equitable relief" under ERISA

§ 502(a)(3)). Here, Plaintiffs ask the Court to order Defendants to pay Plaintiffs enormous sums

of money. "Almost invariably . . . suits seeking (whether by judgment, injunction, or

declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money

damages,' as the phrase has traditionally been applied, since they seek no more than

compensation for loss resulting from the defendant's breach of legal duty." *Great-West Life*, 534

U.S. at 210 (quoting *Bowen v Massachusetts*, 487 U.S. 879, 918-19 (1988) (Scalia, J.,

48

dissenting)). *See also De Pace v. Matsushita Elec. Corp. of America*, 257 F. Supp. 2d 543

(E.D.N.Y. 2003). Such a claim is not suitable for certification under Rule 23(b)(2).

Plaintiffs' analogy between the restitutionary relief they ask for and back pay, a form of

monetary relief traditionally permitted for 23(b)(2) classes, *see* Pls.' Mem. at 27-28, was rejected

by the United States Supreme Court in *Great-West* -- a case Plaintiffs neglect to mention. *See*

534 U.S. at 218, n.4. In *Great-West*, the Supreme Court directly addressed the scope of

restitution available as an equitable remedy under ERISA, and limited it to its historical roots,

which allows "restitution *in equity*" only "where money or property identified as belonging in

good conscience to the plaintiff could clearly be traced to particular funds or property in the

defendant's possession." *Id.* at 213.

Plaintiffs have disavowed the tracing of specific funds spent by each Plan for specific

Nationwide services in favor of a "mechanical calculation" of reasonable damages. Pls.' Mem.

at 35. The remedy sought by Plaintiffs therefore does not sound in equity, as they are seeking

"to impose personal liability on the Defendants," rather than "restor[ing] to the plaintiff[s]

particular funds or property in the defendant's possession." *Great-West*, 534 U.S. at 213; *cf.*

*Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450, 457 (3d Cir. 2003) (where there are

"no funds readily traceable to [an ERISA plaintiff] over which a constructive trust or other

equitable remedy may be imposed," a plaintiff's "claims for restitution and disgorgement are

likely barred by the Supreme Court's recent decision in *Great-West*").

In this regard, the instant case is quite similar to *Bona v. Barasch*, 2003 WL 1395932. In

*Bona*, participants in a group of pension funds brought a putative ERISA and RICO class action

against, *inter alia*, fund trustees, companies and individuals who provided services to the funds.

Like Plaintiffs here, the plaintiffs in *Bona* alleged "that various groups of Defendants have long

manipulated investment services contracts with the employee benefit funds so as to reap inflated fees and otherwise enrich themselves." *Id.* at *1. In response, and in light of *Great-West,* the court rejected the plaintiffs' attempts to characterize monetary relief for the defendants' alleged breaches of fiduciary duty under ERISA as equitable in nature. *See id.* at *10. "Ultimately, Individual Plaintiffs' claim for monetary relief is nothing more than a claim for money damages as compensation for losses." *Id.* at *12. In this case, as in *Bona,* Plaintiffs have failed to allege "that the property they seek is either identifiable or in the hands of the [Defendants], from whom Plaintiffs seek monetary relief." *Id.*

Plaintiffs rely heavily on *Strom v. Goldman, Sachs & Co.,* 202 F.3d 138 (2d Cir. 1999), *see* Pls.' Mem. at 28, which is not good law in light of the Supreme Court's ruling in *Great-West.*[99/] Similarly, Plaintiffs' reliance on *Robinson v. Metro-North Commuter R.R. Co.,* 267 F.3d 147 (2d Cir. 2001) is unavailing, since *Great-West* subsequently rejected any analogy between Title VII -- the statute involved in *Robinson* -- and ERISA.

**B.**    **Plaintiffs' Claims Are Not Certifiable Under Rule 23(b)(2) Because They Are Seeking Enormous Money Damages**

Two factors are relevant to determining whether damages sought are incidental -- the actual amount of damages, and the method by which damages can be calculated. Both factors support Defendants' contention that Plaintiffs are seeking far more than incidental monetary

---

[99/]    *See Bona,* 2003 WL 1395932, at *11 ("Because *Strom's* holding cannot be reconciled with *Great-West,* I conclude that *Strom* does not control the present case; rather, *Great-West* controls, and *Great-West* bars Individual Plaintiffs' request for monetary relief from the trustees."); *see also Augienello v. Coast-to-Coast Fin. Corp.,* No. 01 Civ. 11608(RWS), 2002 WL 1822926, at *6 (S.D.N.Y. Aug. 7, 2002) ("[T]here is reason to believe *Great-West Life* repudiated the Second Circuit's reasoning in *Strom v. Goldman Sachs,* on which Plaintiffs rely in their attempt to frame their claims in equitable terms.") (internal citation omitted); *Kishter v. Principal Life Ins. Co.,* 186 F. Supp. 2d 438 (S.D.N.Y. 2003); *In re Enron,* 2003 WL 22245394, at *62 ("*Strom* [is] no longer good law. No matter how artfully pled, 'make-whole' relief for a claim of breach of fiduciary duty by a trustee cannot cloak a claim for compensatory damages.").

damages. While Plaintiffs do not attempt to quantify the monetary restitution they seek from

Defendants, they cannot escape the conclusion that their monetary damages are sizable by

refusing to name an amount. *See In re Ski Train Fire*, No. 01 MDL 1428 (SAS), 2003 WL

22319577, at *8 (S.D.N.Y. Oct. 9, 2003) ("Although Plaintiffs have not yet provided an estimate

of the damages they seek, it can be assumed that the amount is not insignificant. The 'non-

incidental nature' of the damages sought by Plaintiffs demonstrates that their damages claims

predominate over their claims for declaratory and injunctive relief."). Plaintiffs claim that

ending Defendants' practices would create a benefit of "hundreds of billions of dollars." Pls.'

Mem. at 32. By that logic, any restitution for eight years of those same practices must be

denominated in the billions of dollars. Plaintiffs do not and cannot cite any precedent for the

notion that billions of dollars are "incidental." Indeed, *In re Monumental Life Ins. Co.*, 343 F.3d

331 (5th Cir. 2003), the primary case on which Plaintiffs rely, *see* Pls.' Mem. at 30, was "the

ultimate *negative* value class action lawsuit." 343 F.3d at 335 (emphasis added).

Similarly, Plaintiffs fail to satisfy the *ad hoc* balancing standard adopted by the Second

Circuit in *Robinson*. As the *Robinson* Court explained, a district court may allow 23(b)(2)

certification if it finds that "(1) the positive weight or value to the Plaintiffs of the injunctive or

declaratory relief sought is predominant even though compensatory or punitive damages are also

claimed, and (2) class treatment would be efficient and manageable, thereby achieving an

appreciable measure of judicial economy." 267 F.3d at 164 (internal citations and quotations

omitted). Putting aside for one moment the second factor of manageability, discussed *supra* at

44-46, Plaintiffs cannot show that the value of injunctive relief predominates over monetary

damages. *See, e.g.*, *In re Ski Train Fire*, 2003 WL 22319577 at *8.

The *ad hoc* standard "*at a minimum*" requires that "even in the absence of possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought." *Robinson*, 267 F.3d at 164 (emphasis added). Here, however, injunctive or declaratory relief pursuant to Rule 23(b)(2) is an afterthought in Plaintiffs' case, added only in the Third Amended Complaint. In both their First and Second Amended Complaints, Plaintiffs sought certification only as a 23(b)(3) class. *See* First Amended Compl. (Docket 4) ¶ 31; Second Amended Compl. (Docket 64) ¶ 36. Under these facts, it strains credulity for Plaintiffs to assert that they would have brought this suit "even in the absence of possible monetary recovery." 267 F.3d at 164. Both previous class action Complaints explicitly sought monetary damages for the alleged violation of ERISA's fiduciary duty provisions. *See* First Amended Compl. ¶ 1 ("This is an action for damages and equitable relief under [ERISA] ...."); Second Amended Compl. ¶ 1 (same).

Furthermore, the individualized damages calculations that will be required for each plan should Plaintiffs succeed on the merits, *see supra* at 44–45, are atypical for a case involving merely incidental damages. *See Robinson*, 267 F.3d at 165 ("entitlement to such [incidental] damages *does not vary based on subjective considerations of each class member's claim*, but flows directly from a finding of liability on the claims for class-wide injunctive and declaratory relief.") (emphasis added; internal citations and quotations omitted). Unlike *Monumental Life Ins.*, where grids could be used to mechanically determine the amount of damages owed to class members once liability was established on a class-wide basis, the variety (and variations in value) of the services provided by Nationwide to the funds mean that a finding that Nationwide breached its fiduciary duty to one Plan by charging a fee in excess of the value of the services provided to the funds chosen by that Plan's will not apply uniformly to other Plans. As such, an

individualized, subjective determination as to whether Nationwide breached its duty to each Plan

will be a necessary predicate to any calculation of damages, and the calculation of damages will

turn on the fees charged and services provided.  *Compare Monumental Life Ins.*, 343 F.3d at 343

("In the list of policy variables cited by Defendants and the district court, none requires the

gathering of subjective evidence.").

## IV.    PLAINTIFFS HAVE NOT PROVED THEY ARE ADEQUATE REPRESENTATIVES

To determine adequacy of representation under Rule 23(a)(4), the court must analyze

"the representative's understanding and involvement in the lawsuit, the willingness to pursue the

litigation, the ability to serve as a fiduciary on behalf of the class, and any conflict between the

representative and the class." *In re LILCO Secs. Litig.*, 111 F.R.D. 663, 672 (E.D.N.Y. 1986).

### A.    The Presence Of Counterclaims Renders Plaintiffs Inadequate

The counterclaim alleging that the Plaintiffs breached the fiduciary duty they owed to the

Plans as trustees should disqualify them as class representatives:  "A court should not certify a

class representative who 'is subject to unique defenses which threaten to become the focus of the

litigation.'" *Pecere*, 194 F.R.D. at 72 (quoting *Gary Plastic Packaging v. Merrill Lynch*, 903

F.2d 176, 180 (2d Cir. 1990)).  In this case, some Plan trustees agreed to the modification or

amendment of their Plan's variable annuity contracts with Nationwide Life, which specifically

permitted the receipt of service contract payments for administrative services in exchange for

lower variable annuity contract charges.  Plaintiffs' ratification of a practice they are now suing

over will place their own motivation and credibility near the center of the case, making them

inadequate as class representatives. *See Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983); *see also*

*Koenig v. Benson*, 117 F.R.D. 330, 338 (E.D.N.Y. 1987) ("In the Second Circuit a proposed

class representative can be ruled inadequate under Rule 23(a)(4) if he is vulnerable to attacks on

his credibility concerning key facts at issue in the case."). Although Plaintiffs have substituted

new trustees for two of the Plans, the same inadequacy issue applies to them as well.

**B.   Plaintiffs Are Inadequate Because They Have Essentially No Knowledge About Their Own Plans, the Plans' Investments, This Lawsuit, Or The Actions Of Their Counsel**

Plaintiffs' deposition testimony demonstrates profound ignorance of the nature and basic

facts of their claims.[100] One reason that courts demand a rudimentary degree of knowledge by a

putative class representative is to avoid "'misleading and contradictory testimony with regard to

basic issues in the case that might make their claims subject to unique defenses.'" *Baffa v.*

*Donaldson, Lufkin & Jenrette Secs. Corp.,* 222 F.3d 52, 61 (2d Cir. 2000) (quoting *In re*

*TCW/DW N. Am. Gov't Income Trust Sec. Litig.,* 941 F. Supp. 326, 340 (S.D.N.Y. 1996)). Here,

Plaintiffs' ignorance has manifested itself in an ever-shifting account of Plaintiffs' factual and

legal claims. *See also Panzirer v. Wolf,* 663 F.2d 365, 368 (2d Cir. 1981) (affirming denial of

class certification on inadequacy grounds where plaintiff "gave no less than four versions" of

facts central to her claim); *Darvin v. Int'l Harvester Co.,* 610 F. Supp. 255, 257 (S.D.N.Y. 1985)

("This type of inconsistent testimony could create serious problems with respect to plaintiff's

credibility and could become the focus of cross examination and unique defenses at trial, to the

---

[100]   *See, e.g.,* Transcript of March 11, 2003 Deposition of Edward Kaplan ("Kaplan Deposition") (Ex. 39) at 22-29 (acknowledging that Kaplan had no knowledge of his interrogatory responses); Transcript of April 21, 2003 Deposition of Ronald Simon ("Simon Deposition") (Ex. 40) at 17 ("Q:  As you sit here today, do you have any understanding of what the word 'annuity' means?  A:  No."); *id.* at 69 (witness did not know if he ever received any disclosures regarding challenged service charges); Wiberg Deposition (Ex. 36) at 12 ("Q:  Are you claiming that there were any transactions prohibited by the ERISA laws in this lawsuit?  A: I don't know the -- those laws.  There's too many of them."); *id.* at 56-57 (witness unaware of any facts regarding challenged service relationships between Nationwide and mutual fund entities); *id.* at 65 (Plaintiffs' counsel acknowledging that "Mr. Wiberg has testified at least five times he doesn't know what a variable annuity is"); Gouse Deposition (Ex. 37) at 53 (witness unable to answer questions about Nationwide's alleged fiduciary duties without invading attorney-client privilege).

detriment of the class."); *Savino v. Computer Credit, Inc.*, 173 F.R.D. 346 (E.D.N.Y. 1997), *aff'd in relevant part*, 164 F.3d 81 (2d Cir. 1998).

For example, Plaintiffs Kaplan, Gouse and Wiberg all testified at their deposition that the mutual funds were directly transferring plan assets to Defendants through inflated mutual fund charges.[101] These Plaintiffs then confirmed this version in their supplemental interrogatory answers that they filed in July 2003. *See* Plaintiffs' Supplemental Responses and Objections to Defendants' Third Set of Interrogatories (Ex. 2) at 2-4. But now these same Plaintiffs are seeking class certification on completely different theories of "fruits of plan assets" and accumulation units" that they never mentioned at their depositions, and that disavow any direct transfer of plan assets by the mutual funds. *See* Plaintiffs' First Amended Supplemental Responses and Objections to Defendants' Third Set of Interrogatories (Ex. 1) at 3-4.

There are many examples of such "misleading and contradictory" testimony. These troubling lapses may be attributable in part to the fact that each of these Plaintiffs was solicited by Plaintiffs' counsel, and Plaintiffs' counsel not only told Plaintiffs what the case was about, but persuaded Plaintiffs to verify facts in their interrogatory answers about which they had no personal knowledge.[102] Moreover, these lapses may also be due to their almost complete lack of attention to their duties as trustees of the Plans. For example, the Plaintiffs all reported that they had never reviewed their variable annuity contracts or their plan documents, and had little or no

---

[101]   *See* Kaplan Deposition (Ex. 39) at 41:16-22; Gouse Deposition (Ex. 37) at 41:18-21, 105:5-24, 161:3-9; Wiberg Deposition (Ex. 36) at 2-3, 61, 64.

[102]   *See* Kaplan Deposition (Ex. 39) at 17:15-21, 19:6-20:25, 23:3-11; Gouse Deposition (Ex. 37) at 53:21-54:7; Wiberg Deposition (Ex. 36) at 8, 11, 16-17.

familiarity with the terms of those documents.[103]  Trustees who claim to have completely

abdicated their ERISA fiduciary duties on behalf of their Plans can hardly be deemed adequate

class representatives to be pursuing claims on behalf of trustees who have acted as proper

fiduciaries.

**C.    Plaintiffs Are Inadequate Because They Have Abandoned Claims Valuable to Some Class Members In Order To Increase The Chances For Certification Of Their Own Claims**

All of the Plaintiffs insisted in their depositions and their original interrogatory answers

that they were legitimately pursuing claims for misrepresentation, non-disclosure, and breach of

contract, and that there were facts sufficient to support those claims.  Indeed, the Plaintiffs

described their claim as primarily one for non-disclosure, where they had been misled regarding

the level of charges to be assessed.[104]  Plaintiffs' decision now to abandon all these primary

allegations relating to misrepresentation, non-disclosure, and breach of contract in the Third

Amended Complaint, and possibly forego all but incidental monetary damages if necessary to

obtain certification under Rule 23(b)(2), *see* Pls.' Mem. in Support of Pls.' Mot. For Leave to

File (Docket 128) at 1-2, raises serious concerns about the adequacy of these  Plaintiffs to protect

the interests of absent members of the putative class.  "[A] serious question of adequacy of

representation arises when the class members profess themselves willing, as they do here, to

---

[103]    *See* Kaplan Deposition (Ex. 39) at 46:7-47:7, 70:14-20, 104:23-105:3, 108:23-109:7; Gouse Deposition (Ex. 37) at 53:21-54:7; 66:16-21; 80:2-81:3; 83:7-84:24; Wiberg Deposition (Ex. 36) at 7, 21, 30, 31.

[104]    *See* Kaplan Deposition (Ex. 39) at 42:15-21, 182:7-12; Gouse Deposition (Ex. 37) at 37:15-24, 39:6-9; Wiberg Deposition (Ex. 36) at 2, 13.

assert on behalf of the class only such claims" as are likely to result in class certification.

*Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 606 (S.D.N.Y. 1982).[105]

In *Feinstein*, an abortive products liability class action, counsel for the name Plaintiffs

narrowed the class claims during the course of preliminary hearings, dropping claims for death,

injury or property damage resulting from defective tires, until only a claim for breach of implied

warranty remained. *See id.* at 599. The district court found this unacceptable:

> [P]laintiffs so tailored the class claims in an effort to improve the
> possibility of commonality. But that improvement -- essentially
> cosmetic . . . -- was purchased at the price of presenting putative
> class members with significant risks of being told later that they
> had impermissibly split a single cause of action.

*Id.* at 606; *accord MBTE*, 209 F.R.D. at 338; *Pearl v. Allied Corp.*, 102 F.R.D. 921, 923 (E.D.

Pa. 1984) ("Plaintiffs' efforts to certify a class by abandoning some of the claims of their fellow

class members have rendered them inadequate class representatives").

Plaintiffs' abandonment of claims for misrepresentation and breach of contract here

raises serious due process issues. A class member who potentially could prove the requisite

reliance to recover damages for negligent or fraudulent misrepresentation (including possible

punitive damages), or obtain a larger-than-incidental monetary recovery for damages stemming

---

[105]     *See also Western Sale Wholesale, Inc. v. Synthetic Indus. Inc.*, 206 F.R.D. 271, 277 (C.D.
Cal. 2002) ("A class representative is not an adequate representative when the class
representative abandons particular remedies to the detriment of the class."); *Thompson v.
American Tobacco Co., Inc.*, 89 F.R.D. 544, 550-51 (D. Minn. 1999) ("The Court finds that the
named Plaintiffs' efforts to reserve personal injury and damage claims may, in fact, jeopardize
the class members' rights to bring such claims in a subsequent case. . . . This possible prejudice
to class members is simply too great for the Court to conclude that the named Plaintiffs' interests
are aligned with those of the class."); *Allshouse v. Firestone Tire & Rubber Co.*, No. 742-649
(Cal. Super. Ct. Aug. 28, 1981) ("A related and more important question arises from the class
representatives' last minute abandonment of several legal theories. While these problems do not
reflect the capability of plaintiffs' attorneys, they are a reflection of the underlying obstacles to
treating this controversy through the class action mechanism.") (cited in *Feinstein*, 535 F. Supp.
at 607 n.16).

from breach of contract, will be prevented from pursuing individual claims due to the bar against claims splitting. *See MBTE*, 209 F.R.D. at 339 ("Claim-splitting is generally prohibited by the doctrine of res judicata . . . which bars parties to a prior action or those in privity with them from raising in a subsequent proceeding any claim they *could* have raised in the prior one, where all of the claims arise from the same set of operative facts.") (internal citations omitted).[106]

Plaintiffs' efforts to abandon claims to obtain class certification "only highlight[s] the poor fit between the class action device and this case." *See MBTE*, 209 F.R.D. at 329. The Plaintiffs in the *MBTE* case "made every conceivable argument to persuade th[e] Court that class action treatment is appropriate," offering, *inter alia*, to narrow the scope of injunctive relief, pursue damages on an individual basis, and provide notice and opt-out options to absent class members who disagreed with their pared-down class action. *Id.* at 329, 334, 338 n.23. Plaintiffs here have similarly sacrificied the claims of their class members in their effort to obtain certification of their own claims. *See* Pls.' Mem. 18-20 (restricting damages claims); 36-37 (disclaiming misrepresentation claims to achieve predominance); 37 (offering opt-out to certain class members to pursue individual claims); 38, 39-40 (proposing bifurcation of liability from remedy or appointment of a special master to handle individualized damages questions).

---

[106] Defendants believe that such claims would be without merit. However, these very Plaintiffs previously advanced such claims, *see* Second Am. Compl. at ¶¶ 2, 20, 23, and cannot now claim that such claims are utterly without value.

## **CONCLUSION**

For all the foregoing reasons, Defendants respectfully request that the Court deny

Plaintiffs' First Amended Motion for Class Certification.

Respectfully submitted,

Date:  December 23, 2003

Defendants Nationwide Financial Services
Inc. and Nationwide Life Insurance Co.

By:    *Eric Mogilnicki*

Eric Mogilnicki, Esq.  (CT 23053)
Sam Broderick-Sokol, Esq. (CT 25264)
Mark Bieter, Esq.
Wilmer, Cutler & Pickering
2445 M Street, N.W.
Washington, D.C. 20037
Telephone:    (202) 663-6000
Facsimile:    (202) 663-6363

Charles C. Platt, Esq. (CT 23036)
Wilmer, Cutler & Pickering
399 Park Avenue
New York, NY  10022
Telephone:    (212) 230-8800
Facsimile:    (212) 230-8888

Dennis F. Kerrigan, Jr., Esq. (CT 09621)
Brian O'Donnell, Esq. (CT 16041)
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
Goodwin Square, 225 Asylum Street
Hartford, CT 06103
Telephone:    (860) 293-3500
Facsimile:    (860) 293-3555

## <u>CERTIFICATION</u>

This is to certify that true and correct copies of the foregoing Defendants' Opposition to

Plaintiffs' First Amended Motion for Class Certification and [Proposed] Order were served via

overnight mail on this 23rd day of December, 2003, on the following counsel of record:

> Richard A. Bieder, Esq.
> Antonio Ponvert III, Esq.
> Koskoff, Koskoff & Bieder
> 350 Fairfield Avenue
> Bridgeport, CT 06604
>
> Gregory G. Jones, Esq.
> Law Firm of Gregory G. Jones, P.C.
> 603 South Main Street, Suite 200
> Grapevine, TX 76051
>
> Marc R. Stanley, Esq.
> Roger L. Mandel, Esq.
> Stanley, Mandel & Iola
> 3100 Monticello Avenue
> Suite 750
> Dallas, TX 75205

Mark Bieter

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LOU HADDOCK, as trustee of the Flyte Tool & Die,    :
Incorporated Deferred Compensation Plan, PETER    :
WIBERG, as trustee of the Crown Tool & Die    :
Deferred Compensation Plan, ALAN GOUSE, as    :
trustee of the Greater Hartford Easter Seal    :
Rehabilitation Center Deferred Compensation Plan,    :
RONALD SIMON as trustee of the Hartford Roofing,    :
Inc. Deferred Compensation Plan, CARL    :
ANDERSON as trustee of the Anderson & Ferdon    :
Deferred Compensation Plan,    :
   :
       PLAINTIFFS,    :
   :
             v.    :
   :
NATIONWIDE FINANCIAL SERVICES INC., and    :
NATIONWIDE LIFE INSURANCE CO.,    :
   :
       DEFENDANTS.    :
   :

CIVIL ACTION NO.:

3:01CV1552(CFD)

## **[PROPOSED] ORDER**

The Court has read and considered Defendants' Opposition to Plaintiffs' First Amended

Motion for Class Certification and all other submissions and arguments of the parties in support

of and in opposition to that motion, and based on such consideration, the Court HEREBY

ORDERS THAT Plaintiffs' First Amended Motion for Class Certification is DENIED.

Date: _____           _____

                                The Honorable Christopher Droney
                                United States Judge

1