UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Lou Haddock, as trustee of the Flyte Tool & Die, Incorporated Deferred Compensation Plan, et. al., | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 01-CV-1552 (SRU) |
| Nationwide Financial Services Incorporated, and Nationwide Life Insurance Company, | § § § | |
| Defendants. | § § | March 5, 2004 |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND REVISED MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................. i

INDEX OF AUTHORITIES......................................................................... iii

INTRODUCTION........................................................................................ 1

STATEMENT OF FACTS........................................................................... 2

A.    *THE RELATIONSHIP BETWEEN CLASS MEMBERS,*
      *NATIONWIDE AND THE MUTUAL FUNDS*........................................ 2

B.    *THE RELATIONSHIP BETWEEN NATIONWIDE*
      *AND MUTUAL FUNDS/MUTUAL FUND ADVISORS*
      *PRIOR TO IMPLEMENTATION OF THE*
      *REVENUE SHARING SCHEME*............................................................7

C.    *IMPLEMENTATION OF THE REVENUE SHARING SCHEME* ...........8

ARGUMENT AND AUTHORITIES.......................................................... 12

I.    **AT A MINIMUM, THERE IS A GENUINE ISSUE OF MATERIAL**
      **FACT AS TO WHETHER THE REVENUE SHARING PAYMENTS**
      **CONTITUTE PLAN ASSETS IN NATIONWIDE'S HANDS** .......... 12

A.    *THE COURT SHOULD USE THE FUNCTIONAL APPROACH*
      *TO DETERMINE WHETHER THE REVENUE SHARING*
      *PAYMENTS CONSTITUTE PLAN ASSETS IN NATIONWIDE'S*
      *HANDS, AND IT DOES NOT MATTER UNDER THAT*
      *APPROACH WHETHER THE REVENUE SHARING PAYMENTS*
      *EVER PREVIOUSLY CONSTITUTED PLAN ASSETS* ...........................12

B.    *UNDER THE FUNCTIONAL APPROACH, THERE IS, AT A MINIMUM,*
      *A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE*
      *REVENUE SHARING PAYMENTS CONSTITUTE PLAN ASSETS* .......... 14

1.    The Functional Approach Does Not Make All Payments By Mutual Funds
      for Goods and Services Into Plan Assets in the Hands of Their Recipients.....................16

2.    The Revenue Sharing Payments Are Analogous to Payments
      by a Closing Mutual Fund, Which Payments Would Undeniably
      Constitute Plan Assets in Nationwide's Hands................................................17

i

**Page**

3.      Courts Have Held Funds Analogous to the Revenue Sharing Payments
        Constitute Plan Assets Under the Functional Approach ......................................................8

C.      *PLAINTIFFS SEEK FURTHER DISCOVERY, IF NECESSARY* ....................................20

II.     **A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER
        NATIONWIDE VIOLATED ERISA BY ACCEPTING AND RETAINING
        ASSETS OF THE PLANS (THE REVENUE SHARING PAYMENTS)
        WHICH IT HAD NOT CONTRACTED TO RECEIVE** ...................................22

A.      *THE FROST OPINION SUPPORTS PLAINTIFFS' POSITION,
        NOT NATIONWIDE'S* ........................................................................................22

B.      *THE ALIAC OPINION DOES NOT SUPPORT NATIONWIDE'S POSITION* .................24

C.      *THE AATSC OPINION DOES NOT SUPPORT NATIONWIDE'S POSITION* ...............25

D.      *THE DAMASCO CASE DOES NOT SUPPORT NATIONWIDE'S POSITION* ...............25

E.      *GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER
        THE REVENUE SHARING PAYMENTS CONSTITUTE, IN WHOLE
        OR IN PART, PLAN ASSETS OR FEES RECEIVED FOR
        LEGITIMATE SERVICES RENDERED TO MUTUAL FUNDS* .................................26

F.      *ALTERNATIVELY, THE COURT SHOULD GRANT PLAINTIFFS
        ADDITIONAL TIME TO TAKE THE DISCOVERY NECESSARY
        TO RAISE A GENUINE ISSUE OF MATERIAL FACT AS TO
        THE NATURE OF THE REVENUE SHARING PAYMENTS* ...............................33

III.    **GENUINE ISSUES OF MATERIAL FACT EXIST AS TO
        WHETHER NATIONWIDE CONSTITUTES A FIDUCIARY
        AS TO THE ACCUMULATION UNITS** ....................................................34

A.      *A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO NATIONWIDE'S
        GENERAL EXERCISE OF AUTHORITY OR CONTROL OVER THE
        ACCUMULATION UNITS* ...................................................................................35

B.      *A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO NATIONWIDE'S
        SPECIFIC EXERCISE OF AUTHORITY OR CONTROL OVER THE
        ACCUMULATION UNITS BY RECEIVING THE REVENUE SHARING
        PAYMENTS, THEREBY CAUSING A DECREASE IN THEIR VALUE* ....................36

IV.     **CONCLUSION** .......................................................................37

# INDEX OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Acosta v. Pacific Enterprises*, 950 F.2d 611 (9th Cir. 1992)....................................12, 13

*Bannistor v. Ullman*, 287 F.3d 394 (5th Cir. 2002)........................................13, 19, 20

*Blatt v. Marshall & Lassman*, 812 F.2d 810 (2d Cir. 1987).........................................12

*Board of Trustees of the Air Conditioning and Refrigeration Industry
Health & Welfare Trust Fund v. J.R.D. Mechanical Services, Inc.*,
99 F. Supp. 2d 1115 (C.D. Cal. 1999) ..................................................................... 13-14

*Damasco & Assoc. 401(k) Profit Sharing Plan v. Manufacturers' Life Ins. Co.*,
1999 U.S. Dist. LEXIS 13654 (N.D. Cal. Aug. 20, 1999)................................25, 26, 32

*Lopresti v. Terwilliger*, 126 F.3d 34 (2d Cir. 1997) ...............................................12, 13

*Lowen v. Tower Asset Management, Inc.*,
829 F.2d 1209 (2d Cir. 1987).......................................................................................22

*Patelco Credit Union v. Sahni*, 262 F.3d 897 (9th Cir. 2001) ................................18, 19

*Reich v. Goldstein*, 839 F. Supp. 1068 (S.D.N.Y. 1993) ...............................................14

*U.S. v. Glick*, 142 F.3d 520 (2d Cir. 1998) ..................................................................13

*U.S. v. Grizzle*, 933 F.2d 943 (11th Cir. 1991) ............................................................13

*U.S. v. Labarbara*, 129 F.3d 81 (2d Cir. 1997)............................................................13

## DOL Opinions

DOL Advisory Opinion 97-15A (May 22, 1997) ..................................................... 22-24

DOL Advisory Opinion 97-16A (May 22, 1997) ................................................... 24, 25

DOL Advisory Opinion 2003-09A (June 25, 2003) ....................................................25

**Statutes, Regulations and Rules**                                                    **Page(s)**

29 U.S.C. § 1106(b) ........................................................................................12

29 U.S.C. § 1106(b)(1) ......................................................................................1

ERISA § 406(b) ...............................................................................................12

ERISA § 406(b)(1)...................................................................................... 1, 22-25

ERISA § 406(b)(3) .......................................................................................21, 25

29 C.F.R. § 2510.3-102 (2000) ............................................................................13

Fed. R. Civ. P. 56(f) ........................................................................................20

Fed. R. Evid. 802 ...........................................................................................30

Fed. R. Evid. 1002 .........................................................................................30

## **INTRODUCTION**

In its Revised Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Rev. Mem.") [Docket No. 186], Nationwide plows much the same ground that it did in its unsuccessful motion to dismiss.  It again claims that the revenue sharing payments do not constitute plan assets based upon the following reasoning: (1) the payments do not constitute plan assets in the hands of the mutual funds prior to payment, (2) the payments cannot be specifically traced  back to what indisputably constituted plan assets, and (3) it allegedly cannot conceive of any other manner by which the revenue sharing payments could constitute plan assets.

In making this argument, Nationwide simply ignores a wealth of case law that directs courts to take a functional approach to determining whether funds constitute plan assets in a defendant's hands, as opposed to a formalistic approach that limits plan assets to contributions made to a plan and assets specifically traceable back to those contributions.  Under the functional approach, there is a genuine issue of material fact as to whether the revenue sharing payments constitute plan assets in Nationwide's hands (if they do not do so as a matter of law).

Significantly, the very face of ERISA makes clear that Nationwide faces liability for simply pocketing those plan assets.  ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), provides that, "*a fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account....*"  As a matter of law, Nationwide's pocketing of the revenue sharing payments constitutes it dealing with plan assets in its own interest and for its own account, and Nationwide should be forced by the Court to return those plan assets.

## STATEMENT OF FACTS

The revenue sharing scheme is detailed below in Subsection (C).  Subsections (A) and (B) set forth the facts that provide the context for the scheme.

A.    *THE RELATIONSHIP BETWEEN CLASS MEMBERS, NATIONWIDE AND THE MUTUAL FUNDS.*

The employers who are the sponsors of the ERISA plans which compose the Class ("the Plans") almost exclusively utilized full service providers to create the Plans and provide the entire range of administrative services necessary to run them.[1]  These full service providers, sometimes referred to as Pension Plan Administrators or PPA's, persuaded the Plans to use Nationwide as their investment provider, receiving commissions for doing so.[2]

After setting up the Plans, the PPA's  provided all the services necessary for the Plans to operate, including record keeping, compliance, trustee services, distribution of account proceeds to departing participants, loan processing, withdrawals, communications with participants, participant servicing, and acting as a complete intermediary between the Plans and Nationwide.[3] Much of the record keeping and other services provided by the PPA's were subcontracted by the

---

[1] Pension and Welfare Benefits Administration, Department of Labor, *STUDY OF 401(K) PLAN FEES AND EXPENSES* §§ 2.6 & 2.7 (1998) ("Study"), Appendix in Support of Plaintiffs' First Amended Motion for Class Certification ("App.") Tab 1 [Docket No. 130].

[2] 30(b)(6) Deposition of Nationwide employee John S. Bath of February 27, 2003 ("Bath Depo.") 78:21-79:0, Confidential Appendix in Support of Plaintiffs' First Amended Motion for Class Certification ("Conf. App.") Tab A [the depositions of Bath and other Nationwide employees referenced herein were taken as part of the 30(b)(6) deposition of Nationwide, such that their testimony constitutes binding admissions by Nationwide] [Docket No. 137]; Deposition Exhibit 12 (Broker Compensation Agreement between Nationwide and the PPA for the Easter Seal Plan), App. Tab 2 [Docket No. 130].

[3] Study §§ 2.6, 2.7 & 3.3, App. Tab 1 [Docket No. 130]; Deposition Exhibit 11 (a listing of services to be provided by the PPA to the Easter Seal Plan), App. Tab 3; Deposition Exhibits 13 & 23 (Appointments of Contract Holders' Authorized Representatives for the Easter Seal Plan), App. Tabs 4 & 5; Deposition Exhibit 52 (Appointment of Contract Holders' Authorized Representatives for the Crown Plan), App. Tab 6.

PPA's to Nationwide in return for payments by the PPA's, typically on a per participant basis.[4]

Pursuant to standard form contracts, Nationwide provided investment options to the Plans through insurance products called variable annuities.[5]  Nationwide offered two types of variable annuity contracts: group annuity contracts, pursuant to which Nationwide contracted only with the Plan, but each participant had an individual account, and individual annuity contracts, for which Nationwide contracted separately with each participant.[6]

The group annuity contracts provided for payment by the Plans to Nationwide of "Asset Management Charges" calculated as a percentage of the daily value of a Plan's investment in the variable account in which Nationwide held the shares of the underlying mutual funds, along with a "Contingent Deferred Sales Charge" if a Plan withdrew its investments from Nationwide within a specified number of years after contract inception.[7]

The individual annuity contracts provided for: (i) fixed ($30 per year) contract maintenance charges; (ii) mortality and expense risk charges (1.25%) calculated as a percentage of the daily net asset value of the participant's investment in the variable account in which Nationwide held the underlying mutual fund shares; (iii) administration charges (.05%) calculated as a percentage of the daily net asset value of the participant's investment in the

---

[4] Bath Depo., 38:9-39:12; 43:17-44:12; 44:22-45:3, Conf. App. Tab A [Docket No. 137]; Deposition Exhibits 519 & 520, Conf. App. Tabs B and C.

[5]  Deposition Exhibit 44 (Verification of Receipt of Specimen Group Annuity Contracts executed by the Crown Plan), Conf. App. Tab D [Docket No. 137].

[6] Study § 2.5.1, App. Tab 1 [Docket No. 130]; Defendants' Local Rule 56(a)(1) Statement in Support of Motion for Summary Judgment filed August 29, 2003 ("Statement"), ¶¶ 2-4, App. Tab 7; The group annuity contracts between Nationwide and the Flyte Plan, the Crown Plan, and the Hartford Roofing Plan, Exhibits A, B and C, respectively, to the Affidavit of Ronald L. Wyant, Jr., ("Wyant Aff.") filed November 15, 2001 [Docket No. 16]; The individual annuity contracts between Nationwide and participants in the Anderson & Ferdon Plan and the Easter Seal Plan, Exhibits 1-4, respectively, to the Affidavit of Stephanie Eakins ("Eakins Aff.") filed November 15, 2001 [Docket No. 17].

[7] Wyant Aff., Exhibits A-C [Docket No. 16].

variable account in which Nationwide held the underlying mutual fund shares; and (iv) a Contingent Deferred Sales Charge.[8]

In return for these charges, Nationwide provided all the services necessary for the administration of the contract, including participant and plan record keeping, participant servicing and communications with participants/plans/PPA's.[9] These services provided to the Plans and their participants were the same services provided to the PPA's in return for payments by those PPA's.[10] None of the group or individual annuity contracts (which are standard forms) provided for or even referenced payments by mutual funds or mutual fund advisors to Nationwide.[11]

Nationwide chose a group of mutual funds that it made available for investment by the Plans with group annuity contracts, and the Plans chose a subset of those funds for investment in by their participants, with the Plans' choices as indicated on the group annuity applications becoming part of their group annuity contracts.[12] Likewise, from the subset of mutual funds chosen by a Plan with individual annuity contracts, the individual participants chose specific funds to invest in, with their individual applications becoming part of the individual annuity

---

[8] Eakins Aff., Exhibit 1-4 [Docket No. 17].

[9] 30(b)(6) Deposition of Nationwide employee John M. Davis of March 10, 2003 ("Davis Depo."), 51:21-53:21, Conf. App. Tab E [Docket No. 137].

[10] Davis Depo., 44:9-45:7; 45:8-12; 48:14-50:22; 51:21-53:21; 63:12-21, Conf. App. Tab E [Docket No. 137]; 30(b)(6) Deposition of Nationwide employee Steven Rose of March 17, 2003 ("Rose Depo."), 213:22-216:7, Conf. App. Tab F; 30(b)(6) Deposition of Nationwide employee Eric Henderson of March 18, 2003 ("Henderson Depo."), 82:6-83:20, Conf. App. Tab G; 30(b)(6) Deposition of Nationwide employee John J. Scranton of March 10, 2003 ("Scranton Depo."), 25:5-10, Conf. App. Tab H [Docket No. 137].

[11] Rose Depo., 158:14-23 (group contracts), Conf. App. Tab F [Docket No. 137]; Henderson Depo., 53:2-54:16 (individual contracts), Conf. App. Tab G [Docket No. 137].

[12] Deposition Exhibit 19, App. Tab 8 [Docket No. 130]; Deposition Exhibit 24, App. Tab 9; Wyant Aff., Exhibits A-C [Docket No. 16]; Deposition Exhibit 50, Conf. App. Tab I [Docket No. 137].

contracts.[13]

Technically, however, the Plans and their participants did not invest directly in the mutual funds. Rather, the Plans and their participants invested in "variable accounts," also known as "separate accounts," established by Nationwide.[14] All Plans and their participants holding group annuity contracts invested in the "Nationwide Qualified Plans Variable Account," while all Plans and their participants holding individual annuity contracts invested in the "Nationwide Variable Account – II."[15] Those variable accounts established by Nationwide kept their assets separate from the general assets of Nationwide, and those variable accounts were not chargeable with any of Nationwide's liabilities outside of the variable accounts.[16]

Both of those variable accounts are divided into sub-accounts that correspond to the mutual funds and other investment options available under the annuity contract.[17] Pursuant to their contracts, participants choose the mutual funds in which their contributions and any matching contributions made by their employers are invested, and Nationwide allocates those contributions to particular sub-accounts within the variable accounts which correspond to the chosen mutual funds.[18] In return for the contributions, the Plans and their participants receive accumulation units (shares) of the applicable sub-accounts of the variable accounts.[19] Those

---

[13] Eakins Aff., Exhibits 1-4 [Docket No. 17].

[14] Statement, ¶ 5, App. Tab 7 [Docket No. 130].

[15] Statement, ¶¶ 7 & 8, App. Tab 7 [Docket No. 130].

[16] Statement, ¶ 6, App. Tab 7 [Docket No. 130].

[17] Statement, ¶ 9, App. Tab 7 [Docket No. 130].

[18] Statement, ¶ 10, App. Tab 7 [Docket No. 130].

[19] Statement, ¶ 12, App. Tab 7 [Docket No. 130].

accumulation units owned by the Plans and their participants constitute plan assets.[20]

Based on the combined contributions to the sub-accounts made by all the Plans and their participants, Nationwide sells and purchases mutual fund shares to hold in the variable accounts.[21]  The value of a Plan's accumulation units (shares) in the variable account fluctuates based upon the value of the mutual fund shares held within the various sub-accounts.[22]

According to the Pension and Welfare Benefits Administration:

> *Mutual funds are pools of financial instruments that may include stocks, bonds, commercial paper, cash, and other instruments.  Shares of mutual funds are bought by investors, including 401(k) plans.  The shares represent an undivided common interest in the pool of investments.  The shareholders benefit by receiving the earnings of the investments in the form of additional shares and by a capital gain when the shares are redeemed from the mutual fund.*

Study § 2.4.1, App. Tab 1 [Docket No. 130].  Mutual funds do not have employees and must contract with various entities to perform managerial, administrative, accounting, legal and other services.[23]  Mutual funds pay the entities providing those services.[24]

The mutual funds pass those costs on to their investors by charging them a variety of fees, typically investment management fees, distribution fees or commissions, and marketing or 12(b)(1) fees.[25]  A mutual fund takes these fees from investors by paying to the investment manager/mutual fund advisor or other service provider out of its general assets a dollar amount equal to the designated percentage of the net asset value of all of its shares, which causes the net

---

[20]  Statement, ¶ 13, App. Tab 7 [Docket No. 130].

[21]  Statement, ¶ 14, App. Tab 7 [Docket No. 130].

[22]  Statement, ¶ 15, App. Tab 7 [Docket No. 130].

[23]  Statement, ¶ 20, App. Tab 7 [Docket No. 130].

[24]  Statement, ¶ 21, App. Tab 7 [Docket No. 130].

[25]  Study §§ 3.3.2, 3.3.4 and 3.3.5, App. Tab 1 [Docket No. 130]; The Best of America IV Individual Deferred Variable Annuity Contracts Prospectus, October 1, 1997, pp. 8-11, part of Exhibit 2 to the Eakins Aff. [Docket No. 17].

asset value of all its shares to decrease by that percentage.[26]  This causes the value of the mutual fund shares held by Nationwide in the variable account to decrease by that percentage, which in turn reduces the value of each Plan's and participant's accumulation units (shares) of the Nationwide variable account correspondingly.[27]

B.    THE RELATIONSHIP BETWEEN NATIONWIDE AND MUTUAL FUNDS/MUTUAL FUND ADVISORS PRIOR TO IMPLEMENTATION OF THE REVENUE SHARING SCHEME.

Prior to implementation of the revenue sharing scheme (approximately in November of 1995), mutual funds and/or mutual fund advisors may have incidentally benefited from the trade processing, record keeping, communications and distribution services provided by Nationwide, including generation of customer statements and confirmations; processing of customer transactions; handling of customer services inquiries via phone and fax; processing of payments and tax forms; distribution of checks and tax forms; processing of purchases and sales on a daily basis; calculations of unit values that take place on daily basis; share reconciliation between Nationwide's separate accounts and the funds; printing and mailing of product level and fund level prospectuses; and general administration of systems and processing in a secure environment.[28]  These were services Nationwide provided to PPA's and the Plans in return for compensation from them.[29]

---

[26] Deposition of Nationwide expert witness Frederick M. Werblow of August 20, 2003 ("Werblow Depo."), 42:8-43:15, Conf. App. Tab J [Docket No. 137].

[27] Id.

[28] 30(b)(6) Deposition of Nationwide employee William G. Goslee of February 25, 2003 ("Goslee Depo."), 72:2-74:24; 75:4-12, Conf. App. Tab K [Docket No. 137]; Davis Depo., 44:9-45:7; 60:4-23, Conf. App. Tab E [Docket No. 137]; Bath Depo., 139:19-23; 200:15-202:1; 203:8-13, Conf. App. Tab A [Docket No. 137]; Rose Depo, 31:9-32:23, Conf. App. Tab F [Docket No. 137]; Statement, ¶ 26, App. Tab 7 [Docket No. 130].

[29] Davis Depo., 44:9-45:7; 45:8-12; 48:14-50:22; 51:21-53:21; and 63:12-21, Conf. App. Tab E [Docket No. 137]; Rose Depo., 213:22-216:7, Conf. App. Tab F [Docket No. 137]; Henderson Depo., 82:6-83:20, Conf. App. Tab G [Docket No. 137]; Scranton Depo., 25:5-10, Conf. App. Tab H [Docket No. 137].

Because it provided these services to the Plans and PPA's in return for compensation from them, prior to implementation of the revenue sharing scheme, Nationwide typically didn't receive any revenue sharing or expense reimbursement from mutual funds/mutual fund advisors, although it may have received 50 cents per month ($6.00 per year) per participant from a few funds.[30] Pricing Nationwide's services on a per participant basis made sense, because the costs associated with providing those services vary with the number of participants, not the amount of assets.[31]

## C.     IMPLEMENTATION OF THE REVENUE SHARING SCHEME.

Beginning in 1993 and continuing into 1995, Nationwide became concerned that its pricing of group annuity contracts was becoming non-competitive, particularly in the medium-sized and large case portion of its target market ($5,000,000 and up).[32] Determined to lower its group annuity contract prices and match the competition without actually decreasing (or while actually increasing) the revenue generated by its annuity contracts, Nationwide began investigating and ultimately implemented a system whereby mutual funds and/or mutual fund advisors made revenue sharing payments to it based upon a percentage of the Plans' assets invested in the mutual funds through Nationwide.[33]

---

[30] Bath Depo., 115:9-117:6, Conf. App. Tab A [Docket No. 137].

[31] Davis Depo., 60:25-61:3, Conf. App. Tab E [Docket No. 137].

[32] Rose Depo., 24:1-21, Conf. App. Tab F [Docket No. 137]; Bath Depo., 18:25-19:18; 20:17-21:12; 31:4-32:20; 33:16-37-2; 37:24-45:3; 46:8-47:1; 56:20-57:14; 81:7-87:11, Conf. App. Tab A [Docket No. 137]; Depo. Exhibit 519, Conf. App. Tab B [Docket No. 137]; Depo. Exhibit 520, Conf. App. Tab C [Docket No. 137]; Depo. Exhibit 521, Conf. App. Tab L [Docket No. 137]; Depo. Exhibit 522, Conf. App. Tab M [Docket No. 137]; Depo. Exhibit 524, Conf. App. Tab N [Docket No. 137].

[33] *Id.*

This required Nationwide to initiate changes in its group annuity contract pricing and to negotiate revenue sharing agreements with mutual funds. Over the course of approximately two years, Nationwide developed a pricing model as to group annuity contracts that: (i) set up categories of mutual funds with different charges to the Plans based on how much revenue sharing the funds would pay, and (ii) priced the Asset Management Charge (separately within each category) paid by the Plans on a sliding scale, with the charge decreasing as the amount of assets invested by a Plan increased.[34]

Ultimately, Nationwide ended up with three categories of funds in its group annuity pricing: (i) "Primary Plus" for those mutual funds paying Nationwide 0.25% to 0.58% on assets plus $0 to $12 per participant, (ii) "Primary" for funds paying Nationwide 0.15% to 0.25% on assets; and (iii) "Optional" for those funds paying Nationwide 0.00% to 0.08% on assets.[35] In stark contrast, the pricing of existing and new individual annuity contracts did not change as a result of implementation of revenue sharing, remaining at 1.30 % for mortality and expense risk and administration charges and $30 per year for contract maintenance charges.[36]

In order to implement the new pricing as to existing group annuity contracts, Nationwide obtained signed written standard form amendments from each Plan with which it had a group

---

[34] Bath Depo., 94:4-9; 97:23-99:21; 102:7-104:5; 107:7-10; 113:13-120:19; Conf. App. Tab A [Docket No. 137]; Depo. Exhibit 526, Conf. App. Tab O [Docket No. 137]; Depo. Exhibit 527, Conf. App. Tab P [Docket No. 137]; Contract Summary Page to January 1, 1996 group annuity contract between the Hartford Plan and Nationwide, Exhibit C to the Wyant Aff. (example of standard group annuity contract pricing after implementation of revenue sharing), Docket No. 16; Rose Depo., 131:19-132:2, Conf. App. Tab F [Docket No. 137].

[35] Deposition Exhibit 609, Conf. App. Tab Q [Docket No. 137].

[36] *Compare* pre-revenue sharing contracts from 1991 and 1994 between participants in the Anderson & Ferdon and Easter Seal Plans and Nationwide, Exhibits 1 and 3 to the Eakins Aff. [Docket No. 17], with post-revenue sharing contracts from 1998 between participants in the Anderson & Ferdon and Easter Seal Plans and Nationwide, Exhibits 2 and 4 to the Eakins Aff. [Docket No. 17].

annuity contract.[37]  The revenue sharing was discussed by Nationwide using standard language in the explanatory correspondence which accompanied the amendment forms.[38]  Nationwide did not communicate that it was implementing revenue sharing to the Plan participants who held individual annuity contracts.[39]

Revenue sharing payments are made to Nationwide pursuant to written contracts, variously denominated as service contracts, administration contracts, fund services contracts, fund participation contracts and broker dealer contracts, with the investment management firms which provide to mutual funds the management and other services necessary for the funds to function.[40]  Revenue sharing payments are variously denominated as 12(b)(1) fees (which are supposed to be fees for marketing of the fund), administration fees, service fees and subtransfer agent fees.[41]  All of the revenue sharing payments are based in whole or in overwhelming part on a percentage of a Plan's investment in a mutual fund.[42]

While the revenue sharing payments are described by Nationwide as reimbursements for expenses incurred in providing services to the mutual funds, those services from which mutual funds/mutual fund advisors may incidentally benefit are actually ones which Nationwide had

---

[37] Rose Depo., 84:18-85:4, Conf. App. Tab F [Docket No. 137]; Depo. Exhibit 534, Conf. App. Tab R [Docket No. 137]; Depo. Exhibit 54 (amendment to the Crown Plan, along with the explanatory correspondence from Nationwide), Conf. App. Tab S [Docket No. 137]; Haddock Exhibit 9 (amendment to the Flyte Plan, along with explanatory correspondence from Nationwide), Conf. App. Tab T [Docket No. 137].

[38] Rose Depo., 127:9-22, Conf. App. Tab F [Docket No. 137]; Depo. Exhibit 534, Conf. App. Tab R [Docket No. 137]; Depo. Exhibit 54, Conf. App. Tab S [Docket No. 137].

[39] Bath Depo., 130:22-131:3, Conf. App. Tab A [Docket No. 137].

[40] Goslee Depo., 104:16-18; 108:11-16; 109:10-110:13; 112:5-8; 161:13-162:11, Conf. App. Tab K [Docket No. 137]; Statement, ¶ 25, App. Tab 7 [Docket No. 130].

[41] Goslee Depo., 121:21-123:13, Conf. App. Tab K [Docket No. 137].

[42] Deposition Exhibit 609, Conf. App. Tab Q [Docket No. 137].

traditionally supplied to Plans and PPA's as a necessary part of its business in return for charges collected from them, and those services did not change as a result of revenue sharing.[43] Although the description of Nationwide's services may vary slightly from contract to contract, the actual services performed by Nationwide for Plan's and PPA's from which mutual funds may incidentally benefit are virtually identical in every case.[44]

The effect of revenue sharing on participants' retirement accounts can be huge over time. Assume a forty-five year old rolls over a $300,000 401(k) balance into a plan which has an annuity contract with Nationwide and chooses all Primary Plus funds which pay 0.5% of assets as revenue sharing to Nationwide. In the first year alone, the value of her investment will be reduced by $1,500, all of which ends up in Nationwide's pocket. Assuming she continues to make 401(k) contributions of $10,000 per year, Nationwide's revenue sharing could reduce her account balance at age sixty-five by over $213,000 at a gross annual return (before revenue sharing) of 11% and by over $80,000 at a gross return of 5%.

---

[43] Bath Depo., 139:19-23; 200:15-202:1; 203:8-13, Conf. App. Tab A [Docket No. 137]; Henderson Depo., 82:6-83:20, Conf. App. Tab G [Docket No. 137]; Davis Depo., 60:4-23, Conf. App. Tab E [Docket No. 137].

[44] Goslee Depo., 72:7-74:24; 75:4-12; 83:17-84:13; 87:7-94:7; 94:10-95:2; 95:3-8; 96:15-97:25; 98:1-99:10, Conf. App. Tab K [Docket No. 137], Bath Depo., 56:20-57:11, Conf. App. Tab A [Docket No. 137]; Rose Depo., 31:9-32:23, Conf. App. Tab F [Docket No. 137]; Davis Depo., 44:9-45:7, Conf. App. Tab E [Docket No. 137]; Henderson Depo., 81:7-82:5, Conf. App. Tab G [Docket No. 137].

## ARGUMENT AND AUTHORITIES

I.  **AT A MINIMUM, THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE REVENUE SHARING PAYMENTS CONSTITUTE PLAN ASSETS IN NATIONWIDE'S HANDS.**

A.  *THE COURT SHOULD USE THE FUNCTIONAL APPROACH TO DETERMINE WHETHER THE REVENUE SHARING PAYMENTS CONSTITUTE PLAN ASSETS IN NATIONWIDE'S HANDS, AND IT DOES NOT MATTER UNDER THAT APPROACH WHETHER THE REVENUE SHARING PAYMENTS EVER PREVIOUSLY CONSTITUTED PLAN ASSETS.*

ERISA does not expressly define what constitutes "plan assets." *Acosta v. Pacific Enterprises*, 950 F.2d 611, 620 (9th Cir. 1992). The term should, however, be construed broadly in the context of ERISA § 406(b), 29 U.S.C. § 1106(b), to effectuate Congress' overriding concern with the protection of plan participants and beneficiaries.[45] *Id.* Contrary to this approach of broadly construing what constitutes "plan assets," Nationwide attempts to limit the term to the financial contributions sent by the Plans to it and any items which can be precisely traced back to those contributions.

The Ninth Circuit has explained why such attempts to limit the definition of plan assets must be rejected:

> *Appellees argue that the term 'assets of the plan' encompasses only financial contributions received by the plan administrators. We decline to cabin the term in such a restricted definition. Congress' imposition of a broad duty of loyalty upon fiduciaries of employee benefit plans counsels a more functional approach. To determine whether a particular item constitutes an 'asset of the plan,' it is necessary to determine whether the item in question may be used to the benefit 'financial or otherwise' of the fiduciary at the expense of plan participants or beneficiaries.*

*Id.*

---

[45] This is consistent with the Second Circuit's frequent holding that Congress intended ERISA's definition of fiduciary to be broadly construed in light of its remedial purpose. *See, e.g., Lopresti v. Terwiliger*, 126 F.3d 34, 40 (2d Cir. 1997); *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987).

Notably, this approach does not require proving (or even make relevant whether) the funds in issue constituted plan assets prior to reaching the hands of the defendant or that they can be specifically traced back to what undisputedly constituted plan assets. Indeed, there are numerous examples of where funds did not previously constitute plan assets, but became plan assets in the hands of the defendant.

For example, numerous courts have held that employees' contributions to ERISA plans, after deduction from their paychecks, constitute plan assets in the hands of employers and others, even though the employers' funds used to pay the employees did not constitute plan assets and did not in any sense derive from plan assets. *Bannistor v. Ullman*, 287 F.3d 394, 402 (5th Cir. 2002); *U.S. v. Glick*, 142 F.3d 520, 527 (2d Cir. 1998); *Lopresti v. Terwilliger*, 126 F.3d 34, 39 (2d Cir. 1997); *U.S. v. Grizzle*, 933 F.2d 943, 947 (11th Cir. 1991).[46] *See also* 29 C.F.R. § 2510.3-102 (2000) (the Department of Labor defines plan assets to include amounts "...*that a participant has withheld from his wages by an employer for contribution to the plan...*").

Similarly, numerous courts have held that contractually required employer contributions to plans constitute plan assets in the hands of employers and others despite the facts that the employers paid those contributions from their own assets, not plan assets, and that the contributions did not derive in any sense from plan assets. *U.S. v. Labarbara*, 129 F.3d 81, 88 (2d Cir. 1997); *Board of Trustees of the Air Conditioning and Refrigeration Industry Health & Welfare Trust Fund v. J.R.D. Mechanical Services, Inc.*, 99 F. Supp. 2d 1115, 1120 (C.D. Cal.

---

[46] Nationwide may try to distinguish these cases on the ground that the employee contributions allegedly constituted plan assets because they were defined as same by plan documents or collective bargaining agreements. While there may be some cases that have reasoned in this manner, none of the cases cited above based their holdings on plan documents or collective bargaining agreements. Further, DOL has defined employee contributions as plan assets without regard to the terms of plan documents or collective bargaining agreements. *See* 29 C.F.R. § 2510.3-102 (2000).

1999); *Reich v. Goldstein*, 839 F. Supp. 1068, 1073 (S.D.N.Y. 1993) (specifically applying the functional approach from *Acosta v. Pacific Enterprises*).

Thus, the functional approach focuses on whether the funds should, in light of Congress' overriding concern with the protection of plan participants and beneficiaries, be treated as plan assets in the hands of the defendant. The status of the funds prior to arriving in the defendant's hands has absolutely no relevance at all.

**B.     UNDER THE FUNCTIONAL APPROACH, THERE IS, AT A MINIMUM, A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE REVENUE SHARING PAYMENTS CONSTITUTE PLAN ASSETS.**

The Court should hold either that, as a matter of law, the revenue sharing payments constitute plan assets in Nationwide's hands pursuant to the functional approach or that there is a genuine issue of material fact in that regard. Initially, the Court should find it highly significant that the revenue sharing payments would not have been made but for the Plans' investment of their assets through Nationwide. An example makes this clear.

Suppose a plan with a group annuity invested $1,000,000 through Nationwide with the instruction that it should all be invested in "Janus Growth Fund." Nationwide would deposit the money in a subaccount for Janus Growth Fund within the Nationwide Qualified Plans Variable Account.[47] Further, suppose that the subaccount had a total of $2,000,000 in it -- the $1,000,000 from the plan and $1,000,000 from other plans who are members of the Class. Further, suppose that Nationwide had contractually agreed with Janus that Janus would pay it fifty basis points (.5%) per annum of the amounts invested in the Janus Growth Fund through that variable account.

---

[47] Statement, ¶¶ 7-9, App. Tab 7 [Docket No. 130].

Under those circumstances, Nationwide would receive .5% of $1,000,000 or $5,000 per year as a result of the plan having invested through Nationwide.  But for the plan investing its assets through Nationwide, Nationwide would never have received that $5,000.  Accordingly, it is beyond dispute that the portion of the revenue sharing payment based upon the plan's investment should be regarded as generally deriving from the plan's investment of its assets through Nationwide.

Further, Nationwide concedes that it did not contract with any of the Plans which make up the proposed Class to receive such revenue sharing payments.[48]  Likewise, Nationwide must concede that it could use those payments for the benefit of the Plans, rather than its own benefit, whether by offsetting charges owed by the Plans to Nationwide or by simply issuing them refund checks.[49]

Thus, the functional approach makes the revenue sharing payments plan assets in Nationwide's hands because: (i) they would not have been made but for the Plans' investments through Nationwide, (ii) Nationwide did not contract with the Plans to receive them, despite the opportunity to do so, and (iii) those payments could be used (and equitably should be used) for the benefit of the Plans and their participants rather than Nationwide.  And, crucially, the fact that the revenue sharing payments did not constitute plan assets in the mutual funds' hands prior to payment to Nationwide and cannot be traced back to specific plan assets simply has no relevance under the functional approach.

---

[48] Rose Depo., 158:14-23 (group contracts), Conf. App. Tab F [Docket No. 137]; Henderson Depo., 53:2-54:16 (individual contracts), Conf. App. Tab G .

[49] *See* Depo. Exhibit 522 (¶ 4 discussing Nationwide's choice to pass through the revenue sharing payments to the Plans or simply keep them), Conf. App. Tab M [Docket No. 137]; Depo. Ex. 524 (second page, first full ¶ , discussing Nationwide's choice to either pass through the revenue sharing payments to the Plans or to simply keep them to benefit its bottom line).  Conf. App. Tab N [Docket No. 137].

1.    <u>The Functional Approach Does Not Make All Payments By Mutual Funds for Goods and Services Into Plan Assets in the Hands of Their Recipients</u>.

Nationwide may respond that this functional approach is simply too liberal because it would allegedly make all payments by the mutual funds for anything -- rent, janitorial services or paper clips -- plan assets in the hands of their recipients, in that those recipients theoretically could turn over the payments to the Plans. The Court should reject this argument summarily, because no real comparison exists between the revenue sharing payments and payments by the mutual funds to ordinary service/goods providers like landlords, janitors or paper clip suppliers. In fact, there are three critical distinctions.

First, the mutual funds' service providers will receive the payments regardless of the Plans' investments through Nationwide. The mutual funds would still pay the same rent to their landlords, the same amounts for janitorial services and the same amount for paper clips regardless of whether the Plans had invested in them through Nationwide. Further, the amounts paid to those service providers bear no relationship to the amounts invested by the Plans, unlike revenue sharing payments, which are calculated based on a percentage of those investments.

Second, those service providers, unlike Nationwide, have no contractual relationship with the Plans that governs how much money they are supposed to receive in connection with benefits they provide to the Plans. In fact, unlike Nationwide, those service providers provide nothing directly to the Plans. So, those service providers are not in a situation where they had a chance to negotiate for compensation with the Plans in return for any work they perform that benefits the Plans. Consequently, they are not in the position of attempting to receive more compensation in connection with their relationship with the Plans than they contracted to receive, unlike Nationwide.

- 16 -

Third, and finally, those service providers have no real mechanism by which to dedicate the payments they receive from the mutual funds to the benefit of the Plans, even if there was a reason to do so. They have no contractual relationship pursuant to which they can give credits to the Plans or even send checks to the Plans. They simply have no connection whatsoever with the Plans, unlike Nationwide.

These three distinctions boil down to the fact that the payments made to the service providers by the mutual funds do not constitute funds used by them at the expense of the Plans. Put another way, the Plans simply do not have any claim under either legal or equitable principles to the payments made by mutual funds to ordinary service providers. Thus, the functional approach dictates a different result for Nationwide than it does for simple service providers.

2.    The Revenue Sharing Payments Are Analogous to Payments by a Closing Mutual Fund, Which Payments Would Undeniably Constitute Plan Assets in Nationwide's Hands.

A far better analogy to the revenue sharing payments than payments to service providers would be payments pursuant to the closure of a particular mutual fund offered by Nationwide in which Plans had invested. In that case, the mutual fund would liquidate its assets and pay to Nationwide the money attributable to those Plans' investments. That money did not constitute plan assets in the hands of the mutual fund. Nevertheless, once Nationwide received the money, it would undeniably have to treat that money as assets of the Plans and credit it to the Plans in some manner; it could not simply pocket those funds.[50]

---

[50] Werblow Depo., 63:4-18; 63:25-64:3; 65:3-14 (conceding that in the analogous situation where a participant directed Nationwide to liquidate his investment in a particular mutual fund, resulting in the receipt of cash by Nationwide, Nationwide would have to treat the cash as an asset of the plan and credit it accordingly; it could not simply pocket the money despite the fact the money did not constitute a plan asset in the hands of the mutual fund), Conf. App. Tab J [Docket No. 137].

The functional analysis explains why that is the case. That money paid by the closing mutual fund would not have been received by Nationwide from the mutual fund but for the Plans' investments through Nationwide. Further, Nationwide did not contract to receive that money. Finally, and most importantly, that money could be used for the benefit of the Plans and their participants rather than Nationwide.

Put in restitution terms, that money would constitute funds which, in equity and good conscience, should be treated as assets of the Plans. And, crucially, this is true even though the funds did not constitute plan assets in the mutual fund's hands and could not be specifically traced back to plan assets.

3.     Courts Have Held Funds Analogous to the Revenue Sharing Payments Constitute Plan Assets Under the Functional Approach.

Decisions by the Fifth and Ninth Circuits further illustrate both the appropriateness of the functional approach and that its application makes the revenue sharing payments plan assets in Nationwide's hands. In *Patelco Credit Union v. Sahni*, 262 F.3d 897, 902 (9th Cir. 2001), a self-funded ERISA healthcare plan established by a credit union had purchased stop-loss insurance to protect itself from catastrophic annual losses exceeding $10,000 per employee or $100,000 for the plan. The plan sued the person who handled payment of the health claims to recover the amounts of two checks for stop-loss benefits that the insurance company had made payable to the credit union, not the plan. *Id*. at 908. The defendant claimed that the payments constituted assets of the credit union, rather than the plan, which he was entitled to take as compensation. *Id*.

Applying the functional analysis, the Ninth Circuit rejected the defendant's contention. *Id*. It did so because: (i) the payments had been made in connection with the plan's business (and would not have otherwise been made), (ii) the defendant was already being compensated by the

- 18 -

plan, and (iii) the payments certainly could have been used for the benefit of the plan, rather than for the defendant's benefit. *Id*. at 908-9. Thus, the Ninth Circuit held, as a matter of law, both that the stop-loss checks constituted assets of the plan and that by receiving and depositing those checks, the defendant exercised control over them, making him a fiduciary as to them. *Id*. at 909.

Of course, the insurance company funds paid via the checks did not constitute plan assets in the hands of the insurance company and were not derived in any sense from or traceable back to any plan assets. However, once received by the defendant, those funds became plan assets in his hands under the functional approach. The analogy to revenue sharing payments is clear and the exact same reasoning applies.

Equally clear is the analogy to the facts in *Bannister*. The corporate sponsor of two ERISA plans had entered into a "lock box" financing arrangement with a bank pursuant to which: (i) the company's accounts receivables were collected by the bank, (ii) the bank applied the accounts receivable to the outstanding loan balance, and (iii) the bank then re-advanced funds to the company under a formula based on the value of the company's collateral. 287 F.3d at 397. Once the company received the loan advances, it paid its expenses, including its employees' payroll, from which contributions to the ERISA plans were deducted. *Id*.

The company and its management failed to contribute to the plans employee contributions they had deducted from employees' checks. *Id*. at 398. The Fifth Circuit held that loan advances from the bank to the company made after the company failed to deliver the employee contributions to the plans constituted plan assets in management's hands because those loan advances could have been used to make the contributions that were owed (benefiting the plans). *Id*. at 405-6. The Fifth Circuit then further held that management's receipt and use of the

advances for other purposes constituted the exercise of authority or control over plan assets, making management fiduciaries as to those plan assets. *Id*. This constitutes a classic use of the functional approach.

Of course, the funds which made up the loan advances did not constitute plan assets in the hands of the bank. And, those funds could not be traced back to plan assets and, in fact, were not derived in any sense from plan assets. Nevertheless, when received by management under circumstances such that they could have been used to benefit the plans and their beneficiaries (and equitably should have been so used), they became plan assets in management's hands.

The case for treating the revenue sharing payments as assets of the Plans is actually far stronger than the case for treating the loan advances in *Bannistor* as plan assets. In *Bannistor*, unlike the revenue sharing payments in this case, the loan advances would have been made regardless of the existence of the ERISA plans. Further, unlike Nationwide and the Plans, the bank had no relationship with the ERISA plans pursuant to which it was already being compensated. The existence of those additional factors in this case, coupled with the ability of Nationwide to use the payments for the benefit of the Plans, makes clear that the Court should hold either that the revenue sharing payments constitute plan assets in Nationwide's hands as a matter of law or that a genuine issue of material fact exists in this regard.

C.   *PLAINTIFFS SEEK FURTHER DISCOVERY, IF NECESSARY*.

If the Court is not already convinced that a genuine issue of material facts exists as to whether the revenue sharing payments constitute plan assets in Nationwide's hands, Plaintiffs seek permission to take further discovery. In that regard, Plaintiffs rely on the Declaration of Roger L. Mandel ("the Mandel Declaration"), attached hereto as Exhibit A, filed pursuant to Fed. R. Civ. P. 56(f).

Above, Plaintiffs gave the example of a mutual fund closing and sending money to Nationwide based upon the investments of various Plans in that mutual fund. In that example, Plaintiffs argue Nationwide would have to treat the money as plan assets and credit it to the Plans in some manner despite the fact that the money did not constitute plan assets in the hands of the mutual fund and could not be specifically traced back to plan assets. Plaintiffs believe discovery from Nationwide regarding this scenario will further bolster their arguments.

Specifically, Plaintiffs believe that this scenario has in fact previously happened at Nationwide, and Plaintiffs wish to discover how Nationwide actually handled this situation. *Id.* If, as expected, Nationwide used the payment by the closing mutual fund for the benefit of the Plans which had invested in the closing mutual fund, rather than simply pocketing it, Plaintiffs would inquire as to Nationwide why it did so and why the exact same reasoning does not apply to the revenue sharing payments. *Id*.

If the scenario never happened, Plaintiffs would ask Nationwide how it would handle the situation. *Id.* If Nationwide concedes that such payment from the closing mutual fund would constitute plan assets in its hands despite the fact that the money did not constitute plan assets in the hands of the mutual funds and could not be traced back to plan assets, this would strongly bolster Plaintiffs' arguments regarding the revenue sharing payments. *Id.*

If Nationwide denies that such a payment would constitute plan assets, that will serve to point out the absurdity of its position. *Id.* Either way, it would provide useful additional facts which would help the Court in either ruling, as a matter of law, that the revenue sharing payments constitute plan assets in Nationwide's hands or that a genuine issue of material fact exists in this regard. *Id.*

II.    **A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER NATIONWIDE VIOLATED ERISA BY ACCEPTING AND RETAINING ASSETS OF THE PLANS (THE REVENUE SHARING PAYMENTS) WHICH IT HAD NOT CONTRACTED TO RECEIVE.**

As stated above in the introduction, the plain language of ERISA § 406(b) makes a fiduciary's taking of plan assets for its own use a quintessential violation of § 406(b). *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1214 (2d Cir. 1987). Notwithstanding this, at the very end of its brief, but still in a section regarding whether it constitutes a fiduciary as to the Plans, Nationwide appears to make the argument that its receipt of revenue sharing payments, even if plan assets, did not violate ERISA. Rev. Mem. at 16-18.

To do so, it relies upon three Department of Labor advisory opinions and an unpublished district court opinion from California. Neither the advisory opinions nor the district court opinion considered the premise of Plaintiffs' case, making them unpersuasive at best. In fact, when considered in the context of Plaintiffs' theory of the case, they actually support the Court holding Nationwide liable.

A.    *THE FROST OPINION SUPPORTS PLAINTIFFS' POSITION, NOT NATIONWIDE'S.*

In DOL Advisory Opinion 97-15A (May 22, 1997) (the "Frost Opinion"), DOL responded to an inquiry from Frost National Bank ("Frost"), which, as a trustee of various pension plans, admittedly constituted an ERISA fiduciary. Frost Opinion at 2.[51] DOL concluded that, under the particular facts presented, Frost did not violate ERISA § 406(b)(1) or (3) as a result of receiving "*fees*" from mutual funds in which its plans invested. *Id*. at 3.

---

[51] Significantly, because Frost already owed fiduciary duties based upon its role as trustee, DOL did not address whether receiving and keeping plan assets would cause a party who is not otherwise a fiduciary to become a fiduciary as to those plan assets. For that reason, the Frost Opinion says nothing about whether the revenue sharing payments constitute plan assets in Nationwide's hands or about whether Nationwide becomes a fiduciary as to those revenue sharing payments by arranging for, receiving and retaining them.

DOL initially opined that because Frost directed its plans to invest in mutual funds which paid it "*fees,*" its receipt of those "*fees*" would violate ERISA § 406(b)(1) and (3) if Frost simply pocketed them.  *Id.*  However, because Frost represented that it gave dollar-for-dollar credits to its plans for the full value of the "*fees,*" DOL finally held that Frost did not violate ERISA.  *Id.*  Crucially, Nationwide does not have this defense, because it does not claim that it paid or credited any amounts directly to the Plans based upon its receipt of revenue sharing payments.

According to the Frost Opinion, therefore, if the Court finds that the revenue sharing payments constitute plan assets in Nationwide's hands, Nationwide's pocketing of the fees constitutes a breach of § 406(b)(1) and (3).  For that reason, the Frost Opinion actually supports that Nationwide breached its fiduciary duties by keeping the revenue sharing payments.

Nationwide hangs its hat upon language in the Frost Opinion to the effect that a fiduciary which does not direct plans to invest in funds which pay it "*fees*" (i.e., the plans or their participants choose the funds), does not violate ERISA § 406(b)(1) by accepting the "*fees.*"  *Id.*  That statement says nothing about potential ERISA violations by Nationwide, however, because DOL did not consider the premise underlying Plaintiffs' case.

Specifically, DOL issued its opinion in the context of Frost's representation that it received reasonable fees for services it actually rendered to the mutual funds.  *Id.*  As a consequence, DOL focused its analysis solely on how plan assets came to be invested in the mutual funds in the first instance and not on Frost's pocketing of the fees paid by those mutual funds.  In other words, for the purpose of § 406(b)(1), DOL considered only the funds invested in the mutual funds as the plan assets which Frost potentially dealt with for its own interest.

Thus, when DOL opined that a fiduciary which does not direct plan investments to mutual funds which pay it "*fees*" does not violate § 406(b)(1) by accepting those "*fees,*" it simply

did not consider the possibility that the "*fees*" received by such a fiduciary constituted plan assets which the fiduciary had pocketed. For that reason, the Frost Opinion does not any way indicate that DOL would approve of the conduct of Nationwide in arranging for, receiving and retaining the revenue sharing payments, to the extent those revenue sharing payments constitute plan assets. In fact, it strongly supports that DOL would find that Nationwide thereby violates ERISA § 406(b)(1).

B.      *THE ALIAC OPINION DOES NOT SUPPORT NATIONWIDE'S POSITION.*

DOL Advisory Opinion 97-16A (May 22, 1997) (the "ALIAC Opinion"), decided the same day, starts from exactly the same premise as the Frost Opinion. ALIAC represented to DOL that it provided record keeping and other services in connection with investments by employee benefit plans in unrelated mutual funds in return for reasonable fees paid by those mutual funds. *Id*. at 1-2. It asked DOL to opine on whether or not ALIAC's receipt of such fees from those mutual funds violated ERISA § 406(b)(3).

DOL properly started its analysis by considering whether ALIAC actually constituted a fiduciary subject to § 406(b)(3). *Id*. at 4. In that regard, DOL only analyzed whether ALIAC exercised discretionary authority or control over the choice of mutual funds in which the plans invested plan assets. *Id*.

DOL did not consider whether the "*fees*" constituted plan assets in ALIAC's hands such that ALIAC became a fiduciary as to those "*fees.*" *Id.* DOL apparently did not consider this possibility because it apparently believed that the "*fees*" paid by the mutual funds to ALIAC did not constitute plan assets based upon ALIAC's characterization of them as reasonable fees received in return for the provision of actual services to the mutual funds (which services were

described in detail to DOL). *Id*. For that reason, the ALIAC opinion says nothing about Nationwide's liability in this case.

C.     *THE AATSC OPINION DOES NOT SUPPORT NATIONWIDE'S POSITION.*

DOL started with the exact same premise in DOL Advisory Opinion 2003-09A (June 25, 2003) (the "AATSC Opinion"). AATSC represented to DOL that it received 12b-1 and subtransfer fees from mutual funds in return for services rendered to the mutual funds. *Id*. at 1. DOL concentrated on whether AATSC chose the mutual funds or otherwise exercised authority or control over plan assets by controlling in which mutual funds they were invested. *Id*. at 1-5. Based upon the representation by AATSC, DOL never considered whether the "*fees*" themselves constituted plan assets in the hands of AATSC which AATSC used for its own benefit in violation of ERISA § 406(b)(1) and/or (3). *Id*. Thus, the opinion does not address Nationwide's conduct.

D.     *THE DAMASCO CASE DOES NOT SUPPORT NATIONWIDE'S POSITION*.

The unpublished California district court opinion of *Damasco & Assoc. 401(k) Profit Sharing Plan v. Manufacturers' Life Ins. Co.*, 1999 U.S. Dist. LEXIS 13654 at 20 (N.D. Cal. Aug. 20, 1999), does not address Plaintiffs' claims any more than the DOL advisory opinions. In *Damasco,* the defendants removed the action to federal court arguing that the plaintiffs' claims were preempted by ERISA. *Id*. at 5.6. The federal court issued an order to show cause as to why the case should not be remanded. *Id*. Thus, the **defendants**, not the plaintiffs, sought to establish that the complaint alleged that defendants were ERISA fiduciaries. *Id*. at 5-6, 13.

The defendants based their argument on the allegations by the plaintiffs that the defendant's plan consultant accepted a kickback from the defendant annuity provider of a portion of the asset management charge paid by the plan to the defendant annuity provider for providing

and administering the investment platform.  *Id*. at 13.  In holding that this did not constitute a pleading that the plan consultant had acted as a fiduciary by virtue of it having exercised authority or control over plan assets, the sum total of the reasoning of the district court was, "[T]his ... *method of acquiring fiduciary status indisputably do[es] not apply to Gordon [the plan consultant] under the allegations of the complaint*."  *Id*. at 13.

Because the district court provided no hint as to its reasoning, the opinion is completely unpersuasive.  The most likely explanation for the district court's startling brevity is that it regarded the fees paid by the plan to the defendant annuity provider for asset management as not constituting plan assets in the annuity provider's hands, such that the defendant plan consultant's receipt of kickbacks of portions of those fees (which were not plan assets) necessarily and "*indisputably*" did not constitute exercising authority or control over plan assets.   Thus, *Damasco* has absolutely no application to this case, because Plaintiffs can demonstrate that the revenue sharing payments constitute (in whole or in part) plan assets in Nationwide's hands, not "*fees*" legitimately received for services rendered.

E.    *GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER THE REVENUE SHARING PAYMENTS CONSTITUTE, IN WHOLE OR IN PART, PLAN ASSETS OR FEES RECEIVED FOR LEGITIMATE SERVICES RENDERED TO MUTUAL FUNDS.*

In contrast to the DOL opinions and *Damasco*, Plaintiffs contend that the revenue sharing payments constitute, in whole or in part, plan assets in the hands of Nationwide, rather than legitimate payment of fees by the mutual funds for services rendered by Nationwide.  The evidence set forth above in the Statement of Facts raises a genuine issue of material fact in this regard.

Prior to implementation of the revenue sharing scheme, Nationwide received payment from the Plans pursuant to its group and individual annuity contracts with them and provided in

return all the services necessary for the administration of those contracts, including participant and plan record keeping, participant servicing, and communications with participants/plans/ PPA's.[52]  In addition to payment by the Plans, Nationwide also received payment for the exact same services from the PPA's, because the PPA's also benefited from those services.[53]

Prior to Nationwide's implementation of the revenue sharing scheme, mutual funds and/or mutual fund advisors may have incidentally benefited from those exact same services.[54] However, because Nationwide performed those services for the Plans and PPA's, and received compensation from them in return, prior to implementation of the revenue sharing scheme, Nationwide typically didn't receive any revenue sharing or expense reimbursement from mutual funds/mutual fund advisors, although it may have received fifty cents per month (six dollars per year) per participant from a few funds.[55]

Thus, contrary to Nationwide's description of the revenue sharing payments as reimbursement for expenses incurred in providing services to the mutual funds, those services from which mutual funds/mutual fund advisors may incidentally benefit are actually ones which Nationwide had traditionally supplied to Plans and PPA's as a necessary part of its business in return for charges collected from them, and those services did not change as a result of the implementation of the revenue sharing scheme.[56]  Thus, the evidence proves that Nationwide's

---

[52] Davis Depo., 51:21-53:21, Conf. App. Tab E [Docket No. 137].

[53] Id.

[54] Goslee Depo., 72:7-74:24, Conf. App. Tab K [Docket No. 137], Rose Depo., 24:1-21, Conf. App. Tab F; Bath Depo., 18:25-19:18; 20:17-21:12; 31:4-32:20; 33:16-37-2; 37:24-45:3; 46:8-47:1; 56:20-57:14; 81:7-87:11, Conf. App. Tab A [Docket No. 137]; Depo. Exhibit 519, Conf. App. Tab B; Depo. Exhibit 520, Conf. App. Tab C; Depo. Exhibit 521, Conf. App. Tab L; Depo. Exhibit 522, Conf. App. Tab M; Depo. Exhibit 524, Conf. App. Tab N.

[55] Bath Depo., 115:9-117:6, Conf. App. Tab A [Docket No. 137].

[56] Bath Depo., 139:19-23; 200:15-202:1; 203:8-13, Conf. App. Tab A [Docket No. 137]; Henderson Depo., 82:6-83:20, Conf. App. Tab G; Davis Depo., 60:4-23, Conf. App. Tab E.

characterization of the revenue sharing payments as payment for services rendered to mutual funds is false.

Further supporting this proposition is the fact that the actual services performed for Plans and PPA's from which the mutual funds may incidentally benefit are virtually identical in every case, although the description of the services vary slightly from contract to contract.[57]   If Nationwide were actually providing services to mutual funds and getting paid for them, one would expect that the services provided would vary depending upon the needs and circumstances of particular mutual funds.   The fact that they do not indicates that Nationwide's business inherently requires it to engage in certain activities and that the mutual funds simply benefit incidentally from those basic functions.

Also supporting that revenue sharing payments do not actually constitute payment for services rendered is the fact that the cost to Nationwide of providing its services to Plans and PPA's from which mutual funds may incidentally benefit varies with the number of participants, not the amount of assets.[58]   It makes no sense that Nationwide would abandon its pre-revenue sharing method of pricing to a very few mutual funds on a per participant per annum basis for an asset basis if it were really seeking compensation for services rendered.   A business typically wants to price its services so as to reflect its variable costs.

A very telling piece of evidence is the fact that Nationwide overwhelmingly did not receive any payments from mutual funds prior to implementation of the revenue sharing scheme. Under Nationwide's version of the world, it inexplicably provided valuable services free of

---

[57] Goslee Depo., 72:7-74:24; 75:4-12; 83:17-84:13; 87:7-94:7; 94:10-95:2; 95:3-8; 96:15-97:25; 98:1-99:10, Conf. App. Tab K [Docket No. 137], Bath Depo., 56:20-57:11, Conf. App. Tab A; Rose Depo., 31:9-32:23, Conf. App. Tab F; Davis Depo., 44:9-45:7, Conf. App. Tab E; Henderson Depo., 81:7-82:5, Conf. App. Tab G.

[58] Davis Depo., 60:25-61:3, Conf. App. Tab E [Docket No. 137].

charge to mutual funds prior to the implementation of the revenue sharing scheme. Of course, that did not actually occur. In reality, prior to revenue sharing, Nationwide simply conducted its basic business, which may have incidentally benefited the mutual funds.

Indeed, Nationwide's internal documents at the inception of and during the early stages of its development of the revenue sharing scheme do not discuss a supposed problem of Nationwide performing services for mutual funds without charge which ought to be paid for by the mutual funds or refer to future payments by the mutual funds as payments for services rendered.[59] Rather, the documents merely refer to "mutual fund revenue."[60]

Quite tellingly, Nationwide discussed its options for using the revenue sharing payments only as passing them through to the Plans or keeping them to benefit its bottom line.[61] It never even mentioned using the payments to reimburse itself for expenses it allegedly incurred in providing services to mutual funds.[62]

Significantly, Nationwide recognized early on during the development of the revenue sharing scheme that the revenue sharing payments could constitute prohibited transactions under ERISA.[63] In fact, at one time, Nationwide apparently considered requesting a prohibited

---

[59] *See* Deposition Exhibits 519, 520, 521, 522, 524, 526, 527 & 534, Conf. App. Tabs B, C, L, M, N, O, P, & R [Docket No. 137].

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] Nationwide internal email of August 9, 1993, Tab A to Plaintiffs' Supplemental Confidential Appendix in Support of Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment and Revised Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Supp. Conf. App."); Nationwide internal email dated August 17, 1993, Supp. Conf. App. Tab B; Nationwide internal memorandum from the Pensions Management Team to a number of persons, Supp. Conf. App. Tab C; Nationwide internal memorandum dated November 28, 1994, Supp. Conf. App. Tab D.

transaction exemption from DOL.[64]  In anticipation of a Plan ultimately challenging the revenue sharing payments as violative of ERISA, immediately prior to the actual implementation of the revenue sharing scheme, Nationwide decided to stop referring to "mutual fund revenue" and to start referring to "competitive pricing."[65]

Nationwide's own internal discussion of the revenue sharing payments, accordingly, demonstrates beyond any doubt that it simply concocted at a later date the fiction that the revenue sharing payments constitute payments for services rendered.  It did so to cover up the reality that the revenue sharing payments constitute plan assets in its hands which it did not contract with the Plans to receive.

In contrast to this overwhelming evidence, Nationwide offers only the merest scintilla of evidence that the revenue sharing payments constitute payments by the mutual funds for services actually rendered to them by Nationwide.  Indeed, Nationwide's proffered evidence (paragraphs 5 and 6 of the Declaration of William Goslee ("Goslee Decl."), a regulatory filing by it, and agreements between it and three mutual fund houses) likely does not create a genuine issue of material fact in this regard.[66]

Paragraph 5 of the Goslee Decl. only states that, "*Some of the service providers that are affiliated with a mutual fund sponsor enter into contracts with third-party providers, such as Nationwide Life or entities related to Nationwide Life (the "Nationwide entities") to help to provide services*."  Plaintiffs contend that this testimony is not admissible pursuant to FRE 802 and 1002.  If it is admissible, it amounts, at most, to testimony that Nationwide entered into

---

[64] Task list for filing of a prohibited transaction exemption in connection with accepting money from mutual funds, Supp. Conf. App. Tab E.

[65] Nationwide internal memorandum of October 24, 1995, Supp. Conf. App. Tab F.

[66] Defendants' Local Rule 56(a)1 Statement In Support of Revised Motion for Summary Judgment ("Revised Statement"), ¶¶ 17-21 [Docket No. 187].

contracts which stated that Nationwide would provide services.  It does not state that Nationwide, in fact, actually supplied services to mutual funds or that the revenue sharing payments, in fact, constitute payments for services rendered.  Indeed, the statement doesn't even state that Nationwide ever entered into contracts, but rather only that service providers "s*uch as Nationwide*" entered into such contracts.

Paragraph 6 of the Goslee Decl. is no better.  It merely states that, "*The contracts between Nationwide entities and service providers involve various…service, and payments*" and then goes on to discuss the methods of calculating those payments.  It never says that Nationwide actually provided any services to the mutual funds or that the revenue sharing payments, in fact, constitute payment for services rendered.  It does not matter what the contracts provide; what matters is the reality of the arrangement.

The statements regarding services allegedly rendered by Nationwide to mutual funds contained in its regulatory filing are inadmissible hearsay -- out of court statements offered for the truth of the matter asserted and as to which no hearsay exception has been demonstrated.  Even if they are admissible, they constitute only very general conclusory statements insufficient to raise a genuine issue of material fact.

Likewise, the provisions of the three agreements with fund houses cited by Nationwide constitute inadmissible hearsay -- out of court statements offered for the truth of the matters asserted as to which no hearsay exception has been demonstrated.  To the extent they are admissible, they raise no genuine issue of material fact, as they demonstrate only that the parties to those contracts characterize the revenue sharing payments as payments for services -- not that Nationwide actually provides any services or that the revenue sharing payments in fact constitute payment for services rendered.

The truth is that Nationwide became uncompetitive because it was charging too much for its group annuity contracts. So, Nationwide concocted the revenue sharing scheme in order to contract with Plans to accept what appears to be lesser contractual charges (which are calculated as a percentage of the assets invested by the Plans), but then recoup that revenue (plus more) at the back end by taking payments from the mutual funds calculated based upon a percentage of the Plans' invested assets. Nationwide did not suddenly start charging for services it previously provided to the mutual funds for free.

Knowing that its revenue sharing scheme could and should be challenged under ERISA, Nationwide structured its contracts to the mutual fund houses so as to refer to the revenue sharing payments as payment for services rendered, and it has similarly referred to the revenue sharing payments in regulatory filings. It did so for the purposes of creating a defense, not because the revenue sharing payments in fact constitute payment for services rendered. All the evidence other than the faces of Nationwide's contracts and public documents uniformly supports that the revenue sharing payments do not constitute payments for services rendered but rather a sophisticated scheme to deprive the Plans of funds which Nationwide did not contract to receive from them.

In summary, the evidence offered by Plaintiffs raises a genuine issue of material fact as to the nature of the revenue sharing payments, if necessary. If Plaintiffs prevail on this issue in whole or in part (because either no part of the revenue sharing payments constitute payment for services or they exceed reasonable payments for services), this case does not even arguably fall within the scope of the DOL advisory opinions or *Damasco*, because those opinions were premised on mutual funds paying legitimate "*fees*" for services rendered, not the sham that Nationwide has concocted.

F.     *ALTERNATIVELY, THE COURT SHOULD GRANT PLAINTIFFS ADDITIONAL TIME TO TAKE THE DISCOVERY NECESSARY TO RAISE A GENUINE ISSUE OF MATERIAL FACT AS TO THE NATURE OF THE REVENUE SHARING PAYMENTS.*

Prior to this time, Plaintiffs have not had a chance to conduct any merits discovery; rather, they have been limited to discovery narrowly tailored to class certification issues.[67]  As a consequence, they have not conducted in depth discovery into what services Nationwide provides to the Plans in return for contractual charges, what services Nationwide provides to PPA's in return for payments by them and what services Nationwide allegedly provides to mutual funds in return for the revenue sharing payments.[68]

In particular, Plaintiffs have not had a chance to conduct in depth discovery into whether Nationwide could or would cease any of its activities if all mutual funds ceased making revenue sharing payments to it.[69]  Presumably Nationwide would not continue all of its current activities if revenue sharing ceased, given that companies generally do not provide services for free. Likewise, Plaintiffs have not conducted in depth discovery into whether Nationwide has personnel or procedures devoted to providing mutual fund services, as opposed to other services, or attributes any costs to mutual fund services, as opposed to other services, as one would expect if Nationwide is actually providing services to mutual funds.[70]

Plaintiffs thus believe that further discovery will show that Nationwide inherently has to perform certain services for Plans and PPA's in order to run its business, for which services

---

[67] Mandel Declaration, Exhibit A hereto.

[68] *Id.*

[69] *Id.*

[70] *Id.*

those Plans and PPA's compensate it.[71]  That will prove that while the mutual funds may benefit incidentally from Nationwide's business, they cannot be said in any real sense to be making the revenue sharing payments in return for services rendered by Nationwide.

## III.  GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER NATIONWIDE CONSTITUTES A FIDUCIARY AS TO THE ACCUMULATION UNITS.

Plaintiffs plead that Nationwide constitutes a fiduciary as to the accumulation units only as a fallback position.  If the Court holds that Nationwide constitutes a fiduciary as to the revenue sharing payments, it need not address any issues relating to the accumulation units.

If the Court does address accumulation units, it should hold that genuine issues of material fact exist as to whether Nationwide acted as a fiduciary in regard to them.  Significantly, Nationwide concedes that the accumulation units constitute plan assets.[72]  Plaintiffs contend that Nationwide exercises authority or control over the management or disposition of those accumulation units in two respects, making it a fiduciary as to them.

First, Nationwide does so generally by virtue of all the actions it can and does take as to their management and disposition pursuant to its annuity contracts with the Plans or their participants, including canceling the units to pay its fees, transferring them to use as collateral for loans, canceling them to pay loans, canceling them to purchase annuities and canceling them to make cash payments.[73]  Second, it does so specifically by contractually arranging to receive and by accepting payments from mutual funds and/or mutual fund advisors equal to a percentage of the daily accrued value of a Plan's Units, which causes the Units to decline in value.

---

[71] *Id.*

[72] Statement, ¶ 13, App. Tab 7 [Docket No. 130].

[73] *See* the group contracts, Exhibits A-C to the Wyant Aff. [Docket No. 16], and the individual contracts, Exhibits 1-4 to the Eakins Aff. [Docket No. 17].

- 34 -

A.    *A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO NATIONWIDE'S GENERAL EXERCISE OF AUTHORITY OR CONTROL OVER THE ACCUMULATION UNITS.*

Nationwide does not dispute that pursuant to the group and individual annuity contracts, it exercises authority or control over the accumulation units, making it a fiduciary as to the accumulation units at least for purposes of that exercise of authority or control. Rather, it argues that as a limited purpose fiduciary it can only be liable for arranging for, accepting and retaining the revenue sharing payments if doing so constitutes both the exercise of authority or control over the accumulation units and the breach of fiduciary duty. Rev. Mem. at 13-16.

Nationwide cites no authority for this proposition, however. The cases cited by Nationwide merely stand for the proposition that a limited purpose fiduciary constitutes a fiduciary only as to those assets over which it exercises authority or control, not that the same acts must constitute the exercise of authority or control and the breach of fiduciary duty. *See* cases in Rev. Mem. at 15-16.

An example will hopefully make the distinction clear. Suppose a real estate manager is hired to manage a portfolio of commercial properties owned by an ERISA plan, including leasing, buying and selling the properties in its discretion. The real estate management company would constitute a fiduciary as to those properties, but not as to any other assets of the ERISA plan or as to the management of the plan.

The real estate company would generally owe a fiduciary duty as to the commercial properties and would be liable for breach of that duty. Crucially, it would be liable for breach of that duty even if the breach would not by itself constitute the exercise of authority or control over the commercial properties sufficient to make it a fiduciary as to the properties.

For example, if the real estate company failed to engage in sufficient marketing activities to lease empty properties, that failure would likely not constitute a sufficient exercise of

authority or control by itself to make the real estate company a fiduciary as to the properties if it was not already one, but it would constitute a breach of its existing fiduciary duty. Likewise, if it accepted extra payments from tenants for its own benefit in addition to the agreed upon rents, the acceptance of those payments would not constitute the exercise of authority or control over the commercial properties sufficient by itself to make the real estate company a fiduciary as to the properties if it was not already one, but it would violate its already existing fiduciary duty.

In this case, the Court should hold that Nationwide constitutes a fiduciary as to the accumulation units for all purposes. As a consequence, Nationwide bears liability for any breach of fiduciary duty it engages in as to the accumulation units, regardless of whether the acts that constitute the breach of fiduciary duty would by themselves constitute the exercise of authority or control over the accumulation units sufficient to make Nationwide a fiduciary as to them.

B.    *A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO NATIONWIDE'S SPECIFIC EXERCISE OF AUTHORITY OR CONTROL OVER THE ACCUMULATION UNITS BY RECEIVING THE REVENUE SHARING PAYMENTS, THEREBY CAUSING A DECREASE IN THEIR VALUE.*

Nationwide does not contest that if its receipt of revenue sharing payments causes the accumulation units to decrease in value, it exercises authority or control over the accumulation units and becomes a fiduciary as to them. Rather, it contends that Plaintiffs cannot produce evidence sufficient to create a genuine issue of material fact as to whether its receipt of revenue sharing payments causes the accumulation units to decrease in value. Nationwide is wrong.

Plaintiffs start with the testimony of Nationwide's own expert witness, Frederick M. Werblow, that the payment of fees by mutual funds to the investment managers who make the revenue sharing payments to Nationwide causes a decrease in the value of the Plans' accumulation units.[74] It follows from this that if those investment managers would reduce the

---

[74] Werblow Depo., 42:8-43:15, Conf. App. Tab J [Docket No. 137].

fees they charge to mutual funds for their services in the absence of having to make the revenue sharing payments to Nationwide, Nationwide's practice of receiving the revenue sharing payments causes increased fees which causes accumulation units to decrease in value. Crucially, evidence exists that creates a genuine issue of material fact as to whether investment managers would reduce the fees they charge to mutual funds if they did not have to make revenue sharing payments to Nationwide.

Specifically, Nationwide itself has admitted that the amount of fees charged by an investment manager to a particular fund will often determine in large part how much in revenue sharing it will pay to Nationwide in regard to that particular fund.[75] This supports that mutual fund investment managers take into account their expenses, such as revenue sharing payments, in setting the fees they charge to various mutual funds and, thus, that an investment manager should be willing to charge less if its expenses are less because revenue sharing payments do not need to be made.

## IV.    CONCLUSION

Nationwide's argument that the revenue sharing payments do not constitute plan assets in its hands (so as to make it a fiduciary as to those revenue sharing payments) boils down to a purely conclusory statement that the revenue sharing payments cannot constitute plan assets in its hands because they did not constitute plan assets in the hands of the mutual funds prior to payment and cannot be specifically traced back to plan assets. Accordingly, Nationwide urges a highly formalistic approach to ascertaining whether the revenue sharing payments constitute plan assets in its hands. That approach has been uniformly rejected by the courts.

---

[75] Goslee Depo., 189:25-197:23, Conf. App. Tab K [Docket No. 137].

Rather, courts have adopted a functional and, therefore, liberal approach to determining what constitutes plan assets in light of the remedial purposes of ERISA.  Under that functional approach, which Nationwide chose to simply ignore, the revenue sharing payments constitute plan assets in Nationwide's hands because: (i) they would not have been made but for the Plans' investments in Nationwide, (ii) Nationwide did not contract to receive them, despite the opportunity to do so, and (iii) they could and should be used for the benefit of the Plans and their participants.

Once the Court concludes that the revenue sharing payments constitute plan assets in Nationwide's hands, it should hold that Nationwide's retaining them violates ERISA.  If ERISA does nothing else, it prohibits a fiduciary from simply pocketing plan assets, as Nationwide has done for years and will continue to do unless restrained by the Court.

Respectfully submitted,

_____
Marc R. Stanley
Federal Bar No. ct18179
Roger L. Mandel
Federal Bar No. ct18180
Martin Woodward
Federal Bar No. ct25263

STANLEY, MANDEL & IOLA, L.L.P.
3100 Monticello Avenue, Suite 750
Dallas, Texas  75205
214-443-4300
214-443-0358 (Fax)

Antonio Ponvert, III
Federal Bar No. ct17516
Richard A. Bieder
Federal Bar No. ct04208

KOSKOFF KOSKOFF & BIEDER
350 Fairfield Avenue
Bridgeport, Connecticut 06604
203-336-4421
203-368-3244 (Fax)


Gregory G. Jones
Federal Bar No. ct23443

LAW FIRM OF GREGORY G. JONES PC
603 S. Main Street, Suite 200
Grapevine, Texas 76051
817-424-9001
817-424-1665 (Fax)

**PLAINTIFFS' COUNSEL**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of the foregoing were served this ___ day of March, 2004, upon the following counsel via the methods indicated:

| | |
|---|---|
| Dennis F. Kerrigan, Jr.<br>LeBoeuf, Lamb, Greene & MacRae<br>Goodwin Square<br>225 Asylum Street<br>Hartford, CT 06103 | via certified mail, RRR<br>via fax 860/293-3555<br>via first-class, U.S. mail<br>via overnight delivery<br>via hand delivery |
| Charles C. Platt<br>Wilmer Cutler & Pickering<br>399 Park Avenue<br>New York, NY 10022 | via certified mail, RRR<br>via fax 212/230-8888<br>via first-class, U.S. mail<br>via overnight delivery<br>via hand deliver |
| Eric J. Mogilnicki<br>Wilmer Cutler & Pickering<br>2445 M Street, N.W.<br>Washington, D.C. 20037 | via certified mail, RRR<br>via fax 202/663-6363<br>via first-class, U.S. mail<br>via overnight delivery<br>via hand deliver |

_____

Roger L. Mandel

- 40 -