UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Lou Haddock, as trustee of the Flyte Tool & Die, Incorporated Deferred Compensation Plan, et. al., | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 01-CV-1552 (SRU) |
| Nationwide Financial Services Incorporated, and Nationwide Life Insurance Company, | § § § § § | |
| Defendants. | § | March 1, 2004 |

## DECLARATION OF ROGER L. MANDEL

Roger L. Mandel declares the following is true under penalty of perjury:

1.  I am one of the attorneys of record for Plaintiffs in this case. I submit this declaration in support of Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment and Revised Memorandum of Law in Support of Defendants' Motion for Summary Judgment. Based upon my representation of Plaintiffs in this case, I have personal knowledge of all the facts stated herein, all of which are true and correct.

2.  The Scheduling Order entered by the Court on March 28, 2002, provided as follows:

    *A. General*

    *This case shall be managed in phases-the first being class certification by plaintiffs and a Rule 12 Motion by the defendants. Once class certification and the Rule 12 Motion have been ruled upon, a further Rule 26(f) Report and scheduling order shall address all deadlines and case management issues necessary for trial.*

The Scheduling Order limited discovery to class certification-related discovery, providing that "*...all class certification-related discovery shall be reasonable and tailored for preparation on the issue of class certification.*"

3. On March 5, 2003, the Court entered the First Amended Scheduling Order. It retained the exact same language quoted above. It also retained the limitation on discovery to class certification-related discovery. By endorsement dated May 9, 2003, the Court granted a motion extending certain deadlines set forth in the First Amended Scheduling Order. That endorsement did not provide for discovery on the merits.

4. From the Fall of 2001 to August 21, 2003, the parties engaged in exclusively class certification-related discovery. Nationwide objected to much discovery propounded by Plaintiffs on the basis that it was not reasonably limited to class certification. Accordingly, Plaintiffs have not yet taken general merits discovery, and any discovery they have thus far obtained that is relevant to the merits is only because it was also clearly relevant to class certification.

5. In response to Nationwide's motion for summary judgment on the issue of whether the revenue sharing payments constitute plan assets in the hands of Nationwide, Plaintiffs seek further discovery, if necessary.

6. In their summary judgment response, Plaintiffs give the example of a mutual fund closing and sending money to Nationwide based upon the investments of various Plans in that mutual fund. In that example, Plaintiffs argue Nationwide would have to treat the money as plan assets and credit it to the Plans in some manner despite the fact that the money did not constitute plan assets in the hands of the mutual fund and could not be specifically traced to

plan assets. Plaintiffs believe discovery from Nationwide regarding this scenario will further bolster their arguments.

7. Based upon the annuity contracts between the Plans and Nationwide which provide that Nationwide may substitute mutual funds offered to the Plans when mutual funds chosen by the Plans are closed and documents notifying one of the Plaintiffs of such a closing, I believe that this scenario of the closing of a mutual fund in which Plans had invested has actually happened at Nationwide. Plaintiffs wish to discover how Nationwide actually handled this situation. If, as expected, Nationwide used the payment by the closing mutual fund for the benefit of the Plans which had invested in the closing mutual fund, rather than simply pocketing it, Plaintiffs would inquire as to Nationwide why it did so and why the exact same reasoning does not apply to the revenue sharing payments.

8. If this scenario never happened, Plaintiffs would ask Nationwide how it would handle the situation. If Nationwide concedes that such payment from the closing mutual fund would constitute plan assets in its hands despite the fact the money did not constitute plan assets in the hands of the mutual funds that could not be traced back to plan assets, this would strongly bolster Plaintiffs' arguments regarding the revenue sharing payments.

9. If Nationwide denies that such a payment will constitute plan assets, that will serve to point out the absurdity of its position. Either way, it would provide useful facts which would help the Court in either making its ruling, as a matter of law, that the revenue sharing payments constitute plan assets in Nationwide's hands or determining that a genuine issue of material fact exists in this regard.

10. If necessary, Plaintiffs also seek to take additional discovery in order to raise a genuine issue of material fact as to the nature of the revenue sharing payments. Because

Plaintiffs have been limited to discovery narrowly tailored to class certification issues, they have not conducted in depth discovery into what services Nationwide provides to the Plans in return for contractual charges, what services Nationwide provides to Pension Plan Administrators in return for payments by them and what services Nationwide allegedly provides to mutual funds in return for the revenue sharing payments.

11. In particular, Plaintiffs have not had a chance to conduct in depth discovery into whether Nationwide could or would cease any of its activities if all mutual funds ceased making revenue sharing payments to it. If Nationwide admits it would not cease any activities if revenue sharing ceased, that would demonstrate that Nationwide does not, in fact, provide any services to mutual funds for which it is paid. This is because businesses never provide services to customers that will not pay for them.

12. Plaintiffs have also not obtained in-depth discovery of whether and how Nationwide internally differentiates between and/or attributes costs between services supplied to the Plans, services supplied to PPA's and services allegedly provided to mutual funds. The lack of any separate personnel or separate procedure for handling services provided to mutual funds, as opposed to other services, and the lack of tracking costs associated with providing services to mutual funds, as opposed to other services, would demonstrate that Nationwide, in fact, doesn't actually provide services to mutual funds.

13. Plaintiffs thus believe that further discovery into the basic functions of Nationwide's business and the services it provides will demonstrate that Nationwide inherently has to perform certain services to run its business, for which services it already receives compensation from both the Plans and Pension Plan Administrators. Such discovery would

serve to show that mutual funds simply benefit incidentally from those services but cannot be said in any real sense to be making the revenue sharing payments in return for those services.

14. To the extent that the Court finds that any portion of the revenue sharing payments legitimately constitute payments for services rendered, Plaintiffs wish to obtain additional in depth discovery from both Nationwide and third parties to demonstrate that the revenue sharing payments far exceed any reasonable amounts that would be paid for such services. Plaintiffs would inquire of Nationwide as to what costs, if any, are internally attributed to its alleged provision of services to mutual fund and how those attributed costs compare to the amount of revenue sharing payments it receives.

15. Plaintiffs would also obtain from Nationwide discovery showing how much it charged on a per participant per annum basis for providing the same services to Pension Plan Administrators and mutual funds in the past and presently. Plaintiffs would also conduct discovery into what independent third party service providers charged for the same services. In particular, Plaintiffs would obtain discovery from Pension Plan Administrators who performed some or all of the same services. Plaintiffs believe that such discovery will show that reasonable payments for any services actually provided by Nationwide are far, far less than the amounts of the revenue sharing payments.

16. Behind Tab 1 of the Appendix in Support of Plaintiffs' First Amended Motion for Class Certification ("the Appendix") [Docket No. 130] is a true and correct copy of the April 13, 1998 Final Report of the Pension Welfare Benefits Administration of the Department of Labor entitled "Study of 401(k) Plan Fees and Expenses."

17. Behind Tab 2 of the Appendix is a true and correct copy of the August 5, 1993 letter from The Pension Service, Inc., to Future Benefits, Inc., along with the accompanying

Nationwide Life Insurance Company ("Nationwide") Broker Compensation Agreement ("Agreement") between Nationwide Life Insurance Company and Future Benefits, Inc.

18. Behind Tab 3 of the Appendix is a true and correct copy of a statement of the duties of Future Benefits, Inc., as plan administrator for Greater Hartford Easter Seals along with information on mutual fund choices and costs.

19. Behind Tab 4 of the Appendix is a true and correct copy of the Appointment of Contract Holder's Authorized Representative in which trustees of the Money Accumulation Pension Plan for Employees of Hartford Seals Rehabilitation Center Trust delegated to The Pension Service, Inc., the authority to act on its behalf in connection with the group annuity contract issued by Nationwide Life Insurance Company to Easter Seal.

20. Behind Tab 5 of the Appendix is a true and correct copy of the Appointment of Contract Holder's Authorized Representative, Verification of Receipt of Specimen Group Annuity Contracts and Completed Proposal Pages in which trustees of the Greater Hartford Easter Seal Rehab Center Trust delegated to The Pension Service, Inc., authority to act on behalf of Easter Seal in connection with the group annuity contracts issued by Nationwide Life Insurance Company.

21. Behind Tab 6 of the Appendix is a true and correct copy of the Appointment of Contract Holder's Authorized Representative in which the trustees of the Crown Tool & Die Co., Inc. Salary Deferral Profit Sharing Plan delegated to James H. Dean & Co., Inc., the authority to act on its behalf in connection with group annuity contracts issued to Crown Tool by Nationwide Life Insurance Company.

22. Behind Tab 7 of the Appendix is a true and correct copy of Defendants' Local Rule 56(a)1 Statement in Support of Motion for Summary Judgment filed by Nationwide on or about August 28, 2003.

23. Behind Tab 8 of the Appendix is a true and correct copy of a Best of America IV Investment Options Summary for employees upon which Easter Seals has designated the mutual funds to be available to participants in its plan.

24. Behind Tab 9 of the Appendix is a true and correct copy of the Investment Option Addition Request executed by Easter Seal.

25. Behind Tab 16 are true and correct copies of the firm resume of Koskoff, Koskoff & Bieder, P.C., the firm resume of Stanley, Mandel & Iola, L.L.P., and the resume of Gregory G. Jones.

26. Behind Tab B of the Confidential Appendix in Support of Plaintiffs' First Amended Motion for Class Certification ("the Confidential Appendix") [Docket No. 137] is a true and correct copy of Deposition Exhibit 519, an internal Nationwide memorandum from John Bath to Ron Eppley dated March 9, 1993.

27. Behind Tab C of the Confidential Appendix is a true and correct copy of Deposition Exhibit 520, a March 19, 1993 Nationwide internal memorandum from Steve Rose to Jim Brock and Ron Eppley.

28. Behind Tab D of the Confidential Appendix is a true and correct copy of Deposition Exhibit 44, a June 12, 1996 Verification of Receipt of Specimen Group Annuity Contracts and Completed Proposal Pages in connection with the Crown Plan.

29. Behind Tab I of the Confidential Appendix is a true and correct copy of Deposition Exhibit 50, an October 30, 1997 Investment Option Addition Request in connection with the Crown Plan.

30. Behind Tab L of the Confidential Appendix is a true and correct copy of Deposition Exhibit 521, the 1994 Business Plan for the Pensions area of Nationwide dated December 22, 1993.

31. Behind Tab M of the Confidential Appendix is a true and correct copy of Deposition Exhibit 522, a January 13, 1994 Nationwide internal email from John S. Bath to a number of persons.

32. Behind Tab N of the Confidential Appendix is a true and correct copy of Deposition Exhibit 524, a June 2, 1993 Nationwide memorandum from John Bath to a number of persons.

33. Behind Tab O of the Confidential Appendix is a true and correct copy of Deposition Exhibit 526, an April 4, 1995 Nationwide internal memorandum from Dick Jolley and John Williams to a number of persons.

34. Behind Tab P of the Confidential Appendix is a true and correct copy of Deposition Exhibit 527, a December 6, 1994 internal memorandum of Nationwide from Steve Rose to a number of persons.

35. Behind Tab Q of the Confidential Appendix is a true and correct copy of Deposition Exhibit 609, a The Best of America Retirement Manager Variable Contract Profile dated November 2, 1999.

36. Behind Tab R of the Confidential Appendix is a true and correct copy of Deposition Exhibit 534, minutes of the May 12, 1995 meeting of the Mutual Fund Revenue Implementation Team of Nationwide.

37. Behind Tab S of the Confidential Appendix is a true and correct copy of Deposition Exhibit 54, a March 30, 1999 letter from Nationwide to James H. Dean & Company, Inc., along with an accompanying memorandum and proposed contract amendment in connection with the Crown Plan.

38. Behind Tab T of the Confidential Appendix is a true and correct copy of Exhibit Haddock 9, a June 7, 1997 letter from Nationwide Insurance to the Heritage Group, Ltd., along with a proposed contract amendment in connection with the Flyte Plan.

39. Behind Tab A of Plaintiffs' Supplemental Confidential Appendix in Support of Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment and Revised Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Supp. Conf. App.") filed March 8, 2004, is a true and correct copy of an August 9, 1993 Nationwide internal email.

40. Behind Tab B of the Supp. Conf. App. is a true and correct copy of an August 17, 1993 Nationwide internal email.

41. Behind Tab C of the Supp. Conf. App. is a true and correct copy of a November 17, 1993 Nationwide internal memorandum from the Pensions Management Team to a number of persons.

42. Behind Tab D of the Supp. Conf. App. is a true and correct copy of a November 28, 1994 internal email of Nationwide.

43.     Behind Tab E of the Supp. Conf. App. is a true and correct copy of the task list for the filing of a prohibited transaction exemption in connection with accepting money from mutual funds.

44.     Behind Tab F of the Supp. Conf. App. is a true and correct copy of an October 24, 1995 Nationwide internal memorandum from Steve Rose to the Competitive Pricing Implementation Team.

Dated March ____, 2004.

_____
Roger L. Mandel