

1999 WL 997278
(Cite as: 1999 WL 997278 (E.D.N.Y.))

Page 1

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

EMPIRE RESOURCES, INC., Plaintiff,
v.
DAVIDSON METALS CORP., Defendant.

**No. 99-CV-1509 (JG).**

Oct. 18, 1999.

John Siegal, Proskauer & Rose LLP, New York, NY, for Plaintiff.

Seth Eschen, Joseph & Terracciano, Syosset, NY, for Defendant.

*MEMORANDUM AND ORDER*

GLEESON, J.

*1 Empire Resources, Inc. initiated this action alleging breach of contract to recover damages for shipments of aluminum sheet and coil ordered, received, and accepted by Davidson Metals Corp. The plaintiff has filed a motion for summary judgment. The motion is unopposed. For the reasons set forth below, the plaintiff's motion is granted.

*FACTS*

This action arose out of the sale and delivery of 16 shipments of specially ordered and manufactured aluminum coil and aluminum sheet by Empire Resources, Inc. ("Empire") to Davidson Metals Corp. ("Davidson") between December 17, 1997, and December 31, 1998.

In response to orders placed by Davidson, Empire issued eight contracts between June 4, 1997 and June 17, 1998. The contracts provide that Davidson was to sign and return the contracts with 14 days or, "[i]n the absence of such signature, [Davidson] will

be deemed to have assented to [the printed] terms and conditions if ... [Davidson] accept[s] delivery of all or any part of the material described." The contracts also set forth the following terms of delivery:

> Delivery ... may be made in installments.... Each delivery shall be paid separately ... and in any action or proceeding to recover the price payable for any delivery, or other amounts due under the terms of this or any other contract, [Empire] shall not have the right to assert any counterclaims or set- off with respect to such delivery or contract.

Pursuant to these contracts, Empire delivered and Davidson accepted the 16 shipments referenced above, for a total purchase price of $442,262. [FN1] Each of these shipments was accompanied by an invoice stating that the payment terms were "Net cash 60 days from arrival of material at pier--port of importation." Empire never received payment for the amounts due. With credit for three shipments that Davidson declined to accept, the adjusted total of the amount owed by Davidson to Empire is $385,885.

FN1. The contracts and invoices at issue are as follows:

Empire initiated this action on April 6, 1999, seeking the $385,885 due for the delivered goods, $77,177 for additional expenses (20% of the amount due), and interest at the contractual rate. On April 29, 1999, Davidson filed its answer, asserting the affirmative defenses of breach of warranty of fitness and merchantability, waiver and estoppel, and failure to mitigate. The parties proceeded to discovery. On June 30, 1999, Davidson did not appear for a scheduled deposition. Then, by letter dated July 7, 1999, Davidson stated that it was willing to withdraw the aforementioned affirmative defenses. A joint stipulation and order withdrawing the defenses and amending the answer was filed on July 21, 1999. Lastly, on September 29, 1999, Empire filed a motion for summary judgment or, in the alternative, a motion for default judgment. Davidson did not oppose either motion.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1999 WL 997278
(Cite as: 1999 WL 997278 (E.D.N.Y.))

Page 2

*DISCUSSION*
A. *The Standard for Summary Judgment*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether material facts are in dispute, courts must resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

*2 The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *See Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1223 (2d Cir.1994). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' ' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (quoting Fed.R.Civ.P. 56(e)). The non-moving party cannot survive a properly supported motion for summary judgment by resting on its pleadings "without offering 'any significant probative evidence tending to support the complaint.' ' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 290 (1968)). Moreover, the moving party is not required to affirmatively disprove unsupported assertions made by the non-movant. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Conclusory allegations, conjecture, and speculation are "insufficient to create a genuine issue of fact." *Kerzer,* 156 F.3d at 400 (citing *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.), *cert. denied,* 118 S.Ct. 2075 (1998)).

B. *Breach of Contract*

Empire claims that it is entitled to summary judgment because it has established a *prima facie* case of breach of contract and Davidson has not raised a genuine issue of material fact in opposition to that claim. I agree.

Under New York law, a plaintiff is entitled to summary judgment if it establishes that the defendant "received and accepted, but did not pay for," goods it purchased from the plaintiff. *Avis Rent A Car Sys., Inc. v. McNamara Buick Pontiac, Inc.,* 455 N.Y.S.2d 643, 643 (2d Dep't 1982); *see* N.Y. U.C.C. § 2-607(1) (McKinney 1993) ("The buyer must pay at the contract price for any goods accepted."); *Id.* § 2-607(4) ("The burden is on the buyer to establish any breach with respect to the goods accepted."); § 2- 703(e) ("Where the buyer ... fails to make a payment due on or before delivery ... the aggrieved seller may ... recover ... the price."). It is undisputed that Davidson ordered, received, and accepted the goods at issue. (Wrubel Decl.; Pl.'s Compl. ¶ 6, Def.'s Answer.) [FN2] Harvey Wrubel, Empire's Vice President, attested that all of the allegations set forth in the complaint are true. (Wrubel Decl.) Moreover, Wrubel has declared that the contracts and invoices submitted as exhibits "are business records Empire maintains in the ordinary course of our business." (*Id.* ¶ 2.) Thus, these records are admissible evidence under the business records exception to the hearsay rule. *See* Fed.R.Evid. 803(6); *Moretti v. Commissioner,* 77 F.3d 637, 645 (2d Cir.1996) (noting that contracts for sale may be admissible under the business records exception). Davidson has not offered any evidence-- admissible or otherwise--in opposition to Empire's motion for summary judgment. Indeed, Davidson admitted in its answer that it regularly purchased and received specially manufactured goods by sales contracts; it withdrew all of its affirmative defenses; and it has not opposed Empire's motion in any way. [FN3] Accordingly, drawing all inferences and resolving all ambiguities in favor of Davidson, I find that it has failed to raise a genuine issue of material fact in defense of Empire's breach of contract action.

FN2. "Wrubel Decl." refers to the declaration of Harvey Wrubel, Vice President of Empire Resources, Inc., executed on August 27, 1999.

FN3. Counsel for Davidson did attend the oral argument of this motion. However, he offered no argument in defense.

*3 Empire also seeks, in the alternative, sanctions for Davison's failure to cooperate in discovery.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1999 WL 997278
(Cite as: 1999 WL 997278 (E.D.N.Y.))

Page 3

Specifically, Empire seeks a default judgment or attorney's fees based on Davidson's failure to attend its deposition. *See* Fed.R.Civ.P. 37(b)(2)(C), (d). As Empire has now obtained judgment on the merits, its motion for discovery sanctions is hereby denied as moot.

*CONCLUSION*

For the reasons set forth above, the plaintiff's motion for summary judgment is granted. At oral argument, the plaintiff was asked to prepare a form of judgment calculating the contractual interest. It has done so, and the defendant has not objected. Accordingly, the Clerk is directed to enter judgment in favor of the plaintiff in the amount of $486,939.

| Contract | Invoice | Arrival Date | Due Date | Amount |
|----------|---------|--------------|----------|--------|
| ER-2055-S/5 | 19347 | Dec. 17, 1997 | Feb. 17, 1998 | $51,216 |
| ER-2055-S/26 | 20743 | April 21, 1998 | June 20, 1998 | $35,726 |
| | 21472 | April 29, 1998 | Oct. 26, 1998 | $22,983 |
| ER-2141-S/90 | 22093 | Sept. 23, 1998 | Nov. 22, 1998 | $29,405 |
| | 22109 | Oct. 27, 1998 | Dec. 26, 1998 | $44,575 |
| | 22128 | Oct. 30, 1998 | Dec. 29, 1998 | $10,860 |
| ER-2108-S/16 | 22130 | Oct. 30, 1998 | Dec. 29, 1998 | $54,575 |
| | 22463 | Dec. 21, 1998 | Feb. 19, 1999 | $32,425 |
| | 22464 | Dec. 21, 1998 | Feb. 19, 1999 | $42,948 |
| ER-2055-S/21 | 22641 | Dec. 22, 1998 | Feb. 20, 1999 | $5,381 |
| ER-2055-S/21 | 22518 | Dec. 31, 1998 | March 1, 1999 | $19,362 |
| ER-2108-S/38 | 22519 | Dec. 31, 1998 | March 31, 1999 | $47,058 |
| ER-2108-S/17 | 22520 | Dec. 31, 1998 | March 1, 1999 | $45,745 |

1999 WL 997278, 1999 WL 997278 (E.D.N.Y.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# AUTHORITY C



Slip Copy                                                                    Page 1
(Cite as: 2004 WL 188088 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

WANTANABE REALTY CORP., et al., Plaintiffs,
v.
THE CITY OF NEW YORK, et al., Defendants.

**No. 01 Civ.10137(LAK).**

Feb. 2, 2004.

**Background:** Owner of demolished roller coaster brought action for damages against city, alleging that demolition was unjustified. In bifurcated trial, first jury found city liable for common law trespass.

**Holdings:** On second jury's finding that there were no damages, the District Court, Kaplan, J., held that:
(1) testimony of owner's expert as to his opinion of roller coaster's replication cost was unreliable, and therefore inadmissible;
(2) testimony of owner's expert as to his opinion of roller coaster's pre- demolition value was not admissible; and
(3) testimony of owner's expert as to his opinion of roller coaster's "historic value" was not admissible.
Ordered accordingly.

**[1] Evidence ☞555.9**

157k555.9 Most Cited Cases

In action for damages brought against city by owner of demolished roller coaster, testimony of owner's expert as to his opinion of roller coaster's replication cost was not admissible, where expert's opinion lacked reliable basis, given that it was based on cost estimate prepared for litigation by third-party. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[2] Evidence ☞555.9**
157k555.9 Most Cited Cases

In action for damages brought against city by owner of demolished roller coaster, testimony of owner's expert as to his opinion of roller coaster's pre-demolition value was not admissible, where opinion was based entirely on inadmissable replication cost estimate, and expert failed to explain how he reached his conclusions. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[3] Evidence ☞555.9**
157k555.9 Most Cited Cases

In action for damages brought against city by owner of demolished roller coaster, testimony of owner's expert as to his opinion of roller coaster's "historic value" was not admissible, where expert never expressed reliable basis for his estimate that roller coaster would have drawn 100,000 people more than would a replica or a newly built roller coaster, and that revenue would have been $50 per person, and he did not provide connection between either of incremental revenue figures he gave and either net profit or value attributable to historic nature of roller coaster. Fed.Rules Evid.Rule 702, 28 U.S.C.A

Barry S. Gedan, for Plaintiffs.

Dana Biberman, Kerri A. Devine, Assistant Corporation Counsel, Michael A. Cardozo, Corporation Counsel of the City of New York, for Municipal Defendants.

MEMORANDUM OPINION

KAPLAN, J.

*1 In November 2000, the City of New York demolished the Thunderbolt, a roller coaster at Coney Island that had not been used since 1982 or 1983, allegedly on the ground that the structure had become hazardous. Plaintiff, the owner, brought this action for damages, claiming that the demolition was unjustified. The trial was bifurcated. The first jury found the City liable for common law trespass.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                    Page 2
(Cite as: 2004 WL 188088 (S.D.N.Y.))

The second jury rendered a special verdict that, in substance, found no damages, so plaintiff recovered nominal damages alone.

Shortly before the damages trial, the Court granted defendants' motion *in limine* to exclude the testimony of one of plaintiff's proposed expert witnesses, Richard Battaglia, and indicated that an opinion would follow in the event the matter was not resolved in a manner that obviated any need for it. As no such resolution has been reached, this opinion follows. [FN1] The Court assumes familiarity with its previous opinions. [FN2]

> FN1. Mr. Battaglia's deposition was taken *de bene esse* on December 12, 2003, as he could not be in New York City at the time of the trial. The Court therefore had before it his trial testimony (i.e., the December 12 deposition), as well as his deposition of September 9, 2002, and his report, dated July 19, 2002. It might be noted also that Mr. Battaglia was deposed *de bene esse* in January 2004 for purposes of plaintiff's rebuttal case and that part of that deposition was received in evidence at the damages trial.

> FN2. *Wantanabe Realty Corp. v. City of New York,* --- F. Supp . 2d ----, No. 01 Civ. 10137(LAK), 2003 WL 22862646 (S.D.N.Y. Dec. 3, 2003); *Wantanabe Realty Corp. v. City of New York,* --- F.Supp.2d ----, No.01 Civ. 10137(LAK), 2003 WL 21543841 (S.D.N.Y. July 10, 2003, as corrected July 14, 2003).

*The Proposed Testimony*

Plaintiff proposed to call Mr. Battaglia to testify that replicating the Thunderbolt anew would cost $15.8 million, [FN3] that it had an historic value of $ 4 to $5 million, [FN4] and that the value of the Thunderbolt just prior to its destruction was $10.7 million, of which he attributed $5 million to "historic value." [FN5] According to Mr. Battaglia's report, the $15.8 million replication cost [FN6] included, among other things, $8.1 million for a ride system, which was simply a price quote obtained from a Swiss manufacturer, plus $700,000

for shipping the ride from Switzerland and $1.4 million for installing it in Coney Island, and an additional $928,800 to rebuild the so-called Kensington Hotel.

> FN3. Battaglia Dep. at 68-82. Unless otherwise indicated, references are to the December 12, 2003, deposition transcript.

> FN4. *Id.* at 86-92.

> FN5. *Id.* at 93-94.

> FN6. The report placed the figure at $17.1 million. Mr. Battaglia subsequently reduced the amount in light of facts that came to his attention following its preparation.

*Qualifications*

The threshold question tendered by defendants was whether Mr. Battaglia was qualified to offer opinions as to the replication cost of the Thunderbolt, its pre-demolition value, and its "historic value."

Mr. Battaglia has a B.S. in business with a marketing emphasis. For a number of years, he worked for The Disney Company, first as a ride operator and then in supervisory capacities and in the marketing department at Disneyland. [FN7] Later, he joined a three-person project development team that assessed the relative success of different rides at Disneyland in preparation for the development of Disney World in Florida. [FN8] After leaving Disney, Mr. Battaglia joined Ringling Bros. Barnum & Bailey Circus as a vice president of planning where he did similar work. [FN9]

> FN7. Battaglia Dep. at 6-7.

> FN8. *Id.* at 8-9, 11-12.

> FN9. *Id.* at 13-18.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 2004 WL 188088 (S.D.N.Y.))

Page 3

Eventually, Mr. Battaglia and another started the firm with which he now is associated, Battaglia Incorporated, [FN10] which develops theme parks and entertainment complexes and resorts for clients on a turnkey basis, developing a concept, participating in design, doing feasibility analyses and preparing architectural and engineering drawings. [FN11] While it does not actually build, it sometimes oversees general contractors on behalf of owners. [FN12] It is involved also in developing revenue estimates in order to evaluate proposed capital investments and in making initial estimates of the costs of constructing proposed amusement rides. [FN13]

FN10. *Id.* at 5-6.

FN11. *Id.* at 18-20.

FN12. *Id.* at 19.

FN13. *Id.* at 20-24.

*2 It is far from clear that Mr. Battaglia's background, even given the liberality of the standards for qualification, qualified him to testify concerning these matters. It was unnecessary to make such a determination, however, in light of the discussion that follows.

*Replication Cost*

[1] The measure of damages in this case was the lesser of the value of the structure, in its then depreciated condition, immediately prior to demolition, and the amount, if any, by which the demolition reduced the fair market value of the real estate. [FN14] Plaintiff contended that the difference between building a new replica of the Thunderbolt and the cost to repair the deteriorated structure was a fair estimate of the roller coaster's depreciated value prior to demolition. [FN15] Testimony regarding the replication cost of the Thunderbolt therefore was relevant, contrary to defendants' contention. There remains, however, defendants' assertion that Mr. Battaglia's opinion as to replication cost was insufficiently reliable and grounded.

FN14. *Hartshorn v. Chaddock,* 135 N.Y. 116, 121-22, 31 N.E. 997 (1892); *Property Owners Ass'n of Harbor Acres v. Ying,* 137 A.D.2d 509, 510, 524 N.Y.S.2d 252, 252 (2d Dept.1988); *see also Jenkins v. Etlinger,* 55 N.Y.2d 35, 39, 447 N.Y.S.2d 696, 698, 432 N.E.2d 589 (1982). *See* Jury Charge at 3.

FN15. *See* Order, Jan. 5, 2004; Trial Tr. 30-31, 180, 954, 962, 995- 96.

In assessing reliability under Rule 702, *Daubert v. Merrell Dow Pharmaceuticals,* [FN16] and its progeny, a district court should consider indicia of reliability, including, but not limited to, (1) whether the testimony is grounded on sufficient facts, (2) whether the underlying methodology is reliable, and (3) whether the witness has applied the method reliably to the facts. [FN17] Admissibility, when challenged, must be established by the proponent by a preponderance of the evidence. [FN18] "The burden of demonstrating that the testimony is competent, relevant, and reliable rests with the proponent of the testimony." [FN19]

FN16. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

FN17. *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir.2002).

FN18. *Daubert* 509 U.S. at 592 n. 10.

FN19. *Travelers Property & Casualty Corp. v. General Electric Co.,* 150 F.Supp.2d 360, 363 (D.Conn.2001). *Accord, Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.,* 222 F.Supp.2d 423, 486 (S.D.N.Y.2002); *Cayuga Indian Nation of New York v. Pataki,* 83 F.Supp.2d 318, 321 (N.D.N.Y.2000).

The principal figure in Mr. Battaglia's replication cost estimate was the $10.2 million quote for the ride system ($8.1 million), the cost of shipping it

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                     Page 4
(Cite as: 2004 WL 188088 (S.D.N.Y.))

from Switzerland ($700,000) and the installation cost ($1.4 million). [FN20] It is clear from his report that the $8.1 million bid was that of Intamin, [FN21] a Swiss roller coaster manufacturer and the only supplier from whom Mr. Battaglia sought a quotation. [FN22] To be sure, Mr. Battaglia asserted that his firm "actually did a cost estimate in-house to determine what we felt it was going to cost to fabricate the roller coaster" and that Intamin's bid "corroborated" that estimate. [FN23] But he never offered his firm's in-house estimate, and he certainly never demonstrated the basis for it. In consequence, even if the Court had accepted the assertion that Mr. Battaglia's firm did develop its own estimate, a matter as to which it has reservations, there would have been no basis upon which it reasonably could have concluded that it was reliable and soundly based.

FN20. Battaglia Dep. at 69-70, 72-73.

FN21. *See* Battaglia Report, prepared July 19, 2002, at 8-10.

FN22. Battaglia Dep. at 122.

FN23. *Id.* at 69.

To the extent that the $10.2 million estimate was simply a relation of Intamin's bid, it was not Mr. Battaglia's opinion at all and may not be received as expert testimony. The Court is mindful that Rule 703 allows an expert to rely upon information supplied by another in forming an opinion where the material relied upon is of a type reasonably relied upon by experts in the field. [FN24] But this was not such a situation. Mr. Battaglia was not proposing to offer an opinion based on the Intamin estimate. [FN25] He was proposing to offer the Intamin estimate itself, which of course was hearsay, as it was Mr. Battaglia's account of Intamin's out of court statement that it would have built, shipped and installed the ride system for the quoted price and it was offered for the truth of the matters asserted. But an expert may not act as a "mere conduit" for the hearsay of another. [FN26] Nor did the Intamin estimate come under an exception to the hearsay rule. Rule 803(17), the

exception for market reports and commercial publications, was not applicable, as it covers only those market quotations prepared for general use by an industry or the general public. [FN27] Unpublished price quotations or estimates done for litigation, as was this one, do not contain similar guarantees of reliability. The exception under Rule 807 is equally unavailable, as there is nothing particularly trustworthy about the Intamin estimate, and plaintiff in any case did not rely upon this rule. [FN28]

FN24. *See Gussack Realty Co. v. Xerox Corporation,* 224 F.3d 85 (2d Cir.2000) (expert testimony properly admitted even though expert relied on data provided by another); *In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1223, 1245 (E.D.N.Y.1985), *aff'd,* 818 F.2d 187 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988) (expert may rely on hearsay, provided that data is reasonably relied upon by experts in the field).

FN25. In any case, there was no foundation that would have justified a finding that an expert would offer an opinion based on a single quotation provided by a foreign manufacturer, and the Court declines so to find. Even if there had been such a foundation, it is unclear how Mr. Battaglia could have assisted the trier of fact in understanding the evidence, as required under Rule 702, as a jury certainly would have been capable of reading the Intamin estimate, were it independently admissible, itself.

FN26. *Valentin v. New York City,* No. 94 Civ. 3911(CLP), 1997 WL 33323099, at *27 (E.D.N.Y. Sept.9, 1997) (expert cannot testify on current state of sexual harassment training when only knowledge comes from statements by others that the training is superficial); *see also Hutchinson v. Groskin,* 927 F.2d 722 (2d Cir.1991) (district court erred in allowing physician to testify that three other doctors had reached the same conclusion, as

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 2004 WL 188088 (S.D.N.Y.))

Page 5

testimony of others would be hearsay not subject to cross-examination).

FN27. 5 Weinstein's Federal Evidence § 803.19[1], at 803-118.

FN28. It is established in this circuit that Rule 807 permits the admission of hearsay where (a) it is particularly trustworthy, (b) it bears on a material fact, (c) it is the most probative evidence available, (d) admitting it would promote justice, and (e) there is adequate notice to the opposing party. *United States v. Bryce,* 208 F.3d 346, 350 (2d Cir.1999) (as amended Mar. 7, 2000).

*3 The remainder of Mr. Battaglia's replication figure includes an estimate for cost of replicating the so-called Kensington Hotel and a number of other elements, such as signage and lighting. Mr. Battaglia's opinion as to a replication cost of $928,800 for the replacement of the Kensington Hotel clearly lacked any reliable basis. This was derived by applying a $135 per square foot construction cost figure for which no basis was given, to an unreliable 6,880 square foot estimate of the size of the building, all without any real knowledge of the characteristics of the structure. The other elements in Mr. Battaglia's replication cost estimate together account for something in the neighborhood of $4 to $6 million and may be dealt with summarily. The Court was not persuaded that there was a reliable and sound basis for any of it. [FN29]

FN29. For example, the estimate included $500,000 for site preparation. Battaglia Dep. at 70. Mr. Battaglia did not explain what site preparation was necessary, much less the basis for estimating its cost at $500,000. He offered similar *ipse dixits* with respect to many other items, including $2.25 million for drawings and engineering, $250,000 to replace a maintenance area, $175,000 for a public address system, $250,000 for lighting, $327,500 for signage and so on. *Id.* at 76.

*Pre-demolition Value*

*A. The Roller Coaster*

[2] Mr. Battaglia assigned a $5.7 million value (exclusive of "historic value") to the roller coaster prior to demolition of which he attributed $660,000 to the hotel building. Put another way, he valued the roller coaster itself, including the ride system, the cars, and various other elements, at $5.1 million. In arriving at a figure for the value of the ride system, he started with the Intamin quotation of $8.1 million, estimated how much of that quotation represented the cost of the track, estimated that 50 percent of the track of the roller coaster was reusable, and valued that at half of the Intamin quotation that he attributed to the track. [FN30] This portion of the proposed testimony was unreliable for the reasons described above, as it is based entirely on the inadmissable replication cost estimate.

FN30. Battaglia Dep., Sept. 9, 2002, at 46.

The second component of the $5.1 million pre-demolition value of the Thunderbolt encompassed the value of the queue structure, storage, locker room, signage, lighting and other elements. [FN31] Mr. Battaglia purportedly determined the value of these structures as they existed immediately prior to demolition by multiplying the dimensions of each unit, which were supplied by plaintiff, by a unit cost, to arrive at value per square foot. [FN32] Mr. Battaglia gave little explanation of how he determined the unit cost save to say that he took the unit cost to build each structure in today's market and decreased it to reflect what the structure would have been "worth" per square foot. [FN33] Nor did Mr. Battaglia explain how he reached a value of $150,000 for the two roller coaster trains, a third component of the pre- demolition value. [FN34] In reaching this estimate, he relied on a faint picture from a magazine article, and he had no knowledge of the size of the trains or whether they had been covered. [FN35]

FN31. *See* Battaglia Report at 5.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                      Page 6
(Cite as: 2004 WL 188088 (S.D.N.Y.))

FN32. Battaglia Dep. at 94.

FN33. Battaglia Dep., Sept. 9, 2002, at 77-81.

FN34. *Id.* at 82-86.

FN35. *Id.*

As the December 12, 2003 was a *de bene esse* deposition, it was Mr. Battaglia's trial testimony. In view of the fact that it was plaintiff's burden to develop a record demonstrating admissibility, and its failure to do so, the defendants' motion was granted with respect to Mr. Battaglia's opinion concerning the pre- demolition value of the roller coaster.

*2. Kensington Hotel*

*4 Mr. Battaglia testified that the Kensington Hotel building was worth $660,000 before demolition. His first step in determining the value of the building was to accept as correct the owner's estimate of the square footage of the building (6,880 square feet) without even ascertaining whether the owner had measured it. [FN36] Then--without looking at architectural drawings [FN37] or knowing the condition of its structural members [FN38] or whether it had electricity or plumbing [FN39]--he multiplied the building area by an assumed $125 per square foot value and then subtracted $200,000 for fire damage. [FN40]

FN36. Battaglia Dep. at 104-05, 122-23.

FN37. *Id.* at 105.

FN38. *Id.* at 107.

FN39. *Id.* at 107-08.

FN40. *Id.* at 61, 64-66.

There was nothing in the record to support a view that the $660,000 figure had any reliable basis, even assuming that Mr. Battaglia were qualified to offer an opinion on that point, which is highly debatable but need not be determined.

*3. Historic Value*

[3] Mr. Battaglia opined that the Thunderbolt had a pre-demolition "historic value" of $5 million, above and beyond the $5.1 million value of the structure. [FN41] In reaching this figure, he asserted that he felt that the ridership of the roller coaster would be increased by "at least another hundred thousand ... and at $50 per person we would generate $5 million, and so that would be the value." [FN42] Presumably, this means that the Thunderbolt--as it stood prior to demolition and assuming that it were restored to operating condition--would have drawn 100,000 people more than would a replica or a newly built roller coaster. There were a great many problems with this proposed testimony.

FN41. *Id.* at 85-87.

FN42. *Id.* at 88.

To begin with, Mr. Battaglia never articulated any reliable basis for this 100,000 estimate. [FN43] While he doubtless has experience in the theme park field, he has had no experience in marketing historic roller coasters. [FN44] There is nothing in his background, at least so far as it was developed, to suggest that he has any reliable basis for coming to such a figure. And surely there is no evidence of any empirical market research such as consumer surveys, polling, focus groups or the like.

FN43. He said that "you can range between 3 and 10 percent increase in attendance based on a known entity, say if you had built a ride that was based on, oh, say, Indiana Jones ..." *Id.* at 96-97. The Thunderbolt, however, has not operated since 1982 or 1983. There was no evidence that it then had the sort of awareness among potential consumers that has been achieved in recent times for hit

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                  Page 7
(Cite as: 2004 WL 188088 (S.D.N.Y.))

motion pictures, let alone evidence that it does so now, after having been a disused relic for the better part of two decades. So there was no reason to suppose that Mr. Battaglia's 3 to 10 percent rule of thumb would have been applicable. Even if there were, an increase in ridership of 100,000 to 200,000 people, would have presupposed a ridership of a generic roller coaster of 1 million to 2 million persons at the low end to 3.3 million to 6.6 million at the high. It appeared, however, that the total capacity of the Thunderbolt, using plaintiff's assumption of 134 operating days per season and assuming operation for 12 hours per day rain or shine, was not more than approximately 1.6 million. *Daubert* Hearing, DX W1.

FN44. Battaglia Dep. at 56.

Second, there is no basis for supposing that the $50 per person revenue figure Mr. Battaglia used would have been appropriate in this case. His testimony suggests that this was a per capita revenue figure derived from "a theme park setting," [FN45] which is unlike that in which the Thunderbolt was situated. When pressed on this point, he conceded that a more appropriate revenue figure would have been $20 per capita, but then revised his incremental ridership estimate upward to 200,000 in light of the decreased cost. [FN46] But there was no basis for concluding that either the $20 per capita revenue figure or the revised incremental ridership estimate was reliable or predicated on any appropriate basis.

FN45. *Id.* at 88.

FN46. *Id.* at 90-91.

Third, Mr. Battaglia's testimony provides no connection between either of the incremental revenue figures he gave and either net profit or value attributable to the historic nature of the roller coaster other than the *ipse dixit* that $4 million or $5 million in incremental revenue equated to a $4 million to $5 million incremental value. [FN47]

FN47. *Id.* at 88, 91.

*5 Accordingly, the defendants' motion was granted as to Mr. Battaglia's proposed testimony regarding historic value.

*Conclusion*

This Court is obliged to serve as a gatekeeper to ensure that expert testimony is competent, relevant, and reliable. Bearing in mind that qualified experts may reach different conclusions, each of which is sufficiently competent and reliable to place before the trier of fact, the proponent of Mr. Battaglia's testimony did not persuade the Court that Mr. Battaglia surmounted the relatively low hurdle required by *Daubert* and its progeny. Nor, in light of the fact that Mr. Battaglia's trial testimony already was before the Court in deposition form, could any of these difficulties have been cured. Accordingly, defendants' motion *in limine,* with respect to plaintiff's direct case was granted. [FN48]

FN48. The Court dealt with the use of Mr. Battaglia's testimony on plaintiff's rebuttal case in a separate order. *See* Order, Jan. 27, 2004.

SO ORDERED.

2004 WL 188088 (S.D.N.Y.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Defendants' Opposition to

Plaintiffs' Objections to and Motion to Strike Portions of Defendants' Summary Judgment

Evidence was served via overnight mail and facsimile on this 2nd day of April, 2004, on each of

the following counsel of record:

Richard A. Bieder, Esq.
Antonio Ponvert III, Esq.
Koskoff, Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

Gregory G. Jones, Esq.
Law Firm of Gregory G. Jones, P.C.
603 South Main Street, Suite 200
Grapevine, TX 76051

Marc R. Stanley, Esq.
Roger L. Mandel, Esq.
Stanley, Mandel & Iola
3100 Monticello Avenue
Suite 750
Dallas, TX 75205

Dennis F. Kerrigan, Jr.