affiliates would or would not have reduced their fees to the mutual funds is irrelevant to the summary judgment issue of whether the payments that Defendants received were plan assets.

Furthermore, Plaintiffs have not actually succeeded in creating a genuine issue of fact regarding the putative relationship between the payments and the affiliates' fees because the only evidence they cite to support this dubious claim does not, in fact, support it. The one witness Plaintiffs cite on this point never testified that the fund affiliates base the fees that they charge on the payments they make to any third-party providers such as Defendants. In fact, he testified to the *opposite*—that the affiliates determine the amount of payments to such third-party providers they are willing to make based on their revenues and profit margins. *See* Goslee Deposition Transcript (Conf. Ex. K) at 195:11-196:1. Accordingly, Plaintiffs' assertion that the affiliates would have charged lower fees to the mutual funds if they had not agreed to make payments to third-party providers is wholly unsupported by any evidence. Such speculation is not adequate to create a *genuine* issue of material fact at summary judgment. *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact.").

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT UNDER PLAINTIFFS' "FRUITS OF PLAN ASSETS' AND ACCUMULATION UNIT THEORIES

### A. Plaintiffs Have Abandoned Their "Fruits of Plan Assets" Theory

In their class certification motion and in their latest interrogatory answers, Plaintiffs alleged that, even though the payments were made with fund assets, those payments were nevertheless the "fruits of plan assets" belonging to Plaintiffs and the Plans. Defendants' motion for summary judgment noted that this theory was unsupported by any facts and without any grounding in ERISA, the regulations implementing ERISA, or any reported ERISA opinion. *See* Revised Memorandum at 8-13.

Plaintiffs do not respond to these arguments, and the "fruits of plan assets" theory is nowhere to be found in Plaintiffs' Opposition. Thus, Plaintiffs have conceded that their "fruits of plan assets" theory poses no obstacle to summary judgment. This is the latest in a long line of allegations regarding the "plan assets" at issue in this case that Plaintiffs have made and then discarded.

### B. Plaintiffs' Argument That Accumulation Units Were Diminished Does Not State A Claim Under ERISA

In their class certification motion and their interrogatory answers, Plaintiffs asserted that, although the payments were made with fund assets, they nevertheless should be considered Plaintiffs' plan assets because they diminished the value of Plaintiffs' accumulation units. Defendants offered at least four separate dispositive reasons why this novel theory was invalid as a matter of law. See Revised Memorandum at 13-18. Most prominently, Plaintiffs' "diminishment" theory fails because Plaintiffs have disavowed any intention of proving that the payments may be traced back to their plan assets.

Plaintiffs do not respond to most of those reasons, and now characterize their accumulation unit theory as "only a fallback position." Pls.' Opp. at 34. Instead, Plaintiffs now argue that Defendants were ERISA fiduciaries "as to the accumulation units for all purposes," and violated fiduciary duties any time they took any action (such as accepting payments) that could have any alleged indirect effect on those units. See Pls.' Opp. at 35-36. Plaintiffs provide no support for this theory, which is inconsistent as a matter of law with the definition in ERISA of a "fiduciary."[6]

---

[6] Plaintiffs' new theory is also inconsistent with their own recent statements to Magistrate Judge Garfinkel that "[Defendants are] not a general purpose fiduciary, they're not a trustee, they're not a fiduciary for all purposes." Transcript of November 6, 2003, Hearing (Docket 169) at 5.

-8-

Under ERISA Section 3(21)(A)(i), a party is a plan's fiduciary only "to the extent" that party "exercises any authority or control" over the management or disposition of plan assets. This definition makes clear that there is no such thing as an "all purposes" ERISA fiduciary. Instead, a party is a fiduciary only "to the extent" it is exercising the requisite authority or control. *See Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992) ("[T]he inclusion of the phrase 'to the extent' in § 1002(21)(A) means that a party is a fiduciary only as to the activities which bring the person within the definition."); *see also id.* ("The statutory language plainly indicates that the fiduciary function is not an indivisible one ... a court must ask whether a person is a fiduciary with respect to the particular activity at issue."). Accordingly, a party bears fiduciary burdens only with respect to the particular activities that make it a fiduciary in the first place. When it is not exercising those fiduciary powers, it may take actions to its own benefit, even when those actions affect plan assets. *See Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1186, 1188 (11th Cir. 1994) (holding that defendants were fiduciaries when they managed the plan, but were not fiduciaries when they amended the plan "to serve their own interests, rather than those of investors or employees," even though that amendment affected the plan's assets).

Plaintiffs do not and cannot cite any case that interprets ERISA as imposing the sort of limitless duty they ask the Court to assign Defendants. Indeed, the caselaw clearly *rejects* Plaintiffs' interpretation, and the courts carefully respect the statutory limitation on the scope of ERISA fiduciary duties, even where a challenged action undisputedly causes some harm to plan assets. Thus, in *Friend v. Sanwa Bank California*, 35 F.3d 466 (9th Cir. 1994(, a retirement plan invested in unsecured promissory notes issued by Supreme Financing. Supreme separately owed $3 million on a line of credit to defendant Sanwa Bank, a plan trustee. When Supreme's

financial position worsened, Sanwa refused to extend Supreme's line of credit, which caused Supreme to file for bankruptcy and default on the unsecured notes held by the plan (while fully repaying Sanwa's secured line of credit). *See* 35 F.3d 466, 468 (9th Cir. 1994). When the plan claimed that Sanwa violated ERISA by refusing to extend Supreme's line of credit, causing the destruction of plan assets, the court disagreed: "Sanwa did not act as a trustee and did not spend trust money when it refused to renew Supreme's loan. Rather, it acted as Supreme's creditor. Sanwa did not 'deal with the assets of the plan,' notwithstanding its action did affect the assets." *Id.* at 470 (citation omitted).

Similarly, even if Defendants could be considered fiduciaries regarding the accumulation units, and even if the payments did somehow indirectly harm those units (which harm Plaintiffs themselves admit will not be traced), there still can be no ERISA liability because Plaintiffs have offered no evidence that Defendants were acting in a fiduciary—and not a corporate—capacity when receiving those payments. *See id.* ("Sanwa did not use the assets of the Plans. *Instead, acting as a creditor it conducted a transaction with a third party, which affected the Plans.*") (emphasis added). Thus, as a matter of law, Plaintiffs' allegations regarding harm to the accumulation units are irrelevant to Defendants' alleged fiduciary status regarding the payments.[7/]

---

[7/]    Of course, Plaintiffs never offer any evidence adequate under Rule 56 that payments received by Defendants caused a decrease in the value of plan assets. The only support Plaintiffs offer for that assertion is deposition testimony from Frederick Werblow. *See* Pls.' Opp. at 36. Although Plaintiffs call Mr. Werblow "Nationwide's own expert witness," Nationwide identified Mr. Werblow preliminarily as an expert on mutual fund practices and structures, and did not offer him as a witness at all. There is no reason for the Court to view Mr. Werblow as an expert or fact witness on the payments that the Defendants allegedly received, or the accumulation units with respect to the variable annuity contracts, or the relationship between the two, which are separate issues. Plaintiffs have not provided any such basis, nor any other support for this claim.

Furthermore, Mr. Werblow's testimony does *not* say that the payments received by Defendants caused a decrease in unit value. Instead, Mr. Werblow says only that when a mutual

Plaintiffs do not address the caselaw on this issue (indeed, they cite no cases whatsoever in this section of their brief). *See* Pls.' Opp. at 35-36. Instead, they offer the Court an "example" regarding a hypothetical fiduciary with discretion to manage commercial properties. Plaintiffs' example is notable in two regards. *First*, it simply does not address Defendants' argument that a party bears fiduciary burdens only with respect to the particular activities that make it a fiduciary, and does not bear them with respect to other activities. *Second*, the example amounts to a significant concession by Plaintiffs that merely receiving noncontracted-for payments is insufficient to make a party a fiduciary. Plaintiffs concede that "acceptance of those [side] payments would not constitute authority or control over the commercial properties sufficient by itself to make the real estate company a fiduciary." *Id.* Thus, Plaintiffs' contrary assertion in this litigation that Defendants can be considered fiduciaries merely because they received third-party payments not expressly covered by the annuity contracts, *see, e.g.*, Pls.' Class Cert. Mem. at 13, should be rejected.[8/]

### III. PLAINTIFFS' NEW "FUNCTIONAL APPROACH" THEORY OF ERISA LIABILITY DOES NOT PREVENT SUMMARY JUDGMENT

Rather than defend the "plan asset" allegations that they made in their class certification motion and their latest interrogatory answers, Plaintiffs create an entirely new theory in their Opposition. They label this new theory a "functional approach" to plan assets. *See* Pls.' Opp. at

---

fund accounts for the expense of its advisory fees, its net asset value goes down, and when net asset value goes down, the value of fund shares in an insurance company separate account goes down. *See* Werblow Deposition Transcript (Conf. Ex. J) at 42:8-43:15. Mr. Werblow never even mentions the accumulation units in the passage cited by Plaintiffs, and he certainly makes no statements about the effect of the *payments* received by Defendants, as opposed to the *advisory fees* received by fund affiliates about which Plaintiffs' counsel asked him at deposition. Plaintiffs may believe there is a connection between the payments and the fees, but they have provided the Court with no Rule 56 evidence supporting that belief. *See supra* at 6-7.

[8/] Plaintiffs' unsupported assertion that "Nationwide does not contest that if its receipt of revenue sharing payments causes the accumulation units to decrease in value, it exercises authority and control over the accumulation units," Pls.' Opp. at 36, is simply incorrect.

-11-

12-20. Even if this new theory of plan assets could be raised at this late date (and it certainly should not be), it does not support Plaintiffs' ERISA claim.

### A.  Plaintiffs' Functional Approach Does Not Prevent Summary Judgment

In their Opposition, Plaintiffs claim that the payments received by Defendants became ERISA plan assets under a "functional approach" because: "(i) [the payments] would not have been made 'but for' the Plan's investments through Nationwide, (ii) Nationwide did not contract with the Plans to receive them . . . and (iii) those payments could be used . . . for the benefit of the Plans." Pls.' Opp. at 15. Such a test—for which Plaintiffs cite no direct precedent—would make ERISA liability limitless. The "but for" element of this test would make a fiduciary out of every entity that did business with a plan (directly or indirectly), since every such entity would have revenues that would not be theirs "but for" that business. And even a causal connection between the payments and the plans' investments would not show that the payments consisted of or diminished any relevant plan assets.

The "did not contract for them" element is perfectly circular, as there is no reason to contract with a plan to receive payments from a third party unless those payments come from the plan's assets. Since there was nothing in the variable annuity contracts that prevented Defendants from receiving the payments from the fund affiliates, and Plaintiffs have expressly withdrawn all claims that Defendants failed to fully perform under those contracts, Plaintiffs cannot use those contracts to support their new plan assets theory.

Similarly, the fact that an asset *could* be used for the benefit of a plan does not mean that it *should* be used for the benefit of the plans—unless one simply assumes that it was a plan asset to begin with. If this rule defined plan assets, everyone with any connection to a plan would be subject to ERISA fiduciary status in ways that would dramatically expand the scope of ERISA.

Recognizing the problems caused by the sweep of their description of the functional approach, Plaintiffs propose two limiting principles. Neither of them work. *First*, Plaintiffs claim that "ordinary service/goods providers" are different from Defendants because they will receive their payments "regardless of the Plans' investments through Nationwide," and because they are not paid on a percentage basis. *See* Pls.' Opp. at 16. This is absurd. No mutual fund provider is paid unless there are investments into the fund, and Plaintiffs' own exhibit demonstrates that many service providers are paid on a percentage-of-invested-assets basis. *See* Ex. 1 to Pls.' Class Certification Mem. (Pension and Welfare Benefits Administration Study of 401(k) Plans Fees and Expenses) §§ 3.2, 3.3.2, 3.3.4, 3.3.5, 3.3.6 (describing service fees computed as an annual percentage charge on total investor assets).

*Second*, Plaintiffs assert that Defendants have a contractual relationship with the Plans while other providers do not. *See* Pls.' Opp. at 16-17.[9] But Plaintiffs do not explain how or why any money Defendants received from third parties is transformed into a plan asset simply because Defendants have separate contractual relationships with the Plans, especially where those contracts do not prohibit the payments or earmark them for the Plans.

At bottom, Plaintiffs' contention conflicts with the well-settled ERISA principle that a party may simultaneously transact with a Plan in different capacities, and bears fiduciary burdens only when it exercises fiduciary powers. *See, e.g., Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 88 (2d Cir. 2001) (explaining that ERISA fiduciary duties are "not triggered" when a company engages in "corporate, business" action involving a plan as opposed to "plan administration"); *Brandt v. Grounds*, 687 F.2d 895 (7th Cir. 1982) (bank that was a fiduciary when providing

---

[9] Plaintiffs' third point regarding the other providers' inability to transmit the payments to the Plans is really the same as this point, *see* Pls.' Opp. at 17, and Defendants do not address it separately.

-13-

investment advice to the plan was not a fiduciary when acting as a custodian of plan assets).[10/]
Accordingly, Defendants' contractual relationships with the Plans cannot be used to bootstrap fiduciary status regarding the payments by third parties.

Finally, Plaintiffs claim that the payments received by Defendants are analogous to funds received from a closing mutual fund, which Plaintiffs assert are non-plan assets that are transformed by events into plan assets. *See* Pls.' Opp. at 17. In fact, funds generated by the closing of a mutual fund are no different from funds generated by any redemption of mutual fund shares. In both cases, the resulting monies are assets of the variable account, and become available for reinvestment in a different mutual fund. Indeed, the variable annuity contracts expressly state that reinvestment is the proper course when a mutual fund closes. *See, e.g.*, Flyte Contract (Ex. 1(A) to the Declaration of Mark Bieter in Support of Defendants' Motion for Summary Judgment) at § 9.1 ("If the shares of a Fund should no longer be available for investment by the Separate Account . . . the company may substitute shares of another Fund for Fund shares already purchased or to be purchased in the future."). Throughout such an event, the plan's asset remains an accumulation unit of the variable account, and is never the shares of the

---

[10/]     *See also Friend*, 35 F.3d at 470 (explaining that a party "serving in both fiduciary and corporate capacities may make decisions to benefit its own interests without violating its fiduciary duty to the plan, when it acts in its corporate capacity"); *Pension Fund-Mid Jersey Trucking Indus.--Local 701 v. Omni Funding Group*, 731 F. Supp. 161, 171-75 (D.N.J. 1990) (bank was simultaneously a fiduciary regarding the short-term investment of those assets and a non-fiduciary custodian regarding those same assets, and neglecting its custodial responsibilities to the detriment of the plan assets did not give rise to a claim for breach of fiduciary duty); *Eckelkamp v. Beste*, 201 F. Supp. 2d 1012, 1022 (E.D. Mo. 2002) ("[F]or persons having dual roles, the threshold requirement for fiduciary status under ERISA is discretionary authority or control regarding management of the plan or its assets. However, this definition is not all-encompassing. A court must still inquire as to whether a person is a fiduciary with respect to the particular transaction or conduct at issue."); *Coleman*, 969 F.2d at 61 ("The district court seemed to regard fiduciary status as an all-or-nothing concept. However, the inclusion of the phrase 'to the extent' in § 1002(21)(A) means that a party is a fiduciary only as to the activities which bring the person within the definition.").

mutual fund nor the funds generated by the sale of fund shares or liquidation of a fund. Thus, neither the closing of a mutual fund, nor the routine sale of a mutual fund share—nor any payments to Defendants—transforms monies that are not plan assets into plan assets. Plaintiffs' request to conduct Rule 56(f) discovery in this area is plainly without merit because, as explained above, the issue is irrelevant to summary judgment and the pertinent factual information is already possessed by Plaintiffs in the annuity contracts that have previously been produced.

### B. A Functional Approach Does Not Eliminate the ERISA Elements of Fiduciary Duty and Plan Assets

Plaintiffs cite several cases that they claim support their new "functional approach," and interpret those cases as effectively obliterating the careful limitations that Congress has placed on ERISA liability.[11] Plaintiffs' interpretation of these cases is at odds with ERISA and this precedent. The courts that use the term "functional approach" are not rewriting ERISA, but merely describing the application of pre-existing concepts of legal duty and contract rights to ERISA claims.

The cases that Plaintiffs themselves cite illustrate that the "functional approach" describes—rather than replaces—the legal or contractual bases on which the courts identify plan assets.[12] In *Reich v. Goldstein*, the court explained that "in the absence of an explicit statutory

---

[11] See, e.g., *Coleman*, 969 F.2d at 61-62 ("We cannot blindside Nationwide by implying the existence of [fiduciary] obligations when the only source of such obligations is judicial inventiveness. . . . The costs of ERISA plans would surely surge as parties sought cover from the inevitable barrage of claims."); see also *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1190 (11th Cir. 1994) ("[B]ecause ERISA is a highly technical statute our part is to apply it as precisely as we can, rather than to make adjustments according to a sense of equities in a particular case."); *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147, 148 n.17 (1985) (explaining the Court's "reluctan[ce] to tamper with an enforcement scheme crafted with such evident care as the one in ERISA" and describing Congressional concern that "the cost of federal standards discourage the growth of private pension plans").

[12] Plaintiffs' quotation of broad language found in *Acosta v. Pac. Enter.*, 950 F.2d 611, 620 (9th Cir. 1991), ignores the fact that the *Acosta* court's description of the "plan assets" is dicta,

-15-

definition, the term 'assets of the Plan' should be determined by the documents governing the relationship between the Fund and the employers." *Reich v. Goldstein*, 839 F. Supp. 1068, 1073 (S.D.N.Y. 1993).[13/] In *Bannistor v. Ullman*, the court looked at the precise legal status of the relevant funds (employee contributions that were earmarked for a health and welfare plan) and concluded they were plan assets because a Department of Labor regulation specifically defined employee contributions as such. *See Bannistor v. Ullman*, 287 F.3d 394, 402 (5th Cir. 2002).[14/] Similarly, in *Patelco Credit Union v. Sahni*, 262 F.3d 897 (9th Cir. 2001), the Ninth Circuit held that a stop-loss insurance policy and benefits paid thereunder were plan assets because they were purchased to cover catastrophic losses of a health plan. *See id.* at 902, 908. In all of these cases,

---

since the court determined that there could be no ERISA violation in any event because the alleged plan asset was never used in a self-serving manner.

[13/]   *See also United States v. Labarba*, 129 F.3d 81, 88 (2d Cir. 1997) ("Once wages were paid to Local 66 members, Strathmore had contractual obligations [to make contributions] to the Funds that constituted 'assets' of the Funds by any common definition. Certainly, an audit of the Funds would have to include such fixed obligations as assets."); *Bd. of Tr. of Airconditioning and Refrigeration Indus. Health and Welfare Trust Fund v. J.R.D. Mech. Servs., Inc.*, 99 F. Supp. 2d 1115, 1120 (C.D. Cal. 1999) ("Although the Trust Agreements do not specify that unpaid employer contributions are vested assets of the Trust Funds, such contributions, regardless if they are deducted from wages, are due and owing on the tenth day of the month following the month in which the responsibility for such contributions are incurred. [Citation to agreement.] Inherent in the Trust Agreements is the concept that employer contributions become trust assets immediately after employees earn their wages.").

[14/]   *See also LoPresti v. Terwilliger*, 126 F.3d 34, 39 (2d Cir. 1997) ("It is undisputed that the employees' contributions to the Funds, but not the Union dues and assessments, were plan assets governed by ERISA. *See* 29 C.F.R. § 2510.3-102(a)."); *United States v. Grizzle*, 933 F.2d 943, 947 (11th Cir. 1991) (holding that both the DOL regulation and "the special duties imposed by ERISA, federal regulations, the collective bargaining agreements and the Declaration and Agreement of Trust regarding employee contributions to the Vacation Fund indicate that the funds withheld from the employees are plan assets entrusted to Grizzle to be accounted for by him until such time as they are remitted to the Vacation Fund"); *United States v. Glick*, 142 F.3d 520, 527 (2d Cir. 1998) (holding that participant contributions were plan assets because they could be traced from the participant through the defendant intermediary to the plan: "It is reasonable to conclude that the monies retain their character as fund assets as they pass downstream, through Glick, to the fund's bank account.").

the courts' "functional approach" hinged on a showing that relevant funds were explicitly earmarked by agreement or operation of law for the specific benefit of the plans. The instant case is plainly different, because there is no agreement, Department of Labor regulation, or earmarking of any kind that commits the payments to the plans.

### C. The Department of Labor Recognizes That A Party Does Not Violate ERISA Merely By Receiving Payments

Defendants have previously explained that, even if the payments were somehow held to be plan assets, the Department of Labor already has concluded that the mere receipt of such payments does not violate ERISA. *See* Revised Memorandum at 16-18. Plaintiffs dispute this legal issue by claiming that, in a series of advisory opinion letters, the Department of Labor repeatedly missed the issue. *See* Pls.' Opp. at 23 (asserting that the *Frost* letter "simply did not consider the possibility that" the payments at issue were plan assets); *id.* at 24 (asserting that the *Aetna* letter "did not consider whether the 'fees' constituted plan assets"); *id.* at 25 (asserting that the *ABN Amro* letter "never considered whether the 'fees' themselves constituted plan assets"). Defendants submit that these letters do not focus on any of Plaintiffs' various theories of plan assets here because those theories are obviously incorrect. This explanation is far more reasonable than Plaintiffs' assertion that the Department of Labor failed to identify the relevant plan assets, which is an analysis that lies at the core of the Department's expertise.

Plaintiffs' efforts to rebut the district court's holding in *D'Amasco & Assocs. 401(k) Profit Sharing Plan v. Mfrs. Life Ins. Co.*, No. C 99-2135 CRB, 1999 US Dist. LEXIS 13654 (N.D. Cal. August 20, 1999) (attached as Authority A), are equally unpersuasive. Plaintiffs note that *D'Amasco* was a removal case in which the defendant sought to prove fiduciary status, *see* Pls.' Opp. at 25-26, but do not explain why the status of the litigant raising an issue should affect its resolution. Plaintiffs also assert that the opinion is short and thus "unpersuasive," *id.*, but

again do not explain why brevity undermines the court's reasoning. Defendants submit that the court's discussion of the fiduciary issue was short because the lack of fiduciary status was so clear. Finally, Plaintiffs attempt to distinguish *D'Amasco* on its facts, but their effort is unconvincing. *D'Amasco* held that a service provider does not become a plan fiduciary when it receives undisclosed payments that are made out of fees paid by the plans. *See D'Amasco*, 1999 U.S. Dist. LEXIS 13654 at *20. Plaintiffs claim the situation here is different because the payments in *D'Amasco* must not have been made from plan assets, while the payments here were allegedly plan assets in Defendants' hands. *See* Pls.' Opp. at 26. But, if the payments to the annuity provider in *D'Amasco* were not plan assets, the payments at issue here are equally not plan assets. And in any event, Defendants cite *D'Amasco* simply to show that, even if the payments are plan assets, there is no liability. *See* Revised Memorandum at 17-18. Plaintiffs do not refute this argument by claiming that the case does not apply because the payments here are plan assets.

## IV. PLAINTIFFS' SUMMARY JUDGMENT ARGUMENTS ARE INCONSISTENT WITH THEIR CLASS CERTIFICATION ARGUMENTS

As the foregoing demonstrates, Plaintiffs' new ERISA theories do not prevent summary judgment. However, Plaintiffs' efforts to describe their claims in a way that suggests that there are material factual disputes contradicts Plaintiffs' prior claims that common issues will predominate over individualized issues and that this case could manageably be tried on a class basis. Accordingly, unless and until Defendants' Motion for Summary Judgment is granted, Defendants respectfully request that the Court order Plaintiffs to amend their class certification brief so that Plaintiffs' description of their claims in that brief is consistent with Plaintiffs' description of their claims in their Opposition. *Cf. Cruz v. Am. Airlines, Inc.*, 356 F.3d 320, 330 (D.C. Cir. 2004) (district court's findings on summary judgment are law of the case for purposes