[HN10] Section 1106(a)(1)(D) forbids a "fiduciary" from "causing the plan to engage in a transaction" that constitutes a direct or indirect "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." [HN11] Section 1106(b)(1) prohibits a plan "fiduciary" from "dealing with the assets of the plan in his own interest or for his own account." [HN12] Section 1106(b)(3) prohibits a plan "fiduciary" from receiving "any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." Defendants contend that plaintiff's complaint alleges that Gordon was a Plan fiduciary and therefore the specific [*12] conduct at issue -- Gordon's receiving kickbacks for recommending Manulife annuities -- is regulated by section 1106. Defendants argue in the alternative that even if Gordon was not a fiduciary, he was at a minimum a "party-in-interest" and the Ninth Circuit has held that section 1106 applies to parties in interest as well as fiduciaries.

### 1. Plan Consultants As ERISA Fiduciaries

Defendants base their contention that Gordon was a Plan fiduciary -- and therefore that section 1106 governs the specific conduct alleged in the complaint -- exclusively on the allegations of the complaint. Defendants do not assert that Gordon was in fact a fiduciary; indeed, defendants expressly reserve the right to argue later that he was not a fiduciary. Thus, the Court's analysis of whether Gordon was an ERISA fiduciary must begin and end with the complaint's allegations.

The complaint does not allege that Gordon was an ERISA fiduciary or even expressly allege that he was a fiduciary of any sort. The complaint likewise does not make a claim for breach of fiduciary duty. Rather, the complaint alleges that the "kickback" scheme was unfair within the meaning of *California Business and Professions* [*13] *Code section 17200* and was a breach of Gordon's contract with plaintiff. Defendants nonetheless contend that the complaint's allegations as to the wrongful conduct of Gordon and the defendant class are tantamount to an allegation that Gordon and the defendant class were acting as plan fiduciaries within the meaning of ERISA. In particular, defendants identify plaintiff's allegations that the defendant class (1) recommended Manulife Annuity Contracts to [the Plan] in return for . . . Kickbacks (Complaint P 43); (2) engaged in "self-dealing" by accepting such "Kickbacks" in the form of a portion of Asset Charge assessed on Plan members' investments by Manulife (id. P 44); and (3) failed "to disclose their conflict of interest in connection with their recommendation of Manulife Annuity Contracts" (id.).

These allegations, however, fall short of alleging that Gordon and members of the defendant class are ERISA fiduciaries. [HN13] "ERISA provides three ways in which one can acquire fiduciary status: (1) exercising discretionary authority or control over management of the plan or disposition of its assets; (2) rendering investment advice for a fee or other compensation; or (3) exercising [*14] discretionary authority in the administration of the plan." *Thomas, Head & Greisen Employees Trust v. Buster, 24 F.3d 1114, 1117 (9th Cir. 1994)* (citing *29 U.S.C. § 1002(21)(A) (1988)*. The first and third methods of acquiring fiduciary status indisputably do not apply to Gordon under the allegations of the complaint. [HN14] With respect to the second method, the following five factors must be met: (1) providing individualized investment advice; (2) the advice having been given pursuant to a mutual understanding; (3) the advice was provided on a regular basis; (4) the advice pertained to the value of property or consisted of recommendations as to the advisability of investing in certain property; and (5) the advice was rendered for a fee. *Id. at 1117* (citing *29 U.S.C. § 1002(21); 29 C.F.R. § 2510.3-21(c)(1)(1); 29 C.F.R. § 2510.3-21(c)(1)(ii)(B))*.

All five factors are not present in the allegations of the complaint. For example, even after construing the allegations of the complaint liberally in favor of finding a fiduciary relationship, see *Arizona State Carpenters Pension Trust Fund v. Citibank, 125 F.3d 715;* [*15] *720 (9th Cir. 1997)* ("Fiduciary status under ERISA is to be construed liberally"), the complaint simply does not allege that Gordon and members of the defendant class provided investment advice on a regular basis. Instead, the complaint specifically alleges the contrary:

> Plan Consultants typically do not advise Retirement Plans, their sponsors, or their beneficiaries about investing Plan assets in particular securities, or recommend securities for investment. In the absence of an express agreement to the contrary, Plan Consultants are not authorized by Retirement Plans, their sponsors, or their beneficiaries to receive payments or compensation in connection with the investment of Plan assets.

Complaint P 9. The allegation that Gordon on one occasion advised the Plan to invest in Manulife annuities, even though his contract with the Plan did not call for him to render investment advice, is insufficient to constitute the rendering of regular investment advice. See *Schloegel v. Boswell, 994 F.2d 266, 273 (5th Cir. 1993)* (holding that ERISA defendant's few, isolated instances of rendering investment advice to ERISA plan

did not support a finding that the [*16] defendant "rendered investment-type advice to the Profit Sharing Plan on a regular basis"). The fact that plaintiff accepted Gordon's advice does not make it a fiduciary. Defendants have not cited any case which suggests that even if the other five factors are not met, a plan consultant is an ERISA fiduciary if the plan accepts his one-time investment advice. Since the "regular investment advice" factor is not satisfied by the allegations of the complaint, the complaint does not allege that Gordon was an ERISA fiduciary. See *Thomas, Head & Greisen Employees Trust, 24 F.3d at 1119* (stating that "[a] finding that the investment advisor rendered advice on a 'regular basis' is essential to a determination that a fiduciary relationship existed").

Nor do the allegations of the complaint satisfy the requirement that the fiduciary render the investment advice for a fee. As noted above, the complaint alleges that Gordon was not hired to render investment advice; the advice he allegedly gave was not authorized or required by its contract with plaintiff. The fact that it was paid a fee by Manulife, certainly does not constitute the "fee" the ERISA statute contemplates for [*17] creating a fiduciary relationship between an investment advisor and an ERISA plan.

Defendants seize on plaintiff's statement that he does not concede that "Gordon did not owe [the Plan] fiduciary duties under common law principles" to support their contention that plaintiff in fact intends to allege that Gordon was a Plan fiduciary. The short response to this argument is that the complaint which defendants removed to federal court does not include an allegation of fiduciary status and does not include a claim for breach of fiduciary duties.

The longer response is that even if the complaint alleged that Gordon had common law fiduciary duties to the Plan, that does not mean that he was a fiduciary within the meaning of ERISA; [HN15] ERISA does not define a fiduciary as one who has fiduciary duties under the common law. In *Arizona State Carpenters Pension Trust Fund v. Citibank, 125 F.3d 715, 723 (9th Cir. 1995)*, for example, the plaintiffs alleged that the defendant bank's failure to notify the plan of defaults on payments made by the plan's manager violated ERISA as well as state law, including the bank's common law fiduciary obligations. *Id. at 719*. The [*18] Ninth Circuit held that the defendant bank was not an ERISA fiduciary and that the state law claims, including the claim for breach of fiduciary duty, were not preempted. *Id. at 723-24*; see also *Fluid Components Int'l v. Corporate Benefit Consultants, 977 F. Supp. 1046, 1051 (S.D. Cal. 1997)* (holding that employer's claims for, among other things, breach of common law fiduciary duties, were not ERISA preempted). Thus, under Ninth Circuit law, [HN16] an ERISA plan may pursue a state law claim for breach of fiduciary duty against a non-fiduciary under ERISA.

### 2. Section 1106 And Parties In Interest

[HN17] Section 1006 by its express terms only prohibits a plan fiduciary from engaging in certain conduct. See, e.g., *29 U.S.C. § 1106(a)(1)* ("A fiduciary with respect to a plan shall not . . .") (emphasis added); id. § 1106(b)(1) ("A fiduciary with respect to a plan shall not -- (1) deal with the assets of the plan . . ."). As the Court has explained above, Gordon (and also Manulife) are not Plan fiduciaries within the meaning of ERISA. Thus, it would appear that section 1006 does not govern defendants' conduct. In *Concha v. London, 62 F.3d 1493 (9th Cir. 1995))*, [*19] however, the Ninth Circuit held that [HN18] section 1006(a)(1) can also be enforced against ERISA parties in interest that engage in the prohibited transaction. *Id. at 1503-04*. ERISA parties in interest include persons, such as Gordon and Manulife, who provide services to a plan. See *29 U.S.C. § 1102(14)(B)*. The Concha court allowed plaintiffs to pursue ERISA section 1106(a)(1) claims against the plan's outside accountants, actuaries, and attorneys, despite their non-fiduciary status. As in this case, the defendants were accused of "self-dealing" among other prohibited transactions. *Concha, 62 F.3d at 1504*. The court determined that "even though section 1106(a)(1) on its face appears to apply only to fiduciaries . . . the section is also applicable to parties in interest who engage in transactions enumerated in section 1106." Id.

In reaching this conclusion, the court relied on *Nieto v. Ecker, 845 F.2d 868 (9th Cir. 1988)*, where an attorney (a non-fiduciary under ERISA) for a pension plan was accused of engaging in activities in violation of 1106(a)(1). *Concha, 62 F.3d at 1503-04*. The [*20] Nieto court explained that

> it is true that section 406(a) [ *29 U.S.C. § 1106(a)*] only prohibits certain transactions by fiduciaries, and does not expressly bear parties in interest from engaging in these transactions. However, section 502(a)(3)'s [§ 1132(a)(3), "civil enforcement" provision] language expressly grants equitable power to redress violations of ERISA; prohibited transactions plainly fall within this category. Courts may find it difficult or impossible to undo such illegal transactions unless they have jurisdiction over all parties who allegedly participated in them. Section 502(a)(3) [§ 1132(a)(3)] is not limited to fiduciaries, and there is therefore no reason to exempt parties in

Case 3:01-cv-01552-SRU    Document 225-4    Filed 04/13/2004    Page 3 of 9

Page 8
1999 U.S. Dist. LEXIS 13654, *

interest from this remedial provision when they engage in transactions prohibited by the Act.

*Nieto*, 845 F.2d at 873-74; see also *Landwehr v. Dupree*, 72 F.3d 726, 734 (9th Cir. 1995) (reaffirming that ERISA plaintiffs may obtain equitable relief from parties in interest who engage in transactions prohibited by section 1106).

These Ninth Circuit decisions must be read in light of the subsequent United States [*21] Supreme Court decision in *Lockheed Corporation v. Spink*, 517 U.S. 882, 135 L. Ed. 2d 153, 116 S. Ct. 1783 (1996). In Lockheed, the Court addressed the issue, among others, of whether section 1106 "prevents an employer from conditioning the receipt of early retirement benefits upon the participants' waiver of employment claims." The Court held that it does not because in that situation the employer is not acting as an ERISA fiduciary and section 1106(a)(1) requires a transgression by a fiduciary. *Id. at 888-91*. In particular, a unanimous Court stated that

> [HN19] in order to sustain an alleged transgression of 406(a) [ 29 U.S.C. 1106(a)], a plaintiff must show that a fiduciary caused the plan to engage in the allegedly unlawful transaction. Unless a plaintiff can make that showing, there can be no violation of 406(a)(1) to warrant relief under enforcement provisions.

*Id. at 888-89* (emphasis added). The Court explained that a party in interest who benefitted from a transaction prohibited by section 1106 might still be liable under that section provided the plaintiff has made "a showing that [*22] a fiduciary caused the plan to engage in the transaction in question. . . . the only transactions rendered impermissible by [1106(a)] are transactions caused by fiduciaries." *Id. at 889 n.3* (emphasis added). In sum, [HN20] section 1106 regulates only those prohibited transactions that are caused by fiduciaries. n2

> n2 Likewise, the exemptions to section 1106 outlined in Department of Labor regulation PTE 84-24 would only apply if the "prohibited transaction" was caused by a fiduciary.

The conduct of which plaintiff complains -- the "kickback" scheme -- is not alleged to have been caused by a fiduciary and thus is not regulated by section 1106(a)(1). Plaintiff alleges that Gordon and Manulife -- both non-fiduciaries -- secretly engaged in the prohibited transaction. There is no allegation that any Plan fiduciary had any involvement in the "kickback" scheme.

Moreover, even if one could argue that a Plan fiduciary caused the transactions at issue here because a Plan fiduciary must have made the ultimate [*23] decision to invest in Manulife annuities, section 1106(a) prohibits a fiduciary from engaging in transactions in which it "knows or should know" constitute a transfer of plan assets to a party in interest. 29 U.S.C. § 1106(a)(1)(D). Again, the complaint alleges that the Plan and its fiduciaries were not aware that Manulife was paying Gordon part of the monthly Asset Charge; therefore a Plan fiduciary did not "know or should know" that the investment of asset funds with Manulife constituted a transfer of asset funds to Gordon.

Plaintiff's claims thus "fail" the relationship test; ERISA, and in particular section 1106, does not regulate the parties' relationship under the facts alleged in the complaint. Since the parties' relationships are not ERISA-governed relationships, plaintiff's claims do not "relate to" an employee benefit plan and are therefore not preempted.

## II. ERISA's Civil Enforcement Provisions

[HN21] The second prong of complete preemption requires that Plaintiff's state law claims fall within the scope of ERISA's civil enforcement scheme [HN22] in section 1132(a), which provides:

> A civil action may be brought . . . (3) by a participant, [*24] beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violation or (ii) to enforce any provision of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3). The Plan's suit is based upon the conduct of ERISA parties-in-interest (i.e. service providers) who were allegedly involved in improper payment of "kickbacks," self-dealing, and failure to disclose conflicts of interest. As discussed above, since the complaint does not allege that an ERISA fiduciary caused the prohibited transaction, this conduct does not fall within the scope of section 1106's "prohibited transactions." Since no violation of ERISA is alleged, § 1132(a), which is premised upon an ERISA violation, does not provide an enforcement remedy.

The fact that ERISA does not prohibit defendants' conduct and thus does not provide a civil remedy makes this case similar to Geweke Ford and Toumajian. In Geweke Ford, "the lack of an ERISA remedy against the insurer, though not determinative, counseled the court against preemption. [*25] " *130 F.3d at 1360* (citing

1999 U.S. Dist. LEXIS 13654, *

*Union Health Care v. John Alden Life Ins. Co., 908 F. Supp. 429, 433 (S.D. Miss. 1995)).* In Toumajian, a malpractice action against the plan's accountants, the court specifically held that plaintiffs' claims did not fall within section 1132(a)(3) and thus did not support federal jurisdiction under *ERISA. 135 F.3d 648 at 656.*

## CONCLUSION

Defendants concede that ERISA ordinally does not preempt claims by an ERISA plan against its service providers. They contend, however, that this case is different because the specific conduct alleged by the complaint -- the "kickback scheme" between Gordon and Manulife -- is regulated by ERISA section 1106, the prohibited transactions section. For the reasons stated above, section 1106 only applies if an ERISA fiduciary causes the prohibited transaction and the complaint does not allege that Gordon is a fiduciary within the meaning of ERISA. Section 1106 therefore does not regulate the conduct alleged by the complaint and plaintiff's claims are not preempted by ERISA. Whether defendants' conduct is indeed unlawful is an issue which a state court will have to decide under state [*26] law. Accordingly, this action is hereby REMANDED to the Superior Court for the County of San Francisco and defendants' motion to dismiss is DISMISSED as moot.

**IT IS SO ORDERED.**

Dated: August 20, 1999

CHARLES R. BREYER

UNITED STATES DISTRICT JUDGE

# AUTHORITY B

Westlaw.

1992 WL 223822
RICO Bus.Disp.Guide 8149
(Cite as: 1992 WL 223822 (D.Kan.))

Page 1

H

United States District Court, D. Kansas.

Boyd and Ruby EDGINGTON, individually and as representatives of the class of
all others similarly situated, Plaintiffs,
v.
R.G. DICKINSON AND CO.; Gerald Riedl; and First Securities of Kansas Co.,
Inc., Defendants.

No. 90-1274-C.

Aug. 7, 1992.

James T. McIntyre, McMaster & McMaster, Wichita, Kan., for plaintiffs.

Lee H. Woodard, Woodard, Blaylock, Hernandez, Pilgreen & Roth, Wichita, Kan., for R.G. Dickinson and Co., Gerald Riedl.

David E. Bengtson, Hershberger, Patterson, Jones & Roth, Robert J. O'Connor, Morrison & Hecker, Wichita, Kan., for First Securities of Kansas Co., Inc.

Jack N. Turner, Turner Law, P.A., Wichita, Kan., for Santo M. Catanese.

MEMORANDUM AND ORDER

CROW, District Judge.

*1 The case comes before the court on the motion for summary judgment (Dk. 121) brought by the defendants Gerald Riedl ("Riedl") and R.G. Dickinson and Co. ("R.G. Dickinson"). The defendants contend there is no genuine issue of material facts which prevents this court from entering judgment for defendants on each of the plaintiffs' claims. The plaintiffs respond that many of the issues relevant now have been earlier briefed "at great length" in their application for class certification and in their opposing memorandum to First Securities' motion for summary judgment.

Without leave of the court, the plaintiffs merely incorporate by reference their arguments from those briefs. [FN1] The plaintiffs go on to address some of the contentions advanced by the defendants.

If no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law, the court shall grant a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. The issue also must be based on a viable legal theory in order to be "genuine." *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986), cert. denied, 480 U.S. 947 (1987)). An issue of fact is "material" if proof of it might affect the outcome of the lawsuit. *Anderson*, 477 U.S. at 249. In effect, the inquiry on a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

The movant's burden under Fed.R.Civ.P. 56 is to specify those portions of " 'the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any,' " which demonstrate the absence of a genuine issue of fact. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d at 345 (quoting Fed.R.Civ.P. 56(c)).
It may be sufficient for the movant to establish that the alleged factual issues are without legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987). Summary judgment will be granted when the movant is able to show it is entitled to judgment as a matter of law based upon the uncontroverted, operative facts.

The opposing party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts that show a genuine issue for trial remains and that are supported by the kinds of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1992 WL 223822
RICO Bus.Disp.Guide 8149
**(Cite as: 1992 WL 223822 (D.Kan.))**

Page 2

evidentiary materials listed in Rule 56(c). *Anderson,* 477 U.S. at 250. [FN2] Because its evidence is deemed true and all reasonable inferences are drawn in its favor, the opposing party need come forth with only such evidence from which a fair-minded jury could return a verdict for it. *Windon,* 805 F.2d at 346.

*2 More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences. *Windon,* 805 F.2d at 346.

For purposes of this motion, the court will accept the following facts as uncontroverted:

1. R.G. Dickinson was one of the underwriters of the Industrial Revenue Bonds, Series III, issued by the City of Wichita, Kansas, in 1988 ("Series III bonds"). The plaintiffs purchased their Series III bonds from R.G. Dickinson through their broker Gerald Riedl. Specifically, on April 25, 1988, the plaintiffs placed their order for the purchase of the Series III bonds. They paid for their bonds on May 31, 1988.

2. Before October of 1991, Riedl was a vice president and employee of R.G. Dickinson. Riedl is now the branch owner for R.G. Dickinson.

3. On April 14, 1988, Kim Barthelme, an R.G. Dickinson employee working for Riedl, wrote a letter to the plaintiffs and other holders of the Series XI bonds stating that those bonds "are being called as of 6-1-88 at 103." The letter advised the bondholders that they could deliver or mail their bonds to R.G. Dickinson prior to the call date, and drew their attention to the Series III bonds which would soon be issued. Besides enclosing a flyer on the Series III bonds, the letter stated that if the bondholder wished "to purchase the new issue with the proceeds of your called bond, subject to your approval of the prospectus, please call as soon as possible." The letter concluded with Barthelme "anticipat[ing] the new issue [would] be oversubscribed by Tuesday, April 19, 1988."

4. The plaintiffs' testimony on when, if ever, they received this April 14th letter is confusing and contradictory. They first testified at their deposition that they recalled receiving it. Five days later, they testified that the letter was received after they paid for the bonds. The next day, they testified that the letter was probably received on April 16. When asked if the letter influenced his decision to purchase the Series III bonds, Mr. Edgington said: "Well, I imagine it did. I wouldn't say for sure because I don't remember."

5. The plaintiffs spoke by telephone with Riedl before April 25, 1988. He told them that the Series III bonds were solid, were paying a lower interest rate than the Series XI bonds, but were the best investment he had available for the plaintiffs at the time.

6. The plaintiffs' decision to purchase the Series III bonds was based solely on the oral advice of Mr. Riedl. Even they could not remember when they received the official statement for the Series III bonds, [FN3] the Edgingtons testified that they did not read or rely on the official statement in purchasing the Series III bonds.

*3 7. The plaintiffs have admitted that had they read the disclosure of risks set forth in the official statement before making their purchase decision they would not have purchased the Series III bonds.

8. Whenever a customer of Riedl and R.G. Dickinson purchases bonds from a new issue, he or she is given a prospectus or official statement for the bonds. The customer is allowed a reasonable time after the settlement date to review the prospectus or official statement and cancel their purchase.

9. Although the plaintiffs did not cancel their Series III purchase, they had canceled earlier purchases of other bonds conducted through Riedl.

10. The plaintiffs testified that in December of 1988, Robert Cunningham, a broker who was then managing their securities, advised them that the Series III bonds were junk bonds, and he recommended that plaintiffs should consider selling the bonds as they were too risky. At that time, the bonds were carried in an inventory evaluation by Cunningham at their face value and purportedly had

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1992 WL 223822  
RICO Bus.Disp.Guide 8149  
(Cite as: 1992 WL 223822 (D.Kan.))

Page 3

that value. The plaintiffs passed on this opportunity to sell the bonds believing the bonds' value was greater than the going price. This decision not to sale was made in consultation with Cunningham.

11. By November of 1987, or four months before their purchase of the Series III bonds, the plaintiffs were aware that real estate values in downtown Wichita were declining. In the plaintiffs' opinion, the value of the Series III bonds has decreased because of the economic decline in downtown Wichita and the anticipated loss of tenants in the Market Centre building.

12. On May 31, 1990, the plaintiffs filed their complaint in this court.

*10b-5*

The defendants contend summary judgment should be granted on all of the plaintiffs' securities claims against them for the same reasons given by the court in granting First Securities' motion for summary judgment. Knowing what was argued by First Securities and the reasons offered by the court in granting the motion, it becomes apparent that the defendants are overextending the court's earlier order.

The alleged liability of First Securities rested entirely on its responsibility as an underwriter in the issuance of the official statement. In its motion, First Securities contended the plaintiffs could not prove reliance for they admitted to not reading or relying on the official statement. In response, the plaintiffs pointed to the presumption of reliance applicable in material omission cases and also argued that they indirectly relied on the official statement through their reliance on Riedl. The plaintiffs speculated that Riedl must have read and relied upon the official statement in advising them to purchase the Series III bonds. The court found that First Securities rebutted the presumption of reliance with the plaintiffs' own testimony that they had not read or relied on the official statement.

The court was also not persuaded that the causal link could be restored by the plaintiffs' speculation over whether Riedl relied on the official statement. First, the plaintiff failed to come forth with any evidence or a Rule 56(f) affidavit concerning Riedl's reliance. Second, the case law that had recognized such an indirect reliance theory generally did so only when the plaintiff was bringing a fraud on the market claim. The court noted that the plaintiffs had never properly alleged such a claim. Third, the court believed the evidence of record showed as a matter of law that the material omissions in the official statement were not a substantial or significant contributing cause.

Finally, as a fourth alternative ground, the court said: "Since the plaintiffs constructively knew of risks which they have acknowledged were cause alone for not purchasing the bonds, they could not have justifiably relied on what was told them by Mr. Riedl, regardless of his source." Relying principally on this last reason, the defendants Riedl and R.G. Dickinson ask the court to grant their motion for summary judgment. [FN4]

*4 In proving 10b-5 liability against a broker in connection with the purchase or sale of a security, a plaintiff under either a misrepresentation or omission theory must show: "[1] the broker made an untrue statement of a material fact, or failed to state a material fact, [2] that in do doing, the broker acted knowingly with intent to deceive or defraud, [3] and that plaintiff relied on the misrepresentations, [4] and sustained damages as a proximate result of the misrepresentations." *O'Connor v. R.F. Lafferty & Co., Inc.*, 965 F.2d 893, 897, (10th Cir.1992) (citing *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir.1992)). Because it establishes the causal link between the fraudulent act and the injury, reliance is an element to all 10b-5 actions. *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988). [FN5] A plaintiff is excused from proving reliance and is entitled to a presumption of the same when the theory is that the defendant failed to disclose material information. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972). This presumption of reliance is rebuttable by any proof that severs the causal link between the misrepresentation and the decision to purchase. *Basic*, 485 U.S. at 248. For example, if the plaintiff purchased the securities despite knowledge of the falsity or the omission or if the plaintiff would have purchased or sold the securities assuming full disclosure had been made, then the presumption is rebutted. *In re Fortune Systems Securities Litigation*, 680 F.Supp. 1360, 1372 (N.D.Cal.1987); *see duPont v. Brady*, 828 F.2d 75, 78 (2nd

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1992 WL 223822                                                                 Page 4
RICO Bus.Disp.Guide 8149
**(Cite as: 1992 WL 223822 (D.Kan.))**

Cir.1987). In other words, even if material omissions were made, the defendants can still prevail by showing that the plaintiffs did not rely on the omissions or that the plaintiff's reliance was unjustified.

For the reasons expressed in the court's order of January 14, 1992, excluding the last reason which is withdrawn herein, the court grants summary judgment for defendants on the plaintiffs' 10b-5 claims based on material omissions in the official statement. The uncontroverted facts establish as a matter of law that the plaintiffs would have purchased the Series III bonds even if full disclosure had been made in the official statement. Because the plaintiffs did not read or rely on the official statement, the presumption that the plaintiffs' relied on the material omissions is conclusively rebutted under the circumstances of this case.

As for the plaintiffs' other 10b-5 claims based on material omissions and affirmative misrepresentations in oral advice and written letters, the issue of reliance must be analyzed in more detail. Justifiable reliance is determined from an examination of all relevant factors to a transaction. *Zobrist v. Coal-X, Inc.,* 708 F.2d 1511, 1516 (10th Cir.1983). Distinct from any contributory negligence theory, the justifiable reliance requirement cuts off recovery only if the plaintiff's reckless conduct is comparable to that of the defendants culpable conduct. *Id.* "[A] plaintiff may not justifiably rely on a misrepresentation when its falsity is palpable." *Grubb v. Federal Deposit Ins. Corp.,* 868 F.2d 1151, 1163 (10th Cir.1989) (citing *Holdsworth v. Strong,* 545 F.2d 687, 694 (10th Cir.1976) (en banc), *cert. denied,* 430 U.S. 955 (1977)). Factors relevant in determining whether reliance is justified include:

> *5 (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction; and (8) the generality or specificity of the misrepresentation.

*Zobrist,* 708 F.2d at 1616 (citations omitted).

None of the factors are determinative, and all that are relevant must be considered and weighed in deciding if the plaintiffs' reliance was justified. *Id.* at 1516-1517.

The defendants argue that once the plaintiffs are imputed with constructive knowledge of the official statement then they could not have justifiably relied on the alleged misrepresentations or omissions for they have admitted that had they read and known of the risks disclosed in the official statement they would not have purchased the bonds. This argument assumes a critical fact and fails to account for others. The factual assumption is that the falsity of the alleged misrepresentations and omissions is palpable from a plain reading of the risk disclosure in the official statement. This argument also does not account for each of the relevant factors that must be considered and balanced in deciding the issue of justifiable reliance. Underlying the entire argument is the question whether constructive knowledge of the official statement may be imputed as a matter of law without concern for any mitigating circumstances.

In *Zobrist,* the Tenth Circuit held "that knowledge of information contained in a prospectus or an equivalent document authorized by statute or regulation, should be imputed to investors who fail to read such documents." 708 F.2d at 1518. What is imputed is only the knowledge of that information "actually ... disclosed" and not the inferences which a knowledgeable investor would draw from the information. *Id.* With this constructive knowledge, a plaintiff assumes a position no different from that expected of a cautious or diligent investor. *Id.* The failure to read a prospectus does not automatically cut off a plaintiff's right to recover under 10b-5. The only consequence is that the court is now determining justifiable reliance must evaluate the relevant factors as if the plaintiff were aware of the warnings found in the official statement. *Id.* at 1518.

The only condition to attributing constructive knowledge, expressed in *Zobrist,* was that the information be "contained in a prospectus or an equivalent document authorized by statute or regulation." *Id.* Since *Zobrist,* the Tenth Circuit court has indicated that other conditions may exist. In *Wegerer v. First Commodity Corp. of Boston,* 744 F.2d 719, 722-23 (10th Cir.1984), the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works