the individual conduct of class members. *See, e.g., In re Flat Glass Antitrust Lit.*, 191 F.R.D. 472, 484 (W.D. Pa. 1999) (proof of conspiracy is susceptible to generalized proof because the focus is on defendants' actions); *Playmobil Antitrust Lit.*, 35 F. Supp. 2d at 245 (existence of conspiracy would be proven by evidence common to the class); *In re Catfish Antitrust Lit.*, 826 F. Supp. 1019, 1039 (N.D. Miss. 1993) (proof of conspiracy would be "pertinent and common to all plaintiffs").

### b. Impact

The parties' primary dispute regarding whether common issues will predominate plaintiffs' antitrust claim is whether the issue of impact is susceptible to class-wide proof. Under the impact requirement, a plaintiff must generally show that he or she paid supracompetitive prices as a result of the antitrust conspiracy. *See State of Ala. v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 327 (5th Cir. 1978). Some courts suggest there is a presumption of impact in price-fixing cases. *See, e.g., Linerboard Antitrust Lit.*, 305 F.3d at 153 (observing that a strong argument could be made that the district court properly applied the presumed impact theory in an antitrust price fixing case); *In re Aluminum Phosphide Antitrust Lit.*, 160 F.R.D. 609, 615 (D. Kan. 1995) (citing case law to suggest that impact may be presumed in price-fixing cases); *Catfish Antitrust Lit.*, 826 F. Supp. at 1041 (observing that "[i]n an illegal price fixing scheme, there is a presumption that all purchasers will be impacted/injured by having to pay the higher price"; citing case law). On the other hand, some courts require an expert "to construct a hypothetical market, a but-for market, free of the restraints and conduct alleged to be competitive" to establish antitrust impact. *Concord Boat*

25

*Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000); *see also Linerboard Antitrust Lit.*, 305 F.3d 153-55 (affirming the district court's decision to certify the class where the plaintiffs presented two expert affidavits explaining how impact could be assessed on a class-wide basis); *cf. Playmobil Antitrust Lit.*, 35 F. Supp. 2d at 246 (observing the disparity among courts on this issue). Regardless of which standard applies, the court is satisfied that the impact requirement is satisfied here.

Plaintiffs submitted a declaration of an expert economist, Dr. John C. Beyer.[8] In that declaration, Dr. Beyer devotes approximately five pages of thoughtful discussion to analyzing the impact of the alleged conspiracy. He concludes that if defendants and MCI did engage in the price-fixing conspiracy that is alleged in this case, the impact of that conspiracy can be proven on a class-wide basis:

> 22. From all of the above findings and analyses, I have concluded that the alleged conspiracy would have had a common, class-wide impact in that all class members would have paid higher prices than they would have in the absence of the conspiracy. First, the degrees of product overlap and geographic overlap are so significant that all class members, in the absence of the conspiracy, would have benefited from more active price competition between at least two or more defendants. Second, the defendants' fungible, commodity-like products indicate that purchasers can switch among suppliers largely on the basis of price because there is little quality differentiation. This means that in the absence of a conspiracy, there would have been more intense price competition among the defendants across all products. Therefore, a conspiracy, which lessens competition, would impact prices across all products and hence all customers. Given the market power jointly held by the defendants, class members' ability to avoid impact from a conspiracy by shifting to another supplier would be limited.

---

[8] "[Dr.] Beyer has been involved in roughly 20 class action price-fixing cases." *DeLoach v. Philip Morris Cos.*, 206 F.R.D. 551, 563 (M.D.N.C. 2002).

26

Defendants argue the factual underpinnings of Dr. Beyer's reasoning is flawed because certain large business customers take service pursuant to individually negotiated contracts, *i.e.*, so-called "enterprise customers." The *only* evidence defendants cite in support of this argument are declarations from two employees. The declaration of AT&T employee Robert Dapkiewicz states, in relevant part:

> 3.     In contrast to residential and small business customers, large business customers generally purchase AT&T telecommunications services pursuant to individually-negotiated and physically-executed written contracts that reflect the unique bundle or mix of services needed to satisfy their telecommunications requirements or, in the case of government customers, to comply with the purchasing regime under which they operate. The pricing and other terms and conditions in these contracts may reflect trade-offs between and among the different services included. For example, a retail business customer might accept a higher per minute switched access outbound long-distance price in order to obtain a lower price on inbound long-distance service, or a more fulsome set of warranties. Conversely, a government carrier may be able to command a lower price for a given service because of a reduced risk of uncollectibles.
>
> 4.     When the FCC implemented the Universal Service Fund ("USF") assessment program in 1998, AT&T had a number of pre-existing multi-year contracts that prohibited AT&T from collecting any additional charges from the customer. In light of these contractual provision[s], AT&T believed that it could not pass through to the affected customers any portion of the cost of its contribution to the USF through the collection of the UCC. Over time, virtually all of these contracts have been terminated or re-negotiated.

Similarly, the declaration of Sprint employee Chris D. Schneider states, in relevant part: "Many of Sprint's large business customers purchase services under individually negotiated contracts, that have customized business terms and conditions. These individually negotiated contracts can and do provide for varying bundles of services and specialized pricing and billing as individually negotiated."

27

The court is unpersuaded that these general statements regarding enterprise customers' individually negotiated contracts do in fact successfully challenge the factual underpinnings of Dr. Beyer's declaration. The class definitions only include customers who paid USF surcharges during the relevant time period. The declarations of Mssrs. Dapkiewicz and Schneider notably do not state that any enterprise customer negotiated a lower USF surcharge rate. Thus, the record currently before the court suggests that any enterprise customers who are class members paid the standard USF surcharge rates for businesses. Therefore, all class members, even enterprise customers, were presumably impacted by the alleged price-fixing conspiracy.

Even if the court accepts, however, that product pricing variations exist for enterprise customers because those customers have individually negotiated contracts, the court is nevertheless still unpersuaded that the mere general statements of Mssrs. Dapkiewicz and Schneider, without further meaningful elaboration or evidentiary support regarding the significance of this fact, are sufficient to defeat class certification. Courts have recognized that the mere fact that defendants entered into price negotiations with their customers using the conspiratorially set price as a factor in the negotiations provides adequate proof of impact. As one oft-quoted court has explained:

> In a number of price-fixing cases concerning industries where discounts and individually negotiated prices are common, courts have certified classes where the plaintiffs have alleged that the defendants conspired to set an artificially inflated base price from which negotiations for discounts began. The theory that underlies these decisions is, of course, that the negotiated transaction prices would have been lower if the starting point for negotiations had been list prices set in a competitive market. Hence, if a plaintiff proves that the alleged

28

conspiracy resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury.

*In re Industrial Diamond Antitrust Lit.*, 167 F.R.D. 374, 383 (S.D.N.Y. 1996) (citations and footnote omitted; collecting case law on this issue); *accord Linerboard Antitrust Lit.*, 203 F.R.D. at 221 (quoting *Industrial Diamond*); *In re Plastic Cutlery Antitrust Lit.*, No. 96-CV-728, 1998 WL 135703, at *7 (E.D. Pa. Mar. 20, 1998) (same; holding adequate proof of impact would exist if information on an allegedly conspiratorially set uniform price list was a factor in negotiating purchases); *see also, e.g., In re Corrugated Container Antitrust Lit.*, 80 F.R.D. 244, 250-52 (S.D. Tex. 1978) (quoting an expert affidavit explaining that such price variations "are not inconsistent with . . . an artificially inflated general price level [because] the artificially inflated general price level is the point from which all such price variations start").

Further, plaintiffs submitted a supplemental declaration from Dr. Beyer stating that nothing submitted in defendants' brief in opposition to class certification and related materials (*e.g.*, Mssrs. Dapkiewicz and Schneider's declarations) caused him to change his prior opinions. His original declaration acknowledged that there is a distinction between the "mass market" (residential and small business customers) and the "larger business market" (medium-sized and large business customers), but nevertheless explained that "[e]ach of the defendants offers all of these services, so that service overlap is substantial. In addition, these services are commodity-like in that there is a high degree of product fungibility across the defendants." Dr. Beyer's conclusion that impact can be proven on a class-wide basis rests on the significant degree of product overlap and the fungible nature of defendants' products, both of which Dr.

29

Beyer explained are considerations that apply equally to the larger business market and the mass market. From this, he concluded that "*all* class members would have paid higher prices than they would have in the absence of a conspiracy" (emphasis added) because all class members would have benefitted from more active price competition among the defendants in the absence of a conspiracy. For purposes of demonstrating class-wide impact, then, the fact that the enterprise customers may have had separately negotiated contracts does not mean that they were not impacted by the conspiracy. Instead, it suggests they may have been impacted to a greater or lesser degree than other customers, and this is simply not a consideration in determining whether those customers were impacted by the alleged conspiracy. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) (noting the "burden of proving the fact of damage . . . is satisfied by . . . proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage" (emphasis added)).

In sum, Dr. Beyer's declaration provides a reasonable basis and a feasible means for plaintiffs to prove impact on a class-wide basis. At the class certification stage, the court's task is not to determine whether his opinion will ultimately be persuasive, but rather to evaluate whether his declaration is sufficient to demonstrate common questions of fact warranting class certification. *See In re Visa Check/MasterMoney Antitrust Lit.*, 280 F.3d 124, 135 (2d Cir. 2001). The court is satisfied that his declaration satisfies this criteria. *See, e.g., Linerboard Antitrust Lit.*, 203 F.R.D. at 220 (holding plaintiffs demonstrated a means of proving impact on a class-wide basis despite defendants' arguments regarding variations in products and

30

pricing); *In re Vitamins Antitrust Lit.*, 209 F.R.D. 251, 266 (D.D.C. 2002) (same); *DeLoach v. Philip Morris Cos.*, 206 F.R.D. 551, 561-64 (M.D.N.C. 2002) (same); *Corrugated Container Antitrust Lit.*, 80 F.R.D. at 249-52 (same).[9]

### c.   Proof of Damages

The court is also satisfied that plaintiffs have suggested a potentially feasible method for proving damages on a class-wide basis.   Although Dr. Beyer states that the competitive benchmark method cannot be used to assess class-wide damages because the allegations suggest defendants were pricing collusively before the class period began, he nevertheless states that damages can be proven by using a yardstick measure or estimating a reasonable range of supply and demand elasticities.   He states that if these methods prove problematic a minimum measure of damages can be estimated by determining the USF surcharges actually collected by defendants and deducting the dollar amount they actually remitted to the FCC. Even if damages had to be determined on an individualized basis, however, that would not preclude class certification.   *See, e.g., In re Aluminum Phosphide Antitrust Lit.*, 160 F.R.D. 609, 615 (D. Kan. 1995) ("[T]he fact that individual proof as to the amount of damages may be necessary does not preclude class certification."); *In re Catfish Antitrust Lit.*, 826 F. Supp.

---

[9] For this same reason, the court rejects defendants' argument that the court should modify plaintiffs' proposed class definitions to exclude enterprise customers. Quite simply, plaintiffs have satisfied their burden on this issue at this stage of the proceedings.   Whether plaintiffs can actually prove antitrust impact with respect to these enterprise customers is an issue to be decided on the merits.

1019, 1043-44 (N.D. Miss. 1993) (observing that individual questions of damages should not preclude class certification in price-fixing antitrust cases).

### d.    Other Cases Cited by Defendants

Defendants also argue that the broad spectrum of customers, services, and markets at issue render this case unsuitable for class treatment of plaintiffs' antitrust claims. Defendants point out that the class and subclasses include the smallest residential customers, the largest corporate entities, and everything in between. Defendants argue the USF charges were different for residential and business customers throughout the conspiracy period, and that those charges are set by separate organizations within each carriers. Further, residential customers generally purchase switched access long-distance service whereas business customers purchase customer-specific bundles of different telecommunications services. Also, service for residential customers is generally governed by standard form contracts whereas large businesses are often able to negotiate their contracts. Even the FCC regards the long distance business as being comprised of two markets, one consisting of residential and small business customers and the other consisting of medium-sized and large business customers.

In support of defendants' arguments in this regard, they predominantly rely on three cases, the first of which is *Burkhalter Travel Agency v. MacFarms International, Inc.*, 141 F.R.D. 144 (N.D. Cal. 1991). *Burkhalter* involved a claim that macadamia nut producers conspired to fix prices in violation of the federal antitrust laws. *Id.* at 145. The proposed class of plaintiffs included "buyers of both retail and bulk macadamia nuts, buyers on both Hawaii

32

and the mainland, and buyers of each variety of macadamia nut product (salted nuts, chocolate covered nuts, toasted nuts, macadamia nut brittle, macadamia nut oil, etc.)." *Id.* at 151. The court found that, although the proposed class shared a common issue regarding the defendants' alleged price fixing, the requirement that common issues must predominate was not satisfied because of the many "cross-cutting factual circumstances among the class members." *Id.* at 152. The court explained that

> there are significant differences between the market for macadamia nuts on Hawaii and on the mainland, between large and small purchasers, and between bulk and retail purchasers. In these different markets, defendants price nuts in different ways and purchasers have varying degrees of leverage over defendants. As this action is about price-fixing activities conducted by defendants, grouping purchasers in all of these sub-markets together ignores the crucial differences in how defendants set prices for different purchasers. Given the diversity of markets, it can hardly be said that common issues predominate.

*Id.* at 154 (citations omitted). The proposed class was so ill-defined that one of the defendants was also a member of the proposed plaintiff class. *Id.* at 155.

The second case predominantly relied on by defendants is *Kennett Corp. v. Massachusetts Furniture & Piano Movers Ass'n*, 101 F.R.D. 313 (D. Mass. 1984). *Kennett* involved a claim against moving companies that they conspired to fix the prices of moving household goods and office equipment in Massachusetts. *Id.* at 314. The court held that common issues among the class would not predominate questions affecting only individual members. *Id.* at 315. The court explained that the case was not like those "involving a uniform supracompetitive price for a fungible product" because the claim at issue "involves a bundle of moving services that differs from mover to mover and from customer to customer." *Id.* at

33

316.   A number of variables affected the total price paid by the consumer such as hourly rate for the move, the time and resource efficiency of a move, bargaining with cost-conscious customers in order to win their business. *Id.* The court explained that

> because the exact mix of services purchased by each customer is unique, individual inquiry would be necessary to determine how much that particular defendant would have charged for the move absent the alleged conspiracy, in light of the costs facing the company at the time, its competitive market, its reputation, and the particular services required for the move.

*Id.*

The courts' reasoning in *Burkhalter* and *Kennett* were focused on the allegedly conspiratorially overpriced product, *i.e.*, macadamia nuts in *Burkhalter* and moving charges in *Kennett*.   Here, defendants' argument focuses on their long-distance products in general. The allegedly conspiratorially overpriced product in this case, however, is much more narrow: the USF surcharge.   That surcharge is a fungible, homogenous product embodied in a flat percentage charge that is readily susceptible of being segregated from any non-homogenous aspects of defendants' products.   In other words, defendants' arguments regarding the variations in their products, pricing, services, and markets focus on the sale of defendants' products as a whole, whereas the USF surcharge is the actual product at issue here.  The court recognizes there may be some discrepancies in this surcharge rate among carriers and between business and residential customers.   Plaintiffs, however, allege that defendants engaged in a combination or conspiracy to raise, fix, or maintain at artificially high and non-competitive levels *all* of their USF surcharge levels, and therefore any deviations among those rates go to the issue of individual damage calculations, not to the issue of liability.   While the court can

34

certainly appreciate the fact that common issues do not predominate every horizontal price-fixing antitrust claim, as illustrated in the cases cited by defendants, common issues do in fact predominate the horizontal price-fixing claim at issue in this case.

The third case predominantly relied on by defendants is *Sample v. Monsanto Co.*, 218 F.R.D. 644 (E.D. Mo. 2003). *Sample* involved an alleged conspiracy to fix prices of genetically modified corn and soybean seed. *Id.* at 646. The court explained that the expert testimony offered by plaintiffs was too conclusory for the court to rely on to certify the class. *Id.* at 650. The court relied on "evidence submitted during the class certification hearing" that revealed: the genetically modified seeds are not homogenous products; the market for seeds is highly individualized depending upon geographic location, growing conditions, consumer preference, and other factors; plaintiffs alleged that only the "premium" portion of the seed product was the subject of the alleged price-fixing scheme, and that premium portion could not be segregated from the rest of the seed; and the seeds were not offered for sale at a uniform price. *Id.* at 650-51. The court concluded that the plaintiffs could not establish the "'but-for' marketplace necessary to establish antitrust impact without a reliable methodology to determine the premiums paid by farmers." *Id.* at 651.

In this case, unlike in *Sample*, defendants have offered no evidence to demonstrate the USF surcharge is not a homogenous product, that the USF surcharge market is highly individualized, that the USF surcharge cannot be segregated from the rest of defendants' products, or that the USF surcharge varied among customers (other than as between carriers and as between business versus residential customers, subcategories that are easily defined).

35

Rather, as explained previously, here the allegedly conspiratorially overpriced product is a fungible, homogenous product embodied in a flat percentage charge that is readily susceptible of being segregated from any non-homogenous aspects of defendants' products.    Thus, the court also finds *Sample* unpersuasive.[10]

In sum, despite defendants' admirable attempts to suggest that individual issues will abound, the court is unpersuaded.    This case involves horizontal price-fixing allegations and common issues will clearly predominate.    *See, e.g.*, *Vitamins Antitrust Lit.*, 209 F.R.D. at 262-70 (rejecting arguments similar to those raised by defendants in this case and concluding the predominance requirement was satisfied in a horizontal price-fixing case involving purchasers of vitamins); *Linerboard Antitrust Lit.*, 203 F.R.D. at 214-23 (same in case involving purchasers of corrugated paper made using linerboard); *In re Flat Glass Antitrust Lit.*, 191 F.R.D. 472, 484-88 (W.D. Pa. 1999) (same in case involving purchasers of flat glass

---

[10] The court also finds two other cases cited by defendants to be unpersuasive. Defendants point out that in *In re Microsoft Corp. Antitrust Lit.*, 127 F. Supp. 2d 702 (D. Md. 2003), the court found that the claims of individual consumer class representatives were atypical of the claims of large-volume enterprise customers who purchased software products through an entirely different distribution line.    *Id.* at 376.    *Microsoft*, however, was not a horizontal price-fixing case like this one.    Rather, it was a monopoly case under Section 2 of the Sherman Act involving the issue of whether the defendant monopolized a defined antitrust product market.

Defendants also point out that in *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 215 F.R.D. 523 (E.D. Tex. 2003), the court found that it would be impossible to present class-wide evidence of the price each plaintiff would have paid but for the conspiracy "[b]ecause of the many individualized factors that established what each Plaintiff actually paid." *Id.* at 531.    Again, the court finds *Piggly Wiggly* to be distinguishable for largely the same reasons that *Burkhalter* and *Kennett* are distinguishable.    In addition, in *Piggly Wiggly*, the plaintiffs produced no evidence, by expert testimony or otherwise, to suggest that impact could be proven on a class-wide basis.

36

products); *cf. Amchem*, 521 U.S. at 625 (observing that "predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws").

### 2.    Predominance: Plaintiffs' Breach of Contract Claim

The court is also satisfied that common issues will predominate plaintiffs' breach of contract claims.    Plaintiffs' second amended complaint alleges that defendants breached certain provisions of their standard form contracts.    Defendants argue that "some members of the AT&T and Sprint subclasses, namely large corporate customers, purchased telecommunications services pursuant to individually-negotiated contracts, some of which contained different provisions potentially impacting the collection of USF charges."    The record is notably devoid, however, of any evidence of these "different provisions."    Thus, based on the allegations in plaintiffs' complaint, the court is satisfied that the common issue of liability for breach of contract will predominate plaintiffs' breach of contract claim.    *See, e.g., In re Tri-State Crematory Lit.*, 215 F.R.D. 660, 692 (N.D. Ga. 2003) (finding predominance requirement satisfied with respect to breach of contract claim); *Winkler v. DTE, Inc.*, 205 F.R.D. 235, 243 (D. Ariz. 2001) (rejecting argument that individual issues would predominate breach of contract claim where standard form contracts were at issue); *Heartland Communications, Inc. v. Sprint Corp.*, 161 F.R.D. 111, 117-18 (D. Kan. 1995) (finding individual issues would predominate breach of contract claim).    This is especially true in light of the fact that the proof will overlap somewhat on plaintiffs' antitrust conspiracy claim and their breach of contract claim.    *See, e.g., George Lussier Enters. v. Subaru of New England, Inc.*, No. 99-109-B, 2001 WL 920060, at *19-*20 (D.N.H. Aug. 3, 2001) (holding the

37

predominance requirement for breach of contract claim was met in part because a certifiable antitrust claim involved the same facts).

### 3.    Superiority

The requirement that a class action be the superior method of resolving the claims insures that there is no other available method of handling the litigation which has greater practical advantages.   Fed. R. Civ. P. 23 advisory committee notes to the 1966 amendments. Here, the obvious alternative to a class action would be for plaintiffs to bring individual suits against defendants.   This would be grossly inefficient, costly, and time consuming because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation. The millions of class members are dispersed across the country, each with relatively similar claims.    It can reasonably be anticipated that many of the individual claims will involve relatively insubstantial amounts of money such that a class action is perhaps the only feasible way for plaintiffs to pursue those claims.   Thus, the court is persuaded that a class action is by far the most superior method for resolving the claims at issue in this lawsuit.

### 2.    Certification of the Conspiracy Class Under Rule 23(b)(2)

As a preliminary matter, the court wishes to observe that given the court's ruling certifying the conspiracy class under Rule 23(b)(3), there is some authority to suggest that the court need not decide the issue of whether the conspiracy class may also be certified under Rule 23(b)(2).   Rule 23(b) is written in the disjunctive—that is, it provides that a class action may be certified if the four prerequisites of Rule 23(a) are satisfied and in addition the requirements of subsection (1) "or" (2) "or" (3) are satisfied, and therefore a class action can

38

be maintained under any one of these three subsections. *See In re Visa Check/MasterMoney Antitrust Lit.*, 280 F.3d 124, 147 (2d Cir. 2001) (holding the court was not required to decide the issue of whether the district court properly certified a Rule 23(b)(2) class because the court "already concluded that the district court appropriately certified the class under Rule 23(b)(3)"; citing authority for the proposition that a court need only find that a class action may be maintained under any of the three subdivisions), *cert. denied*, 536 U.S. 917 (2002); *see, e.g., Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159, 203-04 (W.D.N.Y. 2003) (observing that in the Second Circuit once the district court has found an action to be maintainable under any single category of Rule 23(b), the court need not evaluate whether certification under another category is also appropriate); *In re Northwest Airlines Corp.*, 208 F.R.D. 174, 226 (E.D. Mich. 2002) (citing *Visa Check/Mastermoney Antitrust Lit.* and applying this same rule of law), *appeal denied*, 310 F.3d 953 (6th Cir.), *cert. denied*, 123 S. Ct. 2252 (2003).

Plaintiffs nevertheless urge the court to also certify the conspiracy class under Rule 23(b)(2) because, plaintiffs contend, it is the appropriate procedural vehicle for them to obtain the injunctive relief that they seek. The court is not necessarily persuaded this is true. *See, e.g., Northwest Airlines*, 208 F.R.D. at 226 (noting the plaintiffs' proposed damage class could "serve as appropriate vehicles for the award of both monetary and injunctive relief"). The Tenth Circuit, however, has not spoken on the precise issues of the propriety or necessity of certifying the injunctive relief aspect of a class under Rule 23(b)(2) and the damages aspect

39

of the class under Rule 23(b)(3).  The court will, therefore, out of an abundance of caution, evaluate whether the conspiracy class is also certifiable under Rule 23(b)(2).

Rule 23(b)(2) allows certification where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).  The court may decline to certify a class under Rule 23(b)(2) if the predominant form of relief sought is money damages. *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir. 1995) (finding no abuse of discretion where trial court declined to certify class under Rule 23(b)(2) because the relief sought was predominantly money damages); *see, e.g., Zapata v. IBP, Inc.*, 167 F.R.D. 147, 161-62 (D. Kan. 1996) (declining to certify class under Rule 23(b)(2) where plaintiffs primarily sought money damages); *Heartland Communications*, 161 F.R.D. at 117 (same); Fed. R. Civ. P. 23 advisory committee notes to the 1966 amendments (stating that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages").

In this case, the monetary damages aspect of the conspiracy claim is certainly significant, but the injunctive relief aspect is also potentially significant.  Plaintiffs seek to enjoin defendants from continuing to engage in the allegedly unlawful price-fixing conspiracy. Defendants suggest this injunctive relief is obsolete given the FCC's ruling dictating long distance carriers' USF-fund recovery practices effective April 1, 2003, which generally prohibits long distance carriers from imposing USF surcharge rates that exceed the FCC's USF contribution factor.  The declaration submitted by Dr. Beyer, however, suggests that a USF

40

surcharge equal to the USF contribution factor may still be a result of collusion. His declaration states:

> [T]raditional economic analysis indicates that only in the case of a market with perfectly inelastic demand or perfectly elastic supply would one expect suppliers to pass on to customers the full amount of increased costs such as the USF contributions. In no instance would one expect suppliers to pass on more than the cost. In the case of long-distance telephone service, demand is not perfectly inelastic and supply is not perfectly elastic. As a result, absent the alleged cartel, only a portion of USF costs would have been passed on to customers by the defendants.

In other words, defendants' USF-fund recovery practices may continue to violate the prohibition on horizontal price fixing because the FCC's ruling only prescribes a ceiling for USF surcharges.[11] In a truly competitive market, defendants' USF surcharge rates should arguably be lower than the FCC's USF contribution factor. If defendants continue to charge allegedly inflated and anti-competitive USF surcharge rates, the value of those overcharges during the next decade would likely exceed the value of the plaintiffs' current damage claims. Thus, any injunctive relief that might ultimately be awarded could prove to be highly significant. *See, e.g., In re Visa Check/Mastermoney Antitrust Lit.*, 192 F.R.D. 68, 88-89 (E.D.N.Y. 2000) (certifying a class action under Rule 23(b)(3) and Rule 23(b)(2) because the plaintiffs sought "highly significant injunctive relief"), *aff'd*, 280 F.3d 124 (2d Cir. 2001), *cert. denied*, 536 U.S. 917 (2002). Class certification is not the appropriate stage to decide

---

[11] For this same reason, the court rejects defendants' suggestion that the definition of the conspiracy class should be modified temporally so that it runs commensurate with the subclass definitions. Defendants' argument that they are no longer violating the antitrust laws because their USF-fund recovery practices comply with the FCC's ruling is an issue that goes to the merits of plaintiffs' antitrust claim and the court will leave it for another day.

the merits of this argument.    If, however, plaintiffs are able to prove at trial that they are entitled to the sought-after injunctive relief, the court is unpersuaded that monetary relief would be the predominant form of relief.

This court's decision in *Heartland Communications, Inc. v. Sprint Corp.*, 161 F.R.D. 111 (D. Kan. 1995), does not dictate a different result.    In *Heartland*, the court declined to certify a Rule 23(b)(2) class in addition to a Rule 23(b)(3) class.    *Id.* at 117.    The court explained that it was "clear from the stated causes of action contained in plaintiffs' complaint that the predominant relief requested is monetary damages for Sprints' [sic] alleged breach of contractual obligations."    *Id.*    By comparison, in this case, as explained above, the court is unpersuaded that monetary damages are necessarily the predominant form of relief sought.

The court is mindful of the Tenth Circuit's mandate that "if there is error to be made, let it be in favor and not against the maintenance of a class action." *Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir. 1968).    Accordingly, the court will certify the injunctive relief aspect of the conspiracy class under Rule 23(b)(2).    The court will, however, exercise its discretionary authority pursuant to Rule 23(d)(2) and 23(d)(5) and provide the conspiracy class members with notice and opt-out rights equally insofar as that class is certified under Rule 23(b)(2) and Rule 23(b)(3).    *See In re Monumental Life Ins. Co.*, 343 F.3d 331, 340 (5th Cir. 2003) (district court may exercise its discretionary authority under Rule 23(d)(2) to provide notice and opt-out rights to a Rule 23(b)(2) class); *Molski v. Gleich*, 318 F.3d 937, 947 (9th Cir. 2003) (same); *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 166-67 (2d Cir. 2001) (same; also citing the district court's discretionary authority under Rule 23(d)(5)), *cert.*

*denied*, 535 U.S. 951 (2002); *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 582 (7th Cir. 2000) (same). This will hopefully advance the interests of fairness and litigation efficiency by ensuring that conspiracy class members are treated similarly with respect to both the damage and injunctive relief aspects of their antitrust claims.

## III.    Modification of the Class Definition to Exclude MCI Small Business Customers

Defendants have asked the court to revise the conspiracy class so that it does not include any MCI customers because NYLB, the lone non-residential MCI customer plaintiff, is subject to an arbitration clause that is identical to MCI's arbitration clause with its residential customers pursuant to which the court compelled arbitration of the residential customers' claims. *See In re Universal Serv. Fund Tel. Billing Practices Lit.*, No. 02-1468, 2003 WL 23219878, at \*24-\*27 (D. Kan. Dec. 1, 2003). Defendants argue the court should compel arbitration of NYLB's claims for the reasons stated in the court's December 1 order, and that "[g]iven the absence of any MCI plaintiff that can pursue its claims in this Court, no class can properly be certified that includes MCI residential or business customers." Plaintiffs argue defendants have waived any right they may have had to compel arbitration of the MCI business customers' claims. For the reasons explained below, the court agrees. Further, the court would not be inclined to compel arbitration of the MCI business customers' claims in any event.

### A.    Waiver

43

The right to arbitration, like any other contractual right, can be waived. *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1489 (10th Cir. 1994). In determining whether the right to arbitration has been waived, the court must examine the following factors:

> (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether "the litigation machinery has been substantially invoked" and the parties "were well into preparation of a lawsuit" before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) "whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place"; and (6) whether the delay "affected, misled, or prejudiced" the opposing party.

*Id.* (quoting *Peterson v. Shearson/Am. Express*, 849 F.2d 464, 467-68 (10th Cir. 1988)); *accord McWilliams v. Logicon, Inc.*, 143 F.3d 573, 576 (10th Cir. 1998). Whether a waiver has occurred depends upon the facts of the particular case. *Reid Burton Constr., Inc. v. Carpenters Dist. Council*, 614 F.2d 698, 702 (10th Cir. 1980).

Defendants filed their motions to compel arbitration in this case almost sixteen months ago on October 16, 2002. Those motions did not ask the court to compel arbitration of *any* of the MCI customers' claims. In plaintiffs' memoranda in response to defendants' motions, plaintiffs pointed out that defendants did not ask the court to compel arbitration of the MCI customers' claims. The first time defendants urged the court to compel arbitration of the MCI customers' claims was in their reply briefs. In AT&T's reply brief, AT&T quoted the arbitration provision in the "MCI General Service Agreement for Residential Customers." Notably, neither defendant submitted an MCI service contract as an exhibit in support of their

44

argument that the court should compel arbitration of the MCI customers' claims. The *only* MCI service contract that was a part of the record on this issue was the residential customer service contract, and it was submitted as an exhibit to plaintiffs' response memoranda.

The court held a hearing on defendants' motions to compel arbitration more than a year ago on February 5, 2003. At that hearing, the issue of compelling arbitration of the MCI customers' claims was sufficiently discussed such that, despite the fact that defendants first raised this argument in their reply brief, the court considered the issue to have been sufficiently explored that it was a component of defendants' motion to compel arbitration.

On February 20, 2003, plaintiffs filed a motion for leave to file second consolidated and amended class action complaint that, among other things, sought to join Kathy Snavely and Carol Zinsmeister, both MCI residential customers, and NYLB as plaintiffs. On March 10, 2003, plaintiffs' second consolidated and amended class action complaint was filed pursuant to court order, thus joining NYLB as a plaintiff in this case.

On May 27, 2003, the court entered a memorandum and order resolving one of the issues raised by plaintiffs in opposition to defendants' motion to compel arbitration. *See generally In re Universal Serv. Fund Tel. Billing Practices Lit.*, No. 02-1468, 2003 WL 21254765, at *1-*6 (D. Kan. May 27, 2003). In that memorandum and order, the court advised the parties that it would take the remainder of defendants' motion to compel arbitration under advisement until the United States Supreme Court decided whether it would grant AT&T's petition for certiorari in *AT&T Corp. v. Ting*, No. 02-1521. On October 6, 2003, the Supreme Court denied AT&T's petition for certiorari. *See AT&T Corp. v. Ting*, 124 S. Ct. 53

45

(2003).   On December 1, 2003, the court entered a memorandum and order devoting approximately fifty pages to ruling on defendants' motion to compel arbitration.   *See In re Universal Serv. Fund Tel. Billing Practices Lit.*, No. 02-1468, 2003 WL 23219878, at *1-*27 (D. Kan. Dec. 1, 2003).   After that comprehensive memorandum and order was issued, defendants raised the issue of compelling arbitration of NYLB's claims for the first time during a status conference on December 17, 2003.

The court is of the opinion that, on balance, the factors listed above weigh in favor of finding that defendants waived any right they may have had to compel arbitration of NYLB's claims.   Defendants' delay in raising this issue is inconsistent with the right to arbitrate. Defendants should have asserted any arguable right they had to compel arbitration of NYLB's claims within a reasonably prompt period after NYLB joined in this case as a plaintiff.   Further, defendants' delay in raising this issue was substantial.   They raised this issue more than nine months after NYLB joined in this case.   There was a six-month interlude on the arbitration matter while the Supreme Court decided whether to grant certiorari in *Ting*.   If defendants had truly wanted to compel arbitration of NYLB's claims, that issue could have been fully briefed by the parties during that interim time period.

Perhaps more importantly, though, the "litigation machinery ha[d] been substantially invoked" and substantial intervening steps had taken place by the time defendants raised this argument.   By December 17, 2003, the court and the parties had already devoted an inordinate amount of resources to resolving substantial and meaningful threshold legal issues—in particular, the extent to which the named plaintiffs' claims were arbitrable—that defined the

46

contours of this lawsuit.  Defendants now raise this issue as an afterthought on a point they should have raised months ago.  The court is not inclined to belatedly rehash the entire arbitration issue when defendants should have raised it in a manner that was apparent to the court long ago.  Accordingly, the court holds that defendants have waived any right they may have had to arbitrate the MCI business customers' claims.

### B.    Arbitrability of the MCI Business Customers' Claims

The court also rejects defendants' argument on the merits because the court is unpersuaded that defendants are entitled to compel arbitration of the MCI business customers' claims on the same basis that they compelled arbitration of the MCI residential customers' claims.  In the court's December 1, 2003, memorandum and order, it compelled arbitration of the MCI residential customers' claims on an equitable estoppel "intertwined claims" theory.  *See id.* at *24-*27.  The court's ruling rested on the principle of equitable estoppel, a principle with respect to which the district court may exercise its discretion.  *Spaulding v. United Transp. Union*, 279 F.3d 901, 911 (10th Cir.) (trial court's refusal to apply equitable estoppel is reviewed for abuse of discretion), *cert. denied*, 537 U.S. 816 (2002); *see, e.g., Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000) (district court's decision whether to utilize equitable estoppel principles to compel arbitration is reviewed for abuse of discretion).  The court concluded that "notions of equity and fairness require the court to compel arbitration of plaintiffs' antitrust claims against the long distance carriers other than their own under the terms of those plaintiffs' arbitration

47

clauses with their respective long distance carriers." *Universal Serv. Fund*, 2003 WL 23219878, at *26 (quotation and citations omitted).

Here, the court is unpersuaded that notions of equity and fairness require the court to compel arbitration of NYLB's antitrust claim against AT&T and Sprint. The court could arguably compel arbitration of that claim as it did with respect to the MCI residential customers' antitrust claim on the basis that NYLB's antitrust claim is intertwined with its MCI service contract, which is the means by which MCI implemented the alleged conspiracy that was the product of allegedly substantially interdependent and concerted misconduct among defendants and MCI. Ultimately, though, compelling arbitration pursuant to NYLB's arbitration clause presents different considerations than were at issue with respect to arbitration of the MCI residential customers' claims. All of the Sprint, AT&T, and MCI residential customers had arbitration provisions in their respective service contracts. By comparison, here Sprint and AT&T have no parallel arbitration provisions in their service contracts with any of their business customers. The only business customer plaintiffs with arbitration clauses in their service contracts are the MCI small business customers. Thus, the court's rationale in its prior opinion that the meaningfulness of the Sprint and AT&T arbitration clauses would be undercut if the court did not compel arbitration of all of the residential customers' claims does not apply with respect to the business customers' claims. AT&T and Sprint are not entitled to compel arbitration of

their own business customers' claims. Therefore, requiring them to litigate NYLB's claims in court rather than in arbitration does not seem unfair because they never bargained for an arbitration clause with their own customers.

## IV.    Appointment of Counsel

Rule 23 was amended effective December 1, 2003, to require an order certifying a class action to also appoint class counsel that will adequately represent the interests of the class. Fed. R. Civ. P. 23(c)(1)(B), (g)(1); *see also* Order Amending Federal Rules of Civil Procedure, 123 S. Ct. 496 (2003) (providing the 2003 amendments apply to pending cases "insofar as just and practicable").    The court must consider the work counsel has done in identifying or investigating potential claims in the actions, counsel's experience in handling class actions and other complex litigation and claims of the type asserted in the present action, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class.    Fed. R. Civ. P. 23(g)(1)(C).    For the reasons stated on the record at the initial conference in this case on August 15, 2002, the court is satisfied that the firms of Susman Godfrey L.L.P., Heins, Mills & Olson, P.L.C. and Stanley, Mandel & Iola, L.L.P. satisfy these four criteria and will adequately represent the interests of the class as lead counsel.    Diel & Seelman, PC, shall continue to serve as liaison counsel.

## V.    Notice

Rule 23(c)(2)(B) provides that "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."    The court

believes that the overwhelming majority of, if not all, class members can likely be identified through reasonable efforts.   To that end, defendants are directed to provide to plaintiffs the names, addresses, and telephone numbers of all customers who are potential members of the class on or before **March 12, 2004**.  Also on or before **March 12, 2004**, plaintiffs shall prepare and submit to the court for approval an order regarding notice that complies with the requirements of Fed. R. Civ. P. 23(c).

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiffs' motion for class certification (Doc. 102) is granted.   Accordingly, the court hereby certifies the conspiracy class, the AT&T subclass, and the Sprint subclass under the definitions set forth above as proposed by plaintiffs.   The court appoints Susman Godfrey L.L.P., Heins, Mills & Olson, P.L.C., and Stanley, Mandel & Iola, L.L.P. as class counsel.  The parties shall begin the process of giving notice to the class members as described above.

**IT IS SO ORDERED** this 13th day of February, 2004.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge