### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

LOU HADDOCK, as trustee of the Flyte
Tool & Dye Company Inc. 401(k) Profit-
Sharing Plan, et al.,
     Plaintiffs,

v.

NATIONWIDE FINANCIAL SERVICES
INC., et al.,
     Defendants.

Civil Action No.
3:01cv1552 (SRU)

### MEMORANDUM OF DECISION

Lou Haddock, Peter Wiberg, Alan Gouse, Edward Kaplan, and Dennis Ferdon are

trustees of employer-sponsored, profit-sharing retirement plans (collectively "Trustees"). The

Trustees have sued Nationwide Financial Services Inc. and Nationwide Life Insurance Co.

(collectively "Nationwide") under the Employee Retirement Income Security Act ("ERISA"), 29

U.S.C. § 1101 *et seq*., seeking monetary damages and equitable relief. The plaintiffs claim that

Nationwide's contractual arrangements with mutual funds or their affiliates (collectively "mutual

funds") and its retention of so-called revenue-sharing payments constitute breaches of

Nationwide's fiduciary duties, in violation of 29 U.S.C. §§ 1104(a)(1)(A) and (B). The plaintiffs

also claim that Nationwide's contracts with the mutual funds and retention of the revenue-

sharing funds constitute prohibited transactions in violation of 29 U.S.C. §§ 1104 and 1106(b).

Nationwide has moved for summary judgment on all claims. That motion is denied.

### I.    Procedural Background

The Trustees originally filed this suit in August 2001, and filed an amended complaint in

September 2001. Shortly thereafter, the parties filed a Rule 26(f) Report in which they requested

that the case be managed in phases. *See* Doc. # 13. The parties proposed that, during the first

phase, they would pursue discovery on class certification, and the defendants would file any motions under Rule 12 or Rule 56 that were directed to the plaintiffs' individual claims. *Id.* Although the parties did not intend to conduct full merits discovery during that first phase, the plaintiffs contended that a certain amount of discovery necessary for class certification would overlap with discovery on the merits. *Id.* at 11. The parties proposed that the second phase of the case would begin after the court ruled on any Rule 12 or Rule 56 motions. *Id.* at 2.

District Judge Christopher F. Droney, to whom the case had been assigned, referred a number of pending motions to Magistrate Judge William I. Garfinkel. Judge Garfinkel conducted a conference with the parties and adopted their two-phased approach to managing discovery. In late March 2002, Judge Garfinkel denied without prejudice a motion in which Nationwide sought a limited stay of discovery. Doc. # 43. Judge Garfinkel noted that he recognized "the need for phased discovery" and directed plaintiffs' counsel "to propound reasonable, specific further discovery tailored for preparation on the issue of class certification." *Id.* On March 28, 2002, Judge Garfinkel ordered class certification discovery to be completed within six months of commencement. By that point, Nationwide had already filed a motion to dismiss the amended complaint (doc. # 14), and the Trustees had filed a motion for class certification (doc. # 20).

In August 2002, Judge Droney conducted a motion hearing regarding the motion to dismiss (doc. # 14) and the motion for class certification (doc. # 20). Shortly thereafter, the motion to dismiss was denied without prejudice by endorsement order, but no decision was issued on the motion to certify a class.

The Trustees filed a second amended complaint in February 2003 (doc. # 64) to which

Nationwide responded with an answer and counterclaims. The Trustees filed a motion to dismiss the defendants' counterclaims in April 2003 (doc. # 85), which was later denied as moot. On May 9, 2003, Judge Droney granted a motion (doc. # 88) to extend the deadlines set forth in the operative scheduling order.

The Trustees filed a third amended complaint (doc. # 95) to which Nationwide filed an answer (doc. # 94) and asserted three counterclaims: contribution, indemnification, and breach of fiduciary duties. The Trustees filed a motion to dismiss the defendants' counterclaims (doc. # 97).

In August 2003, Nationwide filed a motion for summary judgment (doc. # 116), challenging the legal validity of the Trustees' theories of liability. In September 2003, the Trustees filed an amended motion for class certification (doc. # 128).

The Trustees moved to stay consideration of Nationwide's motion for summary judgment, pending the court's ruling on their motion for class certification. In October 2003, Nationwide moved for leave to conduct additional class certification discovery. Following a motion hearing, Judge Garfinkel denied both the Trustees' motion to stay consideration of the summary judgment motion and Nationwide's motion for leave to conduct additional class certification discovery.

In January 2004, the case was transferred to me. Shortly thereafter, Nationwide requested that I decide its summary judgment motion before ruling on class certification (doc. # 189). I granted that motion, and in June 2004, held oral arguments on the motion for summary judgment.

At that hearing, the Trustees' theories regarding Nationwide's liability differed from the

- 3 -

theories put forth in their third amended complaint and the related briefing on the summary

judgment motion.  I ordered the plaintiffs to file a further amended complaint, setting forth their

current theories of liability.  Thereafter, the Trustees filed their fourth amended class complaint

(doc. # 235), and the parties provided supplemental briefing addressed to that pleading.  The

operative arguments relating to Nationwide's summary judgment motion are set forth in those

three supplemental briefs.  *See* Docs. # 239, 246 & 249.  Additionally, in September 2005, the

plaintiffs submitted a supplemental memorandum and the defendants a supplemental response in

light of a recent Tenth Circuit decision.  *See* Docs. # 253 & 256.

Nationwide also filed an answer to the fourth amended complaint (doc. # 242), again

asserting three counterclaims: contribution, indemnification, and breach of fiduciary duties.  The

Trustees have requested that I treat their pending motion to dismiss as directed toward

Nationwide's most recent answer and counterclaims.

Currently pending are Nationwide's motion for summary judgment, the Trustees' motion

to dismiss Nationwide's counterclaims, and the Trustees' motion for class certification.  This

decision addresses only the motion for summary judgment.

## II.    Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  To present a "genuine" issue of material fact, there must

be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving

party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 256 (1986).  In other words,

summary judgment is only proper when reasonable minds could not differ regarding the import

of the evidence. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In this case, as detailed above, the parties have principally conducted class certification discovery, not full merits discovery. Although the parties expected that Nationwide would file any motions under Rule 12 or Rule 56 during phase one, Rule 26(f) Report (doc. # 13), a motion for summary judgment may be premature when the parties have not conducted merits discovery.

Nationwide's motion for summary judgment focuses almost exclusively on questions of law and essentially accepts the plaintiffs' version of the facts.[1] The defendants do on occasion argue that the Trustees have failed to support essential elements of their claims with evidence in the record. Although such an absence would ordinarily be fatal at the summary judgment stage, because the parties have not yet conducted full discovery on the merits and because Nationwide's motion focuses largely on legal issues, rather than factual ones, I will not treat any gaps in the record as fatal to the Trustees' claims.[2] *Cf. Lawrence v. Richman Group of Connecticut, LLC*, __ F. Supp. 2d __, 2005 WL 3601383 (D. Conn. Dec. 12, 2005) (treating defendants' motion as

---

[1] I note that the defendants' earlier motion to dismiss (doc. # 14), in which they asserted similar legal arguments, was denied without prejudice.

[2] Although the plaintiffs did not move for a continuance, I would have granted a Rule 56(f) motion. When a party requires additional discovery in order to oppose a motion for summary judgment, Rule 56(f) permits the court to deny or to continue the motion *sua sponte*. *See Rustin v. City of Seaside*, 1995 WL 492629, *2 (N.D. Cal. Aug. 10, 1995).

motion to dismiss – not motion for summary judgment – because of complicated procedural

posture of the case); *Katz v. Molic*, 128 F.R.D. 35, 38 (S.D.N.Y. 1989) (discussing authority of

trial judge to convert a motion for summary judgment into a motion to dismiss for failure to state

a claim, with or without notice to the parties).

**III.    Factual Background**

Viewing the evidence in the light most favorable to the Trustees and drawing all

reasonable inferences in their favor, a reasonable jury could find the following facts, which are

largely undisputed.

A.    Structure of Plan Investments

The plaintiffs are trustees of five employer-sponsored retirement plans ("Plans").  The

Plans are participant-directed 401(k) retirement savings plans.  The employers who sponsor the

Plans used service providers to create the Plans and to provide the administrative services

necessary to run them.  Those service providers, sometimes known as Pension Plan

Administrators or PPA's, persuaded the Plans to use Nationwide as their "investment providers."


Nationwide offers the Plans various investment options, including insurance products

such as variable annuities.  The variable annuities are fund vehicles that provide the Plans and

their participants means for investing the retirement contributions.

The variable annuities include two types: group and individual.  Pursuant to the group

variable annuity contracts, Nationwide contracts with the Plans, while each participant holds an

individual account.  Pursuant to the individual variable annuity contracts, Nationwide contracts

separately with each participant.  The variable annuity contracts permit the Plans and participants

to invest in a variety of mutual funds.

Nationwide plays a role in the selection of mutual funds that are available for investment by the Plans and participants. The process for selecting mutual funds available for investment has several steps. First, for group annuity contract-holders, Nationwide offers a selection of funds and the Plans choose a subset from among those funds to be available to their participants. The participants then make investment decisions, choosing from among that subset of funds. For individual annuity contract-holders, Nationwide offers a selection, and the participants choose to invest from among that selection.

In addition, Nationwide retains the authority to delete and substitute mutual funds from the list of available investment options "if, in the judgment of [Nationwide], further investment in the shares of a Fund should become inappropriate in view of the purposes of the Contract, [Nationwide] may substitute shares of another Fund or Fund shares already purchased or to be purchased in the future." Nationwide Contract with the Trustee(s) of the Flyte Tool & Die Company, Inc. 401(k) Profiting-Sharing Plan Trust at ¶ 9.1, Ex. 1A to Aff. of Ronald Wyant. It appears that Nationwide's authority at this stage may be limited to deleting and substituting mutual funds that have already been approved by the Plans (*i.e.*, the subset that the Plans have chosen) and specified in their agreements. *See id.* at ¶ 1.8 (defining the term "Fund" as "a registered investment management company (mutual fund), *specified in the Application*, in which assets of a Series will be invested") (emphasis added).

The Plans and participants do not invest in the mutual funds directly. Rather, they invest their pension contributions and any employer-matching contributions in one of two Nationwide "variable accounts," unit investment trusts that hold assets from multiple Plans and participants.

- 7 -

Those variable accounts are, in turn, divided into numerous "sub-accounts."  Each sub-account

corresponds to a particular investment option available under the group and individual annuity

contracts.  The investment options are largely mutual funds.

From among the selection of mutual funds offered by Nationwide, Plans and participants

choose the mutual funds in which to invest their pension contributions.  Nationwide then

allocates the funds to the appropriate sub-accounts.  The sub-accounts receive allocations from

multiple Plans and participants, and Nationwide purchases or sells a designated mutual fund to

reflect the sub-accounts' combined allocations by the Plans and their participants.  When the

mutual funds receive funds from the sub-accounts, those funds are pooled with funds from

investors other than the plaintiffs.

To reflect the amounts contributed to a particular mutual fund, Nationwide allocates

"accumulation units," *i.e.*, shares, of the corresponding sub-account to the Plans and participants.

The accumulation units reflect the total amount of money that the Plans and participants have

invested in the variable account or sub-account.  The value of the accumulation units fluctuates

according to the value of the mutual fund shares held within the sub-accounts.

Pursuant to the governing contractual provisions, Nationwide cancels the accumulation

units as necessary to pay its fees and to pay taxes.  Nationwide also transfers accumulation units

for use as collateral for loans, and cancels them to purchase annuities and make cash payments at

the request of Plans and participants.

B.     Nationwide's Arrangements with Mutual Funds

In the early to mid-1990's, Nationwide was concerned about the competitiveness of its

pricing of certain annuity contracts.  Accordingly, Nationwide investigated and ultimately

implemented a system under which mutual funds make payments to it based on a percentage of the assets that Plans and participants invested in the mutual funds through Nationwide. Nationwide now refers to that source of income as "service contract payments" or "competitive pricing," although Nationwide previously used language similar to that adopted by the plaintiffs in this case: "mutual fund revenue" and "sharing."

The mutual funds have contracted with various service providers for the latter to provide investment, administrative, and other services. Some of those service providers are affiliated with the mutual funds. Some of those mutual fund affiliates have in turn contracted with Nationwide. Nationwide's contracts with the mutual funds are fashioned as "service contracts."

Although Nationwide contends that it contracted with the mutual funds to provide services to the funds, a fact-finder viewing the evidence in the light most favorable to the Trustees could conclude that the contracts were a guise for making payments to Nationwide or that Nationwide provided only nominal services and that the payments were not in consideration for those services. Prior to the implementation of the so-called service contracts, Nationwide's internal documents do not refer to services or service contracts; rather, they discuss generating additional revenue from the mutual funds or encouraging the mutual funds to "share" their revenue with Nationwide. For example, in one internal memorandum, dated April 4, 1995, "discussion issues" for an upcoming meeting included:

    1. Status of mutual fund negotiations

        a) Funds that have agreed to share

        b) Funds that have refused to share

        c) Funds still in negotiation

2.  What is the strategy for mutual funds that refuse to share?

a) Current funds

b) New Funds

Ex. O to Appendix to Am. Motion to Certify Class.

Although the contracts have been dubbed service contracts, a reasonable fact-finder could infer that Nationwide does not perform additional services in consideration for payments under the contracts.  Rather, pursuant to the service contracts, Nationwide provides mutual funds the same services that it had historically provided to the Plans and PPA's as a necessary part of its business and in exchange for payment from the Plans and PPA's.  The language of the contracts supports that inference.  For example, the Service Agreement between Nationwide and the Janus Service Corporation provides in pertinent part:

> WHEREAS, [Nationwide] provides administrative services to the owners of certain variable annuity contracts (the "Contracts") issued by Nationwide Life Insurance Company ("Nationwide") through certain Nationwide separate accounts (the "Variable Accounts") . . . ; and
>
> WHEREAS, the Funds will be included as underlying mutual fund options for the Contracts issued by Nationwide through the Variable Accounts pursuant to a Fund Participation Agreement  . . . between Janus, on behalf of the Funds, and Nationwide; and
>
> WHEREAS, Janus recognizes substantial savings of administrative expenses as a result of [Nationwide] performing certain administrative services such as significant reductions is [sic] postage expense and participant communications and recordkeeping, by virtue of maintaining an unallocated account for the Plans rather than multiple accounts for individual Plan participants (the "Services" ) on behalf of the Funds  . . . .

Ex. 21 to Decl. of M. Bieter in Supp. of Def. Opp. to Pl. First Am. Motion to Certify Class.

The amounts of the payments to Nationwide were based on how much the Plans and participants invested in the mutual funds.  Nationwide has disclosed to the Plans and participants

the fact that it receives payments from mutual funds.

In sum, viewing the evidence in the light most favorable to the Trustees, a reasonable jury could find that the purported service contracts were a means for Nationwide to collect payments from mutual funds in exchange for offering the mutual funds as investment options to the Plans and participants.

## IV.    Discussion

The Trustees allege that Nationwide engaged in prohibited transactions in violation of 29 U.S.C. § 1106(b)[3] and that the defendants' conduct breached the general fiduciary standards of loyalty and care due under ERISA, 29 U.S.C. §§ 1104(a)(1)(A) and (B).[4]

The Trustees present two theories of liability to support their allegations.  First, they

---

[3] 29 U.S.C. § 1106(b) provides in pertinent part:

> **Transactions between plan and fiduciary.**  A fiduciary with respect to a plan shall not – (1) deal with the assets of the plan in his own interest or for his own account . . . [or] (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

[4] 29 U.S.C. §§ 1104(a)(1)(A) and (B) provide in pertinent part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A) for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> >
> > (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

- 11 -

propose a functional approach to defining ERISA "plan assets" and argue that, under that approach, the payments at issue constitute plan assets that are being retained by Nationwide in violation of ERISA.  Second, the Trustees argue that Nationwide violates ERISA by "generat[ing] the revenue-sharing payments by agreeing with mutual fund families that it will offer their funds in its variable accounts and that, in return, the mutual fund families will pay to Nationwide a percentage of the Plans' investments in their funds."  Pl. Supp. Response (doc. # 246) at 1.  In other words, the Trustees contend that Nationwide engages in a *quid pro quo* arrangement with the mutual funds, agreeing to include their funds as investment options for the Plans in exchange for the revenue-sharing payments.

Nationwide disputes the characterization of the challenged payments as "plan assets" and the extent, if any, of its fiduciary duties.

I conclude that the Trustees have raised triable issues of fact with respect to Nationwide's status as a fiduciary, their claim that the challenged payments constitute "plan assets" under a functional approach, and the character of the so-called service contracts as prohibited transactions.  Accordingly, I deny Nationwide's motion for summary judgment.

A.     Is Nationwide an ERISA Fiduciary with Respect to the Plans?

"In every case charging breach of ERISA fiduciary duty . . . the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether the person was acting as a fiduciary (that is, was performing a fiduciary function)."  *Pegram v. Herdrick*, 530 U.S. 211, 226 (2000).

The Trustees' claims hinge on whether Nationwide is an ERISA fiduciary with respect to the Plans, and if so, whether the challenged conduct was performed when Nationwide was acting

as a fiduciary.  Nationwide argues that it is not a fiduciary or, even if it were, that its fiduciary

function is limited to its authority or control over the accumulation units.  Def. Supp. Reply

Memo. (doc. # 249) at 4-9.  The parties agree that Nationwide is not a fiduciary for all purposes.

Under ERISA, to be a plan's fiduciary, a person or entity must be acting in the capacity of

the plan's manager, financial advisor, or administrator.  29 U.S.C. § 1002(21)(A)(i)-(iii).  *See*

*also Pegram*, 530 U.S. at 222.  Specifically, the statute sets forth that a person is a fiduciary with

respect to a plan *to the extent* that:

> (i) he exercises any discretionary authority or discretionary control respecting
> management of such plan or exercises any authority or control respecting
> management or disposition of its assets, (ii) he renders investment advice for
> a fee or other compensation, direct or indirect, with respect to any moneys or
> other property of such plan, or has any authority or responsibility to do so, or
> (iii) he has any discretionary authority or discretionary responsibility in the
> administration of such plan.

29 U.S.C. § 1002(21)(A)(i)-(iii).

Congress intended the term "fiduciary" to be "broadly construed."  *Blatt v. Marshall &*

*Lassman*, 812 F.2d 810, 812 (2d Cir. 1987) (citing Congressional Record).  Formal titles are not

dispositive of fiduciary status; rather, courts use a functional test in determining whether an

individual or entity is an ERISA fiduciary, and if so, to what extent.  *Id.  See also Mertens v.*

*Hewitt Assoc.*, 508 U.S. 248, 262 (1993) ("ERISA . . . defines 'fiduciary' not in terms of formal

trusteeship, but in functional terms of control and authority over the plan.").  Under the

functional approach, the court considers whether the entity has performed one or more of the

roles described in 29 U.S.C. § 1002(21)(A).  "[F]iduciary status exists with respect to any

activity enumerated in the statute over which the entity exercises discretion or control."  *Blatt*,

812 F.2d at 812.

- 13 -

Courts have focused on the differences between ERISA fiduciaries and common law trustees, emphasizing the limiting effect of the statutory phrase "to the extent." *See F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987) ("[A] person may be an ERISA fiduciary with respect to certain matters but not others, for he has that status only 'to the extent' that he has or exercises the described authority or responsibility."). *See also Harris Trust and Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir. 2002) (same). In short, courts construing ERISA have held that an entity can be a fiduciary with respect to a plan for some purposes, but not others. *See, e.g.*, *Pegram*, 530 U.S. at 225 (comparing a common law trustee, who may only wear his "fiduciary hat" when taking action that affects a beneficiary, with an ERISA fiduciary who "may wear different hats").

The Trustees have argued that once an entity's fiduciary status is established based on its conduct with respect to particular assets, all conduct related to those assets is subject to a fiduciary duty. Pl. Supp. Response (doc. # 246) at 13. Their argument is not grounded in the case law construing ERISA. Those decisions hold consistently that fiduciary duties are linked to actions, not particular assets. "Fiduciary duty and prohibited transaction rules apply only to decisions by an [entity] acting in its fiduciary capacity." *Flanigan v. General Elec. Co.*, 242 F.3d 78, 87 (2d Cir. 2001). In *Flanigan*, the Second Circuit held that, although an employer was an ERISA fiduciary for some purposes, its decision to spin off a division along with the division's pension plan was a corporate business decision, not one of a plan administrator, and thus did not trigger general fiduciary duties. *Id.* at 88.

The Trustees have produced evidence that would permit a reasonable fact-finder to conclude that Nationwide is a fiduciary to the extent it exercises authority or control over the

- 14 -

disposition of retirement contributions that are represented by the accumulation units (shares) in the variable accounts.  Investment in mutual funds is one method of disposition of those plan assets, and Nationwide exercises some control over the selection and offering of particular mutual funds as investment options for the Plans and participants.[5]  *Cf. Harris Trust and Savings Bank*, 302 F.3d at 28 (concluding that "the 'management or disposition' language in ERISA refers to the common transaction in dealing with a pool of assets: selecting investments . . . .").

Although Nationwide's authority or control over the disposition of plan assets is indirect, the Second Circuit has considered other attenuated actions sufficient "control over plan assets" to deem the actor an ERISA fiduciary.  *See Blatt*, 812 F.2d at 813 (holding that accounting firm was an ERISA fiduciary because its refusal to sign and deliver to a former employee a form required for him to receive a distribution from the plan was an exercise of actual control over the disposition of plan assets).  *Cf. Brock v. Hendersott*, 840 F.2d 339, 342 (6th Cir. 1988) (holding that a high-ranking union representative who used his "considerable influence" over local unions to direct them to choose a particular dental plan was an ERISA fiduciary because of his exercise of authority or control over the disposition of plan assets); *Stanton v. Shearson/Lehman American Express, Inc.*, 631 F. Supp. 100, 105 (N.D. Ga. 1986) (holding that a brokerage firm acts as an ERISA fiduciary "when it exercises authority or control over the broker assigned to the ERISA account; since the broker's employment respects the disposition of ERISA assets, control over the broker is control respecting the disposition of those assets").  Furthermore, the Second

---

[5] Nationwide may not be a fiduciary with respect to the individual contract holders because it may not have authority to change their investment options.  *See* Def. Memo. Supp. Motion to Dismiss (doc. # 15) at 12 (arguing that none of the individual annuity contracts contain the share substitution clause).

Circuit has noted that "[a]n entity need not have absolute discretion with respect to a benefit plan in order to be considered a fiduciary." *Blatt*, 812 F.2d at 812.

Viewing the evidence in the light most favorable to the Trustees, a reasonable jury could conclude that Nationwide exercises authority or control respecting disposition of plan assets by controlling which mutual funds are available investment options for the Plans and participants. Although Nationwide does not invest the pension contributions in particular mutual funds, Nationwide does exercise some control over the selection of mutual funds that are available for the Plans' and participants' investments.[6] *Cf.* Department of Labor ("DOL") Advisory Opinion 97-16A, 1997 WL 277979 ("It is the view of the Department that a person would not be exercising discretionary authority or control over the management of a plan or its assets solely as a result of deleting or substituting a fund from a program of investment options and services offered to plans, *provided that the appropriate plan fiduciary in fact makes the decision to accept or reject the change*.") (emphasis added); DOL Advisory Opinion 97-15A, 1997 WL 277980 (noting that bank serving as trustee to ERISA plans may be exercising discretionary authority or control to cause plans to invest in mutual funds because it reserved the right to add or remove mutual funds families available for plans' investment).

Accordingly, Nationwide may be a fiduciary to the extent that it exercises authority or

---

[6] The fact that Nationwide's control may be limited to deleting and substituting mutual funds from a list of funds approved by the Plans does not defeat the plaintiffs' claims. For example, if Nationwide removed as investment options all mutual funds that refused to share revenue with it, only those mutual funds that had agreed to make revenue-sharing payments would be available to the Plans and participants. Under those circumstances, which are consistent with the allegations of the fourth amended class complaint, there is a genuine issue whether Nationwide was exercising control or authority over the disposition of plan assets even if its control or authority was limited to deleting and substituting funds that were initially approved by the Plans.

control over plan assets by determining and altering which mutual funds are available for the Plans' and participants' investments.

The Trustees have argued that Nationwide is also a fiduciary because it exercises authority or control over the accumulation units by transferring them for use as collateral for loans and by cancelling them to pay its fees, to pay taxes, to transfer investments from one mutual fund to another, to pay loans, to purchase annuities, and to make cash payments.  Pl. Supp. Response (doc. # 246) at 4.  The Trustees point to the language of 29 U.S.C. § 1002(21)(A)(i) and emphasize that an entity may be a fiduciary because it exercises *any* authority or control over the disposition of plan assets, regardless of whether such authority or control is *discretionary*.  *Id.* at 6-11.

Nationwide's actions with respect to the transfer or cancellation of accumulation units are governed by specific contractual provisions or requests made by the Plans and participants. Thus, it appears that Nationwide's resulting ministerial acts and its custody of the accumulation units may not amount to "authority or control . . . over plan assets."  *See, e.g.*, *Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 18 (1st Cir. 1998) (reasoning that "the mere exercise of physical control or the performance of mechanical administrative tasks generally is insufficient to confer fiduciary status").  The Trustees attempt to distinguish that decision on the ground that the court did not adequately consider the distinction between: (a) exercising *discretionary* authority or discretionary control respecting plan management, and (b) exercising *any* authority or control respecting management or disposition of plan assets, as set forth in section 1002(21)(A)(i). Several courts have glossed over that distinction and have considered only whether a defendant exercised discretionary control, not whether the defendant exercised any control over plan assets.

- 17 -

*Coldesina v. Estate of Simper*, 407 F.3d 1126, 1132 n.1 (10th Cir. 2005) (noting that such an approach is unpersuasive and cannot be reconciled with the clear statutory language).

It is not necessary for me to decide, however, whether Nationwide's treatment of the accumulation units gives rise to functional fiduciary status under 29 U.S.C. § 1002(21)(A)(i). The Trustees' claims regarding the contractual arrangements with mutual funds do not relate to Nationwide's transfer or cancellation of accumulation units.  As discussed above, an entity only owes a fiduciary duty to the extent that it exercises the control or authority described in section 1002(21)(A)(i).  Because the conduct at issue in the present action does not relate to the treatment of accumulation units, whether Nationwide is a fiduciary to the extent that it transfers or cancels those units is irrelevant to the Trustees' claims.

   B.      Are the Revenue-Sharing Payments "Plan Assets"?

Because the Trustees have raised triable issues of fact concerning Nationwide's status as a fiduciary, it is necessary to consider whether they have also raised triable issues concerning whether Nationwide's conduct violates ERISA.  ERISA prohibits plan fiduciaries from "deal[ing] with assets of the plan in [their] own interest or for [their] own account" or "receiving any consideration for [their] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. §§ 1106(b)(1) & (3). Consequently, if Nationwide is a fiduciary, the conduct at issue only violates section 1106(b) if it involves "assets of the plan."

The parties have focused their dispute in large part on defining ERISA "plan assets" and determining whether the payments made by mutual funds to Nationwide constitute plan assets. The Trustees argue that a functional approach should be used and, applying that approach,

conclude that the revenue-sharing payments are plan assets retained by Nationwide in violation of ERISA.

ERISA provides no explicit definition of "plan assets."  *See Acosta v. Pacific Enterprises*, 950 F.2d 611, 620 (9th Cir. 1992).  No regulation or case law provides a definition of "plan assets" that answers whether fees, arguably received in exchange for services provided, that are paid to an ERISA fiduciary in connection with its fiduciary functions and that may be at the expense of a plan, constitute plan assets.

The statute does provide some guidance to courts considering whether investments are "the assets of [a] plan":

> In the case of a plan which invests in any security issued by an investment company registered under the Investment Company Act of 1940, the assets of such plan shall be deemed to include such security but shall not, solely by reason of such investment, be deemed to include any assets of such investment company.

29 U.S.C. § 1101(b)(1).

With respect to participant contributions and plan investments in other entities, DOL regulations set forth rules for determining what constitutes "plan assets."  The regulations provide that "the assets of the plan include amounts (other than union dues) that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution to the plan . . . ."  29 C.F.R. § 2501.3-102(a).  Concerning plan investments, "[g]enerally, when a plan invests in another entity, the plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity . . . ."  29 C.F.R. § 2510.3-101(a)(2).

When determining whether items not covered by the statute or regulations are "plan

assets" under ERISA, courts have used two approaches: (1) a documentary test, focusing on the documents governing the plan and the relationships between the parties; and (2) a functional test, focusing on whether the item in question may be used to benefit the fiduciary at the expense of plan participants or beneficiaries. *See Metzler v. Solidarity of Labor Organizations Health & Welfare Fund*, 1998 WL 477964, *5 (S.D.N.Y. Aug. 14, 1998), *aff'd sub nom. Herman v. Goldstein*, 224 F.3d 128 (2d Cir. 2000).

The parties agree that the assets of the mutual funds – from which the revenue-sharing payments are made – do not constitute ERISA plan assets as a matter of law, 29 U.S.C. § 1101(b)(1), and there are no Plan documents that suggest that the mutual fund payments are plan assets. The Trustees, however, rely on cases that have used a functional approach to defining "plan assets" and propose a three-factor functional test for defining ERISA plan assets to argue that the payments to Nationwide constitute such assets.

In short, the Trustees argue that the revenue-sharing payments constitute ERISA plan assets under their functional approach because: (1) they would not have been made but for the Plans' investments through Nationwide, (2) Nationwide did not contract with the Plan to receive the payments despite the opportunity to do so, and (3) the payments could be used for the benefit of the Plans and the participants. Pl. Memo. Opp. Summ. J. (doc # 205) at 15.[7] The plaintiffs cite to no decision that proposes or uses such a test, and I decline to adopt it.

The plaintiffs appear to derive the proposed factors from *Acosta*, in which the Ninth

---

[7] In their most recent memorandum in response to Nationwide's motion for summary judgment, the plaintiffs cite to their earlier opposition brief, and appear to adhere to the formulation of the functional approach that is set forth there. *See* Pl. Supp. Response (doc. # 246) (citing Pl. Memo. Opp. Summ. J. (doc # 205)).

Circuit discussed – but did not decide – whether a list of participants/shareholders should be treated as a plan asset under ERISA. In *Acosta*, the Ninth Circuit refused to cabin the term "assets of the plan" as encompassing only financial contributions received by the plan administrators, but did not set forth a three-part test. 950 F.2d at 620. The Ninth Circuit referred to the need for a more "functional approach," and mentioned that in determining "whether a particular item constitutes an 'asset of the plan,' it is necessary to determine whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries." *Id.* The court ultimately held that it was not necessary to determine whether the list constituted a plan asset and thus never applied the approach. *Id.*

The Trustees also cite *Patelco Credit Union v. Sahni*, 262 F.3d 897, 902 (9th Cir. 2001), and *Bannistor v. Ullman*, 287 F.3d 394 (5th Cir. 2002), in support of their argument that the payments to Nationwide should be considered plan assets under a functional approach. Neither the reasoning nor the facts of those cases suggest the applicability of a three-part functional test for defining plan assets.

In *Patelco*, the Ninth Circuit relied on *Acosta*, including its instruction that "plan assets" as used in 29 U.S.C. § 1106(b) should be broadly construed. The court reasoned that benefits checks that may be used to benefit the fiduciary at the expense of plan participants constitute "assets of the plan." *Patelco*, 262 F.3d at 908-09. In that case, the defendant – an ERISA fiduciary who managed a health and medical benefits plan – argued that an insurer's checks for stop-loss benefits were not plan assets. The defendant relied on DOL Advisory Opinion 92-02A, 1992 WL 15175, for the proposition that a stop-loss policy was intended to protect the employer not its employees and thus could not be a plan asset. *Id.* at 908. The court rejected the argument,

holding that the benefits checks were plan assets because "the stop-loss policy protects employees by ensuring that benefits will be available even in the case of catastrophic losses." *Id.* at 908. The court held that the defendant, who received the two benefits checks directly from the insurer, deposited them, but failed to account for them, violated 29 U.S.C. § 1106(b)(1). *Id.* at 911.

In *Bannistor*, the Fifth Circuit noted that ERISA does not define "plan assets," but relied on DOL regulations and related case law to hold that the term "plan assets" includes "employee contributions that are withheld from employees' paychecks and for deposit into their benefit plans, even though the contributions have not actually been delivered to the benefit plan." *Bannistor*, 287 F.3d at 402 (citing 29 C.F.R. § 2510.3-102).

Because of Congress' remedial concerns, the Second Circuit has held that section 1106(b) must be "broadly construed . . . and that liability be imposed even where there is no taint of scandal, no hint of self-dealing, no trace of bad faith." *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987) (internal quotations and citations omitted). Following that guidance, I conclude that a functional approach to defining "plan assets" is appropriate. *See Metzler*, 1998 WL 477964 at *7 (concluding that fees retained by fiduciary were plan assets under a functional perspective). The three-part test proposed by the Trustees, however, is overly broad.

First, as discussed above, an entity that is a fiduciary under ERISA, 29 U.S.C. § 1002(21)(A)(i)-(iii), is not always subject to the statute's general fiduciary duties. *See, e.g.*, *Pegram*, 530 U.S. at 225. It is easy to conceive of payments that Nationwide would not receive but for a Plan's investments, yet not while wearing its "fiduciary hat." For example, if

Nationwide offered term life insurance to all Plan participants, the insurance premiums paid to Nationwide by those accepting the offer would not have been made but for the Plans' investments through Nationwide. Such payments, however, would not implicate Nationwide's role as an ERISA fiduciary. A functional approach, thus, must take into account whether the entity receives payments as a result of its fiduciary function rather than whether payments would not be made but for a Plan's investment.

Second, the question whether a fiduciary contracted with a Plan to receive benefits does not illuminate whether the benefits at issue are plan assets, although it may be relevant to whether the fiduciary is entitled to their receipt. Accordingly, it is not necessary to consider such a contract as part of a functional test for defining plan assets.

Third, courts that have referred to or applied a functional approach have considered whether the items in question could be used to benefit the fiduciary *at the expense of* plan participants or beneficiaries. *See Acosta*, 950 F.2d at 620; *Metzler*, 1998 WL 477964 at *7. The third prong of the plaintiffs' test, however, asks merely whether the payments could be used for the benefit of the Plans and the participants, not whether the payments are made at their expense. Theoretically, any money received by Nationwide could be used to benefit the Plans or participants, but an ERISA problem arises only if that money is received by Nationwide at the expense of the Plans or participants.

Although I reject the Trustees' proposed three-part functional approach for defining plan assets, an alternative functional approach appears consistent with both the reasoning of decisions that embrace a broad interpretation of "plan assets," and Congress' remedial purposes in adopting ERISA. I conclude that "plan assets" include benefits a defendant receives: (1) as a

result of its exercise of fiduciary discretion or authority, and (2) at the expense of plan participants or beneficiaries. This two-pronged test conforms to the approach outlined by the Ninth Circuit in *Acosta*, where the first prong (*i.e.*, the relationship between the receipt of the benefit and the entity's fiduciary function) was implied, and the second prong was explicit.

Tested against this functional approach, the Trustees' claims survive Nationwide's motion for summary judgment. The plaintiffs have alleged that Nationwide receives payments from mutual funds in exchange for offering the funds as an investment option to the Plans and participants, *i.e.*, while exercising authority or control over the disposition of the retirement contributions, a fiduciary function. As discussed above, there is evidence in the record in support of that allegation.

In addition, the Trustees have alleged that the payments were made at the expense of the Plan participants or beneficiaries. Specifically, the fourth amended complaint alleges that the mutual funds set the fees they charged Plans and participants "to cover not only the fees they would have normally charged, but also the amount of the revenue-sharing payments they had to make to Nationwide." Fourth Am. Compl. (doc. # 235) at 8, ¶ 31.

The plaintiffs have not pointed to any record evidence to support that allegation – a requirement under the second prong of the functional approach set forth above. In Nationwide's class certification briefing, the defendants point to evidence that the mutual fund charges actually decreased after Nationwide entered into the service contracts with the funds. *See* Def. Opp. to Class Certif. (doc. # 179-1) (citing Ex. 20(B)). Ordinarily the absence of evidence supporting an essential element of plaintiffs' claim would be fatal at summary judgment. *See Celotex*, 477 U.S. at 333 n.3 (noting that "[o]nce the moving party has attacked whatever record evidence – if any –

- 24 -

the nonmoving party purports to rely upon, the burden of production shifts to the nonmoving

party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2)

produce additional evidence showing the existence of a genuine issue for trial as provided in

Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided

in Rule 56(f)").  Nevertheless, because Nationwide's motion is almost entirely based on

questions of law, and because I have adopted a functional approach different than that proposed

by the Trustees, their claim that the revenue payments constitute plan assets survives the present

motion.

Moreover, the Trustees' claims are not entirely dependent on their theory that the

challenged payments are plan assets.  If Nationwide is an ERISA fiduciary, it may not engage in

prohibited transactions even if the payments Nationwide receives are not themselves plan assets.

C.    Did Nationwide Engage in a Prohibited Transaction?

ERISA bars fiduciaries from engaging in certain transactions, prohibiting a fiduciary from

receiving "any consideration for his own personal account from any party dealing with such plan

in connection with a transaction involving assets of the plan."  29 U.S.C. § 1106(b)(3).

Violations of section 1106(b)(3) must relate to transactions involving assets of the plan,

although the consideration received by the fiduciary need not itself constitute plan assets.  The

transactions at issue here are Nationwide's contractual arrangements with the mutual funds.

Those contracts involve the plaintiffs' shares in Nationwide variable accounts – indisputably plan

assets – or their proxies, the so-called accumulation units, because they are premised on the

offering of the mutual funds as investment options for those plan assets.

Viewing the evidence in the light most favorable to the Trustees, a reasonable fact-finder

could conclude that Nationwide received consideration (*i.e.*, the revenue-sharing payments) from a party dealing with the Plans (*i.e.*, the mutual funds whose shares are available for investment by the Plans and participants) in connection with a transaction (*i.e.*, the so-called service contracts) involving assets of the plan (*i.e.*, the shares of the variable accounts, represented by the accumulation units).  Several DOL Advisory Opinions have addressed similar – though not identical – facts, and their conclusions lend support to the Trustees' claim.  In Advisory Opinion 2003-09A, the DOL considered whether a trust company that provided trustee and non-fiduciary services to ERISA plans and received 12b-1 or subtransfer fees from mutual funds for services in connection with investment in the mutual funds by those plans was in violation of 29 U.S.C. §§ 1106(b)(1) or 1106(b)(3).  The DOL concluded that it was not.  The DOL specifically noted that the trustee company "has no role with respect to the selection of investment options beyond requiring . . . that at least one Proprietary Fund is offered . . . for investment" and assumed that the fees were, in fact, for services.  Similarly, Advisory Opinions 97-15A and 97-16A assumed that the payments were in consideration, at least in part, for actual services.  Here the Trustees have raised a triable issue concerning whether Nationwide in fact performed services in consideration for the payments.

The existence of genuine issues of fact preclude me from granting Nationwide's motion for summary judgment relating to the plaintiffs' claims that Nationwide's "service contracts" constitute prohibited transactions in violation of section 1106(b)(3).

## V.    Conclusion

A rational fact-finder, viewing the evidence in the light most favorable to the Trustees, could find that Nationwide's ability to select, remove, and replace the mutual funds available for

the Plans' investment constituted discretionary authority or discretionary control respecting

disposition of plan assets, and thus that Nationwide is an ERISA fiduciary.  The Trustees have

also raised triable issues concerning whether the challenged payments constitute plan assets

under a functional approach and whether, even if the revenue-sharing payments do not constitute

plan assets, Nationwide's service contracts constitute prohibited transactions.  Accordingly,

Nationwide's motion for summary judgment (doc. # 116) is DENIED.

It is so ordered.

Dated at Bridgeport, Connecticut, this 24th day of February 2006.


    /s/ Stefan R. Underhill
        Stefan R. Underhill
        United States District Judge