## Page 1

**UNITED STATES DISTRICT COURT**
**STATE OF CONNECTICUT**

LOU HADDOCK, AS TRUSTEE OF THE
FLYTE TOOL & DIE, INCORPORATED
DEFERRED COMPENSATION PLAN, PETER
WIBERG, AS TRUSTEE OF THE CROWN
TOOL & DIE DEFERRED COMPENSATION
PLAN, ALLEN GOUSE, AS TRUSTEE OF THE
GREATER HARTFORD EASTER SEAL
REHABILITATION CENTER DEFERRED
COMPENSATION PLAN, RONALD SIMON,
AS TRUSTEE OF THE HARTFORD
ROOFING, INC. DEFERRED
COMPENSATION PLAN, CARL ANDERSON
FOR THE ANDERSON & FERDON
DEFERRED COMPENSATION PLAN
vs.
NATIONWIDE FINANCIAL SERVICES, INC.,
AND NATIONWIDE LIFE INSURANCE CO.

: 3:01CV1552(CFD)
:
:
:
:
:
:
:
:
:
:
: DEPOSITION
: HELD
: AT WINDSOR, CT
: THURSDAY
: FEBRUARY 13, 2003

**DEPOSITION OF: ALLEN GOUSE**

APPEARANCES:

LAW OFFICES OF KOSKOFF, KOSKOFF & BIEDER
  Attorneys for the Plaintiffs
  P.O. Box 1661
  350 Fairfield Avenue
  Bridgeport, CT 06604
  (203) 336-4421
BY: MICHAEL A. STRATTON, ESQ.

LAW OFFICES OF LEBOEUF, LAMB, GREENE & MACRAE
  Attorneys for the Defendants
  125 West 55th Street
  New York, NY 10019-5389
  (212) 424-8107
BY: CHARLES C. PLATT, ESQ.
    GEORGE E. ANHANG, ESQ.

## Page 2

... deposition of ALLEN GOUSE, a witness, taken on behalf of the DEFENDANTS, NATIONWIDE FINANCIAL SERVICES, INC., AND NATIONWIDE LIFE INSURANCE CO., in the herein before entitled action, pursuant to the Federal Rules of Civil Procedure, before Heather A. Pellerin, duly qualified Notary Public in and for the State of Connecticut and Commonwealth of Massachusetts, held at the EASTER SEALS REHAB CENTER, 100 DEERFIELD ROAD, WINDSOR, CT, 11:12 a.m. On THURSDAY, FEBRUARY 13, 2003.

**STIPULATIONS**

It is hereby stipulated and agreed by and among counsel for the respective parties that all formalities in connection with the taking place of this deposition, including time, place, sufficiency of notice, and the authority of the officer before whom it is being taken may be and are hereby waived.

It is further stipulated and agreed that objections other than as to form are reserved to the time of trial.

It is further stipulated and agreed that the reading and signing of said deposition by the witness is hereby waived.

It is further stipulated that the proof of the qualifications of the Notary Public before whom the deposition is being taken is hereby waived.

## Page 3

**INDEX**

**ALLEN GOUSE**

| DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|
| 5* | | | |

*By Mr. Platt
**By Mr. Stratton
**By Mr. Anhang

| DEFENDANT'S EXHIBITS | PAGE |
|---|---|
| Exhibit 1, Second Amended Class Action Complaint | (premarked) |
| Exhibit 2, 30(b)6 Deposition Notice | (premarked) |
| Exhibit 3, Request of Production | (premarked) |
| Exhibit 4, Production Document | (premarked) |
| Exhibit 5, Unmentioned Document | (premarked) |
| Exhibit 6, Prototype Agreement | 46 |
| Exhibit 7, Employee Directed Qualified Plan Enrollment Form | 48 |
| Exhibit 8, Prototype Money Purchase Plan | 54 |
| Exhibit 9, Summary of Plan Description | 61 |
| Exhibit 10, Summary of Plan Description | 62 |
| Exhibit 11, Future Benefits Document | 67 |
| Exhibit 12, August 5th, 1993 Letter | 71 |
| Exhibit 13, Appointment of Contract Holder's Authorized Representative | 73 |
| Exhibit 14, Arranger Document | 80 |
| Exhibit 15, Application for Group Annuity Contract | 82 |
| Exhibit 16, Variable Annuity Contract | 84 |
| Exhibit 17, Best of America Document | 85 |

## Page 4

| | |
|---|---|
| Exhibit 18, Multipage Document | 89 |
| Exhibit 19, Best of America Document | 98 |
| Exhibit 20, February 3rd, 1997 Letter | 100 |
| Exhibit 21, May 15th, 1998 Application | 101 |
| Exhibit 22, Certificate of Resolution | 117 |
| Exhibit 23, Appointment and Verification Document | 118 |
| Exhibit 24, Investment Option Addition Request | 122 |
| Exhibit 25, The Pension Service, Inc. Valuation | 129 |
| Exhibit 26, February 9th, 1999 Document | 129 |
| Exhibit 27, Transaction Confirmation Document | 130 |
| Exhibit 28, Insurance Information for Producing Form | 130 |
| Exhibit 29, March 22nd, 1998 Letter | 130 |
| Exhibit 30, Prospectus | 145 |
| Exhibit 31, April 6th, 1999 Memorandum | 185 |
| Exhibit 32, Retainer Agreement | 187 |
| Exhibit 33, Retirement Plan Changes Effective February 1st, 1994 | 198 |
| Exhibit 34, The Pension Service Valuation | 198 |

| Marked questions | Page: |
|---|---|
| | 31 |
| | 32 |
| | 49 |
| | 61 |
| | 112 |

[EXHIBIT A stamp]

East Hartford, CT 06108   41
(860) 291-9191

```
 2 :46:18  1  by Nationwide's representative. Who is Nationwide's
           2  representative?
           3     A.   The interactions were with -- I believe the names are
           4  Tom Hiten, H-I-T-E-N, and I believe the individual's name is Kevin
2:1'          Grenham, G-R-E-N-H-A-M.
           6     Q.   Where were they employed?
           7     A.   The firm is out of Cheshire, Connecticut.
           8     Q.   You don't remember the name?
           9     A.   I do not remember the name of their company, but on the
2:17:27:00 10 statements we received they were listed as representatives of
          11  Nationwide and so, for me, the name of their firm really did not
          12  matter.
          13     Q.   Now, are you aware of the claims that you are bringing
          14  in this lawsuit?
12:17:51:24 15    A.   I am aware of the claims that I am bringing in this
          16  lawsuit as part of the class action suit.
          17     Q.   What claims are you bringing?
          18     A.   The claim is made that Nationwide had arrangements
          19  with mutual funds it offered to our plan and the plans of others in
12:18:19:06 20 the class action suit for which Nationwide received fees from those
          21  mutual funds.
          22     Q.   Are you claiming anything else?
          23     A.   There have been other elements that were in the original
          24  filing. Those other elements have been removed at this time.
12:19:05:04 25    Q.   And what is it about the arrangements or the fees that
```

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

972 Tolland Street
East Hartford, CT 06108   42
(860) 291-9191

```
12 :08:00  1  you believe wrongful?
           2     A.   Those fees were not disclosed to our plan or to me, as
           3  our trustee.
           4     Q.   And you believe they should have been disclosed?
12:19:43:03 5     A.   I am unclear as to why they would not have been
           6  disclosed to me.
           7     Q.   Was anything about those fees disclosed to the Easter
           8  Seals plan or to you as trustee?
           9     A.   I do not recall receiving any disclosure regarding any
12:20:00:24 10 fees.
          11     Q.   Did -- when you say "any fees," do you mean fees from
          12  the mutual funds or any other fees?
          13     A.   I will be precise in my answer. Yes, I was informed of
          14  a pension administrator fee that Mr. Hiten or Mr. Grenham or
12:20:29:09 15 another individual's company might have been receiving from us.
          16            MR. STRATTON:   Is that Nutmeg Securities?
          17            THE WITNESS:   Thank you. In the ballpark range of
          18  about $5,000 as an annual fee. I am aware of discussion with
          19  regard to the administrative fees, where I personally have
12:21:05:15 20 called and asked about it, so that I can tell you I am quite
          21  aware of those.
          22     Q.   (By Mr. Platt)  What were those fees?
          23     A.   They were represented as a periodic administrative fee
          24  that was required.
12 :17:27 25    Q.   Who is that fee paid to?
```

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

Niziankiewicz & Miller Reporting Services
972 Tolland Street
East Hartford, CT 06108   43
(860) 291-9191

```
12 :19:01  1     A.   All I know is that on statements it showed as a $12 fee.
           2     Q.   Who was it paid to, do you know?
           3     A.   I could not tell you. It simply showed as a fee.
           4     Q.   Were there any other fees you are aware of besides the
12:21:39:15 5  pension administrator fee, the administrative fee, and the fees
           6  that you say Nationwide received from mutual funds?
           7     A.   Until such time as I contacted either Mr. Hiten or
           8  Mr. Grenham, I could not tell you which individual, but in their
           9  capacity as third-party administrator, to determine this surrender
12:22:11:03 10 fee, I was not aware of that because until such time I had been
          11  assured there were no other fees, other than the pension
          12  administrator fee and the $12 administrative fee. Upon questions
          13  to one of those individuals with regard to the surrender fee, it
          14  was then disclosed to me that, yes, it did exist.
12:22:49:25 15    Q.   When you say "it" did exist, you are talking about the
          16  surrender fee?
          17     A.   Yes.
          18     Q.   When did you talk to Mr. Hiten and/or Mr. Grenham
          19  about this?
12:22:58:01 20    A.   I could not give you an exact time frame, but I would
          21  assume it would have been very early in the tenure of my
          22  trusteeship simply because the issue would have immediately come up
          23  and former employees would have suddenly been surprised by a fee.
          24     Q.   So we have identified a pension and administration fee
12:23:18:09 25 that Mr. Hiten and Mr. Grenham received. You have identified an
```

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

Niziankiewicz & Miller Reporting Services
972 Tolland Street
East Hartford, CT 06108   44
(860) 291-9191

```
 2 :22:07  1  administrative fee of $12. You have identified a surrender fee.
           2  Are there any other fees besides the fees that you say that
           3  Nationwide received from the mutual funds?
           4     A.   That were disclosed to me?
2:23:34:27 5     Q.   That were disclosed to you.
           6     A.   That were disclosed by Nationwide to me?
           7     Q.   By anyone.
           8     A.   There were no other fees that were disclosed by
           9  Nationwide to me.
12:23:44:16 10    Q.   Are there any other fees that you became aware of at
          11  some later time?
          12     A.   Yes, there were.
          13     Q.   What other fees did you become aware of?
          14     A.   I received word that the plan was assessed a fee by
12:24:01:25 15 Nationwide. It was a percentage of the plan assets, and I was --
          16  received disclosure of fees that were paid by the mutual funds to
          17  Nationwide.
          18     Q.   Before we get to the fees paid by the mutual funds to
          19  Nationwide, when did you learn that the plan was assessed a fee by
12:24:46:06 20 Nationwide that was a percentage of plan assets?
          21     A.   That we learned when we were making the decision to
          22  terminate our relationship with Nationwide.
          23     Q.   Was that in 1999?
          24     A.   It could have been late 1998. I could not tell you for
12 :27:21 25 sure, but it was in that time frame.
```

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

```
 1                UNITED STATES DISTRICT COURT
 2                   STATE OF CONNECTICUT
 3   LOU HADDOCK, AS TRUSTEE OF THE
     FLYTE TOOL & DIE, INCORPORATED         : 3:01CV1552(CFD)
 4   DEFERRED COMPENSATION PLAN, PETER      :
     WIBERG, AS TRUSTEE OF THE CROWN        :
 5   TOOL & DIE DEFERRED COMPENSATION       :
     PLAN, ALLEN GOUSE, AS TRUSTEE OF THE   :
 6   GREATER HARTFORD EASTER SEAL           :
     REHABILITATION CENTER DEFERRED         :
 7   COMPENSATION PLAN, RONALD SIMON,       :
     AS TRUSTEE OF THE HARTFORD             :
 8   ROOFING, INC. DEFERRED                 :
     COMPENSATION PLAN, CARL ANDERSON       :
 9   FOR THE ANDERSON & FERDON              : DEPOSITION
     DEFERRED COMPENSATION PLAN             : HELD AT
10   vs.                                    : BRIDGEPORT, CT
     NATIONWIDE FINANCIAL SERVICES, INC.,   : MONDAY
11   AND NATIONWIDE LIFE INSURANCE CO.      : FEBRUARY 24, 2003
12   DEPOSITION OF: HECTOR "LOU" HADDOCK
13   APPEARANCES:
14   LAW OFFICES OF KOSKOFF, KOSKOFF & BIEDER
            Attorneys for the Plaintiffs
15          P.O. Box 1661
            350 Fairfield Avenue
16          Bridgeport, CT  06604
            (203) 336-4421
17   BY:    MICHAEL A. STRATTON, ESQ.
18   LAW OFFICES OF LEBOEUF, LAMB, GREENE & MACRAE
            Attorneys for the Defendants
19          1875 Connecticut Avenue, N.W.
            Suite 1200
20          Washington, DC  20009-5728
            (202) 986-8052
21   BY:    GEORGE E. ANHANG, ESQ.
22
23
24
25
```

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

```
 1      ..... Deposition of HECTOR "LOU" HADDOCK, a witness,
 2   taken on behalf of the DEFENDANTS, NATIONWIDE FINANCIAL
 3   SERVICES, INC., AND NATIONWIDE LIFE INSURANCE CO., in the
 4   herein before entitled action, pursuant to the Federal Rules of
 5   Civil Procedure, before Heather A. Pellerin, duly qualified Notary
 6   Public in and for the State of Connecticut and Commonwealth of
 7   Massachusetts, held at the LAW OFFICES OF KOSKOFF, KOSKOFF &
 8   BIEDER, P.C., Attorneys for the Plaintiffs, 350 Fairfield Avenue,
 9   Suite 501, Bridgeport, CT  06604 at 10:15 a.m. On MONDAY,
10   FEBRUARY 24, 2003.
```

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

```
 1                          INDEX
 2                   HECTOR "LOU" HADDOCK
 3   DIRECT      CROSS      REDIRECT      RECROSS
        *4
 4   *By Mr. Anhang
     **By Mr. Stratton
 5   EXHIBITS                                     PAGE
 6   Exhibit 1, Second Amended Complaint          13
 7   Exhibit 2, Application for Group Annuity     51
 8   Exhibit 3, Application for Group Annuity     56
 9   Exhibit 4, Heritage Group Limited Document   59
10   Exhibit 5, November 29th, 1995 Letter        63
11   Exhibit 6, Payer Designation Form            65
12   Exhibit 7, Payment of Contract Holder's Authorized
13        Representative                          66
14   Exhibit 8, Arranger Proposal                 83
15   Exhibit 9, June 7th, 1997 Letter with Attachments   90
16   Exhibit 10, April 2nd, 1997 Letter           93
17   Exhibit 11, Retainer Agreement               119
18   Exhibit 12, Revenue Sharing on Trial Article 124
```


EXHIBIT B

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

```
 1   HECTOR "LOU" HADDOCK, called as a witness by the defendants,
 2   having first been duly sworn by the Notary, was examined and
 3   testified on his oath as follows:
 4
 5              DIRECT EXAMINATION BY MR. ANHANG:
 6
 7        Q.   Good morning.  Can you state your full name for the
 8   record, please.
 9        A.   My full name is Hector L. Haddock.  I'm known as Lou.
10        Q.   Mr. Haddock, does the L. in Haddock stand for Lou?
11        A.   The "L" in Haddock stands for Lou.
12        Q.   Mr. Haddock, are you employed?
13        A.   Yes, I am.  I run a small company, Flyte Tool & Die.
14        Q.   What is your position with the company now?
15        A.   I'm president.
16        Q.   How long have you been president of Flyte Tool & Die?
17        A.   Since 1989, when we purchased that company.
18        Q.   And as president of Flyte Tool & Die what are your
19   responsibilities?
20        A.   I'm responsible for all the operations of the company,
21   all, we're a manufacturing company, and I'm responsible for
22   everything that goes on in a manufacturing company.
23        Q.   Are you responsible for any accounting matters?
24        A.   Yes, I am, though we have outside accountants that do
25   our books.
```

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

45

A. The answer to that is no. There [are] many well-paid gurus on Wall Street that are supposed to monitor that, and believe me, they make terrible errors.

Q. Mr. Haddock, as trustee of the Flyte plan, was it and is it your responsibility to monitor the performance of each entity who is providing services to the Flyte plan?

A. Yes. I felt that Nationwide was a very well-known and reputable insurance firm. I felt very comfortable when we signed up with Nationwide that I was dealing with a trustworthy company, the investments that they provided. The firms that provided investments such as Fidelity and others were very well known Wall Street investment firms who I felt very comfortable with them holding funds for mutual funds, investments, etc.

MR. STRATTON: When you get a chance can we take a restroom break? A five-minute break, whenever you get a chance?

MR. ANHANG: Can we do it in a couple minutes?

MR. STRATTON: Yes, in a few.

Q. (By Mr. Anhang) Mr. Haddock have you ever been accused of not complying with your trusteeship as of the Flyte plan?

A. No.

Q. Have you ever been accused of not complying with your responsibilities as a fiduciary of the Flyte plan?

A. No.

46

Q. [As] a trustee of the Flyte plan is it your responsibility to bring the kind of lawsuit that you are bringing against the Nationwide defendants in this case?

A. I feel so, yes.

Q. When do you feel it is appropriate to bring lawsuits of this kind on behalf of the Flyte plan?

A. When I discover that there are monies that should be in the participant accounts, today, that are not there.

Q. When you say that there are monies that should be in the participants' accounts and are not there, what monies are you referring to that should have been in the participants' accounts that aren't there because of something Nationwide did?

A. The asset management fees, which are taken off the top, and any return on investment that the mutual funds were sending back to Nationwide.

Q. Mr. Haddock, could you elaborate on what you mean by any return of investment that the mutual fund companies were providing?

A. As I understand, and this is from conversations with our attorneys, the mutual fund companies were returning some of the fees at the end of whatever period it was to Nationwide. Those fees should have been distributed to the participants in all the plans, not just the Flyte plan.

Q. Mr. Haddock, when you say the mutual funds were returning some fees, what fees are you referring to that the mutual

47

funds were returning?

A. From what I understand, from our attorneys, apparently there was a system that a company like Fidelity or Merrill Lynch, whoever has the mutual funds, distributes to corporate sponsors of plans like Nationwide a return of some of the fees that they normally charge at the end of whatever fiscal period they agree on. This was something we did not -- we were not aware of. We knew -- let me just finish -- we knew that mutual funds have fees. That's a standard thing. And we assumed, from my personal experience of having mutual funds, that those fees are fairly small and that the mutual funds charge big BOKU -- the mutual funds only charge people who own mutual funds some fees for the administrative process of it doing the investments.

We did not know, however, that if you're a major player, Nationwide would be in this case, purchasing mutual funds for many participants, that they were giving back some of those fees to Nationwide, and that if they were, it doesn't seem fair to me that Nationwide should keep them because it was the participants' money that was being invested, not Nationwide's.

Now, to finish that, we know those fees are small. As I said, as an investor, I know mutual fund fees are small. We don't think they're large. The individual investor probably wasn't a significant amount of money, but it was their money. It shouldn't have gone to Nationwide who was collecting, in addition to that, an asset management fee, which was outrageous, of 2%.

48

MR. ANHANG: Mr. Stratton, we can take that break you wanted.

(A break was taken at 11:55 a.m.)

(Back on record at 12:05 p.m.)

MR. ANHANG: Back on the record.

Q. (By Mr. Anhang) Mr. Haddock, you testified earlier that you had a conversation with a Regina Frazao of MVA in which you asked her about certain fees that you had been told mutual funds were paying Nationwide; isn't that correct?

A. No. I was not aware that those fees existed. I asked Regina Frazao about the asset management fees, the returns of fees that the mutual funds had been given back to Nationwide wasn't something that we discovered until later on. They were never in the conversations with MVA.

Q. After you discovered, as you say, that there were fees that you say the mutual funds were paying to Nationwide, did you talk to anyone about those fees?

A. Only to our attorneys.

Q. So it is correct then that you never spoke to any of the service providers to the Flyte plan about those fees; is that correct?

A. That is correct.

Q. Did the Flyte plan pay Winbry any money or fees for any services?

A. Not that I am aware of, or rather -- let me change that.

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

Niziankiewicz & Miller Reporting Services
972 Tolland Street
East Hartford, CT 06108
(860) 291-9191

```
                UNITED STATES DISTRICT COURT
                   STATE OF CONNECTICUT

LOU HADDOCK, AS TRUSTEE OF THE
FLYTE TOOL & DIE, INCORPORATED          3:01CV1552(CFD)
DEFERRED COMPENSATION PLAN, PETER
WIBERG, AS TRUSTEE OF THE CROWN
TOOL & DIE DEFERRED COMPENSATION
PLAN, ALLEN GOUSE, AS TRUSTEE OF THE
GREATER HARTFORD EASTER SEAL
REHABILITATION CENTER DEFERRED
COMPENSATION PLAN, RONALD SIMON,
AS TRUSTEE OF THE HARTFORD
ROOFING, INC. DEFERRED
COMPENSATION PLAN, CARL ANDERSON
FOR THE ANDERSON & FERDON                 DEPOSITION
DEFERRED COMPENSATION PLAN                HELD AT
   vs.                                    BRIDGEPORT, CT
NATIONWIDE FINANCIAL SERVICES, INC.,      TUESDAY
AND NATIONWIDE LIFE INSURANCE CO.         MARCH 4, 2003

DEPOSITION OF:  PETER WIBERG

APPEARANCES:

LAW OFFICES OF KOSKOFF, KOSKOFF & BIEDER
     Attorneys for the Plaintiffs
     P.O. Box 1661
     350 Fairfield Avenue
     Bridgeport, CT 06604
     (203) 336-4421
BY:  MICHAEL A. STRATTON, ESQ.

LAW OFFICES OF LEBOEUF, LAMB, GREENE & MACRAE
     Attorneys for the Defendants
     125 West 55th Street
     New York, NY 10019-5389
     (212) 424-8107
BY:  CHARLES C. PLATT, ESQ.
```

Deposition of PETER WIBERG, a witness, taken on behalf of the DEFENDANTS, NATIONWIDE FINANCIAL SERVICES, INC., AND NATIONWIDE LIFE INSURANCE CO., in the herein before entitled action, pursuant to the Federal Rules of Civil Procedure, before Heather A. Pellerin, duly qualified Notary Public in and for the State of Connecticut and Commonwealth of Massachusetts, held at the LAW OFFICES OF KOSKOFF, KOSKOFF & BIEDER, P.C, 350 Fairfield Avenue, Bridgeport, CT 06604, at 9:45 a.m. On TUESDAY, MARCH 4, 2003.

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

Niziankiewicz & Miller Reporting Services
972 Tolland Street
East Hartford, CT 06108
(860) 291-9191                         3  4

## INDEX

### PETER WIBERG

| DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|
| 6* | 150* | 151* | |

*By Mr. Platt
**By Mr. Stratton

**DEFENDANT'S EXHIBITS**                              (premarked)

Exhibit 35, Plaintiff's Second Amended Class Action Complaint
Exhibit 36, Plaintiff's First Amended Class Action Complaint
Exhibit 37, Responses and Objections to Defendant's First Set of Interrogatories
Exhibit 38, Wiberg's Responses and Objections to Defendant's Second Set of Interrogatories
Exhibit 39, Crown Tool and Die Salary Reduction Profit Sharing Plan
Exhibit 40, Summary Plan Description
Exhibit 41, Unknown Exhibit
Exhibit 42, Unknown Exhibit
Exhibit 43, Arranger Proposal for Crown Tool and Die
Exhibit 44, Verification of Receipt of Specimen Group Annuity Contracts
Exhibit 45, Application for Group Annuity Contract
Exhibit 46, Salary Deferral Profit Sharing Plan Trust
Exhibit 47, Unknown Document
Exhibit 48, May 28th, 1992 Letter
Exhibit 49, September 29th, 1993 Letter
Exhibit 50, Nationwide Funds Checklist
Exhibit 51, Group of Documents

Exhibit 52, Appointment of Contract Holder's Authorized Representative
Exhibit 53, February 18th, 1999 Letter
Exhibit 54, March 30th, 1999 Cover Letter with Attached Documents
Exhibit 55, 30(b)6 Notice
Exhibit 56, January 25th, 1999 Letter
Exhibit 57, December 21st, 1999 Letter
Exhibit 58, June 2nd, 2000 Letter
Exhibit 59, April 27th, 2001 Letter
Exhibit 60, February 22nd, 1996 Letter
Exhibit 61, May 1st, 1996 Letter
Exhibit 62, Unknown Document
Exhibit 63, August 7th, 1996 Letter
Exhibit 64, Unknown Document
Exhibit 65, August 9th, 1996 Letter
Exhibit 66, Unknown Document
Exhibit 67, November 10th, 1998 U.S. Department of Labor Document
Exhibit 68, Crown Tool & Die Company Letter to Mr. Benages
Exhibit 69, June 27th, 2000 Department of Labor Document
Exhibit 70, February 13th, 2001 Letter
Exhibit 71, November 29th, 2000 Letter
Exhibit 72, April 18th, 2001 Letter
Exhibit 73, Trust Financial Report
Exhibit 74, Aggregate Report
Exhibit 75, Annual Report

**EXHIBIT C**

```
 1      Q.   Have you ever been -- when did you get your M.B.A.?
 2      A.   It took me six and a half years to do it right, so I
 3   forgot exactly what year about. I graduated about '97, I believe.
 4      Q.   And when did you take your B.S. degree?
 5      A.   I graduated in 1977.
 6      Q.   Have you ever been deposed before?
 7      A.   No.
 8      Q.   Have you ever been a party to a lawsuit before?
 9      A.   No.
10      Q.   Do you understand what this lawsuit is all about?
11      A.   Yes.
12      Q.   What is your claim in this lawsuit?
13      A.   That Nationwide charged, or took charges out of the
14   funds that were not disclosed to me.
15      Q.   And when you say "funds," what do you mean?
16      A.   You mean funds that they took out of it?
17      Q.   I thought your answer was "Nationwide took charges out
18   of funds that were not disclosed to me." What were the funds that
19   you're referring to in your answer?
20      A.   The individual accounts, the mutual funds that people
21   chose in my company to invest their money in.
22      Q.   Let me ask you to look at what we marked already as
23   Defendant's Exhibit 35. That document has on the front, down at
24   the bottom, the heading "Plaintiff's Second Amended Class Action
25   Complaint." Do you recognize that?
```

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

Niziankiewicz & Miller Reporting Services
972 Tolland Street
East Hartford, CT 06108                    11
(860) 291-9191

```
 1      A.   I don't know if I have seen -- I have seen a couple of
 2   documents that were sent to me. They all look the same to me.
 3      Q.   Can you leaf through this and tell me whether you have
 4   ever read this document before?
 5      A.   No.
 6      Q.   You have not read this document before?
 7      A.   No.
 8      Q.   This document has your name on it up in the caption on
 9   the first page. Do you see that?
10      A.   Yes.
11      Q.   Are you bringing this lawsuit as trustee of the Crown
12   Tool & Die deferred compensation plan?
13      A.   Yes.
14      Q.   And is the Crown Tool & Die deferred compensation plan
15   a 401(k) retirement plan?
16      A.   Yes.
17      Q.   Are you bringing this lawsuit on behalf of any other
18   retirement plans?
19           MR. STRATTON:   Objection. Are you asking whether
20   he's a class representative?
21           MR. PLATT:   I'm sorry, no, no, I didn't mean to suggest
22   that.
23           MR. STRATTON:   You're limiting it to his particular --
24           MR. PLATT:   Yes.
25      Q.   (By Mr. Platt) Are you acting as a trustee for any
```

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

Niziankiewicz & Miller Reporting Services
972 Tolland Street
East Hartford, CT 06108                    12
(860) 291-9191

```
 1   other plan in this lawsuit?
 2      A.   No.
 3      Q.   The only trustee that you're acting on behalf of is as
 4   trustee of the Crown Tool & Die deferred compensation plan; is that
 5   correct?
 6      A.   Yes.
 7      Q.   That's the plan that's referred to in this complaint?
 8      A.   Yes.
 9      Q.   Are you bringing any other claims in this lawsuit
10   besides the claim that Nationwide took charges out of funds that
11   were not disclosed?
12      A.   Not to my knowledge.
13      Q.   Do you understand that you're serving as a 30(b)6
14   witness in this deposition?
15      A.   I don't know what that is.
16      Q.   Do you know that you have been designated as the
17   representative of the Crown Tool & Die Company deferred
18   compensation plan to answer certain questions on behalf of the
19   plan?
20           MR. STRATTON:   Well, I'm not trying to lead the
21      witness here. You have been designated by your attorneys as
22      the person most knowledgeable at Crown Tool & Die with
23      regards to the plan and all of its various details, so if
24      that's not true, if there are other -- if somebody else at
25      Crown Tool & Die knows more about the plan than you, let us
```

```
 1      know, but I have designated you as the 30(b)6, which means
 2      you're the most knowledgeable person at Crown Tool & Die.
 3      Q.   (By Mr. Platt) I will take Mr. Stratton's
 4   representation if you don't know what this is all about,
 5   Mr. Wiberg. Is what he said fair?
 6      A.   Yes.
 7      Q.   You have been designated as the most knowledgeable
 8   person --
 9      A.   Yes, I am.
10      Q.   -- at Crown Tool & Die deferred compensation plan --
11      A.   Yes.
12      Q.   -- to answer questions about the plan and things having
13   to do with this lawsuit related to the plan?
14      A.   Yes.
15           MR. STRATTON:   You will have lots of numbers thrown
16      at you today.
17           THE WITNESS:   Yes.
18      Q.   (By Mr. Platt) Have you been asked to produce any
19   documents in connection with this lawsuit?
20      A.   Yes.
21      Q.   Have you produced all the documents in your possession
22   that were responsive to the request?
23      A.   Yes.
24      Q.   Did you personally take care of that, or did you
25   delegate that responsibility to someone else?
```

# HADDOCK -V- NATIONWIDE - EDWARD KAPLAN - 3/11/03

## Page 1 to Page 224

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: NIZIANKIEWICZ & MILLER

*NIZIANKIEWICZ & MILLER*
*972 Tolland St.*
*East Hartford, CT   06108-1533*
*Phone:   860-291-9191*
*FAX:   860-528-1972*


EXHIBIT D

## Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                    STATE OF CONNECTICUT
 3  LOU HADDOCK, AS TRUSTEE OF THE       : 3:01CV1552(CFD)
    FLYTE TOOL & DIE, INCORPORATED
 4  DEFERRED COMPENSATION PLAN, PETER    :
    WIBERG, AS TRUSTEE OF THE CROWN
 5  TOOL & DIE DEFERRED COMPENSATION     :
    PLAN, ALLEN GOUSE, AS TRUSTEE OF THE
 6  GREATER HARTFORD EASTER SEAL         :
    REHABILITATION CENTER DEFERRED
 7  COMPENSATION PLAN, RONALD SIMON,     :
    AS TRUSTEE OF THE HARTFORD
 8  ROOFING, INC. DEFERRED               :
    COMPENSATION PLAN, CARL ANDERSON
 9  FOR THE ANDERSON & FERDON            : DEPOSITION
    DEFERRED COMPENSATION PLAN           : HELD AT
10  vs.                                  : GLASTONBURY, CT
    NATIONWIDE FINANCIAL SERVICES, INC., : TUESDAY
11  AND NATIONWIDE LIFE INSURANCE CO.    : MARCH 11, 2003
12  DEPOSITION OF:  EDWARD KAPLAN
13  APPEARANCES:
14  LAW OFFICES OF KOSKOFF, KOSKOFF & BIEDER
         Attorneys for the Plaintiffs
15       P.O. Box 1661
         350 Fairfield Avenue
16       Bridgeport, CT  06604
         (203) 336-4421
17  BY:  MICHAEL A. STRATTON, ESQ.
18  LAW OFFICES OF LEBOEUF, LAMB, GREENE & MACRAE
         Attorneys for the Defendants
19       125 West 55th Street
         New York, NY  10019-5389
20       (212) 424-8107
    BY:      CHARLES C. PLATT, ESQ.
21
    LAW OFFICES OF LEBOEUF, LAMB, GREENE & MACRAE
22       Attorneys for the Defendants
         One Goodwin Square
23       225 Asylum Street
         Hartford, CT  06103
24       (860) 293-3544
    BY:  DENNIS F. KERRIGAN, JR., ESQ.
25
```

## Page 2

1 ..... Deposition of EDWARD KAPLAN, a witness, taken on
2 behalf of the DEFENDANTS, NATIONWIDE FINANCIAL SERVICES,
3 INC., AND NATIONWIDE LIFE INSURANCE CO., in the herein
4 before entitled action, pursuant to the Federal Rules of Civil
5 Procedure, before Heather A. Pellerin, duly qualified Notary Public
6 in and for the State of Connecticut and Commonwealth of
7 Massachusetts, held at the Offices of Hartford Roofing, 734 Hebron
8 Avenue, Glastonbury, CT, at 9:45 a.m. On Tuesday, March 11, 2003.

## Page 3

```
 1  INDEX
 2  EDWARD KAPLAN
 3  DIRECT CROSS REDIRECT RECROSS
    7*  215** 221*
 4  *By Mr. Platt
    **By Mr. Stratton
 5  ***By Mr. Kerrigan
 6  EXHIBITS Exhibit 84-116 Premarked PAGE
 7  Exhibit 84, Notice of Rule 30(b)6 Deposition of Hartford
 8  Roofing, Inc. Deferred Compensation plan
 9  Exhibit 85, Defendant's First Set of Requests for the
10  Production of Documents
11  Exhibit 86, Ronald Simon's Responses and Objections to
12  Defendant's First Set of Interrogatories
13  Exhibit 87, Ronald Simon's Responses and Objections to
14  Defendant's Second Set of Interrogatories
15  Exhibit 88, The Ideal 401(k) Program for the Hartford
16  Roofing Company
17  Exhibit 89, Employee Benefit Compliance Services, Inc.,
18  Regional Prototype Defined Contribution Plan
19  and Trust
20  Exhibit 90, Adoption Agreement for the Employee Benefit
21  Compliance Services, Inc., Nonstandardized 401(k) Profit
22  Sharing Plan and Trust
23  Exhibit 91, Hartford Roofing Company 401(k) Profit Sharing
24  Plan Summary Plan Description
25  Exhibit 92, Plan Administrator's Guide for the Hartford
```

## Page 4

```
 1  Roofing Company 401(k) Profit Sharing Plan
 2  Exhibit 93, Plan and Trust Information for the Hartford
 3  Roofing Company, Inc.
 4  Exhibit 94, Hartford Roofing Company 401(k) Profit Sharing
 5  Plan, Funding Policy and Method
 6  Exhibit 95, Hartford Roofing Company, Inc. Letter dated 2/12/96
 7  Exhibit 96, February 1st, 1996 Letter from Hartford Roofing
 8  Company to the Honorable Robert B. Reich
 9  Exhibit 97, 11/20/95 Fax Cover Sheet from Michael M.
10  Nobile Financial Group
11  Exhibit 98, Vision Trak Money Guide
12  Exhibit 99, Best of America Group Annuity, Variable Proposal
13  for the Hartford Roofing Company Profit Sharing Plan
14  Exhibit 100, Best of America Group Annuity, Variable Proposal
15  for the Hartford South, Inc., Profit Sharing Plan
16  Exhibit 101, Nationwide Insurance Specimen Document
17  Exhibit 102, New Account Application
18  Exhibit 103, Nationwide Insurance Application for Contract
19  Exhibit 104, Appointment of Contract Holder's Authorized
20  Representative, Verification of Receipt of Specimen Group
21  Annuity Contracts and Completed Proposal Pages
22  Exhibit 105, Service Agreement from Devlin & Hale
23  Exhibit 106, December 6th, 1996 Letter from Devlin & Hale to Ed
24  Kaplan
25  Exhibit 107, Hartford Roofing Company, Inc. Letter
```

Page 37

1  that at all.
2  Q.   Is it your responsibility to review and approve any of
3  the materials that are prepared by Devlin & Hale for reporting
4  purposes?
5  A.   Yes.
6  Q.   And do you do that?
7  A.   Yes.
8  Q.   How about maintaining information, is it part of your
9  fiduciary duty to retain records with respect to the plan?
10 A.   Yes.
11 Q.   Do you do that?
12 A.   Yes.
13 Q.   Have you ever been accused of not complying with your
14 fiduciary duties?
15 A.   No.
16 Q.   Do your responsibilities as plan administrator include
17 bringing lawsuits?
18 A.   As plan administrator -- as plan administrator, I don't
19 know.
20 Q.   Were you consulted --
21 A.   As a fiduciary, I would say yes.
22 Q.   Did you consult with Mr. Ronald Simon --
23 A.   Yes.
24 Q.   -- and Mr. Frederick Simon or Mr. Zuboff before this
25 lawsuit was brought on behalf --

Page 38

1  A.   Mr. Ronald Simon.
2  Q.   When did you consult with him?
3  A.   The same -- the timing of the same phone call, in that
4  same phone call.
5  Q.   The same phone call you had with Mr. Stratton you
6  referred to earlier?
7  A.   Yes.
8  Q.   What did you relate to Mr. Simon?
9  A.   I relayed the information and I asked if we should
10 pursue it and, obviously, as a trustee, he agreed.
11 Q.   Did you consult with the other trustees?
12 A.   Did I, personally, no.
13 Q.   Did Mr. Ronald Simon consult with the other trustees?
14 A.   I do not know.
15 Q.   Have you ever spoken with any of the other trustees
16 about this lawsuit?
17 A.   I don't recall a conversation specifically on that.
18 Q.   Do you understand what claims are being made in this
19 lawsuit?
20 A.   I believe I do.
21 Q.   What is your understanding of the claims?
22 A.   My understanding is that when I initially negotiated the
23 terms of the program with Devlin & Hale/Nationwide that I would be
24 paying a fee. I'm not sure of the right word, commission or fee.
25 We will call it a fee, to Nationwide, and that there would,

Page 39

1  obviously, be a fee, a standard fee for the mutual fund, and that
2  was negotiated up front. My understanding is that there were
3  profits that were sent from the mutual fund over to Nationwide out
4  of the fee that I was paying them.
5  Q.   Okay. Let's break down that answer a little bit. You
6  said when you were negotiating at the very beginning of the
7  relationship with Nationwide, you understood that you would be
8  paying a fee. When you say "you," do you mean the Hartford
9  deferred compensation plan?
10 A.   The plan.
11 Q.   And do you recall how much the fee was that the plan
12 would be paying to Nationwide?
13 A.   I know there was an initial fee, and what I did was when
14 I was interviewing other options, I called my personal broker and
15 asked if he knew anything about the Nationwide program, and he did
16 some digging and found out that there is -- the pricing structure
17 is negotiable, which I didn't know, and when I came back to settle
18 on Nationwide we negotiated, because I guess there was probably
19 anywhere from 2% or more of a fee they would charge, and I think
20 ours got dropped into the, you know, 1, 1 1/2% range for that. So,
21 they agreed. I negotiated that, but that made sense, and that kind
22 of came together with Devlin & Hale, which was a third-party
23 administrator.
24 Q.   When you say 1, 1 1/2, what do you mean?
25 A.   Percent.

Page 40

1  Q.   Percent of what?
2  A.   It would have been of the dollars that were in the plan.
3  Q.   And when you said there was a standard fee for mutual
4  funds in your answer, what did you mean by that?
5  A.   I was told that each mutual fund charges about 1%, give
6  or take, that it would be -- it would be part, out of the return of
7  the assets.
8  Q.   When you say they charged a 1% fee out of return on
9  assets, what does that mean?
10 A.   They would charge -- if money went into the fund, they
11 would take 1% of that money.
12 Q.   And when you say "they," do you mean --
13 A.   The mutual fund.
14 Q.   Each mutual fund?
15 A.   Uh-hmm, yes.
16 Q.   Was it your understanding that each mutual fund had a
17 different level of fees, or was it your understanding they all
18 charged the same amount?
19 A.   I don't recall.
20 Q.   And how -- what was your understanding of how the
21 mutual funds were related to Nationwide, if at all?
22 A.   Tell me what you mean by "related." My understanding is
23 Nationwide didn't own the funds, so I wouldn't say they were
24 related that way.
25 Q.   So my understanding is that -- your claim in this case

Page 41

1  was that profits were sent by the mutual funds to Nationwide and
2  that a fee was being paid both to Nationwide and to the mutual
3  funds by the plan; is that accurate?
4      A.   Uh-hmm, yes.
5      Q.   Was there any relationship, contractual or otherwise,
6  between Nationwide and the mutual funds, as far as you know?
7      A.   I don't know. You would have to ask Nationwide.
8      Q.   Why was the plan paying a fee or fees to mutual funds?
9      A.   The Hartford Roofing plan?
10     Q.   Yes.
11     A.   I would say that that was a normal and customary
12 situation.
13     Q.   Do you know what --
14     A.   I mean, if you or I have a mutual fund, there are
15 expenses. You know, that's what they charged.
16     Q.   And when you say that the mutual funds were sending
17 profits back to Nationwide, were they profits on the fees, or were
18 they profits on something else?
19     A.   My understanding was that they were taking part of the
20 1% and sending that out, because basically that's profit, and
21 sending that to Nationwide. That was my understanding of
actually
22 the lawsuit as well.
23     Q.   When you say "they" in that prior answer, do you mean
24 the mutual funds?
25     A.   Yes.

Page 42

1      Q.   Are there any other claims that you understand are being
2  made in this lawsuit?
3      A.   I think that's the bulk of the claim right there.
4      Q.   Is there any claim being made that there was a breach of
5  fiduciary duty in this lawsuit?
6      A.   I understand that's the latest -- I understand that
7  Nationwide is making a claim that the plan itself has some
response
8  to this, or is responsible or culpable, whatever you want to say.
9      Q.   Is it your understanding that any claim is being made
10 that Nationwide breached a fiduciary duty?
11     A.   Specifically a fiduciary duty? I'm aware that there was
12 a disclosure or an ERISA issue. I don't know if that, in effect --
13 I think that might fall under. You would have to get a better
14 definition of fiduciary.
15     Q.   What is your understanding of how ERISA was violated
16 in this case?
17     A.   ERISA really is a lot of -- it's disclosure related,
18 obviously, and I think the problem is there was a lack of
19 disclosure on Nationwide's part to the plans that they signed, not
20 telling them that certain profits were coming from these other
21 mutual funds to them.
22     Q.   Are there any other violations of ERISA that you're
23 aware of in this lawsuit?
24     A.   I believe not, no.
25     Q.   Let me ask you to look at a document we marked as

Page 43

1  Defendant's Exhibit 88 and ask if you recognize this document.
2      A.   This probably is like one of the very first -- like, a
3  proposal thing. I can't verify every single page, but some of it I
4  can -- some of it looks familiar. I mean, the fee quotation looks
5  familiar to me.
6      Q.   Let's go through it and see what you recognize from the
7  pages. There is a table of contents --
8      A.   Uh-hmm.
9      Q.   -- on the second page. Do you see that?
10     A.   Yup.
11     Q.   Does that look familiar to you?
12     A.   Not specifically.
13     Q.   Let's turn to page 3, which has at the top "The Ideal
14 401(k) Package." Do you see that?
15     A.   Let me just look at something on the table here. Are
16 you asking me the question do I specifically remember this page
17 being given to me?
18     Q.   Or reviewing it, or seeing it before?
19     A.   I can't recall.
20     Q.   And looking at it now, nothing jogs your memory?
21     A.   If you're asking me to swear to something, no.
22     Q.   Okay.
23     A.   I'm not going to do it.
24     Q.   All right. Then let's turn over to the fifth page of
25 what we have marked as Exhibit 88 that has at the top "Five Key

Page 44

1  Factors to a Successful 401(k) Plan." Have you ever seen this page
2  before?
3      A.   I can't swear to it.
4      Q.   Do you agree that these are five key factors to a
5  successful 401(k) plan?
6      A.   I wouldn't argue with that.
7      Q.   Would you turn to the next page that has at the top
8  "Selection of an Investment Program?"
9      A.   Uh-hmm.
10     Q.   You see that? "There are a number of facets and
11 ancillary services that should be considered" --
12     A.   Uh-hmm.
13     Q.   -- that are listed here?
14     A.   Yup.
15     Q.   Do you agree that these are all important services to a
16 401(k) plan?
17     A.   Yes. I wouldn't argue with that.
18     Q.   And then there are a couple of pages in this Exhibit 88
19 that talk about information flow. Do you see those?
20     A.   These -- these right here? (Indicating)
21     Q.   Yes.
22     A.   Uh-hmm. Okay. Again, I can't recall seeing, you know,
23 I'm looking at it now.
24     Q.   Was this your understanding of how the information
25 flowed with respect to the Hartford Roofing Company, Inc. Deferred

```
                                 972 Tolland Street
                                 East Hartford, CT 06108
                                   (860) 291-9191
                                                                              1
  1            UNITED STATES DISTRICT COURT
  2              STATE OF CONNECTICUT
  3   LOU HADDOCK, AS TRUSTEE OF THE        : 3:01CV1552(CFD)
      FLYTE TOOL & DIE, INCORPORATED        :
  4   DEFERRED COMPENSATION PLAN, PETER     :
      WIBERG, AS TRUSTEE OF THE CROWN       :
  5   TOOL & DIE DEFERRED COMPENSATION      :
      PLAN, ALLEN GOUSE, AS TRUSTEE OF THE  :
  6   GREATER HARTFORD EASTER SEAL          :
      REHABILITATION CENTER DEFERRED        :
  7   COMPENSATION PLAN, RONALD SIMON,      :
      AS TRUSTEE OF THE HARTFORD            :
  8   ROOFING, INC. DEFERRED                :
      COMPENSATION PLAN, CARL ANDERSON      :
  9   FOR THE ANDERSON & FERDON             : DEPOSITION
      DEFERRED COMPENSATION PLAN            : HELD AT
 10                                         : BRIDGEPORT, CT
            vs.                             : WEDNESDAY
 11   NATIONWIDE FINANCIAL SERVICES, INC.,  : JULY 16, 2003
      AND NATIONWIDE LIFE INSURANCE CO.     :
 12   DEPOSITION OF:  DENNIS A FERDON, ESQ.
 13   APPEARANCES:
 14   LAW OFFICES OF KOSKOFF, KOSKOFF & BIEDER
            Attorneys for the Plaintiffs
 15         P.O. Box 1661
            350 Fairfield Avenue
 16         Bridgeport, CT 06604
            (203) 336-4421
 17   BY:  RICHARD A. BIEDER, ESQ
 18   LAW OFFICES OF LeBOEUF, LAMB, GREENE & MacRAE
            Attorneys for the Defendants
 19         Goodwin Square
            225 Asylum Street
 20         Hartford, CT 06103
            (860) 293-3544
 21   BY:  DENNIS F. KERRIGAN, JR., ESQ.
 22
 23
 24
 25
                  Heather A. Pellerin, License #00144
                     Registered Professional Reporter
                       Certified Realtime Reporter
```

```
              Niziankiewicz & Miller Reporting Services
                           972 Tolland Street
                         East Hartford, CT 06108                         3
                            (860) 291-9191
  1                          INDEX
  2                  DENNIS A FERDON, ESQ.
  3   DIRECT      CROSS       REDIRECT      RECROSS
         4*
  4   *By Mr. Kerrigan
      **By Mr. Bieder
  5   DEFENDANT'S EXHIBITS                          PREMARKED
  6   Exhibit 800, Renotice of Deposition
  7   Exhibit 801, Variable Annuity Contract and Application
  8   Exhibit 802, Letter from Nationwide
  9   Exhibit 803, Collection of Change of Allocations
 10   Exhibit 804, 401(k) Profit Sharing Plan
 11   Exhibit 805, Third Amended Class Action Complaint
 12   Exhibit 806, Standard Insurance Company Group Annuity Contract
 13              and Related Documents.
 14   Exhibit 807, Retirement Plan Proposal             107
 15
 ...
 25
                  Heather A. Pellerin, License #00144
                     Registered Professional Reporter
                       Certified Realtime Reporter
```



```
                                 972 Tolland Street
                                 East Hartford, CT 06108
                                   (860) 291-9191
                                                                              2
  1   .....Deposition of DENNIS A FERDON, ESQ., a witness,
  2   taken on behalf of the DEFENDANTS, NATIONWIDE FINANCIAL
  3   SERVICES, INC., AND NATIONWIDE LIFE INSURANCE CO., in the
  4   herein before entitled action, pursuant to the Federal Rules of
  5   Civil Procedure, before Heather A. Pellerin, duly qualified
  6   Notary Public in and for the State of Connecticut and
  7   Commonwealth of Massachusetts, held at the LAW OFFICES OF
  8   ANDERSON & FERDON, 82 Chelsea Harbor Drive, Norwich, CT
  9   06360, at 10:00 a.m. On WEDNESDAY, JULY 16, 2003.
 10                          STIPULATIONS
 11         It is hereby stipulated and agreed by and among counsel for
 12   the respective parties that all formalities in connection with
 13   the taking place of this deposition, including time, place,
 14   sufficiency of notice, and the authority of the officer before
 15   whom it is being taken may be and are hereby waived.
 16         It is further stipulated and agreed that objections other than
 17   as to form are reserved to the time of trial.
 18         It is further stipulated that the proof of the qualifications
 19   of the Notary Public before whom the deposition is being taken
 20   is hereby waived.
 21
 ...
 25
                  Heather A. Pellerin, License #00144
                     Registered Professional Reporter
                       Certified Realtime Reporter
```

```
              Niziankiewicz & Miller Reporting Services
                           972 Tolland Street
                         East Hartford, CT 06108                         4
                            (860) 291-9191
  1   DENNIS A FERDON, ESQ., called as a witness by the defendants,
  2   having first been duly sworn by the Notary, was examined and
  3   testified on his oath as follows:
  4
  5              DIRECT EXAMINATION BY MR. KERRIGAN:
  6
  7        Q.    Attorney, is it Ferdon or Ferdon?
  8        A.    Ferdon.
  9        Q.    Attorney Ferdon, this deposition is being taken
 10   pursuant to the federal rules of civil procedure in accordance
 11   with a renotice of deposition that I have marked as Defendant's
 12   Exhibit 800. Could you describe for me the structure of your
 13   law firm and trace its history? As I was reviewing the
 14   documents it said a couple of different names. Can you trace
 15   that for me?
 16              MR. BIEDER:   You want him to trace the history or
 17        describe the structure right now?
 18        Q.    (By Mr. Kerrigan)  We can start with its current
 19   iteration and go backwards.
 20        A.    Anderson & Ferdon PC is a corporation, and I am one
 21   of the officers of the corporation. I believe Carl Anderson is
 22   an officer of the corporation. I believe Christopher Anderson
 23   is an officer of the corporation, and at one time I believe
 24   Karen Anderson was an officer of the corporation, but I'm not
 25   certain if that is still true, so that's the structure of the
                  Heather A. Pellerin, License #00144
                     Registered Professional Reporter
                       Certified Realtime Reporter
```

Niziankiewicz & Miller Reporting Services
972 Tolland Street
East Hartford, CT 06108
(860) 291-9191                                    53

1  Q.   Sure. Did anyone play any role in the decision to
2  select, eliminate, or substitute any mutual funds in the
3  Standard Insurance contract besides yourself in your
4  discussions with Mr. Davis?
5      A.   No.
6      Q.   And how about with respect to the Nationwide
7  product, do you know whether or not funds were ever eliminated,
8  added, deleted?
9      A.   There were funds added during the time I was a
10 participant.
11     Q.   And do --
12     A.   It seemed like they were adding funds frequently.
13     Q.   And do you know how that came about?
14     A.   No.
15     Q.   In your position as trustee, were you ever advised
16 or play any role in the decision --
17     A.   No.
18     Q.   -- to add funds?
19     A.   No.
20     Q.   How were you notified then that funds were added?
21     A.   We would get correspondence from Nationwide
22 indicating you now have additional choices.
23     Q.   Do you know whether funds were ever deleted from the
24 Nationwide product?
25     A.   I'm not certain, but I can't recall any being

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

Niziankiewicz & Miller Reporting Services
972 Tolland Street
East Hartford, CT 06108
(860) 291-9191                                    54

1  deleted.
2      Q.   And you can't recall either as a participant or in
3  your capacity as trustee, correct?
4      A.   Yes, that's correct.
5      Q.   Do you recall whether any funds were ever
6  substituted in the Nationwide product, for example, you are in
7  Fidelity Growth and Nationwide says you have to go to XYZ
8  Growth, did that ever happen?
9      A.   I don't recall that ever happening.
10     Q.   And you don't recall in your capacity as a
11 participant or in your capacity as trustee; is that correct?
12     A.   That's correct.
13     Q.   With respect to category 4, have we discussed all
14 you know about the fees, charges, expenses, monies,
15 consideration received by Nationwide from the plan and its
16 participants?
17          MR. BIEDER:   All that he knows about it?
18     Q.   (By Mr. Kerrigan) Yes.
19          MR. BIEDER:   I object. Very broad.
20     Q.   (By Mr. Kerrigan) You can answer.
21     A.   Okay. I think I have told you that Nationwide
22 charged a fee, which I believe was a percentage. The
23 underlying investment companies charged a fee, which I think
24 was a percentage. I think John Rafal charged a fee, and I
25 don't know how that was based, and I think there is a person

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

Niziankiewicz & Miller Reporting Services
972 Tolland Street
East Hartford, CT 06108
(860) 291-9191                                    55

1  named Rob Michalski who received fees for doing work. When it
2  says what do I know about the plan assets --
3      Q.   I haven't gotten to that yet. This is just fees and
4  expenses charged.
5      A.   Fees and expenses charged?
6      Q.   Or received by Nationwide?
7           MR. BIEDER:   It's monies or consideration received
8  by Nationwide.
9           THE WITNESS:   And what I just said is generally what
10 I know about that.
11     Q.   (By Mr. Kerrigan) Okay. And early -- and
12 between that and what you have testified to earlier, does that
13 encompass your knowledge of the charges, expenses, monies, fees
14 and consideration received by Nationwide from the plan and its
15 participants?
16     A.   Yes, to the best of my recollection.
17     Q.   Okay. Have you ever heard of the term "plan
18 assets?"
19          MR. BIEDER:   Other than from his attorney? Other
20 than what he might have heard from his attorney about
21 that term, because if it's not other than what he heard
22 from his attorney, I will object to the question.
23     Q.   (By Mr. Kerrigan) Do you know what the term
24 "plan assets" means?
25          MR. BIEDER:   Other than what he learned from his

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

Niziankiewicz & Miller Reporting Services
972 Tolland Street
East Hartford, CT 06108
(860) 291-9191                                    56

1  attorney?
2           MR. KERRIGAN:   He either knows what the term
3  means or he doesn't. That's what I'm asking.
4           MR. BIEDER:   He might have acquired that knowledge
5  from conversations with his attorney, and if you put that
6  in the question, I will have no objection to it.
7           MR. KERRIGAN:   So are you instructing him not to
8  answer?
9           MR. BIEDER:   I'm instructing him not to answer if
10 you don't change the question.
11          MR. KERRIGAN:   I'm not changing the question.
12     Q.   (By Mr. Kerrigan) Do you know what this lawsuit
13 is about, Attorney Ferdon?
14     A.   Generally, yes.
15     Q.   What is your understanding?
16     A.   My understanding is that at the time Nationwide
17 provided this firm with what I call the 401(k) plan and, in
18 fact, before we agreed to have Nationwide do it, they told us
19 what their charges would be, and they told us what the various
20 charges of the mutual funds or annuity companies would be, but
21 they never told us that they were receiving what I think the
22 lawsuit calls skimmed assets from the various mutual fund or
23 annuity companies, and they didn't tell us that they had a
24 contract with the various mutual fund or annuity companies
25 providing that those companies would pay money to Nationwide,

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

1  which I think the lawsuit describes as skimmed assets, and that
2  that is a violation of ERISA. That is my understa[nding] of the
3  lawsuit.
4      Q.    Okay. In your capacity as a trustee of the 401(k)
5  plan, do you know what the term "plan assets" means?
6           MR. BIEDER:   Other than what he learned from his
7      lawyer?
8           MR. KERRIGAN:  Correct.
9           MR. BIEDER:   So the question is: Other than what
10     you may have learned from your lawyer about that term and
11     what it means, do you have an understanding of what it
12     means?
13          THE WITNESS:  As a term of art, which I think it is,
14     because it's in quotation marks on this document, I don't
15     know.
16     Q.    (By Mr. Kerrigan) And before speaking with
17 counsel, did you know what the term "plan assets" meant?
18     A.    Not as a term of art.
19     Q.    As any term?
20     A.    Yes. The plan assets are the monies put into the
21 plan by the participants, including the growth or loss caused
22 by the, you know, the stock market going up or bond prices
23 falling or so forth. Those are the plan assets. That's what
24 I'm supposed to protect as the trustee and preserve, try to
25 preserve.

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

1      Q.    O[kay.]
2      A.    B[ut we] don't give financial advice. We hire people
3  to do that.
4      Q.    And those are the people you have already described
5  to me, correct?
6      A.    Right.
7      Q.    Were the payments made by the mutual fund companies
8  plan assets?
9           MR. BIEDER:   Ask the question again? I'm sorry. I
10     was thinking of something else.
11     Q.    (By Mr. Kerrigan) Were the payments made by
12 mutual fund companies plan assets?
13     A.    What assets?
14     Q.    That you just described two questions ago?
15          MR. BIEDER:   The payments by mutual fund
16     companies to Nationwide?
17     Q.    (By Mr. Kerrigan) Correct.
18     A.    My understanding of the lawsuit is that they were.
19     Q.    And other than your understanding of the lawsuit,
20 you have no independent opinion as to whether or not they are
21 plan assets, correct?
22          MR. BIEDER:   That's what the lawsuit is about.
23          THE WITNESS:  As I said, I don't have knowledge of
24     the term, quote, plan assets, end quote, in terms of what
25     it means as a term of art.

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

1      Q.    (By Mr. Kerrigan) How about your understanding
2  of the assets of the plan that I believe you testified earlier,
3  one of your jobs as a trustee is to protect those assets of the
4  plan, correct?
5      A.    Yes.
6      Q.    Do you consider the payments allegedly made by
7  mutual fund companies to Nationwide to be assets of the plan
8  that you have to protect?
9      A.    I think that's what this lawsuit is all about.
10     Q.    And is that what you believe, that those payments
11 are, in fact, assets of the plan that you must protect as a
12 trustee?
13     A.    Yes.
14     Q.    And what is the basis for your belief?
15          MR. BIEDER:   Other than what he learned from his
16     lawyer?
17     Q.    (By Mr. Kerrigan) Other than what you learned
18 from your lawyer.
19     A.    Other than what Mr. Bieder told me, I don't know.
20     Q.    Do you know whether the existence of those payments
21 was disclosed to the plan by Nationwide?
22          MR. BIEDER:   Excuse me. I will object to the
23     question. First of all, that doesn't have any time
24     attached to it, so why don't you just attach a time and I
25     will see if I have more objections.

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter

1      Q.    (By Mr. Kerrigan) Are you aware of any
2  disclosure by Nationwide of the mutual fund payments you
3  described earlier?
4      A.    I'm not aware of any.
5      Q.    Are you aware of any disclosures by the mutual fund
6  companies of the payments you described earlier?
7      A.    No.
8      Q.    Do you know whether or not the plan consented to the
9  payment of those monies by the mutual fund companies to
10 Nationwide?
11     A.    No.
12     Q.    Do you know whether or not -- strike that. Have you
13 ever heard of the term "revenue sharing?"
14     A.    No.
15     Q.    Are you aware of any misrepresentations made by
16 Nationwide in connection with the 401(k) plan?
17     A.    Other than what I discussed with Mr. Bieder, no.
18     Q.    Are you aware of any nondisclosures by Nationwide or
19 any materials that Nationwide -- information that Nationwide
20 should have disclosed that it did not?
21     A.    I testified earlier that my understanding of what
22 the lawsuit is about is that Nationwide did not tell anyone
23 here at Anderson & Ferdon that they had a contract with these
24 companies whereby these companies would pay money to
25 Nationwide.

Heather A. Pellerin, License #00144
Registered Professional Reporter
Certified Realtime Reporter