# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LOU HADDOCK, as trustee of the Flyte Tool & Die Company, Inc. 401-K Profit Sharing Plan, PETER WIBERG, as trustee of the Crown Tool & Die Co. Inc. Salary Deferral Profit Sharing, ALAN GOUSE, as trustee of Greater Hartford Easter Seal Rehabilitation Center, Inc., Tax Sheltered Annuity Plan and the Money Accumulation Pension Plan for the Employees of Hartford Easter Rehabilitation Center, Inc., Trust, EDWARD KAPLAN, as trustee of the Hartford Roofing 401(k) Profit Sharing Plan and the Hartford South, L.L.C. 401(k) Profit Sharing Plan, and DENNIS FERDON, as trustee of the Anderson & Ferdon P.C. 401(k) Profit Sharing Plan, | : : : : : : : : : : : : : : | CIVIL ACTION NO.: 3:01CV1552 (SRU) April 20, 2006 |
| PLAINTIFFS, | : : | |
| v. | : : | |
| NATIONWIDE FINANCIAL SERVICES INC., and NATIONWIDE LIFE INSURANCE CO., | : : : | |
| DEFENDANTS. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIFTH AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.     ALLEGATIONS OF THE FIFTH AMENDED CLASS ACTION COMPLAINT .....2

II.    PLAINTIFFS WAIVED ANY CLAIM THAT DEFENDANTS ARE ERISA
       FIDUCIARIES BASED ON FUND SELECTION, SUBSTITUTION OR
       DELETION ...........................................................................................................3

       A.     Plaintiffs Expressly Withdrew And Abandoned Their Fund Selection,
              Substitution, And Deletion Allegations Years Ago. ...........................................4

       B.     Plaintiffs Are Bound By Their Prior Strategic Choices. ....................................7

III.   PLAINTIFFS' FUND SELECTION AND FUND SUBSTITUTION AND
       DELETION THEORIES FAIL AS A MATTER OF LAW. ........................................10

       A.     Defendants Are Not ERISA Fiduciaries Based On The Selection Of
              Investment Options Potentially Available Through Annuity Products..........10

       B.     Defendants Are Not ERISA Fiduciaries Based On The Alleged Fund
              Substitution Or Deletion In Existing Annuity Contracts................................14

IV.    PLAINTIFFS' ALLEGATIONS REGARDING THE PAYMENTS FROM FUND
       AFFILIATES TO DEFENDANTS FAIL AS A MATTER OF LAW. ........................20

       A.     Payments From Mutual Fund Affiliates Are Not ERISA Plan Assets............21

       B.     Mutual Funds And Fund Affiliates Do Not "Deal With The Plans"
              And Their Payments To Defendants Do Not "Involve Assets Of the
              Plans." ................................................................................................................23

V.     CONCLUSION ...............................................................................................................26

## TABLE OF AUTHORITIES

### FEDERAL CASES

Acosta v. Pacific Enterprises, Inc., 950 F.2d 611 (9th Cir. 1992) ................................................22

Am. Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the U.S., 841 F.2d 658 (5th Cir. 1988) .................................................................11

Black v. Bresee's Oneonta Dept. Store, Inc. Sec. Plan, 919 F. Supp. 597 (N.D.N.Y. 1996).........10

Blatt v. Marshall and Lassman, 812 F.2d 810 (2d Cir. 1987).........................................................18

Brock v. Hendershott, 840 F.2d 339 (6th Cir. 1988) ....................................................................18

Chambers v. Time Warner, Inc., 282 F.3d 147 (2d Cir. 2002)........................................................2

Consol. Beef Indust., Inc. v. New York Life Ins. Co., 949 F.2d 960 (8th Cir. 1991) ...................11

Dugan v. Palumbo Bros., Inc., 1991 WL 55755 at 2 (N.D. Ill. April 8, 1991) ..............................7

FDIC v. St. Paul Fire and Marine Ins. Co., 942 F.2d 1032 (6th Cir. 1991)....................................7

F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250 (2d Cir. 1987) .....................11, 13

Farm King Supply, Inc. Integrates Profit Sharing Plan and Trust v. Edward D. Jones & Co., 884 F.2d 288 (7th Cir. 1989)...................................................................................10

Fechter v. Conn. Gen. Life Ins. Co., 800 F. Supp. 182 (E.D. Pa. 1992)..................................11, 16

Fink v. Union Cent. Life Ins. Co., 94 F.3d 489 (8th Cir. 1996) ....................................................10

First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994).................................25

Flacche v. Sun Life Assurance Co., 958 F.2d 730 (6th Cir. 1992).................................................11

Flake v. Hoskins, 55 F. Supp. 2d 1196 (D. Kan. 1999).................................................................16

Flanigan v. Gen. Elec. Co., 242 F.3d 78 (2d Cir. 2001) ...............................................................15

Geller v. County Line Auto Sales, Inc., 86 F.3d 18 (2d Cir.1996)................................................16

Hirsch v. Arthur Andersen & Co., 72 F.3d 1085 (2d Cir. 1995) ..................................................24

In re American Express Co. Shareholder Litig., 39  F.3d 395 (2d Cir. 1994)...............................24

Inductotherm Indus., Inc. v. United States, 351 F.3d 120 (3d Cir. 2003).......................................8

LoPresti v. Terwilliger, 126 F.3d 34 (2d Cir. 1997)........................................................................22

Local 875 I.B.T. Pension Fund v. Pollack, 992 F. Supp. 545 (E.D.N.Y. 1998).....................16, 18

Martin v. Feilen, 965 F.2d 660 (8th Cir.1992)................................................................................16

McMorgan & Co. v. First Cal. Mortgage Co., 916 F. Supp. 966 (N.D. Cal. 1995) ..................1, 17

Mertens v. Hewitt Associates, 508 U.S. 248 (1993)........................................................................21

Metzler v. Solidarity of Labor Organizations Health & Welfare Fund, 1998 WL 477964
(S.D.N.Y. Aug.14, 1998) …………………………………………………………………… 22

Nieto v. Ecker, 845 F.2d 868 (9th Cir. 1988) .................................................................................17

Pappas v. Buck Consultants, Inc., 923 F.2d 531 (7th Cir. 1991)....................................................17

Pegram v. Herdrich, 530 U.S. 211 (2000) ...............................................................................10, 12

Prusky v. Reliastar Life Ins. Co., 2006 WL 690821 (3d Cir. Mar. 20, 2006) ...............................17

Reich v. Goldstein, 839 F. Supp. 1068 (S.D.N.Y. 1993).........................................................21, 22

Reilly v. New England Teamsters and Trucking Indus. Pension Fund, 737 F.2d 1274 (2d
Cir. 1984) ..........................................................................................................................................7

Schulist v. Blue Cross of Iowa, 717 F.2d 1127 (9th Cir. 1983)......................................................21

Sinicropi v. Milone, 915 F.2d 66 (2d Cir. 1990) .............................................................................7

Sirna v. Prudential Sec., Inc., 964 F. Supp. 147 (S.D.N.Y. 1997).................................................12

Skaraborg Invest USA, Inc. v. U.S., 9 F. Supp. 2d 706 (C.I.T. 1998).............................................8

Srein v. Soft Drink Workers Union, Local 812, 93 F.3d 1088 (2d Cir. 1996) .........................11, 13

Stanton v. Shearson/Lehman Am. Express, Inc., 631 F. Supp. 100 (N.D. Ga. 1986) ..................18

Toomey v. Jones, 855 F. Supp. 19 (D. Mass. 1994).......................................................................10

Trustees of Laborer's Local No. 72 Pension Fund v. Nationwide Life Ins. Co., 783 F. Supp. 899 (D.N.J. 1992) ...................................................................................................16

United Indep. Flight Officers, Inc. v. United Air Lines, Inc., 756 F.2d 1274 (7th Cir. 1985) ...................................................................................................12, 13, 14

United States v. Glick, 142 F.3d 520 (2d Cir. 1998) ..............................................12, 13

United States v. Sixty Thousand Dollars ($60,000.00) in U.S. Currency, 763 F. Supp. 909 (E.D. Mich. 1991) ...............................................................................................8

Update Art, Inc. v. Modiin Publ'g., Ltd., 843 F.2d 67 (2d Cir. 1988) .............................8

Waldorf v. Kenilworth, 878 F. Supp. 686 (D.N.J. 1995)...................................................9

## STATUTES

29 U.S.C. § 1002(21)(A)(i)............................................................................................15

29 U.S.C. § 1002(21)(A)(i)............................................................................................16

29 U.S.C. § 1106(b)(3) .................................................................................................25

29 U.S.C. § 1106(b)(3) .............................................................................................25, 26

Defendants respectfully seek dismissal of Plaintiffs' Fifth Amended Class Action Complaint ("Complaint") (Docket 270).[1/]  Dismissal is required for three reasons:

*First,* Plaintiffs' allegations that Defendants are ERISA fiduciaries because they "selected" or "substituted and deleted" investment options in connection with Plaintiffs' variable annuity contracts were expressly withdrawn and abandoned by Plaintiffs for strategic reasons years ago.  The record on this point, recited in detail below, is overwhelmingly clear.  Plaintiffs should not be permitted to proceed on allegations they purposefully dropped earlier in the litigation.  *See infra* Point II.

*Second,* even if the Court were to conclude that Plaintiffs' strategic waiver somehow should be ignored, dismissal would still be warranted because Plaintiffs' recently added "fund selection" and "fund substitution and deletion" allegations do not create ERISA fiduciary status for Defendants as a matter of law.  *See infra* Point III.

*Third,* if Defendants somehow could be considered ERISA fiduciaries, Plaintiffs' allegations that payments to them from mutual fund affiliates are ERISA "plan assets," and that there was some relationship between those payments and Plaintiffs' accumulation units, are contrary to both ERISA law and logic.  Plaintiffs' claim under ERISA's prohibited transactions provision, which is based on those allegations, should therefore be dismissed as well.  *See infra* Point IV.

---

[1/]    For ease of reference, the Complaint, the Court's Decision and all other pleadings and documents cited in this motion are attached as exhibits to the Declaration of Brian O'Donnell in Support of Motion to Dismiss Fifth Amended Complaint.  The Complaint is Ex. A.  All subsequent citations to the exhibits attached to this declaration will be cited simply as "Ex. __".

# I.     ALLEGATIONS OF THE FIFTH AMENDED CLASS ACTION COMPLAINT[2/]

Plaintiffs purport to be trustees of five retirement plans that allegedly invested ERISA plan assets in variable annuity contracts sold by Defendants.  Complaint ¶¶ 13-17 (Ex. A).[3/] Those contracts permitted plans or their participants to invest in separate trusts called variable accounts, and particularly in separate subaccounts within those trusts that corresponded to certain mutual funds.  *Id.* ¶ 26.  When the plans or participants invested in the subaccounts, the variable accounts purchased shares of the corresponding mutual funds.  *Id.* ¶ 28.  In return for their investments, the plans and participants received "accumulation units" that fluctuated in value according to the net asset value of the variable accounts.  *Id.* ¶ 27.

Plaintiffs claim in their Fifth Amended Complaint that Defendants were ERISA fiduciaries that violated ERISA when they received payments from affiliates of the mutual funds. *Id.* ¶ 1.  According to Plaintiffs, Defendants became ERISA fiduciaries to the extent they exercised "authority or control" over the "management or disposition" of the accumulation units. *See, e.g.*, Complaint ¶ 54 (allegations regarding holding, canceling, and transferring the accumulation units).  Those allegations, however, have already been rejected by the Court as a basis for Defendants' fiduciary status in this action.  *See* Amended Memorandum of Decision at 17-18 (Docket 266) ("Decision") (Ex. B).

---

[2/]     This description covers Plaintiffs' allegations in the Fifth Amended Class Action Complaint and documents incorporated by reference, as well as admissions Plaintiffs have made to the Court in prior proceedings.  *See Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002) (court can consider documents referenced in the complaint on a motion to dismiss).

[3/]     For purposes of this motion, Defendants follow the allegations of the Fifth Amended Complaint and simply refer to "Defendants" as the relevant actors without differentiating between them or their particular roles regarding the Plaintiffs and the allegations under suit. However, the two defendants are separate entities with distinct roles and functions and differences between them will likely be highly relevant if this action proceeds.

Plaintiffs also allege that Defendants became ERISA fiduciaries to the extent that they (1) selected investment options available for the plans or participants to choose, which occurred before the variable annuity contracts were purchased (the "fund selection" allegation) and (2) exercised a "unilateral right" to cease offering certain investment options and to substitute others in their place after the variable annuity contracts were purchased (the "fund deletion and substitution" allegation). *See* Complaint ¶¶ 54, 55, 25. (Although such allegations are referred to in this memorandum as involving "fund selection" and "fund deletion and substitution," any investment options that were selected, deleted, or substituted in fact were *not* mutual funds, but were subaccounts of the variable accounts that corresponded to separate funds and other investment vehicles. Complaint ¶¶ 26-27.)

Plaintiffs allege that Defendants engaged in the "fund selection" in exchange for payments from mutual fund affiliates. *Id.* ¶¶ 35, 55. Plaintiffs do *not* allege that the "fund deletion and substitution" was in exchange for any payments. Nor do they explain why Defendants would engage in deletion or substitution of existing investment options if, as Plaintiffs allege, Defendants selected those options in the first place in exchange for payments.

## II.   PLAINTIFFS WAIVED ANY CLAIM THAT DEFENDANTS ARE ERISA FIDUCIARIES BASED ON FUND SELECTION,  SUBSTITUTION OR DELETION

The record unambiguously shows that, many years ago, Plaintiffs for strategic purposes intentionally, explicitly, and in writing withdrew and abandoned any allegations that Defendants were ERISA fiduciaries based on "fund selection," "fund deletion," or "fund substitution." That waiver compels dismissal of the Fifth Amended Complaint, which is predicated on those allegations and theories.

### A.     Plaintiffs Expressly Withdrew And Abandoned Their Fund Selection, Substitution, And Deletion Allegations Years Ago.

Plaintiffs' First Amended Class Action Complaint alleged that Defendants were ERISA fiduciaries because of their "initial selection of the funds offered to the Plans," and their alleged authority to "*delete or substitute funds* available under the annuity contracts" in return for payments from mutual fund affiliates.[4/]  Defendants sought discovery on these allegations in December 2002 in order to determine (1) which, if any, investment options were allegedly selected by Plaintiffs and then later deleted, (2) which, if any, new investment options were substituted for those deleted, and (3) what impact, if any, that change in investment options had on the Plaintiffs' plans and participants.  Plaintiffs refused to respond to this discovery, on the grounds that they planned to "**drop these allegations and their Count II in the First Amended Complaint [based on those allegations], and would not be seeking certification on those claims.**"[5/]  Plaintiffs explained that they reached this decision based upon their review of documents produced by Defendants and in consultation with their class certification experts."[6/]

---

[4/]     First Amended Complaint (Docket 4) (Ex. C) ¶¶ 1, 18 ("Nationwide did not disclose that the portfolio of mutual funds made available by it had not been chosen based upon performance and value to its customers, but rather had been chosen so as to maximize Nationwide's revenue");  ¶¶ 48,49 ("[B]y virtue of its unilateral right under the contracts with the Plans to cease offering funds in which the Plans' assets were invested and substitute other inferior funds in their places, something that it actually did on multiple occasions, Nationwide Life exercised authority or control respecting management or disposition of assets of the Plans.").

[5/]     *See, e.g.,* Plaintiff Carl Anderson's Responses and Objections to Defendants' First Set of Interrogatories at Nos. 4-6 ("Plaintiff further specifically objects on the ground that this interrogatory seeks information concerning the 'fund selection' claims and allegations set forth in Count II of the First Amended Complaint, that the Plaintiff does not intend to seek class certification on Count II, that Plaintiff will shortly be moving to file a Second Amended Complaint deleting Count II, and that the interrogatory is therefore overbroad and seeks information that is irrelevant to this action.") (emphasis in text added) (Ex. D).

[6/]     Plaintiffs' Motion for Leave to File Second Amended Complaint at 2 (Docket 55) (Ex. J).

Plaintiffs' Second Amended Class Action Complaint confirmed these statements when it eliminated the "fund selection" and "fund deletion and substitution" allegations and the claim for relief in Count II that those allegations supported.  To be sure that there was no misunderstanding, Defendants sent a letter to Plaintiffs' counsel on January 22, 2003, stating that "plaintiffs appear to have now abandoned their claims based upon . . . alleged improper deletion and substituting of funds."[7]  Plaintiffs' response to this letter did not dispute or qualify Defendants' stated understanding.[8]

Plaintiffs eventually agreed to stipulate formally that the "fund selection" and "fund deletion and substitution" allegations and claim for relief were no longer part of this case.  Thus, in a February 5, 2003, letter from Plaintiffs' counsel, Plaintiffs stipulated:

> **Nothing in the Proposed Second Amended complaint shall be construed to assert any claim(s) of fiduciary status or breach of fiduciary duties based upon the defendants actual or alleged substitution or deletion of funds or based upon the defendants actual or alleged contractual right to substitute or delete funds.[9]**

Plaintiffs further confirmed that stipulation in a pleading filed with this Court when, in response to a discovery motion, they stated:

> **[The First Amended Complaint] asserted an entirely separate claim, alleging that defendants breached their fiduciary duties by improperly selecting and substituting mutual funds for inclusion in the plaintiffs' plans; however, that fund selection/substitution claim has been omitted from the Second Amended Complaint.[10]**

---

[7]     January 22, 2003, Letter from Dennis Kerrigan to Roger Mandel at 2 (Ex. K).

[8]     January 24, 2003, Letter from Roger Mandel to Dennis Kerrigan at 3 (Ex. L).

[9]     February 5, 2003, Letter from Antonio Ponvert to George Anhang (emphasis added) (Ex. M).

[10]    Plaintiffs' March 3, 2003, Response to Defendants' Motion to Compel at 2 (Docket 65) (emphasis added) (Ex. N); *see also id.* at 8 ("Information concerning the now-deleted 'fund

Defendants noted at the time that they would "accept this representation to the Court as a formal stipulation binding on [P]laintiffs going forward," a characterization that Plaintiffs did not dispute and that they later acknowledged in writing.[11/] Plaintiffs' purported class action expert also confirmed at his deposition that Plaintiffs had abandoned these theories:

> **[T]here was a lot of briefing in the motion to dismiss phase about whether there had been evidence that [Defendants] had actually taken the opportunity to substitute … one mutual fund for another, in its basket of offerings.   To my mind, that issue was now irrelevant, because there was not a claim being brought on that basis.  That was confirmed to me by plaintiffs' counsel.[12/]**

When Plaintiffs filed a Third Amended Complaint in April 2003, they once again plainly and unambiguously stated their intent to remove these issues from the case.  **"[T]he proposed complaint . . . DELETES all allegations concerning the defendants' substitution or deletion of mutual funds**."[13/]   And Plaintiffs again explained their decision to waive any possible reliance on Defendants' alleged substitution or deletion of funds in this action:

> **[T]he proposed deletion of allegations concerning the defendants' ability to substitute or delete mutual funds is necessary to avoid the continued waste of the Court's and the parties' time and resources on an issue that is entirely irrelevant to the single cause of action asserted by the plaintiffs in this case. . . .   [P]laintiffs assert *no claims* based upon selection and deletion of funds . . .** [14/] (Original italics.)

---

selection/deletion' claim is utterly unrelated to the only legal claim in the case – that the defendants breached their duty to the plans and converted the Plans' assets.").

[11/]    Defendants' Reply Memorandum of Law In Further Support of Defendants' Motion to Compel Plaintiffs To Answer Interrogatories at 3 n.1 (Docket 71) (Ex. O); Plaintiffs' Motion For Leave to File Third Amended Complaint and Memorandum in Support Thereof (Docket 83) at 4-5 (Ex. P).

[12/]    Transcript of April 4, 2003 Deposition of Samuel Issacharoff at 97:16-24 (Ex. Q).

[13/]    Plaintiffs' Motion for Leave to File a Third Amended Complaint (Docket 83) at 1-2 (original ALLCAPS) (Ex. P).

[14/]    *Id.* at 4-5 (original emphasis) (Ex. P).

After this Court ordered Plaintiffs to file a Fourth Amended Complaint setting forth the allegations and theories of liability that would be subject to Defendants' motion for summary judgment in June 2004, Plaintiffs continued to focus on Defendants' handling and administration of the accumulation units, and never mentioned the "selection," "deletion," or "substitution" of funds.[15]  Both that Complaint and Plaintiffs' Class Certification Motion demonstrate Plaintiffs' clear decision to drop those allegations and theories – neither addresses "fund selection," "fund deletion," and "fund substitution" issues, instead focusing on "skimmed plan assets," the handling, transfer, and cancellation of the accumulation units, and the alleged use of the accumulation units to calculate the amount of the challenged payments.[16]

### B.    Plaintiffs Are Bound By Their Prior Strategic Choices.

When a party to litigation makes strategic decisions to limit the issues for trial, those decisions must be adhered to and enforced.  Stipulations and like agreements play a critical role in the orderly management of complex litigation, and may not lightly be set aside by either the party or a court.  *See Reilly v. New England Teamsters and Trucking Indus. Pension Fund*, 737 F.2d 1274, 1278 (2d Cir. 1984) ("A party to a stipulation is not entitled to withdraw from its agreement unilaterally."); *Sinicropi v. Milone*, 915 F.2d 66, 68 (2d Cir. 1990) ("Courts generally enforce stipulations that narrow the issues in a case.").[17]  After all, the other side justifiably

---

[15]    *See* Order of June 4, 2004 (Docket 232) (Ex. G); Plaintiffs' Fourth Amended Class Action Complaint (Docket 235) ¶¶ 53-54 (Ex. H).

[16]    *See* Fourth Amended Complaint at *passim* (Ex. H); Plaintiffs' First Amended Memorandum of Law In Support of Plaintiffs' First Amended Motion for Class Certification at *passim* (Docket 129) (Ex. S); *see also* Third Amended Complaint at *passim* (Docket 95) (Ex. R).

[17]    *See also FDIC v. St. Paul Fire and Marine Ins. Co.*, 942 F.2d 1032, 1038-39 (6th Cir. 1991) (reversible error to relieve party of stipulation regarding litigable issues); *Dugan v. Palumbo Bros., Inc.*, 1991 WL 55755 at *2  (N.D. Ill. April 8, 1991) ("By agreeing to a narrowly drawn statement of facts in this case, the plaintiffs made a tactical decision to limit the issues to

7

relies on such stipulations – as Defendants did in this case – in shaping their litigation efforts and in evaluating their litigation posture and strategy. Here, where Defendants have struggled literally for years to understand the basis for Plaintiffs' claims and to fashion a response,[18] it is particularly important to impose limits on Plaintiffs' ability to shift theories and change the basic boundaries of the litigation.

Furthermore, when a party refuses to respond to discovery on the ground that it has dropped certain allegations and that the proposed discovery is therefore irrelevant, that party should not be permitted to revive those allegations at a later date. *See Inductotherm Indus., Inc. v. United States*, 351 F.3d 120, 125-26 (3d Cir. 2003) (refusing to consider a theory that the plaintiff had "expressly disclaimed" in response to an interrogatory); *Update Art, Inc. v. Modiin Publ'g., Ltd.*, 843 F.2d 67 (2d Cir. 1988) (summary judgment appropriate against party that refused to respond to discovery).[19] Such tactics deprive the other side of the facts necessary to defend itself, and subvert the procedures designed to achieve a fair resolution of the litigation. *Update Art* at 70-71; *Sixty Thousand Dollars* at 914.

These principles apply with particular force in this action, because Defendants have expended significant time and resources on a defense based on Plaintiffs' waiver stipulation. Defendants adjusted their entire discovery strategy based on Plaintiffs' unequivocal abandoning

---

be addressed on summary judgment. Since factual stipulations are binding on the parties that make them, the fact that their tactical decision went awry does not entitle the plaintiffs to relief from the effect of the stipulation.").

[18]  *See* Defendants' Objection to Magistrate's Discovery Ruling at 3-10 (Docket 170) (Ex. E); Defendants' Revised Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 5-7 (Docket 186) (Ex. F).

[19]  *Skaraborg Invest USA, Inc. v. U.S.*, 9 F. Supp. 2d 706, 710 (C.I.T. 1998) (plaintiff waived argument by responding to interrogatories as "not applicable"); *United States v. Sixty Thousand Dollars ($60,000.00) in U.S. Currency*, 763 F. Supp. 909, 913-14 (E.D. Mich. 1991) (party could not oppose summary judgment on issue that it refused to address in discovery).

of the fund selection, substitution, and deletion claims in late 2002. In fact, the vast bulk of discovery took place *after* that claim was waived. Defendants served two sets of interrogatories after Plaintiffs' waiver. And the parties conducted all 17 depositions in this case after the waiver – including those of the named plaintiffs and of proposed experts Samuel Issacharoff, Frederick Werblow, and George Priest. Comprehensive and costly expert reports addressing issues related to class certification were prepared and submitted after Plaintiffs' waiver, and were based entirely on allegations and theories other than fund selection, substitution, and deletion. Allowing Plaintiffs to revive those issues now would prejudice Defendants and would be grossly wasteful and unfair, and would invite future parties to play fast and loose with stipulations and agreements that are critical to shaping and managing complex litigation of this sort.[20]

Such a result would be particularly unjust because it is clear that Plaintiffs dropped these (and other) allegations and theories for specific strategic purposes; in particular, to eliminate claims that have no merit or that would hinder their efforts to get a class of some sort certified.[21] Plaintiffs' own purported class certification expert acknowledged at deposition that he had "concern[s]" and "reservation[s]" that claims regarding "adding or eliminating funds based on whether or not they would make payments" would be difficult to prove on a class basis.[22] And when seeking leave to file their Second Amended Complaint, Plaintiffs admitted that the choice was based on concerns arising from review of the documents and on "consultations" with their

---

[20]    *See Waldorf v. Kenilworth*, 878 F. Supp. 686, 695 (D.N.J. 1995) (allowing withdrawal of defendants' stipulation of liability would prejudice plaintiff who had abandoned discovery of liability issues for several years).

[21]    *See* Defendants' Supplemental Memorandum of Law In Support of Defendants' Motion for Summary Judgment at 3-4 (Docket 239) (Ex. T).

[22]    Transcript of April 4, 2003, Deposition of Samuel Issacharoff at 53-55, 58 (Ex. Q).

class certification expert.[23]  There is simply no good reason to allow Plaintiffs to continue this

action based on theories that they intentionally waived for strategic purposes.[24]

### III.    PLAINTIFFS' FUND SELECTION AND FUND SUBSTITUTION AND DELETION THEORIES FAIL AS A MATTER OF LAW.

Even if the Court were to permit Plaintiffs to sidestep their waiver, the fund selection and

fund substitution and deletion allegations do not convert Defendants from an arm's length seller

of annuities into an administrator, manager, or investment advisor of any ERISA plan assets.

### A.    Defendants Are Not ERISA Fiduciaries Based On The Selection Of Investment Options Potentially Available Through Annuity Products.

Plaintiffs' claim in the Fifth Amended Complaint that Defendants are ERISA fiduciaries

is based on allegations of "fund selection" that occurred *before* Plaintiffs purchased Defendants'

variable annuity contracts.  However, it is well settled that simply offering a product for sale to

an ERISA plan does not make the seller an ERISA fiduciary.  *See, e.g.*, *Farm King Supply, Inc.*

*Integrates Profit Sharing Plan and Trust v. Edward D. Jones & Co.*, 884 F.2d 288, 292 (7th Cir.

1989) (merely offering securities for sale does not trigger ERISA fiduciary duties).[25]  Based on

---

[23]/    Plaintiffs' Motion for Leave to File Second Amended Complaint (Docket 55) at 2 (Ex. J).

[24]/    Defendants appreciate that, due to the January 2004 reassignment of this matter, the circumstances of Plaintiffs' waiver were not well known to this Judge when he ruled on summary judgment.  Defendants did not identify or present these waiver arguments before because they understood  Plaintiffs' "quid pro quo" theory in their Supplemental Opposition brief to be arguing that Defendants' alleged fiduciary status arose from some conduct regarding the *accumulation units*, which had been the focus of Plaintiffs' class certification motion, Plaintiffs' oral argument on the summary judgment motion, and all of the allegations in the Fourth Amended Complaint.

[25]/    *See also Pegram v. Herdrich*, 530 U.S. 211, 226-27 (2000) (design of HMO features not a fiduciary function because "[t]he HMO is not the ERISA plan, and the incorporation of the HMO preceded its contract with the State Farm plan"); *Fink v. Union Cent. Life Ins. Co.*, 94 F.3d 489, 493 (8th Cir. 1996) (broker selling insurance to employer was merely a salesperson earning commissions and not a plan fiduciary); *Black v. Bresee's Oneonta Dept. Store, Inc. Sec. Plan*, 919 F. Supp. 597, 606 (N.D.N.Y. 1996) (marketing an ERISA plan does not implicate fiduciary

this principle, the cases unambiguously hold that an insurance company does not act as an ERISA fiduciary when it designs a product and then sells it on the financial products market. *See*, *e.g.*, *Consol. Beef Indust., Inc. v. New York Life Ins. Co.*, 949 F.2d 960, 965 (8th Cir. 1991) (insurer did not act as a fiduciary when it "simply sold . . . annuities" and "did not recommend specific investments beyond its products" – "[t]he mere marketing of the § 401(k) plan does not implicate fiduciary conduct").[26]

This is only common sense:  when an insurance company designs and structures an annuity product for the market, it has no relation with any existing ERISA plan and bears no obligation to consider any interest other than its own commercial objectives.[27]  In ERISA terms, the insurer does not exercise any authority or control over the management or disposition of plan assets by simply offering a variable annuity contract to the plans or participants that the trustees are free to accept or reject, regardless of what investment options are available through that

---

conduct because independent decision-making power resided with the employer); *Toomey v. Jones*, 855 F. Supp. 19, 25 (D. Mass. 1994) (defendant did not become an ERISA fiduciary merely by offering a product to an employee stock ownership plan).

[26]    *See also Flacche v. Sun Life Assurance Co.*, 958 F.2d 730, 733-35 (6th Cir. 1992) (insurer did not act as a fiduciary by supplying its annuity contracts to fund a plan); *Am. Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the U.S.*, 841 F.2d 658, 664 (5th Cir. 1988) ("Simply urging the purchase of its products does not make an insurance company an ERISA fiduciary with respect to those products."); *Fechter v. Conn. Gen. Life Ins. Co.*, 800 F. Supp. 182, 197 (E.D. Pa. 1992) ("the courts have refused to impose fiduciary obligations on insurance companies who merely sell their products or services to a pension plan").

[27]    *Cf. F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987) ("When a person who has no relationship to an ERISA plan is negotiating a contract with that plan, he has no authority over or responsibility to the plan and presumably is unable to exercise any control over the trustees' decision whether or not, and on what terms, to enter into an agreement with him.  Such a person is not an ERISA fiduciary."); *Srein v. Soft Drink Workers Union, Local 812*, 93 F.3d 1088, 1096 (2d Cir. 1996) ("CIGNA was free to negotiate its premium charges with an eye to its profits, its transaction costs (including Srein's commission), and the competition.  CIGNA contends, and we agree, that there was no fiduciary duty under ERISA at that point to negotiate a premium favorable to the Trust Fund.").

product or how they had been selected.  *See Sirna v. Prudential Sec., Inc.*, 964 F. Supp. 147, 149-50 (S.D.N.Y. 1997) (rejecting argument that PSI was an ERISA fiduciary based on its setting the terms of an account opened for an ERISA plan:  "At that point, the plan and PSI were strangers.  PSI had no control over the plan or its assets.  The plan trustee simply made his own decision to accept or reject PSI's offer.  In those circumstances, PSI was not a fiduciary.").[28]

This rule is consistent with the related ERISA principle that, when an employer designs and structures an ERISA plan for its workers, it does not act as a fiduciary and may decide based on its business needs what type and level of benefits to provide.  *See, e.g.*, *Pegram v. Herdrich*, 530 U.S. at 226-27 (explaining that "an employer's decisions about the content of a plan are not themselves fiduciary acts").[29]  If an employer is not an ERISA fiduciary when it directly selects the contents of an ERISA plan, then *a fortiori* an insurance company is not a fiduciary when it offers a product that an ERISA plan, acting through its trustee, may (or may not) purchase.

Based on these rules, the "fund selection" allegations in Plaintiffs' Fifth Amended Complaint cannot support a claim for ERISA fiduciary status.  The "fund selection" described by Plaintiffs took place *before* the Plaintiffs' plans or their participants purchased the variable annuities, when Defendants offered a variety of variable account investment options in the

---

[28]    *See also United States v. Glick*, 142 F.3d 520, 528 (2d Cir. 1998) ("When a person who has no relationship to an ERISA plan is negotiating a contract with that plan, he has no authority over or responsibility to the plan and presumably is unable to exercise any control over the trustees' decision whether or not, and on what terms, to enter into an agreement with him," and therefore "[s]uch a person is not an ERISA fiduciary with respect to the terms of the agreement.").

[29]    *See also United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1274, 1280 (7th Cir. 1985) (ERISA's fiduciary duties do not apply to entities negotiating terms of a future plan, but only to the administering of vested rights under an existing plan).

applications for the variable annuities.[30/]  The Plaintiffs' plans (in the case of the group annuities) or the participants in the Plaintiffs' plans (in the case of the individual annuities) then chose among these investment options when they applied for the variable annuities.  *See* Complaint ¶ 25.  The Complaint itself acknowledges that Plaintiffs exercised their own independent authority in deciding whether to apply for the variable annuities from Defendants, and which particular funds to include in their annuity applications.  *See* Complaint ¶¶ 19, 25.  Thus, there was no relationship between the Defendants and the plans or participants at the time of the "fund selection" that could support a claim that Defendants were ERISA fiduciaries.  *See Glick*, 142 F.3d at 528 (person may only become a fiduciary "*after* [that] person has entered into an agreement with an ERISA-covered plan") (emphasis added).[31/]

Finally, even if Defendants could become ERISA fiduciaries as a result of some pre-contract "fund selection," the Complaint still would not state a claim on behalf of three of the Plaintiffs – the trustees for Greater Hartford Easter Seal, Flyte Tool & Die, and Crown Tool & Die.  The documents incorporated by reference in the Complaint show that their plans or participants purchased annuity contracts in the early 1990s, well before the challenged "revenue

---

[30/]    *Id.* ¶ 25; *see also* Decision at 7; Application for Group Annuity Contract of Flyte Tool & Die Company, Inc. 401(k) Profit Sharing Plan ("Flyte Contract") (Ex. U) at N 021 ("The Contract shall include the following Funds of the Separate Account [listing funds available for investment]"); *see also* Annuity Application of participant in Carl D. Anderson & Associates Inc. 401(k) Profit Sharing Plan ("Anderson Contract") (Ex. V) at N 073 ("contract owners may have purchase payments applied … toward purchase of shares at net asset value of the following fund(s) [listing funds available for investment]").

[31/]    *See also Srein*, 93 F.3d at 1096 (fiduciary status arises only "once" contract is accepted); *F.H. Krear & Co.*, 810 F.2d at 1254 (no fiduciary status during contract negotiations or "prior to the execution of the Contracts").

sharing" payments are alleged to have commenced in 1996.[32]  Plainly the "selection" of investment options for those contracts in the early 1990s could not have been "in exchange for" any alleged payments that did not even exist at the time.

### B.    Defendants Are Not ERISA Fiduciaries Based On The Alleged Fund Substitution Or Deletion In Existing Annuity Contracts.

The Fifth Amended Complaint also seeks to revive the claim that Defendants became ERISA fiduciaries based on a "fund substitution" provision in the group annuity contracts. (Plaintiffs' individual annuity contracts contain no provision regarding the substitution of mutual funds available for investment.[33])  That group contract provision permitted Defendants in certain circumstances to substitute one variable account investment option with another variable account investment option previously selected by the plans:

> If the shares of a Fund should no longer be available for investment by the Separate Account or if, in the judgment of the Company, further investment in the shares of a Fund should become inappropriate in view of the purposes of the Contract, the Company may substitute shares of another Fund for Fund shares already purchased or to be purchased in the future.[34]

Plaintiffs allege that Defendants in fact exercised this right on some unspecified occasions to substitute certain unspecified funds previously selected by the plans for other funds chosen by the plans.[35]  Plaintiffs thus acknowledge that, if such a theory were viable, fiduciary status could arise only on those occasions where Defendants actually *exercised* the contractual power to substitute or delete funds, a result that is compelled in any event by the plain language

---

[32]    *See* Complaint ¶ 44; Flyte Contract at N 021 (Ex. U); The Greater Hartford Easter Seal Rehabilitation Center Contract ("Easter Seal Contract") at N 227 (Ex. W); Crown Tool & Die Co, Inc. Salary Deferral Profit Sharing Plan Contract ("Crown Tool Contract") at N 001 (Ex. X).

[33]    *See* Anderson Contact at *passim* (Ex. V).

[34]    Flyte Contract at N 041 (Ex. U); Decision at 7.

[35]    *See* Complaint ¶¶ 25, 54.

14

of ERISA,[36/] caselaw,[37/] and the Court's Decision.[38/] Even so limited, however, Plaintiffs' theory still fails as a matter of law.

Allegations that Defendants substituted and deleted investment options in variable annuity contracts do not describe an exercise of authority or control respecting the management or disposition of plan assets that could give rise to ERISA fiduciary status. The plan assets alleged to be at issue here are the variable annuity contract accumulation units. But there is no allegation that Defendants have dissipated or misappropriated those units, and the annuity contracts show that Defendants could act with respect to the units only at the direction of the plans and participants.[39/]

Instead, Plaintiffs must rely on a premise that Defendants' alleged "substitution and deletion" affected the investment choices available to the plans and participants, and therefore

---

[36/]    *See* 29 U.S.C. § 1002(21)(A)(i) (person is a fiduciary only "to the extent" he actually "exercises" the requisite authority or control).

[37/]    *See Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 87 (2d Cir. 2001) ("Under this definition, a person ... has [fiduciary] status only 'to the extent' that he has or exercises the described authority or responsibility.") (internal citation omitted); *Bouboulis v. Transp. Workers Union of Am.*, --- F.3d ---, 2006 WL 620645, at *7 (2d Cir. 2006).

[38/]    *See* Decision at 16-17 ("Accordingly, Nationwide may be a fiduciary to the extent that it exercises authority or control over plan assets by determining and altering which mutual funds are available for the Plans' and participants' investments.").

[39/]    *See* Flyte Contract (Ex. U) at N 029 (stating that all deposits will be credited to units according to the contractholder's investment decisions within a specified period of time); *id.* at N 029-30 (stating how unit values are calculated based on contractholder's investment decisions); *id.* at N 033-34 (stating that, upon written notice from the contractholder, the company will cancel a specified number of units to fund the annuity); *id.* at N 032 (stating that at contractholders' written instruction to exchange investments between funds, company will cancel units to facilitate the exchange and stating how to calculate the proper number of units to be transferred and the time period in which the exchange must be effectuated); *id.* at N 040 (stating that at contractholder's written instruction to transfer its investment, the company will cancel the contractholder's units within a specified period of time); *see also* Anderson Contract (Ex. V) at N 081-82 (describing the units and the calculation of their value based on the participant's investment decisions).

should be deemed to have had some "indirect" or "attenuated" effect on the management or disposition of plan assets in order to create fiduciary status.  However, Plaintiffs do not explain how their investment choices could be affected if one of their selected investment options replaced another that was "no longer . . . available for investment."  *See* Flyte Contract (Ex. U) at N 041; Decision at 7.  Further, if, as alleged elsewhere in the Complaint, the investment options were "selected" in the first place in exchange for payments by mutual fund affiliates, then according to Plaintiffs' own logic any subsequent deletion or substitution of those existing options could not have harmed the plans or participants.

In any event, regardless of the logical flaws in Plaintiffs' allegations, it is plain under ERISA that a person does not become a plan fiduciary merely because its actions have an "indirect" or "attenuated" effect upon a plan's investment choices.  Instead, the statute is quite clear:  a person must "exercise" "authority or control" "respecting the management or disposition" of plan assets to be a fiduciary.  *See* 29 U.S.C. § 1002(21)(A)(i).  There is no room in those words for fiduciary status to arise from an attenuated or indirect effect upon the choices available to a plan; only the actual exercise of what the cases describe as the "requisite degree" of authority or control that affects the plan assets themselves can create that status.  *See Geller v. County Line Auto Sales, Inc.*, 86 F.3d 18, 21 (2d Cir.1996) (employer that wasted plan assets did not "exercise the requisite degree of control and discretion to be held liable as a fiduciary"); *Flake v. Hoskins*, 55 F. Supp. 2d 1196, 1219-20 (D. Kan. 1999) (corporate actions that had the indirect effect of preventing the sale of plan assets not a fiduciary function).[40/]

_____

[40/]    *See also Martin v. Feilen*, 965 F.2d 660, 665 (8th Cir.1992) (actions with mere "indirect[]" effect on plan do not implicate fiduciary duties under ERISA); *Local 875 I.B.T. Pension Fund v. Pollack*, 992 F. Supp. 545 (E.D.N.Y. 1998) ("determination of fiduciary status under ERISA is dependent upon all exercise of the 'requisite degree' of control over plan assets,"

16

Such a boundary on ERISA liability is critical, as many actions might indirectly affect a plan's choices – for example, bad decisions by an employer in selecting the investment options initially, cost increases by the mutual funds whose shares are purchased by the variable account, even the conduct of plan participants themselves if they were to engage in rapid trading called "market timing" that affected other plan participants. *See, e.g.*, *Prusky v. Reliastar Life Insur. Co.*, 2006 WL 690821 (3d Cir. March 20, 2006). None of these actions could fairly give rise to ERISA fiduciary status even though they all might have a large (though indirect) impact on the investment choices available to the plan. As the Ninth Circuit explained in rejecting an argument that a service provider was an ERISA fiduciary because he "dissipated [plan] assets": "This argument proves far too much. Under this rationale anyone performing services for an ERISA plan – be it an attorney, an accountant, a security guard or a janitor – would be rendered a fiduciary insofar as he exercised some control over trust assets and through negligence or dishonesty jeopardized those assets."[41]

None of the cases cited on this point in the Court's Decision involved the mere elimination of a possible investment choice. Those cases all involved conduct by the defendant

---

which could not be shown by alleging that the defendants misappropriated plan assets); *Trustees of Laborer's Local No. 72 Pension Fund v. Nationwide Life Ins. Co.*, 783 F. Supp. 899, 908-09 (D.N.J. 1992) (defendant's setting a variable return rate pursuant to contractual authority did not trigger fiduciary duties when it had only a "marginal effect" on the overall rate of return); *Fechter v. Conn. Gen'l Life Ins. Co.*, 800 F. Supp. at 199-200 (defendant's exercising contract authority to pay disbursements over a period of up to ten years – rather than making an immediate lump-sum payout – did not give rise to an ERISA fiduciary duty).

[41]     *Nieto v. Ecker*, 845 F.2d 868, 870-71 (9th Cir. 1988); *see also McMorgan & Co. v. First Cal. Mortgage Co.*, 916 F. Supp. 966, 972-73 (N.D. Cal. 1995) (mortgage company does not become fiduciary by evaluating loans for trust funds, despite its advice indirectly causing a $29 million loss of plan assets); *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 538 (7th Cir. 1991) (professional consultant does not become fiduciary by virtue of allegation that he wasted pension fund assets).

that directly and immediately controlled the amount of money paid either to or by a plan.  Thus,

*Blatt v. Marshall and Lassman*, 812 F.2d 810 (2d Cir. 1987), concluded that defendants could be

ERISA fiduciaries because their conduct prevented the plan participant from receiving any of his

ERISA plan assets for over a year and a half.  That is a real and concrete impact on the actual

disposition of plan funds; nothing comparable is alleged in Plaintiffs' Complaint.[42/]  In *Brock v.*

*Hendershott*, 840 F.2d 339 (6th Cir. 1988), the defendant union official actually directed the

plans to purchase a particular dental service in which he had a financial interest, causing the plan

to pay out money.  In *Stanton v. Shearson/Lehman Am. Express, Inc.*, 631 F. Supp. 100 (N.D.

Ga. 1986), the court held that the fiduciary status of a broker who admittedly controlled a

particular ERISA account could be imputed to his firm on a respondeat superior theory, and also

held that firm had its own direct fiduciary status to the extent it exercised authority or control

over that broker.

Likewise, the Department of Labor's Advisory Opinion 97-16A (*Aetna*) does not support

Plaintiffs' theory that allegations of "fund substitution and deletion" could create an ERISA

fiduciary duty.  That advisory opinion found that Aetna *did not act in a fiduciary capacity* in

selecting a roster of funds for investment.[43/]  And here, Defendants' alleged power to substitute

or delete investment options in the group annuity contracts is substantially less broad, and less

material, than that held by the non-fiduciary insurer in *Aetna*.  While in *Aetna*, the insurer

---

[42/]    Furthermore, *Blatt* is questionable precedent on ERISA fiduciary duty issues, as courts
within the Second Circuit have observed that *Blatt* is not a reliable guide to circuit law.  *See
Pollack*, 992 F. Supp. at 570 ("To the extent that *Lopresti* and *Geller* may be read as being
inconsistent with the Court of Appeals' earlier decision in *Blatt v. Marshall and Lassman*, 812
F.2d 810 (2d Cir. 1987), upon which the plaintiffs rely, it is the later opinions that must be
followed.").

[43/]    DOL Advisory Opinion 97-16A (May 22, 1997).

apparently had discretion to substitute or delete for any reason, Defendants here may do so only

if an investment option is no longer available for investment because the underlying fund is

closing or if further investment in that  option becomes inappropriate for contract purposes.[44]

And, per Defendants' group contract, "[n]o change will adversely affect the rights of any

participant" unless it is required by a government agency or each affected participant consents.[45]

The impact of any substitution is further lessened by the requirement, noted by the Court in its

Decision, that any substituting investment option be one that has already been selected as an

investment option by plan fiduciaries in their contract applications.[46]  And, like the contract

holders in *Aetna*, Plaintiffs with group contracts containing the substitution or deletion clause

also have the right to terminate their contracts if they do not approve a fund substitution or

deletion.[47]  Just as in *Aetna*, these limited and circumscribed contractual rights – which exist

simply to provide a mechanism to deal with unanticipated events that necessarily require quick

action, such as fund dissolutions – cannot as a matter of law convert Defendants into ERISA

fiduciaries.

     Further, to the extent that Plaintiffs' claim of ERISA fiduciary status depends on an

allegation that Defendants substituted or deleted investment options based on the fund affiliates'

refusal to make payments, *see* Decision at 16 n.6, there is no such allegation in the Complaint.

Paragraph 35 alleges that Defendants' initial "offering [of] a mutual fund family's funds" was

---

[44]    *See* Flyte Contract at N 041 (Ex. U).

[45]    *Id.*

[46]    *Id.* at N 027 (defining "Fund" as "a registered investment management company (mutual fund), *specified in the Application*, in which assets of a Series will be invested) (emphasis added); *id.* at N 041 (providing that "the Company may substitute shares of another Fund for Fund shares already purchased or to be purchased in the future").

[47]    Flyte Contract at N 039-40 (Ex. U).

conditioned on such payments, but it contains no allegations regarding substitution or deletion. And paragraph 37 unambiguously acknowledges that some funds paid "0.00%" to Defendants, thus conceding that some funds declined to pay but were even offered as investment options to be incorporated into the contracts *ab initio*.  Similarly, Plaintiffs do not allege that any substitution or deletion actually affected or altered their investment decisions or the disposition of any specific plan funds.  The absence of any such allegation that Defendants' actions even indirectly affected plan assets requires dismissal on that basis alone.

Finally, as the Court noted in its Decision, while Plaintiffs' group annuity contracts allow for the substitution of funds in particular circumstances, Plaintiffs' individual annuity contracts contain no such provision.[48/]  To the extent such a contractual provision is the basis for allegations of fiduciary status, the action must be dismissed as to Plaintiffs Ferdon and Gouse, trustees of plans utilizing individual contracts.

## IV.    PLAINTIFFS' ALLEGATIONS REGARDING THE PAYMENTS FROM FUND AFFILIATES TO DEFENDANTS FAIL AS A MATTER OF LAW.

As described in Point III, *supra*, the Fifth Amended Class Action Complaint does not state a claim that Defendants are ERISA fiduciaries.  Therefore, the Court need not address Plaintiffs' further allegations regarding the status of the so-called "revenue sharing" payments by mutual fund affiliates to Defendants as plan assets, and the relationship of those payments to Plaintiffs' accumulation units.  Even if considered, however, those allegations too fail to state a claim as a matter of law.

---

[48/]    *Compare* Flyte Contract at N 041 (Ex. U) *with* Easter Seal Contract at *passim* (Ex. W) and Anderson Contract at *passim* (Ex. V).

**A.      Payments From Mutual Fund Affiliates Are Not ERISA Plan Assets.**

Plaintiffs do not dispute that, as a matter of law, the "revenue sharing" payments received by Defendants came from assets owned by the mutual funds' affiliates (not from any assets of the plans).  Nor will Plaintiffs attempt to trace these payments to any assets of the plans.[49/] Nevertheless, Plaintiffs allege that these concessions should be ignored, and the "revenue sharing" payments should be transformed from assets of the mutual fund affiliates to assets of the plans, under the two-part "alternative functional approach" in the Court's Decision. Complaint ¶ 55.  Defendants respectfully submit that this "functional approach" and Plaintiffs' corresponding allegations are legally flawed.

While a "functional approach" may be used to determine what actions constitute the exercise of authority and control over plan assets, such an approach is not appropriate to determine whether an asset belongs to a plan in the first place.  The first type of "functional" analysis makes sense, because the statutory definition of a "fiduciary" turns on functional concepts like exercising authority or control, not formal titles.  *See Mertens v. Hewitt Associates*, 508 U.S. 248, 262 (1993) ("ERISA, however, defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan."); *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127, 1131 (9th Cir. 1983).  But nothing in ERISA supports a broader "functional approach" to plan assets that would convert money belonging to mutual funds into money belonging to ERISA plans.  To the contrary, the identification of plan assets has long been understood to be a straightforward task that requires assessing the legal status of the assets based on the relevant documents, contracts, and regulations.  *See Reich v. Goldstein*, 839 F.

---

[49/]      *See* Complaint ¶ 30 (mutual fund pays service providers from "its" assets); Defendants' Response to Plaintiffs' Local Rule 56(a)2 Statement (Docket 223) ¶ 30 (collecting Plaintiffs' allegations and admissions on this issue) (Ex. Y).

Supp. 1068, 1073 (S.D.N.Y. 1993); *LoPresti v. Terwilliger*, 126 F.3d 34, 39 (2d Cir. 1997).

Here, where Plaintiffs have admitted that the money used to make the "revenue sharing"

payments belonged as a matter of law to the mutual fund affiliates, no "functional approach" can

transform those mutual fund assets to "plan assets" simply because they are received by

Defendants. *See* Decision at 20.

Dicta from cases like *Acosta v. Pacific Enterprises, Inc.*, 950 F.2d 611 (9th Cir. 1992),

and *Metzler v. Solidarity of Labor Organizations Health & Welfare Fund*, 1998 WL 477964

(S.D.N.Y. Aug. 14, 1998), should not be taken out of context to hold otherwise, especially

because nothing in those cases addressed allegations comparable to the ones at issue here. While

*Acosta* and *Metzler* may allude conceptually to a "functional approach," the actual facts and

holdings of the decisions demonstrate that even that sort of approach finds plan assets to exist

only where the plan has a demonstrable *pre-existing* claim of entitlement or right to particular

monies. Thus, in *Metzler*, as in many cases, the plans were plainly entitled to the employer's

ERISA contributions; the holding that those contributions were plan assets when paid was

unremarkable and did not turn on any vague or indirect connection between the assets and the

plan. *See Metzler*, 1998 WL 477964 at *6-7; *see also Reich v. Goldstein*, 839 F. Supp. 1068,

1073 (S.D.N.Y. 1993). And the brief mention in *Acosta* of the need for a "more functional

approach" to identifying plan assets had no bearing whatsoever on the outcome of that case,

where the Ninth Circuit concluded that the asset at issue – a list of plan participants – was not

misused in any event and so the question of plan asset status need not even be considered. *See*

*Acosta*, 950 F.2d at 620.

Moreover, even if a "functional approach" were an appropriate way to analyze this issue,

the suggested "alternative" approach is too broad and ambiguous to be workable or fair. ERISA

fiduciaries receive many "benefits" through the exercise of fiduciary discretion or authority that arguably or indirectly come "at the expense of" a plan. For example, a fiduciary investment advisor may receive "benefits" such as advisory fees from a plan: these result from the exercise of a fiduciary function and are at the expense of a plan, but they have never been held to be plan assets once received by the fiduciary. Similarly here, the mutual fund fees – which were not paid by any plan but were paid by the mutual fund shareholders, including the variable accounts *and* many other investors – did not become plan assets when paid to Defendants. In marked contrast to the traditional test which relies on the controlling documents, contracts, and regulations, the proposed functional approach would cause almost any service provider that transacts business with ERISA plans to be subject to ERISA fiduciary status. Such a result is untenable and would make it very difficult for ERISA plans to transact necessary business with wary service providers.

The proposed alternative functional approach is also flawed because it is circular. Under the ERISA statute, Defendants are only ERISA fiduciaries if they exercised authority or control respecting management or disposition of plan assets. But under this new "functional approach," the definition of "plan assets" under the ERISA statute will depend on whether Defendants received the assets as a result of their status as an ERISA fiduciary. Courts would have to determine whether someone is a fiduciary based on how he handles plan assets, while simultaneously determining if those assets are "plan assets" based on whether the person is a fiduciary.

### B.    Mutual Funds And Fund Affiliates Do Not "Deal With The Plans" And Their Payments To Defendants Do Not "Involve Assets Of the Plans."

Again tracking the Court's Decision, Plaintiffs allege that the "revenue sharing" payments from mutual fund affiliates are "prohibited transactions" under section 406(b) of

ERISA because they constitute "a fiduciary receiving consideration (the revenue sharing payments) for its own account from parties (mutual funds) dealing with the Plans in connection with transactions (the so-called service contracts) involving the assets of the Plans (the shares of the variable accounts, represented by the accumulation units)."  Complaint ¶ 59.  Respectfully, this allegation is also insufficient to state a claim as a matter of law because it is directly contradicted by the other allegations of Plaintiffs' Complaint and the documents incorporated by reference.

    In particular, even though Plaintiffs' 406(b) allegation states in conclusory fashion that the mutual funds "dea[l] with Plans," the Complaint more specifically alleges that the mutual funds deal only with the variable account entity, and not any Plaintiff or ERISA plan.[50/]  The referenced contracts confirm that no plan purchases or owns any mutual fund shares, or participates in any transaction involving the funds; to the contrary, the Complaint and the contracts plainly show that only the variable accounts that are separate legal trusts deal with the funds.[51/]  Plaintiffs may not avoid dismissal simply by including in their brief an incorrect legal conclusion that the contracts between Defendants and mutual fund affiliates somehow amount to the funds "dealing with the Plans."  *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) ("General, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint."); *In re American Express Co. Shareholder Litig.,* 39 F.3d 395, 400-01 n.3 (2d Cir. 1994) ("[C]onclusory allegations of the legal status of the

---

[50/]     Complaint ¶ 29 ("the Plans and their participants did not invest in the mutual funds. Rather, the Plans and their participants invested in 'variable accounts,' also known as 'separate accounts' established by Nationwide").

[51/]     Complaint ¶ 28 ("Nationwide sells and purchases mutual fund shares to hold in the variable account.").

defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss.").[52]

Similarly, the assertion that payments made from mutual fund affiliates out of their own assets "involv[es] the assets of the Plan" is incorrect based on Plaintiffs' own admissions in this case and the documents incorporated by reference in the Complaint.[53]  If any transaction having a nexus to a Plan is deemed to constitute "dealing with the plan" and "involving assets of the plan" for purposes of 29 U.S.C. § 1106(b)(3), then virtually any transaction between a plan fiduciary and a service provider will necessarily be prohibited.  Here, the undisputed nature of these transactions as contracts and payments solely between Defendants and mutual fund affiliates, and made from the funds' and affiliates' own personal assets, necessarily defeats any claim under 29 U.S.C. § 1106(b)(3).

The Department of Labor's advisory opinion in *ABN Amro*, cited in the Court's Decision, powerfully supports Defendants' position on this issue.  DOL Advisory Opinion 2003-09A (June 25, 2003).  *ABN Amro* involved a provider of directed trustee services to ERISA plans.  The trustee – described by DOL as an ERISA fiduciary – received payments from affiliates of mutual funds that had been selected for investment by the plans, including so-called "proprietary" funds that were affiliated with the trustee.  As the Court observed, the plans in *ABN Amro* were free to select any available fund, and the trustee did not create a fixed roster from which the plans could choose funds for investment.  However,  each plan was required to select at least one so-called

---

[52]     *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) ("[C]ourts do not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened. . . .") .

[53]     *See* Complaint ¶ 30 (mutual fund pays service providers from "its" assets); Defendants' Response to Plaintiffs' Local Rule 56(a)2 Statement ¶ 30 (collecting Plaintiffs' allegations and admissions on this issue) (Ex. Y).

"proprietary fund" related to the trustee, a requirement imposed by the trustee because its corporate affiliates earned significant asset-management profits from plan investment in proprietary funds. *Id.* at 1-2. And to further encourage investment in proprietary funds, the trustee set the fees that it personally charged directly to the ERISA plans based on the number of proprietary funds selected by the plans for investment; plans that selected fewer proprietary funds for investment were charged higher fees than plans that selected more such funds. *Id.* at 2.

On any fair reading, the actions of the trustee in *ABN Amro* had a far more direct and significant impact on plan assets than any conduct of Defendants here. The *ABN Amro* trustee set its own fees, which were charged directly to the plans based on their investing in particular proprietary funds that generated profits for the trustee's affiliates. The trustee expressly required investment in at least one fund that generated asset management profits for the trustee's company. And the amount of fees directly paid by the plan was set with direct reference to the number of proprietary funds and thus the profits to the trustee's affiliates. If those actions did not give rise to a claim under Section 406(b), as they did not according to the DOL, then certainly the far lesser and far more indirect actions alleged here do not either.

## V.    CONCLUSION

Because Plaintiffs have intentionally waived the only arguably viable theories as to Defendants' fiduciary status, this action must be dismissed. Even if that waiver were overlooked, Plaintiffs' theories nevertheless are legally flawed. Accordingly, Defendants respectfully seek dismissal of this action with prejudice.

Date: April 20, 2006                          Respectfully submitted,


                                     /s/  Jessica A. Ballou  (CT 22253)
                                  Dennis F. Kerrigan, Jr. (CT 09621)
                                  Brian O'Donnell (CT 16041)
                                  Jessica A. Ballou  (CT 22253)
                                  LeBoeuf, Lamb, Greene & MacRae LLP
                                  Goodwin Squire
                                  225 Asylum Street
                                  Hartford, CT 06103
                                  Telephone:  (860) 293-3500
                                  Facsimile:  (860) 293-3555
                                  Email:  jballou@llgm.com

                                  Defendants Nationwide Financial Services Inc.
                                  and Nationwide Life Insurance Co.

                                  Charles C. Platt, Esq. (CT 23036)
                                  Wilmer Cutler Pickering Hale and Dorr LLP
                                  399 Park Avenue
                                  New York, NY  10022
                                  Telephone:(212) 230-8800
                                  Facsimile: (212) 230-8888

                                  Daniel H. Squire, Esq. (*application for admission
                                  *pro hac vice* pending*)
                                  Sam Broderick-Sokol, Esq.
                                  Wilmer Cutler Pickering Hale and Dorr LLP
                                  2445 M Street, N.W.
                                  Washington, D.C. 20037
                                  Telephone: (202) 663-6000
                                  Facsimile:  (202) 663-6363

## <u>CERTIFICATION</u>

I hereby certify that on this 20th day of April 2006, I electronically filed the foregoing

with the Clerk of the District Court using the CM/ECF system, which sent notification of such

filing to the following:

Richard A. Bieder, Esq.
Antonio Ponvert III, Esq.
Koskoff, Koskoff & Bieder, P.C.
350 Fairfield Avenue
Bridgeport, CT 06604

Gregory G. Jones, Esq.
Law Firm of Gregory G. Jones, P.C.
603 South Main Street, Suite 200
Grapevine, TX 76051

Marc R. Stanley, Esq.
Roger L. Mandel, Esq.
Stanley, Mandel & Iola
3100 Monticello Avenue, Suite 750
Dallas, TX 75205

        /s/  Jessica A. Ballou  (CT 22253)