UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Lou Haddock, as trustee of the Flyte | § | |
| Tool & Die, Incorporated Deferred | § | |
| Compensation Plan, et. al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 01-CV-1552 (SRU) |
| | § | |
| Nationwide Financial Services | § | |
| Incorporated, and Nationwide Life | § | |
| Insurance Company, | § | |
| | § | |
| Defendants. | § | November 15, 2007 |

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
BASED ON FIFTH AMENDED COMPLAINT AND MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS ................................................................................................ i

INDEX OF AUTHORITIES ........................................................................................ iii

I.      PRELIMINARY STATEMENT ................................................................ 1

II.     STATEMENT OF FACTS ......................................................................... 2

A.      *THE RELATIONSHIP BETWEEN CLASS MEMBERS,*
        *NATIONWIDE AND THE MUTUAL FUNDS* ................................................ 2

B.      *THE RELATIONSHIP BETWEEN NATIONWIDE AND MUTUAL*
        *FUNDS/MUTUAL FUND ADVISORS PRIOR TO IMPLEMENTATION*
        *OF THE REVENUE SHARING SCHEME* ..................................................... 7

C.      *IMPLEMENTATION OF THE REVENUE SHARING SCHEME* ..................... 9

III.    PLAINTIFFS' CAUSE OF ACTION ...................................................... 12

A.      *NATIONWIDE CONSTITUTES A FIDUCIARY* .................................... 13

B.      *NATIONWIDE'S VIOLATION OF ERISA § 404(a)(1)(A) AND (B)* .............. 16

C.      *NATIONWIDE'S VIOLATION OF ERISA § 406(b)(1) AND (3)* ................... 17

IV.     THE PROPOSED CLASS SATISFIES
        THE REQUIREMENTS OF RULE 23(a) ............................................... 18

A.      *RULE 23(A)(1) - THE PROPOSED CLASS IS SO NUMEROUS*
        *THAT JOINDER OF ALL MEMBERS IS IMPRACTICABLE* .......................... 20

B.      *RULE 23(A)(2) - THERE ARE QUESTIONS OF LAW OR FACT*
        *COMMON TO THE CLASS* ..................................................................... 20

C.      *RULE 23(A)(3) - PLAINTIFFS' CLAIMS ARE TYPICAL OF*
        *THE CLAIMS OF THE CLASS* ................................................................. 23

D.      *RULE 23(A)(4) - PLAINTIFFS WILL FAIRLY AND*
        *ADEQUATELY PROTECT THE INTERESTS OF THE CLASS* ....................... 25

1.      Plaintiffs Do Not Have Disabling Conflicts of Interests With the Class .......... 25

i

**PAGE**

2.   Plaintiffs Have Sufficient Knowledge to Act as Class Representatives ...........................26

3.   Class Counsel Will Adequately Represent the Class ........................................................27

**V.   THE COURT SHOULD CERTIFY
THIS CASE PURSUANT TO RULE 23(b)(2)** ........................................................................27

A.   *THE FINAL INJUNCTIVE AND DECLARATORY RELIEF
SOUGHT BY THE CLASS QUALIFIES FOR CERTIFICATION
UNDER RULE 23(b)(2)* ..............................................................................................27

B.   *THE EQUITABLE MONETARY RELIEF SOUGHT BY
PLAINTIFFS ALSO QUALIFIES FOR CERTIFICATION
UNDER RULE 23(b)(2), BECAUSE IT CONSTITUTES
A FORM OF INJUNCTIVE RELIEF* ...............................................................................28

C.   *ALTERNATIVELY, THE EQUITABLE MONETARY RELIEF
SOUGHT BY PLAINTIFFS QUALIFIES FOR 23(b)(2)
TREATMENT, BECAUSE IT IS ONLY INCIDENTAL TO THE
INJUNCTIVE AND DECLARATORY RELIEF* .................................................................32

D.   *ALTERNATIVELY, PLAINTIFFS' EQUITABLE AND MONETARY
RELIEF QUALIFIES FOR 23(b)(2) TREATMENT BECAUSE
THE INJUNCTIVE AND DECLARATORY RELIEF PREDOMINATES
UNDER THE SECOND CIRCUIT'S AD HOC TEST* .........................................................34

**VI.   THE COURT SHOULD ALSO CERTIFY THIS CASE
PURSUANT TO RULE 23(b)(3)** .....................................................................................37

A.   *COMMON QUESTIONS OF FACT AND LAW PREDOMINATE* ...................................37

B.   *A CLASS ACTION IS SUPERIOR TO OTHER AVAILABLE
METHODS FOR THE FAIR AND EFFICIENT
ADJUDICATION OF THIS CONTROVERSY* ...................................................................38

**CONCLUSION** ......................................................................................................................40

## INDEX OF AUTHORITIES

**CASES**                                                                   **PAGE(S)**

*Allison v. Citgo Petroleum Co.*,
151 F.3d 402 (5th Cir. 1998) ............................................................................28, 32

*Amchem Prods. Inc. v. Windsor*,
521 U.S. 591 (1997) ...............................................................................................37

*Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*,
222 F.3d 52 (2d Cir. 2002) .....................................................................................26

*Board of Trustees of Brick Layers & Allied Craftsmen Local 6 of N.J. Welfare Fund
    v. Wettlin Assoc., Inc.*, 237 F.3d 270 (3d Cir. 2001) ...................................16

*Bradford v. Agco Corp.*,
187 F.R.D. 600 (W.D. Mo. 1999) ...........................................................................26

*Brown v. Kelly*,
244 F.R.D. 222, (S.D.N.Y. 2007) ..........................................................................35

*Bublitz v. E.I. du Pont de Nemours and Co.*,
202 F.R.D. 251 (S.D. Iowa 2001) ....................................................................18, 21

*Chicago Board Options Exchange, Inc. v. Connecticut Gen'l Life Ins. Co.*,
713 F.2d 254 (7th Cir. 1983) .................................................................................15

*Coleman v. Pension Ben. Guar. Corp.*,
196 F.R.D. 195 (D.D.C. 2000)................................................................................21

*Demitropoulos v. Bank One Milwaukee, N.A.*,
915 F. Supp. 1399 (N.D. Ill. 1996) ........................................................................26

*Devine v. Combustion Engineering, Inc.*,
760 F. Supp. 989 (D. Conn. 1991) ........................................................................20

*Dura-Bilt Corp. v. Chase Manhattan Corp.*,
89 F.R.D. 87 (S.D.N.Y. 1981) ...............................................................................23

*Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*,
805 F.2d 732 (7th Cir. 1986) .................................................................................15

**CASES**                                                                            **PAGE(S)**

*Fabricant v. Sears Roebuck*,
202 F.R.D. 310 (S.D. Fla. 2001) ...................................................24

*Fears v. Wilhelmina Model Agency, Inc.*,
2003 WL 21659373 (S.D.N.Y. July 15, 2003) ..........................24

*General Tel. Co. of Southwest v. Falcon*,
457 U.S. 147 (1982) ..............................................................23, 25

*Gerber v. Computer Assoc. Int'l, Inc.*,
1995 WL 228388 (E.D.N.Y. Apr. 7, 1995) .............................21

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) ........................................................29, 30, 31

*Gruby v. Brady*,
838 F. Supp. 820 (S.D.N.Y. 1993) ....................................23, 24

*Guardsmark, Inc. v. Blue Cross & Blue Shield of Tenn.*,
313 F. Supp. 2d 739 (W.D. Tenn. 2004) ................................16

*Gunnells v. Health Plan Services, Inc.*,
348 F.3d 417 (4th Cir. 2003) .........................................27, 38

*Haddock v. Nationwide Financial Services, Inc.*,
419 F. Supp. 2d 156 (D. Conn. 2006) ..............................15, 17

*Harris Trust & Savings Bank v. Salomon Smith Barney*,
530 U.S. 238 (2000)........................................................30, 31

*Health Care Service Corp. v. Tap Pharmaceutical Products, Inc.*,
2003 WL 21801636 (E.D. Tex. 2003) ....................................31

*In Re "Agent Orange" Prod. Liab. Litig.*,
818 F.2d 145 (2d Cir. 1987), *cert denied sub. nom.*,
*Pinkney v. Dow Chemical Co.*, 484 U.S. 1004 (1998) ............. 20-21

*In Re Anjopa Paper & Board Manuf. Co.*,
269 F. Supp. 241 (S.D.N.Y. 1967) ......................................30

*In Re Citigroup Pension Plan ERISA Litig.*,
241 F.R.D. 172 (S.D.N.Y. 2006) ...........................................36

**<u>CASES</u>**                                                                        **<u>PAGE(S)</u>**

*In Re Drexel Burnham Lambert Group, Inc. Sec. Litig.*,
960 F.2d 285 (2d Cir. 1992) .........................................................................20, 23, 25

*In Re Energy Sys. Equip. Leasing Sec. Litig.*,
642 F. Supp. 718 (E.D.N.Y. 1986) ...............................................................23

*In Re Ikon Office Solution Inc. Sec. Litig.*,
191 F.R.D. 457 (E.D. Pa. 2000) ....................................................................19

*In Re Initial Public Offering Securities Litigation*,
471 F.3d 24 (2d Cir. 2006) ...........................................................................19, 20

*In Re Martin Fein & Co., Inc.*,
43 B.R. 623 (Bankr. S.D.N.Y. 1984) .............................................................30

*In Re Monumental Life Ins. Co., Industrial Life Ins. Lit.*,
2003 WL 21921137 (5th Cir. 2003) ..............................................................33, 36

*In Re Revco Sec. Litig.*,
142 F.R.D. 659 (N.D. Ohio 1992) .................................................................39

*In Re Universal Service Fund Telephone Billing Practices Litigation*,
219 F.R.D. 661 (D. Kan. 2004) .....................................................................35, 36

*In Re Visa Check/MasterMoney Antitrust Lit.*
280 F.3d 124 (2d Cert. 2001)........................................................................25, 37, 39

*In Re Warner-Quinlan Co.*,
86 F.2d 103 (2d Cir. 1936) ...........................................................................30

*Ingram v. Joe Conrad Chevrolet, Inc.*,
90 F.R.D. 129 (E.D. Ky. 1981) .....................................................................25

*IT Corp. v. Gen'l American Life Ins. Co.*,
107 F.3d 1415 (9th Cir. 1997) ......................................................................16

*Kaplan v. Pomerantz*,
131 F.R.D. 118 (N.D. Ill. 1990) ....................................................................26

*Karen L. v. Physicians Health Services, Inc.*,
202 F.R.D. 94 (D. Conn. 2001) .....................................................................19, 21, 23

*Koch v. Dwyer*,
2001 WL 289972 (S.D.N.Y. March 23, 2001) ..............................................18

**CASES**                                                                                        **PAGE(S)**

*Krueger v. New York Telephone Co.*,
163 F.R.D. 433 (S.D.N.Y. 1995) ................................................................................21

*Marisol A. v. Giulani*,
126 F.3d 372 (2d Cir. 1997) ...................................................................19, 20, 23, 25

*Matyasovszky v. Housing Authority of the City of Bridgeport*,
226 F.R.D. 35 (D. Conn. 2005) ...........................................................................35, 36

*Midwest Community Health Service, Inc. v. American United Life Ins. Co.*,
255 F.3d 374 (7th Cir. 2001) ................................................................................15

*Norflet v. John Hancock Life Ins. Co.*,
2007 WL 2668936 (D. Conn. Sept. 6, 2007) .......................................................35

*Ohman v. Kahn*,
1990 WL 97756 (S.D.N.Y. June 27, 1990) ..........................................................37

*Pecere v. Empire Blue Cross Blue Shield*,
194 F.R.D. 66 (E.D.N.Y. 2000) .............................................................................19

*Port Authority Police Benevolent Ass'n v. Port Authority*,
698 F.2d 150 (2d Cir. 1983) ..................................................................................21

*Richards v. FleetBoston Financial Corp.*,
174 F.R.D. 165 (D. Conn. 2006) ..........................................................................36

*Rivera v. Fair Chevrolet Geo Partnership*,
165 F.R.D. 361 (D. Conn 1996) ...........................................................................39

*Robinson v. Metro-North Commuter R.R.R. Co.*,
267 F.3d 147 (2d Cir. 2001) ....................................................28, 30, 31, 32, 34, 36

*Rutstein v. Avis Rent-A-Car Sys., Inc.*,
211 F.3d 1228 (11th Cir. 2000) ............................................................................37

*Salisbury Inv. Co. v. Irving Trust Co.*,
70 F.2d 313 (2d Cir. 1934) ....................................................................................30

*Selby v. Principal Mut. Life Ins. Co.*,
197 F.R.D. 48 (S.D.N.Y. 2000) ........................................................................18, 24

## CASES                                                                        PAGE(S)

*Smilow v. Southwestern Bell Mobile Systems, Inc.*,
323 F.3d 32 (1st Cir. 2003) ...........................................................................38

*Sutton v. Medical Service Ass'n of Pa.*,
1993 WL 273429 (E.D. Pa. July 20, 1993) ..................................................24

*Strom v. Goldman, Sachs & Co.*,
202 F.3d 138 (2d Cir. 1999) ...................................................28, 29, 30, 31

*Surowitz v. Hilton Hotels Corp.*,
383 U.S. 363 (1966) .................................................................................26

*Tedesco v. Mishkin*,
689 F. Supp. 1327 (S.D.N.Y. 1988) ..........................................................21

*Thomas v. SmithKline Beecham Corp.*,
201 F.R.D. 386 (E.D. Pa. 2001) ...............................................................18

*Thompson v. Linvatec Corp.*,
2007 WL 1526418 (N.D.N.Y. May 22, 2007) ...................18, 19, 21, 24, 31

*Trief v. Dun & Bradstreet Corp.*,
144 F.R.D. 193 (S.D.N.Y. 1992) ...............................................................20

*Velez v. Norvartis Pharmecueticals Corp.*,
244 F.R.D. 243 (S.D.N.Y. 2007) ...............................................................35

*Vengurlekar v. HSBC Bank*,
2007 WL 1498326 (S.D.N.Y. May 22, 2007) .........................18, 21, 23, 24

*Westman v. Textron, Inc.*,
151 F.R.D. 229 (D. Conn. 1993) ...............................................................18


## STATUTES AND RULES

ERISA § 404(a)(1)(A) ..........................................................................12, 16

ERISA § 404(a)(1)(B) ......................................................................12, 16, 17

ERISA § 406(b)(1) ...................................................................................13, 17

ERISA § 406(b)(3) ...................................................................................13, 17

**STATUTES AND RULES**                                                         **PAGE(S)**

ERISA § 502(a)(3) ................................................................................ 28-31

ERISA § 502(a)(3)(B) .................................................................................29

29 U.S.C. § 1001 .........................................................................................1

29 U.S.C. § 1002(21)(A) ............................................................................13

29 U.S.C. § 1104(a)(1)(A) ..........................................................................12

29 U.S.C. § 1104(a)(1)(B) ..........................................................................12

29 U.S.C. § 1106(b)(1) ...............................................................................13

29 U.S.C. § 1106(b)(3) ...............................................................................13

29 U.S.C. § 1132(a)(3) ...............................................................................28

Fed. R. Civ. P. 23 ...............................................................2, 18, 19, 38, 40

Fed. R. Civ. P. 23(a) ..........................................................18, 20, 23, 25, 37

Fed. R. Civ. P. 23(a)(1) .............................................................................20

Fed. R. Civ. P. 23(a)(2) ...................................................................20, 21, 22

Fed. R. Civ. P. 23(a)(3) .............................................................................23

Fed. R. Civ. P. 23(a)(4) .............................................................................25

Fed. R. Civ. P. 23(b) .................................................................................18

Fed. R. Civ. P. 23(b)(2) ......................20, 27, 28, 30, 31, 32, 34, 36, 37

Fed. R. Civ. P. 23(b)(3) ......................................20, 36, 37, 38, 39, 40

**DOL ADVISORY OPINIONS**

DOL Advisory Opinion 97-16A, 1997 WL 277979 (May 2, 1997)...............................16

DOL Advisory Opinion 97-15A, 1997 WL 277980 (May 22, 1997)...............................16

**OTHER**                                                                                    **PAGE(S)**

Restatement (First) of Restitution § 160, Comment a (1937) ......................................................29

Restatement (First) of Restitution § 209, Comment a (1937) ................................................ 29-30

5 *Scott on Trusts* § 515 (3d ed. 1967) ........................................................................................30

U.S. Dept. of Labor, Employee Benefits Security Administration,
*What You Should Know About Your Pension Rights*,
www.dol.gov/ebsa/publications/ wyskapr.html (Aug. 26, 2003) ....................................................1

## I.   **PRELIMINARY STATEMENT**

Plaintiffs[1] respectfully submit this Memorandum in support of their request for certification of the following class (the "Class") pursuant to FRCP 23:

> All employee pension benefit plans covered by ERISA which had variable annuity contracts with Nationwide or whose participants had individual variable annuity contracts with Nationwide at any time from January 1, 1996, or the first date Nationwide began receiving payments from mutual funds based on a percentage of the assets invested in the funds by Nationwide, whichever came first, to the date of judgment. ¶46.[2]

This action seeks declaratory, injunctive and other equitable relief (restitution/ disgorgement) under ERISA, 29 U.S.C. § 1001, et seq. ¶¶ 3, 60-62 & 65. Plaintiffs are trustees of qualified ERISA pension benefit plans,[3] to which plans Nationwide Life Insurance Company ("Nationwide Life") provided variable annuity platforms of mutual funds during the Class Period. ¶¶ 4-8 & 13-17.[4] Defendants are Nationwide Life and Nationwide Financial Services Incorporated (collectively referred to as "Nationwide" or "Defendants"). ¶¶ 9-10.

---

[1] Plaintiffs are Peter Wiberg ("Wiberg"), as trustee of the Crown Tool & Die Co. Inc. Salary Deferral Profit Sharing Plan (the "Crown Plan"); Alan Gouse ("Gouse"), as trustee of the Money Accumulation Pension Plan for the Employees of Hartford Easter Seal Rehabilitation Center, Inc. Trust and the Greater Hartford Easter Seal Rehabilitation Center, Inc., Tax Sheltered Annuity Plan (collectively the "Easter Seal Plan"); and Christopher Anderson ("Anderson"), as trustee of the Anderson Law Firm, P.C. 401(k) Profit Sharing Plan and Trust ("the Anderson Plan"), formerly the Anderson & Ferdon P.C. 401(k) Profit Sharing Plan (the "Anderson & Ferdon Plan"). Plaintiffs Wiberg, Gouse and Anderson are sometimes collectively referred to as "Plaintiffs." Anderson has moved to substitute as Plaintiff for Dennis Ferdon (formerly a trustee of the Anderson & Ferdon Plan). Lou Haddock ("Haddock"), as trustee of the Flyte Tool & Die Company, Inc. 401-K Profit Sharing Plan (the "Flyte Plan") and Edward Kaplan ("Kaplan"), as trustee of the Hartford Roofing 401(k) Profit Sharing Plan and the Hartford South, L.L.C. 401(k) Profit Sharing Plan (collectively the "Hartford Plan"), are dismissing their claims, leaving the Flyte Plan and the Hartford Plan as unnamed Class members.

[2] Unless otherwise noted, all references to paragraph numbers (¶_) are to Plaintiffs' Fifth Amended Class Action Complaint ("Complaint") filed March 21, 2006 [Docket No. 270].

[3] For a description of the types of plans covered by ERISA, please see U.S. Dept. of Labor, Employee Benefits Security Administration, *What You Should Know About Your Pension Rights*, www.dol.gov/ebsa/publications/ wyskapr.html (Aug. 26, 2003).

[4] *See also* Defendants' Answer to Plaintiffs' Fifth Amended Complaint, ¶¶ 9-10, filed October 12, 2007 [Docket No. 290].

In late 1995, in order to give the appearance of reducing its pricing and thereby shore up its competitiveness in the group annuity market, Nationwide implemented a revenue sharing scheme whereby it received payments from mutual funds.  ¶¶ 35-45.  This scheme made Nationwide a fiduciary as to the assets it affected and simultaneously breached its fiduciary duties.  ¶¶ 54-59.

As demonstrated herein, this action meets all of the prerequisites of Rule 23 and is ideally suited for certification as a class action.

## II.  <u>STATEMENT OF FACTS</u>

The revenue sharing scheme is detailed below in Subsection (C).  Subsections (A) and (B) set forth the facts that provide the context for the scheme.

A.  *THE RELATIONSHIP BETWEEN CLASS MEMBERS, NATIONWIDE AND THE MUTUAL FUNDS.*

The employers who are the sponsors of the Plans which compose the Class almost exclusively utilized full service providers to create the Plans and provide the entire range of administrative services necessary to run them.[5]  These full service providers, sometimes referred to as Pension Plan Administrators or PPA's, sold the Plans on using Nationwide as their investment provider, receiving commissions for doing so.[6]

After setting up the Plans, the PPA's  provided all the services necessary for the Plans to operate, including record keeping, compliance, trustee services, distribution of account proceeds

---

[5] Pension and Welfare Benefits Administration, Department of Labor, *STUDY OF 401(K) PLAN FEES AND EXPENSES* §§ 2.6 & 2.7 (1998) ("Study"), Appendix in Support of Plaintiffs' Motion for Class Certification Based on Fifth Amended Complaint ("App.") Tab 1.

[6] 30(b)(6) Deposition of Nationwide employee John S. Bath of February 27, 2003 ("Bath Depo.") 78:21-79:0, Confidential Appendix in Support of Plaintiffs' Motion for Class Certification Based on Fifth Amended Complaint ("Conf. App.") Tab A [the depositions of Bath and other Nationwide employees referenced herein were taken as part of the 30(b)(6) deposition of Nationwide, such that their testimony constitutes binding admissions by Nationwide]; Deposition Exhibit 12 (Broker Compensation Agreement between Nationwide and the PPA for the Easter Seal Plan), App. Tab 2.

to departing participants, loan processing, withdrawals, communications with participants, participant servicing, and acting as a complete intermediary between the Plans and Nationwide.[7] Much of the record keeping and other services provided by the PPA's were subcontracted by the PPA's to Nationwide in return for payments by the PPA's, typically on a per participant basis.[8]

Pursuant to standard form contracts, Nationwide provided investment options to the Plans through insurance products called variable annuities.[9] Nationwide offered two types of variable annuity contracts: group variable annuity contracts, pursuant to which Nationwide contracted only with the Plan, but each participant had an individual account, and individual annuity contracts, for which Nationwide contracted separately with each participant.[10]

The group annuity contracts provided for payment by the Plans to Nationwide of "Asset Management Charges" calculated as a percentage of the daily value of a Plan's investment in the variable account in which Nationwide held the shares of the underlying mutual funds, along with a "Contingent Deferred Sales Charge" if a Plan withdrew its investments from Nationwide within a specified number of years after contract inception.[11] The individual annuity contracts

---

[7] Study §§ 2.6, 2.7 & 3.3, App. Tab 1; Deposition Exhibit 11 (a listing of services to be provided by the PPA to the Easter Seal Plan), App. Tab 3; Deposition Exhibits 13 & 23 (Appointments of Contract Holders' Authorized Representatives for the Easter Seal Plan), App. Tabs 4 & 5; Deposition Exhibit 52 (Appointment of Contract Holders' Authorized Representatives for the Crown Plan), App. Tab 6.

[8] Bath Depo., 38:9-39:12; 43:17-44:12; 44:22-45:3, Conf. App. Tab A; Deposition Exhibits 519 & 520, Conf. App. Tabs B and C.

[9] Deposition Exhibit 44 (Verification of Receipt of Specimen Group Annuity Contracts executed by the Crown Plan), Conf. App. Tab D.

[10] Study § 2.5.1, App. Tab 1; Defendants' Local Rule 56(a)(1) Statement in Support of Motion for Summary Judgment filed August 29, 2003 ("Statement"), ¶¶ 2-4, App. Tab 7; The group annuity contracts between Nationwide and the Flyte Plan, the Crown Plan, and the Hartford Roofing Plan, Exhibits A, B and C, respectively, to the Affidavit of Ronald L. Wyant, Jr. , ("Wyant Aff.") filed November 15, 2001 [Docket No. 16], a copy of which is included in the App. at Tab 15; The individual annuity contracts between Nationwide and participants in the Anderson & Ferdon Plan and the Easter Seal Plan, Exhibits 1-4, respectively, to the Affidavit of Stephanie Eakins ("Eakins Aff.") filed November 15, 2001 [Docket No. 17], a copy of which is included in the App. at Tab 16.

[11] Wyant Aff., Exhibits A-C, App. Tab 15.

provided for: (i) fixed ($30 per year) contract maintenance charges, (ii) mortality and expense risk charges (1.25%) calculated as a percentage of the daily net asset value of the participant's investment in the variable account in which Nationwide held the underlying mutual fund shares, (iii) administration charges (.05%) calculated as a percentage of the daily net asset value of the participant's investment in the variable account in which Nationwide held the underlying mutual fund shares; and (iv) a Contingent Deferred Sales Charge.[12]

In return for these charges, Nationwide provided all the services necessary for the administration of the contract, including participant and plan record keeping, participant servicing and communications with participants/plans/PPA's.[13]  None of the standard form group or individual annuity contracts provided for or even referenced payments by mutual funds or mutual fund advisors to Nationwide.[14]  These services provided to the Plans and their participants were the same services provided to the PPA's in return for payments by those PPA's.[15]

Nationwide chose a group of mutual funds that it made available for investment in by the Plans, and the Plans chose a subset of those funds for investment in by their participants, with the Plans' choices as indicated on the group annuity applications becoming part of their group

---

[12] Eakins Aff., Exhibit 1-4, App. Tab 16.

[13] 30(b)(6) Deposition of Nationwide employee John M. Davis of March 10, 2003 ("Davis Depo."), 51:21-53:21, Conf. App. Tab E.

[14] 30(b)(6) Deposition of Nationwide employee Steven Rose of March 17, 2003 ("Rose Depo."), 158:14-23 (group contracts), Conf. App. Tab F; 30(b)(6) Deposition of Nationwide employee Eric Henderson of March 18, 2003 ("Henderson Depo."), 53:2-54:16 (individual contracts), Conf. App. Tab G.

[15] Davis Depo., 44:9-45:7; 45:8-12; 48:14-50:22; 51:21-53:21; 63:12-21, Conf. App. Tab E; Rose Depo., 213:22-216:7, Conf. App. Tab F; Henderson Depo., 82:6-83:20, Conf. App. Tab G; 30(b)(6) Deposition of Nationwide employee John J. Scranton of March 10, 2003 ("Scranton Depo."), 25:5-10, Conf. App. Tab H.

annuity contracts.[16]   From the subset of mutual funds chosen by a Plan, the individual participants chose specific funds to invest in, with their individual applications becoming part of the individual annuity contracts.[17]

The group annuity contracts provided Nationwide the right to substitute mutual funds for those chosen and invested in by Plans and their participants in two circumstances: (1) "[i]f the shares of the Fund are no longer be available for investment by the separate account," or (2) "if, in the judgment of the Company, further investment in the shares of the Fund should become inappropriate in view of the purposes of the Contract...."[18]   While the individual annuity contracts do not contain similar fund substitution clauses, Nationwide did reserve the right to substitute mutual funds (subject only to prior approval of the SEC) in the individual annuity prospectuses, as Nationwide explained in a pleading early in this case.[19]

Technically, however, the Plans and their participants did not invest directly in the mutual funds.   Rather, the Plans and their participants invested in "variable accounts," also known as "separate accounts," established by Nationwide.[20]   All Plans and their participants holding group annuity contracts invested in the "Nationwide Qualified Plans Variable Account," while all Plans and their participants holding individual annuity contracts invested in the "Nationwide Variable Account – II."[21]   Those variable accounts established by Nationwide kept

---

[16] Deposition Exhibit 19, App. Tab 8; Deposition Exhibit 24, App. Tab 9; Wyant Aff., Exhibits A-C, App. Tab 15; Deposition Exhibit 50, Conf. App. Tab I.

[17] Eakins Aff., Exhibits 1-4, App. Tab 16.

[18] Wyant Aff., Exhibits A-C, App. Tab 15.

[19] Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' First Amended Class Action Complaint [Docket No. 34] at 14-15.

[20]  Statement, ¶ 5, App. Tab 7.

[21]  Statement, ¶¶ 7 & 8, App. Tab 7.

their assets separate from the general assets of Nationwide, and those variable accounts were not chargeable with any of Nationwide's liabilities outside of the variable accounts.[22]

Each of the two variable accounts is divided into sub-accounts that correspond to the mutual funds and other investment options available under the annuity contract.[23] Pursuant to their contracts, participants allocate their contributions and any matching contributions made by their employers to particular sub-accounts within the variable accounts which correspond to particular mutual funds.[24] In return for the contributions, the Plans and their participants become beneficial owners of accumulation units (shares) of the applicable sub-accounts of the variable accounts, which are held for them by Nationwide.[25] Those accumulation units beneficially owned by the Plans and their participants constitute plan assets.[26]

Based on the combined contributions to the sub-accounts made by all the Plans and their participants, Nationwide sells and purchases mutual fund shares to hold in the variable accounts.[27] The value of a Plan's accumulation units (shares) in the variable account fluctuates based upon the value of the mutual fund shares held within the various sub-accounts.[28]

According to the Pension and Welfare Benefits Administration:

Mutual funds are pools of financial instruments that may include stocks, bonds, commercial paper, cash, and other instruments. Shares of mutual funds are bought by investors, including 401(k) plans. The shares represent an undivided common interest in the pool of investments. The shareholders benefit by

---

[22] Statement, ¶ 6, App. Tab 7.

[23] Statement, ¶ 9, App. Tab 7; Answer ¶ 27.

[24] Statement, ¶ 10, App. Tab 7.

[25] Statement ¶ 12, App. Tab 7.

[26] Statement ¶ 13, App. Tab 7.

[27] Statement ¶ 14, App. Tab 7.

[28] Statement ¶ 15, App. Tab 7.

> receiving the earnings of the investments in the form of additional shares and by a
> capital gain when the shares are redeemed from the mutual fund.

Study § 2.4.1, App. Tab 1. Mutual funds do not have employees and must contract with various entities to perform managerial, administrative, accounting, legal and other services.[29] Mutual funds pay fees to the entities providing these services.[30]

The mutual funds pass those fees on to their investors by charging them a variety of fees, typically investment management fees, distribution fees or commissions, and marketing or 12(b)(1) fees.[31] A mutual fund takes these fees from investors by paying to the investment manager/mutual fund advisor or other service provider out of its general assets a dollar amount equal to the designated percentage of the net asset value of all of its shares, which causes the net asset value of all its shares to decrease by that percentage, which causes the value of the mutual fund shares held by Nationwide in the variable account to decrease by that percentage, which in turn reduces the value of each Plan's and participant's accumulation units (shares) of the Nationwide variable account correspondingly.[32]

B.   THE RELATIONSHIP BETWEEN NATIONWIDE AND MUTUAL FUNDS/MUTUAL FUND ADVISORS PRIOR TO IMPLEMENTATION OF THE REVENUE SHARING SCHEME.

Prior to implementation of the revenue sharing scheme (approximately in November of 1995), mutual funds and/or mutual fund advisors incidentally benefited from the trade processing, recordkeeping, communications and distribution services provided by Nationwide,

---

[29] Statement ¶ 20, App. Tab 7; Answer ¶ 29.

[30] Statement ¶ 21, App. Tab 7; Answer ¶ 29.

[31] Study §§ 3.3.2, 3.3.4 and 3.3.5, App. Tab 1; The Best of America IV Individual Deferred Variable Annuity Contracts Prospectus, October 1, 1997, pp. 8-11, part of Exhibit 2 to the Eakins Aff., App. Tab 16.

[32] Deposition of Nationwide expert witness Frederick M. Werblow of August 20, 2003 ("Werblow Depo."), 42:8-43:15, Conf. App. Tab J; Answer ¶ 30.

including generation of customer statements and confirmations; processing of customer transactions; handling of customer services inquiries via phone and fax; processing of payments and tax forms; distribution of checks and tax forms; processing of purchases and sales on a daily basis; calculations of unit values that take place on daily basis; share reconciliation between Nationwide's separate accounts and the funds; printing and mailing of product level and fund level prospectuses; and general administration of systems and processing in a secure environment.[33]    These were the same services for which Nationwide was already being compensated by both PPA's and the Plans and their participants.[34]

Because it already received compensation for these services from the Plans and their participants and from PPA's, prior to implementation of the revenue sharing scheme, Nationwide typically didn't receive any revenue sharing or expense reimbursement from mutual funds/mutual fund advisors, although it may have received 50 cents per month ($6.00 per year) per participant from a few funds.[35]    Pricing mutual funds'/mutual fund advisors' access to Nationwide's services on a per participant basis made sense, because the cost associated with providing the services from which mutual fund houses incidentally benefit varies with the number of participants, not the amount of assets.[36]

---

[33] 30(b)(6) Deposition of Nationwide employee William G. Goslee of February 25, 2003 ("Goslee Depo."), 72:2-74:24; 75:4-12, Conf. App. Tab K; Davis Depo., 44:9-45:7; 60:4-23, Conf. App. Tab E; Bath Depo., 139:19-23; 200:15-202:1; 203:8-13, Conf. App. Tab A; Rose Depo, 31:9-32:23, Conf. App. Tab F; Statement, ¶ 26, App. Tab 7.

[34] Davis Depo., 44:9-45:7; 45:8-12; 48:14-50:22; 51:21-53:21; and 63:12-21, Conf. App. Tab E; Rose Depo., 213:22-216:7, Conf. App. Tab F; Henderson Depo., 82:6-83:20, Conf. App. Tab G; Scranton Depo., 25:5-10, Conf. App. Tab H.

[35] Bath Depo., 115:9-117:6, Conf. App. Tab A.

[36] Davis Depo., 60:25-61:3, Conf. App. Tab E.

C.     *IMPLEMENTATION OF THE REVENUE SHARING SCHEME.*

Beginning in 1993 and continuing into 1995, Nationwide became concerned that its pricing of annuity contracts was becoming non-competitive, particularly in the medium-sized and large case portion of its target market ($5,000,000 and up).[37]   Determined to lower its annuity contract prices and match the competition without actually decreasing (or while actually increasing) the revenue generated by its annuity contracts, Nationwide began investigating and ultimately implemented a system whereby mutual funds and/or mutual fund advisors make payments to it based upon a percentage of the Plans' assets invested with the mutual funds through Nationwide.[38]   Nationwide implicitly or explicitly made it a condition to offering a mutual fund family's funds that the mutual fund family pay it revenue sharing on a majority or all of the family's funds offered by Nationwide.[39]

The new scheme required Nationwide to initiate changes in its annuity contract pricing and to negotiate revenue sharing agreements with mutual funds.   Over the course of approximately two years, Nationwide developed a pricing model as to group annuity contracts that: (i) set up categories of mutual funds with different charges to Class members based on how much revenue sharing the funds would pay, and (ii) priced the Asset Management Charge (separately within each category) paid by Class members on a sliding scale, with the charge

---

[37] Rose Depo., 24:1-21, Conf. App. Tab F; Bath Depo., 18:25-19:18; 20:17-21:12; 31:4-32:20; 33:16-37:2; 37:24-45:3; 46:8-47:1; 56:20-57:14; 81:7-87:11, Conf. App. Tab A; Depo. Exhibit 519, Conf. App. Tab B; Depo. Exhibit 520, Conf. App. Tab C; Depo. Exhibit 521, Conf. App. Tab L; Depo. Exhibit 522, Conf. App. Tab M; Depo. Exhibit 524, Conf. App. Tab N.

[38] *Id.*

[39] Bath Depo., 114:17-24, Conf. App. Tab A; 5/05/98 email from Lee Scott at Franklin Templeton Group to Rick Frisbee at Franklin Templeton Group, Conf. App. Tab U; Mutual Fund Revenue Issues Summary, N013553, attached to Mutual Fund Revenue Implementation Team Meeting Minutes of 5/4/95, Deposition Exhibit 533, Conf. App. Tab V; 12/22/92 Processing Agreement between Nationwide and Federated Administrative Services, N014572, Section 1.01, Deposition Exhibit 506, Conf. App. Tab W; 10/14/99 Service Agreement between Nationwide and Janus Service Corporation, N013417, third WHEREAS clause, Deposition Exhibit 510, Conf. App. Tab X.

decreasing as the amount of assets invested by the Plan increased.[40]

Ultimately, Nationwide ended up with three categories of funds in its group annuity pricing: (i) "Primary Plus" for those mutual funds paying Nationwide 0.25% to 0.58% on assets plus $0 to $12 per participant, (ii) "Primary" for funds paying Nationwide 0.15% to 0.25% on assets; and (iii) "Optional" for those funds paying Nationwide 0.00% to 0.08% on assets.[41]  In stark contrast, the pricing of existing and new individual annuity contracts did not change as a result of implementation of revenue sharing, remaining at 1.30 % for mortality and expense risk and administration charges and $30 per year for contract maintenance charges.[42]

In order to implement the new pricing as to existing group annuity contracts, Nationwide obtained signed written standard form amendments from each Plan with which it had a group annuity contract.[43]  The revenue sharing was described by Nationwide using standard language in the explanatory correspondence which accompanied the amendment forms.[44]  Nationwide did not communicate that it was implementing revenue sharing to the Plan participants who held

---

[40] Bath Depo., 94:4-9; 97:23-99:21; 102:7-104:5; 107:7-10; 113:13-120:19; Conf. App. Tab A; Depo. Exhibit 526, Conf. App. Tab O; Depo. Exhibit 527, Conf. App. Tab P; Contract Summary Page to January 1, 1996 group annuity contract between the Hartford Plan and Nationwide, Exhibit C to the Wyant Aff. (example of standard group annuity contract pricing after implementation of revenue sharing), App. Tab 15; Rose Depo., 131:19-132:2, Conf. App. Tab F.

[41] Deposition Exhibit 609, Conf. App. Tab Q.

[42] *Compare* pre-revenue sharing contracts from 1991 and 1994 between participants in the Anderson & Ferdon and Easter Seal Plans and Nationwide, Exhibits 1 and 3 to the Eakins Aff., App. Tab 16, with post-revenue sharing contracts from 1998 between participants in the Anderson & Ferdon and Easter Seal Plans and Nationwide, Exhibits 2 and 4 to the Eakins Aff., App. Tab 16.

[43] Rose Depo., 84:18-85:4, Conf. App. Tab F; Depo. Exhibit 534, Conf. App. Tab R; Depo. Exhibit 54 (amendment to the Crown Plan, along with the explanatory correspondence from Nationwide), Conf. App. Tab S; Haddock Exhibit 9 (amendment to the Flyte Plan, along with explanatory correspondence from Nationwide), Conf. App. Tab T; Answer ¶ 38.

[44] Rose Depo., 127:9-22, Conf. App. Tab F; Depo. Exhibit 534, Conf. App. Tab R; Depo. Exhibit 54, Conf. App. Tab S; Answer ¶ 38.

individual annuity contracts.[45]

Revenue sharing payments are made to Nationwide pursuant to written contracts ("revenue sharing contracts"), variously denominated as service contracts, administration contracts, fund services contacts, fund participation contracts and broker dealer contracts, with the investment management firms which provide to mutual funds the management and other services necessary for the funds to function.[46]  Revenue sharing payments are variously denominated as 12(b)(1) fees (which are supposed to be fees for marketing of the fund), administration fees, service fees and subtransfer agent fees.[47]  All of the revenue sharing payments are based in whole or in overwhelming part on a percentage of a Plan's investment in a mutual fund.[48]

While the revenue sharing payments are described by Nationwide as reimbursements for expenses incurred in providing services to the mutual funds, those services from which mutual funds/mutual fund advisors incidentally benefit are actually ones which Nationwide had traditionally supplied as a necessary part of its business in return for charges collected from Plans and their participants and from PPA's, and those services did not change as a result of revenue sharing.[49]  Although the description of the services from which mutual funds/mutual fund advisors incidentally benefit may vary slightly from contract to contract, the actual services

---

[45] Bath Depo., 130:22-131:3, Conf. App. Tab A.

[46] Goslee Depo., 104:16-18; 108:11-16; 109:10-110:13; 112:5-8; 161:13-162:11, Conf. App. Tab K; Statement, ¶ 25, App. Tab 7; Answer ¶ 41.

[47] Goslee Depo., 121:21-123:13, Conf. App. Tab K.

[48] Deposition Exhibit 609, Conf. App. Tab Q.

[49] Bath Depo., 139:19-23; 200:15-202:1; 203:8-13, Conf. App. Tab A; Henderson Depo., 82:6-83:20, Conf. App. Tab G; Davis Depo., 60:4-23, Conf. App. Tab E.

are virtually identical in every case.[50]

Disgorgement of revenue sharing by Nationwide into participants' retirement accounts could greatly increase the accounts over time.  Assume a forty-five year old rolls over a $300,000 401(k) balance into a plan which has an annuity contract with Nationwide and chooses all Primary Plus funds which pay 0.5% of assets as revenue sharing to Nationwide.  In the first year alone, Nationwide would disgorge $1,500 into her account.  Assuming she continues to make 401(k) contributions of $10,000 per year, Nationwide's disgorgement could increase her account balance at age sixty-five by over $213,000 at a gross annual return of 11% and by over $80,000 at a gross return of 5%.

## III.   **PLAINTIFFS' CAUSE OF ACTION**

Plaintiffs assert one cause of action for breach of fiduciary duty against Nationwide.  ¶¶ 54-65.  Plaintiffs specifically assert that Nationwide violated ERISA § 404(a)(1)(A) and (B), which requires a fiduciary to discharge its "duties with respect to a plan solely in the interest of the participants and beneficiaries and – (A) for the exclusive purpose of : (i) providing benefits to participants and their beneficiaries; and (ii) deferring reasonable expenses of administering the plan; (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;.…" 29 U.S.C. § 1104(a)(1)(A) and (B).  ¶ 57.

---

[50] Goslee Depo., 72:7-74:24; 75:4-12; 83:17-84:13; 87:7-94:7; 94:10-95:2; 95:3-8; 96:15-97:25; 98:1-99:10, Conf. App. Tab K, Bath Depo., 56:20-57:11, Conf. App. Tab A; Rose Depo., 31:9-32:23, Conf. App. Tab F; Davis Depo., 44:9-45:7, Conf. App. Tab E; Henderson Depo., 81:7-82:5, Conf. App. Tab G.

Additionally, Plaintiffs assert that Nationwide engaged in prohibited transactions between a plan and a fiduciary pursuant in violation of ERISA § 406(b)(1) and (3), which provides as follows:

A fiduciary with respect to a plan shall not –

(1) deal with the assets of the plan in his own interest or for his own account, … or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan

29 U.S.C. § 1106(b)(1) and (3).  ¶¶ 58-59.

Obviously, the first element of Plaintiffs' cause of action under either § 404 or § 406 is establishing Nationwide's fiduciary status.  This and the other elements of §§ 404 and 406 are discussed in detail below.

A.    *NATIONWIDE CONSTITUTES A FIDUCIARY.*

Nationwide constitutes a fiduciary pursuant to 29 U.S.C. § 1002(21)(A), which provides, in pertinent part, that "… a person is a fiduciary with respect to a plan to the extent (i) he… exercises any authority or control respecting management or disposition of its assets.…" Nationwide exercises authority or control over the variable account accumulation units (the shares of the Nationwide variable account) held by Nationwide for each Plan participant.  The Nationwide variable account accumulation units ("Units") represent the Plans' and their participants' investments and constitute plan assets under ERISA and the case law interpreting it, which Nationwide concedes.  Statement, ¶ 13, App. Tab 7.  Nationwide exercises authority or control over their management or disposition in two respects.

First, it does so by using its custody and control of the accumulation units to obtain the revenue sharing payments from the mutual funds ("the specific accumulation unit method").  The

mutual fund families pay the revenue sharing payments to Nationwide because Nationwide places the investments of the Plans and participants in their funds and conditions its placement of the investments upon the payment of the revenue sharing payments.  Accordingly, Nationwide uses the Plans' and their participants' investments (as represented by the accumulation units) to generate the revenue sharing payments, and that use of those investments by Nationwide constitutes an exercise of authority or control by Nationwide over their management or disposition sufficient to make it a fiduciary as to that use of the accumulation units.

Two examples make this clear.  First, suppose Nationwide had pledged the accumulation units as collateral for a loan which it successfully repaid.  While such action would not have ultimately harmed the investments of the Plans in any way, Nationwide's pledging of the accumulation units to obtain loan proceeds in this manner surely would have constituted an exercise of authority or control over their management or disposition sufficient to make it a fiduciary for this purpose.  Likewise, using the accumulation units to obtain the revenue sharing payments constitutes the exercise of authority or control over their management or disposition.

Second, consider a party which had contracted to store a piece of art for an ERISA plan. If it publicly displayed the art and charged admission to see it, it would exercise authority or control over the management or disposition of the art.  Indeed, Nationwide has conceded this point.[51]  Nationwide's use of the investments of the Plans and their participants (represented by the accumulation units) to generate the revenue sharing payments from the mutual fund families is exactly analogous.

Nationwide also constitutes a fiduciary because it exercises authority or control respecting the management or disposition of the accumulation units by controlling which mutual

---

[51] Supplemental Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Supp. Mem.") [Docket No. 239] at 13-14.

funds are available investment options for the Plans and their participants ("the mutual fund selection method"). The Court articulated the mutual fund selection method in *Haddock v. Nationwide Financial Services, Inc.*, 419 F. Supp. 2d 156, 165-6 (D. Conn. 2006). In summarizing that method, the Court wrote that, "[a] rational fact-finder, viewing the evidence in the light most favorable to the Trustees, could find that Nationwide's *ability to* select, remove, and replace the mutual funds available for the Plans' investment constituted discretionary authority or discretionary control respecting disposition of plan assets, and thus that Nationwide is an ERISA fiduciary." *Id*. at 171-2 (emphasis added).[52]

The Court correctly stated that Nationwide's *ability to* select, remove and replace mutual funds makes it a fiduciary, as case law demonstrates that Nationwide's contracting for this power to change the investments of the Plans and their participants (in the form of the Units) constitutes the exercise of authority or control over their management or disposition regardless of whether Nationwide actually utilizes the power. For example, in *Chicago Board Options Exchange, Inc. v. Connecticut Gen'l Life Ins. Co.*, the Seventh Circuit held that the insurance company's "power to amend" the annuity contract that it issued to the ERISA plan made it an ERISA fiduciary. 713 F.2d 254, 260 (7th Cir. 1983). Similarly, three years later, the Seventh Circuit again held that an insurance company's "power to amend" an annuity contract issued to an ERISA plan made it an ERISA fiduciary. *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 738 (7th Cir. 1986). As the Seventh Circuit later summarized, "We have twice held that an insurer's discretionary authority or control over group insurance contracts purchased by employee benefit plans subjects the insurer to ERISA fiduciary standards." *Midwest Community Health Service, Inc. v. American United Life Ins. Co.*, 255 F.3d 374, 376 (7th Cir. 2001) (holding the power to amend annuity contract made defendant a fiduciary for purposes of representations defendant

---

[52] In its Memorandum of Decision of September 25, 2007, the Court declined to reverse this ruling.

made in persuading plaintiffs to switch from one type of annuity contract to another).

To similar effect is *IT Corp. v. Gen'l American Life Ins. Co.*, in which the Ninth Circuit held that, "The *right to* write checks on plan funds is 'authority or control respecting management or disposition of its assets.'"   107 F.3d 1415, 1421 (9th Cir. 1997) (emphasis added).   The Third Circuit held the same in *Board of Trustees of Brick Layers & Allied Craftsmen Local 6 of N.J. Welfare Fund v. Wettlin Assoc., Inc. ("Wettlin")*, 237 F.3d 270, 275 (3d Cir. 2001).   As one district court put it, "When a person is *authorized to* draw checks on a plan's account, that person necessarily exercises control over the disposition of plan assets." *Guardsmark, Inc. v. Blue Cross & Blue Shield of Tenn.*, 313 F. Supp. 2d 739, 750 (W.D. Tenn. 2004) (emphasis added) (holding that defendant's ability to write checks on checking account made defendant a fiduciary as to the funds in the checking account in connection with claim by plaintiff that defendant should not have retained interest earned by the checking account).

Pursuant to these cases, both Nationwide's power to initially choose the funds available to the Plans for investment and its power to alter a Plan's investments by substituting accumulation units in one sub-account (representing shares of a particular mutual fund chosen by it) for accumulation units in another sub-account (representing investments in another mutual fund chosen by the Plan or its participant) makes it a fiduciary as to all the accumulation units of Plaintiffs and all of the other Plans.   As noted by the Court, two separate Department of Labor Advisory Opinions held exactly that.   Department of Labor ("DOL") Advisory Opinion 97-16A, 1997 WL 277979; DOL Advisory Opinion 97-15A, 1997 WL 277980.

B.      *NATIONWIDE'S VIOLATION OF ERISA § 404(a)(1)(A) AND (B).*

How Nationwide violates § 404(a)(1)(A) should be self-evident.   Regardless of whether the revenue sharing payments constitute plan assets in Nationwide's hands, by using the Units to

obtain the revenue sharing payments for its own benefit, Nationwide did not use the Units for the purpose of providing benefits to participants and their beneficiaries or of defraying reasonable expenses of administering the Plans.

How Nationwide violates § 404(a)(1)(B) should be equally self-evident. Regardless of whether the revenue sharing payments constitute plan assets in Nationwide's hands, by using the Units to obtain the revenue sharing payments, Nationwide does not discharge its duties with respect to the Plans solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. A prudent man does not benefit himself at the expense of those whose interests he is obligated to protect.

C.    *NATIONWIDE'S VIOLATION OF ERISA § 406(b)(1) AND (3).*

How Nationwide violates § 406(b)(1) should also be self-evident. Regardless of whether the revenue sharing payments constitute plan assets in Nationwide's hands, by using the Units to obtain the revenue sharing payments, Nationwide dealt with assets of the Plans in its own interest and for its own account.

Nationwide's two-fold violation of § 406(b)(3) has been previously articulated by the Court. Regardless of whether the revenue sharing payments constitute plan assets in Nationwide's hands, Nationwide received consideration (the revenue sharing payments) from a party dealing with the Plans (the mutual fund families) in connection with transactions (the revenue sharing contracts) involving the assets of the Plans (the Units). 419 F. Supp. 2d at 171. Additionally, to the extent the revenue sharing payments constitute plan assets in Nationwide's hands, as the Court held (*id.* at 170), Nationwide received consideration (the revenue sharing

payments) from a party dealing with the Plans (the mutual fund families) in connection with transactions (the revenue sharing contracts) involving assets of the Plans (the revenue sharing payments).

## IV.    THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(a)

Fed. R. Civ. P. 23 provides that an action may be maintained as a class action if each of the four prerequisites of Rule 23(a) is met and, in addition, the action qualifies under one of the subdivisions of Rule 23(b).  Rule 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

This action should be certified because it meets all of the prerequisites of Rule 23 and is ideally suited for class certification.  Indeed, Plaintiffs' breach of fiduciary duties claims under ERISA are precisely the type of claims that have been routinely found appropriate for class treatment in courts throughout this and other circuits.  *See*, *e.g.*, *Westman v. Textron, Inc.*, 151 F.R.D. 229 (D. Conn. 1993) (Eginton, J.) (certifying class action brought for breach of fiduciary duty claims under ERISA); *Vengurlekar v. HSBC Bank*, 2007 WL 1498326 (S.D.N.Y. May 22, 2007) (same); *Thompson v. Linvatec Corp.*, 2007 WL 1526418 (N.D.N.Y. May 22, 2007) (same); *Koch v. Dwyer*, 2001 WL 289972 (S.D.N.Y. March 23, 2001) (same); *Thomas v. SmithKline Beecham Corp.*, 201 F.R.D. 386 (E.D. Pa. 2001) (same); *Bublitz v. E.I. du Pont de Nemours and Co.*, 202 F.R.D. 251 (S.D. Iowa 2001) (same); *Selby v. Principal Mut. Life Ins. Co.*, 197 F.R.D. 48 (S.D.N.Y. 2000) (same).

Moreover, "the law in the Second Circuit favors the liberal construction of Rule 23...."

*Pecere v. Empire Blue Cross Blue Shield*, 194 F.R.D. 66, 69 (E.D.N.Y. 2000).  *See also Marisol*

*A. v. Giuliani*, 126 F.3d 372, 377 (2d. Cir. 1997); *Linvatec Corp.*, 2007 WL 1526418, at *4;

("Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard

of flexibility...."); *Karen L. v. Physicians Health Services, Inc.*, 202 F.R.D. 94, 99 (D. Conn.

2001) (Droney, J.) (citations omitted).  Any doubt "should be resolved in favor of approving

class certification."  *Linvatec Corp.*, 2007 WL 1526418, at *4; *In Re Ikon Office Solution Inc.*

*Sec. Litig.*, 191 F.R.D. 457, 462 (E.D. Pa. 2000).

The Second Circuit recently set forth the process by which district courts within the

Circuit should determine class certification:

> In light of the foregoing discussion, we reach the following conclusions:  (1) a
> district judge may certify a class only after making determinations that each of the
> Rule 23 requirements has been met;  (2) such determinations can be made only if
> the judge resolves factual disputes relevant to each Rule 23 requirement and finds
> that whatever underlying facts are relevant to a particular Rule 23 requirement
> have been established and is persuaded to rule, based on the relevant facts and the
> applicable legal standard, that the requirement is met;  (3) the obligation to make
> such determinations is not lessened by overlap between a Rule 23 requirement
> and a merits issue, even a merits issue that is identical with a Rule 23
> requirement;  (4) in making such determinations, a district judge should not assess
> any aspect of the merits unrelated to a Rule 23 requirement;  and (5) a district
> judge has ample discretion to circumscribe both the extent of discovery
> concerning Rule 23 requirements and the extent of a hearing to determine whether
> such requirements are met in order to assure that a class certification motion does
> not become a pretext for a partial trial of the merits.

*In Re Initial Public Offering Securities Litigation*, 471 F.3d 24, 41 (2d Cir. 2006).

Thus, "...the district judge must receive enough evidence, by affidavits, documents, or

testimony, to be satisfied that each Rule 23 requirement has been met."  *Id*.  Further, "[a] district

judge is to assess all the relevant evidence admitted at the class certification stage and determine

whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about

any other threshold prerequisite for continuing a lawsuit." *Id*. at 42.

The evidence set forth above demonstrates that each of the requirements for class certification set forth in Rule 23(a) and the requirements of Rule 23(b)(2) and Rule 23(b)(3) are satisfied in this case, as explained below.

A.     *RULE 23(A)(1) - THE PROPOSED CLASS IS SO NUMEROUS THAT JOINDER OF ALL MEMBERS IS IMPRACTICABLE.*

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable.    Here, Rule 23(a)'s numerosity element is unquestionably satisfied, as approximately 24,230 qualified ERISA retirement plans are members of the Class.[53]  Joinder of that many plaintiffs would be expensive, time consuming and not logistically feasible.  *In Re Drexel Burnham Lambert Group, Inc. Sec. Litig.*, 960 F.2d 285, 290 (2d Cir. 1992). Consequently, Nationwide cannot legitimately contest numerosity.  *Devine v. Combustion Engineering, Inc.*, 760 F. Supp. 989, 994 (D. Conn. 1991) (Cabranes, J.) (finding there was "*no question that plaintiffs have satisfied the numerosity requirement of Rule 23(a)(1)*" as to class of at least 690 employees in ERISA action) (emphasis added);  *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198 (S.D.N.Y. 1992) (generally classes with more than 100 members satisfy Rule 23(a)(1)).

B.     *RULE 23(A)(2) - THERE ARE QUESTIONS OF LAW OR FACT COMMON TO THE CLASS.*

Rule 23(a)(2) provides that a suit may be maintained as a class action if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The commonality requirement is met if class members' grievances share a single common question of law *or* fact. *Marisol A*, 126 F.3d at 376; *In Re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 166-67 (2d

---

[53] Answer ¶ 48.

Cir. 1987), *cert. denied sub nom.*, *Pinkney v. Dow Chemical Co.*, 484 U.S. 1004 (1998); *Karen L.*, 202 F.R.D. at 100.

In determining whether common questions exist, Rule 23(a)(2) "requires only that there be 'a common nucleus of operative fact,' not that there be an absolute identity of facts." *Gerber v. Computer Assoc. Int'l, Inc.*, 1995 WL 228388, at *2 (E.D.N.Y. Apr. 7, 1995) (citing *Port Authority Police Benevolent Ass'n v. Port Authority*, 698 F.2d 150, 153-54 (2d Cir. 1983)). Thus, it is not required that all questions be common or that all issues be identical. *Karen L.*, 202 F.R.D. at 100. *See also Tedesco v. Mishkin*, 689 F. Supp. 1327, 1334 (S.D.N.Y. 1988) ("[N]ot every question of fact or law raised need be common to every member of the Class.").

Significantly, commonality has been routinely found to exist in ERISA class actions. *See, e.g., Linvatec Corp.*, 2007 WL 1526418, at *5 (whether defendant breached its fiduciary duties to class by denying them severance benefits after terminating them constituted common question of law); *Vengurlekar*, 2007 WL 1498326, at *6 (whether defendants' transfers of funds from employer to bank violated fiduciary requirements constituted a common issue); *Bublitz*, 202 F.R.D. at 251 (common questions of law and fact in ERISA suit included whether defendants breached their fiduciary duties); *Coleman v. Pension Ben. Guar. Corp.*, 196 F.R.D. 195 (D.D.C. 2000) (proposed class satisfied commonality requirement where alleged ERISA violations concerning amendment of pension plan and the diversion of plan assets would affect all class members.); *Krueger v. New York Telephone Co.*, 163 F.R.D. 433 (S.D.N.Y. 1995) (former employees asserting claims for unlawful interference with pension rights under ERISA met commonality requirement for class certification.).

All of the questions of law and fact in this action are common to the Class, as they arise out of a common course of conduct whereby Nationwide uniformly arranged for, received and

retained the revenue sharing payments.  The common issues include:

- ◆     whether the Units constitute assets of the Plans;

- ◆     whether Nationwide constitutes a fiduciary as to the Units pursuant to the specific accumulation unit method;

- ◆     whether Nationwide constitutes a fiduciary as to the Units pursuant to the mutual fund selection method;

- ◆     whether Nationwide, in arranging for, receiving and retaining the revenue sharing payments, discharged its duties with respect to the Plans solely in the interest of their participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries or defraying reasonable expenses of administering the Plans;

- ◆     whether Nationwide, in arranging  for, receiving and retaining the revenue sharing payments, discharged its duties with respect to the Plans solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use the conduct of an enterprise of a like character and with like aims;

- ◆     whether Nationwide dealt with the Units in its own interest or for its own account;

- ◆     whether Nationwide received any consideration (the revenue sharing payments) for its personal account from any parties (mutual fund families) dealing with the Plans in connection with transactions (the revenue sharing contracts) involving the assets of the Plans (the Units);

- ◆     whether the revenue sharing payments constitute plan assets in the hands of Nationwide pursuant to the functional approach articulated by the Court at 419 F. Supp. 2d at 170; and

- ◆     whether Nationwide received any consideration (the revenue sharing payments) for its personal account from any parties (mutual fund families) dealing with the Plans in connection with transactions (the revenue sharing contracts) involving the assets of the Plans (the revenue sharing payments).

Under Plaintiffs' theory of the case, the answer to each and every one of those questions, which answers collectively will resolve the case entirely, will be exactly the same for each and every Plan in the Class.  Thus, there can be no serious question that the commonality requirement is met in this case, satisfying Rule 23(a)(2).

C.   *RULE 23(A)(3) - PLAINTIFFS' CLAIMS ARE TYPICAL OF THE CLAIMS OF THE CLASS.*

The third requirement of Rule 23(a) is that the claims of the named plaintiffs must be typical of the claims of the class.  "Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *In Re Drexel Burnham Lambert Group, Inc. Sec. Litig.*, 960 F.2d at 291.  *See also Karen L.*, 202 F.R.D. at 101 (citing *Marisol A.*, 126 F.3d at 376).

The Supreme Court noted that the "commonality and typicality requirements of Rule 23(a) tend to merge" and held that "'a class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.'" *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 and 158 n.13 (1982) (citations omitted).  Typicality, does not, however, require that the interests of the named representatives and the class members be "co-extensive."  *Id.*

Rather:

Typicality refers to the nature of the claim of the class representative, and not to specific facts from which the claim arose or relief is sought.  The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.  Factual differences will not defeat class certification where the various claims arise from the same legal theory.

*In Re Energy Sys. Equip. Leasing Sec. Litig.*, 642 F. Supp. 718, 750 (E.D.N.Y. 1986) (quoting *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981)).  Thus, even if the amount of disgorgement/restitution due each individual Plan varies, typicality exists so long as the legal theories and course of conduct upon which the suit is based is consistent for all class members.  *Vengurlekar*, 2007 WL 1498326, at *6; *Gruby v. Brady*, 838 F. Supp. 820, 827-28 (S.D.N.Y. 1993).

Significantly, ERISA class actions have routinely been held to meet the typicality requirement. *See Linvatec Corp.*, 2007 WL 1526418, at *6 (finding typicality where all class members' claims arose from the same course of events pursuant to which they were terminated without severance benefits); *Vengurlekar*, 2007 WL 1498326, at *6 (finding typicality where all class members were subject to the same diversion of assets to bank rather than deposit of pension contributions); *Selby*, 197 F.R.D. at 58 n.14. ("When the named plaintiff in an ERISA class action challenges an insurer's practice that the insurer engages in with respect to all of its plans, the court will allow the plaintiff to represent persons in the insurer's other insurance plans.") (citing *Sutton v. Medical Service Ass'n of Pa.*, 1993 WL 273429 at 5 (E.D. Pa. July 20, 1993)); *Gruby*, 838 F. Supp. at 827-28 (finding typicality in ERISA suit where all plaintiffs suffered from reduced benefits levels as a result of the defendants' alleged breach of fiduciary duties).

Here, Plaintiffs and the other members of the Class have been subject to the exact same course of wrongful conduct by the Defendants. Plaintiffs and each of the Plans entered into uniform, standard group annuity or individual annuity contracts with Nationwide for Nationwide to provide platforms of mutual funds for the investment of the Plans' assets. Plaintiffs and each of the Plans suffered under the same revenue sharing scheme, and Plaintiffs and the Plans seek the same relief.

Finally, Nationwide cannot manufacture a lack of typicality by filing counterclaims against the Plaintiffs in their individual capacities. The assertion of counterclaims against class representatives does not defeat typicality. *Fears v. Wilhelmina Model Agency, Inc.*, 2003 WL 21659373, at *4 (S.D.N.Y. July 15, 2003) ("Although some of the proposed representatives may be subject to counterclaims or defenses, that fact alone will not defeat typicality."). *Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 314 (S.D. Fla. 2001) ("Typicality is not defeated by specific

defenses or counterclaims to the named plaintiff's claim."); *Ingram v. Joe Conrad Chevrolet, Inc.*, 90 F.R.D. 129, 131 (E.D. Ky. 1981) (same).[54]  In any case, no counterclaims have been asserted against Anderson, and they could not be asserted in the future, because he was not a trustee while the Anderson Plan had Nationwide as an investment provider.

Thus, the claims of Plaintiffs are typical, such that the third requirement of Rule 23(a) is satisfied.

D.    RULE 23(A)(4) - PLAINTIFFS WILL FAIRLY AND ADEQUATELY PROTECT THE INTERESTS OF THE CLASS.

To meet the adequacy requirement, there must be no disabling conflicts of interest between the class representatives and the class, and the class representatives must be represented by counsel qualified, experienced and generally able to conduct the litigation.  *Marisol A.*, 126 F.3d at 378 (citing *Falcon*, 457 U.S. at 157 n. 13); *In Re Drexel Burnham Lambert Group, Inc. Sec. Litig.*, 960 F.2d at 291.  Nationwide will not be able to dispute that Plaintiffs meet the standard for adequacy – lack of disabling conflict of interest and adequate counsel.

1.    Plaintiffs Do Not Have Disabling Conflicts of Interests With the Class.

Not every conflict of interest between a class representative and class members prevents typicality and class certification.  *In Re Visa Check/MasterMoney Antitrust Lit.*, 280 F.3d 124, 145 (2d Cir. 2001).  Rather, only a fundamental conflict that goes to the heart of the litigation prevents certification, and speculative conflicts should be disregarded at the class certification stage.  *Id*.

Plaintiffs' interests in asserting their cause of action do not vary from those of the other members of the Class.  Plaintiffs will not suffer harm from the Court awarding any relief which

---

[54]  Further, on November 1, 2007, Plaintiffs' filed a motion to dismiss the counterclaims and supporting memorandum which the Court has set for hearing on January 30, 2008.  Even if the motion is denied (which it should not be, for the reasons stated therein), the counterclaims do not prevent Plaintiffs' claims from being typical.

any other Class members may be entitled to receive and vice versa.  On the other hand, Plaintiffs

and Class members will benefit from the same relief.  Thus, no conflict of interest, much less a

disabling conflict of interest, exists based upon the cause of action asserted by Plaintiffs.[55]

2.    Plaintiffs Have Sufficient Knowledge to Act as Class Representatives.

Plaintiffs Gouse and Wiberg demonstrated during their depositions that they understand

the essence of this suit, which is that Nationwide received payments from mutual funds which

should be disgorged to the Plans.[56]  That makes them adequate, because class representatives

need not have detailed knowledge of the facts or law in complex cases.  *Baffa v. Donaldson,*

*Lufkin & Jenrette Securities Corp.*, 222 F.3d 52, 61 (2d Cir. 2002) ("The Supreme Court in

*Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370-74...(1966) expressly disapproved of attack

on the adequacy of a class representative based on the representative's ignorance.").  *See also*

*Demitropoulos v. Bank One Milwaukee, N.A.*, 915 F. Supp. 1399, 1418-19 (N.D. Ill. 1996)

(holding plaintiff who described his claim primarily as a "lemon law" claim was adequate to

represent a class bringing very technical Consumer Leasing Act claims which he did not fully

understand); *Kaplan v. Pomerantz*, 131 F.R.D. 118, 121-2 (N.D. Ill. 1990) ("Because his

understanding may be rudimentary at times, a layman cannot be expected to explain in detail all

the intricacies of a complex securities fraud law suit.")  This is particularly true in an ERISA

case.  *Bradford v. AGCO Corp.*, 187 F.R.D. 600, 605 (W.D. Mon. 1999) ("In fact, this court

would be shocked if a representative plaintiff in an ERISA and LMRA case took an active role in

the preparation of the case.").

---

[55] *See* Declaration of Peter Wiberg, App. Tab 11; Declaration of Alan Grouse, App. Tab 13; Declaration of Christopher Anderson, App. Tab 18.

[56] February 13, 2003 Deposition of Alan Gouse, 41:13-21, App. Tab. 14; March 4, 2003 Deposition of Peter Wiberg, 9:12-21, App. Tab. 12.

As the Fourth Circuit explained, "[i]t is hornbook law that 'in a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative." *Gunnells v. Health Plan Services, Inc.*, 348 F.3d 417, 430 (4th Cir. 2003) (citations omitted). Furthermore, Plaintiff Anderson, a lawyer, declares that he will have sufficient knowledge to adequately represent the Class.[57]  Plaintiffs, therefore, have sufficient knowledge to act as class representatives.

3.    <u>Class Counsel Will Adequately Represent the Class</u>.

As demonstrated by the firm resumes found behind Tab 17 of the Appendix, Plaintiffs have engaged qualified, experienced and capable attorneys for this type of litigation.  The firms are experienced in ERISA and federal class actions and are dedicated to fairly and adequately advocating and protecting the interests of the entire Class.

## V.    **THE COURT SHOULD CERTIFY THIS CASE PURSUANT TO RULE 23(b)(2).**

A.    *THE FINAL INJUNCTIVE AND DECLARATORY RELIEF SOUGHT BY THE CLASS QUALIFIES FOR CERTIFICATION UNDER RULE 23(b)(2).*

Rule 23(b)(2) requires class certification where "the party opposing the class acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as whole."  Fed. R. Civ. P. 23(b)(2).  Nationwide has acted on grounds generally applicable to the Class by subjecting them all to the revenue sharing scheme.  This will be undisputed on the class certification record.

---

[57] Declaration of Christopher Anderson, App. Tab 18.

Nationwide concedes that a majority of the 24,230 Plans which compose the Class remain under contract with it and, therefore, are subject now and in the future to Nationwide's revenue sharing scheme.[58]   Accordingly, final injunctive or declaratory relief to give the Class the benefit of the revenue sharing scheme in the future is appropriate.

B.     *THE EQUITABLE MONETARY RELIEF SOUGHT BY PLAINTIFFS ALSO QUALIFIES FOR CERTIFICATION UNDER RULE 23(b)(2), BECAUSE IT CONSTITUTES A FORM OF INJUNCTIVE RELIEF.*

Prior to the enactment of the Civil Rights Act of 1991, Title VII discrimination claims seeking both injunctive and equitable monetary relief (back pay) were routinely certified as (b)(2) classes.   *Robinson v. Metro-North Commuter R.R.R. Co.*, 267 F.3d 147, 169 (2d Cir. 2001).   This was because back pay constitutes an equitable remedy, considered a form of the affirmative injunctive relief permitted in (b)(2) class actions.   *Allison v. Citgo Petroleum Co.*, 151 F.3d 402, 415 (5th Cir. 1998).   Significantly, in *Robinson*, the Second Circuit held that:

> Given that the 1991 Act did not alter the general remedial structure of disparate impact claims, we think it plain that (b)(2) certification of disparate impact claims seeking both injunctive and equitable monetary relief remains appropriate.

*Id.* at 169-170.   Accordingly, in the Second Circuit, claims seeking both injunctive and equitable monetary relief, such as back pay, should continue to be routinely certified as (b)(2) classes.

And, crucially, the Second Circuit has held that a claim for restitutionary or "make whole" relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), constitutes an appropriate claim for "other appropriate equitable relief in exactly the same way that back pay under Title VII constituted an equitable remedy."   *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 143-150 (2d Cir. 1999).   In *Strom*, the plaintiff sought to recover $500,000 in insurance proceeds that she would have received had the defendant's alleged breach of fiduciary duty not resulted in her husband's group life insurance failing to become effective before his death.   *Id.* at 143.   The

---

[58] Answer, ¶ 18.

district court had dismissed her claim under ERISA § 502(a)(3)(B) on the grounds that such a recovery did not constitute "other appropriate equitable relief." *Id*. at 142

The Second Circuit first concluded that a back pay award under Title VII constituted "other equitable relief" under § 502(a)(3)(B). *Id*. at 145-147. The Second Circuit then held:

> The relief sought in this case is indistinguishable from back pay in any material respect. Like a back pay award, its objective is to eliminate the direct economic effect of an alleged violation of the statute. [citation omitted]. It includes none of the other subjects of compensation found in traditional tort actions. It is, in the words of the Supreme Court, simply a 'make whole' remedy. [citation omitted].
>
> Congress appears to regard 'make whole' relief such as that sought here as 'equitable.' Only such a construction would serve Congress' purpose of affording meaningful relief to benefit plan beneficiaries in circumstances such as these. We therefore hold that the relief sought here is 'equitable relief' within the meaning of Section 502(a)(3)(B) and such relief would be 'appropriate' in the event plaintiff establishes liability on the part of Goldman.

*Id*. at 147 & 150. The equitable monetary relief sought by Plaintiffs herein constitutes a "make whole" or restitutionary remedy, because Plaintiffs seek only to recover the revenue sharing payments in order to make Plaintiffs and Class members whole.

Nationwide may respond that *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), implicitly reversed *Strom*. While *Knudson* did call into question part of the reasoning of *Strom* by narrowing what constitutes equitable relief under § 502(a)(3), the restitutionary relief sought by Plaintiffs still fits comfortably within that narrowed definition.

Under *Knudson*, restitution lies in equity and thus can be asserted pursuant to § 502(a)(3) when it seeks to recover particular funds in the defendant's possession. *Id*. (citing to Restatement (First) of Restitution § 160, Comment a (1937)). Crucially, this condition is met where the defendant deposits the plaintiff's assets into a bank account containing the defendant's own assets, as the plaintiff is entitled to restitution out of the mingled fund. Restatement (First)

of Restitution § 209, Comment a (1937).[59]

Thus, in the Second Circuit, it has been consistently held that if assets which should be returned to the plaintiff can be identified as going into bank accounts of the defendant, the plaintiff is entitled to equitable restitution out of those bank accounts. *In Re Martin Fein & Co., Inc.*, 43 B.R. 623, 627-8 (Bankr. S.D.N.Y. 1984) (citing *Salisbury Inv. Co. v. Irving Trust Co.*, 70 F.2d 313, 316 (2d Cir. 1934)) ("If a trustee mingles the trust funds with the mass of his other funds, as long as there remains on hand a sufficient sum to cover the amount of the trust fund, the cestui que trust may follow the trust fund and reclaim it."); *In Re Warner-Quinlan Co.*, 86 F.2d 103, 105 (2d Cir. 1936) (dictum); *In Re Anjopa Paper & Board Manuf. Co.*, 269 F. Supp. 241, 261 (S.D.N.Y. 1967); 5 *Scott on Trusts* § 515, at 3610-11 (3d ed. 1967)).

As Nationwide received the revenue sharing payments, it deposited them into one or more of its bank accounts and showed them as contra-expenses in specific ledgers in its books.[60] Under the Second Circuit authorities discussed above, a claim in equity for restitution against those bank accounts can be asserted, making it a claim for "*appropriate equitable relief*" under § 502(a)(3) of ERISA and qualifying it for (b)(2) certification under *Robinson* and *Strom*.[61]

The Supreme Court itself confirmed this in *Knudson* by holding that the plaintiffs in *Harris Trust & Savings Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000), had asserted

---

[59] In prior briefing, Nationwide argued that the Restatement (First) of Restitution § 209 applies only to bankrupt defendants in situations where no further disposition is made of the mingled fund and is held intact by the wrongdoer. Sur-Reply in Support of Defendants' Opposition to Plaintiffs' First Amended Motion for Class Certification [Docket No. 216]. Plaintiffs demonstrated that this argument was completely meritless. Plaintiffs' Response to Sur-Reply in Support of Defendants' Opposition to Plaintiffs' First Amended Motion for Class Certification [Docket No. 218]. In light of this prior briefing, Plaintiffs trust that Nationwide will not make this argument again.

[60] Scranton Depo., 25:18-26:23; 40:21-41:16, Conf. App. Tab H.

[61] Plaintiffs have not specifically pled for imposition of an equitable lien against bank accounts of Nationwide. If their general pleadings for equitable relief do not encompass such relief, Plaintiffs request leave of Court to amend to specifically plead for such relief.

an equitable claim for restitution under § 502(a)(3). 534 U.S. at 215. The plaintiffs in *Harris Trust* sought to recover restitution from the defendant of the purchase price of several motel properties -- which money the defendant presumably had deposited into one or more accounts which could be identified. *Harris Trust*, 530 U.S. at 242-3. This case cannot be distinguished.

To the same effect is *Health Care Service Corp. v. Tap Pharmaceutical Products, Inc.*, 2003 WL 21801636, at *3 (E.D. Tex. 2003). The plaintiff alleged that the pharmaceutical company had induced it into overpaying for drugs, and the plaintiff sought restitution of the overpayments, which presumably the defendant had deposited in one or more bank accounts. *Id.* at *1. Citing to *Harris Trust*, the district court held that the action for restitution constituted appropriate equitable relief under § 502(a)(3).

Finally, *Linvatec Corp.*, 2007 WL 1526418, at *9, held exactly the same way. The plaintiffs sought disgorgement of severance pay, presumably from an identifiable bank account, and the district court held that such restitution constituted an equitable claim for restitution pursuant to § 502(a)(3) under the standard set forth in *Knudson*. *Id.*

The combination of *Robinson* and *Strom* and *Knudson*, therefore, makes clear that the equitable relief sought by Plaintiffs in this case should be routinely certified for class treatment pursuant to 23(b)(2). Indeed, in *Robinson*, the failure to certify a (b)(2) class constituted an abuse of discretion. Significantly, because the equitable monetary relief sought by plaintiffs itself qualifies as injunctive relief, it does not matter whether the other injunctive and declaratory relief sought by Plaintiffs does or does not predominate over this equitable monetary relief. Thus, the Court need not even address that issue.

C.   *ALTERNATIVELY, THE EQUITABLE MONETARY RELIEF SOUGHT BY PLAINTIFFS QUALIFIES FOR 23(b)(2) TREATMENT, BECAUSE IT IS ONLY INCIDENTAL TO THE INJUNCTIVE AND DECLARATORY RELIEF.*

Alternatively, if it determines that the equitable monetary relief sought by Plaintiffs does not qualify as injunctive or declaratory relief under (b)(2), this Court must decide whether the appropriate final relief relates predominately to money damages.   Fed. R. Civ. P. 23(b)(2), advisory committee note (1966); *Robinson*, 267 F.3d at 162-3.  Even under the narrow *Allison* standard, the Court should determine that Plaintiffs seek primarily injunctive relief, not money damages, making (b)(2) certification proper.

In *Robinson*, the Second Circuit rejected the "incidental damages approach" to resolving this predominance issue set forth by the Fifth Circuit in *Allison* as inappropriately narrow.  267 F.3d at 164.  This approach makes certification of claims for monetary relief under (b)(2) inappropriate except where the monetary relief is wholly "incidental" to the requested injunctive relief.  *Robinson*, 267 F.3d at 163; *Allison*, 151 F.3d at 415.  The Second Circuit clearly agreed, however, that any case meeting the *Allison* incidental damages standard would be appropriate for (b)(2) certification.   *Robinson*, 267 F.3d at 163-4.  This case meets even that narrow *Allison* standard.

Under the narrow *Allison* standard, for monetary relief to be incidental, it must be "capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances."  *Allison*, 153 F.3d at 415.  Additional hearings to resolve "the disparate merits of each individual's case" should be unnecessary.  *Id*.

That is the case here.  The amount of revenue sharing payments attributable to each Plan will be a mechanical calculation based upon Nationwide's computer records without the need for

any individualized determinations of fact by the Court.

The Fifth Circuit's decision in *In Re Monumental Life Ins. Co., Industrial Life Ins. Lit.*, 365 F.3d 408, 418-420 (5th Cir. 2004), makes clear that this case meets the incidental damages standard.  That case involved discriminatory insurance policies which charged blacks more than whites for the same coverage and individual damages which would depend on the idiosyncrasies of the particular dual rate or dual plan policy.  *Id*. at 419.  The plaintiffs proposed using standardized formulas or restitution grids to calculate individual class members' damages, and the defendants argued that thousands of grids would have to be constructed to account for myriad of policy variations.  *Id*.

Conceding this to be true, the Fifth Circuit nevertheless held that the damages were still incidental because "the monetary predominance test does not contain a sweat-of-the-brow exception."  *Id*.  The Fifth Circuit noted that none of the policy variables cited as relevant by the defendants and the district court required the gathering of subjective evidence and that class members would automatically be entitled to recover the difference between what a black and a white paid for the same policy calculated through a virtually mechanically, albeit complicated, process.  *Id*.

The same is true in this case.  From Nationwide's records, it is possible to determine for each year in the Class Period how much money each Plan had invested in each mutual fund, and that amount can be multiplied by the percentage of the invested assets paid to Nationwide as revenue sharing in order to calculate the amount of revenue sharing attributable to each mutual fund in each Plan for each year, and those numbers can then be totaled.  Pursuant to this authority, therefore, no doubt exists that the equitable monetary relief sought by Plaintiffs is wholly "*incidental*," such that it does not predominate over the declaratory and injunctive relief

sought by the Class.

D.    *ALTERNATIVELY, PLAINTIFFS' EQUITABLE AND MONETARY RELIEF QUALIFIES FOR 23(b)(2) TREATMENT BECAUSE THE INJUNCTIVE AND DECLARATORY RELIEF PREDOMINATES UNDER THE SECOND CIRCUIT'S AD HOC TEST.*

Even if the equitable monetary relief sought by Plaintiffs is both not part of and not wholly incidental to the injunctive relief (it is), (b)(2) certification is still appropriate.  In *Robinson*, the Second Circuit held that when a district court is presented with a motion for (b)(2) class certification of a claim seeking both injunctive relief and non-incidental monetary damages, it "…may allow (b)(2) certification if it finds in its 'informed, sound judicial discretion' that (1) 'the positive weight or value [to the plans] of the injunctive or declaratory relief sought is predominate even though compensatory or punitive damages are also claimed,' [citation omitted] and (2) class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy."  267 F.3d at 164.

The Second Circuit went on to say that:

> Although the assessment of whether injunctive or declaratory relief predominates will require an ad hoc balancing that will vary from case to case, before allowing (b)(2) certification a district court should, at a minimum, satisfy itself of the following: (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiff to succeed on the merits.

*Id*.

These criteria are clearly met in this case.  As set forth in the Statement of Facts above, the effect of Nationwide disgorging revenue sharing on a going forward basis could make a significant monetary difference to a single participant's retirement account.  When the benefits to the hundreds of thousands of participants in the majority of the 24,532 Plans which remain under contract with Nationwide are accumulated, the potential future benefit to the Class over the next

30 years from appropriate final injunctive and declaratory relief plainly is much greater than the disgorgement sought by Plaintiffs of revenue sharing payments received by Nationwide during the Class Period (since the earlier of January 1, 1996, or the inception of revenue sharing, which occurred at the earliest some time in 1995). Thus, the Court should have no doubt that even in the absence of possible monetary recovery, reasonable plaintiffs would bring this suit to obtain the injunctive and declaratory relief sought.

Indeed, multiple courts have held that reasonable plaintiffs would bring suit to obtain injunctive or declaratory relief even in the absence of a possible monetary recovery under similar circumstances. *See Norflet v. John Hancock Life Ins. Co.*, 2007 WL 2668936, at *8 (D. Conn. Sept. 6, 2007) (Arterton, J.) (holding reasonable plaintiff would seek to enjoin insurer from collecting premiums and policies that discriminated against African Americans and to enjoin insurer from engaging in ongoing racial discrimination in the administration of policies sold to African Americans even in the absence of the large premium refunds sought); *Matyasovszky v. Housing Authority of the City of Bridgeport*, 226 F.R.D. 35, 45 (D. Conn. 2005) (Garfinkel, J.) (holding reasonable plaintiffs would seek injunctive relief against city housing authority to prevent discrimination even in the absence of potentially large monetary recovery); *Velez v. Norvartis Pharmecueticals Corp.*, 244 F.R.D. 243, (S.D.N.Y. 2007) (holding reasonable plaintiff would seek injunctive relief to stop pattern of gender discrimination even in the absence of potentially large money damages); *Brown v. Kelly*, 244 F.R.D. 222, (S.D.N.Y. 2007) (holding mass of persons arrested and/or convicted pursuant to unconstitutional statute would seek injunctive relief in the form of having wrongful criminal convictions and bench warrants expunged and fines disgorged even in the absence of potentially large damages); *In Re Universal Service Fund Telephone Billing Practices Litigation*, 219 F.R.D. 661, 680-681 (D. Kan. 2004)

(holding that injunctive relief to prevent future overcharging in violation of anti-trust laws could predominate over very large past anti-trust damages).

The Court should find it particularly significant that district courts in the Second Circuit have routinely found this requirement satisfied in the process of certifying (b)(2) classes seeking recovery for violations of ERISA. *See*, *e.g., In Re Citigroup Pension Plan ERISA Litig.*, 241 F.R.D. 172, 181 (S.D.N.Y. 2006) (reasonable plaintiff would pursue declaratory judgment as to how plan calculates benefits even in absence of restitution claim); *Richards v. FleetBoston Financial Corp.*, 174 F.R.D. 165, 174 (D. Conn. 2006) (reasonable plaintiff would pursue injunctive relief to invalidate plan amendment even in absence of restitution claim).

Likewise, there should be no doubt that the injunctive or declaratory relief sought will be reasonably necessary and appropriate if Plaintiffs succeed on the merits. In their discussion of 23(b)(3) certification below, Plaintiffs will demonstrate that class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy. Indeed, the Fifth Circuit's decision in *In Re Monumental Life Ins. Co., Industrial Life Ins. Lit.*, 365 F.3d at 418-420, which involved significantly more complicated damages calculations, makes this undeniable.

Finally, Plaintiffs note that in *Robinson* the Second Circuit held that "…any due process risk proposed by (b)(2) class certification of a claim for non-incidental damages can be eliminated by the district court simply affording notice and opt-out rights to absent class members…." 267 F.3d at 166. *See also Matyasovsky*, 226 F.R.D. at 45 (providing notice and opt-out rights to a Rule 23(b)(2) class); *In Re Universal Service Fund Telephone Billing Practices Litigation*, 219 F.R.D. at 681 (same). Plaintiffs believe that providing notice and opt-out rights will be appropriate in this case if it is certified pursuant to (b)(2), and they intend to

ask the Court to order same if it certifies a (b)(2) class.

## VI.   THE COURT SHOULD ALSO CERTIFY THIS CASE PURSUANT TO RULE 23(b)(3)

Plaintiffs additionally seek certification under Rule 23(b)(3) which states:

> (b) . . . An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: . . . . (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3).

A.   *COMMON QUESTIONS OF FACT AND LAW PREDOMINATE.*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *In Re Visa Check/MasterMoney Antitrust Lit.* 280 F.3d at 136 (quoting *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 623 (1997)). "In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof.'" *Id.* (quoting *Rutstein v. Avis Rent-A-Car Sys., Inc.,* 211 F.3d 1228, 1233 (11th Cir. 2000) (internal quotation marks omitted)).

"'Courts generally focus on the liability issue in deciding whether the predominance requirement is met.'" *Ohman v. Kahn*, 1990 WL 97756, at *3 (S.D.N.Y. June 27, 1990) (quoting *Dura-Bilt Corp.*, 89 F.R.D. at 93). Thus, "[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *In Re Visa Check/MasterMoney Antitrust Lit.*, 280 F.3d at 139. As set forth above in the discussion of Rule 23(a) commonality, under Plaintiffs' theory of the case, all of the issues

necessary to resolve Nationwide's liability are common issues.

Furthermore, and as also set forth above, the calculation of the disgorgement/restitution due each Plan will be a mechanical calculation based on Nationwide's records, such that it will not require any trial of the amount of disgorgement/restitution due each Plan. However, even if individual determinations of the amount of disgorgement/restitution due from Nationwide to each Plan are required, this does not destroy the predominance of common issues or otherwise foreclose class certification:

> But Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification. In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations. [citations omitted]....Indeed, 'in actions for money damages under Rule 23(b)(3), courts **usually** require individual proof of the amount of damages each member incurred.' [citation omitted]....Courts have routinely rejected this argument, concluding, as we have in previous cases, that the need for individualized proof of damages alone will **not** defeat class certification. [citations omitted].

*Gunnells*, 348 F.3d at 427-8 & 429 (emphasis in original).

Finally, Nationwide may argue against predominance as if Plaintiffs intend to or have to prove their case in a manner different than set forth in this Motion. The Court should reject such a tactic, because it must take Plaintiffs at their word as to how they will pursue their cause of action and rule on class certification accordingly. *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 42 (1st Cir. 2003).

In sum, no doubt exists here as to the predominance of common questions.

**B.    *A CLASS ACTION IS SUPERIOR TO OTHER AVAILABLE METHODS FOR THE FAIR AND EFFICIENT ADJUDICATION OF THIS CONTROVERSY.***

Not only do common questions predominate in this case, but, as further required by Fed. R. Civ. P. 23(b)(3), a "class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3) sets forth the following factors to be considered

in making a "superiority" determination: (A) the interest of members of the class in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by . . . members of the class; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3).

The first factor favors certification, because it is unlikely that many of the members of the proposed Class would prefer, individually, to control the prosecution of their own claims given the general reluctance to engage in litigation, the difficulties in obtaining counsel and the prohibitive expense involved. *See, e.g., In re Revco Sec. Litig.*, 142 F.R.D. 659, 699 (N.D. Ohio 1992). However, if certain Plans wish to pursue individual litigation, they will have the opportunity to opt out of the Class. *See Rivera v. Fair Chevrolet Geo Partnership*, 165 F.R.D. 361, 366 (D. Conn 1996).

The second and third factors favor certification as well. Plaintiffs have already undertaken to initiate and prosecute this action in this forum. Since jurisdiction and venue are appropriate here, and since Plaintiffs are unaware of any similar efforts to vindicate Class members' rights, this action should proceed here as a class action.

Finally, the fourth factor favors class certification, because this case presents no unusual difficulties in management as a class action. In that regard, the Court must keep in mind that the failure to certify an action under (b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule. *In Re Visa Check/MasterMoney Antitrust Lit.*, 280 F.3d at 140.

This is particularly true in a case like this one that will be tried to the Court and not to a jury, because the absence of a jury make it far more easy for the Court, if necessary, to use

various management techniques such as bifurcation of liability from remedy or appointment of special masters to handle any discreet factual inquires that may have to be made to tailor the remedy.  Indeed, Plaintiffs are not aware of any federal court ever denying certification on the basis of manageability in a case where there will be no jury trial.

Because common questions of fact and law predominate, and because the class action device is superior to other available methods for the fair and efficient adjudication of this case, Rule 23(b)(3) is satisfied.  Accordingly, the proposed Class should be certified.

**V.**

**<u>CONCLUSION</u>**

For the reasons stated herein, Plaintiffs respectfully request that the Court certify the Class as requested pursuant to Fed. R. Civ. P. 23 and designate Plaintiffs as Class representatives and Plaintiffs' counsel as Class Counsel.

Respectfully submitted,

Marc R. Stanley
Federal Bar No. ct18179
Roger L. Mandel
Federal Bar No. ct18180
Martin Woodward
Federal Bar No. ct25263
STANLEY, MANDEL & IOLA, L.L.P.
3100 Monticello Avenue, Suite 750
Dallas, Texas  75205
214-443-4300
214-443-0358 (Fax)

Richard A. Bieder
Federal Bar No. ct04208
Antonio Ponvert, III
Federal Bar No. ct17516
KOSKOFF KOSKOFF & BIEDER, P.C.
350 Fairfield Avenue
Bridgeport, Connecticut 06604
203-336-4421
203-368-3244 (Fax)


Gregory G. Jones
Federal Bar No. ct23443
LAW FIRM OF GREGORY G. JONES PC
603 S. Main Street, Suite 200
Grapevine, Texas 76051
817-424-9001
817-424-1665 (Fax)

**PLAINTIFFS' COUNSEL**

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of November, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel:

Dennis F. Kerrigan, Jr.
LeBoeuf, Lamb, Greene & MacRae
Goodwin Square
225 Asylum Street
Hartford, CT  06103

Charles C. Platt
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
399 Park Avenue
New York, NY 10022

Mr. Daniel H. Squire
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006

Roger L. Mandel