## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LOU HADDOCK, as trustee of the Flyte Tool & Die Company, Inc. 401-K Profit Sharing Plan, et al., | : | CIVIL ACTION NO.: |
| | : | |
| | : | 3:01CV1552 (SRU) |
| PLAINTIFFS, | : | |
| | : | |
| v. | : | |
| | : | |
| NATIONWIDE FINANCIAL SERVICES, INC., and NATIONWIDE LIFE INSURANCE CO., | : | |
| | : | |
| | : | |
| DEFENDANTS. | : | |
| | : | April 25, 2008 |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
## CLASS CERTIFICATION BASED ON FIFTH AMENDED COMPLAINT

## TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF FACTS ...............................................................................................3

    A.    The Different Annuity Contracts Purchased By Plans and Participants.................3

    B.    The Different Variable Accounts In Which The Plans And Participants Invested, And The Different Investment Options In Those Accounts....................4

    C.    The Plans' And Participants' Selection Of Investment Options.............................5

    D.    The Plans' And Participants' Selection Of Additional Investment Options...........7

    E.    The Removal Of Some Investment Options ..........................................................8

    F.    The Plans And Participants Directed Their Own Investments In These Options ......................................................................................................10

    G.    The Different Charges Associated With The Investment Options ........................11

        1.    The Group Annuity Contract Charges ......................................................11

        2.    The Mutual Fund Fees Affecting The Investment Options ......................12

    H.    The Different Mutual Fund Payments ..................................................................13

STANDARD OF REVIEW ..............................................................................................15

ARGUMENT ....................................................................................................................17

I.    CLASS CERTIFICATION MUST BE DENIED BECAUSE PLAINTIFFS LACK STANDING TO SUE. ......................................................................................17

II.    CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFFS HAVE NOT OFFERED GENERALIZED PROOF OF THEIR "MUTUAL FUND SELECTION AND DELETION" THEORY. ......................................................18

    A.    Whether Nationwide Life Became An ERISA Fiduciary By Selecting Or Removing Investment Options Raises Individualized Issues. ...............................20

        1.    There is No Common Proof That Nationwide Life Exercised Authority Or Control By Selecting Investment Options. ...........................20

# TABLE OF CONTENTS

Pages

      2.    There Is No Common Proof That Nationwide Life Exercised Authority Or Control By Removing Investment Options..........................22

B.    Whether Nationwide Breached Any Duty By Selecting Or Removing Investment Options In Return For Mutual Fund Payments Raises Individualized Issues...............................................................................24

      1.    There Is No Common Proof That Nationwide Improperly Selected Investment Options To Receive Payments. ...............................................25

      2.    There Is No Common Proof That Nationwide Improperly Removed Investment Options To Receive Payments. ...............................................27

C.    Whether Nationwide Received Mutual Fund Payments At The Expense Of Plan Participants, And Whether The Payments Caused Any Loss, Raises Individualized Issues. ................................................................28

D.    Whether Nationwide Life Engaged In Prohibited Transactions When It Received Mutual Fund Payments Raises Individualized Issues.........................31

III.    PLAINTIFFS HAVE NOT ESTABLISHED THAT A CLASS ACTION IS SUPERIOR UNDER RULE 23(b)(3)...............................................................34

IV.    PLAINTIFFS CANNOT AVOID THE REQUIREMENTS OF GENERALIZED PROOF AND SUPERIORITY BY RELYING ON RULE 23(b)(2). ...............................37

A.    Plaintiffs Have No Standing To Seek Injunctive Or Corresponding Declaratory Relief. ................................................................................38

B.    Nationwide Has Not Acted On Grounds That Apply Generally To The Class.............................................................................................38

C.    Injunctive Or Declaratory Relief Does Not Predominate Under The Ad Hoc Test Set Forth In Robinson v. Metro-North Commuter Railroad. ..........39

V.    PLAINTIFFS CANNOT MEET THE "ADEQUACY" REQUIREMENTS OF RULE 23(A)....................................................................................................42

A.    Plaintiffs Are Inadequate Because They Have No Standing To Represent The Class.............................................................................................43

B.    Plaintiffs Are Inadequate Because Their Claims Conflict With The Class. ..........43

C.    Plaintiffs Are Inadequate Because Of The Counterclaims Against Them. ...........44

D.    Plaintiffs Are Inadequate Because They Lack Even The Minimal Knowledge Necessary To Control This Litigation and Represent the Class.........45

# TABLE OF CONTENTS

**Pages**

VI.    PLAINTIFFS' "SPECIFIC ACCUMULATION" THEORY WAS REJECTED BY
       THE COURT AND DOES NOT SATISFY RULE 23 ......................................................47

CONCLUSION.............................................................................................................................50

# TABLE OF AUTHORITIES

## CASES

*Abrams v. Interco, Inc.*, 719 F.2d 23 (2d Cir. 1983)......................................................35

*Alpert v. U.S. Indus., Inc.*, 59 F.R.D. 491 (C.D. Cal. 1973) ...........................................37

*Altschul v. Paine, Webber, Jackson & Curtis Inc. v. Altschul*, 518 F. Supp. 591 (S.D.N.Y. 1981) .............................................................................................................................26

*Am. Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the U.S.*, 841 F.2d 658 (5th Cir. 1988) ..............................................................21

*Augustin v. Jablonsky*, No. 99-CV-3126 (DRH), 2001 U.S. Dist. LEXIS 10276 (E.D.N.Y. Mar. 8, 2001) ................................................................................................40

*Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52 (2d Cir. 2000) ...................45, 47

*Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157 (S.D.N.Y. 2003).............................35

*Berkman v. Sinclair Oil Corp.*, 59 F.R.D. 602 (N.D. Ill. 1973)......................................37

*Bowens v. Atlantic Maint. Corp.*, No. 06 CV 809 (NG), 2008 U.S. Dist. LEXIS 20325 (E.D.N.Y. Mar. 14, 2008) ..............................................................................................38

*Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) ....................................36

*Champagnie v. Kaufman*, No. 3:06-cv-1819 (JCH), 2007 U.S. Dist. LEXIS 80496 (D. Conn. Oct. 30, 2007)......................................................................................................17

*Chemical Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, *vacated on other grounds at* 196 F.3d 373 (2d Cir. 1999)...............................................................................................26

*Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12 (2d Cir. 1991) ......................17

*Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463 (7th Cir. 2007) ...................................................................................................18, 21, 31

*Cohn v. Massachusetts Mut. Life Ins. Co.*, 189 F.R.D. 209 (D. Conn. 1999)...................34, 36, 37

*Comer v. Cisneros*, 37 F.3d 775 (2d Cir. 1994)..............................................................38

*Connecticut v. Physicians Health Servs of Conn., Inc.*, 287 F.3d 110 (2d Cir. 2002)...................17

*Consolidated Beef Indus., Inc. v. New York Life Ins. Co.*, 949 F.2d 960 (8th Cir. 1991)..............21

*Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*,
198 F.R.D. 41 (E.D.N.Y. 2000) ..........................................................................................19

*Cortigiano v. OceanView Manor Home for Adults*, 227 F.R.D. 194 (E.D.N.Y. 2005) ................43

*Cotchett v. Avis Rent A Car System, Inc.,* 56 F.R.D. 549 (S.D.N.Y. 1972) ...................................37

*Daniels v. Amerco*, No. 81 Civ. 3801 (RLC), 1983 WL 1794 (W.D.N.Y. Mar. 10, 1983) ...........35

*Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255 (S.D.N.Y. 1985) ................................................45

*Deluca v. Blue Cross Blue Shield of Mich.*, No. 06-12552, 2007 WL 3203131 (E.D.
Mich. Oct. 31, 2007) ..........................................................................................................21

*Deshawn E.  by Charlotte E. v. Safir*, 156 F.3d 340 (2d Cir. 1998) ..............................................38

*Dobson v. Hartford Fin. Servs.*, 196 F. Supp. 2d 152 (D. Conn. 2002), *aff'd in part and
vacated in part,* 389 F.3d 386 (2d Cir. 2004) ....................................................................20

*Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125 (S.D.N.Y. 2003) .......................................17, 39

*Fechter v. Conn. Gen. Life Ins. Co.*, 800 F. Supp. 182 (E.D. Pa. 1992) ..................................22, 32

*Flacche v. Sun Life Assurance Co.*, 958 F.2d 730 (6th Cir. 1992) .................................................21

*Fletcher v. ZLB Behring LLC*, 245 F.R.D. 328 (N.D. Ill. 2006)....................................................28

*FTC. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006)*, cert. denied,* 2007 U.S. LEXIS 3024
(Mar. 19, 2007) ...................................................................................................................41

*Grandon v. Merrill Lynch & Co., Inc.*, 2003 WL 22118979 (S.D.N.Y. Sept. 11, 2003) ..............35

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) .........................................41

*Haddock v. Nationwide Fin. Servs., Inc.*, 419 F. Supp. 2d 156
(D. Conn. Mar. 7, 2006)............................................................................................... *passim*

*Harris v. Initial Sec., Inc.*, No. 05 Civ. 3873 (GBD), 2007 U.S. Dist. LEXIS 18397
(S.D.N.Y. Mar. 7, 2007) ................................................................................................39, 40

*Henry v. Champlain Enters., Inc.*, 468 F. Supp. 2d 368 (N.D.N.Y. 2007)....................................28

*In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374 (S.D.N.Y. 1996)..............................19

*In re Initial Public Offering Secs. Litig.*, 471 F.3d 24 (2d Cir. 2006) ........................16, 21, 22, 25

*In re Lilco Secs. Litig.*, 111 F.R.D. 663 (E.D.N.Y. 1986) ............................................................42

*In re Methyl Tertiary Butyl Ether ("MTBE") Litig.*, 209 F.R.D. 323
    (S.D.N.Y. 2002) ..........................................................................................20, 35, 39, 42

*In re Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89 (D. Conn. 2006) ......................................45, 47

*In re Sears Retiree Group Life Ins. Litig.*, 198 F.R.D. 487 (N.D. Ill. 2000)..................................28

*In re VISA Check/ Mastermoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) .....................17, 34

*Karen L. v. Physicians Health Servs., Inc.*, 202 F.R.D. 94 (D. Conn. 2001) ................................16

*King v. Fox*, No. 97 CIV 4134 RWS, 2004 WL 68397 (S.D.N.Y. Jan. 14, 2004) ........................26

*King v. Rell*, No. 3:06-cv-1703 (VLB), 2008 U.S. Dist. LEXIS 21998 (D. Conn. Mar. 20,
    2008) ............................................................................................................................38

*Kline v. Wolf*, 702 F.2d 400 (2d Cir. 1983)..................................................................................44

*Knoll v. Equinox Fitness Clubs*, No. 02 Civ. 9120 (SAS), 2003 WL 23018807 (S.D.N.Y.
    Dec. 22, 2003).............................................................................................................26

*Kruse v. Wells Fargo Home Mortgage*, No. 02-CV 3089 (ILG), 2006 U.S. Dist. LEXIS
    26092 (E.D.N.Y. May 3, 2006) ...................................................................................38

*Koenig v. Benson*, 117 F.R.D. 330 (E.D.N.Y. 1987)....................................................................44

*Leverett v. Heilig-Meyers Furniture Co., No. CV 194-158*, 1995 U.S. Dist. LEXIS 21797
    (S.D. Ga. Aug. 28, 1995) .............................................................................................37

*Lewis Tree Service Serv., Inc. v. Lucent Techs., Inc.*, 211 F.R.D. 228 (S.D.N.Y. 2002) .............20

*LoPresti v. Terwilliger*, 126 F.3d 34 (2d Cir. 1997)....................................................................23

*McCarthy v. PNC Credit Corp., Civ. No. 2:91CV00854 (PCD)*, 1992 U.S. Dist. LEXIS
    21719 (D. Conn. May 27, 1992)...................................................................................39

*McLaughlin v. Am. Tobacco Co.*, No. 06-4666-cv, 2008 U.S. App. LEXIS 7093 (2d Cir.
    Apr. 3, 2008)................................................................................................................16

*Miller v. Retirement Funding Corp.*, 953 F. Supp. 180 (W.D. Mich. 1996) ................................17

*Miner v. Empire Blue Cross/Blue Shield*, 2001 WL 96524 (S.D.N.Y. Feb. 5, 2001) ..................20

*Moekel v. Caremark, Inc.*, No. 3:04-0633, 2007 WL 3377831 (M.D. Tenn. Nov. 13, 2007) ...................................................................................................................18, 31

*Monarch Ins. Co. of Ohio v. Insurance Corp. of Ireland, Ltd.*, 835 F.2d 32 (2d Cir. 1987) .........26

*Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2d Cir. 2002) ......................................19, 23

*Morgan v. Metro. District Comm'n*, 222 F.R.D. 220 (D. Conn. 2004) ....................................40, 42

*New York Magazine v. Metro. Transp. Auth.*, 136 F.3d 123 (2d Cir. 1998) ..................................38

*O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732 (5th Cir. 2003) ................................34

*Panzirer v. Wolf*, 663 F.2d 365 (2d Cir. 1981) ..............................................................45

*Parker v. George Thompson Ford, Inc.*, 83 F.R.D. 378 (N.D. Ga. 1979) ....................................45

*Parker v. Time Warner Entm't Co.*, 331 F.3d 13 (2d Cir. 2003) ...................................20

*Pecere v. Empire Blue Cross & Blue Shield*, 194 F.R.D 66 (E.D.N.Y 2000) ...............................44

*Pegram v. Herdrich*, 530 U.S. 211 (2000) ....................................................................18

*People United for Children, Inc. v. City of New York*, 214 F.R.D. 252 (S.D.N.Y. 2003) .............43

*Petrolito v. Arrow Fin. Servs., LLC*, Civ. Action No. 3:02-cv-484 (JCH), 2004 U.S. Dist. LEXIS 3978 (D. Conn. Mar. 5, 2004) ...............................................................41

*Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assurance Co.*, 700 F.2d 889 (2d Cir. 1983) ..................................................................................17

*Rehwaldt v. Elec. Data Sys. Corp.*, No. 95-CV-876A, 2005 U.S. Dist. LEXIS 44849 (W.D.N.Y. Apr. 12, 2005) .........................................................................41, 43

*Robinson v. Metro-North Commuter Railroad.*, 267 F.3d 147 (2d Cir. 2001) ........................39, 40

*Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590 (2d Cir. 1986) .....................................16

*Schulist v. Blue Cross of Iowa*, 553 F. Supp. 248 (N.D. Ill. 1982), *aff'd*, 717 F.2d 1127 (7th Cir. 1983) ......................................................................................18, 31

*Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610 (6th Cir. 2003) .......................18, 31

*Smith v. Univ. of Wash. Law Sch.*, 233 F.3d 1188 (9th Cir. 2000) ................................40

*Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307 (S.D.N.Y. 2003) ............................................26

*Street v. Diamond Offshore Drilling, No. Civ. A. 00-1317*, 2001 WL 568111 (E.D. La. May 25, 2001)..................................................................................................37

*Tardif v. Gen. Elec. Co.*, 2000 WL 33376644 (D. Conn. Sept. 30, 2000)....................................28

*Tedesco v. Mishkin*, 689 F. Supp. 1327 (S.D.N.Y. 1988)................................................45

*Trustees of the Am. Fed'n of Musicians & Employers' Pension Fund v. Steven Scott Enters., Inc.*, 40 F. Supp. 2d 503 (S.D.N.Y. 1999)............................................27

*Walker v. Asea Brown Boveri, Inc.*, 214 F.R.D. 58 (D. Conn. 2003)............................................20

*Wiesmueller v. Kosobucki*, 513 F.3d 784 (7th Cir. 2008)................................................38

## STATUTES AND RULES

29 U.S.C. § 1002(21)................................................................................................49

29 U.S.C. § 1104(a)(1)(A)(ii)..................................................................................33

29 U.S.C. § 1104(a)(1)(B)..........................................................................................33

29 U.S.C. § 1132(a)(3)................................................................................................17

## MISCELLANEOUS

1 Dobb, Law of Remedies § 4.2(3) (2d ed. 1993)........................................................45

7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1775 (3d ed. 2005)........................................................................40

Defendants respectfully submit this Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification Based on Fifth Amended Complaint.

## PRELIMINARY STATEMENT

The three remaining Plaintiffs in this case are the trustees of three employer-sponsored retirement plans (the Crown Plan, the Anderson Plan, and the Easter Seals Plan) that held variable annuity contracts issued by Nationwide Life Insurance Co. ("Nationwide Life") at various times between 1991 and 2003.

Plaintiffs claim that the Nationwide Defendants assumed an ERISA fiduciary duty, and violated ERISA, by allegedly selecting and deleting investment options in their annuity contracts for the purpose of receiving payments from mutual funds or their affiliates. *Haddock v. Nationwide Fin. Servs., Inc.*, 419 F. Supp. 2d 156 (D. Conn. 2006) (Doc. # 266) (summary judgment denied on ground that Plaintiffs' "mutual fund selection or deletion" theory stated claim under ERISA). Plaintiffs purport to sue on behalf of a national class of thousands of other employee pension benefit plans that held other Nationwide annuity contracts at various times, and were allegedly subject to those same practices.

Plaintiffs' motion for class certification must be denied because the named Plaintiffs do not have standing to sue. As described in Section I below, Plaintiffs cannot sue on behalf of a class of employee pension benefit plans because those plans themselves have no right to sue under the express language of the ERISA statute and Second Circuit case law. Plaintiffs cannot even sue on behalf of their own three plans because those plans no longer hold Nationwide annuity contracts and have no legitimate interest in obtaining the prospective injunctive or declaratory relief sought by the class. Plaintiff Wiberg cannot sue because he is no longer a trustee (the Crown Plan was terminated in or about 2003), and thus lacks standing under ERISA.

These standing issues are compounded by the Plaintiffs' conflicts of interests and other adequacy issues set forth in Section V below.

Plaintiffs' motion must also be denied because they have not shown that ERISA fiduciary duty and liability can be proved with respect to all the plans on a class-wide basis, using generalized evidence of some systematic mutual fund selection or deletion. To the contrary, as described in Sections II and III below, there is no evidence that Nationwide Life uniformly decided to select or remove hundreds of different investment options in thousands of different annuity contracts at various times over a twelve-year period for the purpose of receiving payments from mutual funds or their affiliates, as Plaintiffs claim.

Indeed, Plaintiffs have not even shown that any removal of investment options affected the entire class. Some plans were not affected at all, as demonstrated by Plaintiffs' own individual circumstances: during the entire period they owned Nationwide annuity contracts, *the plans represented by the three Plaintiffs were not affected by the removal of any investment option that they previously selected*, the alleged conduct by Nationwide Life that is at the core of their legal theory.

Plaintiffs cannot avoid these requirements of uniform and generalized proof, and superiority and manageability, under Rule 23(b)(3) simply by characterizing their claims as falling under Rule 23(b)(2), which provides for injunctive relief. As explained in Section IV below, even if Plaintiffs (whose plans no longer hold Nationwide contracts) have standing to pursue injunctive relief (which they do not), their claims are primarily to recover money and thus fall within Rule 23(b)(3). Furthermore, even Rule 23(b)(2) requires that Plaintiffs' claims must be cohesive and proved through uniform evidence on a class-wide basis.

Perhaps recognizing that their "mutual fund selection and deletion" theory in this case is not capable of uniform proof, Plaintiffs' motion for class certification veers off in a different direction, as has been their habit in this case. They now seek class certification on an "accumulation unit" theory that this Court rejected in its March 2006 decision. Even if that theory were still alive, it could not meet the Rule 23 requirements for the reasons set forth in Section VI below.

## STATEMENT OF FACTS

**A.    The Different Annuity Contracts Purchased By Plans and Participants**

The retirement plans and participants in the proposed class held different Nationwide Life variable annuity contracts at different times beginning in 1988.[1] Some of the retirement plans in the putative class, including the Crown Plan, purchased group annuity contracts that were utilized jointly by all the participants in the plan.[2] Other retirement plans in the class, including the Anderson Plan and the Easter Seals Plan, arranged for individual annuity contracts that were purchased by the plan for the benefit of individual participants in that plan.[3]

Plaintiffs characterize Nationwide Life's annuity contracts as "standard form contracts." Motion for Class Certification Based on Fifth Amended Complaint (Doc. # 299) ("Class Cert.

---

[1]    Plaintiffs' Fifth Amended Class Action Complaint (Doc. # 270) ("Compl.") ¶¶ 46, 48; Declaration of Steven J. Rose ("Rose") ¶¶ 3-5; Declaration of Eric Henderson ("Henderson ") ¶¶ 3-6.

[2]    Crown Plan Group Variable Annuity Contract ("Crown Contract"), Exhibit 1A to Declaration of Mark Bieter ("Ex. 1A") at N 01 (showing application completed May 22, 1992); Plaintiffs' Responses to Requests to Admit ("Resp. to Req. to Admit") (Ex. 3), Response to Request No. 14.

[3]    Anderson Plan Individual Variable Annuity Contract ("Anderson Contract") (Ex. 2A); Easter Seals Plan Individual Variable Annuity Contract ("Easter Seals Contract") (Ex. 2C); Henderson ¶ 3. Although Plaintiffs suggest that they were "sold" the contracts by the pension plan administrators, Class Cert. Br. at 2, those "PPAs" were in fact the agents of the plans, *not* Nationwide. *See* Appointment of Crown Plan's Authorized Representative (Ex. 4); Appointment of Easter Seals Plan's Authorized Representative (Ex. 5, 6).

Br.") at 3. In fact, the evidence shows that there were substantial differences between the terms and charges in the group contracts compared to the individual contracts, among the group contracts, and among the approximately 60 types of individual annuity contracts, as described below. Rose ¶ 4; Henderson ¶¶ 4-5.

**B.    The Different Variable Accounts In Which The Plans And Participants Invested, And The Different Investment Options In Those Accounts**

Each Nationwide Life variable annuity contract permitted the retirement plan or its participants to invest money in a separate legal entity called a "variable account." There were different variable accounts that were associated with the different types of contracts.[4] Most of those variable accounts received money not only from the retirement plans and participants in the putative class here, but also from other Nationwide annuity contract-holders who are not members of the proposed class. Henderson ¶ 7.

At different times over the proposed class period, the variable accounts contained hundreds of investment options that the retirement plans and participants in the putative class (and other Nationwide annuity-holders not in the class) could select for investment of their money. Rose ¶ 7; Henderson ¶ 8. Those investment options corresponded to separate mutual funds that were managed and administered by dozens of mutual fund advisors and their affiliates, including independent managers at Fidelity, Neuberger Berman, Oppenheimer, American

---

[4]    Compl. ¶¶ 14-15, 17-18, 26; Crown Contract (Ex. 1A) at N 006; Anderson Contract (Ex. 2A) at N 075, N 081; Easter Seals Contract (Ex. 2D) at N 325; Minutes of the June 6, 1984 meeting of the Board of Directors of Nationwide Life Insurance Company (Ex 7); The Best of America IV Individual Deferred Variable Annuity Contracts Prospectus (May 1, 1991) (included with Anderson Contract) (Ex. 2A) at N 109 (describing establishment of Nationwide Variable Account – II available for investment by Best of America IV contract owners); America's marketFLEX II Annuity Prospectus (Sept. 7, 2007) (Ex. 8) at N 015820 (describing establishment of Nationwide Variable Account – 4 available for investment by America's marketFLEX II contract owners).

Century, and Dreyfus Corporation. *E.g.*, Crown Contract (Ex. 1A) at N 001; Anderson Contract (Ex. 2A) at N 070.

The variable accounts included investment options corresponding to mutual funds that made payments to Nationwide after 1996 *and* some options that did not.[5] Investment options were included in the variable accounts over time for many reasons unrelated to mutual fund payments, such as investment style, amount of assets, long-term performance, management tenure and philosophy, compliance and regulatory background, risk profile, and expenses, among other factors. Investment options were not included in the variable accounts simply because mutual fund payments were made, as Plaintiffs have argued. Class Cert. Br. at 9; Rose ¶ 8; Henderson ¶ 9; Investment Quality Pamphlet (Ex. 9) at N 018430-43.

C.    **The Plans' And Participants' Selection Of Investment Options**

Before a retirement plan purchased a group annuity contract, the plan's trustee selected the investment options that would be available to that plan from an array of options available in the variable account related to that type of contract.[6] Once selected by the trustee, those investment options became part of the plan's annuity contract, and plan participants could then invest in the applicable variable account and then allocate their money to any of those selected

---

[5]    Rose ¶ 8; Henderson ¶ 9; October 1, 2006 Amendment to No. 2 Fund Agreement with Gartmore (Ex. A) at N 0169593; January 1, 2000 Agreement between Nationwide Financial Services, Inc. and Villanova Mutual Fund Capital Trust (Ex. B) at N 013433-34 (listing some funds with no service payments).

[6]    Compl. ¶ 25 ("[T]he Plans chose a subset of those [investment options] for investment in by their participants, with the Plans' choices as indicated on the group annuity applications becoming part of their group annuity contracts."); Crown Contract (Ex. 1A) at N 001 ("The Contract shall include the following Funds of the Separate Account [listing funds for selection]"); Plaintiff Peter Wiberg's Objections and Responses to Defendants' Fourth Set of Interrogatories (Ex. 10) at 2 ("As Trustee of the Crown Plan, I chose the Investment Options available to participants pursuant to the Crown Plan's group annuity contract with Nationwide from the choices offered by Nationwide ....").

investment options.  Rose ¶ 9.[7]

The arrays of investment options available to plans purchasing group variable annuity contracts changed and increased over time.  For example, arrays of 16 investment options were available to the Crown Plan in 1992, 18 to the Flyte Plan in 1993, and 37 to the Hartford Roofing Plan in 1996, before each purchased its Best of America Advisor group contract.  The number of options in the array under that type of group contract increased to 67 in 1997, to 150 in 2005, and 217 in 2008.  Rose ¶ 10.

In contrast to *group* contracts, the *individual* annuity contracts each had a distinctive array of investment options.  Participants in plans with individual contracts selected their own investment options to which they could allocate their money.  Henderson ¶ 10; Anderson Contract (Ex. 2A) at N 141; Ferdon 2007 Dep. Tr. (Ex. R) at 22, 25.  Each participant selected investment options from an array available in the variable account related to his or her type of contract, and the options selected for investment by each participant became part of his or her individual and separate annuity contract.  Henderson ¶ 10; Compl. ¶ 27; Anderson Contract (Ex. 2A) at N 141.  Different arrays were available depending on the type of individual annuity contract and when the contract was purchased.[8]  For example, arrays of 15 investment options were available to the Anderson Plan participants in 1991 and 28 in 1998, and 7 to the Easter

---

[7]    Compl. ¶ 27 ("Pursuant to their contracts, participants choose the mutual funds in which their contributions and any matching contributions made by their employers are invested."); *see* The Best of America Retirement Manager Variable Contract Profile (Ex. 11) at N 011139 ("The Contractholder may select any of the funds offered to include in the Variable Contract, subject to any limitations imposed by a fund or companion contract.  Participants may then choose from among the selected funds.").

[8]    *Compare* Easter Seals Contract (Ex. 2C) at N 227 (Best of America IV annuity contract purchased in 1994 with an array of 8 investment options) *with* Anderson Contract (Ex. 2A) at N 141 (Best of America IV annuity contract purchased in 1998 with an array of 29 investment options); *see also* Best of America IV Prospectus (May 1, 2007) (Ex. 12) at N 015738-40 (listing array of investment options offered under contract); Best of America All American Gold Annuity Prospectus (May 1, 2007, as amended Sep. 4, 2007) (Ex. 13) at N 015869-71 (same).

Seals Plan participants in 1994 and 34 in 1998.   During the proposed class period, the different

arrays included hundreds of investment options that varied by variable account and type of

contract.  Henderson ¶ 11.

Some plans and participants selected many or all of the investment options available for

their group and individual annuity contracts; other plans and participants selected a smaller

subset.  The plans and participants had no obligation to select any particular investment options,

and Nationwide Life did not direct or advise them on the selection.  Rose ¶ 11; Henderson ¶ 13;

Wiberg 2007 Dep. Tr. (Ex. P) at 52, 56-57, 59; Ferdon 2007 Dep. Tr. (Ex. R) at 25-26.

**D.    The Plans' And Participants' Selection Of Additional Investment Options**

Over time, hundreds of *additional* investment options were included in the different

variable accounts and became available for the plans' and participants' selection *after* they

purchased their annuity contracts.  For example, while they owned Nationwide group variable

annuity contracts, the Crown Plan and the (former Plaintiffs') Hartford Roofing and Flyte Plans

were provided access to the Dreyfus Emerging Leaders fund, the Franklin Small Cap Growth

(Class A) fund, and the INVESCO Small Company Growth fund.[9]  The Easter Seals Plan and

Anderson Plan were presented with the Neuberger Berman Advisers Management Trust –

Guardian Portfolio Fund and the Janus Aspen Series – Forty Portfolio Fund, among many other

additional investment options.[10]  These additional options varied according to the period and the

type of contract.  Rose ¶ 12; Henderson ¶ 14.

Some plans and participants selected many or all of the additional investment options

available for their group and individual contracts; other plans and participants selected a smaller

subset.  Nationwide Life did not require the plans or participants to select these additional

_____

[9]    Sep. 15, 1999 Points of Interest (Ex. 14) at N 017642.

[10]   Best of America IV Product Listing (Ex. C) at N 017352, N 017354; Henderson ¶ 14.

- 7 -

options, nor did it advise them on the selection. Plans and participants in both group and

individual annuity contracts were also free to change their selections over time, and many plans

and participants dropped investment options and added others over time.[11]

### E.    The Removal Of Some Investment Options

On some occasions, investment options were removed from variable accounts after

previously being selected by class plans and participants for inclusion in their contracts. Rose

¶ 14; Henderson ¶ 16. Except in rare circumstances,[12] all of these removals occurred as the

result of an independent decision by the corresponding mutual fund – and not Nationwide Life –

to close its fund entirely or to stop accepting any additional investments.[13] Removals had no

relation to whether Nationwide entities received mutual fund payments or not, and in *all* cases

Nationwide Life provided notice to the plans and participants in advance, and the plans and

participants had the opportunity to select how they wanted to re-invest their money. Rose ¶ 14;

Henderson ¶ 16.[14]

---

[11]    Rose ¶ 13; Henderson ¶ 15; Plaintiff Alan Gouse's Objections and Responses to Defendants' Fourth Set of Interrogatories (Ex. 15), response 1 (acknowledging that he "asked for additional Investment Options to be offered to the participants in [the Easter Seal Plan]"); Ex. O (listing various investment decisions by individual participants in Anderson Plan); Ferdon 2007 Dep. Tr. (Ex. R) at 31-32.

[12]    For example, in 2004, Fidelity Investments advised Nationwide that one fund it managed was implementing a redemption fee that Nationwide was unable to administer. *See* Oct. 18, 2004 template correspondence (Ex. E) at N 019059. Nationwide's attempt to obtain a waiver for the fee was unsuccessful, and the corresponding investment option could no longer be offered to participants who had selected it. *Id.* Even in this example, the fund removal was triggered by a fund decision. Removals also occurred in a handful of other unique circumstances.

[13]    March 30, 2000 Points of Interest (Ex. 17) at N 017652 ("Two funds, the Dreyfus Asset Allocation Total Return Fund and the UAM McKee International Equity Portfolio, are being discontinued and will no longer be offered to existing or new Retirement Resource plans."); *id.* ("Two funds have merged into a single fund; the Federated Latin American Growth Fund-Class A has been merged into the Federated Emerging Markets Fund-Class A.").

[14]    In addition, investment options in variable accounts were sometimes not made available (i.e., were "walled off") to *new* plans and participants, or to existing plans and participants that

The removals had different impacts on each plan that purchased a Nationwide annuity contract. Some plans and participants had to redirect investments because one of the investment options they selected had decided to liquidate. *Other plans, including the Crown, Anderson, and Easter Seals Plans represented by the three Plaintiffs, were not affected at all by a removal during the entire period they owned Nationwide annuity contracts. That is, no investment option was removed for any reason whatsoever (whether as the result of a decision by the mutual fund or Nationwide) from any of the investment options that those three plans had selected for investment.* Rose ¶ 15; Henderson ¶ 17; Wiberg 2007 Dep. Tr. (Ex. P) at 61; Ferdon 2007 Dep. Tr. (Ex. R) at 20.

In the event an investment option was closed entirely, some of Nationwide Life's annuity contracts provided that it could "substitute shares" of the existing investment option with a new option. This provision was included in all group annuity contracts, but only in individual annuity contracts issued after approximately 1998. [15] However, only 9 of these substitutions occurred over the past 24 years. All of those instances related to individual annuity contracts, and in all cases, Nationwide sought approval from the Securities and Exchange Commission (as required by the individual annuity contracts and the law), and gave notice to the plans and participants. Henderson ¶ 18; Section 26(c) of the Investment Company Act of 1940.

---

had *not* previously selected those investment options, because the performance of the corresponding mutual fund was lower than comparable funds, or because of a lack of interest by plans and participants. *See* Rose ¶ 17; Henderson ¶ 20; Sept. 27, 2000 Points of Interest (Ex. 16) at N 017668 (noting certain funds "will no longer be offered to new investors" because they "underperformed [their] benchmark[s] and peer group[s].").

[15]     Rose ¶ 16; Henderson ¶ 18; Crown Contract (Ex. 1A) at N018; Individual Flexible Purchase Payment Deferred Annuity Contract (Ex. 18) at N 015662. The group annuity contracts also allowed Nationwide Life to substitute shares if it otherwise determined that investment in the existing option was "inappropriate in view of the purposes of the Contract." Nationwide Life never substituted shares of a new investment option for an existing option on that basis. Rose ¶ 16. Prior to 1998, the individual annuity contracts contained no such language. Henderson ¶ 18.

In *none* of those cases was substitution related to mutual fund payments.[16] The reason for the substitution request was typically that the mutual fund family stopped offering the corresponding mutual fund, and Nationwide always proposed a substituting investment option that charged *lower* fees. Plans and participants were free to reject the substituting investment option and invest their funds in another existing option. Henderson ¶ 19.

## F.     The Plans And Participants Directed Their Own Investments In These Options

After a plan or participant selected investment options for its annuity contract, it could choose to allocate money to those options or to a "fixed account" that paid a certain rate of interest. Each plan or participant made its own independent decision whether to invest and where to allocate its money, and could transfer its money to different options or the fixed account after the initial allocation. Nationwide Life did not direct the allocation or transfer of this money or offer investment advice to the plans or participants. Nationwide simply followed their directions. Rose ¶¶ 18-20; Henderson ¶¶ 21-22; Wiberg 2007 Dep. Tr. (Ex. P) at 45, 69-71; Ferdon 2007 Dep. Tr. (Ex. R) at 23-24.

When the plans or participants allocated money to one of the various investment options, that money was aggregated with all money from other investors in that option (including money from contract-holders who are not members of the proposed class). The variable account used that money to purchase shares of the corresponding mutual fund. The value of each plan's and participant's contract would increase or decrease depending on the performance of the investment options where it allocated money. The value of each investment option would increase or decrease based on the performance of its corresponding mutual fund. The increase or

---

[16]     Henderson ¶ 18. Several of these substitutions occurred before January 1, 1996, the date Plaintiffs have alleged that Nationwide began to receive payments from the investment options. *See id.*; Compl. ¶ 44.

decrease of each investment option was reflected for each plan or participant in an accounting measure called "accumulation units" in the variable account. Rose ¶¶ 21-23; Henderson ¶¶ 23-25.

**G.    The Different Charges Associated With The Investment Options**

**1.    The Group Annuity Contract Charges**

The group annuity contracts generally contained a charge by Nationwide Life that was negotiated by each individual plan. The charge varied by contract and was a percentage of the amounts invested in the investment options. Rose ¶ 24.

By 1996, these percentage charges declined for new and existing plans based on payments by some of the corresponding mutual funds (or their affiliates) to Nationwide entities. For example, in October 1996, the Crown Plan's standard percentage charge for the "optional" tier of investment options was reduced by .10% for the "primary" tier of investment options and by .30% for the "primary plus" tier of options. Crown Contract Amendment (Ex. F) at N 009756. In January 1996, when the Hartford Roofing Plan purchased its annuity contract, its standard percentage charge for the optional tier was reduced by .20% for the primary tier. Hartford Roofing Contract (Ex. 1C) at N 049. In May 1997, the Flyte Plan's standard percentage charge for the optional tier was reduced by .20% for the "primary plus" tier. Flyte Contract Amendment (Ex. G) at N 005393; Rose ¶ 25.

Nationwide Life explained to existing plans – and to new plans that purchased contracts after 1996 – that these reduced fees reflected the payments to Nationwide by some of the corresponding mutual funds (or their affiliates).[17] The plans agreed to and ratified these

---

[17]    Crown Contract Amendment (Ex. 1A) at N 009754; Rose ¶ 26; The Best of America Retirement Advisor Group Variable Annuity Contract Profile (Ex. 11) at N 011139.

reductions based on this explanation.[18]  Rose ¶ 26.

2.     **The Mutual Fund Fees Affecting The Investment Options**

Each mutual fund that corresponded to an investment option had its own fees that

affected the value of the fund (and thus indirectly the value of the corresponding investment

option).  These types of fees that might be charged included management fees, 12b-1 fees (which

are related to distribution and marketing), administration fees, redemption fees, and transfer

agent fees, and they were fully disclosed to the plans and their participants.  The amount and

type of fees actually charged by each fund varied widely depending on the parties providing

services or other resources to the particular fund, and on the type of services provided.[19]

Plaintiffs argue that these mutual fund fees included any payments made to the

Nationwide entities by the mutual funds or affiliates, but offer no admissible evidence to support

this point.[20]  Even if the mutual fund fees sometimes reflected the payments, those fees were

spread among many different shareholders in the fund, most of which did not invest through

Nationwide Life.  Many of the mutual funds' fees actually declined after payments to

---

[18]     Nationwide Life's individual annuity contracts contained charges different from the
group contracts, and they varied according to type of contract and when they were purchased.
Henderson ¶ 27; Best of America IV Annuity Prospectus (May 1, 2007) (Ex. 12) at N 015744
(listing 1.25% Mortality and Expense Risk Charge); The Best of America All American Gold
Annuity Prospectus (May 1, 2007) (Ex. 13) at N 015875 (listing 0.95% Mortality and Expense
Risk Charge).

[19]     Rose ¶ 27; Henderson ¶ 29; Prospectus of Fidelity Variable Insurance Products Fund
(April 30, 2001) (Ex. 20) at N 003959-61; Prospectus of Dreyfus Stock Index Fund (May 1,
2001) (Ex. 21) at N 004707; Prospectus of Janus Aspen Series (May 1, 2001) (Ex. 22) at N
004393 (describing investment advisor management with Janus Capital).

[20]     Plaintiffs rely principally on a "DOL Study" that was not drafted by the Department of
Labor and represents hearsay and opinion that should not be considered by the Court.  *See* Class
Cert. Br. at 7.  Regardless, the "DOL Study" does not support Plaintiffs' argument that payments
by mutual funds and affiliates caused the value of their accumulation units to decrease dollar-for-
dollar.  Compl. ¶ 30; Class Cert. Br. at 7.  Plaintiffs fail to draw a correlation between payments
by mutual funds and affiliates and the fees those funds charged their shareholders.

- 12 -

Nationwide Life began.  Rose ¶ 28; Henderson ¶ 30.

## H.    The Different Mutual Fund Payments

Beginning in the mid-1990s, different Nationwide entities negotiated different agreements with mutual fund families (or their affiliated advisors or administrators) transacting business with one or more Nationwide variable accounts that provided for payments to Nationwide.  Rose ¶ 29; Henderson ¶ 32.[21]

The agreements for mutual fund payments provided for different Nationwide entities to perform a variety of distribution and administrative services that would benefit the funds.[22] These services and benefits included:  the aggregation of thousands of transactions by annuity contract holders into a single daily "omnibus trade" (i.e., a purchase or sale) of each mutual fund's shares, thereby sparing the mutual funds from processing thousands of individual purchases or sales; the distribution and marketing of the annuity contracts and associated investment options in the market, and the dissemination of mutual fund prospectuses and other disclosures, which reduced or eliminated the marketing and distribution costs that mutual funds would otherwise incur; the transmission of purchase orders and redemption requests placed by the plans and participants; the preparation of federal, state, and local government reports for each account maintained on behalf of a plan; the distribution and filing of tax forms related to

---

[21]    Although Plaintiffs argue that Nationwide Life "made [payments] a condition to offering a mutual fund family's funds," Class Cert. Br. at 9, Nationwide Life's participation agreements with the fund families contained no such provision.  Rose ¶ 29; Henderson ¶ 32.

[22]    Rose ¶ 30; Henderson ¶ 33; *see, e.g.*, October 14, 1999 Service Agreement between Janus Service Corporation and Nationwide Financial Services, Inc. (Ex. H) at N 013417 ("Janus recognizes substantial savings of administrative expenses as a result of [Nationwide] performing certain administrative services ….").

- 13 -

transactions of shares; and accounting reconciliation, among other services.[23]  Many of these services and benefits (particularly the "aggregation" and "distribution" services) were fundamentally different from any "recordkeeping" and "administrative" services that Nationwide Life agreed to provide to the plans in the variable annuity contracts,  Rose ¶ 33; Henderson ¶¶ 32-36, and even Plaintiffs have suggested that these services have at least some value.  Compl. ¶¶ 3, 43.[24]

The payments that Nationwide entities received for these benefits and services were made from the assets of the mutual funds or their affiliates, not from any assets of the plans or their participants.  In some cases, these payments involved a flat fee.  The payments included: payments deducted from 12b-1 fees charged by a fund; sub-transfer agent fees; fees pursuant to administrative service plans adopted by the mutual fund; payments by a mutual fund's adviser or sub-adviser (or its affiliates) from its advisory fee; or some combination of those sources.  Rose ¶¶ 34-35; Henderson ¶¶ 37-38.  Although Plaintiffs suggest that a "majority of the class" was "subject to" these mutual fund payments, Class Cert. Br. at 28, they offer no evidence as to which members were and which were not.[25]

Nationwide Life and the mutual funds disclosed these mutual fund payments to the plans

---

[23]    *See* June 1, 2003 Restated Service Agreement with Dreyfus Corporation (Ex. I) at N 016370; Recordkeeping Agreement with Federated Shareholder Services Company (Ex. J) at N 016571; Administrative Services Agreement with AIM Advisors, Inc. (Ex. K) at N 016728-29; Distribution Services Agreement with AIM Distributors, Inc. (Ex. L) at N 016735.

[24]    Plaintiffs mischaracterize deposition testimony to argue that the services Nationwide Life performed for the mutual funds were the same services it was already being paid by the plans to perform, implying that Nationwide was collecting twice for the same services.  Class Cert. Br. at 4, 8.  There is no testimony that Nationwide was paid twice for the same services.

[25]    Plaintiffs cite Nationwide's Answer ¶ 18 for this proposition, but in fact that paragraph *denied* any such allegation.

and their participants in different ways at different times.[26]  Nationwide Life sent letters to the trustees (or the trustees' authorized representatives) of all plans that had purchased group contracts.  Rose ¶ 36; Class Cert. Br. at 10.  The letters informed the trustees that Nationwide was implementing new tiered pricing that reflected the mutual fund payments, and required the trustees to sign a contract amendment to implement the new pricing for their plan.  Rose ¶ 36.  For participants holding individual variable annuities, the disclosures included Statements of Additional Information and annual reports of the variable account, which were made available to each individual contract owner.[27]  The retirement plans had different practices with regard to reviewing this information.[28]

　　　None of the group or individual contracts prohibited Nationwide Life from receiving the mutual fund payments or put any limits on Nationwide Life's arrangements with mutual funds or their affiliates.  Rose ¶ 37; Henderson ¶ 40; Crown Contract (Ex. 1A); Easter Seals Contract (Ex. 2C).

## STANDARD OF REVIEW

　　　Plaintiffs seek to certify a sprawling class of thousands of retirement plans that held Nationwide group or individual variable annuity contracts after Nationwide began to receive certain payments from mutual funds in or around 1996.  Before certifying any class, the Court

---

[26]　　　Rose ¶ 36; Henderson ¶ 39; Crown Contract Amendment (Ex. F) at N 009756; Class Cert. Br. at 10.

[27]　　　Henderson　¶ 39; Statement of Additional Information of The Best of America IV Individual Deferred Variable Annuity Contracts Prospectus (May 1, 1998) (Ex. 19) at N 014024; *see* 1997 Annual Report of Nationwide Variable Account-II (Ex. 23) at 21; Best of America IV Annuity Prospectus (May 1, 2007) (Ex. 12) at N 015750.

[28]　　　Rose ¶ 36; Henderson ¶ 39; Haddock 2003 Dep. Tr. (Ex. M) at 73:8-16 (stating that he did not request copies of mutual fund prospectuses); Wiberg 2003 Dep. Tr. (Ex. N) at 12:16-17 (acknowledging review of plan documents); Gouse 2003 Dep. Tr. (Ex. O) at 96:1-7, 120:1-18 (stating that he read all documents provided to him regarding the plans).

must be persuaded, "after a *rigorous analysis*," that the prerequisites of Rule 23 have been

satisfied.[29] Those prerequisites include the "commonality," "typicality," and "adequacy"

elements of Rule 23(a)(2)-(4), as well as the "predominance" and "superiority" requirements of

Rule 23(b)(3) and the "cohesiveness" element of Rule 23(b)(2).[30]

     Plaintiffs bear the burden of establishing each element of Rule 23 by admissible

evidence such as affidavits, documents or testimony.  The court must address each Rule 23

requirement, "resolv[ing] underlying factual disputes" and ensuring that he or she is "persuaded

that the fact at issue has been established." *In re Initial Public Offering Sec. Litig.*, 471 F.3d at

24, 40, 42 (rejecting the implication in earlier cases that plaintiffs need only make "some

showing" of their ability to satisfy the Rule 23 requirements); *see also McLaughlin v. Am.

Tobacco Co.*, No. 06-4666-cv, 2008 U.S. App. LEXIS 7093, at *29 (2d Cir. Apr. 3, 2008) ("*In re

IPO* makes clear that courts may resolve contested factual issues where necessary to decide on

class certification, and when a claim cannot succeed as a matter of law, the court should not

certify a class on that issue.") (quoting *Velez v. Novartis Pharms. Corp.*, 244 F.R.D. 243, 257

(S.D.N.Y. 2007)).  This analysis must "examine the relevant facts *and both the* claims *and

defenses* in determining whether a putative class meets the requirements of Rule 23(b)(3) …." *In

---

[29]     *In re Initial Public Offering Sec. Litig,*. 471 F.3d 24, 33 (2d Cir. 2006) (quoting *Gen. Tele. Co. v. Falcon*, 457 U.S. 147, 161 (1982)) (emphasis added). *See also Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 597-98 (2d Cir. 1986) (noting that "courts have been generally strict in their application of the Rule 23(a) criteria"); *Karen L. v. Physicians Health Servs., Inc.*, 202 F.R.D. 94, 99 (D. Conn. 2001) (Droney, J.).

[30]     *See Falcon*, 457 U.S. at 158 n.13 (explaining that both commonality and typicality "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence"); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 75 (S.D.N.Y. 2002) ("[A]lthough there is no predominance or superiority requirement under Rule 23(b)(2), classes certified pursuant to it must be cohesive.")

*re VISA Check/ Mastermoney Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001) (emphasis

added); *see also Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 128 (S.D.N.Y. 2003).

## ARGUMENT

### I.    CLASS CERTIFICATION MUST BE DENIED BECAUSE PLAINTIFFS LACK STANDING TO SUE.

Plaintiffs lack standing to sue on behalf of their proposed class of "employee pension

benefit plans" because the express ERISA statutory language and case law applying it could not

be more clear:  plans themselves may not sue.  29 U.S.C. § 1132(a)(3) ("A civil action may be

brought – by a participant, beneficiary, or fiduciary . . .").  This language is exclusive and allows

only participants, beneficiaries, and fiduciaries – not plans – to sue.  *See Champagnie v.*

*Kaufman*, No. 3:06-cv-1819 (JCH), 2007 U.S. Dist. LEXIS 80496, at *5 (D. Conn. Oct. 30,

2007) (explaining that ERISA plan could not have brought suit).[31]  Class certification must be

denied on this ground alone.

Plaintiff Wiberg also lacks standing to sue as a former trustee now that the Crown Plan

has been terminated.[32]  Wiberg 2007 Dep. Tr. (Ex. O) at 6-7.  As a result, a class cannot be

certified with Wiberg as its representative.

Even if Plaintiffs otherwise had standing to maintain this lawsuit (which they do not),

---

[31]    *See also Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 121 (2d
Cir. 2002) (explaining that "non-enumerated parties lack statutory standing to bring suit under §
1132(a)(3) even if they have a direct stake in the outcome of the litigation"); *Pressroom Unions-
Printers League Income Sec. Fund v. Cont'l Assurance Co.*, 700 F.2d 889, 892 (2d Cir. 1983)
(affirming denial of motion to amend complaint to substitute plan participants as plaintiffs).

[32]    *See Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 14 (2d Cir. 1991)
(a former fiduciary of an existing plan cannot sue because "[t]here is no indication of any
legislative intent to grant a former fiduciary a continuing right to sue on behalf of [an active]
plan . . . ."); *Ello v. Singh*, 531 F. Supp. 2d 552, 564 (S.D.N.Y. 2007) (former trustee has no
standing); *Miller v. Retirement Funding Corp.*, 953 F. Supp. 180, 182 (W.D. Mich. 1996) (once
plan was terminated, plaintiff became former trustee who lacked standing to assert ERISA
claims).

they surely cannot represent a Rule 23(b)(2) injunctive class for the simple reason that none of

the three plans they purport to represent continues to hold an annuity contract with Nationwide.

The Crown Plan terminated its annuity contract in 2001 (and terminated its plan altogether in

approximately 2003); all the Anderson Plan participant contracts were terminated in 2002; and

all the Easter Seals Plan participant contracts were terminated in 1998.  Rose ¶ 5; Henderson ¶ 6;

Wiberg Dep. Tr. (Ex. P) at 5-6.  Plaintiffs thus have no legitimate interest in obtaining

prospective injunctive or declaratory relief and cannot represent others who might claim such an

interest.

## II.    CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFFS HAVE NOT OFFERED GENERALIZED PROOF OF THEIR "MUTUAL FUND SELECTION AND DELETION" THEORY.

Plaintiffs bring their complaint under Sections 409(a) and 502(a)(2) of ERISA, claiming

that Defendants are ERISA fiduciaries that violated their duties under Sections 404 and 406 of

ERISA.  To prove their case, Plaintiffs will have to show that:  Defendants became ERISA

fiduciaries by "exercis[ing] ... authority or control respecting management or disposition" of

plan assets, that Defendants breached their fiduciary duties while exercising this authority or

control, and that this breach caused some harm to Plaintiffs.  *Haddock*, 419 F. Supp. 2d at 170.[33]

After numerous tries, Plaintiffs advanced a theory of ERISA fiduciary duty and violation

– the so-called "mutual fund selection and deletion" theory – that was upheld by the Court in its

summary judgment decision.  According to this Court, that theory will require Plaintiffs to prove

at trial that (1) Nationwide Life became an ERISA fiduciary when it exercised control over plan

---

[33]    *See also Pegram v. Herdrich*, 530 U.S. 211, 234 (2000); *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463 (7th Cir. 2007) (showing of loss causation required); *Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610 (6th Cir. 2003) (same); *Moekel v. Caremark, Inc.*, No. 3:04-0633, 2007 WL 3377831, at *20 (M.D. Tenn. Nov. 13, 2007); *Schulist v. Blue Cross of Iowa*, 553 F. Supp. 248 (N.D. Ill. 1982), *aff'd*, 717 F.2d 1127 (7th Cir. 1983).

assets by selecting or removing investment options available to the plans or participants through their annuity contracts, *Haddock*, 419 F. Supp. 2d at 165-166 and n.5, (2) Nationwide Life breached that duty by selecting only those investment options that corresponded to mutual funds making payments, and removing those that did not, *id.* at 166 and n.6, (3) Nationwide Life received the mutual fund payments as a result of its selection and removal of the investment options, and at the expense of the plan participants, *id.* at 170, and (4) Nationwide Life engaged in prohibited transactions when it received consideration (i.e., mutual fund payments) from a party dealing with the plans (i.e., the mutual funds) in connection with a transaction (i.e., Nationwide Life's service contracts with the mutual funds) involving assets of the plan (i.e., the shares of the variable account). *Id.* at 171.

To meet their burden under Rule 23, Plaintiffs must establish that each element of this theory can be proved, and each defense of the Defendants can be rebutted, on a class-wide basis at trial using generalized proof common to all class members.[34] If the resolution of any element

---

[34]    *See McLaughlin v. American Tobacco Co.*, No. 06-4666-cv, 2008 U.S. App. LEXIS 7093, at *47 (Rule 23 requires generalized proof); *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) (class can be certified only where resolution of legal or factual questions can be achieved through generalized proof); *Heerwagon v. Clear Channel Communs.*, 435 F.3d 219, 226 (2d Cir. 2006) (proposed class must be "cohesive" to warrant adjudication by representation); *Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*, 198 F.R.D. 41, 46 (E.D.N.Y. 2000) (denying certification because "the Plaintiffs cannot offer common proof" of liability); *In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 381 (S.D.N.Y. 1996) (plaintiffs' burden is to establish that common or generalized proof will predominate at trial).

of Plaintiffs' claim for relief or Defendants' defenses will break down into individual legal or

factual issues, class certification must be denied.[35]

## A.    Whether Nationwide Life Became An ERISA Fiduciary By Selecting Or Removing Investment Options Raises Individualized Issues.

### 1.    There is No Common Proof That Nationwide Life Exercised Authority Or Control By Selecting Investment Options.

Plaintiffs have offered no uniform evidence establishing on a class-wide basis that

Nationwide Life assumed an ERISA fiduciary duty by selecting investment options that would

be available to the plans or participants. *Haddock*, 419 F. Supp. 2d at 165-166 and n.5. As a

result, Plaintiffs cannot meet the "commonality" or "typicality" elements of Rule 23(a), or the

"predominance" or "cohesiveness" elements of Rule 23(b)(3) and (2).

*First*, the evidence in the record shows that Nationwide Life did *not* select the investment

options at all – the plans and participants did. Each retirement plan that purchased a group

contract selected a subset of investment options for inclusion in its particular contract, from a

much larger array available in the variable account, before entering the contract. Statement of

Facts ("Facts") at C. Likewise, participants in plans with individual annuity contracts selected

their own investment options from a large array in the applicable variable account before the

contracts were purchased. Facts at C. Each plan or participant was then free to invest in one or

more of those investment options in its group or individual contract based on its independent

---

[35]    *Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 18, 21 (2d Cir. 2003); *Dobson v. Hartford Fin. Servs.*, 196 F. Supp. 2d 152, 165 (D. Conn. 2002) (class treatment of ERISA claim "inappropriate" because of "individualized" liability issues); *see also Walker v. Asea Brown Boveri, Inc.*, 214 F.R.D. 58, 65 (D. Conn. 2003) (denying certification of ERISA class because "a fact-specific inquiry" required as to Plaintiffs' conduct); *In re Methyl Tertiary Butyl Ether ("MTBE") Litig.*, 209 F.R.D. 323, 349 (S.D.N.Y. 2002) (certification denied due to individualized issues of fact); *Lewis Tree Serv., Inc. v. Lucent Techs., Inc.*, 211 F.R.D. 228, 231 (S.D.N.Y. 2002) (common questions of fact or law required for certification of claims); *Miner v. Empire Blue Cross/Blue Shield*, No. 97 Civ. 6490, 2001 WL 96524, at *5 (S.D.N.Y. Feb. 5, 2001) (ERISA class action is inappropriate where "individualized evaluation" required).

judgment, or to reject all those options and invest in the "fixed account" that paid a guaranteed rate of interest.  Facts at D.

Plaintiffs have offered no contrary evidence – let alone uniform evidence on a class-wide basis – that Nationwide Life selected the investment options for plans and participants.  To the extent Plaintiffs intend to argue that Nationwide did on some particular occasions select the funds for a plan or participant (with respect to which there is no evidence), that argument would require individualized proof as to each particular transaction, which would "defeat the requirement of Rule 23 that common questions of law or fact predominate over questions affecting only individual members."  *In re Initial Public Offering Sec. Litig.*, 471 F.3d at 42.

*Second*, the case law is very clear that, even if Nationwide Life were somehow deemed to have "selected" the investment options simply because arrays of those options were available in the variable accounts *before* the annuity contracts were issued, that would not give rise to an ERISA fiduciary duty as a matter of law.  *See*, *e.g.*, *Consol. Beef Indus., Inc. v. New York Life Ins. Co.*, 949 F.2d 960, 965 (8th Cir. 1991) (insurer did not act as a fiduciary when it "simply sold . . . annuities" and "did not recommend specific investments beyond its products" – "[t]he mere marketing of the § 401(k) plan does not implicate fiduciary conduct").[36]  Accordingly, to

---

[36]    *See also Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 477 (7th Cir. 2007) ("Caremark was not a fiduciary at the time it was engaged in arm's-length negotiations with Carpenters, prior to entering into any of the agreements."); *Flacche v. Sun Life Assurance Co.*, 958 F.2d 730, 733-35 (6th Cir. 1992) (insurer did not act as a fiduciary by supplying its annuity contracts to fund a plan); *Am. Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the U.S.*, 841 F.2d 658, 664 (5th Cir. 1988) ("Simply urging the purchase of its products does not make an insurance company an ERISA fiduciary…."); *Deluca v. Blue Cross Blue Shield of Mich.*, No. 06-12552, 2007 WL 3203131, at *6-9 (E.D. Mich. Oct. 31, 2007) (defendant was not an ERISA fiduciary when it negotiated rates with hospitals prior to offering plan a contract that included those rates); *Fechter v. Conn. Gen. Life Ins. Co.*, 800 F. Supp. 182, 197 (E.D. Pa. 1992) ("[C]ourts have refused to impose fiduciary obligations on insurance companies who merely sell their products or services to a pension plan").

prove that Nationwide Life assumed an ERISA fiduciary duty, Plaintiffs would have to show that Nationwide Life made those selections *after* the annuity contracts were issued. Any argument by Plaintiffs that this in fact occurred on some specified occasions (with respect to which there is no evidence) would require individualized proof as to each particular transaction.

*Third*, even when *additional* investment options were available for the plans' and participants' selection *after* the contracts were purchased, the record evidence again shows that Nationwide Life did *not* select those additional investment options for any plan or participant. Rather, the plan or participant made the selection (if any) from the array available, based on the plan's or participant's own independent judgment. Facts at D. If Plaintiffs intend to argue that Nationwide did in fact on some specified occasions select the additional options for a plan or participant (with respect to which there is no evidence), that argument would require individualized proof as to each particular transaction, which would defeat the Rule 23 requirement that common questions of law or fact predominate. *In re Initial Public Offering Sec. Litig.*, 471 F.3d at 42.

## 2. There Is No Common Proof That Nationwide Life Exercised Authority Or Control By Removing Investment Options.

Likewise, Plaintiffs have not offered any uniform proof establishing that Nationwide Life had the authority to remove investment options initially selected by the plans or their participants, much less exercised such authority. Thus, they have not met the Rule 23 requirements of typicality, adequacy, predominance, and cohesiveness described above.

To the contrary, the evidence in the record shows that Nationwide Life's authority or control to remove investment options was not uniform. Prior to 1998, the individual annuity contracts contained no language addressing the removal or substitution of investment options. Facts at E; *Haddock*, 419 F. Supp. 2d at 165 n.5. After 1998, Nationwide Life was required to

seek approval from the Securities and Exchange Commission for any substitution of a new

investment option, and to give notice to the plans and participants of the individual contracts, and

thus cannot be deemed to have acted unilaterally on a class-wide basis.  Facts at E; Section 26(c)

of the Investment Company Act of 1940.  *See also Moore*, 306 F.3d at 1253 (class certification

improper if defendants' representations to members of putative class were not uniform).

Moreover, as this Court repeatedly recognized in its March 2006 decision, an ERISA

fiduciary duty can only be established if Plaintiffs show that Nationwide Life actually *exercised*

authority or control through some systematic removal of investment options.  *Haddock*, 419 F.

Supp. 2d at 165 (Nationwide may be a "fiduciary to the extent it exercises authority or control"

over investment options).  *See also LoPresti v. Terwilliger,* 126 F.3d 34, 41 (2d Cir. 1997)

(ERISA fiduciary status arises from the power to, and the actual exercise of, control).  Plaintiffs

cannot provide that generalized proof because there is none.  The evidence in the record shows

instead that, except in rare circumstances, all removals of investment options were the result of

an independent decision by the mutual fund – not Nationwide Life.  Facts at E.  And at all times,

plans and participants were free to move their investments to any options they selected to include

in their contracts.  Facts at F.

When Nationwide Life removed investment options for any reason, it rarely substituted a

new option for a closed one.  These few substitutions occurred only after Nationwide received

SEC approval, and only in relation to certain types of individual annuity contracts.  Furthermore,

in all cases, plans and participants were free to reject the substituting investment option and

select another existing option.  For individual contracts, from 1984 through 2008, Nationwide

Life filed 9 substitution applications with the SEC, as required by the contracts and by law.  In

virtually all cases, the reason for the substitution request was that the mutual fund family stopped

offering the corresponding mutual fund. In each application, Nationwide proposed a substituting investment option that charged lower fees than the investment option removed. Facts at E. Thus, there can be no uniform proof on a class-wide basis that Nationwide exercised fiduciary authority or control by substituting investment options.

Plaintiffs cannot provide generalized proof for the additional reason that, as the Department of Labor has recognized, Nationwide Life would *not* be exercising authority or control if the plan trustee made the decision to accept the removal or substitution of any investment option, or instead to reject it (e.g., by terminating the contract or negotiating with Nationwide Life). DOL Advisory Opinion 97-16A (Aug. 28, 1997) ("*Aetna*"); *see also Haddock*, 419 F. Supp. 2d at 166. That in turn would require the fact-finder to determine, on a plan-by-plan basis, whether Nationwide Life removed investment options without providing notice to, and receiving consent from, the plans; and whether any trustee who made the decision to accept or reject the removal of an investment option (not Nationwide Life) was exercising authority or control as defined by ERISA. Such a determination is necessarily one that could only be made after an individualized inquiry into whether each plan accepted or rejected the removal and thus whether the removal "affect[ed] only individual members" of the putative class. *In re Initial Public Offering Sec. Litig.*, 471 F.3d at 42.

**B.     Whether Nationwide Breached Any Duty By Selecting Or Removing Investment Options In Return For Mutual Fund Payments Raises Individualized Issues.**

To prevail on their claim, Plaintiffs must also prove that Nationwide breached an ERISA fiduciary duty by systematically selecting only those investment options that corresponded to mutual funds making payments, and by removing those that did not. *Haddock*, 419 F. Supp. 2d at 166 and n.6. Plaintiffs offer no uniform and generalized, class-wide proof establishing this element of their claim that would meet the "commonality," "typicality," "predominance," or

"cohesiveness" requirements.  Class Cert. Br. at 9 (Plaintiffs argue only that a breach occurred through Nationwide's alleged use of accumulation units, not any mutual fund selection or deletion, to obtain mutual fund payments).

### 1.    There Is No Common Proof That Nationwide Improperly Selected Investment Options To Receive Payments.

To the contrary, the evidence in the record shows instead that many different arrays of investment options were available to plans and participants over time through different types of annuity contracts for many reasons unrelated to mutual fund payments.  In all cases, the arrays were designed to provide a diverse collection of options that performed well and met the many different needs and objectives of all its annuity contract holders (including the plans and participants in this case).  The arrays included investment options corresponding to mutual funds that made payments to Nationwide Life *and* some that did not.  Compl. ¶ 37 (acknowledging that some funds paid Nationwide "0.00% . . . on assets").  Investment options were not included in the variable accounts, or the arrays available for those accounts, simply because they involved mutual fund payments.  Facts at B.

Plaintiffs do refer to a few isolated documents where mutual fund payments are cited as a factor in determining whether certain investment options would be available in particular variable accounts.  Class Cert. Br. at 9 and n.39.  From these isolated instances, Plaintiffs argue that Nationwide Life breached a duty by "implicitly or explicitly" conditioning the inclusion of investment options on the receipt of mutual fund payments.  *Id.*; Compl. ¶ 35.  But that argument would require an individualized analysis of hundreds of different arrays that changed frequently over a twelve-year period (*see* Facts at B) to determine whether those options were included on the condition of receiving payments, whether the condition was "explicit or implicit," and whether the inclusion of those options was inconsistent with an ERISA fiduciary's duty under

- 25 -

sections 404(a) and (b) to act reasonably and prudently *under the circumstances then prevailing*. 29 U.S.C. § 1104(a)(1)(A)(ii) (must "defray[] reasonable expenses"); §1104(a)(1)(B) (must act prudently "under the circumstances then prevailing"); *Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307, 319 (S.D.N.Y. 2003) (class certification denied under ERISA because, *inter alia*, determination of liability would require individualized scrutiny of numerous agreements).

Any such claim for breach by presenting arrays would also require an individualized analysis of each group annuity plan's ratification of the mutual fund payments. The evidence in the record shows that the plans with group contracts agreed to investment options being "tiered" to reflect those options associated with mutual fund payments, and took advantage of the lower contract charges that applied to those investment options. Facts at G.1, H; Class Cert. Br. at 10 (Plaintiffs admit agreement to lower group contract prices based on mutual fund payments). If Plaintiffs intend to argue a breach despite the plans' ratification of these arrangements, that would require an individualized assessment of each plan's contract, which precludes class certification. *See Chemical Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, 128 (2d Cir. 1999) (ratification when banks had notice of insurance policy termination), *vacated on other grounds at* 196 F.3d 373, 376 (2d Cir. 1999);[37] *Aetna* (the responsible plan fiduciaries must ensure that any

---

[37]    *See also Monarch Ins. Co. of Ohio v. Insurance Corp. of Ireland, Ltd.*, 835 F.2d 32, 36 (2d Cir. 1987) (ratification of reinsurance contracts when principal accepted the benefits of the contracts with knowledge of the facts); *Trustees of the Am. Fed. of Musicians and Employers' Pension Fund v. Steven Scott Enters., Inc.*, 40 F. Supp. 2d 503, 512 (S.D.N.Y. 1999) ("Once the Pension Fund had knowledge of the settlement agreements, its failure to repudiate Moriarity's actions constituted ratification of the agreements."); *Altschul v. Paine, Webber, Jackson & Curtis Inc. v. Altschul*, 518 F. Supp. 591, 594 (S.D.N.Y. 1981) (Paine Webber not responsible for mismanagement of an account where trading ratified by plaintiff); *King v. Fox*, No. 97 Civ. 4134 RWS, 2004 WL 68397, at *8 (S.D.N.Y. Jan. 14, 2004) (ratification of fee agreement by accepting royalty payments without protest for 17 years); *Knoll v. Equinox Fitness Clubs*, No. 02 Civ. 9120 SAS, 2003 WL 23018807, at *8 (S.D.N.Y. Dec. 22, 2003) (ratification of contract when "accepted [its] benefits" and did not repudiate).

compensation retained by Aetna is reasonable"). Such an argument by Plaintiffs would also raise individualized issues under the applicable three-year statute of limitations, which would bar any ERISA claims if the plans or plan participants ratified the mutual fund payments in 1996 or 1997, more than three years before the complaint was first filed in this case. *McLaughlin v. American Tobacco Co.,* No. 06-4666-cv, 2008 U.S. App. LEXIS 7093, at *44 (2d Cir. April 3, 2008) (statute of limitations defense should be considered in class certification); *Ello v. Singh,* 2007 WL 3396483, at *9 (S.D.N.Y. 2007).

### 2.  There Is No Common Proof That Nationwide Improperly Removed Investment Options To Receive Payments.

Plaintiffs have alleged vaguely in their complaint that "on some occasions" Nationwide Life actually removed an investment option because the corresponding mutual fund family (or its affiliate) was *not* making payments. Compl. ¶ 25. But there is no evidence of that and, moreover, their motion offers no generalized proof establishing that such removals occurred on some systematic, uniform basis. To the contrary, the evidence shows that, except in rare circumstances, Nationwide Life removed an investment option only when the corresponding mutual fund advised Nationwide Life that the investment option merged with another option, would not accept additional investments, or closed down entirely. Facts at E.

If Plaintiffs intend to challenge this evidence and claim that there was some hidden motive to remove investment options due to mutual fund payments, that would require a separate inquiry into why each removal occurred, and whether the removal affected any plans or participants (or whether the removal had no impact because there was no money invested in the option at the time). The Plaintiffs' own circumstances show why this individualized inquiry would be required: *during the entire period they owned Nationwide annuity contracts, the Crown, Anderson, and Easter Seals Plans represented by the three Plaintiffs were not affected by*

- 27 -

*the removal of any investment option; no investment option was removed for any reason from any of the investment options that those three plans had selected for investment.* Facts at E.

Indeed, Plaintiffs have not even shown that, regardless of any selection or removal, the entire class was even invested in options that corresponded to payments by mutual funds or their affiliates. Plaintiffs cannot do so because there were options that did not correspond to funds or affiliates that made payments, and each plan or participant was free to invest entirely in those options (or even invest in Nationwide Life's "fixed account" that paid a guaranteed rate of interest and was not subject to any mutual fund arrangements). Moreover, some mutual funds made payments based on the number of participants, not a percentage of assets. Rose ¶ 34. Thus, without a plan-by-plan analysis, it would be impossible to tell which plans were "subject to" the "revenue sharing scheme" that Plaintiffs allege.[38] Class Cert Br. at 27.

## C. Whether Nationwide Received Mutual Fund Payments At The Expense Of Plan Participants, And Whether The Payments Caused Any Loss, Raises Individualized Issues.

Plaintiffs also must prove that Nationwide Life received the mutual fund payments "at the expense of" the plan participants, *Haddock*, 419 F. Supp. 2d at 170, and that the payments caused some loss to the plans or participants. *Tardif v. Gen. Elec. Co.*, No. 498 CIV. 1374, 2000 WL 33376644 (D. Conn. Sept. 30, 2000); *Henry v. Champlain Enters., Inc.* 468 F. Supp. 2d.

---

[38] Plaintiffs have expressly disavowed any ERISA claims based on a failure to disclose the mutual fund payments, *see* Plaintiffs' Motion for Leave to File Third Amended Complaint (Doc. # 83) at 1, 3, and the evidence shows that disclosure was made. Facts at H. But Plaintiffs nevertheless spent more than an hour examining Nationwide's 30(b)(6) witness recently on disclosure. If Plaintiffs are planning a surprise resurrection of disclosure issues on reply, such claims would involve individualized analysis of what was disclosed, who reviewed the disclosures, and whether any non-disclosures were uniform, material and caused any loss. *See Fletcher v. ZLB Behring LLC*, 245 F.R.D. 328, 333-34 (N.D. Ill. 2006) (class not certified where disclosures "varied"); *In re Sears Retiree Group Life Ins. Litig.*, 198 F.R.D. 487, 490 (N.D. Ill. 2000) (looking at the total mix of statements received by each retiree, too much variation to permit class adjudication).

368, 373 (N.D.N.Y. 2007). Plaintiffs have not (and cannot) offer such uniform, class-wide

evidence that would meet the Rule 23(a) and (b) requirements. They only allege vaguely that

"simple economics dictates" that mutual funds would have lowered their fees but for the

payments made to Nationwide. Compl. ¶ 32.

In fact, there is no uniform evidence that any of the charges affecting the plans or

participants (e.g., the annuity contract charges or the mutual fund fees) were higher than they

otherwise would have been as a result of the mutual fund payments. To the contrary, the

evidence shows that the plans *benefited* from the mutual fund payments when the group annuity

contract charges were significantly reduced based in part on these payments, and that the plans

understood and agreed to the payments as the basis for these reductions. Facts at G.1. The

mutual fund charges to the plan participants also generally declined after the mutual fund

payments began in 1996. Facts at G.2.

Indeed, Plaintiffs' whole premise – that Nationwide was somehow able to condition the

inclusion of investment options in arrays of options made available to plans on the receipt of

mutual fund payments, and then retain those payments at the expense of the plans and plan

participants – is contrary to the well-documented existence of a competitive market for variable

annuity products. Declaration of Robert J. Mackay, Ph.D. (Senior Vice President, National

Economic Research Associates, Inc.), Expert Report ("Mackay Report") at 13-20. As a matter of

"simple economics," in such a competitive market, Nationwide does not have the power to

compel payments from mutual funds that are not justified by the value of the services

Nationwide provides to the funds. Likewise, Nationwide cannot retain any mutual fund

payments exceeding the cost of providing the agreed services without passing them on to plans

and plan participants in the form of lower fees, higher quality, or some other benefit. Mackay

Report at 11-13. Dr. Mackay's conclusions are consistent with the observed decline in plan fees, and increase in product quality, over time.

If Plaintiffs intend to argue nonetheless that a specified plan somehow suffered an expense or loss, that will require individualized proof of that plan's particular circumstances. Such proof would require an individualized analysis of whether each mutual fund family (or affiliates) passed along some or all of the costs of these mutual fund payments to their customers and, if so, whether a particular plan or participant had money allocated to the investment option corresponding to the payment. For the reasons described in Section III below, that type of tracing of a mutual fund's payments to a particular plan's assets cannot be performed in any event, much less on a uniform basis.

Moreover, such proof would require an individualized analysis as to whether the mutual fund payments were effectively passed along to group contract-holders in the form of lower contract charges or other (non-price) benefits, and to new individual contract-holders in the form of lower prices or other benefits. Compl. ¶¶ 35, 37 (Plaintiffs admit that the payments reduced the group annuity contracts prices differently on a "sliding scale" and that there are "stark differences" between the individual and group annuity contracts). Although Plaintiffs allege in their complaint that any lower prices were a "sham" and were in fact at "market" levels, Compl. ¶ 39, that in turn would require an individualized analysis of the "market pricing" for each year the contracts were sold, and for each of the different types of contracts. *See* Mackay Report at 10-11 (a determination of any economic impact of mutual fund payments on plans and plan participants would have to be determined on a plan-by-plan basis).

Plaintiffs' proof of this element of their ERISA claim would also require an individualized analysis of whether each plan or participant actually invested money in the option

that corresponded to mutual fund payments, and suffered some harm as a result.  More broadly,

individualized issues will arise as to whether any "loss" was caused by each plan's or

participant's own independent decision to enter into the annuity contract and invest in certain

investment options knowing of the mutual fund payments, rather than choosing other options or

even a lower-cost annuity or other retirement product that Plaintiffs claim existed in the market.

Compl. ¶ 39; *see* 29 U.S.C. §1104(c)(1)(B) (fiduciary not liable for any loss or breach resulting

from participant's exercise of control).  If any plan or participant knew about the mutual fund

payments but entered into a contract that did not (at least in their current view) adequately

address those payments, they cannot now re-write their contract by claiming a violation of

ERISA.[39]

**D.      Whether Nationwide Life Engaged In Prohibited Transactions When It Received
Mutual Fund Payments Raises Individualized Issues.**

Finally, to prevail at trial, Plaintiffs must prove that Nationwide Life engaged in

prohibited transactions when it received consideration (i.e., mutual fund payments) from a party

dealing with the plans (i.e., the mutual funds) in connection with a transaction (i.e., Nationwide

Life's service contracts with the mutual funds) involving assets of the plan (i.e., the shares of the

variable account).  *Haddock*, 419 F. Supp. 2d at 171.

*First*, Plaintiffs have not offered any generalized proof establishing that the mutual funds

are parties "dealing with the plans."  To the contrary, Plaintiffs admit (and the uniform evidence

confirms) that the mutual funds do *not* deal with the plans, but rather interact only with the

---

[39]      *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463 (7th
Cir. 2007); *Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610 (6th Cir. 2003); *Ello v.
Singh,* 2007 WL 3396483 (S.D.N.Y. 2007) (ERISA plaintiff must prove an "injury in fact" to
recover restitution or disgorgement); *Schulist v. Blue Cross of Iowa*, 553 F. Supp. 248 (N.D. Ill.
1982); *Moekel v. Caremark, Inc.*, No. 3:04-0633, 2007 WL 3377831, at *20 (M.D. Tenn. Nov.
13, 2007); *Fechter v. Conn. Gen. Life Ins. Co.*, 800 F. Supp. 182, 199-200 (E.D. Pa. 1992).

Nationwide variable accounts. *Haddock*, 419 F. Supp. 2d at 161 (the plans and participants do not invest in mutual funds directly; the Nationwide variable accounts purchase and sell the mutual fund shares); Compl. ¶ 26 (plans and their participants do *not* invest directly in the mutual funds; they invest in the Nationwide variable accounts); Rose ¶ 22; Henderson ¶ 24. Moreover, the funds' transactions with the variable accounts are on an aggregate basis, do not involve any particular plan, and indeed relate to many investors who are *not* members of the putative class. If Plaintiffs intend to argue otherwise, that would require proof that on some unique occasion a particular mutual fund had some interaction with a particular plan.

*Second*, neither have Plaintiffs offered class-wide proof establishing that the service contracts between the mutual fund families (or their affiliates) and the Nationwide entities were "transactions involving assets of the plan." The service contracts provide for the Nationwide entities to perform services and deliver benefits that are not "plan assets." In return, the contracts provide for the Nationwide entities to receive money that comes from the assets of the mutual funds (or their affiliates), *not* any assets of the plan. Facts at F.[40] If Plaintiffs intend to argue that money belonging to the mutual funds or their affiliates is in fact a "plan asset," that would require tracing the money invested by the plans or their participants to money paid in the service contracts – which Plaintiffs have consistently said they cannot do – and would require a highly-complex individualized inquiry into the path of each investment by the plans or their participants and whether it is related in some way to the mutual fund payments. *See infra* Section III.

---

[40]     In addition, the money invested in the variable accounts, and the mutual fund shares purchased with that money, were not plan assets. 29 U.S.C. 1101(b)(1); Rose ¶ 22; Henderson ¶ 24; *see also* Statement of Additional Information, Deferred Variable Annuity Contracts Issued by Nationwide Life Insurance Company Through its Nationwide Variable Account-II (May 1, 1998) (Ex. 19) at N 014028.

*Third*, more fundamentally, to prove a violation of section 406 of ERISA, Plaintiffs would have to prove that the mutual fund payments received by the Nationwide entities were not in return for legitimate services. *See* DOL Advisory Opinion 93-12A (April 27, 1993) (Section 406(b)(3) is not violated when a fiduciary receives compensation from a third party in which the plan has invested and provides additional non-advisory services to the plan for such compensation); DOL Advisory Opinions 97-15A and 97-16A (May 22, 1997) (no violation of Section 406 where the fee received from the third party is used to reduce or offset a fee that would otherwise have to be paid by the plan, or where the entity receiving the fee has not acted as the decision making or advisory fiduciary); DOL Advisory Opinion 2003-09 (June 25, 2003).

Plaintiffs have offered no uniform evidence that the services provided by Nationwide to the mutual funds or their affiliates had no value, and Defendants have produced evidence that they do. Facts at H; Compl. ¶¶ 3, 43 (recognizing that Nationwide's services may have had some value). Thus, Plaintiffs' ERISA claims will necessarily require an individualized analysis of each service provided and each payment made for that service, to determine whether the services were legitimate and the fees reasonable. That analysis in turn will vary from fund to fund, and from year to year, and involve dozens of different agreements between Nationwide and different mutual fund families or their affiliates over the entire proposed class period. *See* Mackay Report at 7-10 (a determination whether the services Nationwide provides to the mutual funds or their affiliates have value, and if so, how much, would require individualized analysis).

Plaintiffs' argument that the mutual fund payments "do not actually constitute payment for services," or alternatively that the payments were excessive because they are for services that overlap with those provided to the plans, underscores the differences that will exist among the proposed class members' claims. Nationwide has offered evidence that legitimate services and

benefits were provided to the funds or their affiliates, that they were not duplicative of those

provided to the plans, and that the payments represented reasonable compensation.  Resolving

these defenses will require an analysis of the facts relating to each service agreement.  *See In re*

*Initial Public Offering Sec. Litig.*, 471 F.3d at 44; *In re Visa*, 280 F.3d at 138 ("[A] court must

examine the relevant facts and both the claims and defenses"); Fed. R. Civ. P. 23(a)(3) (requiring

that "claims or defenses of the class representatives [be] typical of the claims or defenses of the

class").  *See also O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 742 (5th Cir.

2003) (abuse of discretion to certify a class because establishing liability would require the court

"to examine the reasonableness of payments for goods and services," an inquiry that must be

"performed on a transaction-by-transaction basis . . .").

## III.     PLAINTIFFS HAVE NOT ESTABLISHED THAT A CLASS ACTION IS SUPERIOR UNDER RULE 23(b)(3).

Even if Plaintiffs had offered some generalized proof to support a "mutual fund selection

and deletion" theory, their motion for class certification still must be denied because they have

not established that class litigation would be "superior" to individual litigation, as required by

Rule 23(b)(3).  The proposed class action is not superior here because this case is unmanageable,

the claims are untested, and individual litigation by the three Plaintiffs on behalf of their

respective plans is feasible.

*First*, a class action is not superior to individual litigation because the need to determine

individualized issues of liability and damages on Plaintiffs' "mutual fund selection and deletion"

theory would render the class action unmanageable.  *See Cohn v. Massachusetts Mut. Life Ins.*

*Co.*, 189 F.R.D. 209, 218 (D. Conn. 1999) (agreeing that "the superiority requirement cannot be

satisfied [if] the predominance of individual issues would render a class action

- 34 -

unmanageable").[41]  Plaintiffs have offered no plan for how this case could ever manageably be tried.[42]

Second, the same facts also require individualized assessment of any restitution.  Cf. Abrams v. Interco, Inc., 719 F.2d 23, 31 (2d Cir. 1983) (denying certification because of a "serious problem of manageability relate[d] to damages").  Plaintiffs are seeking the return of the mutual fund payments that the Nationwide entities received, but have offered no plan for how any particular plan or participant would establish any entitlement to all or even part of those payments.  To the contrary, Plaintiffs have admitted that they cannot trace any investments made by a plan or participant to any particular payment.  See First Am. Mem. in Supp. of Pls.' First Am. Mot. for Class Cert. (Doc. # 129) at 13 ("Plaintiffs' contentions do not depend on tracing specific dollars from the hands of a Plan into the hands of Nationwide."); Pls.' Opp'n to Defs.' Disc. Mot. (Doc. # 155) at 24 ("Plaintiffs do not rely on tracing plan assets from the hands of the Plans into the hands of Defendants").

Such tracing would be impossible because the money invested in most of the Nationwide variable accounts by the plans and their participants was aggregated with the money of other investors who are not proposed members of the class, and the mutual funds in turn pooled the

---

[41]    See also Benner v. Becton Dickinson & Co., 214 F.R.D. 157, 168, 174 (S.D.N.Y. 2003); MTBE, 209 F.R.D. at 328-29, 334 (denying class certification despite a "lengthy trial plan" prepared by plaintiffs; the limitations and tailoring of the class proposed by plaintiffs were still insufficient to persuade the court that "class action is appropriate"); Daniels v. Amerco, No. 81 Civ. 3801 (RLC), 1983 WL 1794 (W.D.N.Y. Mar. 10, 1983) (manageability problems arising from need for individualized examination of particular transactions); Grandon v. Merrill Lynch & Co., 2003 WL 22118979, at *10 (S.D.N.Y.) (series of mini-trials required to determine whether defendant charged undisclosed, excessive markup).

[42]    Plaintiffs advert to the absence of a jury or some possible role for a special master as solving the manageability problem.  Class Cert. Br. at 39-40.  But to resolve Plaintiffs' class claims, someone will be obligated to undertake a plan-by-plan and fund-by-fund analysis.  The case is unmanageable regardless of whether the overburdened factfinder is a jury, a special master, or this Court.

Nationwide variable account money with money received from many other investors who have no relation to the proposed class.  Henderson ¶ 23; *Haddock*, 419 F. Supp. 2d at 161.  Tracing the putative class members' investments to any payments by mutual funds or affiliates is impossible for the additional reason that in most cases those payments were made in the aggregate to Nationwide entities based on Nationwide's combined purchases of shares in the mutual fund family as a whole, and not based on Nationwide's purchases of shares in a particular mutual fund corresponding to a particular plan's or participant's investment choice.[43]  Further, when the mutual fund families or their affiliates made payments to Nationwide and its affiliates, in some cases the payment came from an affiliate's assets, not the fund's assets, and therefore the mutual fund would not absorb the cost.[44]  Even if the payments came from the mutual fund's assets, the fund did not necessarily pass the cost along to the plans or their participants.

As a result, there are serious problems of manageability with respect to providing the novel and untested remedy that Plaintiffs seek.[45]

*Third*, Nationwide's counterclaims against Plaintiffs for contribution, indemnification,

---

[43]     *See* January 1, 2000 Villanova Agreement (Ex. B) at N 013424 ("The Service Fee shall be calculated as an annualized percentage … of the average amount invested in the Funds under the Contracts issued by the Variable Accounts for the applicable period.  The average aggregate amount shall be computed by totaling the aggregate investment (net asset value multiplied by total number of Fund shares held in the Variable Accounts) on each calendar day ….").

[44]     *Id.* ("The Service Fee shall be paid either by VMF or one of its affiliates from general operating funds, administrative service fees, or 12b-1 plan fees, as applicable.").

[45]     *See Castano v. American Tobacco Co.*, 84 F.3d 734, 747 (5th Cir. 1996) (explaining that case should not be certified "without a prior track record of trials from which the district court can draw the information necessary to make the predominance and superiority analysis required by Rule 23"); *Cohn v. Massachusetts Mut. Life Ins. Co.*, 189 F.R.D. 209 (D. Conn. 1999) (class action would not be a superior form of adjudication because case presents immature or novel theories and because plaintiffs' claims are likely to be unsuccessful).

and breach of fiduciary duty also render this matter completely unmanageable as a class action.[46]

If a class were certified, Nationwide would have the right to assert counterclaims against

thousands of trustees of the putative class members, which would require individualized inquiry

into their knowledge of and participation in the selection and removal of investment options.

    *Fourth*, there is also no need for a class action here. Where the class claims are of

allegedly substantial value and where attorneys' fees are available to a prevailing litigant, a class

action is not superior to traditional litigation. *Street v. Diamond Offshore Drilling*, No. Civ. A.

00-1317, 2001 WL 568111, at *12 (E.D. La. May 25, 2001) ("[T]he most compelling rationale

for finding superiority in a class action [is] the existence of a negative value suit."). Indeed, even

where the alleged claims are of relatively small value, the availability of fees weighs heavily

against class certification. *See Cohn*, 189 F.R.D. at 219 ("[A]lthough the small size of any loss

suffered might deter suits by many members of the proposed class, the cost of litigation will not

be an insurmountable obstacle to those who wish to pursue claims, given the availability of

attorneys' fees").

## IV.   PLAINTIFFS CANNOT AVOID THE REQUIREMENTS OF GENERALIZED PROOF AND SUPERIORITY BY RELYING ON RULE 23(b)(2).

    Unable to meet the generalized proof or superiority requirements of Rule 23(b)(3),

Plaintiffs try to invoke Rule 23(b)(2), which provides for certification if "the party opposing the

class has acted or refused to act on grounds that apply generally to the class, so that final

---

[46]     *Cotchett v. Avis Rent A Car System*, 56 F.R.D. 549, 552 (S.D.N.Y. 1972) (common issues likely to be substantially splintered by the counterclaims into myriad of separate trials); *Leverett v. Heilig-Meyers Furniture Co., Inc.*, No. CV 194-158, 1995 U.S. Dist. LEXIS 21797, at * 9 (S.D. Ga. Aug. 28, 1995) ("Individual adjudications will be required for each of these counterclaims, therefore increasing the number of separate trials that will be required."); *Berkman v. Sinclair Oil Corp.*, 59 F.R.D. 602, 609 (N.D. Ill. 1973); *Alpert v. U.S. Indus., Inc.*, 59 F.R.D. 491, 499-500 (C.D. Cal. 1973).

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole[.]"

**A.    Plaintiffs Have No Standing To Seek Injunctive Or Corresponding Declaratory Relief.**

The Crown Plan, the Anderson Plan, and the Easter Seals Plan represented by the three

Plaintiffs no longer hold annuity contracts with Nationwide.  Therefore, even if Plaintiffs

otherwise have standing to maintain this lawsuit (which they do not, *see infra* Section I), they

surely have no ongoing injury that could support their standing to request prospective injunctive

or declaratory relief, and thus cannot meet the Rule 23(b)(2) element.[47]

Further, since Plaintiffs face no immediate threat of harm, their claims for injunctive or

declaratory relief are moot, and thus those claims become moot for the entire class.[48]  A Rule

23(b)(2) class cannot be certified based upon Plaintiffs' moot claims.

**B.    Nationwide Has Not Acted On Grounds That Apply Generally To The Class.**

Furthermore, Plaintiffs have not shown that Nationwide "has acted or refused to act on

grounds that apply generally to the class."  Plaintiffs claim summarily that Nationwide

---

[47]    *New York Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)) (standing to seek injunctive or corresponding declaratory relief exists only when plaintiff demonstrates a "real and immediate" threat of future injury). *See also Deshawn E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) ("A plaintiff seeking injunctive or declaratory relief cannot rely on past injury … but must show a likelihood that he or she will be injured in the future."); *King v. Rell*, No. 3:06-cv-1703 (VLB), 2008 U.S. Dist. LEXIS 21998, at *6 (D. Conn. Mar. 20, 2008) (plaintiff who is "no longer in danger of suffering a future harm" cannot assert claim for injunctive relief).

[48]    *Comer v. Cisneros*, 37 F.3d 775, 798 (2d Cir. 1994); *see also Wiesmueller v. Kosobucki*, 513 F.3d 784, 786 (7th Cir. 2008) (if "the named plaintiff's claim becomes moot before the class is certified, the suit must be dismissed …" ); *Bowens v. Atl. Maint. Corp.*, No. 06 CV 809 (NG), 2008 U.S. Dist. LEXIS 20325, at *47 (E.D.N.Y. Mar. 14, 2008) (citing *Board of Sch. Comm'rs of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975)); *Kruse v. Wells Fargo Home Mortgage, Inc.*, No. 02-CV-3089 (ILG), 2006 U.S. Dist. LEXIS 26092, at *28 (E.D.N.Y. May 3, 2006) (prior to certification, purported class is not protected from mootness of named plaintiffs' claims).

"subject[ed] [all class members] to the revenue sharing scheme." Class Cert. Br. at 27. But, as

described above in Section II, there are individualized questions with respect to whether each of

the plans and participants in fact invested in options that corresponded to mutual funds or

affiliates making payments. Moreover, there is no uniform proof establishing that Nationwide

systematically selected or removed any investment options in return for mutual fund payments,

and there are individualized issues as to whether some plans agreed to, and received reductions

in expenses due to, the mutual fund payments.[49]

## C.    Injunctive Or Declaratory Relief Does Not Predominate Under The Ad Hoc Test Set Forth In *Robinson v. Metro-North Commuter Railroad.*

In any event, Rule 23(b)(2) is inapplicable here because Plaintiffs are primarily seeking

to recover money paid by the mutual funds and affiliates. Clearly, this potential multi-million

dollar award predominates over the injunctive or declaratory relief sought, *see* Fed. R. Civ. P. 23,

cmt. to 1966 amendment ("The subdivision [(b)(2)] does not extend to cases in which the

appropriate final relief relates exclusively or predominantly to money damages."); *Robinson v.

Metro-North Commuter Railroad*, 267 F.3d 147 (2d Cir. 2001) (addressing a claim seeking both

injunctive relief and non-incidental[50] monetary damages). Contrary to the standard articulated in

---

[49]    *McCarthy v. PNC Credit Corp.*, Civ. No. 2:91CV00854 (PCD), 1992 U.S. Dist. LEXIS 21719, at *4 (D. Conn. 1992) (certification denied in suit alleging excessive and unreasonable default and early termination charges even though similar forms used). *See also MTBE*, 209 F.R.D. at 342 ("[I]ndividualized issues destroy Rule 23(b)(2)'s presumption of cohesiveness."); *Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 139 (S.D.N.Y. 2003) (certification of an ERISA class action is inappropriate where such "individualized evaluations" would be required).

[50]    Plaintiffs assert that the monetary award they seek – mutual fund payments by [hundreds] of funds over the course of a decade – is incidental because it is capable of computation by objective standards. *See* Class Cert. Br. at 32 (citing *Allison v. Citgo Petroleum Co.*, 151 F.3d 402, 415 (5th Cir. 1998)). Even if the award were computable based on objective standards (which it clearly is not), the volume of the award sought here (which Plaintiffs claim is "hundreds of millions of dollars") is certainly not "incidental." *See Harris v. Initial Sec., Inc.*, No. 05 Civ. 3873 (GBD), 2007 U.S. Dist. LEXIS 1839 (S.D.N.Y. Mar. 7, 2007) (concluding that injunctive relief does not predominate where plaintiffs seek $20 million in damages).

*Robinson,* Plaintiffs have not established that they would bring the case even in the absence of a possible monetary recovery, and that the injunctive or declaratory relief sought is both reasonably necessary and appropriate were the Plaintiffs to succeed on the merits. *Id. See Matyasovszky v. Hous. Auth. of Bridgeport,* 226 F.R.D. 35, 44 (D. Conn. 2005).

*First*, "damages would hardly be incidental when the prospective relief portion of the action had become moot" – as they are here, for the reasons just explained. *Smith v. Univ. of Wash. Law Sch.*, 233 F.3d 1188, 1196 (9th Cir. 2000).[51]

*Second,* Plaintiffs' primary purpose in bringing this suit clearly is to obtain monetary damages: they no longer hold Nationwide annuity contracts and, "in the absence of a possible monetary recovery," *Robinson*, 267 F.3d at 164, they have no interest in receiving prospective injunctive or declaratory relief. That is also true of numerous other putative class members who no longer hold Nationwide contracts.[52]

*Third*, despite Plaintiffs' lone conclusory sentence to the contrary, Class Cert. Br. at 36, they have not shown that the injunctive or declaratory relief sought "[would] be [both] reasonably necessary and appropriate." *Robinson*, 267 F.3d at 164. "If final injunctive or

---

[51]    See *also Augustin v. Jablonsky*, No. 99-CV-3126 (DRH) (ARL), 2001 U.S. Dist. LEXIS 10276, at *31 (E.D.N.Y. Mar. 8, 2001) (observing that mootness of injunctive and declaratory relief "tend[s] to support the Court's conclusion that Plaintiffs' damages claims predominate over their claims for declaratory and injunctive relief") (internal citation omitted).

[52]    See *Morgan v. Metro. District Comm'n*, 222 F.R.D. 220, 236 (D. Conn. 2004) (holding that reasonable plaintiffs would not have brought suit absent prospect of monetary award because "the proposed class contemplates former employees, including [named plaintiffs]. It is difficult to see how these former employees could meaningfully benefit from the declaratory relief Plaintiffs seek …. For former employees, their incentive to join the class is monetary relief."); *see also Harris v. Initial Sec., Inc.*, No. 05 Civ. 3873 (GBD), 2007 U.S. Dist. LEXIS 18397, at *24 (S.D.N.Y. March 7, 2007) ("Finally, as Plaintiffs no longer work for Defendant and do not seek or want reinstatement, they would not benefit from any injunctive relief that this Court might award, another indication that Plaintiffs' primary interest is individual monetary compensation.").

declaratory relief is not available to the class as a whole for the claims being asserted, then Rule 23(b)(2) cannot be utilized." 7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1775 at 51-54 (3d ed. 2005).[53] An injunction prohibiting the mutual fund payments is not necessary for the class as a whole because the damages they seek would make them whole, and in any event, should the mutual fund payments continue, any existing plans may simply take their business elsewhere (as Plaintiffs themselves have done).

*Fourth*, Plaintiffs maintain that the monetary relief they seek *itself* constitutes equitable relief. Class Cert. Br. at 28-31. As a threshold matter, even if Plaintiffs' claims for restitution could somehow be considered equitable, Rule 23(b)(2) applies to claims for which "final injunctive or corresponding declaratory relief" – not *any* type of equitable relief – is appropriate. *See Petrolito v. Arrow Fin. Servs., LLC*, Civ. Action No. 3:02-cv-484 (JCH), 2004 U.S. Dist. LEXIS 3978, at *33 (D. Conn. March 5, 2004) (holding that the "prayed-for remedy, while arguably equitable, is hardly injunctive or declaratory in the sense usually required to satisfy subsection (b)(2)").

Further, although restitutionary remedies may sometimes be equitable in nature, such as when property in the hands of a defendant can be traced back to the plaintiff's ownership, restitution of the nature Plaintiffs seek is a legal remedy.[54] That is because Plaintiffs do not seek the return from Nationwide's possession of property *to which they can trace title*. The mutual

---

[53]    *See also Rehwaldt v. Elec. Data Sys. Corp.*, No. 95-CV-876A, 2005 U.S. Dist. LEXIS 44849, at *8 (W.D.N.Y. Apr. 12, 2005) ("[M]any of the proposed class members have long since terminated their employment with the defendant. In such a situation, class certification is inappropriate.").

[54]    *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) (restitution was "at law," not in equity, in cases in which the plaintiff *could not* assert title or right to possession of the particular property, but nevertheless was seeking to recover some benefit the defendant has received from him); *see also FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 66-67 (2d Cir. 2006) (same), *cert. denied*, 2007 U.S. LEXIS 3024 (Mar. 19, 2007); *Council of Carpenters Pension Fund v. Savasta*, 2004 U.S. Dist. LEXIS 26242, at *9-10 (S.D.N.Y. 2004) (same).

fund payments never belonged to Plaintiffs in any sense of the word – they were made with money belonging to the mutual funds or their affiliates, not with money belonging to the plans, and Plaintiffs have admitted throughout this litigation that the mutual fund payments cannot be traced to plan assets.  Plaintiffs thus allege not that Nationwide took property that belonged to Plaintiffs, but rather that Nationwide should not have been permitted to profit from Plaintiffs' selection and removal of particular mutual funds.  Compl. ¶ 40 (alleging that Nationwide failed to "pass[] on the benefit of the revenue sharing payments to the Plans"); Class Cert. Br. at 26 (referring to "the essence of this suit, which is that Nationwide received payments from mutual funds which should be disgorged to the Plans.").  Restitution in such situations is a legal remedy. *See* 1 Dobbs § 4.2(3), at p. 584.

*Fifth*, Plaintiffs likewise fail to satisfy *Robinson*'s requirement that class treatment be "efficient and manageable" for the reasons discussed above (*see supra*, section III).  *See Morgan v. Metro. District Comm'n*, 222 F.R.D. 220, 236 (D. Conn. 2004) ("[A]ny injunctive relief that could be granted to the class can be obtained by the named Plaintiffs in their pending suit.  This would enhance efficiency by averting a potentially overwhelming and highly individualized damages phase that would threaten to convert the ostensibly unified class action into a series of mini-trials . . . ."); *MTBE*, 209 F.R.D. at 346.

## V.    PLAINTIFFS CANNOT MEET THE "ADEQUACY" REQUIREMENTS OF RULE 23(A).

To determine adequacy of representation under Rule 23(a)(4), the court must analyze whether the Plaintiffs themselves have a claim, and if they do, their "understanding and involvement in the lawsuit, the willingness to pursue the litigation, the ability to serve as a fiduciary on behalf of the class, and any conflict between the representative and the class." *In re Lilco Sec. Litig.*, 111 F.R.D. 663, 672 (E.D.N.Y. 1986).

A.    **Plaintiffs Are Inadequate Because They Have No Standing To Represent The Class.**

As explained above, Plaintiffs are inadequate because they have no statutory standing

under ERISA for a number of reasons (*see supra*, Sections I, IV.A).  *See, e.g.*, *Cortigiano v.*

*Oceanview Manor for Adults*, 227 F.R.D. 194, 206 n.3 (E.D.N.Y. 2005) (individuals with no

claims of their own cannot serve as class representatives); *People United for Children, Inc. v.*

*City of New York*, 214 F.R.D. 252, 262 (S.D.N.Y. 2003) (same).

B.    **Plaintiffs Are Inadequate Because Their Claims Conflict With The Class.**

Plaintiffs are also inadequate because their claims clearly conflict with those of the other

proposed class members, for a variety of reasons:

- Even if the evidence showed that the Nationwide Defendants exercised their alleged

    power to remove investment options for the purpose of receiving mutual fund payments

    (*see supra*, Section II), none of those removals ever affected Plaintiffs' own plans.  Thus,

    Plaintiffs will have no incentive to pursue an argument that they have insisted is central

    to their case, and that the Court accepted as the reason for denying summary judgment.

    *Haddock*, 419 F. Supp. 2d at 166 and n.6.

- None of the Plaintiffs represents a plan that still holds annuity contracts with Nationwide,

    and thus they have no incentive to seek any prospective relief on behalf of the class that

    is requested in the complaint.  Their only incentive is to seek restitution for past conduct,

    which creates a conflict with the interests of the class as a whole.[55]

---

[55]    *See Harris*, 2007 U.S. Dist. LEXIS 18397, at * 21 (named plaintiffs who could no longer
benefit from injunctive relief are inadequate because their interests in receiving monetary award
"might prevent them from adequately protecting the interests of those class members who are
still employed by Defendant and who might be more inclined to receive injunctive, rather than
monetary relief"); *Rehwaldt*, 2005 U.S. Dist. LEXIS 44849, at *9 (named plaintiff is inadequate
due to her lack of interest in injunctive relief).

- The claims of Plaintiffs Anderson and Gouse conflict with those of the class as a whole because their plans held pre-1998 individual contracts that (in contrast to later contracts) did not give Nationwide Life the alleged unilateral right to substitute investment options. Facts at E. Thus, as this Court has recognized, they cannot pursue the "mutual fund deletion" theory that is central to the proposed class's claims. *Haddock*, 419 F. Supp. 2d at 165 n.5. Conversely, Plaintiff Wiberg's claims conflict with the class as a whole because his plan held a group contract that allegedly did give Nationwide Life the right to unilaterally substitute investment options. Facts at E. Thus, he has no incentive to pursue the claims of those plans that held individual contracts that did not provide that right.

- Plaintiff Wiberg's claims are in conflict with the claims of the class because the evidence shows that he ratified the mutual fund payments under his plan's group contract and took advantage of the reduced contract charges that accompanied those payments. Facts at G.1, H. Plaintiff's ratification of a practice he is now suing over will place his own motivation and credibility near the center of the case, making him an inadequate class representative.[56]

## C.    Plaintiffs Are Inadequate Because Of The Counterclaims Against Them.

The counterclaims alleging that Plaintiffs breached the fiduciary duty they owed to the plans as trustees should disqualify them as class representatives. "A court should not certify a class representative who 'is subject to unique defenses which threaten to become the focus of the litigation.'" *Pecere v. Empire Blue Cross & Blue Shield*, 194 F.R.D. 66, 72 (E.D.N.Y. 2000)

---

[56]    *See Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983); *see also Koenig v. Benson*, 117 F.R.D. 330, 333-34 (E.D.N.Y. 1987); *id.* at 338 ("In the Second Circuit a proposed class representative can be ruled inadequate under Rule 23(a)(4) if he is vulnerable to attacks on his credibility concerning key facts at issue in the case.").

(quoting *Gary Plastic Packaging v. Merrill Lynch*, 903 F.2d 176, 180 (2d Cir. 1990)). Further, Plaintiffs are inadequate representatives because the counterclaims could cause them to consider their interests above the interests of the class.[57]

### D. Plaintiffs Are Inadequate Because They Lack Even The Minimal Knowledge Necessary To Control This Litigation and Represent the Class.

Class representatives do not merely lend their names to litigation, but must have enough of a commitment to represent the interests of the class as fiduciaries.[58] Here, Plaintiffs have demonstrated a profound lack of knowledge, and have not demonstrated any desire to inform themselves so as to be in a position to control this litigation or stand up to the possibly conflicting interests of their attorneys.[59]

Plaintiffs' deposition testimony demonstrates profound ignorance of the nature and basic facts of their claims. Plaintiff Wiberg did not even know what a variable annuity was, was

---

[57]    *See Tedesco v. Mishkin*, 689 F. Supp. 1327, 1338 (S.D.N.Y. 1988) (removing co-trustee of defendant trust as named plaintiff because "[e]ven if the court were to accept the plaintiffs' assertion that [the co-trustee] was himself victimized by the defendants, it does not follow that his interests lie exclusively with the plaintiff class. Inactivity on the part of a co-trustee does not serve to insulate that fiduciary from potential liability for the breaches committed by his fellow trustees. All trustees have a duty to maintain a degree of watchfulness over the acts of their co-trustees") (internal citations omitted); *Parker v. George Thompson Ford, Inc.*, 83 F.R.D. 378, 380 (N.D. Ga. 1979) (recognizing that class members facing counterclaims have interests averse to those not facing counterclaims).

[58]    *In re Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89, 100 (D. Conn. 2006) ("This inquiry into the knowledge of the representatives is to ensure that the parties are not simply lending their names to a suit controlled entirely by the class attorney ….") (citations, brackets and quotation marks omitted; emphasis added).

[59]    *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000) (plaintiffs are not adequate class representatives if they have "so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys"); *Panzirer v. Wolf*, 663 F.2d 365, 368 (2d Cir. 1981) (affirming denial of class certification on inadequacy grounds where plaintiff "gave no less than four versions" of central facts); *Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (denying class certification where plaintiff had "extremely limited or nonexistent" personal knowledge of facts pled in the complaint).

unaware of the challenged service relationships between Nationwide and the mutual fund

entities, and was unaware of how Nationwide allegedly used his accumulation units to obtain

mutual fund payments.  Wiberg 2003 Dep. Tr. (Ex. N) at 56-57, 65; Wiberg 2007 Dep. Tr. (Ex.

P) at 63-64, 66.  Wiberg did not review the complaint before it was filed and has done nothing to

advance this litigation or to monitor counsel.  *Id.*  at 8, 83, 85.  He conceded he had done nothing

to monitor counsel or protect the interests of the class.  Wiberg is dependent on counsel for

essentially all his information about the litigation, including even the details of the claims he is

supposedly asserting.  To cite just a few examples, Wiberg claimed that he could not say,

without disclosing advice of counsel:

- why it is that he claims that the moneys from the mutual funds went to Nationwide and should have gone to the participants' accounts;

- what he did to confirm the accuracy of his own interrogatory responses; or

- what basis he had for thinking that Nationwide breached any contract by receiving money from mutual funds.

*Id.* at 9, 27, 31-34.

Similarly, Plaintiff Gouse barely appears to have read any documents relevant to the

litigation, and could not even say whether Nationwide and the plan he oversees had entered into

a contract.

> Q.    … Is it your understanding that the Greater Hartford Easter Seal Rehabilitation Center deferred compensation plan had a contract or has a contract with Nationwide Life? …
>
> THE WITNESS: I cannot speak to any documents that my predecessors may have entered into, so –
>
> Q.    (By Mr. Platt) While you have been trustee of the Greater Hartford Easter Seal Rehabilitation Center deferred compensation plan, have you entered into any contracts on behalf of that plan with Nationwide Life? …
>
> A.    I am not aware of any contracts that I have entered into.

Gouse 2003 Dep. Tr. (Ex. O) at 9-11. Likewise, Gouse could not say what mutual fund documents he reviewed, whether he ever asked for any documents from Nationwide or the third-party administrator, or whether the mutual funds were providing services that benefited his plan. Gouse 2007 Dep. Tr. (Ex. Q) at 244, 247, 251. Although Gouse claims to object to Nationwide's revenue sharing, he could not say in 2003 whether the Easter Seals Plan's current investment provider, Phoenix Insurance Company, was engaged in the same type of revenue sharing that is at issue here. Gouse 2003 Dep. Tr. (Ex. O) at 177-81. Gouse said in 2003 he would inquire of the Phoenix, but he conceded in 2007 that he had not done so. *Id.* at 253.

The only remaining named Plaintiff, Christopher Anderson, is new to the case. Plaintiffs' counsel effectively concede he is not currently an adequate Plaintiff when they promise that, after he reviews documents, he will understand the case well enough to serve. Pl.'s Mem. Appx. Tab 18, at ¶ 2. Especially based on the track record of the other Plaintiffs, that promise is insufficient.

Given this complete lack of knowledge and involvement in the case, Plaintiffs have not shown the ability "to protect the interests of the class against the possibly competing interests of the attorneys," *Baffa*, 222 F.3d at 61, nor demonstrated that they "are not simply lending their names to a suit controlled entirely by the class attorney," *In re Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89, 100 (D. Conn. 2006).

## VI.    PLAINTIFFS' "SPECIFIC ACCUMULATION" THEORY WAS REJECTED BY THE COURT AND DOES NOT SATISFY RULE 23.

Plaintiffs' class certification motion spends little time arguing that a class should be certified on their "mutual fund selection and deletion" theory. Instead, Plaintiffs argue that a class should be certified based on a different theory: that the Nationwide defendants assumed and breached an ERISA fiduciary duty by "using [their] custody and control of the accumulation

units to obtain the revenue sharing payments from the mutual funds." Class Cert. Br. at 13. Rather than explaining how Nationwide allegedly exercised authority or control over these accumulation units, Plaintiffs simply skip to the conclusion that "Nationwide places the investments of the Plans and their participants' in [the funds making payments] and conditions its placement of the investments upon payment of the revenue sharing payments." Class Cert. Br. at 13-14.

In other words, Plaintiffs are no longer arguing that a class should be certified based on the Nationwide Defendants' alleged control of *investment options* (through selection and removal) to obtain mutual fund payments. Instead, Plaintiffs now seek class certification on the entirely different theory that Nationwide directly controlled the *retirement money,* and how it was invested, to obtain the mutual fund payments. Plaintiffs refer to this different theory throughout their class certification motion as the Nationwide Defendants "using the accumulation units to obtain revenue sharing," Class Cert Br. at 13, 14, 16-17, apparently hoping that this vague shorthand will eliminate any further need to show that such a claim meets the requirements of Rule 23.

Plaintiffs' effort once again to transform their theory of the case must fail because this Court has already rejected any "accumulation unit" theory of ERISA liability in its March 2006 decision as a matter of law. The Court recognized that the Nationwide Defendants did *not* invest the retirement money for the plans or participants, but instead followed the investment directions of the plans and participants pursuant to the terms of the annuity contracts. *Haddock*, 419 F. Supp. 2d at 161, 166-167. Moreover, this Court recognized that any "exercise of authority or control" that Nationwide may allegedly have over the "accumulation units" (e.g., transferring or cancelling the units for loans, cash payments or contract charges) would not give rise to a valid

- 48 -

ERISA claim because Plaintiffs had not offered any legitimate link between that alleged exercise and the challenged conduct in this case (i.e., a breach of an ERISA fiduciary duty that resulted in the receipt of mutual fund payments), as required by ERISA. *Id*. at 167.

Even if this Court had not already dismissed Plaintiffs' accumulation unit theory as a matter of law, Plaintiffs have not offered sufficient class-wide proof to meet the Rule 23 requirements with respect to any claim based on that theory. Plaintiffs have alleged in conclusory fashion that Nationwide Life exercised authority or control over the "accumulation units" by canceling or transferring them for loans, cash payments, and contract charges. Compl. ¶ 54. But Nationwide Life had no right under the annuity contracts to manage, dispose of, cancel or transfer accumulation units without specific instructions or permission from plans or participants, and never took any such action with respect to the accumulation units without instructions or permission from the plans or participants. Rose ¶ 23; Henderson ¶ 26; Wiberg 2007 Dep. Tr. (Ex. P) at 71-72; Ferdon 2007 Dep. Tr. (Ex. R) at 29-30.

Plaintiffs present no uniform evidence to show that Nationwide Life had the authority to invest the plans' or participants' money. Nor do they present any evidence that Nationwide actually manipulated or conditioned the retirement money of the plans and participants, *and* that such manipulation or conditioning of the retirement money was in fact linked to the mutual fund payments made to different Nationwide entities. Plaintiffs cannot offer such uniform proof because the evidence in the record is to the contrary – the plans and participants made all the investment decisions independently, as Plaintiffs themselves have admitted, and it was the ultimately the trustees' duty to manage and control the plan assets. *See, e.g.*, Wiberg 2007 Dep. Tr. (Ex. P) at 42-44, 46; Resp. to Req. to Admit (Ex. 3) Nos. 8, 12. Nationwide thus had no power to "condition" any of those independent investment decisions on the payment by the

mutual funds.  Nationwide Life only followed the directions of the plans and participants.  Rose
¶ 20; Henderson ¶ 22.

Further, even if Nationwide did have some power with respect to the accumulation units
or the investment of the participants' money that it exercised on its own, Plaintiffs' allegations
would require a separate evidentiary showing with respect to the thousands of investments and
other transactions engaged in by each plan over many years that affected the accumulation units,
and whether any investments were made, or accumulation units canceled or transferred, in return
for any mutual fund payments.  That in turn would require a tracing of the investments of the
plans and participants to the mutual fund payments that Plaintiffs have acknowledged they
cannot do.

If the Court were to allow Plaintiffs to base their motion for class certification on this
theory of the case that the Court has already dismissed, or on some new theory that may appear
in Plaintiffs' reply brief to this opposition, Defendants would request an opportunity to address
these issues further.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs'
motion for class certification based on their Fifth Amended Complaint.

Dated:  April 25, 2008

Defendants Nationwide Financial Services Inc.
and Nationwide Life Insurance Co.


By: _____

Dennis F. Kerrigan, Jr., Esq. (CT 09621)
Brian O'Donnell, Esq. (CT 16041)
Dewey and LeBoeuf, L.L.P.
Goodwin Square, 225 Asylum Street
Hartford, CT 06103
Telephone:     (860) 293-3500
Facsimile:     (860) 293-3555

Charles C. Platt, Esq. (CT 23036)
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, NY  10022
Telephone:     (212) 230-8800
Facsimile:     (212) 230-8888

Daniel H. Squire, Esq.
Mark Bieter, Esq.
Heath A. Brooks, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone:     (202) 663-6000
Facsimile:     (202) 663-6363

## CERTIFICATION

I hereby certify that on 25th day of April, 2008, I electronically filed the foregoing with

the Clerk of the District Court using the CM/ECF system, which sent notification of such filing

to the following:

Richard A. Bieder, Esq.
Antonio Ponvert III, Esq.
Koskoff, Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

Gregory G. Jones, Esq.
Law Firm of Gregory G. Jones, P.C.
630 E. Southlake Blvd., Suite 110
Southlake, TX 76092

Marc R. Stanley, Esq.
Roger L. Mandel, Esq.
Stanley, Mandel & Iola
3100 Monticello Avenue
Suite 750
Dallas, TX 75205