UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LOU HADDOCK, as trustee of the Flyte Tool & Die, :
Incorporated Deferred Compensation Plan, et al., :
:
PLAINTIFFS, : CIVIL. ACTION NO.:
:
v. : 3:01CV1552(CFD)
:
NATIONWIDE FINANCIAL SERVICES INC., and :
NATIONWIDE LIFE INSURANCE CO., :
:
DEFENDANTS. :
:

## DECLARATION OF ERIC HENDERSON

Eric Henderson declares that the following is true under penalty of perjury:

1. I am Senior Vice President, Individual Investments, of Nationwide Life Insurance Company ("Nationwide Life"). I submit this declaration to accompany Defendants' Opposition to Plaintiffs' Motion for Class Certification Based on Fifth Amended Complaint.

2. I have been with Nationwide Life since 1985 in a number of different capacities. In my current position, I oversee finance, actuarial, business development, operations, and other aspects for Nationwide Life's individual annuity line of business. I am a Fellow of the Society of Actuaries, and a member of the American Academy of Actuaries. Based on my experience, I have personal knowledge of the matters set forth in this declaration.

**Nationwide Life's Individual Variable Annuity Contracts**

3. Nationwide Life issues individual variable annuity contracts to many different types of customers for investment of their money on a tax-deferred basis. Since 1988, 401(k) and 403(b) retirement plans that qualify for favorable tax treatment under the Internal Revenue Code have arranged for their plan participants to hold these individual contracts for investment

of their retirement money. Nationwide Life also issued individual annuity contracts to many purchasers who were *not* retirement plans or participants.

4. There were numerous types of individual annuity contracts issued by Nationwide Life since 1988. Nationwide currently offers approximately 60 different types of individual annuity contracts, as listed in Exhibit A to this declaration.

5. The terms of those contracts varied significantly by type of contract, and were approved in different forms by state insurance departments at different times. Further, there were substantial differences between the terms and charges in group contracts purchased by some retirement plans compared to individual variable annuity contracts issued by Nationwide Life.

6. The periods during which plan participants held these individual annuity contracts with Nationwide varied substantially. None of the participants in the three remaining plans represented by Plaintiffs currently holds an individual contract with Nationwide. The participants in the Anderson & Ferdon Plan P.C. 401(k) Profit Sharing Plan (the "Anderson Plan") held individual Nationwide contracts from 1991 to 2002, and then terminated those contracts. The participants in the Greater Hartford Easter Seal Rehabilitation Center, Inc. Trust plan (the "Easter Seal Plan") held Nationwide individual contracts from 1994 to 1998, and then terminated those contracts.

**The Different Variable Accounts In Which The Participants Invested, And The Different Investment Options In Those Accounts**

7. Each Nationwide Life individual annuity contract permitted the plan participants to invest money in a separate "variable account." These variable accounts were unit investment trusts registered under the Investment Company Act of 1940 that kept their assets separate from Nationwide Life. There were many different variable accounts that were associated with the

different types of individual contracts. Most of those variable accounts received money not only from the plan participants in the putative class here, but also from other Nationwide annuity contract-holders who are not members of the proposed class. For example, approximately 84% of the money invested in the Nationwide Variable Account-II as of November 30, 2003 was from investors who were *not* 401(k) or 403(b) retirement plans and participants.

8.   At different times over the proposed class period, the numerous variable accounts contained hundreds of investment options that the plan participants (and other Nationwide annuity-holders) could select for investment of their money. Those investment options corresponded to separate mutual funds that were managed and administered by dozens of mutual fund advisors and their affiliates, including independent managers at Fidelity, Neuberger Berman, Oppenheimer, American Century, and Dreyfus Corporation.

9.   The numerous variable accounts included investment options corresponding to mutual funds that made payments to Nationwide after 1996 *and* some options that did not. Investment options were included in the variable accounts over time for many reasons unrelated to mutual fund payments, such as investment style, amount of assets, long-term performance, management tenure and philosophy, compliance and regulatory background, risk profile, and expenses, among other factors. Investment options were not included in the variable accounts simply because mutual fund payments were made.

**The Participants' Selection of Investment Options for The Individual Contracts**

10.   When a plan participant applied for an individual annuity contract, before the contract was issued, the participant selected investment options in which he or she wished to invest. The participant made his or her selections from the particular array of options available in the variable account related to his or her type of contract, based on his or her own independent judgment.

3

11.     The arrays of investment options available to plan participants applying for individual annuity contracts changed and increased over time. Different arrays were available depending on the type of individual annuity contract and when the contract was issued. For example, arrays of 15 investment options were available to the Anderson Plan participants in 1991 and 28 in 1998, and 7 to the Easter Seals Plan participants in 1994 and 34 in 1998. Over time, the different arrays included hundreds of investment options that varied by variable account and type of contract.

12.     The arrays available for selection included options that corresponded to mutual funds or affiliates making payments to Nationwide entities and options that did not.

13.     Participants were free to select as many or as few of the investment options as they wished. Some participants selected many or all of the investment options available for their individual annuity contracts; other participants selected a smaller subset. The participants had no obligation to select any particular investment options, and indeed had no obligation to purchase the individual contract if they did not like the investment options available. Nationwide Life did not direct or advise them on the selection. Participants were free to change their selections over time, dropping some investment options and adding others.

**The Participants' Selection Of Additional Investment Options**

14.     Over time, hundreds of *additional* investment options were included in the different variable accounts and became available for the participants' selection *after* they purchased their individual annuity contracts. For example, while they owned Nationwide variable annuity contracts, the Easter Seals Plan and Anderson Plan participants were presented with the Neuberger Berman Advisers Management Trust – Guardian Portfolio Fund and the Janus Aspen Series – Forty Portfolio Fund, among many other additional investment options. These additional options varied according to the period and the type of contract. The arrays

4

included investment options that corresponded to mutual funds (or affiliates) that made payments to Nationwide, and some options that did not.

15. Some plan participants selected many or all of the additional investment options available for their individual contracts; other plan participants selected a smaller subset. Nationwide Life did not require that the plans or participants select these additional options or advise them on the selection. Plan participants were also free to add to their selections or not.

**The Removal Of Some Investment Options**

16. On some occasions, investment options were removed from variable accounts after previously being selected by plan participants for inclusion in their individual contracts. Except in rare circumstances, all of these removals occurred as the result of an independent decision by the corresponding mutual fund – and not Nationwide Life – to close its fund entirely or to stop accepting any additional investments. Removals had no relation to whether Nationwide entities received mutual fund payments or not, and in *all* cases Nationwide Life provided notice to the plans and participants in advance, and the plan participants had the opportunity to select how they wanted to re-invest their money.

17. The removals had different impacts on plan participants who held Nationwide annuity contracts. Some participants had to redirect investments because one of the investment options they selected had decided to liquidate. *Other plan participants, including those in the Anderson Plan and Easter Seal Plan represented by Plaintiffs, were not affected at all by a removal during the entire period they owned Nationwide annuity contracts. That is, no investment option was removed for any reason whatsoever from any of the investment options that those participants had selected for investment.*

18. In the event an investment option was closed entirely, Nationwide Life's individual annuity contracts issued after 1998 provided that it could "substitute shares" of the

5

existing investment option with a new option. However, only 9 of these substitutions occurred over the past 24 years, and in all those instances, Nationwide Life sought approval from the Securities and Exchange Commission (as required by the individual annuity contracts and the law), and gave notice to the plans and participants. In *none* of those cases was substitution related to mutual fund payments.

19. The reason for the substitution request was typically that the mutual fund family stopped offering the corresponding mutual fund, and Nationwide Life always proposed a substituting investment option that charged *lower* fees. Participants were free to reject the substituting investment option and invest their money in another existing option.

20. Investment options in variable accounts were sometimes not made available to new participants, or to existing participants that had not previously selected those investment options, because the performance of the corresponding mutual fund was lower than comparable funds, or because of a lack of interest by participants. In such cases, the option was closed (or "walled-off") only to *new* participants, or to existing participants that had *not* previously selected that option.

**The Plan Participants Directed Their Own Investments In These Options**

21. After plan participants selected investment options for their annuity contracts, they could choose to allocate money to those options or to a "fixed account. The fixed account did not purchase or sell mutual fund shares. Rather, it invested in fixed income securities, and credited interest at a rate that did not vary according to the performance or costs of any mutual funds. Contract owners could invest in the fixed account at any time, and could move the money they invested in the variable account over to the fixed account, or move money they invested in the fixed account over to the variable account.

22. Each plan participant made his or her own independent decision whether to invest, how much to invest, and where to allocate his or her money. Each participant could transfer his or her money to different options or the fixed account after the initial allocation, subject to some contractual limitations. Nationwide Life did not direct the allocation or transfer of this money, or offer investment advice to the participants. Nationwide simply followed their directions.

23. When the plan participants allocated money to one of the various investment options, that money was aggregated with all the money from other investors in that option, including significant amounts of money from contract-holders who are not members of the proposed class. The variable account used that money to purchase shares of the corresponding mutual fund.

24. The money allocated to the investment option, and the mutual fund shares purchased, were the property of the variable account, *not* the property of the plans or the participants. Only the variable accounts interacted with the corresponding mutual funds; the mutual funds did *not* interact with the plan participants.

25. The value of the participants' individual contracts would increase or decrease depending on the performance of the investment options where they allocated money. The value of those investment options would increase or decrease based on the performance of their corresponding mutual funds. The increase or decrease of each investment option was reflected for each participant in an accounting measure called "accumulation units" in the variable account.

26. Nationwide Life had no right under the individual annuity contracts to manage, dispose of, cancel, or transfer accumulation units without specific instructions or permission

from the plans or their participants. Nor did Nationwide Life actually manage, dispose of, cancel, or otherwise transfer accumulation units without specific instructions or permission from the plans or their participants.

**Different Charges In The Individual Variable Annuity Contracts**

27. Nationwide Life's individual annuity contracts contained charges different from the group contracts, including a "mortality and expense" charge based on the amount allocated to the investment options. That charge varied according to the type of individual annuity contract and the date the contract was purchased. This charge compensated Nationwide Life for, among other things, the death benefit and "annuitization" rate provided in the contract.

28. The costs of administering the individual variable annuity contracts varied by retirement plan. For example, the cost of administration varied significantly if the retirement plan permitted participants to take loans, or the plan selected a large number of mutual funds to participate in their contract, or the participants engaged in frequent transactions or inquiries.

**The Mutual Fund Fees Affecting the Investment Options**

29. Each mutual fund that corresponded to an investment option in an individual contract had its own fees that affected the value of the fund (and thus indirectly the value of the corresponding investment option). These types of fees might include management fees, 12b-1 fees (which are related to distribution and marketing), administration fees, redemption fees, and transfer agent fees, and they were fully disclosed to the plans and their participants. The amount and type of fees actually charged by each fund varied widely depending on the parties providing services or other resources to the particular fund, and on the type of services provided.

30. These fees were charged to many different shareholders in the fund, most of which did not invest through Nationwide Life. Many of the mutual funds' fees actually declined after payments to Nationwide Life began. For instance, out of 26 mutual funds corresponding to

investment options offered in the Best of America IV individual annuity contract purchased by the Anderson Plan and Easter Seals Plan, 15 featured lower fees in 2001 than they did in 1994.

31. These fees to fund shareholders may or may not have reflected any mutual fund payments that were made to the Nationwide entities. For instance, some mutual fund service providers may have made payments from their own assets and did not charge those payments back to the mutual funds. The mutual funds' prospectuses and statements of additional information disclosed that they made such payments.

**The Different Mutual Fund Payments**

32. Beginning in the mid-1990s, different Nationwide entities negotiated different agreements with some, but not all, of the mutual fund families (or their affiliated advisors or administrators) transacting business with one or more Nationwide variable accounts. Nationwide Life did not make payments a condition to making any investment options available to annuity contract purchasers. A variety of investment options were made available regardless of whether mutual fund payments were made.

33. The agreements for mutual fund payments provided for different Nationwide entities to perform a variety of distribution and administrative services that would benefit the funds. These services and benefits included the variable accounts' aggregation of thousands of transactions by annuity contract holders and combination of all those transactions into a single "omnibus trade" (i.e. a purchase or sale) each day of a mutual fund's shares, thereby sparing the mutual funds from processing thousands of individual purchases or sales.

34. Nationwide Life also incurred the costs of distribution of the annuity contracts and associated investment options and dissemination of mutual fund prospectuses and other disclosures, which reduced or eliminated the costs that mutual funds would otherwise incur.

35. Further benefits and services included transmission of purchase orders and redemption requests placed by the plans and participants; preparation of federal, state, and local government reports for each account maintained on behalf of a plan; distribution and filing of tax forms related to transactions of shares; accounting reconciliation; and development and distribution of sales and promotional material, among other services.

36. Many of these services and benefits to the funds, in particular the aggregation and distribution services, were fundamentally different from any services that Nationwide Life agreed to provide to participants in the individual annuity contracts.

37. The payments that Nationwide entities received for these benefits and services were made from the assets of the mutual funds or their affiliates, not from any assets of the plans or participants. The amount of these payments was typically, but not always, a percentage of the combined total assets that *all* the variable accounts had invested in *all* the mutual fund family's funds (not just one particular fund). In some cases, these payments involved a flat fee.

38. The payments included: payments deducted from 12b-1 fees charged by a fund; sub-transfer agent fees; fees pursuant to administrative service plans adopted by the mutual fund; payments by a mutual fund's adviser or sub-adviser (or its affiliates) from its advisory fee; or some combination of those sources.

39. Nationwide Life and the mutual funds disclosed these mutual fund payments to the plan participants in different ways at different times. The disclosures included statements of additional information, annuity product prospectuses, and annual reports of the variable account, which were provided to each individual contract owner. The information in these various forms of disclosure varied over time. The retirement plans had different practices with regard to reviewing this information.

40. None of the individual contracts prohibited Nationwide Life from receiving the mutual fund payments or put any limits on Nationwide Life performing services or benefits for any mutual funds or their affiliates.

*Eric S. Henderson*
Eric Henderson

## INDIVIDUAL ANNUITY CONTRACTS CURRENTLY OFFERED BY NATIONWIDE

All America Gold
Achiever
America's Future II
American Capital
BB&T Future
Best of America I
Best of America II
Best of America III
Best of America IV
Best of America Achiever
Best of America Advisor
Best of America All American
Best of America All American Gold
Best of America Choice
Best of America Choice Venue
Best of America Elite Venue
Best of America Exclusive Venue
Best of America Exclusive
Best of America Exclusive II
Best of America Future
Best of America Future II
Best of America Future Venue
Best of America IVB
Best of America Qualified
Best of America V
Best of America Vision FI
Best of America Vision Plus
Choice Venue II
CMPS All America Gold
Comnpass All America
Elitepro Classic
Elitepro LTD
Evergreen Plus
Future w 1-year annuity
Future w/5% INT
Future w/STD DB
Key Future
M&T Variable Annuity
Marketflex Annuity
Marketflex II
Multiflex I
Multiflex II
Multiflex IV

NW Classic
NW Select
NWI Agent FPDA
NWI-EMP Mult-Ann
One Investor
Paine Webber CHO
Preservation Plus
Smith Barney
Soloist
Spectrum
The One INV ANN
Variable Ann Port II
Variable Annuity
Vision Plus (NY)
W&R Advisor Select PREF
W&R Advisor Select
W&R Select Plus