UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LOU HADDOCK, as trustee of the Flyte Tool & Die Company, Inc. 401-K Profit Sharing Plan, et al., <br><br> PLAINTIFFS, <br><br> v. <br><br> NATIONWIDE FINANCIAL SERVICES INC., and NATIONWIDE LIFE INSURANCE CO., <br><br> DEFENDANTS. | CIVIL ACTION NO.: <br><br> 3:01CV1552 (SRU) |

## DECLARATION OF STEVEN J. ROSE

Steven J. Rose declares that the following is true under penalty of perjury:

1. I am Vice President-Performance Management and Analysis of Nationwide Life Insurance Company ("Nationwide Life"). I submit this declaration to accompany Defendants' Opposition to Plaintiffs' Motion for Class Certification Based on Fifth Amended Complaint.

2. I have been with Nationwide Life since September 1985. My responsibilities since then have included operations and product management responsibilities involving Nationwide Life's group variable annuity business. Based on my experience, I have personal knowledge of the matters set forth in this declaration.

**Nationwide Life's Variable Annuity Contracts**

3. Since 1988, 401(k) and 403(b) retirement plans that qualify for favorable tax treatment under the Internal Revenue Code have purchased group annuity contracts from Nationwide Life for investment of their retirement money.

4. There were several different types of group annuity contracts issued by Nationwide Life since 1988. The terms of those contracts varied by type of contract, were approved in different forms by state insurance departments at different times, and contained principal terms negotiated individually by plans before their purchase. Further, there were substantial differences between the terms and charges in the group contracts purchased by the plans compared to individual variable annuity contracts issued by Nationwide Life.

5. The periods during which plans held these group annuity contracts with Nationwide varied substantially. None of the plans represented by the three remaining Plaintiffs currently holds a group contract with Nationwide. The Crown Tool & Die Co., Inc. Salary Deferral Profit Sharing Plan (the "Crown Plan") purchased a Nationwide group contract in 1992, and terminated that contract in 2001.

**The Different Variable Accounts And Investment Options In Those Accounts**

6. Nationwide Life's group annuity contracts permitted the retirement plans or their participants to invest money in a variable account called the "Nationwide Qualified Plans Variable Account" (QPVA). The QPVA is an independent legal trust formed under Ohio law that keeps its assets separate from Nationwide Life.

7. At different times over the proposed class period, the QPVA contained hundreds of investment options that the retirement plans and participants could select for investment of their money. Those investment options corresponded to separate mutual funds that were managed and administered by dozens of mutual fund advisors and their affiliates, including independent managers at Fidelity, Neuberger Berman, Oppenheimer, American Century, and Dreyfus Corporation.

8. The QPVA included investment options corresponding to mutual funds that made payments to Nationwide after 1996 *and* some options that did not. Investment options were included in the variable accounts over time for many reasons unrelated to mutual fund payments, such as investment style, amount of assets, long-term performance, management tenure and philosophy, compliance and regulatory background, risk profile, and expenses, among other factors. Investment options were not included in the variable accounts simply because mutual fund payments were made.

**The Plans' Selection Of Investment Options For The Group Contracts**

9. Before a retirement plan purchased a group annuity contract, the plan's trustee selected the investment options that would be available to that plan from an array of options available in the variable account related to that type of contract. Once selected by the trustee, those investment options became part of the plan's annuity contract, and plan participants could then invest in the applicable variable account and allocate their money to any of those selected investment options.

10. The arrays of investment options available to plans purchasing group variable annuity contracts changed and increased over time. For example, arrays of 16 investment options were available to the Crown Plan in 1992, 18 to the Flyte Tool & Die Company, Inc. Profit Sharing Plan (the "Flyte Plan") in 1993, and 37 to the Hartford Roofing 401(k) Profit Sharing Plan (the "Hartford Roofing Plan") in 1996 before they purchased their Best of America Advisor group contracts. The number of options in the array under that type of group contract increased to 67 in 1997, to 150 in 2005, and 217 in 2008. These arrays included investment

options that corresponded to mutual funds and affiliates making payments to Nationwide, and some that did not.

11. Retirement plans were free to select as many or as few of the investment options as they wished. Some retirement plans that purchased group contracts selected many or all of the investment options in the array presented. Other retirement plans selected a smaller subset of those investment options. Plans were under no obligation to select any investment options, and could decide not to purchase the contract if they did not like the investment options available. Nationwide Life did not decide which investment options should be selected to be included in any particular group annuity contract or advise the retirement plans as to which investment options to select. Plans were free to change their selections over time, dropping some and adding others.

**The Plans' Selection Of Additional Investment Options**

12. Over time, hundreds of *additional* investment options were included in the QPVA and became available for the plans' selection *after* they purchased their group annuity contracts. These additional options varied according to the period and the type of contract. The arrays may or may not have included investment options that corresponded to mutual funds and affiliates making payments to Nationwide.

13. Some plans selected many or all of the additional investment options available for their group contracts; other plans selected a smaller subset. Nationwide Life did not require the plans to select these additional options or advise them on the selection. Plans in the group annuity contracts were also free to add to their selections or not based on their own independent judgment.

- 4 -

**The Removal Of Some Investment Options**

14. On some occasions, investment options were removed from the QPVA after previously being selected by plans for inclusion in their group contracts. Except in rare circumstances, all of these removals occurred as the result of an independent decision by the corresponding mutual fund – and not Nationwide Life – to close its fund entirely or to stop accepting any additional investments. Removals had no relation to whether Nationwide entities received mutual fund payments or not, and in *all* cases Nationwide Life provided notice to the plans in advance, and the plans (and their participants) had the opportunity to select how they wanted to re-invest their money.

15. The removals had different impacts on each plan that purchased a Nationwide annuity contract. Some plans and participants had to redirect investments because one of the investment options they selected had decided to liquidate. *Other plans, including the Crown Plan, were not affected at all by a removal during the entire period they owned a Nationwide Life annuity contract. That is, no investment option was removed for any reason whatsoever from any of the investment options that the Crown Plan had selected for investment.*

16. Nationwide Life's group annuity contracts provided that it could "substitute shares" of an existing investment option with a new option if an investment option was closed entirely or if Nationwide determined that investment in the existing option was "inappropriate in view of the purposes of the contract." Nationwide Life never substituted the shares of an existing investment option with a new option in a group contract.

17. Investment options in variable accounts were sometimes not made available to new plans and their participants, or to existing plans that had not previously selected those

investment options, because the performance of the corresponding mutual fund was lower than comparable funds, or because of a lack of interest by plans and participants. In such cases, the option was closed (or "walled-off") only to *new* plans and their participants, or to existing plans that had *not* previously selected that option.

**The Plans Or Their Participants Directed Their Own Investments In These Options**

18. After a plan selected investment options for its group contract, the plan or its participants could choose to allocate money to those options or to a "fixed account." The fixed account did not purchase or sell mutual fund shares. Rather, it invested in fixed income securities, and credited interest at a rate that did not vary according to the performance or costs of any mutual funds.

19. The plan or its participants could invest in the fixed account at any time. They could also move the money they invested in the variable account over to the fixed account, and move money they invested in the fixed account over to the variable account, subject to some contractual limitations not relevant here.

20. The plans or participants made their own independent decisions whether to invest, how much to invest, and where to allocate their money. Nationwide Life did not direct the allocation or transfer of this money, or offer investment advice to the plans or participants. Nationwide simply followed their directions.

21. When the plans or participants allocated money to one of the various investment options, that money was aggregated with all the money from other investors in that option. The QPVA used that money to purchase shares of the corresponding mutual fund.

22. The money allocated to the investment option, and the mutual fund shares

purchased, were the property of the variable account, *not* the property of the plans or the participants. Only the QPVA interacted with the corresponding mutual funds; the mutual funds did *not* interact with the plans or participants.

23.     The value of the plans' group contracts would increase or decrease depending on the performance of the investment options where they (or the participants in the plan) allocated money. The value of those investment options would increase or decrease based on the performance of their corresponding mutual funds. The increase or decrease of each investment option was reflected for each plan or participant in an accounting measure called "accumulation units" in the variable account. Under the group contracts, Nationwide Life had no right to manage, dispose of, cancel, or transfer any of these accumulation units without specific instructions or permission from the plans or their participants. Nor did Nationwide actually manage, dispose of, cancel, or otherwise transfer any of these accumulation units without specific instructions or permission from the plans or their participants.

**The Different Charges Associated With The Investment Options**

24.     The group annuity contracts generally contained a charge by Nationwide Life that was negotiated by each individual plan. The charge varied by contract and was a percentage of the amounts invested in the investment options.

25.     By 1996, these percentage charges declined for new and existing plans based on payments by some of the corresponding mutual funds (or their affiliates) to Nationwide entities. For example, in October 1996, the Crown Plan's charges for the "primary" tier of investment options was reduced by 0.10%, and for "primary plus" investment options by 0.30%. Likewise, in May 1997, the Flyte Plan's charge was reduced by .20% for investment options in the

"primary plus" tier. In January 1996, when the Hartford Roofing Plan purchased its annuity contract, the charge applicable to the "primary" tier of investment options was .20% lower than the charge for "optional" investment options.

26. Nationwide Life explained to existing plans – and to new plans that purchased contracts after 1996 – that these reduced fees reflected payments to Nationwide by some of the corresponding mutual funds (or their affiliates). The plans agreed to and ratified these reductions based on this explanation.

**The Mutual Fund Charges Affecting The Investment Options**

27. Each mutual fund that corresponded to an investment option had its own fees that affected the value of the fund (and thus indirectly the value of the corresponding investment option). The type of fees that might be charged included management fees, 12b-1 fees (which are related to distribution and marketing), administration fees, redemption fees, and transfer agent fees that were fully disclosed to the plans and their participants. The amount and type of fees actually charged by each fund varied widely depending on the parties providing services or other resources to the particular fund, and on the type of services provided.

28. These fees were charged to many different shareholders in the fund, most of which did not invest through Nationwide Life. These fees charged to fund shareholders may or may not have reflected any payments by mutual funds or affiliates to Nationwide. For instance, some mutual fund affiliates may have made payments to Nationwide from their own assets, and did not recover those payments from the mutual funds. Many of the mutual funds' fees actually declined after payments to Nationwide Life began.

- 8 -

**The Different Mutual Fund Payments**

29. Beginning in the mid-1990s, different Nationwide entities negotiated different agreements with mutual fund families (or their affiliated advisors or administrators) transacting business with one or more Nationwide variable accounts that provided for mutual fund payments to Nationwide. Nationwide Life did not make these payments a condition to including investment options that corresponded to a mutual fund family's funds.

30. The agreements for mutual fund payments provided for different Nationwide entities to perform a variety of distribution and administrative services that would benefit the funds. These services and benefits included the variable accounts' aggregation of thousands of transactions by annuity contract holders and combination of all those transactions into a single "omnibus trade" (i.e. a purchase or sale) each day of a mutual fund's shares, thereby sparing the mutual funds from processing thousands of individual purchases or sales.

31. Nationwide Life also incurred the costs of distribution of the annuity contracts and associated investment options and dissemination of mutual fund prospectuses and other disclosures, which reduced or eliminated the costs that mutual funds would otherwise incur.

32. Further benefits and services included transmission of purchase orders and redemption requests placed by the plans and participants; preparation of federal, state, and local government reports for each account maintained on behalf of a plan; distribution and filing of tax forms related to transactions of shares; accounting reconciliation; and development and distribution of sales and promotional material, among other services.

33. Many of these services to the funds, in particular the aggregation and distribution services, were fundamentally different from any services that Nationwide Life agreed to provide

to the plans in the group annuity contracts.

34. The payments that Nationwide entities received for these benefits and services were made from the assets of the mutual funds or their affiliates, not from any assets of the plans or their participants. In some cases, these payments involved a flat per-participant fee.

35. The payments included: payments deducted from 12b-1 fees charged by a fund; sub-transfer agent fees; fees pursuant to administrative service plans adopted by the mutual fund; payments by a mutual fund's adviser or sub-adviser (or its affiliates) from its advisory fee; or some combination of those sources.

36. Nationwide Life and the mutual funds disclosed these mutual fund payments to the plans and their participants in different ways at different times. After Nationwide Life began receiving mutual fund payments, it sent different contract amendments at different times to the trustee of each plan (or to the trustee's authorized representative) in order to implement new pricing. In many cases, these amendments were accompanied by correspondence to the plan trustee or authorized representative informing them that the new pricing reflected payments that Nationwide Life received from mutual fund entities, and that the trustee of each plan was required to sign the amendment in order to implement the new pricing for their plan. The trustees provided their agreement to the new pricing at different times. For new plans, Nationwide Life disclosed these mutual fund payments in different ways in different marketing (pre-contract) documents at different times. The retirement plans and their participants had different practices with regard to reviewing this information, and the plans' authorized representatives had different practices with regard to communicating the information to the plans or participants.

37.  None of the group contracts prohibited Nationwide Life from receiving the mutual fund payments or put any limits on Nationwide Life performing services or benefits for any mutual funds or their affiliates.

_____
Steven J. Rose