```
                    UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

LOU HADDOCK, ET AL              :  No. 3:01CV-1552 (SRU)
                                :  915 Lafayette Boulevard
            vs.                 :  Bridgeport, Connecticut
                                :
                                :  February 27, 2009
NATIONWIDE FINANCIAL SVCS, INC. :
ET AL                           :

- - - - - - - - - - - - - - - x
```

MOTION HEARING

B E F O R E:

   THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

   FOR THE PLAINTIFFS:

         STANLEY, MANDEL & IOLA
                3100 Monticello Avenue, Suite 750
                Dallas, Texas  75205
            BY:  ROGER L. MANDEL, ESQ.
                 MARC R. STANLEY, ESQ.

         KOSKOFF, KOSKOFF & BIEDER, P.C.
                350 Fairfield Avenue
                Bridgeport, Connecticut 06604
            BY:  ANTONIO PONVERT, III, ESQ.

         GREGORY G. JONES, ESQ.  (Via telephone)
                603 South Main, Suite 200
                Grapevine, Texas  76051

   FOR THE DEFENDANTS:

         WILMER CUTLER PICKERING HALE & DORR
                399 Park Avenue
                New York, New York  10022
            BY:  CHARLES C. PLATT, ESQ.
                 DANIEL H. SQUIRE, ESQ.  (WASHINGTON, D C)

                        (Continued)

```
          WIGGIN and DANA, LLP
               400 Atlantic Street
               P. O. Box 110325
               Stamford, Connecticut  06911-0325
          BY:  THOMAS F. CLAUSS, JR., ESQ.



                Susan E. Catucci, RMR
               Official Court Reporter
               915 Lafayette Boulevard
            Bridgeport, Connecticut  06604
                 Tel: (917)703-0761
```

```
 1                    (2:00 O'CLOCK, P. M.)

 2              THE COURT:  Good afternoon.  We're here in

 3    Haddock v. Nationwide.  Could I have appearances, please?

 4              MR. MANDEL:  Your Honor, Roger Mandel and Marc

 5    Stanley from Stanley, Mandel & Iola in Dallas, Texas.

 6              MR. PONVERT:  Anthony Ponvert, Koskoff, Koskoff

 7    & Bieder.  Good afternoon.

 8              THE COURT:  Good afternoon.  And we have on the

 9    phone --

10              MR. JONES:  Yes, Your Honor.  This is Gregory

11    Jones with the law firm of Gregory G. Jones in South Lake,

12    Texas.

13              THE COURT:  That's good.  Thank you.

14              MR. CLAUSS:  Thomas Clauss from Wiggin & Dana,

15    Your Honor.  And Charley Platt and Dan Squire from Wilmer

16    Cutler Pickering Hale & Dorr.

17              THE COURT:  Very good.

18              MR. PLATT:  Good afternoon, Your Honor.

19              THE COURT:  Good afternoon.  Okay, feel free to

20    be seated please.  Mr. Jones, if there comes a time where

21    you can't hear someone, me or anybody else, please let me

22    know and we'll try and make adjustments.

23              MR. JONES:  Thank you very much, Your Honor.

24              THE COURT:  We have three motions pending, I

25    wanted to touch on each of them today, and the first
```

1    perhaps is ministerial but I wanted to be sure of that.

2         The motion to seal documents, I would be frank,

3    I haven't looked at and want to confirm that to the extent

4    that documents are being sealed that there has been

5    compliance with the local rule requirement to submit

6    redacted copies of as much as possible, in effect, so that

7    the public's aware of what's being presented.  I just

8    haven't had a chance to look at that but wanted to be sure

9    there was some sort of redacted filing made for public

10   consumption.

11        MR. SQUIRE:  Your Honor, I'm certain that is

12   true but can check if you want.

13        THE COURT:  Sure, and the basis for sealing is

14   the proprietary information?

15        MR. SQUIRE:  Yes, Your Honor.

16        THE COURT:  Okay, I'll take a look at that in

17   due time.

18        The second motion, the want one I wanted to

19   start with today is the motion to strike the first two

20   counterclaims and dismiss the third counterclaim.  Who's

21   going to argue that for the defense?

22        MR. PLATT:  Your Honor, Charles Platt.  I was

23   not aware that that motion was on for today so I

24   apologize.

25        THE COURT:  Well, it may not have been included.

1    I think it's fairly straightforward and, unless you have

2    an objection, my thought was to take it up.  Otherwise I

3    can decide it on the papers.

4            MR. PLATT:  I think we'll have to decide it on

5    the papers, Your Honor.  Simply, I have not prepared to

6    argue that motion.  I apologize.  I was not told it was on

7    the calendar.

8            THE COURT:  That's all right, that's all right.

9    Fine.  I don't mind taking it on the papers.

10           Okay.  Motion to certify the class.  Before we

11   get into the meat of it, let me try and address some

12   housekeeping or technical issues that I think we ought to

13   take up.  The papers talk as if there are three remaining

14   plaintiffs, yet there's been no filing with the court to

15   dismiss any of the plaintiffs and I think we just ought to

16   sort out who the plaintiffs are.  Everyone seems to be

17   assuming they know who they are, but from the court's

18   point of view, I still have, I think it's five plaintiffs.

19           MR. CLAUSS:  Your Honor, if I might, I believe

20   I've got some of the docket cites where the plaintiffs

21   have filed their motions or notices of dismissal.

22           THE COURT:  Oh, good, that would be helpful.

23           MR. CLAUSS:  And let me see if I have them all

24   in hand here.  Docket Number 297 is a notice of dismissal

25   of plaintiff Lou Haddock as Trustee of the Flyte Tool and

1    Die Company.

2            And Docket Number 298, Your Honor, is a notice

3    of dismissal of plaintiff Ed Kaplan as Trustee for

4    Hartford Roofing.

5            There was also a motion to substitute plaintiff

6    they filed at the same time, which is docket number 296,

7    to substitute Chris Anderson for Dennis Ferdon as Trustee

8    of the Anderson law firm Profit Sharing Plan.

9            THE COURT:  Which I assume was granted.

10           MR. CLAUSS:  I haven't checked the docket sheet

11   to see they were granted, Your Honor, but --

12           THE COURT:  It's not pending.

13           MR. CLAUSS:  -- we have no objection to them.

14           THE COURT:  It's not pending so I assume they

15   were granted.  Thank you, that's helpful.

16           There's an issue concerning the identification

17   of proposed class counsel, which I didn't see clearly set

18   out in the papers who is proposed as class counsel.  I,

19   therefore, am assuming all plaintiff's counsel, current

20   plaintiffs counsel are proposed to be class counsel, is

21   that right?

22           MR. MANDEL:  That is correct, Your Honor.

23           THE COURT:  All right.  There were some issues

24   that came up with respect to the wording of the notice and

25   I want to be sure whether plaintiffs are resisting the

1    idea of there being a class of, proposed class of trustees

2    as opposed to a proposed class of plans.

3            MR. MANDEL:  Your Honor, our original proposed

4    definition was a class of plans and we think that is

5    appropriate, but we have no objection to it being a class

6    of trustees if the court thinks it's preferable and, in

7    fact, we suggested that as an alternative in our reply

8    brief.

9            THE COURT:  All right.

10           MR. CLAUSS:  Your Honor, on that point, we'll

11   have something to say during the course of the oral

12   argument as to the propriety of that class but I didn't

13   want to give the court the impression that we were, the

14   defendants were conceding that that was an appropriate

15   class to certify in this matter.

16           THE COURT:  Yes, fair enough.  Believe me, I

17   don't have the understanding the defendants think any

18   class is appropriate, so I'm not going to try and cut you

19   off.  I just wanted to make sure what the plaintiff's

20   position on that was.  In reading the briefs back and

21   forth, it didn't stick with me frankly who is suggesting

22   that and who is opposing it.

23           Okay.  Let's -- there's an issue regarding

24   standing that's come up and I want to suggest that the

25   issue is one that strikes me as an issue of mootness

1    rather than standing.  In other words, standing is a

2    concept, the jurisdictional concept, that's tested at the

3    time that the complaint is filed.  Mootness is a concept

4    that requires a personal stake to continue during the

5    course of litigation.  And as I understand the argument,

6    the argument is there is no personal stake in certain of

7    the named plaintiffs that has continued at this point into

8    the litigation, which I don't understand to be a standing

9    concept but, rather, a mootness concept.  Anybody want to

10   address that initial issue?

11            MR. MANDEL:  Your Honor, first of all, I think

12   we have to be clear that when we're talking -- they had

13   three different arguments under the rubric of standing and

14   you seem to be addressing the third one, which is that the

15   current plaintiffs are no longer under contract with

16   Nationwide.

17            THE COURT:  Right.

18            MR. MANDEL:  And, therefore, would not benefit

19   from injunctive, injunctive relief.  And -- but I think

20   you're also right that not only were they measured at the

21   time of the filing but even as of today they have Article

22   3 standing because they still have disgorgement claims.

23   So the question really becomes, one could argue it's

24   mootness or one could argue it's really an adequacy

25   question which is do class representatives who have

1   Article 3 standing because they have disgorgement claims,

2   can they suitably represent class members who, in addition

3   to their disgorgement claims, also have live claims for,

4   for injunctive relief.  And we believe that, yes, they

5   can.  We cited in the briefs a variety of cases where

6   class representatives were found to be adequate to

7   represent class members who had claims different than

8   their own or in addition to the ones that the class

9   representatives have.

10          And, in fact, we cited one case in particular

11   which was right on point, which was the Marisol A. v

12   Giulani case which was a case where the named plaintiffs'

13   claims were mooted during the pendency of the litigation

14   and the court, nevertheless, held it was acceptable for

15   those class representatives to represent members of the

16   class who continue to have those injunctive claims.

17          You know, and we think that throughout the

18   course of this lengthy litigation, one would expect some

19   attrition in plaintiffs in terms of contractual

20   relationships coming and going, and so the real question

21   for the court is has the representation by counsel and

22   these class representatives demonstrated to them that they

23   are still fully committed to these injunctive remedies on

24   behalf of class members who would benefit from them,

25   despite the named plaintiffs no longer having contracts.

 1   And I think the course of the representation shows that,

 2   shows that to the court.

 3        And so, I think that in terms of the mootness

 4   and adequacy, I really don't think that's a significant

 5   issue.  What I would also say to Your Honor is that if the

 6   court thinks it's an issue, the case law suggests the

 7   appropriate remedy would be for the court to conditionally

 8   certify and to give plaintiffs a certain amount of time to

 9   find an additional plaintiffs/class representative who's

10   still under contract with Nationwide.  They have admitted

11   in their answer that of the 14,200-something odd plans

12   involved in this class that the majority of them are still

13   under contract so obviously the injunctive relief is an

14   issue for the majority of the class, and one would think

15   these plaintiffs can still adequately represent them.

16        MR. CLAUSS:  Your Honor, addressing the question

17   that you asked about mootness versus standing, I think

18   that Mr. Mandel is correct there may be some sliding

19   nature between the two concepts, but the Supreme Court

20   decision in Lewis and the Supreme Court decision in the

21   City of L. A. indicate that standing must continue

22   throughout each stage of the litigation and that indeed it

23   is the plaintiff's burden and that the mootness concept

24   and the standing concept, while I would agree they are

25   quite similar, the court in both Lewis and City of L. A.

1    indicated that it was a constitutional power matter as to

2    the ability of the plaintiff and the ability of the court

3    to continue to hear those claims.

4           Now, there's a lot Mr. Mandel said that I

5    disagree with but I just wanted to focus on the point that

6    Your Honor asked, and I'm not disagreeing that it looks

7    like mootness and sounds like mootness, but there's

8    Supreme Court precedent out there that addresses it from a

9    standing context and, indeed, holds from a standing

10   context that a plaintiff who doesn't have live claims at

11   the time has no ability to represent a class seeking

12   injunctive relief.  More on that later, Your Honor, but

13   focused principally --

14          THE COURT:  The Supreme Court has also said the

15   opposite.  So, if you look at Garrity against United

16   States Parole Commission, the Supreme Court held that an

17   individual whose individual claims have been decided on

18   the merits and who had class certification denied still

19   had constitutional case or controversy standing to appeal

20   the denial of class certification.  So, somebody who's

21   been thrown out of court, whose claims have been been

22   fully adjudicated, has a separate interest according to

23   Garrity and the class certification question, even if it

24   was previously denied by the district court.

25          MR. CLAUSS:  There are a couple of cases out

1    there, one I believe is cited by the plaintiffs in their

2    briefing.  But in our context, Your Honor, there's a

3    couple of factual issues that need to be focused on and

4    that is that several of these plaintiffs did not have

5    contracts with Nationwide at the time that the lawsuit was

6    filed.  The Gouse represented -- Gouse, who represents the

7    Easter Seals Plan, Your Honor, they didn't have a contract

8    at the time of the filing of the complaint.

9              THE COURT:  Well, let me understand, let me

10   understand what the defense is arguing.  Is the argument

11   that the court has no subject matter jurisdiction to hear

12   this case or is the claim that these representatives are

13   not adequate representatives?

14             MR. CLAUSS:  On the standing point, Your Honor,

15   the claim is that they have no standing to represent

16   anyone seeking injunctive relief.  And that's the --

17   there's a constitutional standing argument and there may

18   very well be a mootness argument that falls into that.

19             THE COURT:  Isn't the standing issue decided at

20   the time the case is filed?

21             MR. CLAUSS:  I don't think so, Your Honor.  I

22   believe the standing issue is decided at each stage of the

23   litigation, according to the Lewis decision which says you

24   have got to have specific allegations at the pleadings

25   stage and at the motion stage you've got to show by

1  affidavit or otherwise, and at trial you've got to show by

2  evidence.  So it is not simply a --

3       THE COURT:  There's no question that you have to

4  prove standing at trial, but in proving standing at trial,

5  isn't the question whether at the time you file the

6  complaint you had standing, and on appeal you have to

7  survive standing, but isn't the issue whether at the time

8  of the filing of the complaint the court had jurisdiction.

9       MR. CLAUSS:  And with regard to that, Your

10  Honor, there is one plaintiff left with whom -- who had a

11  contract with Nationwide at the time of the contract -- at

12  the time the case was filed.

13       THE COURT:  But that doesn't matter.

14       MR. CLAUSS:  There's no standing for injunctive

15  relief.

16       THE COURT:  That doesn't matter.  If you're

17  talking about whether this court has subject matter

18  jurisdiction to hear the claim, the plaintiffs have to

19  prove that at the time the claim was filed in 2001, the

20  court had subject matter jurisdiction and the plaintiffs

21  had standing to raise the claims that they were raising.

22  Standing doesn't -- standing doesn't get lost over time.

23       MR. CLAUSS:  I believe it does, Your Honor.

24  Unless --

25       THE COURT:  A case can become, a case as to

1    which there is standing can become moot.

2         MR. CLAUSS:  That's where the Supreme Court

3    decisions in Lewis and in City of L. A. would indicate

4    that the mootness and standing arguments are not

5    necessarily as distinct as Your Honor was suggesting.

6         THE COURT:  All right.  You haven't moved to

7    dismiss for lack of subject matter jurisdiction.  I'm

8    assuming you're conceding subject matter jurisdiction.

9         MR. CLAUSS:  There's subject matter jurisdiction

10   of the case, Your Honor, but not necessarily standing for

11   these particular plaintiffs to raise the particular claims

12   that they have raised.

13        THE COURT:  All right.

14        MR. CLAUSS:  That's the argument that we're

15   making, Judge.

16        THE COURT:  And what is -- what authority are

17   you relying upon that there has to be standing with

18   respect to each particular remedy sought by the plaintiff?

19        MR. CLAUSS:  I would start with the Supreme

20   Court decision in Lewis, Your Honor, where the Supreme

21   Court said that standing is not dispensed in gross and

22   that it examined whether folks had standing to raise a

23   claim for damages or a claim for injunctive relief, and it

24   found that since the plaintiff did not have the standing

25   to raise a claim for injunctive relief because it had no

1    current or no future speculative injury, then they could

2    not --

3            THE COURT:  So it fails on the merits.  If you

4    don't have standing to raise, it fails on the merits.

5            MR. CLAUSS:  That's it.

6            THE COURT:  Absolutely.  There's no question

7    about that.  But the question of jurisdiction of the court

8    to hear a particular claim or of a party to raise a

9    particular claim is judged at the time the complaint is

10   filed.  Later, if they lose standing, the issue becomes

11   moot.  It may well be dismissed.  It may well in fact not

12   survive a hearing on the merits, but --

13           MR. CLAUSS:  I would --

14           THE COURT:  -- the court still has jurisdiction.

15           MR. CLAUSS:  I would have agreed with Your

16   Honor's proposition prior to studying the cases in Lewis

17   and City of L. A. with respect to the difference between

18   standing and mootness, and I understand the distinction.

19   All I'm saying is that there is Supreme Court authority

20   out there using the standing concepts to dismiss claims in

21   this context where they don't have standing to raise

22   future injunctive -- seek future injunction relief, Your

23   Honor.  But I agree with your analysis that the standing

24   and mootness points are sisters of each other in this

25   context, at least from my reading of those Supreme Court

1    decisions.

2              And there are other cases in our brief, Your

3    Honor, where there are -- as I said, City of L. A.  The

4    Shain case from the 2nd Circuit which wasn't in the class

5    context, admittedly, but the Shain case in the 2nd Circuit

6    looked at the claims that were being asserted by the

7    plaintiff, damages and injunctive relief, and the court

8    found that the gentleman didn't have standing to assert

9    the claim for injunctive relief and that was gone.  The

10   case for damages continued.

11             THE COURT:  Have you read Comer?

12             MR. CLAUSS:  I have read Comer, Your Honor.

13             THE COURT:  Right.  How do you distinguish that

14   case?

15             MR. CLAUSS:  Let me just pull it out, if you

16   don't mind.

17             THE COURT:  Well, let me just read a portion of

18   it to you and you can react to it.  "Where the claims of

19   the named plaintiffs become moot prior to class

20   certification, there are several ways in which mootness is

21   not had.  First, an intervenor might have stepped in.

22   Second, under the appropriate circumstances, class

23   certification may relate back to the filing of the

24   complaint.  And that is held especially to be true where,

25   as here, the litigation has been a lengthy one."  There it

1     was two years; here I remember it's eight years.

2              So, the point is even though the named class

3     plaintiffs have their claims mooted, i.e. they no longer

4     have standing to raise the class certification issue, the

5     court held there that given the length of time it took the

6     court to get the issue decided, it wasn't a problem.  It

7     was an exception to mootness.

8              MR. CLAUSS:  There are -- from the way I read

9     the cases, Judge, and I think there are three exceptions

10    to this standing/mootness argument that I'm making, and

11    they come up in cases where the injury or the plaintiff in

12    either case could be inherently transitory, where you have

13    got cases that -- the public housing cases --

14              THE COURT:  Sure.

15              MR. CLAUSS:  -- welfare cases, prison cases,

16    things that are inherently transitory.  And as a subclass

17    of that, there are cases where the defendants have done

18    something to frustrate the prosecution of the class action

19    by basically settling with the plaintiffs or somehow

20    nulling a prosecution in one case, and the courts look at

21    that as an exception.

22              And another exception is where the plaintiffs

23    have not had time to move for class certification before

24    the particular -- because of the status of a particular

25    proceeding, and the court basically gives them a chance to

1    find another plaintiff.

2          So I think there are limited exceptions and I

3    think the -- I don't remember which decision but they said

4    there are limited circumstances in which these exceptions

5    apply, Judge, and I don't think that they apply in this

6    case.  I agree with you that there are cases out there

7    where they have had plaintiffs whose claims either became

8    moot or lost standing, and then the courts have allowed a

9    limited period of time for a substitution of plaintiffs.

10   That is not -- they don't fit in the exceptions that I

11   believe are the ones that could possibly be applicable

12   here, Your Honor.

13         THE COURT:  Okay, well, I understand your point

14   of view.  And I don't know if anybody wants to be heard

15   further on this question.

16         MR. MANDEL:  No, Your Honor.

17         MR. CLAUSS:  I have more on standing, Your

18   Honor, but --

19         THE COURT:  Go ahead.  I don't want to cut you

20   off.

21         MR. CLAUSS:  No, it's of a different type of a

22   question that Your Honor proceeded on.  I thought we'd

23   proceed with the merits or the substance of it first but

24   that's obviously up to Your Honor.

25         THE COURT:  Yes, I want -- to the extent that

1    there was an argument that the court lacks jurisdiction, I

2    wanted to take that up first and I don't hear an argument

3    that the court lacks jurisdiction.  I hear an argument

4    that these plaintiffs lack standing or are otherwise

5    inappropriate to bring injunctive relief claims as class

6    representatives.

7            MR. CLAUSS:  And just to -- it's not just the

8    injunctive relief claim, Your Honor.  There are two types

9    of, in gross terms, types of contracts here.  There's

10   group -- there are plans that have group contracts with

11   Nationwide and then there are plans that have participants

12   who had individual annuity contracts.

13           THE COURT:  Right.

14           MR. CLAUSS:  And Plaintiff Wiberg, who is a

15   former trustee of a defunct plan, clearly under the case

16   law, Chemung and others, does not have standing to raise a

17   claim on behalf of anybody.  But I didn't want to

18   particularly get into that as a distraction from the main

19   argument, Your Honor, which is that the injunctive relief,

20   there's nobody standing in front of you who has standing

21   to seek injunctive relief.

22           As a second matter, Plaintiff Wiberg can't

23   represent a group, a plan, no matter how you constitute

24   it, plans, trustees or whatever, of those plans that had

25   group contracts because his -- as a former fiduciary, he

1    has no standing under ERISA to bring his claim.

2          THE COURT:  Of course he was a fiduciary at the

3    time the complaint was brought.

4          MR. CLAUSS:  That is correct, Your Honor, he was

5    a fiduciary at the time the plan was brought but not one

6    as to Nationwide.  Nationwide didn't have any relationship

7    with him at that point.  The -- at that point the Wiberg

8    plan, the one that he represents, had terminated its

9    contract with Nationwide, Your Honor.

10          THE COURT:  At the time of the initial

11    complaint.

12          MR. CLAUSS:  Before the filing of the complaint,

13    Your Honor.

14          THE COURT:  Okay.  Plaintiffs' counsel,

15    Mr. Mandel, you mentioned the possibility of a conditional

16    certification.  What, if anything, are plaintiffs doing to

17    address the issue we've been talking about in terms of

18    identifying participants who may become named plaintiffs

19    or other trustees, so forth?  In other words, why should

20    that, that effort await a ruling on a class certification

21    motion?

22          MR. MANDEL:  Well, two things, Your Honor.  One

23    is that we believe that given the variety of arguments

24    that are made by defendants, and depending on what Your

25    Honor rules, we don't quite know who the court would think

1    would be appropriate to substitute, whether it would be

2    other trustees or other participants.  We have -- we

3    believe that the people who are trustees in these plans --

4    and, by the way, the current trustees were all

5    participants, if that makes a difference, and they could

6    simply say they are bringing this as participants rather

7    than as trustees, and they believe they can get these

8    other participants in those plans to act in their stead.

9            As far as getting trustees from other plans,

10   obviously this case has been ongoing for eight years,

11   these people a lot of time and effort invested and a

12   knowledge base, and we have a list of -- we have a list of

13   plans that were under contract with Nationwide.  So if the

14   court, if the court thinks it appropriate and tells us to

15   do so, we can quickly try to contact some of them and find

16   somebody who's willing to do it.  I'm not sure that

17   bringing them in now, until we know if it's necessary,

18   makes sense because they are going to have to get up to --

19   anybody new obviously is going to have to get up to speed

20   on eight years of history in the litigation, but we think

21   we can do that quickly if the court believes it's

22   necessary.

23           MR. STANLEY:  If I might add, we also always

24   walk a fine line between soliciting clients versus a court

25   ordering us to go find a substitute client.  We have the

 1    14,300 plans, we have on our own obtained that

 2    information, not from Nationwide.  But if we went out and

 3    did that before the court said, no, you need to find

 4    someone else, then we get accused of soliciting clients.

 5            THE COURT:  Okay.  I see easels.  I assume

 6    there's a presentation of sorts and I'm happy to allow

 7    that presentation to be made, and maybe it may be more

 8    focused and coherent than me spewing out a bunch of

 9    questions that I've got.  So, I understand counsel for

10    plaintiffs do not intend or would prefer not to make a

11    formal argument, is that fair?

12            MR. MANDEL:  Well, Your Honor, we -- Mr. Bieder

13    called your office to find out what the court's preference

14    was, saying that given the amount of briefing, we didn't

15    believe it was necessarily appropriate or necessary to do

16    formal presentations, but we could do that or we could

17    just be prepared to answer, answer questions.  And the

18    response that we received was the court likely did not

19    want or desire presentations and would have questions for

20    us and so what we are prepared to do today, and we were

21    told that would be conveyed to the defendants as well so

22    we did not prepare a formal presentation today.  We, we

23    were prepared to answer any questions that Your Honor

24    might have.

25            THE COURT:  That's fine.  I'm not going to, I'm

1   not going to suggest it if you don't want to do it, and it

2   may be more efficient again to hear first from defense and

3   let you respond.

4          MR. MANDEL:  Well, if we're going to do

5   presentations, what I would like, Your Honor, is just to

6   take about three or four minutes just to give you an

7   overview of where we see the briefing leaving the court,

8   and that's it.

9          The court has -- this is sort of unique in that

10  we've had basically class certification briefing which has

11  stretched over two years, and we've had an extra sur reply

12  and sur response.  And as a result of that, I think that

13  as you -- I think it's important for the court to sort of

14  trace the arguments through the briefing and I think

15  that's very, very telling, because I think in their

16  initial response, defendants' goal was to throw as much

17  mud up there as they could and to try to contest every

18  single point and try to raise as many speculative issues

19  regarding individual issues or other things as they could.

20         But I think through the course of the briefing,

21  we've seen what has, what -- even what they perceive has

22  any stickiness and what has sort of disappeared throughout

23  the course of the briefing.

24         For example, even from the beginning, they made

25  very little challenge on three of the four 23(a)

1   requirements.  Numerosity, commonality and typicality.

2   And they made something of an issue on adequacy, but as we

3   continued through the briefing, the adequacy arguments

4   virtually disappear.  And I would submit to Your Honor

5   that the 23(a) requirements, that there's no real dispute

6   about those on the face of the briefing.

7          The standing issues, which they've called the

8   so-called standing issues.  They have tried to carry those

9   throughout, but as I think as Your Honor has elucidated

10  already, they are not really Article 3 standing questions

11  because all of these plaintiffs had injury and

12  disgorgement claims at the time they filed suit.  And so

13  the question really becomes one of some sort of adequacy

14  question, should these plaintiffs who no longer have

15  injunctive claims, are they suitable to represent people

16  who do.

17         And I think the case law is pretty overwhelming

18  in that favor and I would -- if the court will permit --

19  submit one additional case that was not in our briefing

20  and I found as I was preparing for this hearing, it's the

21  Kelsey case, which can be found at 2007 Westlaw 603406 and

22  the specific location would be at page 13, and it's a

23  court -- case out of the Northern District of New York

24  from February 21st, 2007, and it is another case that said

25  that where plaintiffs' claims have become mooted during

1    the course of the litigation, they can continue to

2    represent the class members who had injunctive claims.

3    And we previously cited to you the Marisol A. v. Giulani

4    case, which was a similar case.

5            The other arguments they make about standing,

6    one is they say it can't be a class of plans.  And really

7    that's not a standing issue, it's what's the proper class

8    definition, as you alluded to, and then they said, we said

9    okay, then let's do it as trustees, and they claim it

10   can't be a class of trustees based upon cases that were

11   not class action cases at all, but where it was an

12   individual case and the plaintiffs tried to represent --

13   the trustees wanted to bring suit on behalf of the

14   participants in another plan.

15           But, in fact, the cases which have actually

16   addressed this, and one of them in our briefing was the

17   Fallick v. Nationwide case where Nationwide was a

18   defendant and they said that's confusing the requirements

19   of Rule 23 and Article 3 standing and that a class of

20   trustees -- trustees can, if Rule 23 is met, represent

21   trustees of other plans, and we cited a case out of the

22   District Court of Massachusetts which was another 401(k)

23   revenue sharing plan where they said exactly the same

24   thing, exact same sort of case, and they said you could

25   have a class of trustees.

1          We think either plans or trustees would be

2     appropriate but -- and I don't think it's really of much

3     importance because a plan is represented by trustees so

4     it's really just what word you have in the, in the class

5     definition.  As a practical matter, the people who will be

6     making the decisions as to whether to opt-out, for

7     example, of the plan would be the same.  It would be the

8     fiduciaries of the plan, the trustees.

9          And as far as Mr. Wiberg goes on the standing

10    issue, just let me say that we cited the Wilmington case

11    out of the Fourth Circuit which says that where you have a

12    plan and then it's terminated, that a former participant

13    in the plan can bring suit.  And we think the exact same

14    rationale because it was based on the language of the rule

15    applies to a fiduciary as well.  Otherwise, if a fiduciary

16    was ever sued, he could simply terminate litigation by

17    terminating the plan and then saying that nobody has

18    standing to bring suit, neither the former participants or

19    other former trustees.

20         And in all of the cases that they cite, Chemung,

21    et cetera, are cases where there was an ongoing plan when

22    the suit was brought so that there was a current fiduciary

23    who could have brought suit and a former fiduciary was

24    trying to usurp that position.  But in our case, where

25    there's a terminated plan, it has to be a former

1    participant or it has to be a former trustee who can bring

2    suit or nobody can bring suit, which as a matter of public

3    policy would be a bad situation because it would encourage

4    fiduciaries that were sued to simply terminate their

5    plans.

6            THE COURT:  Let me interrupt you there.  You say

7    it has to be a terminated plan or nobody could sue.

8            MR. MANDEL:  Uh huh.  (Affirmative.)

9            THE COURT:  Why can't a nonterminated plan, i.e.

10   a plan that had not been terminated and still had a

11   relationship with Nationwide at the time the complaint was

12   filed, why can't that be your named plan?

13           MR. MANDEL:  Well, absolutely, Your Honor,

14   although one wonders whether Nationwide would contend that

15   a terminated plan could not be part of the class.  I don't

16   know.  But in terms of the plaintiff we have, who's been

17   here with us for eight years, we don't think the fact that

18   the plan was terminated, the crown plan was terminated,

19   deprives Mr. Wiberg of standing to try to seek relief on

20   behalf of the former participants, but all along the way

21   we have said to the court and supplied ample case law that

22   says if the court is concerned about the suitability of

23   these particular plaintiffs, what it should do is

24   conditionally certificate and allow us to go out and get

25   people who have.  And --

1          THE COURT:  Let me ask you this.  Which of the

2     plaintiffs at the time the case was filed were trustees of

3     plans with then existing relationships with Nationwide?

4          MR. MANDEL:  Okay.  At the time that the -- if

5     you'll bear with me a second, I've got that somewhere in

6     one of the briefs.

7          At the time, at the time that the suit was

8     originally filed, out of the five plans, three of them

9     were still under contract.  Two of those plaintiffs have

10    now dropped off so that of the three that are remaining,

11    one of them was under contract at the time that the

12    complaint was filed in 2001.

13         THE COURT:  Which one was that?

14         MR. MANDEL:  I believe it would be --

15         MR. CLAUSS:  It's Gouse of the Easter Seals

16    Plan, Your Honor.

17         THE COURT:  Thank you.

18         MR. MANDEL:  Yes, I think that's right.  One of

19    the three had a contract at the time but from an Article 3

20    standing point of view, all of them had standing because

21    there was an injury.  They all had -- even if the plan was

22    no longer under contract with Nationwide, they had, they

23    had claims for disgorgement of the past revenue sharing.

24         THE COURT:  Right, right.  But Mr. Clauss'

25    Lewis argument becomes stronger to the extent that a

1  plaintiff did not have at the time the complaint was filed

2  a claim for injunctive relief.  That I think is the

3  situation with Lewis.  If you don't have a claim in the

4  beginning, you're out of luck.  And if one, if one or more

5  of these plaintiffs couldn't have sought injunctive relief

6  individually at the time this complaint was filed, then

7  the argument they don't have standing to raise the

8  injunction relief is a stronger argument.

9         What you're telling me, just to cut through it,

10  what you're telling me is one of the current plaintiffs in

11  fact had an existing -- that plan had an existing

12  relationship with Nationwide at the time the complaint was

13  filed.

14         MR. MANDEL:  That is correct, Your Honor.

15         THE COURT:  Okay.  All right.

16         MR. MANDEL:  So, you know, Your Honor, I really

17  believe that Rule 23(a) is not really an issue for the

18  court and I don't believe that standing or the things that

19  they've argued under the rubric of standing are really

20  significant arguments.

21         THE COURT:  Let me get one more detail.  I take

22  it the Easter Seals Plan has now terminated.

23         MR. MANDEL:  Yeah, they subsequently terminated

24  their contracts with --

25         THE COURT:  When did they terminate?

1          MR. MANDEL:  I don't know the date right off

2    hand, Your Honor.

3          MR. CLAUSS:  Easter Seals terminated in 1998,

4    Your Honor.  The Anderson Plan, which is the one plan

5    which had contract at the time of the filing of the

6    complaint, terminated its contract with Nationwide in

7    2001 -- 2002, excuse me.  I misspoke.

8          THE COURT:  All right.

9          MR. CLAUSS:  Anderson terminated its

10   relationship with Nationwide in 2002.  The Easter Seals

11   plan terminated its relationship with Nationwide in 1998.

12   The Gouse -- the Wiberg plan represented by Mr. Wiberg, it

13   terminated its relationship with Nationwide prior to the

14   filing of the complaint in, I believe, May or June of

15   2001.  I'm not sure exactly about the date, Your Honor.

16         THE COURT:  All right, so I had it wrong.

17   Anderson is the one that had an existing relationship.

18         MR. CLAUSS:  That is correct.  After filing the

19   complaint, they still had a contract with Nationwide and

20   then got rid of it the next year.

21         MR. MANDEL:  That is correct, Your Honor.

22         THE COURT:  All right -- okay.

23         MR. MANDEL:  So then I think the issue moves to

24   the (b), to the (b) elements, (b)(2) or (b)(3).  And,

25   quite frankly, Your Honor, we believe that the (b)(2)

1   certification arguments are simply overwhelming in this

2   case.

3          THE COURT:  But, you know, the step in between

4   there is, which I think you perhaps take for granted and I

5   think the defense is going to challenge, is what are the

6   breach of fiduciary duty claims that are potentially

7   certifiable?  And you had two in your fifth amended

8   complaint, and the argument is only one of those should be

9   permitted to proceed.  And I don't know if you want to

10  address that or not.  I'm sure it's something we're going

11  to hear about today.

12         MR. MANDEL:  Your Honor -- okay.

13         THE COURT:  You see what I'm saying?

14         MR. MANDEL:  You're talking about the theories

15  as to how they are a fiduciary.

16         THE COURT:  Correct.

17         MR. MANDEL:  Okay, and only one of those should

18  be allowed to proceed, I see what you're saying, and that

19  would be involved in either (b)(2) or (b)(3).

20         Now, I think there's a two-fold response to

21  that, I think.  Number one is they made the argument that

22  the court had already decided against the theory in its

23  summary judgment opinion earlier in this case and I think

24  that's clearly not the case.

25         In the summary judgment opinion, the court

1    addressed what was called the general accumulation unit

2    method or theory which was we had listed all of the

3    various actions that Nationwide could take and regarded

4    the accumulation units under the terms of the annuity

5    contracts, such as they could sell them to exchange for

6    one or the other, or they could, you know, sell them to

7    pay taxes and all sorts of things like this.  And the

8    court did rule against us on that and said that -- had

9    doubts as to whether they were fiduciary in nature, they

10   might just be ministerial, but in any case, they didn't

11   really -- the complaint that we made, the breach of

12   fiduciary duty wasn't within the exercise of those

13   activities.  Okay.

14         We also had the specific accumulation theory,

15   which is that they actually use the accumulation units and

16   actually the mutual fund shares held in the separate

17   account that it's connected with the general, with the --

18   with the group annuity contracts and that they use their

19   possession and custody of these to obtain the revenue

20   sharing payments.  In other words, the same action is the

21   exercise of control that makes them a fiduciary and also

22   is the breach of that fiduciary duty.  The court clearly

23   did not rule upon that argument in the, in its summary

24   judgment opinion.

25         Furthermore, as the court will recall, at the

1    end of the -- when the court made its summary judgment

2    ruling, it held that our, it found a pre-existing motion

3    for class certification which had been briefed at that

4    time moot, and said we should file a fifth amended

5    complaint and they were given a chance to move to dismiss

6    it.

7         We pled the specific accumulation unit method by

8    name in the fifth amended complaint.  In their motion to

9    dismiss, they never address it.  In our reply brief we

10   pointed out, we said, hey, we pled the Fifth Amendment,

11   this thing, they didn't respond to it, and we further

12   elucidated on it and then the court denied their motion to

13   dismiss.  So the argument that somehow the court has ruled

14   against us is not supported on the face of the pleadings.

15        In the face of that, and this really only -- and

16   really this is only relevant to (b)(3) certification.  In

17   terms of the (b)(3) certification, we've argued that we

18   can prove this theory on a class-wide basis.  And we

19   elucidated all sorts of categories of evidence which would

20   be class-wide evidence of them using their control.  In

21   essence what the theory is is this:  When the retirement

22   plan send their contributions to the -- to Nationwide

23   under this contract, Nationwide buys shares of mutual

24   funds which it holds in a separate account.  By DOL

25   regulation those are plan assets as to the group annuity

contracts, not as to the individual annuity, and they issue these accumulation units. And what Nationwide does is it goes to their mutual funds and it says, look, by virtue of these contracts, we've tied up literally a pool of billions of dollars of retirement plan assets and they say that mutual funds, the only way that you can get to these, because they are under contract with us, they are being given to us, they are in our custody, is if you pay us the revenue sharing and we offer you as options in these annuity products and we continue to offer them as annuity products.

So, the theory is that by saying, hey, if you want access to these units, you have to make us these payments, they are using the units. They are exercising custody and control over them to, in a way that makes them a fiduciary and simultaneously is a breach of fiduciary duty because it's in their own interest rather than in the interest of the plans.

And we demonstrated how we could show that with class-wide evidence. When they initially started the revenue sharing, how they said that what this was is that we were getting revenue sharing and that our goal is to make -- to get this from everybody. And, and we produced evidence from mutual funds where there's back and forth which makes it very clear with certain of the mutual funds

1      that, that there was this thing going on.

2              In their prospectuses in 2004, 2005 and 2006,

3      they said we only offer mutual funds which pay revenue

4      sharing.  Then they changed it in 2007 and on their

5      website they say that, what we can offer.

6              So we have all this sort of evidence which is

7      class-wide evidence that would show that Nationwide had a

8      systematic policy and practice of only -- of requiring

9      revenue sharing in order to be offered.  In other words, a

10     mutual fund family would have to offer, would have to pay

11     revenue sharing in connection with the majority of the

12     funds that were offered, not necessarily every one but the

13     majority.  And we did some analysis to show that of the

14     ones they offered in 2007, of all the mutual funds, when

15     you compare this to the revenue sharing contracts, they

16     had a revenue sharing contract with a mutual fund house

17     that offered each and every one of those mutual funds that

18     was paying revenue sharing on the majority of the funds.

19             So we have all this common evidence to show that

20     this practice was going on and they were fiduciary in this

21     matter.  So their tactic is then to say oh, well, either,

22     one, court, you are already ruled against it, or, two,

23     this theory is not viable as a matter of law.  Well, Your

24     Honor, I think that as far as what the 2nd Circuit said in

25     the In Re: Public Offering case was, is that you decide

1   disputed issues of fact in order to resolve Rule 23

2   requirements, and if that overlaps with the merits issue,

3   you have to do it.  But it also said that you shouldn't go

4   into Rule 23 issues which are unrelated -- you shouldn't

5   go into factual issues which are only merits and not Rule

6   23, and the fact is very apparent that we've offered

7   class-wide evidence to show that, that they use the

8   accumulation units to obtain the revenue sharing payments.

9           And so it really would not be appropriate for

10  the court to delve into the merits as to whether this is a

11  viable theory at this time under Rule 23 analysis.  It

12  ought to be decided on a class-wide basis after class

13  certification.  But if the court wants to delve into it,

14  we feel very, very comfortable on it, that it is

15  sufficient exercise of authority or control over these

16  units to use their holding of them to get the mutual funds

17  to make these payments.

18          In our initial motion, we had a couple of

19  analogies that I think are potentially helpful.  One is

20  suppose the mutual funds had -- suppose Nationwide had

21  taken out a loan and had offered the accumulation units as

22  collateral for the loan.  Okay?  That use of them,

23  pledging them as collateral would be exercise of authority

24  over and control over the accumulation units sufficient to

25  make it fiduciary and it would simultaneously be a breach

1    of that duty because it was for its own interest and not

2    those of the plans, and that would be true even if they

3    paid off the loan, if nothing physically or, you know,

4    nothing ever else happened to the accumulation units and

5    there was never any loss suffered.

6              Another analogy that we would use is --

7              THE COURT:  I understand the theory.  You said

8    it well in your papers.  I understand it.

9              MR. MANDEL:  So, I think the answer is, number

10    one, the court has not decided this issue previously.

11    Number two, we've shown that it can be proven by

12    class-wide evidence, that they had this systematic policy

13    and practice.  And that makes it sufficient for class

14    certification under a B(3) analysis, regardless of the

15    ultimate outcome.  And the court shouldn't decide the

16    ultimate outcome, but if it does, we feel comfortable on

17    that issue.

18              THE COURT:  Let me press you on this one.  Did

19    you raise this theory in your fourth amended class action

20    complaint?

21              MR. STANLEY:  Fourth or fifth?

22              THE COURT:  I know it's in the fifth.  The

23    question is -- the fourth was the complaint that was the

24    operative complaint at the time of summary judgment.  As I

25    read it, it appears to raise only the claim that I

1    addressed on summary judgment.  It does not appear to

2    raise the claim that you're making now.  I don't think

3    that's a problem necessarily, but I just want to

4    understand your point of view about whether you in fact

5    had made this claim in the fourth amended complaint.

6            MR. MANDEL:  You know, Your Honor, to be quite

7    frank with you, I don't even have a fourth amended

8    complaint with me and over the last few years I haven't

9    reviewed the fourth amended complaint because it just

10   wasn't relevant to anything but --

11           THE COURT:  Let me read this to you because this

12   is what's said in paragraph 53 for why Nationwide's a

13   fiduciary as to the accumulation units.  "One, they are

14   plan assets and, two, Nationwide exercises authority or

15   control respecting their management or disposition by

16   virtue of all the actions it can and does take as to them

17   pursuant to its annuity contracts with plans whether

18   participants, including" -- and then there's a list of

19   specific activities.

20           MR. STANLEY:  Are you reading from the fourth?

21           THE COURT:  Yes.  Paragraph 53, fourth amended

22   complaint.

23           MR. MANDEL:  Your Honor, my vague recollection,

24   not having looked at the fourth amended complaint in

25   several years, was that -- was somewhere I had thought

1      that we had pled that the use of the accumulation units to

2      obtain the revenue sharing payments itself was, was one of

3      the grounds that they exercised authority or control over

4      accumulation units.  I haven't seen it in a couple of

5      years.  That's my vague recollection.  Obviously it will

6      speak for itself upon review, but I think that --

7                 THE COURT:  My point is, as I'm reading it, I'm

8      agreeing with you that I didn't decide because I couldn't

9      have decided because I wasn't presented with a theory that

10     this specific accumulation unit --

11                MR. MANDEL:  Yes, and I guess what I would also

12     remind the court of on that is that, number one, I'm not

13     certain that that, that that matters but, number two, as

14     you will recall, between the time we filed the fourth

15     amended complaint and the court's summary judgment ruling,

16     we had completely briefed summary judgment and we had

17     completely briefed the first round of class certification

18     and if it was not on the face of the fourth amended

19     complaint, I feel confident that somewhere in that

20     briefing that it had been, it had been articulated, you

21     know, and -- because I don't think that it was only after

22     your ruling that this first occurred to us.  And --

23                THE COURT:  It may, in fact, have been in an

24     earlier complaint, I don't know, but the -- I think I'm

25     agreeing with you.  I don't think I've decided it.

1          MR. MANDEL:  All right.  Your Honor, I think

2     though that, be that as it may, I don't think that the --

3     assuming it's in the case, I really think of this as more

4     of a (b)(3) issue, and in terms of (b)(2), you know, as I

5     said, I really think that the presentation was

6     overwhelming in our favor as you follow through the

7     briefing.

8          And particularly, I would point attention to

9     the, to the argument that we made that the injunctive

10    relief predominates over the equitable monetary relief,

11    the disgorgement under the wholly incidental standard

12    found in the Allison v. Citgo case articulated by the 5th

13    Circuit.

14          The 2nd Circuit in the Robinson case didn't

15    reject the Allison standard, that narrow standard, in

16    favor of something broader, but I think that the court was

17    clear that at a minimum a case that met the wholly

18    incidental standard would be, would be subject to

19    predominance under the, in the 2nd Circuit.  And, in fact,

20    I think Your Honor writing an opinion in Parker v. Time

21    Warner case for the 2nd Circuit by designation in 2003

22    suggested exactly that thing, that the 2nd Circuit did in

23    the process, you know, say that even though we're not

24    going that narrow, we think anything that fits that

25    standard would be suitable for Rule 23(b)(2) designation.

1           And I think the case the court -- and as the

2      court knows from having written that, I'm sure, in Allison

3      what they said was if -- the recovery flows naturally from

4      the injunctive relief and it's a mechanical calculation of

5      the remedy, regardless of how complicated it is and how

6      much money it is, and we don't have to have individualized

7      factual determinations as to the amount, that it is wholly

8      incidental.

9           And the Monumental Life case as cited by the 5th

10     Circuit a little later in 2005 as a classic case example

11     was a discrimination case where black life insurance

12     policy holders paid higher premiums and got less coverage

13     than similarly situated white policy holders, and the 5th

14     Circuit, which is certainly no friend to class

15     certification, Judge Smith who had written the Costano

16     (ph) case, said look, the plaintiffs have proposed that we

17     can use thousands of individualized grids that puts up

18     characteristics, policy holder characteristics of blacks

19     and whites and using these grids it comes to a mechanical

20     calculation of what, if the black person had been subject

21     to the same underwriting criteria as the white person,

22     what his policy would have cost and what the amount of the

23     refund was.  And that was a case involving potentially

24     hundreds of millions or billions in damages and a much

25     more complicated calculation scenario than we have, and it

1    found it suitable.

2          In our case they have admitted that, as far back

3    as their compute data goes, they know how much money each

4    participant in each plan had invested in each mutual fund

5    on any given day.

6          THE COURT:  No, I remember reading the same

7    paragraph in your --

8          MR. MANDEL:  Okay, I'm sorry.

9          THE COURT:  It's all right.

10          MR. MANDEL:  And they also have the rate books

11    which are these books, computerized, that have all, during

12    any given year how much was each mutual fund paying in

13    revenue sharing.  And you can just put those in the data

14    base program and do the multiplication and come up with

15    the amount of revenue sharing that should be disgorged.

16          And I would note in the same Parker v. Time

17    Warner case, which Your Honor wrote the main opinion, in

18    the concurring opinion, Justice Newman suggested that as

19    one example of something that would be appropriate under

20    the wholly incidental standard would be exactly this

21    disgorgement of ill gotten gains which are subject to a

22    mechanical calculation.

23          We also think that under the 2nd Circuit's ad

24    hoc approach, which is broader, that we would meet that

25    requirement as well.  But overall, we think that the back

1    and forth of the briefing shows an overwhelming favor on

2    the briefing on the (b)(2).

3           On the (b)(3), that's where they spent most of

4    their time, and what we would say to you, the court, Your

5    Honor, is they've indulged in this tactic, and this is

6    what the court needs to keep in mind, their first tactic

7    is to always say, oh, there's a million individualized

8    issues and you can't prove this with generalized proof.

9    And so then when we come back and say, wait, here's the

10   generalized proof, here's how we can prove it on a

11   class-wide basis, and then their tactic or their response

12   would be to say, oh, well, that would not be legally

13   sufficient and they would challenge on the merits the

14   method that we had proven and then say because you can't

15   use this method that is legal insufficient, you have to

16   use this other method which would involve all sorts of

17   individualized factual circumstances.

18          But the question for Your Honor is, is can we

19   show with, you know, with common -- on a class-wide basis

20   with common evidence the various elements of the cause of

21   action, and if the court finds that that's the case, it

22   should certify the class and then it can decide whether

23   that proof is legally sufficient when we have the bench

24   trial on this ERISA case at a later time.  It shouldn't

25   delve into the merits.

1          Now, we address the merits on each of these

2     things out of an abundance of caution but we really think

3     that it's an illegitimate tactic they are using of trying

4     to say you can't do it this way as a matter of law and,

5     therefore, you'll have to do it this other way.

6          And so we think that when the court keeps that

7     tactic in mind, that it will find that (b)(3)

8     certification is also appropriate, but we would remind the

9     court that the court doesn't have to address (b)(3) in

10    addition to (b)(2) if it doesn't want to.  If it finds

11    that the case is suitable for (b)(2) it can go ahead on

12    that basis and, as I said, we believe really that the

13    briefing on (b)(2) is overwhelming.  Thank you.

14              THE COURT:  Thank you.  Mr. Platt?

15              MR. PLATT:  Good afternoon, Your Honor.

16              THE COURT:  Good afternoon.

17              MR. PLATT:  We're going to be doing our

18    presentation in three parts.  I'm going to go first and

19    Mr. Tucker -- Mr. Clauss and then Mr. Squire.

20          It's my point, Your Honor, that the plaintiffs'

21    motion for class certification here doesn't meet the Rule

22    23 requirements under the IPO burden of proof, In Re: IPO

23    burden of proof.  The plaintiffs have not proved that they

24    are adequate representives under Rule 23(a)(4), or that

25    they have typical claims class under the Rule 23(a)(3),

1      and we think we challenged this in our opening briefs.

2      Simply because we didn't carry those arguments in great

3      detail into our surreply briefs doesn't mean we weren't

4      raising those arguments, Your Honor.  It simply means we

5      were trying not to repeat ourselves when we didn't think

6      it was necessary.  So we have conceded nothing on Rule 23.

7                THE COURT:  But aren't those issues that can be

8      resolved by naming additional lead plaintiffs?  In other

9      words, why can't they bring in a participant or another

10     trustee or whatever to get over the bumps in the road?

11               MR. PLATT:  Because my adequacy arguments, Your

12     Honor, and my typicality arguments are different than

13     Mr. Clauss's, and my adequacy and typicality arguments are

14     essentially because the plaintiffs purchased variable

15     annuity contracts at different times from the class and

16     because they were presented with different arrays of

17     investment options, there is no evidence in their case

18     that their investment options were initially selected and

19     deleted for purposes of these so-called revenue sharing

20     payments.  I'm using the words "revenue sharing payments"

21     without conceding that's what they should be called.  We

22     think they should be called service payments.

23               But, nevertheless, there's no evidence of any

24     selection and deletion on some systematic basis with

25     respect to these particular plaintiffs' investment options

1     for purposes of the so-called revenue sharing, and there's

2     no evidence that the accumulation units or the shares as

3     some group annuity contract were used in some way to

4     obtain revenue sharing as the class alleges, and that's

5     why these particular plaintiffs are not adequate

6     representatives of the class claims, nor do they have

7     claims typical of the class claims.

8          And all that is swept within the larger argument

9     that we're making in our briefs, Your Honor, and that is

10    the plaintiffs haven't met their requirements under Rule

11    23(b)(3) and (b)(2).  There are so many individual issues

12    here, Your Honor, as to, first, how, when and why hundreds

13    of investment options were selected or deleted at

14    different times over the class period, whether or not

15    accumulation units were, in fact, used.  We still have not

16    seen any evidence that any particular accumulation units

17    were used, but even if they were, how they were used, when

18    they were used, which accumulation units were used, those

19    are all going to create individualized issues.  And

20    finally --

21          THE COURT:  Why isn't the question whether there

22    was control over the accumulation units and whether

23    Nationwide used that control, its ability to affect the

24    selection of plans rather than the selection of plans

25    itself?  Why isn't that sufficient?

1          MR. PLATT:  Well, Your Honor, I must admit I get

2     confused when I read the plaintiffs' complaints and when I

3     read the plaintiffs' briefs because I never know what

4     theory they are talking about.  One is a so-called mutual

5     fund selection and deletion theory and that is that

6     Nationwide somehow had control over the selection and

7     deletion of investment options --

8          THE COURT:  Correct.

9          MR. PLATT:  -- which created an ERISA fiduciary

10     status.  And then there's an accompanying theory that

11     Nationwide somehow had control over the accumulation units

12     and have used that for purposes of revenue sharing.  And

13     you're correct, Judge, they have to pick one because it's

14     causing mass confusion because everytime we raise an

15     individualized issue, they say, well, that's not about

16     this, that's about that.

17          THE COURT:  Well, why do they have to pick one?

18     Why can't there -- in other words, why can't there be more

19     than one theory for why Nationwide is a fiduciary?

20          MR. PLATT:  Because it seems to me as a matter

21     of due process, Your Honor, we should know at this point

22     in the litigation exactly what the class claim is against

23     us.  Is the class claim that we exercise authority or

24     control over accumulation units or is the theory that we

25     exercise authority or control over the selection and

 1    deletion of mutual funds.  If they are going to be kept

 2    separate, Your Honor --

 3              THE COURT:  It's both.  It's both.

 4              MR. PLATT:  Well, if they are -- well, if they

 5    are saying yes, they did one, and yes, they did the other,

 6    we will address them separately.  But the problem is they

 7    keep melding together and everytime we raise an argument

 8    with respect to mutual funds selection and deletion, they

 9    say no, no, our theory is about specific accumulation.

10    And everytime we raise an argument about specific

11    accumulation, they say, oh no, we're over here now with

12    mutual fund selection and deletion.  And the problem is

13    that we can't get a handle on this case until plaintiffs

14    come down in one spot.

15              THE COURT:  Or two spots.

16              MR. PLATT:  Well, if they come down in two

17    spots, Your Honor, then yes, let's engage on one theory

18    and let's engage on the other theory, but let's not have

19    this constant cross-over of no, no, that argument doesn't

20    apply because we're over here on the specific accumulation

21    theory now.

22              THE COURT:  Let me just say, I understand them

23    to be saying they are making both arguments and you

24    probably ought to address both arguments.  It seems to me

25    if either argument wins, then we proceed.  In other words,

1    if Nationwide is a fiduciary under one or both of these

2    theories that's been shown, then we go on to the next

3    question.

4        MR. PLATT:  Right, I agree with that, Your

5    Honor, just so long as we can focus on one theory or

6    another, and that's been one of our problems.

7        And, finally, Your Honor, just kind of from a

8    broad overview perspective, there's not only going to be

9    all these individualized questions with respect to whether

10   or not investment options were so-called selection deleted

11   and whether or not accumulation units were used and, if

12   so, how, when and why.  But there's also going to be

13   individualized issues as to whether or not Nationwide was,

14   in fact, acting as an ERISA fiduciary; that is performing

15   a fiduciary function at the time that it was engaged in

16   these practices of going out and, I don't know, arranging

17   for revenue sharing payments or receiving revenue sharing

18   payments.

19       And that's because the Pegram case, the Supreme

20   Court decision in Pegram makes it very clear that that is

21   an element of the cause of action for ERISA fiduciary duty

22   and the plaintiffs have to meet that and show that there's

23   generalized proof with respect to that element, not just

24   ERISA fiduciary duty element.

25       If you look at all these issues together, not

only the Rule 23 but also 23(a) but also the Rule 23(b),

you come down to the conclusion, Your Honor, that there's

not even a class that's ascertainable here.  And that's

because plaintiffs haven't met their burden of showing

who's in the class, which plans are in this class and

which plans are not.  They simply say, well, it looks like

most of the plans have been affected by revenue sharing

and then they proceed to define the class as every plan

that's held Nationwide for annuity contract with respect

to a retirement plan since 1996, and then they don't even

define what the starting period is for the class period.

At this point, Your Honor, they should be

defining which plans are in the class and which plans are

not, and they should be defining when the class period

begins with some definite proof.  They haven't met their

IPO burden if they haven't done that at this point.

Mr. Mandel put in an affidavit saying, well,

it's, in his opinion it's highly likely that as of 2007

the people that still held contracts would be affected by

these revenue sharing payments.  We think that affidavit

is completely inadmissible and unsupported opinion

testimony and shouldn't be submitted by counsel in a case

like this.

But, nevertheless, it still doesn't satisfy the

requirement that a class be ascertainable, that we know

1    who the plans are that are in and who the plans are that

2    are out and when the class period begins.

3              THE COURT:  Why isn't the class definition

4    shaped by the payment of revenue sharing payments?

5              MR. PLATT:  Good question, Your Honor.  And

6    that's -- the plaintiffs would like you to have to believe

7    that that's how you would define this class but, in fact,

8    Your Honor, if you go back and read your decision or you

9    read the other decisions that have been written on ERISA

10   revenue sharing, you'll see there's nothing wrong with

11   revenue sharing.  That does not constitute an ERISA

12   violation.  To prove an ERISA violation, plaintiffs have

13   to show first that Nationwide assumed a functional

14   fiduciary status as a result of their exercise of

15   authority and control with respect to plan assets.

16             Second, they have to show that Nationwide was

17   acting as an ERISA fiduciary; that is performing a

18   fiduciary function at the time of the conduct challenged

19   in the complaint, the revenue sharing payments.

20             Third, they have to show a breach of the ERISA

21   fiduciary duty by the acceptance of the revenue sharing

22   payments.

23             And, finally, they have to show some harm or

24   some profit as a result of all this.

25             And they haven't gone through the analysis of

1    those four elements showing those generalized proof with

2    respect to all four of those elements.  They want this

3    court to simply rule that because plans received revenue

4    sharing, that defines the plan -- defines the class, and

5    that can't be the definition of the class because the

6    definition of the class has to be related to the elements

7    of the cause of action for ERISA.

8              If you look at the Ruppert case, Your Honor, the

9    Ruppert against Principal case, Your Honor, which as far

10   as we know is the only case to address ERISA revenue

11   sharing in the class certification context, the District

12   of Iowa there says there cannot be a class in a situation

13   like this because of all of the variety of investment

14   options that are offered.  But more fundamentally, when

15   it's a functional fiduciary that's being addressed,

16   functional fiduciary status that is being addressed as one

17   of the issues in the lawsuit, that's necessarily an

18   individualized plan by plan question that depends on how

19   the defendant acted towards that particular plan step by

20   step.  It requires a look at all of the arrangements and

21   all of the facts with respect to the so-called functional

22   and fiduciary and the particular plan.  There can't just

23   be generalized evidence as -- with respect to 24,000-plus

24   plans, which is what the plaintiffs are suggesting here.

25              THE COURT:  But help me understand that.

1    Nationwide is holding these accumulation units and the

2    theory is, went to mutual funds and said look at this big

3    pot of money we have.  You want a chunk of it, give us

4    revenue sharing payments.  And the argument is there --

5    Nationwide is acting as a fiduciary, as I understand the

6    argument, they are acting as a fiduciary by in effect

7    holding and having some control over these assets, which

8    ought to be enough in and of itself to be a fiduciary

9    function, and misuse that, the money it was holding in

10   order to benefit itself.  So, which step are they missing,

11   I guess is the question.

12          MR. PLATT:  Okay.  If we're talking about

13   specific accumulation unit --

14          THE COURT:  Let's start there, yes.

15          MR. PLATT:  Okay.  First of all, that claim

16   doesn't hold up as a matter of law, and Mr. Mandel made a

17   big point of saying Your Honor doesn't have to address

18   those questions at a class certification hearing.  We beg

19   to differ because the 2nd Circuit says in the McLaughlin

20   against American Tobacco case that the IPO case makes very

21   clear that courts may resolve contested factual issues

22   where necessary to decide on class certification.  And

23   when a claim cannot succeed as a matter of law, the court

24   should not certify a class on that issue.

25          That's what the 2nd Circuit says as to what the,

1    this court has to do when it's addressing class

2    certification issues.  And it's our, we have several

3    points in answer to your, to Your Honor's question.

4          The first is that this specific accumulation

5    unit theory doesn't state a claim as a matter of law.  We

6    believe that Your Honor essentially addressed this

7    question in its summary judgment decision in March 2006

8    because Your Honor recognized that Nationwide does not

9    have control over these accumulation units; that

10   Nationwide only follows the directions of the plans and

11   the plan participants and takes no independent action

12   whatsoever with respect to these accumulation units.

13         All of the evidence in the record shows that,

14   Your Honor.  There is no evidence that we're aware of that

15   either the plaintiffs' accumulation units were somehow

16   touched or transferred or controlled in any way, or that

17   any other plan's accumulation units were touched or

18   transferred in any way.  And so, therefore, the claim

19   fails as a matter of law because it doesn't meet the first

20   element of the cause of action which is that Nationwide

21   was acting as functional fiduciary because it was

22   exercising authority or control over these plan assets.

23         THE COURT:  Well, doesn't -- isn't it sufficient

24   that it has the ability to exercise control?  In other

25   words, let me give you an example because, as I understand

1    ERISA law, the general law of fiduciary duty is kind of

2    subsumed into ERISA, so if you have a lawyer's trust

3    account, some client has given you a chunk of money to

4    hold, for whatever reason, and you're holding that in a

5    trust account and you're only writing checks off of it at

6    the direction of your client.  You're not, you're not

7    using it to fund your holiday party or anything else.

8    You're just waiting for them, if they say send this much

9    money somewhere, you do it.  But when you go to get a loan

10   and you say to the bank, look, I'm holding this big chunk

11   of money, that's my collateral right there.  Now, I think

12   you've breached your fiduciary duty.  I think you're

13   acting as a fiduciary.  I think you've breached your

14   fiduciary duty and I think you've benefited and I think

15   that your client is entitled to disgorgement of whatever

16   benefit you received through the so-called use of the

17   client's money.  Do you disagree with that?

18           MR. PLATT:  Your Honor, I don't think ERISA law

19   says that.  I think ERISA law says that, first of all, in

20   a participant directed plan, Nationwide is not an ERISA

21   fiduciary.  It does not have fiduciary authority or

22   control over the assets that are in a variable account

23   because those assets are being directed by the

24   participant.  It's the participant that is exercising

25   authority or control and Nationwide does not have that

1    authority or control.  If you're talking about a situation

2    where Nationwide actually took money out of the variable

3    accounts and used that money for itself, that would be a

4    different situation but there's no evidence whatsoever of

5    that occurring, and to the extent that's the case and the

6    plaintiffs are trying to proof, that's going to raise

7    individualized issues.

8         THE COURT:  No, I don't think they are saying

9    that.  I think they are saying that Nationwide took the

10   pot of money and used the pot of money to benefit itself

11   rather than to benefit the plaintiffs.  So, again, going

12   back to the lawyer example, if you use the trust account

13   as collateral, if you are able somehow to get a benefit

14   from, let's say from your bank.  You know, the bank where

15   you hold the trust account gives you 3 percent back

16   because, just because you have that money in their bank

17   and they want to recognize good customers, and so they

18   say, you know what?  You got $2 million in our bank, we're

19   going to give you 3 percent back.  Now, that money isn't

20   yours because the money that you got the 3 percent from is

21   your client's money.  That's the argument here.

22        MR. PLATT:  I understand, Your Honor, that's the

23   argument.  But all I'm saying is that unless we are

24   exercising authority or control with respect to those

25   assets and we are then going to the mutual funds and

1    acting as an ERISA fiduciary, that is, performing an ERISA

2    fiduciary function when we're negotiating the revenue

3    sharing payments, there is not a violation of ERISA.

4          And I think it's quite clear from the Pegram

5    case, if you look at the Pegram language, it says in every

6    case charging an ERISA fiduciary duty, the threshold

7    question is not whether the actions of some person

8    employed to provide services under a plan adversely

9    affected some plan beneficiary's interest, but whether

10   that person was acting as a fiduciary, that is performing

11   a fiduciary function when taking the action that is the

12   subject of the complaint.  That is, they would have to

13   prove under the Pegram Supreme Court decision that

14   Nationwide was actually acting as a fiduciary, performing

15   a fiduciary function when it went to the mutual funds and

16   was engaged in this so-called specific accumulation units

17   analysis.

18          THE COURT:  Why isn't, why isn't the holding of

19   the money on behalf of the plans a fiduciary, an ERISA

20   fiduciary function?

21          MR. PLATT:  Because ERISA says it's not in a

22   participant directed plan, Your Honor, so we're already --

23   that seems to me to be black letter law.  Simply

24   because --

25          THE COURT:  So, Nationwide could have taken that

money, invested it itself, and as long as it didn't lose

money it could keep whatever extra profit it got, it could

put it in a bank where it gets a kickback 3 percent a

year.  It could do anything it wants to.

MR. PLATT:  That's not this case, Your Honor,

no.  No, it can't take the money out of the account and

there's no evidence that it took money out of the account.

Indeed there's no allegation that Nationwide took any

independent action with respect to these accumulation

units.

THE COURT:  Let me --

MR. PLATT:  They sat there for the benefit of

the participants and they were directed and controlled

entirely by the participants.

THE COURT:  Right, right.  Let me ask you this.

If Nationwide goes out and says, hey, we've got this big

pot of money that we're holding for all these plans.  Give

us bids.  How much will you pay us to put you on our list

of approved accounts?  Now, any problem under ERISA in

doing that?

MR. PLATT:  Your Honor, again, unless Nationwide

is going to the mutual funds, performing an ERISA

fiduciary function, acting as an ERISA fiduciary when it's

making that request for bids or whatever, that's not a

violation of ERISA.

1          THE COURT:  But what if the fiduciary function

2      is picking which plan?  In other words, the way you're

3      picking your plan, the way you're serving your role as a

4      fiduciary, if you're saying we're going to have an open

5      auction, whoever gives us the most money will be on our

6      approved list and our function is picking who's on our

7      approved list, and guess what?  The ten plans that we

8      approve that are permissible for these participants to

9      invest in are, guess what, the ten who paid us the most

10     money.  No ERISA problem there.  All we did was select the

11     funds, all we did was take the money.

12          MR. PLATT:  Your Honor, there's all kinds of

13     individualized issues that come out of that, because

14     you're making an assumption that there was one point in

15     time in this case when Nationwide went out out to all the

16     mutual fund companies and that broad agreement was

17     reached.  In fact, what happened here was that there were

18     numerous revenue sharing agreements that were negotiated

19     over a period of time and some of those times there were a

20     lot of plans that weren't even contractable in this case

21     yet, so Nationwide didn't owe them any fiduciary status at

22     that point.  All right?  And you had situations where

23     people had already purchased their annuity contracts and

24     already had their selections of investment options.  So

25     clearly there was no ERISA fiduciary status with respect

1   to them, so --

2           THE COURT:  You're focusing on the revenue

3   sharing agreement between the mutual funds and Nationwide.

4   I'm focusing on the fiduciary activity of Nationwide in

5   selecting the plans for particular -- selecting the

6   investment options for a particular plan.  So if you have

7   a revenue sharing agreement pre existing and then you get

8   a new plan that signs up with Nationwide and you have to

9   pick your plans, which -- excuse me, pick your options.

10  Which option are we going to pick?  Oh, let's pick these

11  three, they all have revenue sharing plans.

12          Now, haven't you violated in theory your

13  fiduciary obligation because you're using the plan's money

14  to enrich yourself?

15          MR. PLATT:  Your Honor, now, with all respect,

16  we're getting into that area where the specific

17  accumulation unit theory is becoming indistinguishable

18  from the mutual fund selection and deletion theory,

19  because my understanding with respect to the mutual fund

20  selection and deletion theory is that Nationwide is

21  exercising authority or control over the investment

22  options for purposes of getting revenue sharing.  It's not

23  exercising authority or control over the accumulation

24  units for getting revenue sharing.

25          So, if we're moving over to the mutual fund

1    selection and deletion side of things, I'll give you the

2    answer to that, which is that in the Hecker against Deere

3    case that just came down from the 7th Circuit, and I will

4    give you the citation for it.  It's 2009 Westlaw 331285,

5    7th Circuit, February 12, 2009.

6         The 7th Circuit expressly rejects the argument

7    that simply displaying investment options for the plans to

8    make choices as to whether to select or not select or

9    whether to enter into the contract or not enter into the

10   contract does not give rise to any ERISA fiduciary duty.

11   And they particularly say, and they particularly say

12   "Plaintiffs point to no authority that holds that limiting

13   funds automatically creates discretionary control

14   sufficient for fiduciary status.  To the contrary, as

15   Fidelity points out, there are cases holding that a

16   service provider does not act as a fiduciary with respect

17   to the terms in the service agreement if it does not

18   control the named fiduciary in the negotiation of those

19   terms."

20        That's this case, Your Honor.  There's a similar

21   decision in something called the Colombia Air Services in

22   the District of Massachusetts and, indeed, even the

23   Department of Labor in its brief in the Hecker against

24   Deere case in the 7th Circuit said expressly that simply

25   because an insurance company or any other service provider

1    presents an array of investment options to a plan for the

2    plan to make its selection, does not does not give rise to

3    ERISA fiduciary status.  So, again, that's just black

4    letter law.

5          But even if that weren't the case, Your Honor,

6    there would still be all these individualized issues that

7    would arise because, remember, that the displays of

8    investment options that occurred throughout the 14 year

9    class period were for 24,000 plus plans and were many,

10   many different types of arrays, some of which included the

11   investment options that corresponded to mutual fund

12   payments, some of which did not.

13         And, indeed, in the plaintiff's case, when they

14   made their selections initially for their contract, there

15   was no revenue sharing going on, so there couldn't have

16   been this manipulation that the plaintiffs are talking

17   about.

18         So there are going to be all these

19   individualized issues, Your Honor, not only in terms of

20   the side that you're talking about, which is whether or

21   not Nationwide was somehow exercising a fiduciary

22   responsibility, but if you recall, all this is allegedly

23   tied to Nationwide's negotiation of revenue sharing

24   agreements with the mutual funds and those negotiations

25   took place at different times regarding different fund

1    houses in different amounts for different reasons for

2    different products and investment options.  Oftentimes

3    they were for some general set of products and investment

4    options, only a small portion of which involved these

5    plans and participants.  And Your Honor's going to have to

6    look at 24,000-plus situations in order to figure out

7    whether or not those investment arrays were, in fact,

8    driven by revenue sharing or by something else.

9         The plaintiffs make a big deal about the

10   isolated documents that they have thrown into their

11   appendix, saying that that somehow generalized evidence

12   either of this mutual fund selection and deletion theory

13   or the specific accumulation unit theory -- and I'd like

14   to focus on those because I think it's really important

15   there's no misconception left about those.  Those are the

16   documents that are in, I think, footnote four of their

17   surreply brief and footnote 39 of their initial brief.

18        If you look at those documents carefully, Your

19   Honor, in their reply appendix, the tab C, D, E, H and I,

20   they all refer to revenue sharing arrangements that have

21   nothing to do with any plan in this case.  Those are

22   revenue sharing arrangements that Nationwide was

23   negotiating with wrap programs (ph) with respect to a wrap

24   program that's completely unrelated to any 401(k) plan.

25   Those documents have to do with a Nationwide trust company

1    which has nothing to do with this lawsuit, and those

2    documents have to do with Nationwide's own 401(k) plan,

3    not any plan that's a member of this class.  So --

4              THE COURT:  Nationwide's plan is not part of the

5    class?

6              MR. PLATT:  I don't believe so, Your Honor.

7              And number five out of the 11 documents that

8    they cite have nothing whatsoever to do with this case.

9    If you look at the other documents in Tab U and X of their

10   original appendix, and then A, D, F and G of their reply,

11   those documents refer to goals or potential revenue

12   sharing arrangements with respect to only three mutual

13   funds.

14             And they refer to some investment options

15   without ever linking, and the plaintiffs never link those

16   investment options to investment options that were

17   included in any display that was presented to the

18   plaintiffs or any other member of this class.

19             So there's no evidence in this record right now,

20   Your Honor, showing that all mutual funds were involved in

21   any revenue sharing program affecting this plan, nor is

22   there any evidence showing that all of the investment

23   options that were ultimately displayed were somehow

24   subject to some revenue sharing arrangement.

25             Indeed, the evidence is that there were

1    investment options that weren't affected by these revenue

2    sharing arrangements.

3         At most, Judge, the evidence that the plaintiffs

4    have presented is just kind of isolated examples of

5    revenue sharing negotiations or revenue sharing

6    aspirations, and that's not generalized uniform class-wide

7    proof of the four elements that the plaintiffs have to

8    prove; that there was some ERISA fiduciary duty; that

9    there was some evidence that Nationwide was acting as an

10   ERISA fiduciary, performing a fiduciary function when it

11   went to these mutual funds and negotiated those revenue

12   sharing arrangements, and; that there was some breach as a

13   result of these revenue sharing arrangements.

14        The other, the other thing that they say is

15   crucial in their brief, this is the evidence that they say

16   is crucial to their class certification theory, and that

17   is they cite three prospectuses with respect to an

18   individual annuity contract called the achiever annuity.

19   Well first of all, there's no link between the achiever

20   annuity and any plaintiff.  The plaintiffs didn't buy

21   achiever annuities, they bought something called a Boa-4

22   (ph) annuity, and there's no link to the achiever annuity

23   in any other member of this class.

24        So, plaintiffs haven't identified that these

25   prospectuses and the planning prospectuses relate to any

1    investment options that were ever presented to any plan

2    member, but even if they did, these statements sure

3    wouldn't apply to the plaintiffs who had already

4    terminated their contractual relationship long before

5    2004.  So they wouldn't be adequate representatives.  They

6    wouldn't have a typical claim with respect to any of this

7    evidence, and these statements with respect to these

8    annuities refer to investment options that are only

9    offered by this annuity.  They don't refer to any other

10   investment options that were being offered to any other

11   class members or, indeed, to the plaintiffs.

12           So when they talk about their crucial evidence,

13   Your Honor, it's evidence that is just not linked to

14   anything having to do with this case.  So, where is the

15   uniform generalized class-wide proof that Nationwide

16   actually was selecting investment options in order to

17   somehow obtain revenue sharing payments?  It's just not in

18   this record.  Indeed, the individualized evidence shows

19   that there were all kinds of different scenarios where

20   Nationwide may have been negotiating revenue sharing

21   payments with this mutual fund but not with that mutual

22   fund.  That's going to be 24,000 plus individualized

23   issues.

24           I think it's important to go back to that Pegram

25   point two, Your Honor, when you're talking about this

1    mutual fund selection and deletion point, because it seems

2    to me that not only do the plaintiffs have to show that

3    there's uniform proof that Nationwide exercised some

4    authority and control over the mutual fund selection

5    process, but the plaintiffs also have to prove that

6    Nationwide was acting as a fiduciary when they are engaged

7    in those revenue sharing negotiations, and there's no

8    prove of that.

9         Your Honor would have to look at every single

10   one of the revenue sharing negotiations in order to make

11   some determination as to whether or not Nationwide was

12   wearing its ERISA fiduciary hat as opposed to some other

13   hat, its general corporate purpose hat when it was sitting

14   down and negotiating those revenue sharing payments.

15        THE COURT:  Why do they have to be acting in an

16   ERISA fiduciary capacity when they are negotiating the

17   revenue sharing payments as opposed to when either using

18   accumulation units to obtain revenue sharing payments or

19   when selecting funds, the investments available for plan

20   participants?  Is your point that the only way you can use

21   the accumulation units is to hold them out during a

22   negotiation for revenue sharing?

23        MR. PLATT:  Yes, they to have be engaged in some

24   transaction with respect to accumulation units and be

25   taking revenue sharing for that transaction, Your Honor.

```
1    That's what Pegram says.  And that's what is going to
2    require individualized issues because, remember, when
3    Nationwide goes into these revenue sharing negotiations,
4    we can't even tell whether or not Nationwide was wearing
5    an ERISA fiduciary hat for the entire class.  Let's take
6    the example, just 1998.  If Nationwide were to go in and
7    negotiate with a mutual fund house in 1998 and was using
8    some accumulation unit transaction in order to get revenue
9    sharing payments, Nationwide I guess under the plaintiff's
10   theory would arguably be an ERISA fiduciary with respect
11   to contract holders up to 1998 but it certainly would not
12   be an ERISA fiduciary duty with respect to all the
13   contract holders in the class who came after 1998.  So
14   that the class is going to be divided up with respect to
15   every single negotiation for revenue sharing payments.
16   There's going to be individualized issues as to who
17   Nationwide was acting as a fiduciary for.
18             THE COURT:  All right.  Let me get this right.
19   To use my trust fund example, you have a client, gives you
20   a million dollars, you go to the bank and you say if I
21   deposit this million dollars in your bank, will you give
22   me 3 percent?  Bank says sure.  Next year, you get another
23   client who gives you a million dollars.  Now you already
24   have the deal negotiated with the bank.  You get your
25   3 percent on the second million but you haven't
```

1    renegotiated anything.  No breach of fiduciary duty?

2         MR. PLATT:  Under Pegram, Your Honor, I would

3    have to be going to the bank and saying in connection with

4    a transaction having to do with that money, I would like,

5    you know, some particular benefit and it says it in black

6    and white, Your Honor.  It says it doesn't matter whether

7    or not the plan is adversely affected.  It matters whether

8    or not that person was acting as a fiduciary performing a

9    fiduciary function when taking the action subject to the

10   complaint.  That's a key element of the ERISA law.

11        I mean we disagree, you know, at the very

12   beginning, Your Honor, that there was an ERISA fiduciary

13   in that situation if it was a participant directed account

14   with respect to that money.  It just seems to me it's

15   clear black letter law that if it's a participant directed

16   account, and I don't have any authority or control over

17   that money, I cannot be an ERISA fiduciary.  Unless I'm

18   taking the money out of the account.  Unless I'm somehow

19   independently acting to exercise authority or control over

20   that money.

21        THE COURT:  Okay.  I understand.

22        MR. PLATT:  Okay.  There is one more point I'd

23   like to make, Your Honor, because -- two more points I'd

24   like to make because I know I've been going on for a

25   while.

1           There is this argument that Nationwide was

2     somehow conditioning assets.  That comes up throughout the

3     plaintiff's briefs and I want to talk about this as if

4     it's an separate theory because I can never understand

5     what this condition assets theory means.

6           They say the conditioning of assets was either

7     explicit or implicit.  Well, that seems to me it's just,

8     it underscores the individualized issues that are going to

9     arise because to the extent that a condition was implicit,

10    there are going to have to be -- there's going to have to

11    be an individualized inquiry into Nationwide's words or

12    deeds as to whether or not that creates the inference that

13    there was some implicit condition.  But, leaving that

14    aside, if there's a condition that's placed on the

15    mutual fund's assets, I don't understand where the

16    exercise of authority or control over plan assets is.

17    What plan assets are being controlled in the event that

18    Nationwide, quote, conditions assets of the mutual funds.

19    That's going to devolve into individualized questions as

20    to whether or not the different mutual funds, first of

21    all, could be conditioned in that way as an economic

22    matter, and Mr. Squire is going to talk about that.

23          But it also kind of, you know, raises a more

24    fundamental question as to whether or not the plaintiffs

25    were benefiting from that conditioning of assets because,

1    as the plaintiffs recognize, Nationwide started using a

2    two tier pricing system that lowered the cost of contracts

3    when certain mutual funds received, were making payments,

4    and at least some of the group contracts ratified and

5    consented to that practice.

6          So, that's going to not only raise

7    individualized issues as to who ratified and who didn't,

8    but it's also going to raise pretty serious statute of

9    limitation issues because there's a three year statute of

10   limitations in the event that the plaintiffs know or any

11   other class member knows about the so-called revenue

12   sharing conduct and not only consents to or ratifies it,

13   but benefits from it.

14         All right.  One more point, Your Honor, and then

15   I will sit down and let Mr. Clauss go.  And that's under

16   Rule 23(b)(2), and I get the sense reading plaintiffs'

17   brief that 23(b)(2) is somehow this cure-all for all the

18   individualized issues that are going to arise in this

19   case.  But, in fact, 23(b)(2) requires the plaintiffs to

20   show that Nationwide acted or refused to act on grounds

21   generally applicable to the entire class, and the 2nd

22   Circuit has interpreted that in the Robinson case and in

23   other cases, as saying there has to be cohesiveness with

24   respect to the class.  There has to be evidence of uniform

25   conduct with respect to the class.

1        And so all the individualized issues that

2   Mr. Mandel keeps on trying to cubbyhole into (b)(3) apply

3   to (b)(2) as well.  A class can't be certified simply on

4   the ground that the plaintiffs are seeking injunctive

5   relief.  They also have to show that the class is cohesive

6   and was uniform conduct with respect to the class

7   generally.

8        Our second point with respect to (b)(2) is that

9   they have not shown that injunctive relief is appropriate

10  for the entire class.  The plaintiffs' situation confirms

11  that because there's lots of prior contract holders who

12  have no interest and would receive no benefit from any

13  sort of injunctive relief.

14       More fundamentally, Your Honor, they don't

15  define the injunctive relief that they are seeking.  Is

16  the injunctive relief that they are speaking stopping

17  revenue sharing payments?  That can't be right because

18  simply receiving revenue sharing payments isn't an ERISA

19  violation.  An injunctive relief would have to be

20  individualized with respect to each particular plan under

21  either a mutual fund selection and deletion theory or some

22  specific accumulation unit theory.

23       If Nationwide was in fact doing something with

24  its fiduciary hat on to improperly select investment

25  options or it was doing something with its fiduciary hat

1    on to get revenue sharing payment through the use of those

2    accumulation units, that is the individualized conduct

3    that would have to be enjoined in this case.  It couldn't

4    just be a sweeping injunction with respect to revenue

5    sharing.

6         And then finally, Your Honor, under (b)(2), the

7    predominance of monetary relief, the plaintiff's going to

8    go back and forth on this.  On page 26 of on their opening

9    brief they say, quote, "The essence of this suit is that

10   money must be disgorged."  That's on page 26.  That is not

11   a situation where monetary relief is -- sorry, where

12   injunctive relief is predominant, regardless of what

13   standard you like to use.  And, indeed, the Southern

14   District of New York in a decision called New York

15   District Council Carpenters Pension Fund, that is at 2005,

16   Westlaw, 22872, says very specifically at Star Three, "An

17   action seeking to recover money damages, whether by

18   judgment, injunction or declaration, are suits for money

19   damages because they seek to recover for compensation for

20   loss resulting from defendant's breach of the legal duty."

21             THE COURT:  All right.

22             MR. PLATT:  Thank you, Your Honor.

23             THE COURT:  Thank you.  I'm going to suggest we

24   take a short break.  The court reporter has been going for

25   almost two hours and I'm sure she would like a break.

1    Should we take five minutes and come back?  Stand in

2    recess.

3                    (Whereupon a recess was taken from 3:50 o'clock,

4        p. m. to 4:00 o'clock, p. m.)

5                    THE COURT:  Well, that's one way to shorten an

6    argument.

7                    MR. PLATT:  I know he's coming right away, Your

8    Honor.

9                    (Mr. Clauss enters.)

10                    MR. CLAUSS:  I am the waterboy, Your Honor, so

11    --

12                    THE COURT:  No problem.

13                    MR. PLATT:  Could I make one addition to my

14    argument, Your Honor?  I forgot to mention a case called

15    F H Gear (ph) in the 2nd Circuit which we think is

16    dispositive on what we call the selection argument.  The

17    2nd Circuit said in that case that it is not an ERISA

18    fiduciary responsibility for a company like Nationwide to

19    engage in negotiations with the plans and make displays of

20    investment options, for example, while still owing the

21    plans a fiduciary duty.  When we are making those

22    precontractual displays of investment options, Nationwide

23    is in an arms-length relationship with the plans and does

24    not assume fiduciary responsibility simply by making

25    display of investment options at that time.