## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| LOU HADDOCK, as trustee of the Flyte Tool & Dye Company Inc. 401(k) Profit-Sharing Plan, et al.,<br>    Plaintiffs,<br><br>    v.<br><br>NATIONWIDE FINANCIAL SERVICES, INC. and NATIONWIDE LIFE INSURANCE COMPANY,<br>    Defendants. | CIVIL ACTION NO.<br>3:01cv1552 (SRU) |

### RULING ON MOTION TO STRIKE, MOTION TO INTERVENE,

### and MOTION FOR CLASS CERTIFICATION

Peter Wiberg, Alan Gouse, and Christopher Anderson as trustees of employer-sponsored, profit-sharing retirement plans (collectively, the "Trustees"), move for class certification of their claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1101 *et seq.*, against defendants Nationwide Financial Services, Inc. and Nationwide Life Insurance Co. (collectively, "Nationwide").[1]  The named plaintiffs seek to certify a class of the trustees of all ERISA-covered employee benefit plans that held, or continue to hold, group and/or individual variable annuity contracts with Nationwide.  The Trustees' Fifth Amended Complaint raises a single breach of fiduciary duty cause of action against Nationwide: the Trustees allege that, as an ERISA fiduciary, Nationwide violated several fiduciary duties under ERISA by collecting so-called "revenue sharing payments" from the mutual funds it offered to its annuity

---

[1] Plaintiffs Lou Haddock and Edward Kaplan voluntarily dismissed their claims against the defendants and have withdrawn as representative plaintiffs in this litigation.  (Docs. # 297 & # 298).  In addition, on November 16, 2007, Chris Anderson was substituted as a plaintiff for Dennis Ferndon.  (Docs. # 296 & # 300).

contract-holders. The Trustees seek to certify a class pursuant to either Rule 23(b)(2) or Rule 23(b)(3) of the Federal Rules of Civil Procedure.

In addition, the plaintiffs seek to strike the defendants' counterclaims one, two, and three from the Answer (doc. # 357), and H. Grady Chandler moves to intervene in this action as a lead plaintiff (doc. # 402). I will take up those two motions first.

## I.     Motion to Strike

On August 11, 2008, I granted the plaintiffs' motion to dismiss Nationwide's counterclaims – with prejudice with respect to their counterclaims for indemnification and contribution, and without prejudice to refiling an amended answer that eliminated the defects with respect to their breach of fiduciary counterclaim. *Haddock v. Nationwide Fin. Servs.*, 570 F. Supp. 2d 355, 366 (D. Conn. 2008). The plaintiffs have moved to strike Nationwide's second amended answer because it repleads the indemnification and contribution counterclaims and fails to correct the problems with the breach of fiduciary duty counterclaim.

At the motion hearing held February 27, 2009, Nationwide conceded that it had repled counterclaims one and two, asserting that it did so in order to preserve its claims with respect to my ruling dismissing those counterclaims on appeal. Transcript of Feb. 27, 2009 Hearing at 95.[2] Because Nationwide's claims with respect to those counterclaims have already been appropriately preserved for appeal, it is unnecessary to replead them in the Answer. Accordingly, the motion to strike is granted with respect to counterclaims one and two.

In counterclaim three, Nationwide brings a breach of fiduciary claim against the Trustees, which it intends to pursue in the event it is held to be a fiduciary at trial. I conclude that

---

[2] Hereinafter, citations to the February 27, 2009 transcript will read "Tr. at __."

Nationwide has sufficiently cured the defects in its original breach of fiduciary counterclaim.

Accordingly, the motion to strike is denied with respect to counterclaim three.

## II.    Motion to Intervene

On July 20, 2009, H. Grady Chandler, as Trustee of the Law Offices of H. Grady

Chandler, P.C., 401(k) Profit Sharing Plan and Trust (the "Chandler Plan"), moved to intervene

as plaintiff and class representative in this action pursuant to Rule 24(a)(2) or 24(b)(1)(B) of the

Federal Rules of Civil Procedure .  Nationwide opposes the motion to intervene on the grounds

that Chandler's motion is not timely.

For the reasons explained below, the motion to intervene is granted.

### A.    Standard of Review

A motion to intervene as a matter of right may be granted under Rule 24(a)(2) if the

following four elements have been met: the movant must (1) timely file his application for

intervention, (2) show that he has an interest in the action, (3) demonstrate that the interest may

be impaired by the disposition of the action, and (4) show that the interest is not adequately

protected by the other parties to the action.  *In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291,

300 (2d Cir. 2003).   Failure to meet any one of these elements is sufficient to deny the motion.

*Id.*

A court deciding a motion to intervene under Rule 24(b)(1)(B), which allows for

permissive intervention, is subject to fewer constraints.  A court may grant permissive

intervention when the intervening party shares a common question of law or fact with the "main

action" of the lawsuit.  *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 73 (2d Cir. 1994).

Permissive intervention is only available, however, if the motion for intervention is timely and

the intervention will not unduly delay or prejudice the adjudication of the rights of the original

parties. *Id.* at 73.

     B.    <u>Discussion</u>

     Chandler may intervene as a plaintiff and class representative under either Rule 24(a)(2)

or 24(b)(2). Because I hold that Chandler's intervention must be permitted as a matter of right, I

focus my discussion on Rule 24(a)(2). But I conclude that intervention is warranted on a

permissive basis, too.

     The second, third, and fourth elements of Chandler's motion to intervene as a matter of

right are not in dispute. In 1993, the Chandler Plan entered a group variable annuity contract

with Nationwide, which the Chandler Plan continues to hold to this day. Chandler, therefore, has

an interest in the action that might be impaired by its disposition. The legality of Nationwide's

alleged conduct with respect to the Chandler Plan's annuity contract is at issue in this case, and

Chandler may be impeded from seeking injunctive relief in a separate or later action. Finally,

Chandler's interests are not adequately protected by the other parties. There is no other class

representative who continues to hold an annuity contract and has standing to assert a claim for

injunctive relief against Nationwide on Chandler's behalf.

     The contested issue with respect to Chandler's intervention as a matter of right is the first

element, the timeliness of his motion to intervene. "A district court has broad discretion in

assessing the timeliness of a motion to intervene, 'which defies precise definition.'" *In re*

*Holocaust Victim Assets Litig.*, 225 F.3d 191, 198 (2d Cir. 2000) (quoting *Pitney Bowes*, 25 F.3d

at 70); *see* Charles Alan Wright, Arthur Miller & Mary Kay Kane, 7C Federal Practice and

Procedure § 1916 (3d ed. 2007) ("Since the requirement of timeliness is a flexible one, much

must necessarily be left to the sound discretion of the court." (footnote omitted)).  When deciding

whether a motion is timely, a court is to consider "the totality of the circumstances," including

these four factors: "(1) how long the applicant had notice of the interest before making its

motion; (2) the prejudice to existing parties resulting from his delay; (3) the prejudice to the

applicant resulting from a denial of the motion; and (4) any unusual circumstances militating in

favor of or against intervention." *Id.*  Nationwide challenges each factor, arguing that Chandler

has been on notice for years that there was no representative plaintiff for injunctive relief; that

granting the motion will cause prejudice to Nationwide and pose little prejudice to Chandler; and

that there are no unusual circumstances weighing in favor of Chandler's intervention.

The defendants claim that the first factor strongly favors denying Chandler's motion.

Nationwide argues that there has not been a plaintiff class representative with a Nationwide

annuity contract since March 2003, giving the plaintiffs a half-dozen years to find a new

representative for the injunctive claim against the defendants.  *See* Mot. to Intervene by H. Grady

Chandler (Doc. # 402), Ex. B at 180 (describing when last Trustee's retirement plan cancelled its

annuity contract with Nationwide).  Chandler responds that the plaintiff class did not receive

notice of this defect until April 25, 2008, when Nationwide filed its opposition to plaintiffs'

motion for class certification.  *See* Defs.' Opp'n to Pls.' Mot. (Doc. # 338) at 17-18 (arguing

against plaintiffs' standing to sue for injunction).  Furthermore, the plaintiffs located a substitute

representative for injunctive relief in September 2008, but that representative withdrew after

three weeks.  *See* Mot. to Intervene by Donald F. Houston (Doc. # 356); Mot. to Withdraw Mot.

to Intervene (Doc. # 359).  It was only in July 2009 that the plaintiffs succeeded in finding

Chandler.

The lag in finding a new class representative for injunctive relief is certainly not ideal, but it is also not fatal to Chandler's motion to intervene.  First, it is the responsibility of this Court to "undertake a stringent and continuing examination of the adequacy of representation by the named class representative at all stages of the litigation where absent members will be bound by the court's judgment."  *Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Mathews*, 551 F.2d 340, 344-45 (D.C. Cir. 1976).  This includes the preliminary stage of class certification, where the existence of the class and the members to be included in it are determined.  After Nationwide informed me of the representative Trustees' inadequate representation of the injunctive interests in this case, I alerted the plaintiffs.  *See* Tr. at 96.  The plaintiffs took action to find a new class representative immediately after I notified them that none of the representative trustees had standing to sue for injunctive relief.

The Trustees also claim that they were hindered by the large number of class members whose retirement plans removed their funds from Nationwide entirely or switched from Nationwide Life Insurance Company to Nationwide Trust Company, which is not a party to this action.  Reply of H. Grady Chandler (Doc. # 407) at 3.  Although it is only an allegation, plaintiffs' claim makes sense.  Given that the Trustees accuse Nationwide of collecting self-interested revenue sharing payments from the mutual funds it offers as investment choices to its pension benefit plan clients (and it is, therefore, allegedly not providing impartial investment services), it is not surprising that the members of the plaintiff class, acting pursuant to their own fiduciary duties, sought alternative services.  The plaintiffs' understandable difficulty in finding another class representative is an important factor when assessing the significance of the lull between Nationwide's April 2008 notification and Grady's motion to intervene more than a year

later.

The other relevant factors to timeliness also support granting Chandler's motion. Permitting Chandler to intervene is not prejudicial to Nationwide. The defendants were on notice that the Trustees sought injunctive relief at the time this suit was initially filed, and the ability of the plaintiffs to pursue that claim has been undercut by the long pendency of this suit. Chandler's intervention, therefore, will not alter the nature or dimensions of this lawsuit; the action remains the same as the day that plaintiffs commenced it. *Cf. D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001) (denying motion to intervene because additional intervening parties would upset the negotiation dynamics between the original parties); *In re Holocaust Victim Assets*, 225 F.3d at 198-99 (2d Cir. 2000) (denying motion to intervene because additional intervening parties represented a distinct class not addressed in the lawsuit and eventual settlement). Indeed, permitting or barring Chandler's intervention will have no effect on the questions at the core of this case – whether Nationwide's alleged conduct constituted a breach of its duties as a functional ERISA fiduciary – but will only change the remedies available to the plaintiffs should Nationwide be found liable. Allowing Chandler to intervene will likely lead to some additional litigation costs for Nationwide. But those expenses do not merit denying Chandler's motion to intervene, especially because Nationwide has anticipated defending against an injunction since this suit's inception.

In contrast, not permitting Chandler to intervene will prejudice him and other class members significantly. The defendants assert that Chandler and other plaintiffs still holding Nationwide annuity contracts will be able to seek the same injunctive relief in separate action or actions. But this is not a case where the intervenor was distinct from the original plaintiff class

and could represent his own interests in a different, discrete lawsuit. *Cf. In re Holocaust Victim Assets*, 225 F.3d at 199 & n.11 (holding that denial of motion to intervene did not prejudice applicants because they constituted a separate class capable of filing its own freestanding complaint). Instead, Chandler is a class member who shares the same questions of law and fact with the other plaintiffs, except that the Chandler Plan still has standing sue for an injunction in addition to monetary relief. Forcing him and other injunction-eligible plaintiffs to file a separate action would be unduly costly, repetitive, and inefficient.

Finally, if there are any unusual circumstances in this case, they favor Chandler's motion to intervene. The most unusual fact with respect to Chandler's motion is the coincidence that every representative Trustee's retirement plan terminated its Nationwide annuity contract. That is a circumstance that other class members who continued to hold their annuity contracts, such as Chandler, could not monitor or prevent. On account of that unusual circumstance, I am willing to be more flexible with Chandler's delay in filing his motion.

The totality of the circumstances and the four relevant factors for determining the timeliness of intervention lead me to conclude that Chandler's motion is timely. Chandler has therefore met all of the elements necessary to intervene as a matter of right under Rule 24(a)(2). Nonetheless, I also hold that Chandler may intervene pursuant to Rule 24(b)(1)(B)'s permissive intervention standard. The test for permissive intervention is "substantially the same" as intervening as a matter of right. *In re Bank of N.Y.*, 310 F.3d at 300 n.5. As noted above, permissive intervention is left to a trial court's discretion, subject to the caveats that the application must be timely and the intervention must not unduly delay the proceedings or prejudice the adjudication of the original parties' rights. Chandler shares common questions of

law and fact with the main action in this case, and, based on the previous analysis under Rule 24(a)(2), I find that his motion to intervene is timely and will cause neither undue delay nor prejudice.  As such, he may intervene as a plaintiff and class representative under Rule 24(b)(1)(B).

Accordingly, Chandler's motion to intervene pursuant to Rule 24(a)(2) and (b)(1)(B) (doc. # 402) is granted.

## III.    Motion for Class Certification

### A.    Factual Background

I have made three previous rulings that comprehensively set forth the procedural history. *Haddock v. Nationwide Fin. Servs.* ("*Haddock I*"), 419 F. Supp. 2d 156 (D. Conn. 2006); *Haddock v. Nationwide Fin. Servs.* ("*Haddock II*"), 514 F. Supp. 2d 267 (D. Conn. 2007); *Haddock v. Nationwide Fin. Servs.* ("*Haddock III*"), 570 F. Supp. 2d 355 (D. Conn. 2008). Because I presume familiarity with *Haddock I*, *Haddock II*, and *Haddock III*, I will only briefly review the pertinent facts of the case.

Plaintiffs are trustees of qualified ERISA pension benefit plans (collectively, "the Plans"). Peter Wiberg sues as trustee of the Crown Tool & Die Co., Inc. Salary Deferral Profit Sharing Plan (the "Crown Plan").  The Crown Plan, which held a group variable annuity contract with Nationwide, ended its relationship with Nationwide prior to the filing of this lawsuit.  *See* Tr. at 30.  The Crown Plan was terminated subsequent to the filing of this suit after the employer-sponsor went out of business.  Alan Gouse sues as trustee of the Greater Hartford Easter Seal Rehabilitation Center, Inc., Tax Sheltered Annuity Plan and the Money Accumulation Pension Plan for Employees of Hartford Easter Rehabilitation Center, Inc., Trust (the "Easter Seal Plan").

The Easter Seal Plan, which held an individual annuity contract with Nationwide, ended its relationship with Nationwide in 1998, prior to the filing of this lawsuit.  Tr. at 30.  Christopher Anderson sues as trustee of the Anderson Law Firm, P.C. 401(k) Profit Sharing Plan and Trust f/k/a the Anderson & Ferndon P.C. 401(k) Profit Sharing Plan (the "Anderson Plan").  The Anderson Plan also held an individual annuity contract with Nationwide; it terminated its relationship with Nationwide in 2002, after this suit was commenced.  H. Grady Chandler, sues as trustee of the Chandler Plan.  The Chandler Plan, which has a group variable annuity contract with Nationwide, began its relationship with Nationwide in 1993; that relationship remains ongoing.

The Plans are employer-sponsored, participant-directed 401(k) retirement savings plans. The employers contracted with Pension Plan Administrators ("PPAs") to provide the necessary administrative services for the Plans.  Those PPAs then persuaded each Plan to select Nationwide as their "investment provider," which earned the PPAs a commission from Nationwide.

Nationwide provided those Plans various investment options, including insurance products known as "variable annuities."  Nationwide provided two types of variable annuities: "group" variable annuity contracts and "individual" annuity contracts.  With group variable annuity contracts, Nationwide contracted only with the Plans, but each participant had an individual account.  With the individual annuity contracts, Nationwide contracted separately with Plan participants.  Both types of variable annuity contract permitted the Plans and participants to invest in a variety of mutual funds.

The basic investment process worked as follows.  Nationwide provided a selection of mutual funds for potential investment by the Plans and participants.  For group variable annuity

-10-

contract-holders, the Plans then chose a subset of mutual funds and their participants made investment choices from that subset. Plans were free to select as many or as few of the investment options as they chose and were under no obligation to select any investment options (meaning no contract was signed). For individual variable annuity contract-holders, the participants chose from the Nationwide offerings which mutual funds to invest in directly.

For the group variable annuity contracts, Nationwide retained the authority to delete and substitute mutual funds from the list of available options, "if, in the judgment of [Nationwide], further investment in the shares of a Fund should become inappropriate in the view of the purposes of the Contract." The individual variable annuity contracts issued prior to 1998 did not contain similar language; Nationwide, however, does not dispute that it retained the authority (and exercised the authority) to remove mutual funds after participants selected them for inclusion in their individual variable annuity contract.[3] Henderson Decl. (Doc. # 338 Attach. 2) ¶ 16. Individual annuity variable annuity contracts issued after 1998 contained the language referenced above. *Id.* ¶ 18; Def. Ex. 18.

After the Plans and participants chose which mutual funds they wanted to invest in, rather than investing directly in the chosen mutual funds, those pension contributions and employer-

---

[3] Nationwide contends that "except in rare circumstances," the decision to remove a mutual fund from the available investment options was driven by the mutual fund itself. It also contends that in all cases where a mutual fund was eliminated, Nationwide gave the Plans and participants the option of where to reinvest the money and did not exercise its contractual authority to substitute a different fund. Whatever authority Nationwide may or may not have exercised with regard to each variable annuity contract, the pertinent issue here relates to Nationwide's ability to shape the universe of available funds.

-11-

matching contributions were invested in "variable accounts," also known as "separate accounts,"[4] established by Nationwide.  Those variable accounts were further sub-divided into numerous "sub-accounts" that corresponded to the different investment options, which were primarily mutual funds.  Once the Plans and participants selected the mutual funds in which to invest their pension contributions, Nationwide allocated those pension funds to the appropriate sub-accounts. The sub-accounts received allocations from multiple Plans and participants, and Nationwide purchased or sold a designated mutual fund to reflect the sub-accounts' combined allocations by the Plans and their participants.  Put another way, when the mutual fund received funds from the sub-accounts, those funds were pooled with funds from investors other than the Plans' participants.

To reflect the amounts contributed to particular mutual funds, Nationwide allocated "accumulation units," i.e., shares of the corresponding sub-accounts, to the Plans and participants.  The accumulation units reflected the Plans' and participants' total investment in the variable account or sub-account.  The value of those accumulation units fluctuated according to the value of the mutual fund shares held within the sub-account.

Pursuant to its contracts with the Plans and participants, Nationwide had the authority to cancel the accumulation units as necessary to pay its fees and to pay taxes.  Nationwide also transferred accumulation units for use as collateral for loans, and canceled them to purchase annuities and make cash payments at the request of the Plans and participants.

---

[4] ERISA defines a "separate account" as "an account established or maintained by an insurance company under which income, gains, and losses, whether or not realized, from assets allocated to such account, are, in accordance with the applicable contract, credited to or charged against such account without regard to other income, gains, or losses of the insurance company." 29 U.S.C. § 1002(17).

At some point in the mid-1990s Nationwide began collecting income from mutual funds, referred to as, *inter alia*, "revenue sharing payments," based on a percentage of the assets invested in the mutual fund through Nationwide.[5]  Nationwide informed the trustees of the group variable annuity contracts (or their authorized representatives) about those payments, requiring the trustees to sign off on the revenue sharing payments as contract amendments.  Rose Decl. (Doc. # 338 Attach. 3) ¶¶ 36-37.  Nationwide provided notice of the payments to persons with individual variable annuity contracts through statements of additional information, annuity product prospectuses, and annual reports, but never required the contract-holders to agree to the revenue sharing payments.  Henderson Decl. ¶¶ 39-40.

Plaintiffs seek to certify the following class (the "Class"), under either Rule 23(b)(2) or Rule 23(b)(3):

> All trustees of all employee pension benefit plans covered by ERISA which had variable annuity contracts with Nationwide or whose participants had individual variable annuity contracts with Nationwide at any time from January 1, 1996, or the first date Nationwide began receiving payments from mutual funds based on a percentage of the assets invested in the funds by Nationwide, whichever came first, to the date of [the class certification order].

B.    Overview of Plaintiffs' Legal Theories

Before beginning the analysis of the motion for class certification, I will broadly outline the legal theories that the plaintiffs are asserting.  The following is merely a roadmap to the plaintiffs' legal theories and should not be construed as a pronouncement on the merits of those theories.

---

[5] Because it contends those payments were made in exchange for legitimate services, Nationwide prefers the term "service payments."  Although I recognize this is a point of dispute, I will continue to refer to the payments as "revenue sharing payments" in the interest of clarity and continuity.

-13-

In order to prevail on their breach of fiduciary cause of action against Nationwide, the Trustees must successfully prove (1) that Nationwide was a fiduciary to the Plans, and (2) that Nationwide's acceptance of revenue sharing payments from the mutual funds was a breach of its fiduciary duties. The Trustees have advanced two theories why Nationwide is a fiduciary with respect to the Plans: (1) the "specific accumulation unit" theory, and (2) the "revenue sharing payment" theory. Plaintiffs contend that Nationwide breached its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and engaged in prohibited transactions in violation of ERISA § 406(b)(1) and (3), 29 U.S.C. § 1106(b)(1) and (3).

### 1.   *Nationwide as Alleged Fiduciary*

According to the plaintiffs, Nationwide is a fiduciary pursuant to 29 U.S.C. § 1002(21)(A), which provides that "a person is a fiduciary with respect to a plan to the extent (i) he . . . exercises any authority or control respecting management or disposition of its assets . . . ." Here, the ERISA "plan assets," as Nationwide concedes, are the accumulation units.

### a.    Specific Accumulation Unit Theory

Under the specific accumulation unit theory, Nationwide was a fiduciary because it used its custody and control of the accumulation units to obtain revenue sharing payments from the mutual funds. The Trustees' specific accumulation unit theory posits that "[t]he mutual fund families pay the revenue sharing payments to Nationwide because Nationwide places the investments of the Plans and participants in their funds and conditions its placement of the investments upon the payment of the revenue sharing payments. Accordingly, Nationwide uses the Plans' and participants' investments (as represented by the accumulation units) to generate the revenue sharing payments, and that use of those investments by Nationwide constitutes an

exercise of authority or control by Nationwide over their management or disposition sufficient to make it a fiduciary as to that use of the accumulation units." Plaintiffs' Motion for Class Certification Based on Fifth Amended Complaint and Memorandum in Support (hereinafter "Pl. Mem. in Support") at 13-14. In other words, Nationwide is a fiduciary because it uses its possession and control of the accumulation units to obtain the revenue sharing payments.

According to the plaintiffs, the variable annuity contracts give Nationwide custody and control of a large pool of money contributed by the Plans, and that Nationwide uses that pool of money to extract revenue sharing payments from the mutual funds in exchange for access to that pool of money. At the hearing, the plaintiffs maintained that this conduct at once makes Nationwide a fiduciary and represents a breach of its fiduciary duties because Nationwide is acting in its own interest rather than in the interests of the Plans. Tr. at 34.

Nationwide contends that the specific accumulation unit theory cannot succeed as a matter of law because I already rejected that theory in *Haddock I*. In addition, Nationwide contends that, even if I did not reject the specific accumulation unit theory, the Trustees will nevertheless be unable to succeed on it as a matter of law because the undisputed evidence demonstrates that Nationwide does not exercise any authority or control over where the Plans and participants direct their investments. Nationwide maintains that it only purchases those mutual fund shares that correspond to the investment decisions of the Plans and participants.

Both of Nationwide's points miss the thrust of the Trustees' theories. First, although I did reject the Trustees' "general" accumulation theory in *Haddock I*, the Trustees have alleged a new accumulation unit theory in the Fifth Amended Complaint that I did not address in *Haddock I*. My decision in *Haddock I* was directed to the claims alleged in the Trustees' Fourth Amended

Complaint, which contained the claim that Nationwide was a fiduciary with respect to the accumulation units because "Nationwide exercises authority or control respecting their management or disposition by virtue of all the actions it can and does take as to them pursuant to its annuity contracts with the Plans or their participants, including holding them for the benefit of the Plans, cancelling them to pay its fees, transferring them to use as collateral for loans, cancelling them to pay loans, cancelling them to purchase annuities and cancelling them to make cash payments." Fourth Am. Compl. (Doc. # 235) at 14-15. Addressing that allegation in *Haddock I*, I stated in dicta that, because those actions are governed by specific contractual provisions or requests made by the Plans and participants, such acts were merely "ministerial," and likely could not provide the basis for the necessary authority or control over plan assets under section 1002(21)(A)(i) to make Nationwide a fiduciary. 419 F. Supp. 2d at 166-67.

Following my decision in *Haddock I*, however, the plaintiffs amended their complaint, raising a different legal theory for how Nationwide was a fiduciary based on its control and authority over the accumulation units, i.e., the "specific" accumulation units theory. Because I was not presented with that theory at the time of my ruling on Nationwide's motion for summary judgment, I could not have rejected it as Nationwide contends.

Moreover, the specific accumulation theory pleaded in the Fifth Amended Complaint is distinct from what I suggested would be insufficient to establish Nationwide as a functional ERISA fiduciary. In *Haddock I*, I wrote that Nationwide's "custody of the accumulation units" and "ministerial acts" performed in the course of investing those accumulation units pursuant to the directives of Plans and participants "may not amount to authority or control over plan assets." *Id.* at 166 (quotation omitted). In their Fifth Amended Complaint, the Trustees have alleged that

-16-

Nationwide did more than serve as custodian of the accumulation units and perform related ministerial tasks. The plaintiffs claim in their specific accumulation theory that Nationwide actively used its control of plan assets to bargain for revenue sharing payments from the mutual funds that Nationwide offers as investment options to its ERISA-protected group and individual annuity contract-holders. That is a form of control and discretion different in kind than the passive and ministerial authority I addressed in *Haddock I*.

Second, Nationwide's characterization of the plaintiffs' specific accumulation unit theory is not entirely accurate. The Trustees do not dispute that, after being presented with the array of mutual fund options chosen by Nationwide, the Plans and participants are the ones who ultimately decide which mutual funds to invest in. Nor do the Trustees dispute that Nationwide only buys shares of those mutual funds that the Plans and participants have selected for investment. Those issues, however, have no bearing on the specific accumulation unit theory advanced by the plaintiffs. According to the Trustees' theory, the pertinent issue is that, through its variable annuity contracts with the Plans and participants, Nationwide is able to amass a pool of billions of dollars in retirement plan assets so that, by virtue of its control and authority over that pool of money, it is a fiduciary with respect to those assets. Nationwide's control and authority is evidenced by the fact that it is able to leverage its position as sole gatekeeper to those funds to extract the revenue sharing payments from the mutual funds in exchange for giving the mutual funds the opportunity to be investment choices for the Plans and the participants. But for the funds contributed by the Plans and participants – funds that Nationwide controlled and for which Nationwide could define the universe of investment options – the mutual funds would not pay the defendants revenue sharing payments.

b.    Mutual Fund Selection Theory

Under their second fiduciary theory, the plaintiffs contend that Nationwide exercises the requisite authority and control respecting the disposition of the accumulation units by controlling which mutual funds are available as investment options for the Plans and their participants.  As I stated in *Haddock I*, a reasonable fact-finder could find that Nationwide's ability to select, remove, and replace mutual funds constituted the requisite authority or control respecting the disposition of the accumulation units so as to render Nationwide a fiduciary.  *Id.* at 166.

Nationwide's primary objection to this theory relies on a different "selection" stage of the mutual fund selection process than the one used in the plaintiffs' theory.  Although the Trustees' theory relies on the initial selection by Nationwide of those mutual funds that will be made available to the Plans and participants for investment, Nationwide claims that the appropriate selection stage to focus on is the actual selection of mutual funds for investment by the Plans and participants.  Relying on that stage of the selection process, Nationwide concludes that it had no role in the Plans and participants' selection of the mutual funds in which to invest.  The Trustees do not dispute that the final investment decision fell to the Plans and participants; the pertinent issue, according to the plaintiffs, is that Nationwide made the *initial* mutual fund selection that would be made available for the Plans and participants *then* to choose from.[6]

_____

[6] Contrary to Nationwide's claim in its Supplemental Brief in Opposition to Plaintiffs' Motion for Class Certification (Doc. # 408), *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009), would not preclude the Trustees' mutual fund selection theory.  *Hecker* differentiated a pension adviser that "played a role" in a plan's investments from a manager that has "final authority" over the investments a pension plan selects, and held that merely pleading the former was insufficient to establish that a defendant was a functional ERISA fiduciary.  *Id.* at 584.  The Trustees in this case have alleged that Nationwide has done more than "play[] a role."  Their claim is not that Nationwide provided advice or suggested investment options to them; rather, the Trustees allege that Nationwide exerts control over their investment options by selecting and

Nationwide also objects to this theory on the ground that the Trustees have failed to demonstrate that Nationwide actually exercised its authority to remove mutual funds from the choices available to the Plans and participants for investment. Again, for clarity's sake, the plaintiffs' mutual fund selection theory does not rely on having to prove that Nationwide actually exercised its authority to remove mutual funds from the group available to the Plans and participants for investment. Rather, the Trustees contend that the fact that Nationwide had a contractual right to substitute and delete mutual funds, even if such authority was never exercised, by itself constitutes sufficient authority or control over annuity contracts to make it a fiduciary. Indeed, in *Haddock I*, I concluded that "[a] rational fact-finder, viewing the evidence in the light most favorable to the Trustees, could find that Nationwide's *ability* to select, remove, and replace the mutual funds available for the Plans' investment constituted discretionary authority or discretionary control respecting disposition of plan assets, and thus that Nationwide is an ERISA fiduciary." *Id.* at 171-72 (emphasis added). As the Trustees reiterate: so long as the ability to select, remove, or replace mutual funds as investment options for the Plans and participants make Nationwide a fiduciary, it is irrelevant whether Nationwide actually exercised its authority to remove or replace mutual funds.

2.    *Nationwide's Alleged Breach of Fiduciary Duty*

The Trustees' claim that Nationwide's acceptance of revenue sharing payments from the

---

deleting the mutual funds available to the Plans. Described this way, Nationwide has "final authority": the defendants have the power to permit or veto an investment option without the Trustees' input. It is for this reason that the Seventh Circut specifically distinguished the facts of *Hecker* from this very case. *See id.* (describing plaintiffs' reference to *Haddock I* as unpersuasive "since the service provider in that case had the authority to delete and substitute mutual funds from the plan without seeking approval from the named fiduciary").

mutual funds it made available to the Plans and participants breached Nationwide's fiduciary

duties under two separate ERISA provisions.

a.      Violation of ERISA § 404(a)(1)(A) & (B)

ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in relevant

part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the
> participants and beneficiaries and –
>
> (A) for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> >
> > (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing
> that a prudent man acting in a like capacity and familiar with such matters would use in
> the conduct of an enterprise of a like character and with like aims . . . .

According to the Trustees, by using the accumulation units to obtain the revenue sharing

payments for its own benefit, Nationwide was not discharging its duties solely in the interest of

the Plans and participants or for the exclusive purpose of providing benefits to the Plans and

participants and defraying reasonable administrative expenses.  That, the Trustees claim, was in

violation of section 404(a)(1)(A).  The Trustees further argue that by using the accumulation

units to obtain those revenue sharing payments, Nationwide did not discharge its duties with the

care, skill, prudence, and diligence of a reasonably prudent person acting in a like capacity and

familiar with such matters because a prudent person acting in the capacity of a fiduciary would

not consider his own benefit when discharging his duties.

b.      Violation of ERISA § 406(b)(1) & (3)

-20-

ERISA § 406(b)(1) and (3), 29 U.S.C. § 1106(b)(1) and (3), provides, in pertinent part:

A fiduciary with respect to a plan shall not –

(1) deal with the assets of the plan in his own interest or for his own account; . . .

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

According to the Trustees, by using the accumulation units to obtain the revenue sharing payments, Nationwide dealt with the plan assets in its own interest and for its own account in violation of section 406(b)(1).  They further contend that Nationwide received consideration (the revenue sharing payments) from a party dealing with the Plans (the mutual fund families) in connection with transactions (the revenue sharing contracts) involving the assets of the Plans (the accumulation units) in violation of section 406(b)(3).[7]

3.    *Remedies Sought*

For breaching its fiduciary duties and engaging in prohibited transactions, the plaintiffs seek the following relief: a declaratory judgment that Nationwide's conduct violates its duties under ERISA; a permanent injunction against Nationwide prohibiting the illegal practices; disgorgement/restitution of all the revenue sharing payments received by Nationwide or, alternatively, the difference between the revenue sharing payments and the fair market value of any services provided by Nationwide to the mutual funds for which the revenue sharing payments purportedly constituted payment; attorneys' fees and costs; and any other legal or equitable relief

---

[7] Without fully articulating its fiduciary theory with regard to the revenue sharing payments as "plan assets," the plaintiffs have preserved that theory in their brief.  As they state, "Nationwide received consideration (the revenue sharing payments) from a party dealing with the Plans (the mutual fund families) in connection with transactions (the revenue sharing contracts) involving assets of the Plans (the revenue sharing payments)."  Pl. Mem. in Support at 17-18 (citing *Haddock I*, 419 F. Supp. 2d at 170).

deemed fair and just by this court.

Significantly, the Trustees are neither alleging nor seeking to recover any losses to the Plans resulting from Nationwide's alleged breach of fiduciary duties. Rather, the only monetary relief they seek on behalf of the Plans is equitable in nature. Specifically, the Trustees are seeking disgorgement of the profits Nationwide accrued through use of the Plans' assets, i.e., the revenue sharing payments. *See* 29 U.S.C. § 1109(a) ("Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable . . . to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . .").[8]

C.     Discussion

Plaintiffs seek to certify a class pursuant to Rules 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure. Nationwide objects to class certification on several grounds, including that the lead plaintiffs lack standing to pursue the requested relief, that the plaintiffs' legal theories cannot succeed as a matter of law, and that it will be impossible to determine the necessary issues of fact and/or law on a class-wide basis. I will begin with the threshold issue of standing.

1.     *Standing*

In addition to its objections that class certification is not warranted on the merits, Nationwide raises several threshold arguments related to issues of standing. Specifically, Nationwide contends that the named plaintiffs lack standing to bring a class action on behalf of

---

[8] As discussed further below, this monetary relief sought on behalf of the Plans pursuant to ERISA section 502(a)(2) is substantively distinct from the monetary relief that may be sought by individuals pursuant to ERISA section 502(a)(3).

other ERISA plans or trustees, plaintiff Wiberg lacks standing entirely as a former trustee, and the named plaintiffs lack standing to seek injunctive relief.  I will address each of those arguments in turn.

> a.     Plaintiffs' Standing to Pursue a Class Action

Addressing the Trustees' first proposed class definition,[9] Nationwide contends that the Trustees lack standing to sue on behalf of a class of employee pension benefit plans because ERISA plans may not sue under the express statutory language of ERISA, which permits only participants, beneficiaries, or fiduciaries to bring suit.  In response to Nationwide's objections, the Trustees subsequently amended their proposed class definition; consequently, the plaintiffs now seek to certify a class of trustees.  Although the Trustees have not conceded that they are not permitted to certify a class of plans, because the Trustees have amended their proposed class definition, I will only address whether the Trustees may seek to certify a class of trustees.

Nationwide argues that the plaintiffs' attempt to certify a class must fail as a matter of law because the Trustees do not have any standing to sue on behalf of plans for which they are not fiduciaries.  According to Nationwide, each trustee's duty to protect the interests of his or her plan is unique and the Trustees, therefore, do not have the authority or standing to sue on behalf of other plans using the class certification mechanism.  To permit class certification would,

_____

[9] The Trustees originally sought to certify the following class:

> All employee pension benefit plans covered by ERISA which had variable annuity contracts with Nationwide or whose participants had individual variable annuity contracts with Nationwide at any time from January 1, 1996, or the first date Nationwide began receiving payments from mutual funds based on a percentage of the assets invested in the funds by Nationwide, whichever came first, to the date of judgment.

according to Nationwide, "interfere with" and "usurp" the authority of other trustees to sue on behalf of their own plans. Defs.' Sur-Reply in Opp'n to Pls.' Mot. for Class Certification Based on Fifth Am. Compl. (Doc. # 382) ("Def. Sur-Reply") at 3-4.

Nationwide is erroneously attempting to conflate the standing and class certification requirements, when, in fact, the two inquiries are logically separate and distinct. Although it is true as a matter of basic ERISA law that trustees lack standing to sue on behalf of a plan for which they are not a fiduciary, that reasoning does not translate to the class certification context. To adopt Nationwide's position would eliminate class certification as an option for any statutorily-qualified party suing an ERISA fiduciary for breach of fiduciary duty on behalf of an ERISA-covered plan.

As explained by the Sixth Circuit in *Fallick v. Nationwide Mutual Insurance Co.*, 162 F.3d 410, 423 (6th Cir. 1998), a potential class representative's individual standing and ability to represent a putative class are separate inquiries. "[O]nce a potential ERISA class representative establishes his individual standing to sue his own ERISA-governed plan, there is no additional constitutional standing requirement related to his suitability to represent the putative class of members of other plans to which he does not belong." *Id.* at 424. In *Fallick*, the plaintiff, an ERISA plan participant, sought to certify a class on behalf of all participants or beneficiaries of ERISA-regulated plans administered by the defendant who made a claim for benefits and were improperly denied reimbursement of medical expenses. *Id.* at 421. The Sixth Circuit rejected the same logic advanced by Nationwide in this case, reversing the district court's decision denying the motion to certify a class on the ground that, although the plaintiff had individual standing, his efforts to represent a class failed because the class included participants or

beneficiaries of plans to which the plaintiff did not belong.  *Id.* at 422-23.

The *Fallick* Court outlined the steps that a court must undertake when examining a motion to certify a class in the ERISA context.  First, a court must determine whether the class representative has individual standing vis-à-vis the defendant.  *Id.* at 423.  "Once his standing has been established, whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure."  *Id.*  Thus, once individual standing is established, the court must examine whether the plaintiff has successfully satisfied the requirements of Rule 23.  *Id.* at 423-22.  The *Fallick* Court concluded that, because the plaintiff had individual standing to bring suit under ERISA against the defendant, the district court erred by failing to next examine whether the requirements of Rule 23 had been met.  *Id.* at 423-24; *see also Charters v. John Hancock Life Ins. Co.*, 534 F. Supp. 2d 168, 172 (D. Mass. 2007) (following *Fallick* to reject defendant's argument that the plaintiff lacked standing to pursue a class certification in an ERISA action, and holding that beneficiaries and fiduciaries had standing to pursue a class action on behalf of trustees of other employee benefit plans that contracted with the defendant); *In re Mut. Funds Inv. Litig.*, 519 F. Supp. 2d 580, 583 (D. Md. 2007) ("Traditionally, courts bifurcated the inquiries required by Article III and Federal Rule of Civil Procedure 23."); *cf. Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.,* 504 F.3d 229, 241 (2d Cir. 2007) (noting that, in putative class action brought by ERISA plan fiduciaries, "only one of the named Plaintiffs is required to establish standing in order to seek relief on behalf of the entire class").

The decision Nationwide relies on to argue that the plaintiffs lack standing to pursue class

certification does not support that proposition.  In *Ruppert v. Principal Life Insurance Co.*, No. 06-cv-903-DRH, 2007 WL 2025233, at *1-3 (S.D. Ill. July 9, 2007), the plaintiff in a putative ERISA class action sought reconsideration of the court's order transferring the case to the Southern District of Iowa.  The *Ruppert* Court's decision was focused entirely on whether its decision to grant the defendant's motion to transfer was proper; the Court never touched on the merits of the plaintiff's pending motion for class certification or whether he had standing to pursue such a motion.  In *Ruppert*, the issue of standing only arose because the plaintiff was opposing the motion to transfer based on the number of employment benefit plans serviced by the defendant that were located in the Southern District of Illinois.  *Id.* at *4.  The Court's point in stating that the plaintiff "does not have standing to sue on behalf of plans of which he is not a fiduciary" was that it was irrelevant how many plans the defendants serviced in the district for purposes of determining the motion to transfer.  *Id.*

Nationwide has taken out of context the language on which it relies so heavily.  There is nothing in the *Ruppert* decision to suggest that the Court was purporting to address anything beyond the relevancy of the number of plans located in the district to its transfer order.  To the extent that *Ruppert*'s language about standing is not dicta, there is nothing to suggest that the Court's reasoning on the issue of standing was directed to the issue whether an ERISA trustee (or plan participant, beneficiary, or other fiduciary) has the authority or ability to seek to certify a class.  *Fallick* makes clear that standing and satisfaction of the Rule 23 requirements are separate and distinct issues.  The *Ruppert* Court's discussion of standing is simply inapplicable to the question of whether the Trustees may seek to certify a class of trustees of ERISA-regulated employer pension benefit plans.  Accordingly, Nationwide's application of *Ruppert* to the present

context is not persuasive.

Under *Fallick*, so long as the plaintiffs have individual standing to pursue their claims against Nationwide, they are at least eligible to seek class certification of those claims. Therefore the threshold question, before reaching the question whether the Rule 23 requirements have been satisfied, is whether the parties have individual standing vis-a-vis Nationwide. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("That a suit may be a class action adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." (internal alteration and quotation omitted)).

To bring an ERISA suit, a plaintiff must demonstrate both statutory standing and constitutional standing. *Kendall v. Employees Ret. Plan of Avon Prods.*, __ F.3d __, No. 07-4203-cv, 2009 WL 763991, at *4 (2d Cir. Mar. 25, 2009). For statutory standing, an ERISA plaintiff must identify "a statutory endorsement of the action." *Id.* ERISA section 502(a) provides that a participant, beneficiary, or fiduciary may bring a civil action for "appropriate relief under section 1109 of this title [i.e., breach of fiduciary duty]," 29 U.S.C. § 1132(a)(2), or "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). The Trustees have statutory standing; as fiduciaries of ERISA-covered employer benefit plans, the

trustees of those plans may bring suit on behalf of their own plans.[10]

  To demonstrate constitutional standing: "(1) the plaintiff must have suffered an injury-in-fact; (2) there must be a causal connection between the injury and the conduct at issue; and (3) the injury must be likely to be redressed by a favorable decision." *Kendall*, 2009 WL 763991, at *4 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "In a class action, once standing is established for a named plaintiff, standing is established for the entire class." *Id.*

  At least one district court has held that the class action context merits a more focused constitutional standing inquiry than in a traditional suit, noting that several recent Supreme Court decisions call into question the proposition that, so long as an individual plaintiff can establish at least one type of injury caused by the defendant's actions, that plaintiff has satisfied the standing requirements and is permitted to pursue damages for all the types of injuries suffered by class members at the hands of that defendant. *In re Mut. Funds*, 519 F. Supp. 2d at 584. Although mere individual standing is not sufficient to permit a plaintiff to represent a class, the *In re Mutual Funds* Court noted that a plaintiff would have adequate constitutional standing to seek to certify a class where: "(1) she has suffered an injury in fact traceable to a defendant and redressable by the court, and (2) her claimed injury is shared in common with others who have been similarly harmed by the same defendant's actions." *Id.* at 586. The Court suggested the appropriate standing inquiry for class actions would be "whether a defendant's allegedly illegal conduct caused the same type of harm to the plaintiff and all the others on whose behalf he is

---

[10] Nationwide objects specifically to the standing of plaintiff Wiberg to bring suit under ERISA. Nationwide also disputes some of the relief the Trustees are entitled to pursue on behalf of their plans. I will take up those issues in more detail below.

asserting claims." *Id.* at 587.

Nationwide has not disputed that the named plaintiffs, with the exception of Wiberg, have constitutional standing to raise their breach of fiduciary duty claims on behalf of their own plans, nor could they plausibly dispute the plaintiffs' individual standing.   Even applying the heightened constitutional standing inquiry for class actions suggested by *In re Mutual Funds*, the plaintiffs here allege that the same conduct, i.e., accepting revenue sharing payments from the mutual funds it offered to Plans and participants, caused the same type of harm to all class members, i.e., breach of fiduciary duty.   Therefore, having established the necessary statutory and constitutional standing to pursue their claims, the Trustees may seek to certify a class.

> b.    Wiberg's Standing

Nationwide challenges Wiberg's standing to sue, labeling him a "former trustee" because the Crown Plan has terminated since this suit was filed in 2001 and he is no longer a fiduciary.[11] Relying on the well-settled principle that former fiduciaries do not have standing to sue for breach of fiduciary on behalf of a plan, Nationwide contends that Wiberg no longer has a personal stake in the outcome of this suit and that the fact Wiberg was a fiduciary at the time the suit was filed is irrelevant.[12]   Plaintiffs argue that Wiberg is more accurately characterized as a

---

[11] The Crown Tool & Die Company went out of business after this suit was filed and the Crown Plan was accordingly terminated.  Nationwide notes that the Crown Plan terminated its relationship with Nationwide prior to the filing of this suit, in May or June of 2001, but concedes that the Crown Plan was in existence, meaning that Wiberg was a current fiduciary of that Plan, at the time this suit was filed.  Tr. at 19-20, 30.

[12] It is important to note that Nationwide's standing argument relies solely on the fact that the Crown Plan was terminated after this suit was filed in August 2001, not that Wiberg's plan ended its relationship with Nationwide prior to the commencement of this suit.  Presumably, if the Crown Plan was still in existence, and Wiberg was still its trustee, Nationwide would not dispute that Wiberg has standing to assert the breach of fiduciary claim for Nationwide's conduct

"then-current" trustee suing on behalf of a "then-existing" ERISA plan and that, because standing is determined at the time of the suit's inception, Wiberg retains standing to sue for the breach of fiduciary duties that occurred during its contractual relationship with Nationwide, notwithstanding the fact that the Crown Plan was terminated after the lawsuit was initiated.

Nationwide's argument that Wiberg has lost his standing to sue on behalf of the Crown Plan relies primarily on cases holding that *former* fiduciaries lack standing to sue under ERISA. *See, e.g.*, *Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 14 (2d Cir. 1991) (holding that former fiduciaries lack standing to sue under ERISA section 502, 29 U.S.C. § 1132). Significantly, however, Wiberg's situation is distinguishable from *Chemung*. In *Chemung*, the plaintiff, a present trustee of an ERISA plan, brought suit against the plan's former trustee, alleging that the former trustee had breached his fiduciary duties to the plan. *Id.* at 13. Ruling on the former trustee's attempt to bring a counterclaim for breach of fiduciary duty against the present trustee, the Second Circuit held that former fiduciaries have no standing to sue on behalf of the plan to recover for the plan's losses due to another party's breach of fiduciary duty. *Id.* at 14-15. Unlike the former fiduciary in *Chemung*, Wiberg was a present fiduciary at the time this suit commenced. Furthermore, the plan at issue in *Chemung* remained in existence and there was a present trustee to effectively assert the interests of the plan; here, the Crown Plan has ceased existence and there are no present trustees to protect the interests of the Crown Plan in pursuing a claim for breach of fiduciary duty against Nationwide.

The Fourth Circuit addressed almost this precise issue in *Wilmington Shipping Co. v. New England Life Insurance Co.*, 496 F.3d 326, 340-41 (4th Cir. 2007), when it held that a plan

---

that occurred during its contractual relationship with the Crown Plan.

*participant* retains standing to sue under ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2) for breach of fiduciary duty even though the plan had been terminated following the commencement of the lawsuit, and despite the appointment of the Pension Benefit Guaranty Corporation ("PBGC") as statutory trustee.  Examining the statutory language of section 502(a)(2), the Court first held that the plain language grants participants the right to sue for breach of fiduciary duties on behalf of the plan "without qualification," noting that, significantly, ERISA "does not say that a plan participant can sue for breach of fiduciary duty 'until plan termination' or 'before plan termination,' just that a participant can sue for breach of fiduciary duty."  *Id.* at 338.  The Court further stated that "[o]ur review of ERISA reveals . . . that there is no provision in the statutory scheme that expressly revokes participants' standing upon termination of the plan."  *Id.*

　　　Nationwide has not offered any convincing argument why the reasoning set forth in *Wilmington Shipping* would not be equally applicable to trustees suing for breach of fiduciary duty on behalf of a plan that is terminated mid-litigation.[13]  Plan trustees and participants have equal status under ERISA section 502(a)(2).  To simply label Wiberg a "former" trustee, and hold that his standing to pursue the breach of fiduciary claim is extinguished by the termination of the plan after this suit has already commenced, would effectively leave the Crown Plan without remedy to pursue the alleged breach of fiduciary duty.[14]

---

　　　[13] Nationwide has cited one case where the district court granted summary judgment for the defendant on the ground that the plaintiff lacked standing after the plan was terminated in the course of the litigation because he became a "former Trustee."  *Miller v. Retirement Funding Corp.*, 953 F. Supp. 180, 182 (W.D. Mich. 1996).  The *Miller* Court, however, relied on cases where a former fiduciary sought to bring suit on behalf of a plan that had present fiduciaries, which makes the reasoning of that case unpersuasive here.

　　　[14] Because neither side has presented evidence whether the PBGC has become the statutory trustee of the Crown Plan, I am assuming that there is no present entity acting as trustee

Furthermore, to hold that the Crown Plan's termination deprives Wiberg of standing mid-suit would encourage fiduciaries to terminate plans in the event they are sued under ERISA for breach of fiduciary duty. *Cf. Pilkington PLC v. Perelman*, 72 F.3d 1396, 1398 (9th Cir. 1995) (rejecting argument that trustees of a successor plan lack standing under ERISA to sue the trustees of a predecessor plan for breach of fiduciary duty because reading such a limitation into the statute would encourage "fiduciaries [to] insulate themselves from liability for breaches of substantive statutory obligations by effecting a spin-off, merger, or other formal change of the trust entity").

Therefore, because Wiberg indisputably had statutory and constitutional standing to pursue a breach of fiduciary duty claim against Nationwide on behalf of the Crown Plan at the time this suit commenced, the fact that the plan has since terminated does not deprive Wiberg of standing to continue to pursue that claim against Nationwide. Despite the Crown Plan's termination, Wiberg still has a personal stake in the outcome of this case. If disgorgement of the revenue sharing payments is awarded, the Crown Plan and its participants remain eligible to receive a portion of those funds for the time that plan had a contractual relationship with Nationwide during the Class period.

c.     Plaintiffs' "Standing" to Pursue Injunctive Relief

Nationwide contends that the Trustees have no standing to seek injunctive relief because none of their plans currently has variable annuity contracts with Nationwide. Nationwide's argument is better characterized as raising "mootness" rather "standing," because the plaintiffs

---

for the Crown Plan, other than Wiberg. Therefore, I do not reach the question whether a trustee of a terminated plan retains standing to sue where another entity, such as the PBGC, has stepped in as trustee.

did have standing to assert claims for injunctive relief at the time this suit was filed in 2001. *See* Tr. at 30 (defense counsel stating that the Anderson Plan terminated its relationship with Nationwide in 2002). "In order to meet the constitutional minimum of standing to seek injunctive relief, [the plaintiff] must carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)). Based on the Anderson Plan's then-ongoing relationship with Nationwide, the Trustees had standing to seek injunctive relief when the complaint was filed. Because the Anderson Plan's relationship with Nationwide has since terminated, it is more accurate to argue that the claim has become moot. *See Comer v. Cisneros*, 37 F.3d 775, 797-98 (2d Cir. 1994) ("While the standing doctrine evaluates a litigant's personal stake at the onset of a case, the mootness doctrine ensures that the litigant's interest in the outcome continues throughout the life of the lawsuit." (internal citation and quotation omitted)).

Generally speaking, "if the claims of the named plaintiffs become moot prior to class certification, the entire action becomes moot." *Id.* at 798. The Trustees, however, are not without recourse to seek injunctive relief against Nationwide. "Where the claims of the named plaintiffs become moot prior to class certification, there are several ways in which mootness is not had," including permitting additional plaintiffs to intervene, which can save otherwise moot claims. *Id.* at 799 (citing *Pasadena City Bd. of Ed. v. Spangler*, 427 U.S. 424, 430-31 (1976), and *Baxter v. Palmigiano*, 425 U.S. 308, 310 n.1 (1976)).

Chandler has been permitted to intervene as a plaintiff in this action. Because Chandler is a trustee of a group variable annuity plan that has a present relationship with Nationwide, he has

standing to pursue the claims for injunctive relief that would otherwise be moot without his

intervention in this suit.  Chandler's intervention in this suit negates Nationwide's argument that

the Trustees lack "standing" to seek injunctive relief.  As a present customer of Nationwide's

variable annuity contract services, Chandler has standing to seek an injunction to halt the practice

of obtaining revenue sharing payments from the mutual funds Nationwide makes available to its

ERISA-covered pension benefit plan clients.

### 2.    *Class Certification Standard of Review*

The Trustees seek to certify a class pursuant to either Rule 23(b)(2) or Rule 23(b)(3), or

both, claiming they have successfully satisfied all the necessary prerequisites under both Rule

23(a) and either of the subparts of Rule 23(b).  Nationwide argues that the Trustees have failed to

establish that they will fairly and adequately protect the interests of the Class, as required by Rule

23(a)(4).  In addition, Nationwide claims that the class cannot be certified pursuant to either Rule

23(b)(3), because individualized questions of fact and law will predominate over common

questions, or Rule 23(b)(2), because the Trustees have failed to demonstrate how Nationwide

acted or refused to act on grounds generally applicable to the purported class.

The Second Circuit recently clarified the standard of review for assessing motions for

class certification in *In re Initial Public Offerings Securities Litigation* ("*In re IPO*"), 471 F.3d

24, 41-42 (2d Cir. 2006).  In that decision, the Court disavowed the previous standard of review,

holding that a district court should no longer grant class certification when the plaintiffs have

merely made "some showing" of the Rule 23 prerequisites, and should not accept an expert's

report to establish a Rule 23 requirement on the basis that it was "not fatally flawed."  *Id.* at 32,

40, 42 (quoting, respectively, *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292 (2d

Cir. 1999), and *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir.

2001)).

Before certifying a class, the district court must undertake a "rigorous analysis" to

determine whether each of the Rule 23 requirements has been met. *Id.* at 33, 41 (quoting *Gen.*

*Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). Significantly, the district judge must

resolve any factual dispute material to a Rule 23 requirement. *Id.* That obligation is not lessened

if the necessary factual finding overlaps with a merits issue; rather, the court should resolve the

dispute as it would any other threshold issue. *Id.* at 41-42. "[T]he determination as to a Rule 23

requirement is made only for purposes of class certification and is not binding on the trier of

facts, even if that trier is the class certification judge." *Id.* at 41.[15] The Court cautioned,

however, that considering facts for purposes of determining whether the plaintiff had established

all the Rule 23 requirements is not a license to delve into *all* merits issues, and that the district

court should not assess "any aspect of the merits unrelated to a Rule 23 requirement." *Id.*

Finally, the "district judge has ample discretion to circumscribe both the extent of discovery

concerning Rule 23 requirements and the extent of a hearing . . . to assure that a class

certification hearing does not become a pretext for a partial trial of the merits." *Id.* Keeping

those precautions in mind, however, "the district judge must receive enough evidence, by

affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."

---

[15] Analogizing the Rule 23 inquiry to the preliminary injunction process, the Court held
that any findings on the merits at the class certification stage would not be binding for the
ultimate fact-finder. "A trial judge's finding on a merits issue *for purposes of a Rule 23*
*requirement* no more binds the court to rule for the plaintiff on the ultimate merits of that issue
than does a finding that the plaintiff has shown a probability of success for purposes of a
preliminary injunction." *Id.* at 39 (emphasis in original).

*Id.*

On a motion for class certification, plaintiffs must demonstrate four threshold requirements under Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. In addition, a plaintiff must show that the case falls into one of the three categories of class actions under Rule 23(b). The plaintiffs here seek to certify a class under Rule 23(b)(2) and/or Rule 23(b)(3).

a.    Requirements of Rule 23(a)

Apart from the adequacy requirement of Rule 23(a)(4), Nationwide does not seriously contest that the Trustees have satisfied the requirements of Rule 23(a).

(i).    Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Generally having at least 40 class members is considered sufficient to satisfy the numerosity requirement. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). The plaintiffs allege that there are over 24,000 affected plans (and presumably at least the same number of affected trustees of those plans). Because joinder of that many plaintiffs would be impractical, plaintiffs have established the numerosity prerequisite.

(ii).    Commonality

Under Rule 23(a)(2), a putative class action plaintiff must show that "there are questions of law or fact common to the class." "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). Not every question of fact or law must be identical for each class member. *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 163 (S.D.N.Y.

-36-

2007). Commonality is established so long as the plaintiffs can "'identify some unifying thread among the members' claims.'" *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007) (quoting *Cutler v. Perales*, 128 F.R.D. 39, 44 (S.D.N.Y. 1989)).

The Trustees have identified the following questions of fact or law that are common to the Class:

- Whether Nationwide constitutes a fiduciary pursuant to the specific accumulation theory;

- Whether Nationwide constitutes a fiduciary pursuant to the mutual fund selection theory;

- Whether Nationwide, in arranging for, receiving and retaining the revenue sharing payments, discharged its duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries or defraying reasonable expenses of administering the Plans (i.e., whether Nationwide violated ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A));

- Whether Nationwide, in arranging for, receiving and retaining the revenue sharing payments, discharged its duties with respect to the Plans solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims (i.e., whether Nationwide violated ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B));

- Whether Nationwide dealt with the assets of the Plans (accumulation units and the underlying mutual fund shares in the case of group annuity contracts) in its own interest or for its own account (i.e., whether Nationwide violated ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1));

- Whether Nationwide received any consideration (the revenue sharing payments) for its personal account from any parties (mutual fund families) dealing with the Plans in connection with transactions (the revenue sharing contracts) involving the assets of the Plans (the accumulation units and the underlying mutual fund shares in the case of the group annuity contracts) (i.e., whether Nationwide violated ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3));

- Whether any part of the revenue sharing payments constitutes payments by the mutual fund families to Nationwide for services rendered by Nationwide to the mutual fund families;

- Whether Nationwide passed on any part of the revenue sharing payments to the Plans;

- Whether the Class is entitled to an injunction requiring Nationwide to disgorge all revenue sharing in the future pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3); and

- Whether the Class is entitled to disgorgement/restitution of all past revenue sharing pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2).

At a minimum, the questions of law raised by the Trustees are applicable to each member of the putative Class. If one or more Class members brought suit individually, they would raise the same legal claim, that is, that Nationwide breached its fiduciary duty (under one of the legal theories set forth by the Trustees) to the Plans and participants by accepting revenue sharing payments from mutual funds that it offered as investment options to its variable annuity contract-holders. Thus, the commonality requirement is met.

### (iii).    Typicality

Rule 23(a)(3) is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "Typicality . . . requires that the claims of the class representatives be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Marisol A.*, 126 F.3d at 376 (quoting *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

Because all the Trustees' claims arise from the same practice or course of conduct that

-38-

gives rise to the claims of proposed Class members – namely, that Nationwide accepted revenue

sharing payments from those mutual funds that it offered as investment options to annuity

contract-holders in violation of its fiduciary duties to the Plans – the plaintiffs have established

the typicality requirement.

(iv).    Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect

the interests of the class." This generally requires plaintiffs to make a two-part showing: first,

that the lead plaintiffs' interests are not "antagonistic" to the other members' interests, and

second, that the plaintiffs' attorneys are "qualified, experienced and able to conduct the

litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

This is the only prong of the Rule 23(a) requirements that Nationwide contests.

(1).    The plaintiffs' interests are not antagonistic<br>to other class members' interests

Nationwide first argues that the named plaintiffs are inadequate because they lack

standing. As discussed above, because Nationwide's standing arguments lack merit, that

challenge to the plaintiffs' adequacy as class representatives fails.

Nationwide next argues that the named plaintiffs are inadequate representatives by noting

the technical differences between the plaintiffs' contracts with Nationwide and later Nationwide

variable annuity contracts. Nationwide contends that those differences mean that the Trustees

lack the necessary incentive to pursue particular avenues of relief. Specifically, Nationwide

contends that: (a) Nationwide never unilaterally exercised its authority to substitute a mutual

fund for the named plaintiffs' plans; (b) none of the plaintiffs currently hold an annuity contract

-39-

with Nationwide and, therefore, lack the incentive to pursue prospective relief; (c) Anderson and

Grouse's individual annuity contracts did not give Nationwide the explicit authority to

unilaterally substitute investment options, unlike post-1998 individual annuity contracts; and (d)

Wiberg's ratification of the revenue sharing payments in exchange for reduced contract charges

places his credibility into question.

Beginning with Nationwide's argument that plaintiffs are inadequate because Nationwide

never unilaterally substituted a mutual plan with respect to the plaintiffs' plan, that point is not

persuasive on the issue of adequecy because it misconstrues the nature of the Trustees' legal

theory. As the Trustees note, their legal theories do not depend on demonstrating that

Nationwide actually deleted or substituted specific investment options. Rather, the Trustees are

arguing that Nationwide is a fiduciary because it retained the *ability* to remove and replace

mutual funds, and that, as a fiduciary, it breached its duty to the Plans and participants by using

its access and control over the Plans' and participants' investments to obtain revenue sharing

payments from the mutual funds in exchange for offering them as investment options to the Plans

and participants. Because demonstrating actual removal or substitution is not essential to the

plaintiffs' legal theory, the fact that Nationwide never deleted or substituted a mutual fund with

respect to the Trustees' Plans is irrelevant and does not create a conflict between the Trustees and

Class members.

Second, with the intervention of Chandler, the argument that the plaintiffs no longer have

contracts with Nationwide fails. The Trustees have the incentive and authority to pursue both

injunctive relief and disgorgement on behalf of the Class.

Third, to the extent that pre-1998 individual contract-holders' claims fail on the merits

because their contracts did not contain explicit contractual authority permitting Nationwide to substitute mutual funds, that is an issue that can only be decided by the fact-finder deciding the issue on the merits. In the interim, there is no reason to believe that the difference in contractual language will make plaintiffs Anderson and Gouse less likely, or less incented, to pursue their claims for breach of fiduciary on behalf of the class. Finally, plaintiff Wiberg has adequate incentive to pursue relief for both post-1998 individual annuity contract-holders and group contract-holders whose contracts all contained the same explicit contractual language referenced above.

Fourth, to the extent that Nationwide's "ratification" defense is applicable, it would apply to all class members who were trustees of plans that held group annuity contracts prior to the implementation of "revenue sharing payments." There is evidence that suggests the trustees of such plans received standard correspondence relating to the contract changes and were each asked to sign off on identical changes to the group annuity contracts. Additionally, the viability of the ratification defense is still an open question, subject to a determination by the fact-finder on the merits. Therefore, there is no reason to suspect that Wiberg would not be an adequate representative to pursue the Class claims on behalf of those members who would be subject to a similar ratification defense. Because Nationwide has not demonstrated how the existence of a ratification defense is unique to Wiberg or how it threatens to become the focus of this litigation, I conclude that the presence of a possible ratification defense does not render Wiberg an inadequate class representative. *See Baffa*, 222 F.3d at 59 (noting that "[w]hile it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class

representative is subject to unique defenses which threaten to become the focus of the litigation").

Fifth, the fact that Nationwide has stated a counterclaim against the Trustees for breach of fiduciary duty does not make the Trustees inadequate class representatives. Wiberg, Gouse, and Anderson have submitted sworn declarations that the threat of individual liability has not deterred their determination to pursue their claims against Nationwide. Chandler intervened in this litigation notwithstanding the threat of litigation against him. *See* Tr. at 95 (describing litigation consequences for intervenor representative plaintiffs). Given the length of time this litigation has been pending, I have no reason to doubt the veracity of those assertions. Furthermore, these counterclaims are not "unique" to those named plaintiffs; *any* trustee who stepped forward to act as class representative (or, for that matter, any putative class member who opts out and chooses to litigate his or her claims individually) would be subject to the same breach of fiduciary counterclaim. Therefore, the presence of a counterclaim does not make the Trustees' interest adverse to the Class.

Given the weakness of the remaining counterclaim (which barely survived the plaintiffs' motion to dismiss), the likelihood that the counterclaim was specifically pled with an eye towards defeating class certification on adequacy grounds, and the fact that any breach of fiduciary duty on the part of the Trustees is necessarily derivative of, and dependent upon, a finding that Nationwide breached its fiduciary duties, it is unlikely that the counterclaim will become the focus of the litigation. Therefore, I see no reason why Nationwide's counterclaim would inhibit the Trustees' ability and determination to pursue class relief. To hold otherwise would effectively prevent trustees from ever pursuing breach of fiduciary claims on behalf of a class

-42-

because fiduciaries are always potentially subject to breach of fiduciary counterclaims from their co-fiduciaries. There is therefore no reason why the counterclaims against these particular plaintiffs render them inadequate representatives to pursue the interests of the Class.

Finally, Nationwide seeks to discredit the named plaintiffs as adequate representatives by highlighting their apparent lack of knowledge about the legal issues central to this case. Nationwide relies on the Second Circuit decision in *Baffa*, which stated that, because class representatives must fairly and adequately protect the interests of the class, "class representative status may properly be denied 'where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'" 222 F.3d at 61 (quoting *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995)). Because "[t]he Supreme Court in *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370-74 (1966), expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance," the significant avenue for inquiry is not whether the putative class representative has an intricate knowledge and understanding of his legal strategy, but whether he demonstrates any unwillingness or inability to pursue litigation on behalf of the class. *Baffa*, 222 F.3d at 61-62; *see also Gunnells v. Health Plan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003) ("It is hornbook law . . . that in a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative." (citing *Baffa*, 222 F.3d at 61) (internal quotation and alteration omitted)).

-43-

The putative class representative in *Baffa*, a securities fraud class action suit, was an eighteen-year-old who had recently taken control of the shares held for him by his father in a Uniform Gifts to Minors Act account. 222 F.3d at 56. The Second Circuit held that the plaintiff was an acceptable class representative because "he understood the nature of his proposed role in the litigation and demonstrated his willingness to carry it forward," notwithstanding the fact that he had only met with his attorneys a "couple" of times or that he acknowledged relying on the advice and support of his father and attorneys. *Id.* at 62.

Similarly, the lead plaintiffs here have a knowledge about the basic claims they are asserting, i.e., that Nationwide was improperly accepting fees from the mutual funds it was offering to the Plans and participants. Nationwide has not pointed to any evidence that would suggest that the named plaintiffs are unable or unwilling to pursue their cause of action vigorously on behalf of the class. It is not surprising that the plaintiffs do not understand the intricacies of the legal theory advanced by their attorneys. Particularly in the area of ERISA law, it is a rare instance where a client is fully aware of the legal issues or understands the particular legal strategy advanced by the attorney. *See Bradford v. AGCO Corp.*, 187 F.R.D. 600, 605 (W.D. Mo. 1999) ("In fact, this Court would be shocked if a representative plaintiff in an ERISA and [Labor Management Relations Act] case took an active role in the preparation of the case.").

Nationwide has not advanced any argument relating to the plaintiffs' choice for class counsel or those attorneys' ability to adequately handle the litigation. Nationwide's argument relies entirely on the idea that the named plaintiffs should be deemed inadequate because they have not exhibited sufficiently detailed knowledge about the nature of their legal claims, a line of attack the Second Circuit has expressly discouraged. As the Second Circuit held in *Baffa*, a class

representative cannot be deemed inadequate simply because he or she relies on his or her attorney

for advice and guidance.

> (2).    Are the plaintiffs' attorneys qualified,
> experienced, and able to conduct the
> litigation?

Nationwide has not attacked the plaintiffs' attorneys qualifications, experience, and

ability to conduct the litigation.  After reviewing the firm and attorney C.V.s attached to the

motion for class certification, I find that the plaintiffs have engaged qualified, experienced, and

capable attorneys to litigate this ERISA class action suit on their behalf.

Therefore, the plaintiffs have sufficiently established the adequacy prong of the Rule

23(a) test, namely, that (1) they have no disabling conflicts of interest with the rest of the class,

and (2) they have retained adequate counsel to protect and represent the interests of the Class in

this litigation.

> b.    Requirements of Rule 23(b)

Plaintiffs seek certification under either or both Rule 23(b)(2) and Rule 23(b)(3).  Where

plaintiffs would qualify for class certification under both subsections, a class "should be treated

as if it had been brought exclusively" under Rule 23(b)(2).  7AA Charles Alan Wright, Arthur R.

Miller, & Mary Kay Kane, Federal Practice & Procedure, § 1784.1 (3d ed. 2005); *e.g.*, *Robinson*

*v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 167 n.12 (2d Cir. 2001) ("Because we hold

that the liability phase of the pattern-or-practice claim is appropriate for (b)(2) class treatment,

we are not required to respond to Class Plaintiffs' contention that the liability phase is also

appropriate for (b)(3) class certification.").  Therefore, I will first analyze whether a class could

be certified under Rule 23(b)(2).

-45-

"Rule 23(b)(2) provides that an action may be maintained as a class action if, in addition to the threshold requirements of numerosity, commonality, typicality, and adequacy of representation, 'the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.'" *Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 18 (2d Cir. 2003) (quoting Fed. R. Civ. P. 23(b)(2)). Significantly, (b)(2) class treatment is not appropriate for cases where money damages are the exclusive or predominant relief sought. *Id.* (citing Fed. R. Civ. P. 23(b)(2), advisory committee note (1966)). Still, the Second Circuit does not foreclose (b)(2) class certification for cases that seek both monetary relief and injunctive or declaratory relief, provided that the injunctive relief predominates.

In *Robinson v. Metro-North Commuter Railroad Co.*, 267 F.3d 147 (2d Cir. 2001), the Second Circuit articulated the standard for class certification pursuant to Rule 23(b)(2) where the plaintiffs seek monetary relief in addition to injunctive or declaratory relief. Describing the class certification standard as an "ad hoc" approach to (b)(2) class certification, the Second Circuit declined to adopt a bright-line bar to (b)(2) class treatment for claims that sought non-incidental monetary damages in addition to equitable relief. *Id.* at 164. According to the *Robinson* Court, "when presented with a motion for (b)(2) class certification of a claim seeking both injunctive relief and non-incidental monetary damages, a district court must consider the evidence presented at a class certification hearing and the arguments of counsel, and then assess whether (b)(2) certification is appropriate in light of the relative importance of the remedies sought, given all of the facts and circumstances of the case." *Id.* (internal quotations and alteration omitted).

A district court may grant a motion for (b)(2) class certification if, in its "informed, sound

judicial discretion," it finds that (1) the injunctive relief is the predominant relief sought, and (2) "class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy." *Id.* (internal quotations omitted). Assessing whether injunctive relief predominates requires "an ad hoc balancing that will vary from case to case." Nevertheless, a district court should satisfy itself that:

> (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits.

*Id.* The primary concern is to avoid (b)(2) certification of claims where the injunctive or declaratory relief sought is "insignificant or [a] sham." *Id.*

The Court went on to discuss the due process concerns of certifying a class pursuant to Rule 23(b)(2), which does not provide for notice to or opt-out rights for absent class members. Noting that, although notice and opt out rights were generally unnecessary in (b)(2) class actions because "there is a presumption of cohesion and unity between absent class members and class representatives," due process concerns arise when monetary relief is sought in addition to injunctive relief because "entitlement to non-incidental damages may vary among class members depending on the circumstances and merits of each claim." *Id.* at 165. The Court, therefore, suggested that, under such circumstances, district courts should exercise their discretionary authority pursuant to Rule 23(d)(1)(B) to require an opt-out right and notice to absent class members "for those portions of the proceedings where the presumption of class cohesion falters i.e., the damages phase of the proceedings."[16] *Id.* at 166.

---

[16] Rule 23(d)(1)(B) states that "[i]n conducting an action under this rule, the court may issue orders that . . . require – to protect class members and fairly conduct the action – giving

Because the Trustees seek monetary relief in addition to injunctive and declaratory relief, the *Robinson* ad hoc approach governs whether (b)(2) class treatment is appropriate for the claims at issue here.[17] Class certification pursuant to Rule 23(b)(2) is appropriate if, in addition to demonstrating that Nationwide acted or refused to act on grounds that apply generally to the class, the Trustees can demonstrate that they would pursue their claims for injunctive and declaratory relief even in the absence of monetary relief, and that any injunctive or declaratory relief would be both reasonably necessary and appropriate should they succeed on the merits of their claims.

               (i).     Nationwide Acted or Refused to Act on Grounds that Apply Generally to the Class

If the Trustees ultimately succeed in proving that Nationwide was a fiduciary and breached its ERISA fiduciary obligations, final injunctive and declaratory relief would be

---

appropriate notice to some or all class members of: (i) any step in the action; (ii) the proposed extent of the judgment; or (iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action."

[17] Plaintiffs offer two alternative theories for why Rule 23(b)(2) class certification is appropriate: first, that the monetary relief they seek is a form of injunctive relief, and second, that the monetary relief is incidental to the injunctive relief sought. Their first argument lacks merit. Although an injunction requiring disgorgement of money is technically injunctive relief, it is more fairly characterized as monetary relief. Their second argument, that the monetary relief is incidental to equitable relief, relies on an interpretation of Rule 23(b)(2) that the Second Circuit expressly rejected in *Robinson*. In *Allison v. Citgo Petroleum Co.*, 151 F.3d 402 (5th Cir. 1998), the Fifth Circuit adopted a rule that a class seeking both equitable and monetary relief could be certified pursuant to Rule 23(b)(2) when the monetary relief was merely "incidental" to the injunctive relief. The *Robinson* Court, however, held that even non-incidental claims for monetary relief could be certified pursuant to Rule 23(b)(2), provided that the monetary relief did not predominate over the injunctive relief. 267 F.3d at 164. Thus, the Second Circuit's standard set forth in *Robinson* is easier to meet than the Fifth Circuit's standard set forth in *Allison*, making the plaintiffs' argument that they satisfy the *Allison* standard unnecessary surplusage.

appropriate respecting the class as a whole. According to the plaintiffs' theory of the case, the conduct that allegedly makes Nationwide subject to fiduciary obligations under ERISA, and the conduct that allegedly puts Nationwide in breach of those obligations, is uniform with respect to the entire Class. For instance, it is beyond dispute that, for each underlying Plan in the Class, Nationwide selected the universe of mutual funds that were made available as investment options for the Plans and participants. It is also not in dispute that Nationwide collects revenue sharing payments from most, if not all, of the mutual funds it makes available to the Plans and participants for investment. As explained in more detail above, this is the general conduct that the Trustees argue both makes Nationwide a fiduciary and puts it in breach of its fiduciary duties. A declaration that this conduct subjects Nationwide to ERISA fiduciary obligations and an injunction prohibiting it from engaging in conduct in breach of those duties – i.e., collecting revenue sharing payments from the mutual funds it makes available as investment options for its ERISA-protected group and individual annuity contract-holders – would be appropriate respecting the class as a whole because it would uniformly stop Nationwide from engaging in that disputed conduct. According to the plaintiffs' theory of the case, an injunction would bring Nationwide in line with its fiduciary obligations by removing any incentive for Nationwide to choose mutual funds for a reason other than what is in the Plans' best interests and stopping it from engaging in a prohibited self-dealing transaction.

Nationwide counters that injunctive and declaratory relief is not appropriate because it has not acted or refused to act on grounds that apply generally to the class, arguing that the determination whether it is a fiduciary and, in turn, whether it breached its fiduciary duties requires an individualized, plan-by-plan inquiry. Calling this a "functional fiduciary" analysis,

Nationwide argues that it can only be a fiduciary with respect to a particular plan if it was acting as a fiduciary for that plan when it negotiated the revenue sharing payments with a particular mutual fund. But Nationwide misconceives several key aspects of the plaintiffs' legal theories regarding fiduciary status and breach. Therefore, its arguments relating to the inapplicability of injunctive and declaratory relief are not persuasive.

Nationwide is correct that ERISA employs a "functional" approach to determining whether a particular person or entity is a fiduciary and to what extent. 29 U.S.C. § 1002(21)(A) ("[A] person is a fiduciary with respect to a plan *to the extent* (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . ." (emphasis added)); *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) ("[T]he threshold question [for breach of ERISA fiduciary duty] is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) . . . ."). Nationwide does not appear to disagree with my explanation regarding limited fiduciary status under ERISA, as set forth in *Haddock I*:

> Congress intended the term "fiduciary" to be "broadly construed." *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987) (citing Congressional Record). Formal titles are not dispositive of fiduciary status; rather, courts use a functional test in determining whether an individual or entity is an ERISA fiduciary, and if so, to what extent. *Id. See also Mertens v. Hewitt Assoc.*, 508 U.S. 248, 262 (1993) ("ERISA ... defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan."). Under the functional approach, the court considers whether the entity has performed one or more of the roles described in 29 U.S.C. § 1002(21)(A). "[F]iduciary status exists with respect to any activity enumerated in the statute over which the entity exercises discretion or control." *Blatt*, 812 F.2d at 812.

> * * *

In short, courts construing ERISA have held that an entity can be a fiduciary with respect to a plan for some purposes, but not others. *See, e.g.*, *Pegram*, 530 U.S. at 225 (comparing a common law trustee, who may only wear his "fiduciary hat" when taking action that affects a beneficiary, with an ERISA fiduciary who "may wear different hats").

419 F. Supp. 2d at 164-65.

Although ERISA recognizes that an entity may be a limited fiduciary, subject to ERISA fiduciary obligations only when exercising its discretionary authority as set forth under section 1002(21)(A)(i)-(iii), Nationwide has too narrowly construed the window of time when it may be reasonably described as a fiduciary subject to ERISA fiduciary obligations.  As Nationwide argued at the February hearing, it believes that it would only be eligible for fiduciary status at the time it was actually negotiating the revenue sharing payments with each mutual fund.  Tr. at 65, 67.  For example, it contends that it could not be a fiduciary with respect to those Plans that were either already contract-holders with Nationwide or that had not yet signed an annuity contract with Nationwide.  Tr. at 59.

Nationwide's argument misconstrues both the nature of the functional fiduciary analysis and the plaintiffs' theory regarding its fiduciary status.  An entity is a fiduciary with respect to, and to the extent that, it actually has discretionary authority or control respecting the management or disposition of plan assets, 29 U.S.C. § 1002(21)(A)(i), therefore, the plaintiffs' claims for breach of fiduciary duty must arise out of that discretionary authority or function.  *See Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 87 (2d Cir. 2001) ("Under this definition, a person . . . has [fiduciary] status only 'to the extent' that he has or exercises the described authority or responsibility." (internal quotation omitted)); *Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 569 (7th Cir. 1991) ("[T]he obligation as a fiduciary pertains only to the

discretion thus created."); *Leigh v. Engle*, 727 F.2d 113, 134-35 (7th Cir. 1984).

The plaintiffs here allege two theories for how Nationwide exercises authority and control with respect to the plan assets, i.e., the accumulation units: (1) the specific accumulation unit theory and (2) the mutual fund selection theory. First, under the specific accumulation unit theory, the plaintiffs allege that Nationwide is a fiduciary because it is able to amass billions of dollars in plan assets under its authority and control, which is demonstrated by its ability to leverage access to those funds in exchange for revenue sharing payments from the mutual funds. Second, under the mutual fund selection theory, the plaintiffs allege, and I determined in *Haddock I* that a reasonable fact-finder could conclude, that Nationwide is a fiduciary because it "exercises authority or control respecting disposition of plan assets by controlling which mutual funds are available investment options for the Plans and participants." 419 F. Supp. 2d at 166.

Under neither of those theories is Nationwide's fiduciary status only determinable on a micro level by examining the nature and circumstance of each Class plan's annuity contract and the timing of when that contract was signed relative to Nationwide's agreement with a particular mutual fund. The plaintiffs rely on those aspects of Nationwide's relationships with the Plans and the mutual funds that are identical with respect to each Class member. First, each Plan committed its retirement assets to Nationwide's control, thus establishing and becoming part of the giant pool of money that enabled Nationwide to trade access to that pool in return for revenue sharing payments from mutual funds seeking to become an investment option for the Plans and participants. Second, for each plan that contracted with Nationwide, Nationwide was charged with selecting the mutual funds that would then be made available to the Plans and participants as investment options. It is out of those specific activities that plaintiffs allege Nationwide was a

fiduciary and was, in turn, in breach of its ERISA fiduciary obligations by accepting the revenue sharing payments from the mutual funds. Under the plaintiffs' theory, the revenue sharing payments are evidence that Nationwide was (1) not selecting the mutual funds in the sole interest of the Plans by not acting for the exclusive purpose of providing benefits or defraying the Plans' reasonable expenses, (2) acting contrary to what the reasonably prudent person would do, (3) dealing with the assets for its own self-interest, and (4) receiving consideration for its own personal account from any party dealing with the Plans in connection with a transaction involving the assets of the Plans.[18]

A hypothetical may be useful to demonstrate the fallacy of Nationwide's argument regarding how and when an entity's status as a fiduciary is determined. Take an attorney who is holding $3 million in a client trust account. He is in a position of trust with respect to those funds and owes his clients fiduciary obligations to hold those funds for the exclusive benefit and sole interest of his clients. The attorney is prohibited from using his access to those funds to engage in self-dealing transactions for his own benefit. A bank is very appreciative that the attorney keeps this large pool of money with it and, as a way of showing its appreciation, offers the attorney a personal 3% kickback above and beyond whatever interest is accruing on the client funds in the trust account. By accepting the money from the bank, the attorney has breached his fiduciary duties by engaging in a self-dealing transaction by using the client assets to receive a

---

[18] It is also significant that the value of the revenue sharing payments was directly tied to the value of the accumulation units invested in each mutual fund. This is not a situation where Nationwide received a fixed fee from the mutual funds to be part of the investment options that were subsequently made available to the Plans and participants. Instead, the value of the revenue sharing payments to Nationwide was derived directly from the value of the plan assets that were invested in the mutual funds. The more the Plans and participants invested, the more Nationwide stood to gain in revenue sharing payments.

personal benefit.

Now assume the attorney is aware that the bank is potentially insolvent or that there is another bank across town that will offer lower account fees and a better interest rate for the client account, but no extra incentive for the attorney. The attorney does not take his client account to that other bank, despite the obvious advantages to the client account, but instead leaves it with the first bank because of the extra 3% return he is receiving from the bank for his business. The attorney is in further breach of his fiduciary duties by failing to act in the sole interest of the account beneficiaries by placing the account with an unstable financial institution that is not offering the lowest administrative fees or best rate of return for the account.

Likewise, by accepting the revenue sharing payments from mutual funds that it selects to be investment options for the Plans and its participants, Nationwide is allegedly placing its interests in collecting revenue sharing payments ahead of selecting the best investment options for the Plans and participants. The revenue sharing payments are an incentive for Nationwide to offer those mutual funds to the Plans as investment options. The harm to the Plans and participants flows from the money Nationwide allegedly receives as a result of its control of the funds and the alleged way Nationwide shapes the universe of available investment options in any way other than in the sole interest of the Plans.

Going back to the attorney hypothetical, it cannot be that the attorney's fiduciary status only existed at the moment in time when he first placed the client trust account with the bank in exchange for the 3% return. Nor can he only owe a fiduciary duty to those clients whose funds were in the account at the time he negotiated the deal with the bank. Rather, the attorney owes fiduciary obligations to all the clients whose funds he is holding in the trust account throughout

the duration that he has control and authority over the disposition and management of the funds being held in the trust account. Similarly, Nationwide's fiduciary status extends further than it admits.

   *Marshall v. Carroll*, 1980 U.S. Dist. LEXIS 17767 (N.D. Cal. 1980), provides an example of how even passive conduct can violate the precise ERISA provisions at issue in the present case. In *Marshall*, in return for placing ERISA plan assets in certain banks, the defendant received favorable terms on loans that were unrelated to the management of the plan assets. *Id.* at *8-12, *18. The defendant was deemed to be a fiduciary with respect to the plans because he "exercised discretionary authority and control respecting the management of the plans and disposition of their assets" by virtue of his ability to select those institutions where the plan assets would be deposited. *Id.* at *20. The district court held that the defendant had violated 29 U.S.C. § 1104(a)(1)(A), the obligation to act solely in the interest of the plans and for the exclusive purpose of the plans, and 29 U.S.C. § 1106(b)(1), the prohibition against self-dealing, "[b]y causing or permitting plan assets to be placed" in a variety of banks "to obtain loans from those banks." *Id.* at *22, *24. Like the defendant in *Marshall* and the attorney in my hypothetical example, Nationwide is alleged to be a fiduciary by virtue of its continuing authority and control over the investment options for the plan assets.

   Getting back to the issue at hand – whether Nationwide acted or refused to act on grounds common to the class – it is clear, after articulating the plaintiffs' theories of fiduciary duty and breach, how it is plausible that declaratory and injunctive relief would be appropriate relief across the class as a whole. In making their case for why Nationwide is an ERISA fiduciary and why its collection of revenue sharing payments was in violation of its ERISA fiduciary

obligations, plaintiffs do not purport to rely on evidence that is individual to each plan.  Rather,

their legal and factual theories are premised on the structural nature of Nationwide's contractual

relationship with the Plans, which is identical across the Class.  For that reason, if Nationwide is

found to be a fiduciary and in breach of its ERISA fiduciary duties, final injunctive and

corresponding declaratory relief would be appropriate respecting the class as a whole.

> (ii).    The Injunctive and Declaratory Relief Sought Predominates
>          Over Monetary Relief

Having established that Rule 23(b)(2) class treatment is potentially available to the Class

because the plaintiffs seek both monetary relief and injunctive and declaratory relief, the next

question that must be answered is whether the injunctive and declaratory relief predominates

under the *Robinson* ad hoc analysis.  To answer that question, I must first consider whether, even

in the absence of possible monetary recovery, reasonable plaintiffs would bring suit to obtain the

injunctive or declaratory relief sought here; and second, whether the injunctive and declaratory

relief would be both reasonably necessary and appropriate should the plaintiffs succeed on the

merits of their claim against Nationwide.  *Robinson*, 267 F.3d at 164.

Given the nature of the plaintiffs' claims, it is clear that, even in the absence of a possible

monetary award disgorging profits that Nationwide obtained through its breach of fiduciary duty,

a reasonable plaintiff's primary objectives in bringing this suit would be to obtain (1) a

declaratory judgment that Nationwide was both a fiduciary to the Plans and in breach of its

fiduciary obligations under ERISA and (2) an injunction preventing it from continuing to engage

in the conduct that constitutes a breach of its fiduciary duties.  The monetary relief sought here –

disgorgement – is ancillary to and derivative of a finding that Nationwide is a fiduciary and in

breach of its fiduciary duties under ERISA.  Not only would a reasonable plaintiff seek

declaratory and injunctive relief in the absence of a possible monetary award, but because of the equitable nature of the monetary relief sought, the plaintiffs could not obtain the required monetary relief in the absence of the injunctive and declaratory relief. This is not a typical breach of contract claim where, in addition to damages for the loss arising out of the breach, the plaintiff seeks an injunction preventing further breaches of the contract. In such a case, the plaintiff would be entitled to money damages even in the absence of an injunction. Here, the success of plaintiffs' claims for monetary relief depend upon a declaratory judgment that Nationwide is an ERISA fiduciary and in breach of its fiduciary duties. The plaintiffs would not be able to obtain disgorgement in the absence of such a judgment. Accordingly, I conclude that the declaratory and injunctive relief sought predominates.

It bears noting at this juncture that the plaintiffs are seeking *equitable* monetary relief as opposed to money damages, which is contrary to Nationwide's argument that the plaintiffs are seeking legal restitution. Citing *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002), Nationwide contends that recovery of the revenue sharing payments is a claim for legal, not equitable, restitution. Nationwide therefore contends that the claim for monetary relief cannot be ancillary to the injunctive and declaratory relief sought, and is, in fact, a claim for money damages that predominates over that injunctive and declaratory relief. Because Nationwide has mischaracterized the nature of the monetary relief sought by the plaintiffs, and is citing a different ERISA remedial provision than the one relied upon by the plaintiffs in their claim for monetary relief in this suit, it is necessary to briefly discuss the nature of the monetary relief sought by the plaintiffs on behalf of the Class.

The *Knudson* Court addressed the type of relief that a participant or beneficiary could

pursue under ERISA section 502(a)(3). 534 U.S. at 206. In *Knudson*, the Court held that parties

seeking relief pursuant to section 502(a)(3) are limited to seeking equitable relief, concluding

that the petitioners' claim for "restitution" was actually a remedy at law because they were

seeking to impose personal liability "for a contractual obligation to pay money – relief that was

not typically available in equity." *Id.* at 210. The petitioner in *Knudson* was an insurance

company seeking reimbursement, pursuant to section 502(a)(3), of certain medical expenses paid

to a policyholder who had received compensation for those same expenses from a settlement

agreement with a third party. *Id.* at 207. Rejecting the petitioner's characterization of its claim

for relief as "equitable" merely because it labeled it "restitution," the Court concluded that claims

for "restitution" could lie in equity or in law, depending on the basis of the claim and the nature

of the remedy sought. *Id.* at 213. The Court held that the petitioner was seeking *legal* restitution

because it was not claiming that it was entitled to specific funds in the respondents' possession,

but that it was "contractually entitled to *some* funds for benefits that they conferred." *Id.* at 214;

*see also Coan v. Kaufman*, 457 F.3d 250, 264 (2d Cir. 2006) (relying on *Knudson* to conclude

that the plaintiff was not entitled to seek individual non-equitable monetary relief under section

502(a)(3)).

Knudson and *Coan* are distinguishable from the present case in several key ways.[19] First,

_____

[19] In *Knudson*, the petitioners were not seeking recovery on behalf of an ERISA-covered plan, but instead were seeking individualized reimbursement of benefits conferred on the respondents. In *Coan*, the Second Circuit concluded that the individual plaintiff could not obtain monetary relief pursuant to section 502(a)(3) because she essentially sought the equivalent of money damages, which are not appropriately considered "equitable." 457 F.3d at 264. In those cases, the courts were focused on whether the putative claim for "restitution," pursuant to section 502(a)(3), could be fairly described as an "equitable" remedy, the only available monetary remedy under that provision.

In contrast, section 502(a)(2) permits those suing on behalf of the class to seek both

the plaintiffs here are seeking relief on behalf of their Plans, not individual relief, which makes

ERISA section 502(a)(2) the governing provision for the type of monetary relief that the

plaintiffs are permitted to pursue. *Compare Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134,

142-44 (1985) (identifying ERISA section 409 – and, in turn, ERISA section 502(a)(2) – as the

appropriate remedial provision for claims seeking relief *on behalf of the plan* for breach of

fiduciary duty), *with Varity v. Howe*, 516 U.S. 489, 512 (1996) (identifying ERISA section

503(a)(3) as the appropriate remedial provision for parties seeking *individual* equitable relief for

breach of fiduciary duty).[20]  Furthermore, section 502(a)(2) expressly permits the type of relief

the plaintiffs are seeking here, i.e., disgorgement.  Section 502(a)(2), 29 U.S.C. § 1132(a)(2),

_____

equitable relief and monetary damages, by incorporating the relief permitted under section
409(a), 29 U.S.C. § 1109(a).  *See* James Jorden, et al., Handbook on ERISA Litigation, § 4.05[C]
("Monetary damages for breach of fiduciary duty is provided within ERISA § 409(a), which
requires a fiduciary to 'make good to [the] plan any losses to the plan resulting from each such
breach.' . . .  Even when a plan has not suffered losses, ERISA § 409(a) enables the plan to
recover 'any profits of such fiduciary which have been made through use of the assets of the plan
by the fiduciary.'" (quoting 29 U.S.C. § 1109(a))).  Because the Trustees are seeking monetary
relief on behalf of the Plans, they are entitled to seek recovery pursuant to section 502(a)(2).
Therefore, *Knudson* and *Coan* are not applicable to this case.

Nationwide's focus on the fact that the lead plaintiffs, with the exception of Chandler, are
eligible to receive only monetary relief because they no longer have a current contractual
relationship is misplaced.  The *Robinson* predominance test uses an objective test to determine
what type of relief the reasonable plaintiff in similar circumstances would prefer.
Notwithstanding the fact that monetary relief is the primary form of relief sought by several of
the lead plaintiffs who no longer have an ongoing contractual relationship, the primary thrust of
the Trustee's case is to stop Nationwide from continuing to engage in conduct that is in breach of
its fiduciary obligations.  Therefore, the declaratory and injunctive relief may be fairly
characterized as relief a reasonable plaintiff would seek even in the absence of monetary
recovery.

[20] Section 502(a)(3) provides the basis for the Trustees' claim for declaratory and
injunctive relief sought on behalf of the Plans.  My discussion of sections 502(a)(2) and
502(a)(3) is intended to address only the question of the appropriate section to support the
plaintiffs' claim for monetary relief.

states that "[a] civil action may be brought . . . by the Secretary, or by a participant, a beneficiary, or fiduciary for appropriate relief under section 409 [29 U.S.C. § 1109]."  Section 409, in turn provides, in pertinent part, "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable . . . to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . ."  29 U.S.C. § 1109(a).  Although section 502(a)(3) is a "catch-all" provision that provides relief for claims that do not fall within section 502(a)(2), *see Varity*, 516 U.S. at 512, where the claim for relief *does* fall within sections 409 and 502(a)(2), those provisions govern.

The plaintiffs' claim for monetary relief in this case is very plainly disgorgement.  The plaintiffs have chosen to alternatively refer to their monetary relief claim as "restitution," "disgorgement," or "restitution/disgorgement."  Still, because the Trustees do not allege that the revenue sharing payments are rightfully their property, *see* Black's Law Dictionary 1339 (8th ed. 2004) (defining "restitution" as the "[r]eturn or restoration of some specific thing to its rightful owner or status"), and because they have not alleged any loss resulting from Nationwide's breach of fiduciary duty, their claim that Nationwide should relinquish its profits made in breach of its fiduciary duties is more accurately described as disgorgement.  *Id.* at 501 (defining "disgorgement" as "[t]he act of giving up something (such as profits illegally obtained) on demand or by legal compulsion").  To achieve ERISA's goal of preventing the mismanagement and misuse of plan assets by fiduciaries, "ERISA § 409(a), 29 U.S.C. § 1109(a), requires a fiduciary to disgorge to an employee benefit plan any profits he makes through improper use of the plan's assets."  *Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861

F.2d 1406, 1411 (9th Cir. 1988); *see also Leigh*, 727 F.2d at 122 n.16 ("With its focus on

protecting the interests of plan beneficiaries, ERISA clearly prohibits [fiduciaries from profiting

by using plan assets], and the provisions in [29 U.S.C.] section 1109(a) [ERISA section 409(a)]

for disgorgement of profits are the remedy to deter such violations.").

Finally, injunctive and declaratory relief is both reasonably necessary and appropriate if

the plaintiffs were to succeed on the merits.  It is difficult to conceive how merely collecting

monetary relief for past practices found to be in breach of Nationwide's fiduciary obligations,

without simultaneously providing injunctive relief to halt the illegal practice going forward,

would make any sense from a judicial efficiency standpoint.  Therefore, the injunctive and

declaratory relief sought in this case predominates over the monetary relief requested.

(iii).    Class Treatment Would  Be Efficient and Manageable

The final prong of the *Robinson* ad hoc analysis for Rule 23(b)(2) class certification

claims requires the court to consider whether "class treatment would be efficient and

manageable, thereby achieving an appreciable measure of judicial economy."  *Robinson*, 267

F.3d at 164.  Without a doubt, class certification pursuant to (b)(2) would provide an appreciable

measure of judicial economy because it would simultaneously resolve Nationwide's fiduciary

status and breach with respect to the more than 24,000 Class trustees and their underlying plans

and participants.

First, on the issue of liability, as discussed in more detail above, whether Nationwide is a

fiduciary and whether it breached its obligations to the Plans as a fiduciary can be resolved on the

basis of the characteristics of Nationwide's contractual relationship with the plans that are

common to the Class.  Furthermore, any breach of Nationwide's fiduciary obligations will be

determined on the basis of conduct that is applicable to the whole Class.

On the issue of monetary relief, the inquiry is not nearly as complicated as Nationwide contends. Nationwide contends that the Trustees must prove on a classwide basis that Nationwide received the revenue sharing payments at the expense of the plan participants and that the payments caused some loss to the plans or participants. Nationwide maintains that such proof requires individualized analyses of each plan's particular circumstances, making class treatment inappropriate.

Nationwide misstates the Trustees' burden of proof. Where a plaintiff seeks disgorgement of ill-gotten profits on behalf of a plan, pursuant to ERISA sections 409 and 502(a)(2), it is not necessary to prove any loss, let alone individualized losses. "ERISA clearly contemplates actions against fiduciaries who profit by using trust assets, even where the plan beneficiaries do not suffer direct financial loss." *Leigh*, 727 F.2d at 122 (citing 29 U.S.C. § 1109(a)). In *Leigh*, the plaintiffs did not allege a loss of plan assets, but rather that the defendants had risked the plan's assets in a way that was not solely in the interest of the plan's beneficiaries. *Id.* "ERISA expressly prohibits the use of assets for purposes other than the best interests of the beneficiaries, and the language of section 1109(a) providing for disgorgement of profits from improper use of trust assets is the appropriate remedy." *Id.* "The purpose of the rule is not to make beneficiaries whole for any damages they may have suffered. In fact, whether beneficiaries have been financially damaged by the breach is immaterial." *Murdock*, 861 F.2d at 1411-12.

Disgorgement is an available remedy under any of the plaintiffs' fiduciary theories. *See* 29 U.S.C. § 1109(a). Determining the amount of revenue sharing payments that can be attributed

to each Class plan would not be difficult because Nationwide has kept very clear records

regarding the amount of revenue sharing payments it has collected.  According to the plaintiffs,

Nationwide has produced data demonstrating the amount of revenue sharing payments it received

from each mutual fund starting in 2002.  The Trustees have reason to believe that Nationwide

would be able to tabulate the same data for revenue sharing payments for the entire class period.

Pl. Confidential Reply App. Ex. L, Mandel Decl. (Doc. # 366 Attach. 12) ¶ 3.  The plaintiffs

maintain that, because the revenue sharing payments are derived from the value of the plan assets

in each sub-account tied to a particular mutual fund, and Nationwide has data for both the value

of the plan assets in each sub-account from each Plan and the amount in revenue sharing

payments it collected from each mutual fund, it would be relatively simple to calculate the

amount of revenue sharing payments attributable to each Plan.  Therefore, if the value of the

disgorgement award is the value of the revenue sharing payments themselves, determining the

appropriate figure for each Class member requires a mechanical calculation using readily

available data.

　　　Nationwide's alternative argument on the issue of calculating the appropriate monetary

relief is that, even if the plaintiffs need not show a loss, determining the amount of "profit"

requires an individualized analysis of the circumstances of each plan.  Nationwide contends that

the revenue sharing payments were administrative service fees rendered in exchange for

providing distribution and administrative services including: aggregating the annuity contract-

holders' transactions into a daily "omnibus trade" of each mutual fund's shares; distributing and

marketing the annuity contracts and investment options; disseminating mutual fund prospectuses

and other disclosures; transmitting the purchase orders and redemption requests placed by the

plans and participants; preparing federal, state, and local government reports for each account maintained on behalf of a plan; distributing and filing tax forms; and preparing accounting reconciliations.  Def. Opp'n Br. (Doc. # 338) 13-14.

There are several problems with Nationwide's argument.  First, the plaintiffs allege that the revenue sharing payments were not made in return for any services, arguing that those services were already being paid for by the Plans and participants through the standard fees charged by Nationwide and the PPA arrangements, and that those services were necessary to doing business with mutual funds in general because they have no physical presence.  According to the plaintiffs' expert, Stanley Monsowitz, Nationwide provided those "services" before and after the institution of the revenue sharing payments, and they "represent[] the standard inherent business functions that a variable annuity distributor such as Nationwide must perform for all its clients and represent[] services required by both its customers and for its own benefits."  Pl. Confidential Reply App. Ex. J, Monsowitz Decl. (Doc. # 366 Attach. J) at 3.  In other words, Nationwide was already being compensated for those administrative tasks, and, therefore, the revenue sharing payments were pure profit.  Indeed, as I have already held in *Haddock I*, "the Trustees have raised a triable issue concerning whether Nationwide in fact performed services in consideration for those payments."  419 F. Supp. at 171.  Because a reasonable fact-finder could conclude that the entire value of the revenue sharing payments is "profit" eligible to be disgorged for Nationwide's violation of its ERISA fiduciary obligations, no individualized inquiry into an offset for the reasonable value of the services performed would be necessary.  *Cf. Kim v. Fujikawa*, 871 F.2d 1427, 1431 (9th Cir. 1989) (upholding district court's award of entire cost of the prohibited transaction even where there were benefits to the plan because defendants had not

presented sufficient evidence to apportion the benefits received).

Second, even if Nationwide did perform administrative tasks in exchange for the revenue sharing payments, Nationwide may not be entitled to any off-set for the reasonable value of any services rendered.  In *Patelco Credit Union v. Sahni*, 262 F.3d 897, 910-12 (9th Cir. 2001), the Ninth Circuit concluded that the reasonable compensation off-set provision in 29 U.S.C. § 1108(c)(2),[21] does not apply to violations of 29 U.S.C. §§ 1104(a) (breach of the general duty of loyalty)  or 1106(b) (fiduciary self-dealing).  According to the *Patelco* Court:

> Section § 1106(b) thus creates a per se ERISA violation; even in the absence of bad faith, or in the presence of a fair and reasonable transaction, § 1106(b) establishes a blanket prohibition of certain acts, easily applied, in order to facilitate Congress' remedial interest in protecting employee benefit plans. In essence, a combined reading of §§ 1106 and 1108 and the relevant regulation suggests that a fiduciary, normally permitted to receive reasonable compensation for services rendered – this rule is preserved by the § 1108 exemption – may not if self-dealing is involved in the transaction securing the payment.

*Id.* at 911 (quoting *Gilliam v. Edwards*, 492 F. Supp. 1255, 1264 (D.N.J. 1980)).  In other words, there is no "safe harbor" for self-dealing fiduciaries – fiduciaries are permitted to receive reasonable compensation for services performed on behalf of the plan to the extent that those payments do not also constitute self-dealing.[22]  *Id.*; *see also Chao v. Linder*, 421 F. Supp. 2d

---

[21] 29 U.S.C. § 1108(c)(2) states that "[n]othing in section 406 [29 U.S.C. § 1106] shall be construed to prohibit any fiduciary from . . . receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan . . . ."

[22] Finally, it is not clear that Nationwide even has a colorable defense under ERISA section 408(c)(2) because it argues that the revenue sharing payments are rendered for services performed on behalf of the mutual funds, not the plans.  The extent to which services performed on behalf of the mutual funds are actually incurred on behalf of the plans is a question on the merits that goes to the issue of breach – even if Nationwide is deemed to be a fiduciary, it could escape liability if it is found not to have engaged in self-dealing transactions.  If Nationwide is

1129, 1135-36 (N.D. Ill. 2006) (adopting holding from *Patelco* that there is no safe harbor for self-dealing fiduciaries); *Daniels v. Nat'l Employee Benefit Servs., Inc.*, 858 F. Supp. 684, 693 (N.D. Ohio 1994) ("[Section] 1108 does not apply to § 1106(b), because fiduciaries are prohibited from receiving consideration – whether or not reasonable – from a third party for transactions involving the plan to which they owe their fiduciary obligations."); *Whitfield v. Tomasso*, 682 F. Supp. 1287, 1304 (E.D.N.Y. 1988) ("[T]he exemptive provisions of sections 408(b)(2) and 408(c)(2) apply only to violations of section 406(a), not violations of section 406(b).").

Third, even if Nationwide is permitted to off-set any benefits to the Plans, it is Nationwide's burden to prove such benefits. Where the defendant is the party responsible for the difficulty in determining reasonable compensation, awarding the total amount of compensation obtained is not inappropriate. *Kim v. Fujikawa*, 871 F.2d 1427.

Finally, even if Nationwide is permitted to off-set any benefits to the Plans from the disgorgement award, and if it becomes clear during the course of the trial on the merits that the amount of monetary relief is dependent upon an individualized inquiry, it would be possible to de-certify the class to determine the issue of damages once the question of liability has been determined on a class-wide basis. *In re Visa Check/MasterMoney*, 280 F.3d at 141, *overruled on other grounds by In re IPO*, 471 F.3d at 42. The Second Circuit has suggested at least five ways to address individualized damages issues:

(1) bifurcating liability and damage trials with the same or different juries; (2)

---

not found to be self-dealing, however, it could still be found to be in breach of its fiduciary duties under section 404(a), which carries no reasonable compensation safe harbor. *Patelco*, 262 F.3d at 910.

appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.

*Id.* at 141 (internal footnote omitted). Even if it is necessary to assess individualized circumstances on the issue of monetary relief, that does not detract from the efficiency of assessing liability on a class-wide basis.

Therefore, having determined that injunctive and declaratory relief predominates over monetary relief and that class certification would be both efficient and manageable, I conclude that the plaintiffs' claims should be certified pursuant to Rule 23(b)(2).

(iv).    Due Process Concerns for Hybrid (b)(2) Classes

Traditionally, Rule 23(b)(2), unlike (b)(3), does not provide for notice or opt-out rights for absent class members. Acknowledging that notice and opt-out rights are generally unnecessary in (b)(2) class actions because "there is a presumption of cohesion and unity between absent class members and class representatives," the *Robinson* Court stated that due process concerns arise when monetary relief is sought in addition to injunctive relief because "entitlement to non-incidental damages may vary among class members depending on the circumstances and merits of each claim." 267 F.3d at 165. "Absent class members may therefore need notice that their claims are being pursued in the class action and the opportunity either to opt out and pursue their claims separately or to intervene, should they conclude such active participation would better protect their individual interests." *Id.* at 166. The Court, therefore, suggested that under such circumstances district courts should exercise their discretionary authority pursuant to Rule 23(d)(1)(B) to require an opt-out right and notice to absent class members "for those portions of the proceedings where the presumption of class

cohesion falters – i.e., the damages phase of the proceedings." *Id.* For those reasons, I will require that class members be given notice and opt-out rights similar to the requirements set forth in Rule 23(c)(2)(B) for (b)(3) classes.

**IV**.    **Conclusion**

For the forgoing reasons, the plaintiffs' motion to strike (**doc. # 358**) is **GRANTED** in part and **DENIED** in part. The defendants shall submit an amended Answer within ten (10) days. H. Grady Chandler's motion to intervene (**doc. # 402**) is **GRANTED**. Finally, the plaintiffs' motion for class certification (**doc. # 299**) pursuant to Rule 23(b)(2) is **GRANTED**. The plaintiffs shall submit a proposed notice to class members, and all other necessary documents, within forty-five (45) days.

It is so ordered.

Dated at Bridgeport, Connecticut, this 6th day of November 2009.

/s/
_____
Stefan R. Underhill
United States District Judge
