UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LOU HADDOCK, as trustee of the Flyte Tool  §
& Die Company, Inc. 401-K Profit Sharing  §
Plan, PETER WIBERG, as trustee of the  §
Crown Tool & Die Co. Inc. Salary Deferral  §
Profit Sharing, ALAN GOUSE, as trustee of  §
the Greater Hartford Easter Seal Rehabilitation  §
Center, Inc., Tax Sheltered Annuity Plan  §
and the Money Accumulation Pension Plan  §
for the Employees of Hartford Easter  §
Rehabilitation Center, Inc., Trust,  §    CASE NO. 01-CV-1552 (SRU)
CHRISTOPHER ANDERSON, as trustee of  §
the Anderson Law Firm, P.C. 401(k) Profit  §
Sharing Plan and Trust, f/k/a the Anderson  §
& Ferdon P.C. 401(k) Profit Sharing Plan,  §
and H. GRADY CHANDLER, as trustee of  §
the Law Offices of H. Grady Chandler, P.C.,  §
401(k) Profit Sharing Plan and Trust  §
 §
    PLAINTIFFS,  §
 §
v.  §
 §
NATIONWIDE FINANCIAL SERVICES  §
INC., and NATIONWIDE LIFE  §
INSURANCE CO.,  §
 §
    DEFENDANTS.  §

## PLAINTIFFS' SIXTH AMENDED CLASS ACTION COMPLAINT

Plaintiffs, through counsel, hereby allege as follows:

## I.    SUMMARY OF THE ACTION

1.    This is an action for equitable relief or damages under the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.  It seeks to recover, for the benefit of

the Plaintiff Trustees' 401(k) plans and all others similarly situated, payments from mutual

funds/mutual fund advisors (hereinafter referred to as "the revenue sharing payments") received

and wrongfully kept by Defendants, Nationwide Life Insurance Company and/or Nationwide Financial Services Incorporated (hereinafter sometimes collectively referred to as "Nationwide").

2.  Nationwide's arranging for payment by mutual funds of and its retention of the revenue sharing payments for its own benefit constitute prohibited transactions which violate ERISA § § 404 and 406(b), 29 U.S.C. § § 1104 and 1106(b), and breaches of its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

3.  Plaintiffs bring this action, on their own behalf and on behalf of all those similarly situated, under ERISA § § 409(a) and 502(a)(3) and (g), 29 U.S.C. § § 1109(a) and 1132(a)(3) and (g), to recover the following relief:

- A declaratory judgment holding that the acts of Nationwide described herein are illegal as violations of ERISA;

- A permanent injunction against Nationwide prohibiting the practices described herein;

- Disgorgement/restitution of all the revenue sharing payments received by Nationwide and/or its subsidiaries and affiliates, or, alternatively, the difference between the revenue sharing payments and the reasonable fair market value of any services provided by Nationwide to the mutual funds for which the revenue sharing payments purportedly constituted payment;

- Attorneys' fees and costs; and

- Any other legal or equitable relief deemed by the Court to be fair and just.

## II.   THE PARTIES

4.  Plaintiff, Peter Wiberg ("Wiberg"), is a trustee of the Crown Tool & Die Co. Inc. Salary Deferral Profit Sharing (the "Crown Plan").  Wiberg brings this action on behalf of the Crown Plan in his capacity as its trustee.  In that capacity, he is a fiduciary of the Crown Plan. Both the Crown Plan and its sponsor are located in Bridgeport, Connecticut.

5.     Plaintiff, Alan Gouse ("Gouse"), is a trustee of the Greater Hartford Easter Seal Rehabilitation Center, Inc., Tax Sheltered Annuity Plan and the Money Accumulation Pension Plan for the Employees of Hartford Easter Rehabilitation Center, Inc., Trust (collectively the "Easter Seal Plan"). Gouse brings this action on behalf of the Easter Seal Plan in his capacity as its trustee. In that capacity, he is a fiduciary of the Easter Seal Plan. Both the Easter Seal Plan and its sponsor are located in Windsor, Connecticut.

6.     Plaintiff, Christopher Anderson ("Anderson"), is a trustee of the Anderson Law Firm, P.C. 401(k) Profit Sharing Plan and Trust, f/k/a the Anderson & Ferdon P.C. 401(k) Profit Sharing Plan (the "Anderson Plan"). Anderson brings this action on behalf of the Anderson Plan in his capacity as its trustee. In that capacity, he is a fiduciary of the Anderson Plan. Both the Anderson Plan and its sponsor are located in Norwich, Connecticut.

7.     Plaintiff, H. Grady Chandler ("Chandler") is a trustee of the Law Offices of H. Grady Chandler, P.C., 401(k) Profit Sharing Plan and Trust (the "Chandler Plan"). Chandler brings this action on behalf of the Chandler Plan in his capacity as its trustee. In that capacity, he is a fiduciary of the Chandler Plan. The Chandler Plan and its sponsor are located in Garland, Texas.

8.     Defendant, Nationwide Life Insurance Company ("Nationwide Life"), is a wholly owned subsidiary of Defendant, Nationwide Financial Services, Incorporated. Nationwide Life is a foreign corporation with its principal place of business in Columbus, Ohio, which has appeared in this litigation.

9.     Defendant, Nationwide Financial Services Incorporated ("NFS"), is a publicly traded company incorporated in Delaware with its principal place of business in Columbus, Ohio. Directly and/or through its subsidiaries, NFS provides savings and retirement products,

including the products provided by Nationwide Life to the Plans. NFS is the third largest writer of variable annuity contracts in the United States. Nationwide Life and NFS transact business in every state, including Connecticut.  NFS has appeared in this litigation.

## III.   JURISDICTION AND VENUE

10.   Plaintiffs seek relief on behalf of the Plans pursuant to the civil enforcement remedies provided by ERISA against fiduciaries and other interested parties pursuant to ERISA § 409, 29 U.S.C. § § 1109, and 29 U.S.C. § 1132.  Therefore, this Court has jurisdiction over this action pursuant to 28 U.S.C.  § 1331 and ERISA  § 502(e)(1)(2), 29 U.S.C.  § 1132(e)(1)(2).

11.   Venue of this action in the District of Connecticut is proper pursuant to ERISA  § 502(e)(2), 29 U.S.C.  § 1132(e)(2), because three of the Plaintiffs' Plans are administered in the district, many of Nationwide's breaches took place in the district, and Nationwide may be found in the district.

## IV.   EVENTS UNDERLYING THE CLAIMS

*A.   THE PLAINTIFFS.*

12.   During all or part of the Class Period, the Crown Plan was a participant directed 401(k) savings-for-retirement plan. Crown Plan participants each had their own individual accounts in the Plan, which they and the plan sponsor funded. Under the Crown Plan and through the Crown Plan's contract with Nationwide Life, participants were entitled to invest in the various mutual funds selected for inclusion in the platform by Nationwide Life.

13.   During all or part of the Class Period, the Easter Seal Plan was and is a participant directed 401(k) savings-for-retirement plan. The Easter Seal Plan participants each had their own individual accounts in the Plan, which they and the plan sponsor funded. Under the Easter Seal Plan and through the Easter Seal Plan's contract with Nationwide Life, participants were entitled

to invest in the various mutual funds selected for inclusion in the platform by Nationwide Life.

14.     During all or part of the Class Period, the Anderson Plan was and is a participant directed 401(k) savings-for-retirement plan. The Anderson Plan participants each had their own individual accounts in the Plan, which they and the plan sponsor funded. Under the Anderson Plan and through the Anderson Plan's contract with Nationwide Life, participants were entitled to invest in the various mutual funds selected for inclusion in the platform by Nationwide Life.

15.     Since at least October 1, 1993, the Chandler Plan was and is a participant directed 401(k) savings-for-retirement plan.   The Chandler Plan participants each had their own individual accounts in the Plan, which they and the plan sponsor funded.   Under the Chandler Plan and through the Chandler Plan's group annuity contract with Nationwide Life, participants were entitled to invest in the various mutual funds selected for inclusion in the platform by Nationwide Life.

16.     Including the Plaintiffs' Plans, approximately 24,230 qualified ERISA retirement plans are represented by the trustees who are the members of the Class, which Plans contracted with Nationwide for Nationwide to provide variable annuity investment platforms for the investment of their assets during the Class Period.   Over 8,000 of the Plans, including the Chandler Plan, remain under contract with Nationwide to this day.

B.     *THE RELATIONSHIP BETWEEN CLASS MEMBERS, NATIONWIDE AND THE MUTUAL FUNDS.*

17.     The employers who are the sponsors of the ERISA plans represented by the trustees who compose the Class ("the Plans") almost exclusively utilized full service providers to create the Plans and provide the entire range of administrative services necessary to run them. These full service providers, sometimes referred to as Pension Plan Administrators or PPA's, persuaded the Plans to use Nationwide as their investment provider, receiving commissions for

doing so.

18.     After setting up the Plans, the PPA's  provided all the services necessary for the Plans to operate, including record keeping, compliance, trustee services, distribution of account proceeds to departing participants, loan processing, withdrawals, communications with participants, participant servicing, and acting as a complete intermediary between the Plans and Nationwide.  Much of the record keeping and other services provided by the PPA's were subcontracted by the PPA's to Nationwide in return for payments by the PPA's, made on a per participant basis.

19.     Pursuant to standard form contracts, Nationwide provided investment options to the Plans through insurance products called variable annuities.  Nationwide offered two types of variable annuity contracts: group annuity contracts, pursuant to which Nationwide contracted only with the Plan, but each participant had an individual account, and individual annuity contracts, for which Nationwide contracted separately with each participant.

20.     The group annuity contracts provided for payment by the Plans to Nationwide of "Asset Management Charges" calculated as a percentage of the daily value of a Plan's investment in the variable account in which Nationwide held the shares of the underlying mutual funds, along with a "Contingent Deferred Sales Charge" if a Plan withdrew its investments from Nationwide within a specified number of years after contract inception.  The group contracts did not provide for Nationwide to receive any other benefits in connection with its relationships with the Plans.

21.     The individual annuity contracts provided for: (i) fixed ($30 per year) contract maintenance charges; (ii) mortality and expense risk charges (1.25%) calculated as a percentage of the daily net asset value of the participant's investment in the variable account in which

Nationwide held the underlying mutual fund shares; (iii) administration charges (.05%) calculated as a percentage of the daily net asset value of the participant's investment in the variable account in which Nationwide held the underlying mutual fund shares; and (iv) a Contingent Deferred Sales Charge.  The individual contracts did not provide for Nationwide to receive any other benefits in connection with its relationships with the Plans.

22.     In return for its charges to the Plans, Nationwide provided all the services necessary for the administration of the contract, including participant and plan record keeping, participant servicing and communications with participants/plans/PPA's.   These services provided to the Plans and their participants were the same services provided to the PPA's in return for payments by those PPA's.  None of the group or individual annuity contracts (which are standard forms) provided for or even referenced payments by mutual funds or mutual fund advisors to Nationwide.

23.     Nationwide chose a group of mutual funds that it made available for investment by the Plans with group annuity contracts, and the Plans chose a subset of those funds for investment in by their participants, with the Plans' choices as indicated on the group annuity applications becoming part of their group annuity contracts.  Likewise, Nationwide chose a group of mutual funds that it made available for investment by the Plans with individual annuity contracts, and from the subset of mutual funds chosen by a Plan with individual annuity contracts, the individual participants chose specific funds to invest in, with their individual applications becoming part of the individual annuity contracts.  Pursuant to the annuity contracts and/or prospectuses associated with those annuity contracts, Nationwide had the unilateral right to cease offering mutual funds chosen by participants and substitute other mutual funds in their place.

24.     Technically, the Plans and their participants did not invest directly in the mutual funds.  Rather, the Plans and their participants invested in "variable accounts," also known as "separate accounts," established by Nationwide.  All Plans and their participants holding group annuity contracts invested in the "Nationwide Qualified Plans Variable Account," while all Plans and their participants holding individual annuity contracts invested in the "Nationwide Variable Account – II."  Those variable accounts established by Nationwide kept their assets separate from the general assets of Nationwide, and those variable accounts were not chargeable with any of Nationwide's liabilities outside of the variable accounts.

25.     Both of those variable accounts are divided into sub-accounts that correspond to the mutual funds and other investment options available under the annuity contract.  Pursuant to their contracts, participants choose the mutual funds in which their contributions and any matching contributions made by their employers are invested, and Nationwide allocates those contributions to particular sub-accounts within the variable accounts which correspond to the chosen mutual funds.  In return for the contributions, which are plan assets, the Plans and their participants receive accumulation units (shares) of the applicable sub-accounts of the variable accounts, which accumulation units are held by Nationwide.  Those accumulation units owned by the Plans and their participants and held by Nationwide constitute plan assets.

26.     Based on the combined contributions to the sub-accounts made by all the Plans and their participants, Nationwide sells and purchases mutual fund shares to hold in the variable accounts.  The value of a Plan's accumulation units (shares) in the variable account fluctuates based upon the value of the mutual fund shares held within the various sub-accounts.

27.     According to the Pension and Welfare Benefits Administration:

*Mutual funds are pools of financial instruments that may include stocks, bonds, commercial paper, cash, and other instruments.   Shares of mutual funds are*

*bought by investors, including 401(k) plans.  The shares represent an undivided common interest in the pool of investments.  The shareholders benefit by receiving the earnings of the investments in the form of additional shares and by a capital gain when the shares are redeemed from the mutual fund.*

Study § 2.4.1, App. Tab 1 [Docket No. 130].  Mutual funds do not have employees and must contract with various entities to perform managerial, administrative, accounting, legal and other services.  Mutual funds pay the entities providing those services.

28.     The mutual funds pass those costs on to their investors by charging them a variety of fees, typically investment management fees, distribution fees or commissions, and marketing or 12(b)(1) fees.  A mutual fund takes these fees from investors by paying to the investment manager/mutual fund advisor or other service provider out of its general assets a dollar amount equal to the designated percentage of the net asset value of all of its shares, which causes the net asset value of all its shares to decrease by that percentage.  This causes the value of the mutual fund shares held by Nationwide in the variable account to decrease by that percentage, which in turn reduces the value of each Plan's and participant's accumulation units (shares) of the Nationwide variable account correspondingly.

29.     At all relevant times, the mutual funds offered by Nationwide to the Plans, almost without exception, have not been the same mutual funds offered to individual investors.  Rather, they have been either "clone" funds created by the mutual fund companies for investment in by 401(k) plans investing through variable annuity contracts which imitate funds the same mutual fund companies offer to the general public or funds created specifically for investment in by 401(k) plans investing through variable annuity contracts which do not mimic funds offered to the general public by the same mutual fund companies.  Many of the funds have been owned and/or operated by Nationwide itself or its subsidiaries or affiliates.

30.     The mutual funds set the percentages of the Plans' assets they took as fees for

their services (which fees had to be disclosed in the funds' prospectuses) so as to cover not only the fees they would have normally charged, but also the amount of the revenue sharing payments they had to make to Nationwide. Simple economics dictates that if Nationwide had not required the mutual funds to make the revenue sharing payments, but rather asked the funds to lower the fees they charged to the Plans and their participants by a like amount, they would readily have agreed, because their revenue would have remained unchanged.

C.   *THE RELATIONSHIP BETWEEN NATIONWIDE AND MUTUAL FUNDS/MUTUAL FUND ADVISORS PRIOR TO IMPLEMENTATION OF THE REVENUE SHARING SCHEME.*

31.   Prior to approximately January 1, 1996, Nationwide routinely performed certain services in conjunction with the investment of the Plans' assets in mutual funds, such as maintaining separate records for each participant reflecting the mutual fund shares purchased and redeemed and the mutual fund share balances of each participant; dispersing or crediting to participants all proceeds of redemptions of shares of the mutual funds and all dividends and other distributions not reinvested in shares in the mutual funds; preparing and transmitting periodic statements to participants; supporting and responding to service inquires from participants; maintaining and preserving records required by law to be maintained and preserved in connection with participants' investments in mutual funds; generating written confirmations and quarterly statements to participants; distributing to participants the mutual funds' prospectuses, etc.; and transmitting purchase and redemption orders to the mutual funds on behalf of the participants. Performance of these services was necessary for Nationwide to conduct its business. Nationwide provided these services to the Plans and PPA's in return for compensation from them.

32.   Because it provided these services to the Plans and PPA's in return for

compensation from them, prior to implementation of the revenue sharing scheme, Nationwide typically didn't receive any revenue sharing or expense reimbursement from mutual funds/mutual fund advisors, although it may have received 50 cents per month ($6.00 per year) per participant from a very few funds. Pricing Nationwide's services on a per participant basis made sense, because the costs associated with providing those services vary with the number of participants, not the amount of assets.

D.      *IMPLEMENTATION OF THE REVENUE SHARING SCHEME.*

        33.     Beginning in 1993 and continuing into 1995, Nationwide became concerned that its pricing of group annuity contracts was becoming non-competitive, particularly in the medium-sized and large case portion of its target market ($5,000,000 and up). Determined to lower its group annuity contract prices and match the competition without actually decreasing (or while actually increasing) the revenue generated by its annuity contracts, Nationwide began investigating and ultimately implemented a scheme whereby mutual funds and/or mutual fund advisors made revenue sharing payments to it based upon a percentage of the Plans' assets invested in the mutual funds through Nationwide. Nationwide implicitly or explicitly made it a condition to offering a mutual fund family's funds that the mutual fund family pay it revenue sharing on a majority or all of its funds offered by Nationwide.

        34.     In order to implement this scheme, Nationwide initiated changes in its group annuity contract pricing and negotiated revenue sharing agreements with mutual funds. Over the course of approximately two years, Nationwide developed a pricing model as to group annuity contracts that: (i) set up categories of mutual funds with different charges to the Plans based on how much revenue sharing the funds would pay, and (ii) priced the Asset Management Charge (separately within each category) paid by the Plans on a sliding scale, with the charge decreasing

as the amount of assets invested by a Plan increased.

35.     Ultimately, Nationwide ended up with three categories of funds in its group annuity pricing: (i) "Primary Plus" for those mutual funds paying Nationwide 0.25% to 0.58% on assets plus $0 to $12 per participant, (ii) "Primary" for funds paying Nationwide 0.15% to 0.25% on assets; and (iii) "Optional" for those funds paying Nationwide 0.00% to 0.08% on assets.  The group annuity contracts only referenced the three categories; they did not disclose that they were based on how much the mutual funds in the categories were paying to Nationwide.  In stark contrast to the group contracts, the pricing of existing and new individual annuity contracts did not change as a result of implementation of revenue sharing, remaining at 1.30% for mortality and expense risk and administration charges and $30 per year for contract maintenance charges.

36.     In order to implement the new pricing as to existing group annuity contracts, Nationwide obtained signed written standard form amendments from each Plan with which it had a group annuity contract.  The revenue sharing was discussed by Nationwide using standard language in the explanatory correspondence which accompanied the amendment forms. Nationwide did not communicate that it was implementing revenue sharing to the Plan participants who held individual annuity contracts.

37.     Presumably anticipating a challenge under ERISA to its scheme as a breach of fiduciary duty, Nationwide drafted its new group annuity contracts and the amendments to its existing group annuity contracts so as to portray that it had certain "standard" administrative fees which it was discounting.  This "discounting" was a sham, however, because the "standard" administrative charges were above fair market pricing.  The supposedly discounted administrative fees constituted, in fact, only market pricing.  Nationwide engaged in this illusion so as to create the argument that it was passing the value of the revenue sharing payments on to

the Plans in the form of discounted administrative fees.  Significantly, the contracts themselves did not reference the Plans receiving the supposed discounts to the administrative fee because Nationwide was receiving revenue sharing payments from mutual funds.  Rather, the contracts referenced the supposed discounts without explaining the reasons for their existence.

38.    In reality, therefore, because its supposedly discounted pricing really only constituted market pricing that it would otherwise have been forced to offer in order to remain competitive, none of the supposed discounts to the administrative fees offered by Nationwide constituted Nationwide passing on the benefit of the revenue sharing payments to the Plans. Alternatively, to the extent that any portion of the discounted pricing constituted Nationwide actually passing on some portion of the benefit of the revenue sharing payments to the Plans, Nationwide did not pass on the full amount of the revenue sharing payments to the Plans.  In fact, not only did Nationwide succeed in appearing to reduce its administrative fees (thereby keeping it competitive with its rivals) without losing revenue, its implementation of the revenue sharing scheme actually served to significantly increase its revenues.

39.    Revenue sharing payments are made to Nationwide pursuant to written contracts ("revenue sharing contracts"), variously denominated as service contracts, administration contracts, fund services contracts, fund participation contracts and broker dealer contracts, with the investment management firms which provide to mutual funds the management and other services necessary for the funds to function.   Revenue sharing payments are variously denominated as 12(b)(1) fees (which are supposed to be fees for marketing of the fund), administration fees, service fees and subtransfer agent fees.  All of the revenue sharing payments are based in whole or in overwhelming part on a percentage of a Plan's investment in a mutual fund.

40.     While the revenue sharing payments are described by Nationwide in the revenue sharing contracts as reimbursements for expenses incurred in providing services to the mutual funds, those services from which mutual funds/mutual fund advisors may incidentally benefit are actually ones which Nationwide had traditionally supplied to Plans and PPA's as a necessary part of its business in return for charges collected from them, and those services did not change as a result of revenue sharing.  Although the description of Nationwide's services may vary slightly from revenue sharing contract to contract, the actual services performed by Nationwide for Plans and PPA's from which mutual funds may incidentally benefit are virtually identical in every case.

41.     The revenue sharing payments are calculated based upon a percentage of the Plans' assets invested in the mutual funds through Nationwide.  Such amounts bear no relationship whatsoever to the cost of providing the services or a reasonable fair market value for the services.  Simply put, it does not cost any more to keep records regarding and handle the transactions of a participant with $10,000 invested in a mutual fund than it does to keep records regarding and handle the transactions of a participant who has $100,000 invested in the mutual fund.  Accordingly, in an open market between unrelated parties, such services would be provided on an annual per participant basis, as Nationwide provided them prior to its implementation of the plan asset skimming scheme, and not on a percentage of assets basis. Furthermore, the reasonable fair market price of such services would be far, far less than the amounts of the revenue sharing payments.  Indeed, the market may be such that no one other than Nationwide could or would ever provide these services, making the provision of these services an inherent part of Nationwide's business, such that the services provided by Nationwide would actually have no reasonable fair market value at all.  In reality, therefore, the mutual funds

are paying Nationwide either not at all or virtually not at all for the performance of services.

42.     Since approximately January 1, 1996, therefore, Nationwide (and/or Nationwide's subsidiaries or affiliates) has been arranging for, receiving and keeping the revenue sharing payments for its own use and benefit in breach of its fiduciary duties under ERISA.  These revenue sharing payments range from less than 25 to over 58 basis points on the total assets of the Plans for each year of their contracts during the Class Period.

43.     As a wholly owned subsidiary of NFS, Nationwide Life is necessarily subject to the control of NFS.   As to all actions of Nationwide described in this Complaint, those acts were engaged in by Nationwide Life under the control of and at the direction of NFS. Indeed, Nationwide Life's acts were a facilitation of a scheme designed and controlled by NFS.  To the extent necessary, Federal law, in light of the purposes of ERISA, requires piercing of the corporate veil between NFS and Nationwide Life and the resulting treatment of them as mere alter egos who are jointly and severally liable for the conduct complained of herein.

## V.     CLASS ACTION ALLEGATIONS

44.     This action is brought as a class action by Plaintiffs on behalf of themselves and the following defined Class:

> All trustees of all employee pension benefit plans covered by ERISA which had variable annuity contracts with Nationwide or whose participants had individual variable annuity contracts with Nationwide at any time from January 1, 1996, or the first date Nationwide began receiving payments from mutual funds based on a percentage of the assets invested in the funds by Nationwide, whichever came first, to the date of November 6, 2009.

45.     This action may be maintained as a class action pursuant to FRCP 23, because it meets all the requirements of Rule 23(a)(1-4), in that it satisfies the numerosity, commonality, typicality, and adequacy requirements, and it satisfies the requirements of Rule 23(b)(2) and/or 23(b)(3).  It satisfies the requirements of 23(b)(2), because Nationwide has acted or refused to

act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole. It also satisfies the requirements of 23(b)(3), in that the predominance and superiority requirements are met.

46.     By Nationwide's own estimate, there are approximately 24,230 Plans throughout the United States whose trustees are members of the Class. Thus, the members of the Class are so numerous that their individual joinder herein is impractical.

47.     There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to, whether Nationwide constitutes a fiduciary in connection with the conduct described herein and whether that conduct breaches its fiduciary duties. The common questions of law and fact predominate over questions affecting only individual class members, in that the Court and the parties will spend the vast majority of their time resolving common issues. Indeed, the only individual issues will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function.

48.     Plaintiffs, who are all members of the Class, have claims that are typical of all the members of the Class. Plaintiffs' and Class members' claims arise out of the same uniform course of conduct by Nationwide and arise under the same legal theories as all the other members of the Class.

49.     Plaintiffs will fairly and adequately represent the interests of the members of the Class. Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation, and counsel have agreed to advance all expenses of the litigation.

50.     A class action is superior to all other feasible alternatives for the resolution of this matter.  Class members are uniformly unaware of Nationwide's breaches of fiduciary duty, such that they will never bring suit individually.  Furthermore, even if they were aware, the claims of many Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties and potentially lead to inconsistent results.

51.     Nationwide has acted on grounds generally applicable to the Class by uniformly subjecting them to the revenue sharing scheme described above, which scheme Nationwide has made clear it intends to continue to perpetrate in the future.  Accordingly, final injunctive relief and equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

## VI.     CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTIES

### A.     *NATIONWIDE IS A FIDUCIARY AS TO THE ACCUMULATION UNITS.*

52.     Nationwide is a fiduciary under ERISA  § 3(21)(A), 29 U.S.C.  § 1002(21)(a), as to the accumulation units because (a) they are plan assets, and (b) Nationwide exercises authority or control respecting their management or disposition in at least three different manners, including: (i) by controlling which mutual funds are available investment options for the Plans and participants, (ii) by using its custody and control of them to obtain the revenue sharing payments from the mutual fund advisors, and (iii) by virtue of all the actions it can and does take as to them pursuant to its annuity contracts with the Plans or their participants, including holding them for the benefit of the Plans, cancelling them to pay its fees, transferring them to use as collateral for loans, cancelling them to pay loans, cancelling them to purchase annuities and cancelling them to make cash payments.  As a fiduciary to the accumulation units, Nationwide is

prohibited from receiving benefits in connection with its control or exercise of authority over them not specifically agreed to by the Plans or their participants in their annuity contracts with Nationwide.

B.    *NATIONWIDE IS ALSO A FIDUCIARY AS TO THE REVENUE SHARING PAYMENTS.*

53.    The revenue sharing payments themselves constitute plan assets in Nationwide's hands under the functional approach because, at least: (i) Nationwide received the payments as a result of its fiduciary status or function (e.g., because Nationwide receives payments from mutual funds in exchange for offering the funds as an investment option to the Plans and participants), and (ii) they were made by the mutual fund advisors and received by Nationwide at the expense of the Plans and participants (e.g., because the mutual funds set the fees they charged Plans and participants to cover not only the fees they would have normally charged, but also the amount of the revenue-sharing payments they had to make to Nationwide), or (iii) they effectively constitute the proceeds of the Plans' and participants' investments.

54.    Nationwide is, therefore, also a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), with respect to the revenue sharing payments, because it controls or exercises authority respecting their management or disposition by arranging for, accepting and retaining (or its subsidiaries or affiliates arranging for, accepting and retaining) them.

C.    *NATIONWIDE BREACHED ITS FIDUCIARY DUTIES AS TO THE PLANS.*

55.    Regardless of whether the revenue sharing payments constitute plan assets in Nationwide's hands, Nationwide's arranging for and retention (or the retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, violates its fiduciary duties pursuant to ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), in that it constitutes Nationwide failing to discharge its duties with respect to the Plans solely in the

interest of their participants and beneficiaries and:

    (A)    For the exclusive purpose of:

        (i)    providing benefits to participants and their beneficiaries; and

        (ii)    defraying reasonable expenses of administering the Plans;

    (B)    With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims….

Specifically, as to the accumulation units, by using its possession of them to generate the revenue sharing payments which it pockets, Nationwide does not use the accumulation units for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plans or with the care, skill, prudence and diligence of a prudent man.  As to the revenue sharing payments themselves, to the extent they constitute plan assets, by pocketing them, Nationwide does not use them for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plans or with the care, skill, prudence and diligence of a prudent man.

    56.    Additionally, and also regardless of whether the revenue sharing payments constitute plan assets in Nationwide's hands, Nationwide's arranging for and retention (or the retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, constitute prohibited transactions pursuant to ERISA  § 406(b)(1), 29 U.S.C.  § 1106(b)(1), in that it constitutes a fiduciary dealing with the assets of the Plans in its own interest or for its own account.  Specifically, as to the accumulation units, it constitutes Nationwide using those plan assets in its own interest to generate the revenue sharing payments which it pockets.  As to the revenue sharing payments themselves, to the extent they constitute plan assets, Nationwide deals with them in its own interest and for its own account by pocketing them.

57.     Additionally, and also regardless of whether the revenue sharing payments constitute plan assets in Nationwide's hands, Nationwide's receipt and retention (or the receipt and/or retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, constitute prohibited transactions pursuant to ERISA  § 406(b)(3), 29 U.S.C.   § 1106(b)(3), in that it constitutes a fiduciary receiving consideration (the revenue sharing payments) for its own personal account from parties (mutual funds) dealing with the Plans in connection with transactions (the so-called service contracts) involving the assets of the Plans (the shares of the variable accounts, represented by the accumulation units).  Specifically, the mutual funds deal with the Plans by accepting funds from Nationwide's separate accounts which represent the investment of the Plans' assets, and they do so in connection with transactions involving the assets of the Plans -- the accumulation units.

D.      *THE PLANS ARE ENTITLED TO RELIEF UNDER ERISA.*

58.     Pursuant to ERISA  § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Plans seek an order declaring that the above-described practices of Nationwide in connection with the revenue sharing payments violate ERISA as set forth above and a permanent injunction preventing Nationwide from engaging in such conduct in the future.

59.     Pursuant to ERISA  § § 409(a) and 502(a)(2), 29 U.S.C.   § §   1109(a) and 1132(a)(2), Nationwide is liable to the Plans to disgorge/make restitution of all revenue sharing payments received by it, its subsidiaries or affiliates, or, alternatively, of the difference between those revenue sharing payments and the reasonable fair market value of any services provided by Nationwide to the mutual funds for which the revenue sharing payments purportedly constituted payment, plus all such other equitable or remedial relief as the Court may deem appropriate.

60.     In addition, pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), the Plans request the Court to exercise its discretion and award them their reasonable attorneys' fees and the costs of the action.

E.     *NFS IS JOINTLY AND SEVERALLY LIABLE WITH NATIONWIDE LIFE.*

61.     As set forth above, NFS controlled and directed Nationwide Life in engaging in the above-referenced conduct.  As a consequence, NFS is a fiduciary of the Plans in connection with the revenue sharing payments in the same manner and for the same reasons as Nationwide Life.  And, in the same manner and for the same reasons, NFS violated its ERISA § 404 duties owed to the Plans and engaged in transactions prohibited by ERISA § 406.  Consequently, NFS is liable pursuant to ERISA § § 409 and 502(a)(2) and (3) to the Plans in exactly the same manner and respect as Nationwide Life, and the Plans are entitled to recover the exact same relief from NFS and Nationwide Life on a joint and several basis.

62.     Alternatively, pursuant to ERISA § 405(a)(1), (2) and (3), 29 U.S.C. § 1105(a)(1), (2) and (3), NFS is jointly and severally liable to the Plans as a co-fiduciary for Nationwide Life's breaches of fiduciary duty set forth above.

## VII.   REQUEST FOR RELIEF

63.     Wherefore, Plaintiffs and the Class, on behalf of the Plans, demand judgment against Defendants, Nationwide Financial Services Incorporated and Nationwide Life Insurance Company, jointly and severally, for the following relief:

(a)     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), declaratory and/or injunctive relief as set forth above;

(b)     Pursuant to ERISA § § 409(a) and 502(a)(2), 29 U.S.C. § § 1109(a) and 1132(a)(2), disgorgement/restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate;

(c)     Pursuant to ERISA  § 502(g)(1), 29 U.S.C.  § 1132(g)(1), reasonable attorneys' fees and costs;

(d)     Pre-judgment and post-judgment interest at the maximum possible rates, whether at law or in equity; and

(e)     All such other and further relief, general or special, legal or equitable, to which they may be justly entitled.

Respectfully submitted,

/s/ Roger L. Mandel
Marc R. Stanley
Federal Bar No. ct18179
Roger L. Mandel
Federal Bar No. ct18180
Martin Woodward
Federal Bar No. ct25263
STANLEY, MANDEL & IOLA, L.L.P.
3100 Monticello Avenue, Suite 750
Dallas, Texas  75205
214-443-4300
214-443-0358 (Fax)

William Bloss
Federal Bar No. ct01008
Antonio Ponvert III
Federal Bar No. ct17516
Richard A. Bieder
Federal Bar No. ct04208
KOSKOFF KOSKOFF & BIEDER, P.C.
350 Fairfield Avenue
Bridgeport, Connecticut 06604
203-336-4421
203-368-3244 (Fax)

Gregory G. Jones
Federal Bar No. ct23443
LAW FIRM OF GREGORY G. JONES PC
603 S. Main Street, Suite 200
Grapevine, Texas 76051
817-424-9001
817-424-1665 (Fax)

**PLAINTIFFS' COUNSEL**

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 16, 2009, the foregoing motion was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

/s/ Roger L. Mandel
ROGER L. MANDEL