# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LOU HADDOCK, as trustee of the Flyte
Tool & Die Company, Inc. 401-K Profit
Sharing Plan, et al.,

  Plaintiffs,         No. 3:01-cv-1552 (SRU)

   v.

NATIONWIDE FINANCIAL SERVICES,
INC. and NATIONWIDE LIFE
INSURANCE COMPANY,

  Defendants.

## RULING ON PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

The plaintiffs, Peter Wiberg, Alan Gouse, Christopher Anderson, and H. Grady

Chandler,[1] trustees of employer-sponsored profit-sharing retirement plans (collectively, the

"Trustees" or the "plaintiffs"), brought this action against Nationwide Financial Services, Inc.

and Nationwide Life Insurance Co. (collectively, "Nationwide"), asserting breach of fiduciary

duty claims under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101, *et

seq.* ("ERISA").  On November 6, 2009, I granted the plaintiffs' motion to proceed with those

claims on a class-action basis, certifying the class under Federal Rule of Civil Procedure

23(b)(2).  *See Haddock v. Nationwide Fin. Services, Inc.*, 262 F.R.D. 97 (D. Conn. 2009).  The

Second Circuit granted Nationwide leave to appeal, and while that appeal was pending, the

United States Supreme Court decided the landmark case of *Wal-Mart Stores, Inc. v. Dukes*, 131

S. Ct. 2541 (2011), a decision that, among other things, narrowed Rule 23(b)(2)'s reach over

---

[1] Plaintiffs Lou Haddock and Edward Kaplan voluntarily dismissed their claims against
the defendants and have withdrawn as representative plaintiffs in this litigation (docs. # 297 & #
298).  Christopher Anderson was substituted as a plaintiff for Dennis Ferndon (docs. # 296 & #
300), and H. Grady Chandler was subsequently permitted to intervene as a plaintiff (doc. # 416).

class complaints seeking individual claims for monetary relief in addition to injunctive or declaratory relief.  Thereafter, on February 6, 2012, the Second Circuit issued a summary order vacating the class certification order under Rule 23(b)(2) in light of *Wal-Mart* and remanding the case with instructions to consider class certification under Federal Rule of Civil Procedure 23(b)(3).  *See Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26 (2d Cir. 2012).  Now pending is the plaintiffs' renewed motion for class certification under Rule 23(b)(3),[2] which has been the subject of additional briefing by both parties.[3]  For the reasons that follow, the plaintiffs' renewed motion (doc. # 299) is GRANTED.

## I.     Background

The court presumes familiarity with the facts and procedural history of this case, which have been set forth comprehensively in four previous rulings.  *See Haddock v. Nationwide Fin. Servs.* ("*Haddock I*"), 419 F. Supp. 2d 156 (D. Conn. 2006); *Haddock v. Nationwide Fin. Servs.* ("*Haddock II*"), 514 F. Supp. 2d 267 (D. Conn. 2007); *Haddock v. Nationwide Fin. Servs.* ("*Haddock III*"), 570 F. Supp. 2d 355 (D. Conn. 2008); *Haddock v. Nationwide Fin. Servs.* ("*Haddock IV*"), 262 F.R.D. 97 (D. Conn. 2009).  What follows merely provides the factual

---

[2] The plaintiffs' original motion called for class certification of the claims contained in the Fifth Amended Complaint.  *See* Pls.' Mot. For Class Certification (doc. # 299).  However, after granting certification under Rule 23(b)(2), as well as granting H. Grady Chandler's motion to intervene, I permitted the plaintiffs to file a Sixth Amended Complaint so that all class representatives would have one operative pleading.  *See* Stipulation and Order Re: Filing of Operative Pleadings (doc. # 421).  Thus, although the renewed motion for class certification references the Fifth Amended Complaint, the plaintiffs are, as a technical matter, seeking class certification of the claims contained in the Sixth Amended Complaint.

[3] The parties' original briefing on the question of class certification consisted of the following: (1) Pls.' Mot. For Class Certification (doc. # 299); (2) Defs.' Opp'n (doc. # 338); (3) Pls.' Mem. In Reply (doc. # 360); (4) Defs.' Sur-Reply (doc. # 382); and (5) Pls.' Sur-Response (doc. # 385).  Following the Second Circuit's mandate, I permitted the parties to submit additional briefing on certification under Rule 23(b)(3), which consisted of the following:  (1) Defs.' Opp'n to Pls.' Renewed Mot. For Class Certification (doc. # 473); (2) Pls.' Reply (doc. # 478); and (3) Defs.' Sur-Reply (doc. # 479).  Both parties also submitted numerous notices of

background pertinent to the instant motion.

A.    Factual Background

The plaintiffs are trustees of qualified ERISA pension benefit plans (collectively, "the Plans") that held group and/or individual annuity contracts with Nationwide.  The employers of various plan participants contracted with Pension Plan Administrators ("PPAs") to provide the necessary administrative services for the Plans.  Those PPAs then persuaded each Plan to select Nationwide as their "investment provider," which earned the PPAs a commission from Nationwide.

Nationwide provided the Plans with various investment options, including insurance products known as "variable annuities" contracts.  Those contracts came in two basic types: "group" and "individual."  With group variable annuity contracts, Nationwide contracted only with the Plans, but each participant had an individual account.  With the individual annuity contracts, Nationwide contracted directly with plan participants.  Both types of variable annuity contracts permitted the Plans and participants to invest in a variety of mutual funds.

Briefly stated, that investment process worked as follows.  Nationwide provided the Plans and participants a list (or "menu") of mutual funds for potential investment.  For group variable annuity contract-holders, the Plans then chose a subset of mutual funds and their participants made investment choices from that subset.  Plans were free to select as many or as few of the investment options as they wanted, and were under no obligation to select any investment options at all.  For individual variable annuity contract-holders, the participants chose which mutual funds to invest in from Nationwide's menu of available options.

For the group variable annuity contracts, Nationwide retained the authority to delete and

---

supplemental authority.  I have considered all of these documents in reaching my decision.

substitute mutual funds from the list, "if, in the judgment of [Nationwide], further investment in the shares of a Fund should become inappropriate in the view of the purposes of the Contract." The individual variable annuity contracts issued prior to 1998 did not contain this exact language, but Nationwide does not dispute that it retained the authority to remove mutual funds after participants selected them for inclusion in their individual variable annuity contract. Individual contracts issued after 1998, however, did contain the language referenced above.

After the Plans and participants chose which mutual funds they wanted from Nationwide's menu, rather than investing directly in the chosen mutual funds, pension contributions and employer-matching contributions were invested in "variable accounts" established by Nationwide. Those variable accounts were further sub-divided into numerous "sub-accounts" that corresponded to the different investment options. Once the Plans and participants selected the mutual funds in which to invest their pension contributions, Nationwide allocated those pension funds to the appropriate sub-accounts. The sub-accounts received allocations from multiple Plans and participants, and Nationwide purchased or sold a designated mutual fund to reflect the sub-accounts' combined allocations by the Plans and their participants. Put differently, when the mutual fund received funds from the sub-accounts, those funds were pooled with funds from other investors.

To reflect the amounts contributed to particular mutual funds, Nationwide allocated "accumulation units," i.e., shares of the corresponding sub-accounts, to the Plans and participants. The accumulation units reflected the Plans' and participants' total investment in the variable account or sub-account. The value of those accumulation units fluctuated according to the value of the mutual fund shares held within the sub-account.

Pursuant to its contracts with the Plans and participants, Nationwide had the authority to

- 4 -

cancel the accumulation units as necessary to pay its fees and to pay taxes. Nationwide also transferred accumulation units for use as collateral for loans, and canceled them to purchase annuities and make cash payments at the request of the Plans and participants.

In the mid-1990s, Nationwide began collecting income—sometimes referred to as "revenue sharing payments"—from the mutual funds listed on its menu of investment options. Those payments were based on a percentage of the assets invested in the mutual funds through Nationwide. According to the plaintiffs, that process allowed Nationwide to leverage its large pool of pension contributions to extract additional payments from mutual funds seeking access to the Plans and their money.

In their Sixth Amended Complaint, the plaintiffs contend that Nationwide's investment process and receipt of the revenue sharing payments breached fiduciary duties under ERISA. To prevail on that claim, the Trustees must successfully prove (1) that Nationwide was a fiduciary to the Plans, and (2) that Nationwide's acceptance of revenue sharing payments from the mutual funds was a breach of its fiduciary duties. The Trustees have advanced two theories to show how Nationwide acted as a fiduciary with respect to the Plans: (1) the "specific accumulation unit" theory, and (2) the "mutual fund selection" theory. They contend that Nationwide's conduct in collecting revenue sharing payments amounted to a breach of fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and also constituted prohibited transactions in violation of ERISA § 406(b)(1) and (3), 29 U.S.C. § 1106(b)(1) and (3). On that basis, the plaintiffs seek to certify a Rule 23(b)(3) class of trustees of all ERISA-covered employee benefit plans that formerly held, or continue to hold, group and/or individual variable annuity contracts with Nationwide.

B.    Prior Class Certification Under Rule 23(b)(2)

On November 6, 2009, I granted the plaintiffs' motion for class certification, certifying the class under Rule 23(b)(2).  *See Haddock IV*, 262 F.R.D. at 131.  First, I determined that the four prerequisites of Rule 23(a) were met:  numerosity, commonality, typicality, and adequacy of representation.  *Id.* at 116-20.  Relevant to our purposes here, I identified the following questions of fact or law common to the class:

• Whether Nationwide constitutes a fiduciary pursuant to the specific accumulation theory;

• Whether Nationwide constitutes a fiduciary pursuant to the mutual fund selection theory;

• Whether Nationwide, in arranging for, receiving and retaining the revenue sharing payments, discharged its duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries or defraying reasonable expenses of administering the Plans (i.e., whether Nationwide violated ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A));

• Whether Nationwide, in arranging for, receiving and retaining the revenue sharing payments, discharged its duties with respect to the Plans solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims (i.e., whether Nationwide violated ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B));

• Whether Nationwide dealt with the assets of the Plans (accumulation units and the underlying mutual fund shares in the case of group annuity contracts) in its own interest or for its own account (i.e., whether Nationwide violated ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1));

• Whether Nationwide received any consideration (the revenue sharing payments) for its personal account from any parties (mutual fund families) dealing with the Plans in connection with transactions (the revenue sharing contracts) involving the assets of the Plans (the accumulation units and the underlying mutual fund shares in the case of the group annuity contracts) (i.e., whether Nationwide violated ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3));

• Whether any part of the revenue sharing payments constitutes payments by the mutual fund families to Nationwide for services rendered by Nationwide to the mutual fund families;

• Whether Nationwide passed on any part of the revenue sharing payments to the Plans;

• Whether the Class is entitled to an injunction requiring Nationwide to disgorge all revenue sharing in the future pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3); and

• Whether the Class is entitled to disgorgement/restitution of all past revenue sharing pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2).

*Id.* at 116-17.  With respect to commonality under Rule 23(a)(2), I determined that, "[a]t a minimum, the questions of law raised by the Trustees are applicable to each member of the putative class . . . that is, that Nationwide breached its fiduciary duty (under one of the legal theories set forth by the Trustees) to the Plans and participants by accepting revenue sharing payments from mutual funds that it offered as investment options to its variable annuity contract-holders." *Id.* at 117.  Moreover, "[b]ecause all the Trustees' claims arise from the same practice or course of conduct that gives rise to the claims of proposed Class members—namely, that Nationwide accepted revenue sharing payments from those mutual funds that it offered as investment options to annuity contract-holders in violation of its fiduciary duties to the Plans," I concluded that the plaintiffs had established typicality under Rule 23(a)(3).  *Id.*

Having determined that the plaintiffs satisfied the Rule 23(a) prerequisites, I went on to hold that the class could be certified under Rule 23(b)(2) because Nationwide "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  *Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 18 (2d Cir. 2003) (quoting Fed. R. Civ. P. 23(b)(2)).  Citing the Second Circuit's approach in *Robinson v. Metro-North Commuter Railroad Co.*, 267 F.3d 147

(2d Cir. 2001), I concluded that, although the plaintiffs were seeking monetary relief (disgorgement) in addition to the injunctive and declaratory relief expressly provided for under Rule 23(b)(2), the claims for injunctive and/or declaratory relief "predominated," and therefore a (b)(2) class was appropriate.  *See Haddock IV*, 262 F.R.D. at 130-31.  An order certifying the class issued that same day.  S*ee* Order of Class Certification (doc. # 417).  Nationwide later sought and was granted leave to appeal the class certification order.

     C.    <u>*Wal-Mart* and its Effects</u>

     During the pendency of the appeal, the United States Supreme Court handed down its decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).  The *Wal-Mart* decision essentially did two things.  First, it increased the "rigor" with which courts must analyze the threshold element of "commonality" under Rule 23(a)(2).  The Court explained that plaintiffs seeking class certification "must be prepared to prove that there are *in fact* sufficiently . . . common questions of law or fact," that the class members have "suffered the same injury," and that their claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id*. at 2551.  In other words, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  *Id.*  (internal quotation omitted).

     Second, *Wal-Mart* narrowed Rule 23(b)(2)'s reach over class complaints seeking individual claims for monetary relief in addition to injunctive or declaratory relief.  Specifically, the Court held that Rule 23(b)(2) does not authorize class certification of claims seeking monetary relief "at least where . . . the monetary relief is not *incidental* to the injunctive or

declaratory relief." 131 S. Ct. at 2557 (emphasis added). The Court reasoned that, because members of a (b)(2) class are not entitled to the notice and opt-out provisions afforded members of a (b)(3) class, due process required "that individualized monetary claims belong in Rule 23(b)(3)." *Id.* at 2558. This holding was significant, particularly for the Second Circuit, which had long held that a (b)(2) class could include claims for monetary relief so long as individual monetary claims did not predominate over claims for injunctive and/or declaratory relief. *See Robinson*, 267 F.3d at 164-66.

Thus, *Wal-Mart* upped the ante on "commonality" under Rule 23(a)(2) and narrowed the application of Rule 23(b)(2). What it did *not* do, however, was change the analysis to be applied under Rule 23(b)(3)—i.e., whether common questions "predominate" and whether the class action device is "superior" to other methods of adjudication. Indeed, the Court explicitly stated that the "applicability of [Rule 23(b)(3)] to the plaintiff class is not before us." *Id.* at 2549 n.2; *see also Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 169 (S.D.N.Y. 2011) ("*Dukes* makes no new law that impacts in any way this Court's certification of the Rule 23(b)(3) 'damages class.'"); *Cambridge Lane, LLC v. J-M Mfg. Co.*, No. CV 10-6638-GW, 2012 U.S. Dist. LEXIS 43533 at *5-6 n.2 (C.D. Cal. Mar. 15, 2012) (noting that the predominance requirement of Rule 23(b)(3) "was not at issue in *Dukes*").[4]

---

[4] This is not to say that the commonality and predominance inquiries are unrelated. On the contrary, the "common questions" that must predominate under Rule 23(b)(3) are precisely those "questions of law or fact common to the class' under Rule 23(a)(2). *See, e.g.*, *Kendler v. Federated Dep't Stores, Inc.*, 88 F.R.D. 688, 693 (S.D.N.Y. 1981) ("[I]n the absence of a showing of identifiable common issues, amenable to proof on a class-wide basis, . . . common issues of law and fact do not predominate herein and plaintiffs have not satisfied the requirements of Rules 23(a)(2) and 23(b)(3)."); *Frey v. Bekins Van Lines, Inc.*, No. CV 09-5430, 2012 WL 1107719, at *4 (E.D.N.Y. Apr. 2, 2012) ("Issues arising from allegations of commonality with respect to Rule 23(a) are also relevant to the Rule 23(b)(3) inquiry, which requires the court to determine whether common questions 'predominate over any questions affecting only individual members.'") (quoting Fed. R. Civ. P. 23(b)(3)). *Wal-Mart* may have

D.      The Second Circuit's Mandate

On February 6, 2012, the Second Circuit issued a summary order vacating the order granting class certification under Rule 23(b)(2) in light of *Wal-Mart* and remanding the case with instructions to consider class certification under Rule 23(b)(3).  *See Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26 (2d Cir. 2012).  The Court explained that the decision in *Wal-Mart* "altered the applicable analysis for class certification under Rule 23(b)(2)," and that this court's reliance on *Robinson's* "predominance" test for recovery of monetary damages in addition to injunctive relief was no longer viable.  *Id.* at 29.  In other words, the legal landscape had changed considerably since the class was certified in this case; after *Wal-Mart*, "unless merely 'incidental' to the requested declaratory or injunctive relief, claims for individualized monetary damages preclude class certification under Rule 23(b)(2)."  *Id.* (citing *Wal-Mart*, 131 S. Ct. at 2557-60).  On that basis, the Second Circuit concluded that:

> In the case at bar, if plaintiffs are ultimately successful in establishing Nationwide's liability on the disgorgement issue, the district court would then need to determine the separate monetary recoveries to which individual plaintiffs are entitled from the funds disgorged.  This process would require the type of non-incidental, individualized proceedings for monetary awards that *Wal-Mart* rejected under Rule 23(b)(2).

*Id*.

With respect to this court's Rule 23(a) analysis, however, the Second Circuit, applying the more rigorous *Wal-Mart* standard, stated "we see no abuse of discretion in the district court's conclusion that the putative class meets Rule 23(a)'s requirements."  *Id.* at 29 n.2.  Thus, nothing in the Second Circuit's mandate disturbed my prior Rule 23(a) analysis or the findings made thereunder.  Nor did the mandate call into question the legal viability of the plaintiffs' proffered

---

increased the rigor of commonality analysis under Rule 23(a)(2), but it did nothing to change how courts determine whether and to what extent those common questions, once identified,

theories of recovery.  On the contrary, the Second Circuit indicated that my threshold determinations on commonality withstood *Wal-Mart*'s increased scrutiny.

Therefore, the scope of remand is quite limited.  The only question is whether the proposed class, having met the Rule 23(a) prerequisites, should be certified under Rule 23(b)(3); that is, whether common questions "predominate" over individual questions and whether class-wide adjudication is "superior" to other modes of adjudication.  *See* Fed. R. Civ. P. 23(b)(3).

Unfortunately, Nationwide grossly misinterprets the mandate as requiring a *de novo* reconsideration of my previous determinations on the legal viability of plaintiffs' theories and other threshold elements under Rule 23(a).  Indeed, Nationwide peppers its brief with citations to *Wal-Mart* in an effort to undermine those very findings and conclusions.  As explained above, however, the Second Circuit has already reviewed my Rule 23(a) analysis in light of *Wal-Mart* and found no abuse of discretion  *See Haddock*, 460 F. App'x at 29 n.2.  And because *Wal-Mart* itself did nothing to change the familiar "predominance" and "superiority" inquiries under Rule 23(b)(3), its holding has little to no bearing on the narrow determinations I am now being asked to make.  *See Jermyn*, 276 F.R.D. at 169.  In other words, *Wal-Mart* may have necessitated remand in this case, but it does not govern the legal analysis upon remand.

## II.   Discussion

In their renewed motion for class certification (doc. # 299), the plaintiffs seek to certify the following class pursuant to Rule 23(b)(3):

> All trustees of all employee pension benefit plans covered by ERISA which had variable annuity contracts with Nationwide or whose participants had individual variable annuity contracts with Nationwide at any time from January 1, 1996, or the first date Nationwide began receiving payments from mutual funds based on a percentage of the assets invested in the funds by Nationwide, whichever came first, to the date of [the class certification order].

---

"predominate" over individualized issues under Rule 23(b)(3).

Nationwide opposes certification, arguing that the plaintiffs cannot satisfy the requirements of Rule 23(b)(3).

      A.    <u>General Standard for Class Certification</u>

Class certification is appropriate "only if the trial court is satisfied, after a rigorous analysis," that the requirements of Rule 23 have been met. *Wal-Mart*, 131 S. Ct. at 2551 (internal quotation omitted). That "rigorous" analysis proceeds in two steps. First, the district court must "assess whether the proposed class satisfies Rule 23(a)'s four threshold requirements: (1) numerosity ('the class is so numerous that joinder of all members is impracticable'), (2) commonality ('there are questions of law or fact common to the class'), (3) typicality ('the claims or defenses of the representative parties are typical of the claims or defenses of the class'), and (4) adequacy of representation ('the representative parties will fairly and adequately protect the interests of the class')." *In re Am. Int'l Grp., Inc. Sec. Litig.* ("*In re AIG*"), 689 F.3d 229, 238 (2012) (quoting Fed. R. Civ. P. 23(a)).

Second, the district court must determine whether the class action can be maintained under Rule 23(b)(1), (2), or (3). *Id.* The plaintiffs in this case seek to certify a class under Rule 23(b)(3), which permits certification where the court "'finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) (quoting Fed. R. Civ. P. 23(b)(3)).

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). Determining whether the plaintiffs have satisfied

their burden on class certification may entail some overlap with the merits of the underlying

claim, but the Supreme Court has cautioned that "Rule 23 grants courts no license to engage in

free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the

extent—but only to the extent—that they are relevant to determining whether the Rule 23

prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,

133 S. Ct. 1184, 1194-95 (2013); *see also In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24,

41 (2d Cir. 2006).

B.      Rule 23(a) Requirements

My previous ruling in *Haddock IV* contained detailed findings and conclusions regarding

each of Rule 23(a)'s requirements, *see* 262 F.R.D. at 116-20, which are hereby incorporated by

reference.  Both parties confirmed at oral argument that the Second Circuit's mandate did not

disturb my previous findings with respect to the Rule 23(a) factors.  *See* Mot. Hrg. Tr. at 9-11

(doc. # 505).  Therefore, I need not revisit those factors here.

C.      Rule 23(b)(3) Requirements

As noted above, to certify a class under Rule 23(b)(3), the plaintiffs "must show that

common questions of law or fact 'predominate' over purely individual questions and that a class

action is 'superior' to other methods of resolving the dispute."  *In re AIG*, 689 F.3d at 239 (citing

Fed. R. Civ. P. 23(b)(3)).   The Rule also instructs that "matters pertinent" to predominance and

superiority include:

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  The  purpose of these requirements is to ensure that a "class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Myers*, 624 F.3d at 547 (internal quotation marks and citation omitted).

Nationwide contests (b)(3) class certification, arguing that (1) individualized questions outnumber common ones; and (2) class-wide resolution of the plaintiffs' claims is not the "superior" method of adjudication.  I address each of those requirements in turn.

### 1.    Predominance

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  In the Second Circuit, that "requirement is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *In re AIG*, 689 F.3d at 240 (quoting *Myers*, 624 F.3d at 547).  Thus, when "determining whether common issues predominate, courts focus on the liability issue . . . and if the liability issue is common to the class, common questions predominate over individual ones." *Tiro v. Public House Investments, LLC*, 288 F.R.D. 272, 280 (S.D.N.Y. 2012) (internal quotation omitted).  "Although a defense may arise and may affect different class members differently, this does not compel a finding that individual issues predominate over common ones. . . .  As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not

automatically foreclose class certification under Rule 23(b)(3)."  *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010) (internal quotation and alternation omitted).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).  Accordingly, my analysis begins with a brief overview of the elements of the plaintiffs' claims.

a.   Elements of Plaintiffs' Claims

Under ERISA, "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable . . . to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . ."  29 U.S.C. § 1109(a).  Thus, to prevail on a claim for breach of fiduciary duty, the plaintiffs must demonstrate that "(1) the defendant was a fiduciary who (2) was acting in a fiduciary capacity, and (3) breached his fiduciary duty."  *In re Bank of America Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 756 F. Supp. 2d 330, 350 (S.D.N.Y. 2010).  I address each of those elements below.

With respect to the first element, ERISA provides, in relevant part, that "a person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . ."  29 U.S.C. § 1002(21)(A).  Courts construe the term "fiduciary" broadly, *see Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987), taking a functional approach to determining fiduciary status, *see Mertens v. Hewitt Assoc.*, 508 U.S. 248, 262 (1993) ("ERISA . . . defines "fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan.") (emphasis in

- 15 -

original).  Under that functional approach, "a person may be an ERISA fiduciary with respect to certain matters but not others, for he has that status only 'to the extent' that he has or exercises the described authority or responsibility." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987*); see also Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir. 2002) (quoting same).

Because an ERISA fiduciary "may wear different hats," *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000), functioning as a fiduciary for some purposes but not others, courts have held that ERISA's rules and prohibitions "apply only to decisions by an [entity] acting in its fiduciary capacity." *Flanigan v. General Elec. Co.*, 242 F.3d 78, 87 (2d Cir. 2001).  Thus, the second element requires that plaintiffs demonstrate not only that the defendant qualifies for fiduciary status, but that the actions or transactions complained of were undertaken in the defendant's capacity as a fiduciary to the plan. *See id.* at 87-88.

Lastly, with respect to the third element, ERISA imposes "a number of detailed duties and responsibilities" on those who are—or who function as—fiduciaries, the breach of which gives rise to personal liability under the statute. *Mertens*, 508 U.S. at 251.  As relevant here, an ERISA fiduciary has (1) a duty of loyalty, which requires that he "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A); and (2) a duty of prudence, which requires that the fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," 29 U.S.C. § 1104(a)(1)(B).  Moreover, the statute imposes certain transaction rules prohibiting fiduciaries from, *inter alia*, "deal[ing] with the assets of the plan in his own interest or for his own account," 29 U.S.C. § 1106(b)(1), or "receiv[ing] any

consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan," 29 U.S.C. § 1106(b)(3).

In the case at bar, the plaintiffs rely on two different theories to explain how Nationwide functioned as a fiduciary: (1) the specific accumulation theory; and (2) the mutual fund selection theory.  Under the specific accumulation theory, the plaintiffs contend that Nationwide acted as a fiduciary because its variable annuity contracts gave it custody and/or control over a large pool of retirement contributions, which Nationwide used, in turn, to obtain revenue sharing payments from mutual funds seeking access to that pool of money.  In other words, Nationwide "leverage[ed] its position as sole gatekeeper to those funds to extract the revenue sharing payments from the mutual funds in exchange for giving the mutual funds the opportunity to be investment choices for the Plans and the participants."  *Haddock IV*, 262 F.R.D. at 107.  In addition, under the mutual fund selection theory, the plaintiffs argue that Nationwide exercised the requisite authority or control over the accumulation units by retaining the ability to select, remove and replace the mutual funds that would be offered as investment options for the Plans and their participants.  *Id.* at 107-08.  Based on one or both of those fiduciary theories, the plaintiffs claim that Nationwide's acceptance of revenue sharing payments from the mutual funds it made available to the Plans and participants breached its duties of loyalty and prudence under sections 1104(a)(1)(A)-(B), and violated ERISA's prohibited transaction rules under sections 1106(b)(1) and (3).

As explained more fully below, having considered the underlying elements of the plaintiffs' claims, as well as my prior determinations on the sources of class-wide proof supporting those claims, I conclude that the common legal and factual questions I previously identified in *Haddock IV* are far more substantial than any individualized issues that may arise at

trial.  I divide my analysis into two parts: (1) the plaintiffs' liability case; and (2) the plaintiffs'

claims for monetary relief.

> b.    Liability

With respect to liability, the two core determinations that must be made at trial—namely,

(1) whether Nationwide functioned as an ERISA fiduciary with respect to the Plans, and (2)

whether Nationwide's conduct in collecting revenue sharing payments violated its fiduciary

obligations—both hinge on the ERISA consequences of Nationwide's basic investment process,

a process that was relatively uniform across the proposed class.  As I stated in *Haddock IV*,

"whether Nationwide is a fiduciary and whether it breached its obligations to the Plans as a

fiduciary can be resolved on the basis of the characteristics of Nationwide's contractual

relationship with the plans that are common to the Class.  Furthermore, any breach of

Nationwide's fiduciary obligations will be determined on the basis of conduct that is applicable

to the whole Class."  262 F.R.D. at 128.  Thus, because the plaintiffs' "legal and factual theories

are premised on the structural nature of Nationwide's contractual relationship with the Plans,

which is identical across the Class," *id.* at 125, the plaintiffs' liability case is particularly well

suited for class-wide adjudication.

Moreover, I previously determined that the plaintiffs satisfied the "typicality"

requirement under Rule 23(a)(3) because "all of the Trustees' claims arise from the same

practice or course of conduct that gives rise to the claims of proposed Class members—namely,

that Nationwide accepted revenue sharing payments from those mutual funds that it offered as

investment options to annuity contract-holders in violation of its fiduciary duties to the Plans . . .

."  *Id.* at 117.  That determination, which the Second Circuit has reviewed and implicitly

sustained, bolsters the view that common issues predominate in the plaintiffs' liability case.  *See*

*Stinson v. City of New York*, 282 F.R.D. 360, 382 (S.D.N.Y. 2012) ("Although predominance is a more stringent inquiry, 'satisfaction of the typicality requirement of Rule 23(a) . . . goes a long way toward satisfying the Rule 23(b)(3) requirement of commonality.'") (quoting *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir. 1986)).

Nationwide's arguments to the contrary—nearly all of which were raised and rejected in my previous rulings in *Haddock I* and *Haddock IV*—are (yet again) unpersuasive.

First, Nationwide recycles a number of arguments to demonstrate why the plaintiffs cannot prove principally through common evidence that Nationwide functioned as a fiduciary when it collected revenue sharing payments from the select group of mutual funds it offered as investment options. *See* Def.'s Opp'n to Pl.'s Renewed Mot. for Class Certification at 5-15 (doc. # 473). Those arguments follow a similar refrain. According to Nationwide, even though the plaintiffs' theories of liability purport to be based on generalized company policies and practices applicable to the class as a whole, those theories fail as a matter of law[5] and, as a result, the plaintiffs will have to rely on *different* theories to prove their case—theories that, unsurprisingly, depend on thousands of individualized inquiries that are inappropriate for class-wide adjudication.

On more than one occasion, however, I have ruled that the fiduciary theories relied upon by the plaintiffs—namely, the specific accumulation theory and the mutual fund selection theory—are viable under ERISA's functional approach. *See Haddock I*, 419 F. Supp. 2d at 164-

---

[5] Indeed, Nationwide has been absolutely adamant throughout this litigation that the plaintiffs' fiduciary claims cannot succeed under prevailing ERISA law. It is somewhat curious, therefore, that Nationwide has opposed class certification of those claims with such vigor. If Nationwide is so certain that the plaintiffs' fiduciary claims will fail on the merits under ERISA, it should welcome class certification so that any and all such claims—involving thousands of potential plaintiffs—can be resolved in its favor in a single proceeding. Filing reams of paper to oppose class certification suggests that, perhaps, Nationwide doth protest too much.

66; *Haddock IV*, 262 F.R.D. at 122-25.  And as I stated before, "[u]nder neither of those theories is Nationwide's fiduciary status only determinable on a micro level by examining the nature and circumstance of each Class plan's annuity contract and the timing of when the contract was signed relative to Nationwide's agreement with a particular mutual fund." *Haddock IV*, 262 F.R.D. at 123-24.  Thus, although Nationwide strives mightily to limit its eligibility for fiduciary status to the narrow window of time in which it negotiated the revenue sharing payments with particular mutual funds, I have already determined that the plaintiffs' fiduciary theories extend much further, capturing other aspects of Nationwide's alleged relationship with the proposed plaintiff class.  *See id.* at 124-25.[6]

---

[6] In *Haddock IV*, I compared the plaintiffs' breach of fiduciary duty theories to a hypothetical attorney who places money from client trust accounts with a particular bank based not on prevailing interest rates, but on certain personal kickbacks the bank offered him to keep client money on the books.  *See Haddock IV*, 262 F.R.D. at 124-25.  Nationwide takes issue with that hypothetical, arguing that it "highlighted the presumptions built into Plaintiffs' theories" because unlike a lawyer, whose fiduciary obligations are inherent to the attorney-client relationship, Nationwide is an "arms-length provider of annuity products to the marketplace." Def.'s Opp'n to Pls.' Renewed Mot. for Class Certification at 26 (doc. # 473).

    To be clear, that hypothetical was never meant to liken Nationwide to an attorney; rather, it was meant to rebut Nationwide's excessively narrow view of how and when fiduciary status is determined.  But, in any event, the analogy is not rendered inapt merely because Nationwide is an "arms-length provider" in a free market.  Attorneys, too, offer their services in the open market where consumers are free to pick and choose whom to retain (and whom to trust).  What matters, for present purposes, is that my hypothetical attorney's fiduciary status was not restricted to the moment in time when he first placed his clients' money with the bank in exchange for kickbacks, nor were his fiduciary obligations limited to those clients whose funds were in the account at the time negotiated the deal.  Rather, the attorney's fiduciary obligations extended to all clients whose funds he controlled throughout the duration of his dealings with the bank.  *See Haddock IV*, 262 F.R.D. at 125.  The point, which the defendant appears to miss, is that Nationwide's fiduciary status similarly "extends further than it admits."  *Id.* at 125. Nationwide's eligibility for fiduciary status is not limited to the moment in time in which it negotiated the revenue sharing payments with particular mutual funds, but rather extends to its alleged exercise of authority or control over the "menu" of mutual funds in which plan assets were invested over time.

Second, Nationwide argues that, even if the plaintiffs can demonstrate fiduciary status based on general company polices without resort to micro-level analysis of individual annuity contracts, *Wal-Mart* now precludes such "general practice" theories. The theories at issue in *Wal-Mart*, however, bear little resemblance to those asserted here. *Wal-Mart* involved a proposed class of 1.5 million female employees alleging sex discrimination in violation of Title VII. There, the plaintiffs' theories of liability were based not on any "express corporate policy against the advancement of women," 131 S. Ct. at 2548, or "uniform employment practice," *id.* at 2554, but rather on Wal-Mart's policy of allowing local managers to exercise discretion over their employees' pay and promotion. According to the plaintiffs, that discretion, when combined with a "corporate culture" of sexual stereotyping, created a disparate impact on women in the workplace. *Id.* But what was lacking was evidence of a common thread tying the putative class members' claims together. Because the plaintiffs failed to present any "significant proof" of a "general policy" of discrimination that affected class members in the same way, *see id.* at 2254, the Supreme Court ultimately rejected the class for lack of "commonality" under Rule 23(a)(2).

Here, in contrast, the "general policy" at the heart of the plaintiffs' case—namely, Nationwide's uniform investment process—is evidenced by the standardized terms contained in the annuity contracts that governed Nationwide's relationship with the Plans and participants. That, in my view, is "significant," if not ample, proof sufficient to satisfy *Wal-Mart*. Moreover, the Second Circuit has already reviewed the plaintiffs' theories of liability in light of *Wal-Mart* and concluded that those theories are viable, at least for Rule 23(a) purposes. *See Haddock*, 460 F. App'x at 29 n.2. Thus, to the extent *Wal-Mart*'s increased rigor under Rule 23(a)(2) has any bearing on the determinations I am now being asked to make under Rule 23(b)(3), the Second

Circuit's mandate makes clear that the plaintiffs' liability case survives that heightened scrutiny. Nationwide's reliance on *Wal-Mart* to oppose class certification is, therefore, unavailing.

In any event, even putting the above analysis aside, nothing in the Second Circuit's mandate or the Supreme Court's decision in *Wal-Mart* prohibits me from certifying separately a (b)(2) injunctive (i.e., liability) class and a (b)(3) damages (i.e., disgorgement) class under the traditional authority conferred by Federal Rule of Civil Procedure 23(c)(4). *See Maziarz v. Hous. Auth. of the Town of Vernon*, 281 F.R.D. 71, 83 (D. Conn. 2012) ("[I]t is consistent with *Wal-Mart* for the court, in an appropriate situation, to certify an 'injunction class' under Rule 23(b)(2) and a 'damages class' under Rule 23(b)(3)."); *United States v. City of New York*, 276 F.R.D. 22, 27-32 (E.D.N.Y. 2011) (holding that *Wal-Mart* did not disturb the district court's ability under Rule 23(c)(4) to certify only those portions of a claim that satisfy Rule 23(b)(2), even if other portions of the claim do not).  Thus, even if the plaintiffs' liability case was somehow inappropriate for (b)(3) class treatment, nothing prevents me from bifurcating this case and proceeding with the liability phase based on the same (b)(2) injunctive class I previously certified in *Haddock IV*, while reserving for later stages, if necessary, a decision on whether to certify separately a (b)(3) damages class to determine the amount of disgorged profits to which individual members of the plaintiff class are entitled.  *See, e.g.*, *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 371-72 (7th Cir. 2012) (endorsing the method of "divided certification," whereby the court conducts "a (b)(2) proceeding first, and if the plaintiffs obtain declaratory relief a (b)(3) proceeding (where notice and the right to opt out are mandatory) to follow").

In sum, I conclude that common questions predominate the plaintiffs' claims for breach of fiduciary duty under ERISA, making the liability case appropriate for class-wide adjudication

under Rule 23(b)(3).  Alternatively, I also conclude that the injunctive class I previously certified under Rule 23(b)(2) remains a viable means of adjudicating the plaintiffs' liability case, so long as any individual claims for monetary relief are determined in a separate proceeding—either by way of a subsequently-certified (b)(3) damages class or through individual damages trials—after the liability phase has concluded.

c.      Monetary Relief

The plaintiffs' claims for monetary relief (i.e., disgorgement of ill-gotten profits) pose different challenges under Rule 23(b)(3).  On this front, Nationwide argues that individualized issues relating to certain defenses preclude certification, including (1) whether the Plans ratified Nationwide's receipt of revenue sharing payments; (2) whether the payments were made in consideration for services rendered by Nationwide; and (3) whether the Nationwide actually retained any "profits" from those payments.  *See* Def.'s Opp'n to Pls.' Renewed Mot. for Class Certification at 29-34 (doc. # 473).

I have already determined, however, that "a reasonable fact-finder could conclude that the *entire value* of the revenue sharing payments is 'profit' eligible to be disgorged for Nationwide's violation of its ERISA fiduciary obligations," so that "no individual inquiry into an offset for the reasonable value of the services performed would be necessary."  *Haddock IV*, 262 F.R.D. at 129 (emphasis added); *see also id.* (relying on a report by the plaintiffs' expert, Stanley Monsowitz, to conclude that, because "Nationwide was already being compensated" for administrative tasks related to the mutual funds, "the revenue sharing payments were pure profit").  If that is the case, then calculating the amount of disgorged profits attributable to individual plans "would not be difficult because Nationwide has kept very clear records regarding the amount of revenue sharing payments it has collected."  *Id.* at 128.  In other words,

- 23 -

"if the value of the disgorgement award is the value of the revenue sharing payments themselves, determining the appropriate figure for each Class member requires a mechanical calculation using readily available data." *Id.* at 129.

Moreover, even if individualized damages issues do arise at trial, "there are a number of management tools available" to address them, "such as bifurcation, the use of a magistrate or special master, alteration of the class definition, the creation of subclasses, or even decertification after a finding of liability." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 231 (2d Cir. 2006) (quotation marks and alteration omitted). Given the substantial efficiencies generated by assessing liability on a class-wide basis, I am not at all persuaded that Rule 23(b)(3) precludes certification merely because some individualized assessments may be necessary on the issue of monetary relief. *See, e.g.*, *Brown*, 609 F.3d at 484 ("Rule 23(b)(3) requires that common questions predominate, not that the action include only common questions.").

To summarize, based on the detailed findings I made in *Haddock IV*—findings the Second Circuit reviewed and found no reason to disturb—I conclude that the plaintiffs have satisfied the predominance requirement of Rule 23(b)(3).

### 2. Superiority

Rule 23(b)(3)'s superiority prong requires that class-wide adjudication be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In making this determination, the court must balance, "in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication." *Anwar v. Fairfield Greenwich Ltd.*, 289 F.R.D. 105, 114 (S.D.N.Y. 2013). And although "pertinent" to both the predominance and superiority inquiries, *see In re AIG*, 689 F.3d

at 240, the four pragmatic factors listed under Rule 23(b)(3) are particularly helpful in this

regard.  Those factors include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Nationwide does not seriously contest the first three factors—and for good reason.  All of

those factors either weigh in favor of certification or are neutral factors.  First, even with the

availability of attorneys' fees, there is no evidence that individual class members would prefer to

control the prosecution of their claims through separate lawsuits.  Second, I am unaware of any

litigation concerning these specific claims that is already in progress.  Lastly, there is nothing to

suggest that concentrating the litigation in this forum is undesirable; jurisdiction and venue are

appropriate in this district, and plaintiffs have already spent over a decade prosecuting this action

here.  Thus, I conclude that, on balance, the first three factors support (b)(3) certification.

Nationwide's primary challenge to superiority is focused on the last factor:

manageability.  Manageability, however, "is an issue peculiarly within a district court's

discretion," *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010), and courts rarely, if

ever, deny class certification solely on manageability grounds, particularly where, as here, the

case will be tried to the court, rather than to a jury.  In any event, Nationwide's arguments

against manageability rely, almost entirely, on a premise I have already rejected—namely, that

innumerable individualized inquires will swallow common ones.  Thus, for substantially the same reasons articulated above, manageability poses no impediment to (b)(3) certification.

In my view, class-wide adjudication of the plaintiffs' claims serves the core pragmatic objectives of Rule 23, including the "efficient resolution of the claims or liabilities of many individuals in a single action, as well as the elimination of repetitious litigation and possibly inconsistent adjudications."  *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 479 (E.D.N.Y. 2001) (citation omitted).  Accordingly, I conclude that the plaintiffs have satisfied Rule 23(b)(3)'s superiority requirement.

## III.   Conclusion

In sum, the plaintiffs' renewed motion for class certification (doc. # 299) is GRANTED. The claims asserted in the Sixth Amended Complaint shall proceed on a class-action basis under Federal Rule of Civil Procedure 23(b)(3).  A separate order of class certification shall issue forthwith.  That order will require the plaintiffs to submit a proposed notice to class members, and all other necessary documents, within forty-five (45) days.

It is so ordered.

Dated at Bridgeport, Connecticut, this 6th day of September 2013.

  /s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge