# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LOU HADDOCK, as trustee of the Flyte Tool & Die Company, Inc. 401-K Profit Sharing Plan, PETER WIBERG, as trustee of the Crown Tool & Die Co. Inc. Salary Deferral Profit Sharing Plan, ALAN GOUSE, as trustee of Greater Hartford Easter Seal Rehabilitation Center, Inc., Tax Sheltered Annuity Plan and the Money Accumulation Pension Plan for the Employees of Hartford Easter Rehabilitation Center, Inc., Trust, CHRISTOPHER ANDERSON, as trustee of the Anderson Law Firm, P.C. 401(k) Profit Sharing Plan and Trust, f/k/a the Anderson & Ferdon P.C. 401(k) Profit Sharing Plan, and H. GRADY CHANDLER, as trustee of the Law Offices of H. Grady Chandler, P.C., 401(k) Profit Sharing Plan and Trust | CIVIL ACTION NO.: 3:01CV1552 (SRU) |
| PLAINTIFFS, | |
| v. | |
| NATIONWIDE LIFE INSURANCE CO., | |
| DEFENDANT. | |

# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

STATEMENT OF FACTS ...........................................................................................2

    A.    Nationwide's Provision of Variable Annuity Products to ERISA Plans ................2

    B.    Mutual Fund Revenue Sharing ...........................................................................4

STANDARD OF REVIEW .......................................................................................5

ARGUMENT ...........................................................................................................6

I.    Nationwide Did Not Exercise Any Fiduciary Function In Receiving Revenue Sharing ...........................................................................................................6

    A.    The Selection of Investment Options For An Annuity Product Is Not A Fiduciary Function Under ERISA ....................................................................8

    B.    Nationwide Did Not Substitute Or Delete Investment Options In Connection With Revenue Sharing........................................................................10

    C.    Neither The Custody Of Plan Assets Nor The Receipt Of Revenue Sharing While Maintaining Custody Of Plan Assets Implicates Any Fiduciary Duty....................................................................................................13

        1.    Receipt of revenue sharing while maintaining "custody" of the separate accounts does not implicate a fiduciary duty.............................14

        2.    Plaintiffs' "custody and control" theory is merely a recharacterization of their selection, substitution, and deletion theories..................................................................................................16

        3.    Receipt of revenue sharing does not transform a non-fiduciary custodial role into a fiduciary role. ...........................................................17

II.    The Registered Individual Annuity Separate Accounts Do Not Contain ERISA "Plan Assets" ......................................................................................................19

CONCLUSION........................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................5

*F.H. Krear & Co. v. Nineteen Named Trustees*,
   810 F.2d 1250 (2d Cir. 1987)...............................................................9

*F.W. Webb Co. v. State Street Bank & Trust Co.*,
   No. 09 Civ. 1241, 2010 WL 3219284 (S.D.N.Y. Aug. 12, 2010) ...........10

*Faber v. Metro. Life Ins. Co.*,
   648 F.3d 98 (2d Cir. 2011)..................................................................17

*Gummo v. Village of Depew*,
   75 F.3d 98 (2d Cir. 1996).....................................................................5

*Haddock v. Nationwide Fin. Servs., Inc.*,
   262 F.R.D. 97 (D. Conn. 2009).......................................................10, 16

*Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*,
   --- F. Supp. 2d ----, No. 11-282, 2013 WL 4446919 (D. Conn. Aug. 9, 2013) ......19

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) ......................................................... passim

*In re Mid-Island Hosp., Inc.*,
   276 F.3d 123 (2d Cir. 2002)................................................................18

*Johnson v. Priceline.com, Inc.*,
   711 F.3d 271 (2d Cir. 2013)................................................................18

*Leimkeuhler v. American United Life Insurance Co.*,
   713 F.3d 905 (7th Cir. 2013) ......................................................... passim

*LoPresti v. Terwilliger*,
   126 F.3d 34 (2d Cir. 1997).................................................................5, 7

*Miller v. American Nat'l Bank & Trust Co. of Chicago*,
   4 F.3d 518 (7th Cir. 1993) ................................................................18

*Pegram v. Herdrich*,
   530 U.S. 211 (2000)..........................................................1, 7, 13, 15

*Santomenno v. John Hancock Life Ins. Co.*,
   No. 10-1655, 2013 WL 3864395 (D.N.J. July 24, 2013) .............................................10, 13, 17

*Schulist v. Blue Cross of Iowa*,
   717 F.2d 1127 (7th Cir. 1983) ............................................................................................9, 10

*Thomas v. UBS AG*,
   706 F.3d 846 (7th Cir. 2013) .......................................................................................................18

*Tiblier v. Dlabal*,
   No. 13-50344, 2014 U.S. App. LEXIS 3897 (5th Cir. Feb. 28, 2014) ......................................6

*Trustees of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health &*
   *Welfare Plan v. Bjorkedal*,
   516 F.3d 719 (8th Cir. 2008) ....................................................................................................6

*Zang v. Paychex, Inc.*,
   728 F. Supp. 2d 261 (W.D.N.Y. 2010) ..................................................................7, 10, 17, 19

STATUTES AND RULES

15 U.S.C. § 80a-4 ...............................................................................................................20

15 U.S.C. § 80a-26 .............................................................................................................20

29 U.S.C. § 1002(21)(A)(i) ......................................................................................... passim

29 U.S.C. § 1002(21)(A)(iii) ............................................................................................19

29 U.S.C. § 1101(b)(1) ..................................................................................................2, 20

Fed. R. Civ. P. 56(a) ..........................................................................................................5

SEC RELEASES

*Nationwide Life Ins. Co., et al.*, SEC Release No. IC-25312, 2001 WL 1566673
(Dec. 7, 2001) ....................................................................................................................20

*National Life Ins. Co., et al.*, SEC Release No. IC-29627, 2011 WL 1325580
(Apr. 7, 2011).....................................................................................................................20

Since this Court addressed Nationwide's motion for summary judgment in 2006, the ERISA law concerning fiduciary status and revenue sharing has continued to develop. Last year, after oral argument on class certification in this case, the Seventh Circuit issued a landmark decision in this area—*Leimkeuhler v. American United Life Insurance Co.*, 713 F.3d 905 (7th Cir. 2013). That decision and others show that Plaintiffs' claim has no merit as a matter of law and that summary judgment should be entered for Nationwide.

Plaintiffs assert that Nationwide is a functional fiduciary to their plans because the company purportedly exercised "authority or control respecting management or disposition of [plan] assets" (29 U.S.C. § 1002(21)(A)(i)), and that Nationwide breached its alleged fiduciary duties by receiving payments from mutual funds. None of Plaintiffs' theories for proving these elements, however, has any merit:

> *First*, a product provider's selection of investment options for a variable annuity product menu is not an exercise of authority or control respecting the management or disposition of plan assets, so that selection does not render the provider an ERISA fiduciary. Several courts have held just that, including the recent *Leimkeuhler* decision.

> *Second*, a product provider's mere contractual authority to substitute or delete an investment option from a variable annuity product menu also does not render the provider an ERISA fiduciary. Under ERISA's text, confirmed by the case law, only an actual exercise of that substitution or deletion authority could constitute a fiduciary function. Accordingly, Plaintiffs must focus their case on an actual substitution or deletion. Moreover, under well-established ERISA law (*see Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)), Plaintiffs must then tie any such substitution or deletion to the challenged conduct (*i.e.*, receipt of mutual fund payments). Again, this is the holding of

1

the recent *Leimkeuhler* decision.  There has never been any allegation in this case, nor is there any evidence, that Nationwide substituted or deleted any mutual fund in any plan in connection with revenue sharing.

*Finally*, a product provider's receipt of revenue sharing while maintaining custody of plan assets (as Plaintiffs allege here) also does not transform the provider into an ERISA functional fiduciary.  Several courts—again, most recently *Leimkeuhler*—have rejected any such fiduciary-status theory.

There is also an independent reason why Plaintiffs' claim regarding Nationwide's individual (as opposed to group) annuity contracts should be dismissed.  Plaintiffs' lawsuit is the only revenue-sharing challenge of which Nationwide is aware concerning individual annuity contracts, and for good reason.  Under ERISA, the assets under these contracts, which are held in SEC-registered investment companies and subject to stringent regulation in that context, are not plan assets at all for purposes of ERISA.  *See* 29 U.S.C. § 1101(b)(1).  Thus, even if Plaintiffs' broader fiduciary-status and fiduciary-breach theories had merit, they would not apply to the individual annuity contracts.

## STATEMENT OF FACTS

### A.    Nationwide's Provision of Variable Annuity Products to ERISA Plans

This case concerns Nationwide's role as a provider of group and individual variable annuity products to ERISA plans.  While Plaintiffs' complaint focuses on ERISA plans alone, Nationwide offers its annuity products to various customers, only some of which are ERISA plans.  *See* Defendant's Local Rule 56(a)1 Statement ("Rule 56(a)1 Statement") ¶ 1.  Nationwide's variable annuity products allow participants to allocate their money to investment options that correspond with underlying mutual funds.  Each variable annuity product contains a

menu of such investment options.  *See id.* ¶ 2.  Of course, no menu contains all of the thousands of mutual funds available in the market.  Rather, Nationwide selects a set of investment options for each product menu, generally consisting of a mix of proprietary Nationwide-affiliated funds and non-proprietary funds.  *See id.* ¶ 3.  This selection of product investment options is part of the design of the product, and thus occurs before the product or investment option is offered to a customer (*e.g.*, an ERISA plan).  *See id.* ¶ 4.

Nationwide is but one of dozens of companies offering investment products to trustees of retirement plans.  *See id.* ¶ 5.  Every potential customer considering a Nationwide variable annuity product has complete authority and control over the decision whether to choose the product in the first instance.  When an ERISA plan chooses a Nationwide annuity product, it is specifically the plan's trustee that makes that decision, often with advice from separately hired plan consultants or brokers.  *See id.* ¶ 6.  As part of that process, the trustees, consultants, and brokers are able to review the pre-established, standard menu of investment options for the product.  *See id.* ¶ 7.  It is not disputed that, as part of that process, the trustees, consultants, and brokers also receive full disclosure of the costs of the investment options available in the product.  *See id.* ¶ 8.  If the trustee desires different investment options, or different priced options, the trustee need not choose the Nationwide annuity.  *See id.* ¶ 9.  Nationwide had no authority or control over the trustee's choice of annuity product.  *See id.* ¶ 10.

In the case of group annuity products—as opposed to individual annuities—the trustees can, and often did, refine the investment options available in the product menu.  Upon choosing a Nationwide annuity, the trustee could select for his or her plan a subset of the product's pre-established, standard investment options.  *See id.* ¶ 11.  For example, in this case the initial application for the Crown Plan's group annuity contract offered sixteen investment options; the

trustee selected six.  *See id.* ¶ 12.  Nationwide had no authority or control over these trustee selections of investment options.  *See id.* ¶ 13.

Once a trustee selects an annuity product, and Nationwide issues a contract, it is the plan participants who choose how much money to contribute, how often to contribute, and the investment options to which their contributions shall be allocated.  *See id.* ¶ 14.  Nationwide has no authority or control over these plan participant decisions.  *See id.* ¶ 15.  Nationwide simply follows the plan participants' directions.  *See id.* ¶ 16.

The group annuity contracts and some (but not all) of the individual annuity contracts at issue in this case included a provision allowing Nationwide to substitute or remove an investment option from the annuity contract menu in particular circumstances.  *See id.* ¶ 17. While Nationwide had that legal authority, it rarely used it.  *See id.* ¶ 18.  Indeed, Plaintiffs have never alleged, nor is there any evidence, that Nationwide ever substituted or deleted an investment option in any plan in connection with revenue sharing.  *See id.* ¶ 19.

### B.    Mutual Fund Revenue Sharing

The mutual fund companies whose funds correspond to the investment options in Nationwide's variable annuity products make payments to Nationwide that are sometimes referred to as revenue sharing.  *See id.* ¶ 20.  Nationwide has relationships with approximately 160 mutual fund families offering thousands of mutual funds that correspond to investment options in Nationwide's products.  *See id.* ¶ 21.  Generally, Nationwide reached agreements with these fund families on an entity-wide, aggregate level for all Nationwide product menus; the agreements were not limited to ERISA plans.  *See id.* ¶ 22.  Many of these mutual fund agreements provided for the funds and their affiliates to pay revenue sharing to Nationwide.  *See id.* ¶ 23.  Although some revenue sharing was calculated as a flat fee, the agreements typically

provided for revenue sharing to be calculated as a percentage of the combined total assets allocated to the family's funds, including assets unrelated to ERISA plans. *See id.* ¶ 24. The percentages and amounts of revenue sharing varied across funds, depending on the circumstances of each fund family, and thus on the value that each fund family placed on the services, marketing, and distribution channel that Nationwide provided. Some mutual funds paid a higher rate, others paid a lower rate, and some paid no revenue sharing at all. *See id.* ¶ 25. The practice of revenue sharing is, and was during the class period, ubiquitous in the industry. *See id.* ¶ 26.

## **STANDARD OF REVIEW**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Whether a fact is "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy [its summary judgment] burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996). "[W]here the facts are not in question, whether a party is an ERISA fiduciary is purely a question of law." *LoPresti v. Terwilliger*, 126 F.3d 34, 39 (2d Cir. 1997) (internal quotation marks omitted).

## ARGUMENT

I.   **NATIONWIDE DID NOT EXERCISE ANY FIDUCIARY FUNCTION IN RECEIVING REVENUE SHARING**

ERISA's text and settled ERISA precedent, including the Seventh Circuit's recent decision on materially indistinguishable facts in *Leimkeuhler v. American United Life Insurance Co.*, 713 F.3d 905 (7th Cir. 2013), show as a matter of law that Plaintiffs' challenge to Nationwide's receipt of revenue sharing has no merit.

Nationwide is not the named fiduciary of Plaintiffs' plans, but rather is a product provider to those plans.  To hold Nationwide liable for its receipt of revenue sharing, Plaintiffs must prove (among other things) that Nationwide (1) functioned in certain respects as an ERISA fiduciary, and (2) did so with respect to the receipt of revenue sharing.

To show the *first* requirement—*i.e.*, functional fiduciary status—Plaintiffs rely on 29 U.S.C. § 1002(21)(A)(i).  Paragraph (A)(i) provides, in pertinent part, that "[a] person is a fiduciary with respect to a plan to the extent … he … *exercises* any authority or control respecting management or disposition of its assets."  (Emphasis added.)  It is not sufficient for a plaintiff to show that a person merely possessed authority over the disposition of plan assets. Rather, "Section 1002(21)(A)'s 'reach is limited to circumstances where the individual *actually exercises* some authority.'"  *Leimkeuhler*, 713 F.3d at 914 (emphasis added) (citation omitted); *see also Tiblier v. Dlabal*, No. 13-50344, 2014 U.S. App. LEXIS 3897, at *12-13 (5th Cir. Feb. 28, 2014) ("[W]hether Plaintiffs gave [defendant] discretionary authority or control over the Plans is irrelevant here because it is undisputed that [defendant] did not *exercise* that authority with respect to the only transaction at issue in this case."); *Trustees of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719, 733 (8th Cir. 2008) ("Because [§ 1002(21)(A)(i)] imposes a fiduciary duty on those not named as a

6

fiduciary, its reach is limited to circumstances where the individual *actually exercises* some authority." (emphasis added)); *Zang v. Paychex, Inc.*, 728 F. Supp. 2d 261, 272 (W.D.N.Y. 2010) ("[T]he statute does not state that a person is a fiduciary if he *has* authority or control over plan assets, but only if, and to the extent, that he *exercises* such authority or control." (citing *LoPresti*, 126 F.3d at 40)).

Moreover, because a functional fiduciary wears its fiduciary hat only with respect to certain functions—here, "only 'to the extent' it exercises its authority or control," *Leimkeuhler*, 713 F.3d at 913—there is a *second* requirement that a plaintiff also must satisfy.  The plaintiff must prove a link between a defendant's performance of a fiduciary function and the challenged conduct:

> In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.

*Pegram*, 530 U.S. at 226.  Because Plaintiffs proceed under paragraph (A)(i) here, they must tie a Nationwide exercise of authority or control with respect to the management or disposition of plan assets to Nationwide's receipt of revenue sharing.  *See Leimkeuhler*, 713 F.3d at 913.

Plaintiffs assert that Nationwide acted as a functional fiduciary in accepting revenue sharing, but the case law now firmly rejects their argument.  *First*, a product provider's selection of mutual funds for a variable annuity product does not constitute a fiduciary function.  Thus, Nationwide's design of its products with a menu containing only a subset of the thousands of mutual funds available in the market implicates no fiduciary duty, regardless of the reasons why Nationwide selected those funds.  *See infra*, Part A.  *Second*, a product provider's contractual authority to substitute or delete investment options also does not render the provider a fiduciary.

7

Only an actual exercise of that authority could constitute fiduciary conduct.   Moreover, for liability to exist, any such exercise must be tied to the challenged practice—here, the receipt of revenue sharing.   The undisputed facts show that Nationwide rarely substituted or deleted investment options, and never substituted or deleted an option in connection with revenue sharing.  *See infra*, Part B.  *Finally*, neither a product provider's mere custody of plan assets (*e.g.*, as Plaintiffs allege here, in the variable annuity separate accounts) nor the receipt of revenue sharing while maintaining such (alleged) custody of plan assets implicates any fiduciary duty.   The receipt of revenue sharing is not an "exercise" of "authority or control respecting management or disposition of [plan] assets."  § 1002(21)(A)(i).  *See infra*, Part C.

## A.   The Selection of Investment Options For An Annuity Product Is Not A Fiduciary Function Under ERISA

Plaintiffs first assert that Nationwide's selection of mutual funds as investment options for its annuity products is an ERISA fiduciary function, but the case law clearly rejects that proposition.   The Seventh Circuit's recent *Leimkeuhler* decision is squarely on point.   Like Nationwide, defendant American United Life Insurance (AUL) offered an annuity contract that "did not enable Plan participants to invest in all of the roughly 7,500 mutual funds currently available on the market."  *Leimkeuhler*, 713 F.3d at 909.   The selection of mutual funds for AUL's products proceeded in stages.   In "stage one," AUL "selected a 'menu' of mutual funds and presented this menu to [the plan trustee]."  *Id.* at 910.   Then, in "stage two," the plan trustee "selected from the menu the specific funds that he wished to make available to Plan participants," and "Plan participants could then direct their contributions to one or more of the investment options that [the trustee] had selected."  *Id.*

The Seventh Circuit acknowledged that AUL "[i]n crafting its menu of investment options ... set[] the stage for any revenue sharing in which it wishes to engage" (*id.* at 911), but

flatly rejected the plaintiff's argument that this "crafting" made AUL a fiduciary: "the act of selecting both funds and their share classes for inclusion on a menu of investment options offered to 401(k) plan customers does not transform a provider of annuities into a functional fiduciary under Section 1002(21)(A)(i)." *Id.* at 912. While these "product-design decisions … limit the universe of funds" in a product, "[t]hose steps occur well before a Plan participant deposits her contributions in the separate account and directs AUL where to invest those contributions." *Id.* at 911, 914. The plan is "free to seek a better deal with a different 401(k) service provider." *Id.* at 912.

*Leimkeuhler* is precisely in line with the governing Second Circuit precedent, *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987). Because the selection of investment options for an annuity product is a matter of "*product* design" (*Leimkeuhler*, 713 F.3d at 911 (emphasis added)), it is not an exercise of authority or control over the management or disposition of *plan* assets. The plan retains full authority and control to accept or reject the product and its terms, retaining "final say on which investment options will be included" in a given product, *id.* (internal quotation marks and citation omitted), as well as the authority to choose another product altogether. This product-versus-plan distinction is critical. As the Second and Seventh Circuits both recognize (citing the same authority), "a service provider does not act as a fiduciary with respect to the terms in the service agreement if it does not control the named fiduciary's negotiation and approval of those terms." *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009) (citing *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127 (7th Cir. 1983)); *see F.H. Krear & Co.*, 810 F.2d at 1259 ("When a person who has no relationship to an ERISA plan is negotiating a contract with that plan, he has no authority over or responsibility to the plan

and presumably is unable to exercise any control over the trustee's decision whether or not, and on what terms, to enter into an agreement with him." (also citing *Schulist*, 717 F.2d at 1131-32)).

This proposition is well accepted under ERISA, with numerous district courts rejecting product-design theories of fiduciary status like the Plaintiffs assert here. *See, e.g., Santomenno v. John Hancock Life Ins. Co.*, No. 10-1655, 2013 WL 3864395, at *7 (D.N.J. July 24, 2013) ("A provider does not incur fiduciary status simply because it offers a 'big menu' of investment options from which a trustee selects a 'small menu' for her plan."); *F.W. Webb Co. v. State Street Bank & Trust Co.*, No. 09 Civ. 1241, 2010 WL 3219284, at *6 (S.D.N.Y. Aug. 12, 2010) ("[D]efendants' role here in establishing the 'big menu' bears too tenuous a connection to the eventual disposition of plan assets to constitute 'authority or control' within the meaning of the statute."); *Zang*, 728 F. Supp. 2d at 272 ("Paychex's mere creation and offering of a menu or lineup of funds cannot legally or logically give rise to fiduciary status.  Those lists, or menus, are created prior to the existence of any contractual relationship between the parties.").

**B.     Nationwide Did Not Substitute Or Delete Investment Options In Connection With Revenue Sharing**

Previously in this case, Plaintiffs have sought to distinguish decisions like *Hecker* and *Zang* on the ground that Nationwide also had the authority to substitute and delete investment options.  *See, e.g.*, Final Form Brief for Plaintiffs-Counter-Defendants-Appellees at 30-31, *Nationwide Life Ins. Co. v. Haddock*, No. 10-4237 (2d Cir. July 13, 2011), 2011 WL 3019476. As this Court has recognized, however, Plaintiffs do not seek "to prove that Nationwide actually exercised its authority to remove mutual funds from" the investment option menus.  *Haddock v. Nationwide Financial Servs., Inc.*, 262 F.R.D. 97, 108 (D. Conn. 2009).  "Rather, the Trustees contend that the fact that Nationwide had a contractual right to substitute and delete mutual funds, *even if such authority was never exercised*, by itself constitutes sufficient authority or

10

control over annuity contracts to make it a fiduciary." *Id.* (emphasis added).  The developed case law—most importantly, the Seventh Circuit's decision in *Leimkeuhler*—now decisively rejects Plaintiffs' contract structure theory.

The facts of *Leimkeuhler* regarding substitution and deletion are materially indistinguishable from the facts here.  AUL "reserved the right to make substitutions to or deletions from [the plan trustee's] selections," but AUL exercised that right only rarely (there, twice).  713 F.3d at 910.  The Seventh Circuit acknowledged that this presented a "factual distinction" from its earlier decision in *Hecker* because "there is at least some basis for questioning whether [the plan trustee] has 'the final say on which investment options will be included.'"  *Id.* at 911 (quoting *Hecker*, 556 F.3d at 583).  But the court rejected the distinction as legally irrelevant on the facts there, for at least two reasons.

First, as a matter of law, contractual authority to undertake an act of control is insufficient.  "Section 1002(21)(A)'s 'reach is limited to circumstances where the individual *actually exercises* some authority.'"  *Id.* at 914 (citation omitted, emphasis added).  As a result, a product provider "can be liable as a fiduciary only 'to the extent' it *exercises* [the relevant] contractual authority."  *Id.* at 914 (emphasis added).  Second, the facts in *Leimkeuhler* showed that AUL only exercised its substitution and deletion authority twice, and never substituted or deleted a mutual fund in connection with revenue sharing.  Because AUL "never exercised this contractual right in a way that could give rise to a claim," the Seventh Circuit held, "this distinction" of *Hecker*—*i.e.*, the existence of the substitution and deletion authority—"falls away."  *Leimkeuhler*, 713 F.3d at 911, 914.

The same is true here, on both scores.  First, Nationwide's mere authority to substitute or delete funds from the annuity product investment menus provides no basis for transforming

Nationwide from a product provider to a functional fiduciary.  Second, Plaintiffs have never alleged, and there is no evidence, that Nationwide ever substituted or deleted an investment option in connection with revenue sharing.  Thus, just as the Seventh Circuit held in *Leimkeuhler* that there was "no basis for distinguishing AUL's actions [t]here from those in *Hecker*"—there also is no basis for distinguishing this case from *Hecker*.  713 F.3d at 912.

The Seventh Circuit in *Leimkeuhler* specifically rejected the Department of Labor's argument as amicus that AUL's "non-exercise" of the substitution and deletion power—*i.e.*, the receipt of plan contributions into revenue-sharing funds, because AUL *did not* remove or replace such funds with non-revenue-sharing funds—could constitute the requisite exercise of authority or control.  Roundly rejecting the theory as "effectively a 'non-exercise' theory of exercise," the court explained:

> This theory is unworkable.  It conflicts with a common-sense understanding of the meaning of "exercise," is unsupported by precedent, and would expand fiduciary responsibilities under Section 1002(21)(A) to entities that took no action at all with respect to a plan.  In contrast to a named fiduciary, a functional fiduciary under Section 1002(21)(A) owes a duty to a plan through its actions, regardless of whether it chose to assume fiduciary responsibilities or even anticipated that such responsibilities might arise.  Section 1002(21)(A)'s "reach is limited to circumstances where the individual actually exercises some authority," and "people may be fiduciaries when they do certain things but be entitled to act in their own interests when they do others."

*Id.* at 914 (citations omitted).  For these reasons, the Seventh Circuit held that the mere contractual authority to substitute and delete funds from an annuity product's investment menu is insufficient for fiduciary status.  Any claim must be based on an actual substitution or deletion tied to the challenged revenue sharing.  *Id.*

*Leimkeuhler*'s holdings on the substitution and deletion issues follow directly from ERISA's text and Supreme Court precedent.  The first principle—that a substitution or deletion

authority is relevant only if and when it is actually exercised—follows from ERISA's text, which renders one a fiduciary in this context only "to the extent … he … *exercises* any authority or control respecting management or disposition of [the plan's] assets."  29 U.S.C. § 1002(21)(A)(i) (emphasis added).  The principle is also confirmed by the developed case law.  *See supra*, pp.6-7 (citing decisions).  The second principle—that a claim may lie only if the product provider actually substitutes or deletes an investment option in connection with revenue sharing—follows from the Supreme Court's *Pegram* decision, which holds that a fiduciary is liable only if "that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."  530 U.S. at 226.  Indeed, just last year, on the heels of *Leimkeuhler*, the *Santomenno* court rejected a materially identical ERISA argument based on mere substitution and deletion authority, reasoning that "[p]laintiffs do not allege that [defendant] selected investment options with reasonable fees, and then unilaterally substituted funds with high fees."  *Santomenno*, 2013 WL 3864395, at *8 (citing *Leimkeuhler*, 713 F.3d at 914).

Plaintiffs' reliance on Nationwide's contractual authority to substitute or delete mutual funds from the investment options menu thus provides no basis for ERISA liability.  Plaintiffs have never alleged that Nationwide exercised the substitution or deletion power in connection with revenue sharing.  There is a reason:  there is no evidence that Nationwide ever substituted or deleted any mutual funds in any plan in connection with revenue sharing.

## C.    Neither The Custody Of Plan Assets Nor The Receipt Of Revenue Sharing While Maintaining Custody Of Plan Assets Implicates Any Fiduciary Duty

Plaintiffs also assert that Nationwide "uses" its alleged "custody and control" of plan assets by conditioning mutual funds' "access" to plan contributions, *see* Pls.' Sixth Amended Class Action Complaint [Dkt. #423] ¶ 52, but that assertion—to the extent it is any different

13

from the selection, substitution, and deletion theories addressed above—also has been firmly rejected.[1]

### 1. Receipt of revenue sharing while maintaining "custody" of the separate accounts does not implicate a fiduciary duty.

The Seventh Circuit in *Leimkeuhler* also confronted—and rejected—the assertion that AUL's custody of the plan's assets rendered it a fiduciary with respect to revenue sharing payments it received based on those plan contributions.  There, as here, plan participants' 401(k) contributions were deposited "into a 'separate account'—distinct because state insurance law and ERISA require AUL to keep retirement contributions separate from other assets."  713 F.3d at 908.  "The use of the separate account … substantially reduces the mutual funds' administrative, marketing, and service costs" because "AUL must perform many of the services that the mutual funds would otherwise handle themselves"—*e.g.*, "keep[ing] track of individual accounts, tak[ing] responsibility for calculating the daily value of assets in the separate account, distribut[ing] information to the Plan sponsor and participants, and provid[ing] a customer-service hotline."  *Id.* at 909.  The Seventh Circuit recognized that AUL could cover these costs either by directly billing *plans* or by charging the *mutual funds* through the "practice known as 'revenue sharing.'"  *Id.*  The *Leimkeuhler* case, like this one, involved the latter—charging mutual funds through revenue sharing.  Importantly, the Seventh Circuit acknowledged that there

---

[1] It is not disputed that, in fact, the variable account does not hold any plan money to which it could condition access.  Rather, Nationwide uses the money contributed by participants in an annuity product, immediately after the participants' allocation, to purchase mutual fund shares at the participants' direction.  The variable account then keeps records of those mutual fund shares. While this is a critical distinction for purposes of Plaintiffs' theory that Nationwide conditioned access to contributions it supposedly held, Nationwide's argument here in Part C does not depend on this distinction.  The argument here applies regardless of whether the variable account is considered to hold plans' money or, instead, keeps records of—or even holds—mutual fund shares.

need not be "a one-to-one correspondence between the cost to AUL of providing participant-level services and the amount that AUL receives in revenue-sharing payments.  AUL may be making a profit, perhaps even a sizeable profit, from revenue sharing."  *Id.*

*Leimkeuhler* rejects Plaintiffs' "custody and control" theory here.  The plaintiff trustee in *Leimkeuhler* sought to establish fiduciary status based on AUL's alleged custody of plan assets—*i.e.*, "maintaining the separate account, which AUL alone controls."  713 F.3d at 912.  The Seventh Circuit rejected that "custody and control" assertion as legally irrelevant, pointing to the Supreme Court's *Pegram* principle "requiring that an entity exercise authority or control with respect to the action at issue in the suit in order to be subject to liability as a fiduciary under [§ 1002(21)(A)]."  *Id.* at 913 (citing *Pegram*, 530 U.S. at 226).  The problem for the plaintiff trustee, the Seventh Circuit held, was that "AUL's maintenance of the separate account" (*i.e.*, its custody and control of it) had nothing to do with revenue sharing.  *Id.*  Custody and control of the separate account might implicate a fiduciary duty if, for example, AUL "los[t] track of participants' contributions or withdr[ew] funds in the separate account to pay for a company-wide vacation to Las Vegas."  *Id.*  But the receipt of revenue sharing involves nothing of the sort.  Rather, revenue-sharing decisions are associated, at best, with product-design decisions, when the service provider (*i.e.*, AUL) selects investment options for the product menu.  *Id.* at 913-914.  "Because the actions [the plan trustee] complains of"—*i.e.*, revenue sharing—"do not implicate AUL's control over the separate account, the separate account does not render AUL a fiduciary under the circumstances of this case."  *Id.* at 914.

The same is true here.  Plaintiffs do not allege that Nationwide used its custody of the separate accounts to improperly dispose of plan assets invested in those accounts.  Rather, as in *Leimkeuhler*, Plaintiffs here focus on revenue sharing, which the undisputed evidence shows is

associated with product design—*i.e.*, the selection of funds for a variable annuity product. Plaintiffs' theory of Nationwide's so-called "use" of "custody and control" should therefore be rejected for the same reasons as in *Leimkeuhler*.

> **2.    Plaintiffs' "custody and control" theory is merely a recharacterization of their selection, substitution, and deletion theories.**

Plaintiffs' theory—labeled as the "specific accumulation unit" theory—should be rejected for another reason.  In reality, it is not a theory about "use" of "custody and control" at all.  The only "use" of purported "custody and control" that Plaintiffs have ever clearly asserted is Nationwide's alleged conditioning of mutual funds' access to Nationwide annuity products based on a fund's willingness to pay revenue sharing.  That allegation, however, is simply a recharacterization of the selection, substitution, and deletion theories discussed above.  The only purported gatekeeping "control" that Nationwide could exercise over a mutual fund's access to a Nationwide annuity product consists of Nationwide's ability to select investment options for the product menus and its authority to substitute and delete investment options from those menus. *Compare Haddock*, 262 F.R.D. at 107 (describing Nationwide's "control and authority … as sole gatekeeper"—*i.e.*, Nationwide's ability to "define the universe of investment options"—as the basis of the "specific accumulation unit theory") *with id.* (describing Nationwide's "controlling which mutual funds are available as investment options for the Plans and their participants" as the basis of the "mutual fund selection theory").  Plaintiffs do not allege *any other means* by which Nationwide could or did control mutual funds' "access" to the annuity products or the plans' assets.[2]  Because, then, the "use" of "custody and control" theory in fact still rests solely

---

[2] Indeed, Plaintiffs themselves have acknowledged that their theories "tend[] to merge."  Pls' Mem. in Reply to Defs.' Opp. to Pls.' Mot. for Class Cert. Based on Fifth Amended Complaint [Dkt. #360] 4.

on selection, substitution, and deletion, it should be rejected for the reasons discussed in Parts A and B, above.

### 3.    Receipt of revenue sharing does not transform a non-fiduciary custodial role into a fiduciary role.

Plaintiffs have at times suggested that the receipt of revenue sharing is itself the exercise of a fiduciary function, but that assertion has no support in either ERISA's text or case law and would render the receipt of revenue sharing a *per se* ERISA violation, a result that cannot be squared with ERISA precedent (or the regulated, industry-wide practice of revenue sharing). There is no support in ERISA's text because receipt of revenue sharing from a mutual fund involves no exercise of any authority or control over the management or disposition of a plan's assets.  That is, in receiving payments from mutual funds, Nationwide takes no action with respect to a plan's assets.  There is also no support in the ERISA case law for Plaintiffs' position. To the contrary, to the extent the proposition has been considered directly, it has been flatly rejected.  *See Santomenno*, 2013 WL 3864395, at *7 ("Service providers do not 'become fiduciaries merely by receiving shared revenue.'" (citation omitted)).  And, more generally, many courts have considered ERISA challenges to revenue sharing and not one has suggested that the receipt of revenue sharing itself constitutes a fiduciary act under the statute.  Instead, most cases hold that revenue sharing implicates no fiduciary conduct at all, whether in the act of receiving such payments or more broadly.  *See, e.g.*, *Leimkeuhler*, 713 F.3d at 909, 911-914; *Hecker*, 556 F.3d at 583-84; *Santomenno*, 2013 WL 3864395, at *2, *7; *Zang*, 728 F. Supp. 2d at 272.

Under both ERISA and the common law, moreover, receipt of a profit on custodial assets is insufficient to transform a non-fiduciary role into a fiduciary role.  That is the core proposition of cases rejecting ERISA fiduciary status based on custody of plan money.  *See, e.g., Faber v.*

*Metro. Life Ins. Co.*, 648 F.3d 98, 100 (2d Cir. 2011) (insurance company using retained asset account did not act as a fiduciary "by retaining and investing for its own profit life insurance proceeds due [plaintiffs] under employee benefit plans that [insurer] administered").  The same principle holds in common-law cases:  holding or accepting money and making a profit off the arrangement does not make a person a fiduciary.  *See In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) (insurer had no fiduciary obligation to invest withheld funds for plaintiffs' benefit and was not required to disgorge interest or profits on such funds); *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 280 (2d Cir. 2013) (declining to find fiduciary obligation and holding that "[t]he parties' relationship is contractual and, so long as the customer receives the benefit of the bargain … , the profit generated by [defendant] should be of no concern").

Take a simple, straightforward example:  Banks accept deposits and then use those deposits to lend money to generate revenue for the bank.  Yet it is well-established that a bank customarily owes no fiduciary duties to its depositors.  *See, e.g.*, *Thomas v. UBS AG*, 706 F.3d 846, 853 (7th Cir. 2013) ("a bank is not a fiduciary of its depositors").  This is true notwithstanding the fact the bank uses the depositor's funds to earn revenue, even substantial revenue.  *See, e.g.*, *Miller v. American Nat'l Bank & Trust Co. of Chicago*, 4 F.3d 518, 520-521 (7th Cir. 1993) (bank owed no fiduciary duty to plaintiff depositor, even though "it was able to loan out Miller's money at a significantly higher interest rate than it paid to plaintiff").

To the extent Plaintiffs allege that Nationwide "uses" plan assets to earn money, the same legal principle holds:  Nationwide's mere alleged custody of plan assets does not render it a

fiduciary.  The additional fact that Nationwide receives revenue (allegedly) based on that custody does not transform Nationwide's non-fiduciary role into a fiduciary role.[3]

## II.   THE REGISTERED INDIVIDUAL ANNUITY SEPARATE ACCOUNTS DO NOT CONTAIN ERISA "PLAN ASSETS"

Plaintiffs' claims concerning Nationwide's *individual* annuities fail for an additional reason:  for purposes of ERISA, the individuals' contributions are *not* "plan assets."  The reason is that the contributions are held in SEC-registered separate accounts, and are excluded from ERISA's coverage by a specific statutory provision.  There is, accordingly, no basis at all to assert fiduciary conduct.

To Nationwide's knowledge, of all the ERISA litigation concerning variable annuity contracts and mutual fund revenue sharing, this is the only case in which the plaintiffs' suit includes individual, as opposed to only group, annuities.  This is not surprising given ERISA's express exclusion of such assets, found in § 401(b)(1) of the act:  "In the case of a plan which invests in any security issued by an investment company registered under the Investment Company Act of 1940, the assets of such plan shall be deemed to include such security *but shall not*, solely by reason of such investment, *be deemed to include any assets of such investment*

---

[3] The decision in *Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, --- F. Supp. 2d ----, No. 11-282, 2013 WL 4446919 (D. Conn. Aug. 9, 2013), does not affect any of the issues here. The court there denied summary judgment based on a different theory of fiduciary status than Plaintiffs assert here.  The plaintiffs in *Healthcare Strategies* proceeded under (A)(iii)—*i.e.*, 29 U.S.C. § 1002(21)(A)(iii).  Plaintiffs in this case have never proceeded under (A)(iii), nor did this Court certify this case for class treatment under (A)(iii).  Rather, this has always been an (A)(i) case, which requires an actual exercise of authority or control over the management or disposition of plan assets.  More importantly, and with due respect to the *Healthcare Strategies* court, (A)(iii) is legally irrelevant.  That provision concerns "discretionary authority or discretionary responsibility in *the administration of [the] plan*."  § 1002(21)(A)(iii) (emphasis added).  Nationwide provides a product *to* ERISA plans, but it has no authority itself over the administration of those *plans*.  *See, e.g.*, *Zang*, 728 F. Supp. 2d at 273 (rejecting application of (A)(iii) because "[t]here is no allegation here that [the service provider defendant] has been granted discretionary authority or responsibility for the administration of the Plan in this case.").

*company*." 29 U.S.C. § 1101(b)(1) (emphasis added).  It is undisputed that plan contributions to the Nationwide individual annuities are held in separate accounts registered with the SEC as "unit investment trusts" under the Investment Company Act of 1940 ('40 Act).  *See* Henderson Decl., filed 4/25/08 [Dkt. #338] ¶ 7 (attached as Exhibit 1 to the accompanying Declaration of Thomas F. Clauss, Jr. ("Clauss Decl.")).  A "unit investment trust" is a type of "investment company" under the '40 Act.  *See* 15 U.S.C. § 80a-4 (defining a "[u]nit investment trust" as "an investment company").  The assets in the individual annuity separate accounts are thus *not* considered to be ERISA plan assets.

This is not an anomaly.  Investors in individual annuities—like mutual fund investors—are protected by extensive SEC regulation.  The annuities are subject to prospectus disclosures filed publicly with the SEC.  *See* Clauss Decl. Exhibit 1 ¶ 18; Supp'l Henderson Decl., filed 3/30/12 [Dkt. #475] ¶¶ 29-30 (attached as Exhibit 2 to the accompanying Clauss Decl.).  In addition, substitutions to the individual annuities are subject to various requirements, including an arduous SEC approval process, pursuant to § 26(c) of the '40 Act.  That approval process involves extensive SEC oversight and input, and may frequently involve advance notice to contract-holders of the proposed substitution, an opportunity for contract-holders to transfer money to a different option without penalty, and restrictions on the provider's receipt of revenue sharing from the replacement option.  *See* 15 U.S.C. § 80a-26 (approval requires SEC finding that the substitution "is consistent with the protection of investors and the purposes fairly intended by the policy and provisions of [the '40 Act]"); *see also, e.g.*, *Nationwide Life Ins. Co., et al.*, SEC Release No. IC-25312, 2001 WL 1566673, at *5 (Dec. 7, 2001) (notice of application for Section 26(c) order representing that Nationwide "will not receive for a period of three years from the date of the Order" any "revenue sharing" from the replacement options); *National Life*

*Ins. Co., et al.*, SEC Release No. IC-29627, 2011 WL 1325580, at *9 (Apr. 7, 2011) (notice of Section 26(c) application in which insurer "represent[s] that for three years" the insurer "will not receive in the aggregate" any "revenue-sharing" from the replacement option "at a higher rate than [it] had received" any such payments from the substituted option).  In light of this extensive regulatory scheme, ERISA reasonably excludes assets held in SEC-registered separate accounts from its purview.  Plaintiffs' claims with respect to the individual annuities should accordingly be dismissed as a matter of law.

## CONCLUSION

For the foregoing reasons, Nationwide respectfully requests that the Court grant its motion for summary judgment.

Dated: March 17, 2014

Respectfully submitted,

Defendant Nationwide Life Insurance Co.

By:     s/ Thomas F. Clauss, Jr.
        Thomas F. Clauss, Jr. (CT 12392)
        Wiggin and Dana LLP
        Two Stamford Plaza
        281 Tresser Boulevard
        Stamford, CT  06901
        Telephone:  (203) 363-7610
        Facsimile:  (203) 363-7676

        Charles C. Platt (CT 23036)
        Noah A. Levine (PHV 05067)
        Wilmer Cutler Pickering Hale and Dorr LLP
        7 World Trade Center
        250 Greenwich Street
        New York, NY  10007
        Telephone:  (212) 230-8800
        Facsimile:  (212) 230-8888

        David W. Bowker (PHV 05714)
        Daniel P. Kearney, Jr. (PHV 05813)
        Wilmer Cutler Pickering Hale and Dorr LLP

1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

## CERTIFICATION

I hereby certify that on March 17, 2014, a copy of the foregoing Memorandum of Law in Support of Defendant's Motion for Summary Judgment was filed electronically. Notice of this filing will be sent by electronic mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic filing system.

By:     /s/ Thomas F. Clauss, Jr.
        Thomas F. Clauss, Jr. (CT 12392)
        Wiggin and Dana LLP
        Two Stamford Plaza
        281 Tresser Boulevard
        Stamford, CT  06901
        Telephone:  (203) 363-7610
        Facsimile:  (203) 363-7676