UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LOU HADDOCK, as trustee of the Flyte Tool & Die Company, Inc. 401-K Profit Sharing Plan, PETER WIBERG, as trustee of the Crown Tool & Die Co. Inc. Salary Deferral Profit Sharing Plan, ALAN GOUSE, as trustee of the Greater Hartford Easter Seal Rehabilitation Center, Inc., Tax Sheltered Annuity Plan and the Money Accumulation Pension Plan for the Employees of Hartford Easter Seal Rehabilitation Center, Inc., Trust, CHRISTOPHER ANDERSON, as trustee of the Anderson Law Firm, P.C. 401(k) Profit Sharing Plan and Trust, f/k/a the Anderson & Ferdon P.C. 401(k) Profit Sharing Plan, H. GRADY CHANDLER, as trustee of the Law Offices of H. Grady Chandler, P.C., 401(k) Profit Sharing Plan and Trust, and CHRISTOPHER M. McKEON, as trustee of the Bershtein, Volpe & McKeon Profit Sharing Plan, f/k/a the Bershtein, Lippman, Bachman & McKeon Profit Sharing Plan, | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | CASE NO. 01-CV-1552 (SRU) |
| PLAINTIFFS, | | |
| v. | | |
| NATIONWIDE FINANCIAL SERVICES INC., and NATIONWIDE LIFE INSURANCE CO., | | |
| DEFENDANTS. | | |

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF UNOPPOSED MOTION
FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiffs Peter

Wiberg, Alan Gouse, Christopher Anderson, H. Grady Chandler, and Christopher M.

McKeon, in their capacities as trustees of retirement plans that purchased Annuity

Contracts and/or Trust Platforms from Nationwide ("Plaintiffs"), on behalf of themselves

and all others similarly situated (the "Class"), respectfully submit this Memorandum of Law in Support of their Unopposed Motion for Final Approval of Class Action Settlement ("Unopposed Motion").

Plaintiffs, with the consent of Defendants Nationwide Financial Services, Inc. and Nationwide Life Insurance Co. (collectively, "Defendants" or "Nationwide"), respectfully request the Court to enter the proposed Final Order and Judgment previously submitted to the Court, which finally approves the Settlement Stipulation and Release ("Stipulation").[1]

## I.     Introduction

By all measures, the Stipulation deserves final approval.  The Settlement[2] therein, which was only reached after more than thirteen (13) years of hard-fought litigation, represents a large and very significant resolution of this ERISA class action.  As a testament to the excellent result achieved in this case, after nearly 65,000 class members received direct notice via U.S. mail and notice of the settlement appeared in *The New York Times*, not a single objection to the Stipulation or the amount of Class Counsel's fee request has been filed.

---

[1] The Stipulation and proposed Final Order and Judgment are on file with the Court as Exhibits A and G, respectively, to Plaintiffs' Memorandum of Law in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement [Doc. 588-1]. All defined terms herein have the same meaning as set forth in the Stipulation. In an effort not to burden the Court with excessive or duplicative submissions, this Memorandum assumes familiarity with prior proceedings in this case, and with Class Counsel's Motion (and Memorandum of Law in Support) for Award of Fees and Expenses From The Common Fund And for Incentive Awards for Class Representatives, submitted contemporaneously herewith.

[2] Capitalized terms are given the meaning defined in the Stipulation, unless separately defined herein.

## II.      Background

### A.      The Litigation

Plaintiffs and the Class are trustees of qualified retirement plans covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), which held Annuity Contracts and/or Trust Platforms with Defendants or their affiliates.[3]  Plaintiffs sued Defendants under ERISA for breaching their fiduciary duties to the Plans, asking the Court for damages, declaratory and injunctive relief, and disgorgement of the revenue sharing Payments Defendants received from Mutual Funds.  The extensive procedural history of the Litigation, resulting in no less than six (6) published opinions, is well-known to the Court and is summarized in detail in Plaintiffs' Memorandum of Law in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement [Doc. 588-1] at 4-8.

### B.      The Settlement

After more than thirteen (13) years of vigorously contested litigation, and after hard-fought, arm's-length negotiation by highly experienced counsel, Plaintiffs and Defendants reached a Settlement resolving the claims of Plaintiffs and the members of the Class.  This Settlement achieves an excellent result for the members of the Class: it secures a number of significant changes to Defendants' business practices that will limit Defendants' ability to modify Plan Menus, provide access to investment platforms that pass-through one-hundred percent (100%) of Mutual Fund Payments to the Plans, and enhance disclosures for the Class and for future purchasers of Defendants' annuity

---

[3] As the Court will recall, the Class now consists of two subclasses, the certification of which is proposed for purposes of settlement: the Variable Annuity Subclass, represented by Plaintiffs Wiberg, Gouse, Anderson and Chandler, and the Trust Platform Subclass, represented by Plaintiff McKeon.

contracts and trust platform products.  Defendants will also pay $140,000,000 (including Attorneys' Fees and Class administration expenses) to the Class.[4]

Plaintiffs and Defendants tried twice—with the help of two of the top independent mediators in the country—to resolve the Litigation through mediation.  On July 5, 2012, the Parties participated in a mediation before Judge Layn Phillips.  This mediation did not succeed in resolving the Litigation.

On October 14 and 15, 2014 (and subsequently by phone), the Parties participated in a second mediation session before David Geronemus, Esq. of JAMS.  After extensive, arm's-length negotiations, during which the merits of each Party's positions were thoroughly discussed, evaluated and negotiated, a preliminary settlement was reached between the Plaintiffs and Defendants.

All of the Parties' settlement discussions were founded on a full understanding of the strengths and weaknesses of the case, based on the Parties' extensive familiarity with all material facts and issues in the case developed over the course of its thirteen (13)-year pendency.

### 1.     Non-Cash Future Benefits to The Class

The basic terms of the business changes and enhancements agreed to in the Settlement are:

- Defendants will supplement the disclosures for its new group variable annuity customer proposals, its new group variable annuity contracts, and its plan sponsor website that relate to Mutual Fund-related fees and expenses in connection with group variable annuity products.  Defendants will also add language in new customer proposals or plan sponsor

---

[4] The summary of the Settlement that follows is essentially identical to that set forth in Plaintiffs' Memorandum of Law in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement [Doc. 588-1] at 8-12 and is included here for the convenience of the Court.

website(s) informing trustees of Plans holding group variable annuity contracts of the opportunity to be transferred to a product where Mutual Fund Payments are credited to the Plan in the form of reduced asset fees in an amount equivalent to the disclosed reimbursement rate received for each Mutual Fund investment option.

- Defendants will supplement the disclosures for its new individual variable annuity customer proposals and its new product prospectuses that relate to Mutual Fund-related fees and expenses in connection with individual variable annuity products with specific language in these disclosures that Nationwide shall provide, upon Plan Trustees' written request, its best estimate of plan-specific, aggregate data regarding the Mutual Fund Payments received in connection with the Plan's investments for the previous calendar year.

- Defendants will supplement the disclosures for its trust customer proposals, new trust, custodial, services or program agreements, and plan sponsor website that relate to Mutual Fund-related fees and expenses in connection with trust products.  Defendants will also add language to the new customer proposals; trust, custodial, service or program agreements; or plan sponsor website(s) informing trustees of Plans holding group variable annuity contracts of the opportunity to be transferred to a product where Mutual Fund Payments are credited to the Plan in the form of reduced asset fees in an amount equivalent to the disclosed reimbursement rate received for each Mutual Fund investment option.

- Defendants will enhance the procedures for certain future changes to the Product Menus in connection with Annuity Contracts and the Program Menus for the Trust Platforms as follows:

    o For group variable annuity products and Trust Platforms, Defendants will specifically identify to Plan Trustees, via mail, electronic delivery, or Defendants' plan sponsor website, any addition of a Mutual Fund investment option to a Product Menu or Program Menu at the time of the addition.  Defendants will update the new customer proposals; trust, custodial, service or program agreements; or plan sponsor website(s), as applicable, to inform Plan trustees that such Product and Program Menu additions are identified on the plan sponsor websites.

    o For group variable annuity products and Trust Platforms, Defendants will provide to Plan trustees written notice of any removal or substitution of a Mutual Fund investment option from the Product and Program Menus that is initiated solely by Defendants, and will not remove or substitute that fund from the Product or Program Menu for a particular Plan until it has received

affirmative consent from that Plan's trustee(s).  Such notice shall be provided via mail, electronic delivery, or published on the plan sponsor websites at least thirty (30) days prior to the removal or substitution of a Mutual Fund investment option, and shall state the effective date of such removal or substitution. Defendants will update their new customer proposals; trust, custodial, service or program agreements; or plan sponsor website(s), as applicable, to inform Plan trustees that such removals or substitutions from the Product and Program Menus are identified on the plan sponsor websites.

o For group variable annuity products and Trust Platforms, Defendants generally will not substitute one fund for another or otherwise unilaterally remove or substitute a fund from a Plan Menu. Defendants will confirm this change in their business practices by modifying their contracts and Trust Platforms to eliminate any authority to unilaterally remove or substitute a fund from a Menu (the group variable annuity modifications will be subject to State insurance department approval).

o For group variable annuity products, in those circumstances where a substitution or removal is necessitated by the actions of Mutual Funds (such as decisions by Mutual Funds or corresponding separate accounts to liquidate a fund, merge funds, change investment advisers or sub-advisers, or make other changes that prevent Nationwide Life from offering an investment option on the Plan Menu, or otherwise require Nationwide Life to change the Plan Menu), where administratively feasible, Nationwide Life will provide sixty (60) days written notice to the trustee of each Plan affected by the change via notice sent by first class mail, fax, or email.  The notice will:  (1) explain the proposed modification to the Plan Menu; (2) fully disclose any resulting changes in the Mutual Fund Payment rate received by Nationwide; (3) identify the effective date of the change; (4) explain the Plan trustee's right to terminate the Annuity Contract; and (5) reiterate that, pursuant to the contract provisions agreed to by the Plan trustee, failure to object or otherwise respond shall be deemed to be consent to the proposed change.  Nationwide Life will confirm this change in their business practice by modifying their existing and future Annuity Contracts to reflect this notice process (the Annuity Contract modifications will be subject to State insurance department approval).

o For Trust Platforms, NFS has enhanced its notification procedures in those circumstances where a substitution or removal is necessitated by the actions of Mutual Funds (such as decisions by

Mutual Funds or corresponding separate accounts to liquidate a fund, merge funds, change investment advisers or sub-advisers, make other changes that prevent NFS from offering an investment option on the Plan Menu, or otherwise require NFS to change the Plan Menu. These notification enhancements are substantially the same as the proposed enhancements to the group variable annuity products' notification procedures.

o For Individual Variable Annuities, Nationwide Life agrees to follow applicable U.S. Securities and Exchange Commission regulations, including notice requirements, with regard to the addition, substitution or removal of any investment option.

o As part of the Settlement, current and future group variable annuity contract holders and those holding trust, custodial, services or program agreements, shall be offered the opportunity to be transferred to a product or Trust Platform where Mutual Fund Payments are credited to the Plan in the form of reduced asset fees in an amount equivalent to the disclosed reimbursement rate received for each Mutual Fund investment option. Defendants agree that they will continue to make available at least one Trust Platform offering for which Mutual Fund Payments are passed-through in their entirety and/or the Mutual Fund Payment amounts are disclosed, subject to the restrictions on Defendants' ability to substitute one fund for another as set forth in the Stipulation.

• Defendants shall begin to implement these changes within six (6) months of the Settlement Effective Date, and will make diligent and good faith efforts to ensure that the implementation of these changes is concluded within twelve (12) months of the Settlement Effective Date, unless there is a change in applicable law or regulatory policy that renders any change or practice unlawful or impracticable or imposes different disclosure or other substantive requirements.

## 2.    Cash Benefits to The Class

Defendants agree to pay a Settlement Amount of $140,000,000. One hundred and ten million ($110,000,000) of the Settlement Amount is a non-reverting payment for the benefit of members of the Annuity Contracts Sub-class, and the remaining $30,000,000 is a non-reverting payment for the benefit of members of the Trust Platform Sub-Class. The Settlement Amount will be used first to pay Administrative Expenses, Case

Contribution Fees, Independent Fiduciary Fees, Taxes and Tax-Related Costs, Attorneys' Fees, and Attorneys' Expenses, which will be deducted *pro rata* from each of the Sub-Classes, or as otherwise applicable.  The remaining amount, called the Net Settlement Fund, will be used to make Settlement Payments necessary to satisfy claims actually made by the Class Members under the Plan of Allocation.

Defendants do not object to Plaintiffs' Counsel's application for reasonable Attorneys' Fees, and for reimbursement of costs and other expenses (the "Fee and Expense Application"), submitted contemporaneously herewith, in which Plaintiffs' Counsel request Attorneys' Fees of thirty-five percent (35%) of the Settlement Amount, Attorneys' Expenses of $1,308,264.56, and a Case Contribution Fee of $25,000 for each of the five (5) Named Plaintiffs, to be deducted from the Settlement Amount.

**3.    Release of Defendants and Findings Of Compliance With ERISA**

In exchange, Plaintiffs and the Class will be bound to have released Defendants from any and all Claims or Causes of Action (including Unknown Claims) that are based upon or related to, in whole or in part, the allegations, facts, subjects, or issues that were or could have been set forth or raised in the Litigation, including, but not limited to, the solicitation, negotiation, arrangement, receipt, or retention of Mutual Fund Payments, or other Released Conduct.  This Release also includes an express waiver, covenant not to sue, and bar and injunction, by Plaintiffs, and the Plans and Participants they represent, with regard to any and all such past, present, and future Claims or Causes of Action (including Unknown Claims). .

In addition, in consideration for the cash benefits and the business changes, the Parties agree—and ask the Court to affirm in its Final Order and Judgment—that (a) for

so long as Nationwide continues to abide by the practices described in Section F of the Stipulation, Nationwide is not a fiduciary within the meaning of the common law and ERISA, including any subsection of Section (3)(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and that Nationwide's receipt of Mutual Fund Payments, and the practice of revenue sharing, do not constitute a breach of any fiduciary duty or any prohibited transaction under the common law and ERISA, including Section 404 or Section 406 of ERISA, 29 U.S.C. §§ 1104 and 1106, and (b) Nationwide's compliance with the terms of the Stipulation (including entering into this Settlement) shall not create any common law or ERISA fiduciary duty, or constitute a breach of fiduciary duty or prohibited transaction in violation of the common law or ERISA, including Sections 404 or 406 of ERISA, 29 U.S.C. §§ 1104, 1106.  In entering these findings, the Court would not be  finding or implying that, in the absence of the changes described in Section F of the Stipulation, Nationwide was a fiduciary with respect to soliciting, negotiating, arranging for, receiving, or retaining Mutual Fund Payments, breached any fiduciary duty, violated any prohibited transaction rule, or was otherwise in violation of the common law or ERISA in any respect.

### C.    Independent Fiduciary Assessment of the Settlement

Pursuant to §I(5) of the Stipulation,[5] Plaintiffs' Counsel engaged Nicholas L. Saakvitne as Independent Fiduciary for the Class Members to review the Stipulation and the terms of the Settlement. The written report of the Independent Fiduciary ("Report") is attached hereto as Exhibit A.

---

[5] *See* Plaintiffs' Memorandum of Law in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement [Doc. 588-1], Exh. A at 30-31.

In the Report, the Independent Fiduciary concludes that the Settlement is not only reasonable, but also provides very substantial and valuable benefits to Class Members. Report (Exh. A) at 7-11; *see also id*. at 11 ("In sum, I believe that the Settlement is a reasonable and attractive settlement for the retirement plans, which comprise the Members of the Settlement Class and in the best interests of participants and beneficiaries thereof, and I hereby approve it as Independent Fiduciary acting on their behalf…."). Other significant findings of the Independent Fiduciary include:

- The $140,000,000 Settlement Amount is very substantial in comparison to many class action settlements, roughly an order of magnitude or more larger than other mutual fund revenue sharing settlements;

- The fee and expense disclosure reports to be provided by defendants in the future provide substantial value to the plans in the Class in the amount of millions or tens of millions of dollars;

- The option for group variable annuity product and Trust Platform Class Members to elect a Products Menu or Program Menu with all revenue sharing payments credited against Defendants' fees is anticipated to produce very meaningful savings to the plans and plan participants;

- The Attorney's Fees, Attorneys' Expenses, and Case Contribution Fees sought by Plaintiffs' Counsel are reasonable in light of the thirteen-year pendency of the litigation and the excellent result the Settlement represents for Class Members.

- The Settlement satisfies the conditions of Sections II and III of Prohibited Transaction Class Exemption 2003-39 as amended (to the extent applicable), including that the scope of the Released Conduct is reasonable and that the Attorneys' Fees (up to $49,000,000) and Attorneys' Expenses up to ($2,000,000) are each reasonable.

Report (Exh. A) at 7-8, 11.

Among the materials the Independent Fiduciary reviewed in reaching these conclusions was Declaration of Plaintiffs' expert witness James Scheinberg. *See* Report (Exh. A) at 6. A complete copy of this Declaration ("Scheinberg Dec.") is attached hereto

as Exhibit B.  Mr. Scheinberg's conservative estimate of the potential present value of the business changes contemplated by the Settlement is $54,494,126.  Scheinberg Dec. (Exh. B) ¶25; *see also id.* ¶¶ 8-21 (detailing methodology).  Mr. Scheinberg also opined that Plans in the Class may realize potential additional savings of several hundred million dollars over time due to these business changes.  Scheinberg Dec. (Exh. B) ¶25; *see also id.* ¶¶ 22-24 (detailing methodology).

### D.    Confirmatory Discovery

Pursuant to §I(7) of the Stipulation,[6] Plaintiffs' Counsel conducted additional discovery in order to verify (a) the data and methodology used by Defendants to determine the total amount of Mutual Fund Payments made with regard to Nationwide's Annuity Contracts, and (b) the Trust Platform's Mutual Fund Payments and practices during the relevant Sub-Class Periods.  Defendants produced additional documents and data to Plaintiffs, which Plaintiffs reviewed carefully.  On February 11, 2015, Plaintiffs deposed Marc-Andre Giguere, an actuary and expert witness whom Defendants designated to calculate Mutual Fund Payment totals using data supplied by Defendants. Plaintiffs followed Mr. Giguere's deposition with the depositions of Nationwide Vice-President of Business Development and Program Management Harold Schafer and Nationwide Associate Vice President and Actuary Todd Statczar on February 13, 2015 to obtain additional information regarding the Trust Platform and to authenticate the Mutual Fund Payment data provided by Defendants.  Based on this discovery (as well as discovery taken before the Settlement was reached), Plaintiffs do not dispute Defendants' calculations of the total amount of Mutual Fund Payments made with regard to

---

[6] *See* Plaintiffs' Memorandum of Law in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement [Doc. 588-1], Exh. A at 31-32.

Nationwide's Annuity Contracts or the facts regarding the Trust Platforms' Mutual Fund Payments and practices.

## III.    ARGUMENT

### A.    The Proposed Settlement Should Be Approved Because It Is Fair, Reasonable, and Adequate

Federal Rule of Civil Procedure 23(e) requires court approval of settlements in class cases. To approve a class action settlement, a court must determine that the proposed terms are "fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d. Cir. 2000). "This requires an assessment of both procedural and substantive fairness." *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 113 (2d. Cir. 2005); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (citing *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983)) ("The District Court determines a [class action] settlement's fairness by examining the negotiating process leading up to the settlement as well as the settlement's substantive terms."). Courts conduct this analysis keeping in mind that there is strong public policy supporting the settlement of class actions. *Wal-Mart Stores, Inc.*, 396 F.3d at 117.

To determine procedural fairness, courts examine the "negotiating process leading to the settlement," and can presume "fairness, adequacy, and reasonableness" when a class settlement is reached "in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Id*. at 116-17.

To evaluate the substantive fairness of a settlement, courts in the Second Circuit consider the "*Grinnell* factors," which include: (1) the reaction of the class to the settlement the complexity, expense, and likely duration of the litigation; (2) the range of reasonableness of the settlement fund in light of the best possible recovery; (3) the range

of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation; (4) the complexity, expense, and likely duration of the litigation, (5) the risks of establishing liability; (6) the risks of establishing damages; (7) the risks of maintaining the class action through the trial; (8) the stage of the proceedings and the amount of discovery completed; (9) the ability of the defendants to withstand a greater judgment.  *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). Although not every factor must weigh in favor of approval of the settlement, and a court may consider the factors together to determine whether to approve the settlement, here each and every one of the factors squarely weighs in favor of approval.  *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004).

> 1.  **The *Grinnell* Factors Weigh in Favor of Approving the Settlement**
>
> a)  **The Class's Reaction to the Settlement**

Of all the *Grinnell* factors that a court must consider in making the determination to approve or reject a settlement, "the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.... [T]he lack of objections may well evidence the fairness of the [s]ettlement."  *In re Host Am. Corp. Sec. Litig.*, 2008 WL 659579, at *1 (D. Conn. Mar. 7, 2008) (citing *In re Am. Bank Note Holographics, Inc., Sec. Litig*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001)); *see also In re Sturm, Ruger, & Co., Inc. Sec. Litig.*, 2012 WL 3589610, at *5 (D. Conn. Aug. 20, 2012) (citation omitted) ("[T]he absence of objectants may itself be taken as evidencing the fairness of a settlement.").

On January 20, 2015, Plaintiffs' Counsel caused the court-authorized Settlement Administrator Kurtzman Carson Consultants LLC ("KCC") to mail notice of the

Settlements directly to nearly seventy-three thousand potential class members. Declaration of Markham Sherwood ("Sherwood Dec."), Exhibit C hereto, ¶ 6. In addition, Plaintiffs' Counsel, through KCC, established a case website, published notice in the Business Section of *The New York Times*, and set up a toll-free telephone number's phone script to provide information about the Settlement. *See id.* ¶¶ 9-11. Despite thousands of Claim Forms already filed well in advance of the May 20, 2015 submission deadline, not one Class Member has objected to the terms of the Settlement,[7] or to the amount of Class Counsel's request for Attorney's Fees, Attorneys' Expenses, or the Case Contribution Fees to the Named Plaintiffs. *See id.* ¶¶ 13-14. Instead, responses to the Settlement have been overwhelmingly positive. As the reaction of the class to the settlement is the most significant factor for the Court to consider, the fact that there have been no objections weighs heavily in favor of approval. In addition, of the nearly seventy-three thousand (73,000) potential claimants that were mailed notice of the Settlements, only six (6) requested exclusion from the Settlement, and none of these expressed any particular concerns about or dissatisfaction with any of the Settlement terms.[8] *See id.* ¶ 12.

The lack of any objection, despite wide publication and active interest in the Settlement, weighs strongly in favor of approval.

---

[7] The deadline for objections passed on March 21, 2015. *See* Order Preliminarily Approving Settlement and Approving Form and Manner of Notice [Doc. 591] at 5-6.

[8] The deadline for Exclusion Requests passed on March 21, 2015. *See* Order Preliminarily Approving Settlement and Approving Form and Manner of Notice [Doc. 591] at 5.

> **b)**     **The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation**

The next two *Grinnell* factors that the Court must consider in evaluating the substantive fairness of the Settlement are the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation.  As with the other factors, the touchstone for this comparison is reasonableness, and "there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion[.]"  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).  In addition, courts must compare the potential of a larger recovery with the benefit of the settlement's immediacy.  *See Gilliam v. Addicts Rehab. Center Fund*, 2008 WL 782596, at *5 (S.D.N.Y. March 24, 2008) (recognizing that an expedient result can be preferable "even if it means sacrificing speculative payment of a hypothetically larger amount years down the road.") (internal quotes and citation omitted).[9]

Courts have approved incredibly small percentages where the risks of litigation were great and the possible recoveries quite large.  *See In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting that "average settlement amounts in securities fraud class actions where investors sustained losses over the past

---

[9] *See also In re Sturm, Ruger, & Co., Inc. Sec. Litig.*, 2012 WL 3589610, at *7 ("Here, the parties indicate that the settlement represents approximately 3.5% of Lead Plaintiff's 'most aggressive estimate of maximum provable damages' which 'exceeds the average recovery in shareholder litigation.'…In light of the legal and factually complexity, the unpredictability of a lengthy trial and the appellate process as discussed above, the settlement amount is well within the range of reasonableness for similar securities cases.").

decade ... have ranged from 3% to 7% of the class members' estimated losses") (internal quotation marks and citation omitted); *In re Union Carbide*, 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989) (acknowledging that "a settlement can be approved even though the benefits amount to a small percentage of the recovery sought" and that the "essence of settlement is compromise.") (internal quotation marks and citation omitted).

A recovery of $140,000,000 from Defendants is an excellent result for the Class and well within the range of reasonableness.  Plaintiffs' analysis of the potential damages in this case, based on the data produced by Defendants and as verified by Plaintiffs in confirmatory discovery, indicates that the settlement amount for the Annuity Contracts Sub-Class—$110 million of approximately $359 million, or more than 30%—is well in excess, as calculated as a percentage of total damages, of the percentage thresholds typically approved by courts in the Second Circuit.[10]  *See, e.g, Menkes v. Stolt-Nielsen S.A.*, 2010 U.S. Dist. LEXIS 94184, at *63-66 (D. Conn. Sept. 10, 2010) (preliminarily approving settlement that represents approximately eight percent of the maximum recoverable damages for all Class Members); *In re Initial Pub. Offering Sec. Litig,* 671 F. Supp. 2d 467, 483-85 (S.D.N.Y. 2009) (approving settlement that provided only two percent of defendants' maximum possible liability, observing that "the Second Circuit has held that a settlement amount of even a fraction of the potential recovery does not render a proposed settlement inadequate"); *Hall v. Children's Place Retail Stores, Inc.*, 669 F. Supp. 2d 399, 402 n.30 (S.D.N.Y. 2009) (approving a settlement that amounted to

---

[10] Indeed, even if the settlement were a smaller percentage of total damages, "courts have determined that a settlement can be approved even if the benefits amount to a small percentage of the recovery sought . . .  And, 'there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.'" *Lazy Oil, Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (quoting *Grinnell*, 495 F.2d at 455 n.2).

5-12 percent of provable damages); *In re Prudential Sec. Ltd. P'ships Litig.*, MDL No. 1005, 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995) (approving settlement of between 1.6 percent and 5 percent of claimed damages); *In re Crazy Eddie Sec. Litig.,* 824 F. Supp. 320, 324 (E.D.N.Y. 1993) (approving settlement that awarded class members between six cents and ten cents for every $1.00 lost).  The settlement amount for the Trust Platform Sub-Class—$30 million of approximately $500 million, or approximately 6%—is substantial and reasonable in light of the shorter class period and increased disclosure during this period, which was robust and largely consistent with U.S. Department of Labor regulations.

The confirmatory discovery Plaintiffs conducted further ascertained the reasonableness of the settlement amounts for both the Annuity Contracts Sub-Class and the Trust Platform Sub-Class. And this is fully consistent with the conclusions of the Independent Fiduciary. *See* Report (Exh. A) at 7-11.

Furthermore, the business changes provisions of the Settlement Agreement constitute additional fair and adequate consideration that provides substantial value to the Class.   The Settlement requires Defendants to alter their policies by enhancing disclosures, curtailing Mutual Fund investment option substitution and deletion, and offering alternative products where mutual fund payments are credited to Plans in the form of reduced asset fees in an amount equivalent to the disclosed reimbursement rate received for each Mutual Fund investment option.  Plaintiffs' expert witness, relied on in the Independent Fiduciary's Report, estimated the potential present value of the business changes contemplated by the Settlement at $54,494,126, and opined that the Class may

17

realize potential additional savings of several hundred million dollars over time due to these business changes.  Scheinberg Dec. (Exh. B) ¶25.

A Settlement providing at least a $140,000,000 recovery and substantial, valuable business changes is fair, reasonable and adequate when balanced against the expense and risk that Plaintiffs and the Class would face in litigating this case through trial and appeal against Defendants.

### c)     Complexity, Expense, and Duration of the Litigation and Risks of Establishing Liability and Damages

Other *Grinnell* factors the Court must weigh are the complexity, expense, and duration of the litigation as well as the risks of establishing liability and damages.  In deciding whether these factors support approval of the settlement terms, courts consider the level of complexity of the area of law, the difficulty of proving the claims and defenses, and how long the case is likely to continue.[11]  Under these factors, the Court must conduct a forward-looking analysis to determine how difficult it will be for Plaintiffs to continue the case to judgment.

Continuing the Litigation would entail a lengthy and expensive legal battle, with an uncertain outcome.  The Parties and the Court estimated that trial only of Defendants'

---

[11] *See, e.g. Collins v. Olin Corp.*, 2010 WL 1677764, at *3 (D. Conn. Apr. 21, 2010) ("Should this case continue, counsel for the plaintiffs face complex issues of environmental law. In order to try to prove their case, the plaintiffs would have to identify and retain a variety of expert witnesses … In addition to the complex issues of proof, securing expert testimony in these areas would be expensive for the plaintiffs. Furthermore, rejecting this proposed settlement would force this case to continue into its seventh year of litigation, with much time still ahead."); *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 196 (S.D.N.Y. 2012), *aff'd sub nom. Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1941, (2014) ("The path from this stage of the litigation to a final judgment on the issue of Defendants' liability for violation of the RICO statutes and the New York Consumer Protection Act would be long, complicated, and expensive.").

liability would require several weeks of testimony, with a separate phase to follow in which the quantum of damages would be addressed.  In addition, the losing Party would be all but certain to appeal from an adverse judgment, which would potentially require years to resolve.

Furthermore, additional discovery, motions practice, and trial time would be required to resolve the claims in the Amended Complaint that are related to the Trust Platform.  While the facts related to the Trust Platform are intertwined with those of the Annuity Contracts, litigation of these allegations would cause the Parties to incur significant additional expense and risk, would add complexity to the case, and would likely delay resolution of the Litigation at trial and on appeal.

Notwithstanding the confidence of Class Counsel in the merits of Plaintiffs' Claims, Class Counsel are cognizant that no case is a sure winner at trial or on appeal, and that Defendants had arguments and potential defenses available to them, including potential arguments and defenses to substantially limit any damages recovered by the Class even if Plaintiffs were successful in securing a judgment as to liability (which, of course, also constituted a risk despite Plaintiffs' belief that they were correct on the merits).

Against this background, the Settlement represents an excellent result for the members of the Class.  To the best of Plaintiffs' Counsel's knowledge, this case involves one of the largest mutual fund revenue settlements ever reached (*cf*. Report (Exh. A) at 7).  Defendants' $140,000,000 payment provides for significant compensation to the Class that will be available much earlier than if litigation against Defendants continued through trial and appeal.  And, in addition to a significant cash payment, the Settlement also

provides important benefits to the Class by obtaining, within just six (6) months of the execution of the Settlement, modification of Defendants' policies that enhance disclosures, curtail Mutual Fund investment option substitution and deletion, and require Defendants to offer alternative products where mutual fund payments are more expressly credited to the Plans—the present value of which is conservatively estimated at nearly $55,000,000, with the potential for hundreds of millions of dollars in savings in the future. Scheinberg Dec. (Exh. B) ¶25.

Thus, the Settlement provides the Class with a certain (and substantial) recovery immediately, and avoids the considerable risk that the Litigation will stretch on for years and could ultimately end in a result less favorable for the Class.  Because taking this case to judgment and through subsequent appeals would likely take years, because it would cost the Class millions in additional expenses, and because there is no guarantee that the Class would prevail on its claims, the Court should weigh this factor in favor of approving the Settlement.

###### d)      Risks of Maintaining the Class Action Through Trial

The next *Grinnell* factor requires the Court to consider the risks that Plaintiffs would not be able to maintain class action status through trial.  The Parties litigated class certification intensely for approximately seven (7) years until January of last year, when the Second Circuit denied Defendants' second petition for leave to appeal this Court's September 2013 recertification in *Haddock v. Nationwide Fin. Servs., Inc.*, 293 F.R.D. 272 (D. Conn. 2013).[12]

---

[12] The Trust Platform Sub-Class was never the subject of a contested motion for class certification, and certification of it is requested for settlement purposes only. *See infra* Part IV.

Although Plaintiffs' Counsel view as minimal the risk that Defendants would ever succeed in decertifying the Class, there is a chance that Defendants could bring a decertification motion arguing that the Class should be partially decertified or modified based on evidence adduced at trial.  As well, the Class theoretically risks decertification from changes in class action jurisprudence by the Supreme Court, its large size, and the complex nature of its ERISA claims and damages proof.

The Settlement between the Parties ensures that the Class as certified by this Court will receive prompt monetary recovery, and eliminates the risk that a later development could cause decertification, even if only partial decertification, with little or no recovery to those portions that are decertified.

### e)      The Stage of the Proceedings and the Amount of Discovery Completed

Under this *Grinnell* factor, the Court should consider the stage of the proceedings and the amount of discovery completed to determine "whether the parties ha[ve] adequate information about their claims."  *See In re Global Crossing*, 225 F.R.D. at 458. Settlement agreements reached before class certification should receive "additional scrutiny," but where, as here, settlements are reached after a class was certified, extra scrutiny is not required. *See D'Amato* 236 F.3d at 85; *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 240 n.6 (E.D.N.Y. 2010).  This factor does not require "that the parties have engaged in extensive discovery ... Instead, it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to intelligently make an appraisal of the Settlement."  *In re Sturm, Ruger, & Co.*, 2012 WL 3589610, at *5. (citation omitted).

21

Here, the Parties have in fact engaged in extensive and wide-ranging discovery for more than a decade.  At this point, Plaintiffs have issued multiple rounds of written discovery requests, served dozens of third-party subpoenas for documents, taken dozens of depositions of fact and expert witnesses, conducted many informal interviews, reviewed tens of thousands of pages of electronic and hard-copy documents, analyzed significant amounts of data, hired and consulted with experts, and responded to Defendants' discovery requests to Plaintiffs.  Moreover, pursuant to the terms of the Stipulation, Plaintiffs have also completed confirmatory discovery tailored to assess the reasonability of the Mutual Fund Payment amounts furnished by Defendants earlier in the discovery process.  All parties are more than sufficiently apprised of the facts to evaluate the Settlement's terms, and have presented many of the facts to the Court in numerous filings and motions.  This factor weighs in favor of approval, as there is no risk that the parties lack the information necessary to evaluate the viability of the claims, estimate potential damages, and assess the quality of the Settlement's terms.

### f)        The Ability of the Defendants to Withstand Greater Judgment

The final *Grinnell* factor the Court must consider asks whether the Defendants could withstand a larger judgment.  This factor does not require the defendant "to empty its coffers before a settlement can be found adequate."[13]  Instead, it is often used to justify the approval of small settlements where a defendant is bankrupt, or nearly so.[14]  In cases

---

[13] *In re Sony SXRD Rear Projection Television Class Action Litig.*, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008) (internal quotation marks and citation omitted).

[14] *O'Connor v. AR Res., Inc.*, 2012 WL 12743 (D. Conn. Jan. 4, 2012) (approving small settlement where Defendant had negative net worth); *Hertzberg v. Asia Pulp & Paper Co.*, 197 F. App'x 38, 41 (2d Cir. 2006) (finding that the settlement was reasonable because Defendant was judgment-proof and Plaintiffs would not be able to collect a higher judgment even if won at trial).

where defendants are able to withstand larger judgments, or the parties fail to provide the court with sufficient information to make a determination, the factor has been found not to weigh against approval, but rather is neutral.[15]

Here, there is no need to justify any paucity in the Settlement.  The $140,000,000 Settlement Amount is, to Plaintiffs' Counsel's knowledge, one of the largest mutual fund revenue sharing settlements ever obtained (*cf.* Report (Exh. A) at 7), and, as explained in Section III(A)(1)(b) above, will provide a significant recovery to claimants.

### 2. The Settlement Is Presumptively Fair Because it is the Product of Informed Arm's Length Negotiations

To evaluate the procedural fairness of a settlement, the Court looks to the negotiations between the parties and can presume "fairness, adequacy, and reasonableness" when a class settlement is reached "in arm's-length negotiations between experienced, capable counsel after meaningful discovery."  *Wal–Mart Stores, Inc*., 396 F.3d at 116.

As summarized in Sections II(B) and III(A)(1)(e) above, and as set forth in detail in Plaintiffs' Memorandum of Law in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement [Doc. 588-1] at 8-12, the Parties have been litigating this case since 2001 and have taken extensive discovery.  Plaintiffs and Defendants are represented by "experienced, capable counsel."  Plaintiffs are represented by multiple law firms with extensive experience in class action litigation.  Defendants are represented by experienced Connecticut litigation counsel, Wiggin and Dana LLP, and Wilmer Cutler Pickering Hale and Dorr LLP, one of the largest and most prominent

---

[15] *Kiefer v. Moran Foods, LLC*, 2014 WL 3882504 (D. Conn. Aug. 5, 2014); *In re Sturm, Ruger, & Co., Inc. Sec. Litig*., 2012 WL 3589610, at *5.

litigation firms in the country.  The Stipulation reached last winter was therefore the result of compromises reached between highly experienced counsel after many years of contentious litigation.

### B.    The Plan of Allocation is Fair, Reasonable, and Adequate

To approve the allocation plan, the court must find it fair, reasonable, and adequate.  *See Maley v. Del Global Techs Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002).  To decide if the plan is fair, "courts look primarily to the opinion of counsel. That is, as a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information."  *Chavarria v. N. Y. Airport Serv., LLC*, 2012 WL 2394797, at *8 (E.D.N.Y. June 25, 2012) (internal quotes and citations omitted).  "Courts also consider the reaction of the class to a plan of allocation." *Id.*

The proposed Plan of Allocation (described at §E of the Stipulation)[16] anticipates distribution of the entire Settlement Amount directly to the Class Members who submit valid Claim Forms, less Attorneys' Fees, Attorneys' Expenses, Case Contribution Fees, Administrative Expenses, Independent Fiduciary Fees and Taxes and Tax-Related Costs. The Net Settlement Fund will be divided based on the Mutual Fund Payments attributable to the assets of each Class Member's Plan, and for every Class Member that fails to submit a Claim Form, there will be a proportional increase in the amount allocated to Class Members who have submitted Claim Forms up to one hundred percent (100%) of those Mutual Fund Payments.  In the unlikely event that the proportional increase would

---

[16] *See* Plaintiffs' Memorandum of Law in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement [Doc. 588-1], Exh. A at 11-17 & Exh. E.

result in Class Members receiving more than 100% of the Mutual Fund Revenue payments attributable to their Plans' assets, any excess amounts will be distributed in a *cy pres* award to the National Endowment for Financial Education.

The Plan of Allocation anticipates paying out the entire distributable portion of the Settlement Amount to claimants, rather than having any amount revert to Defendants, and only contemplates a *cy pres* distribution in a highly unlikely event. As such, Class Members who make valid claims will receive the maximum possible recovery under the terms of the Stipulation, up to 100% of the Mutual Fund Revenue payments attributable to their Plans' assets. Moreover, the claims process is straightforward, and does not require the Class Members to do much more than complete, sign, and return a simple form. The Plan of Allocation is thus fair, reasonable, and adequate.

**C.     Class Notice Complied with the Preliminary Approval Order and Satisfied Due Process Requirements**

Federal Rule 23(c)(2)(B) defines notice requirements and instructs that the Court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; and (vi) the binding effect of a class judgment on members under Rule 23(c)(3).

Again, "the standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness."

*See Soberal–Perez v. Heckler*, 717 F.2d 36, 43 (2d Cir. 1983); Fed. R. Civ. P. 23(e). "There are no rigid rules for determining whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings" and is "adequate if it may be understood by the average class member." *Charron*, 874 F. Supp. 2d at 191 (internal citations omitted).

As set forth herein and in the Sherwood Dec. (Exh. C), Plaintiffs' Counsel has disseminated class notice in full compliance with the Court's January 5, 2015 Order Preliminarily Approving Settlement and Approving Form and Manner of Notice [Doc. 591], due process, and Rule 23(c)(2)(B).

On January 20, 2015, KCC sent 73,091 Notice Packets (consisting of the Notice and Claim Form) via First Class postage, and subsequently undertook efforts to locate and re-send Notice Packets to Class Members for whom the initial mailing was returned. *See* Sherwood Dec. ¶¶ 5-8; *see also* Fed. R. Civ. P. 23(c)(2)(B) (requiring "individual notice to all members who can be identified through reasonable effort"). The Notice is attached as Exhibit A to the Sherwood Dec., and it complies fully with Rule 23(c)(2)(B), because it expressly sets forth: (i) the nature of the action; (ii) the definition of the class; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the Court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3). *See also Phillips Petroleum v. Shutts*, 472 U.S. 797, 811-12 (1985) (due

26

process mandates that class notice "describe the action and the plaintiffs' rights in it," and afford an absent plaintiff "an opportunity to remove himself from the class").

On or before January 20, 2015, KCC updated an existing class website (www.nwclassaction.com), where visitors can download copies of the relevant court documents, as well as Notice and Claim Forms. *See* Sherwood Dec. ¶ 11. In addition, on or before January 20, 2015, KCC caused an existing class toll-free telephone number's phone script (866-894-0420) to be updated to provide information about the Settlement, including to fulfill requests to speak with live call center representatives and for Notice Packets. Sherwood Dec. ¶ 10. The website and telephone support center have been and will be maintained until final disposition of this matter. KCC also published the text of the Published Class Notice in *The New York Times* on January 24, 2015. *See* Sherwood Dec. ¶ 9. The Published Class Notice is attached as Exhibit C to the Sherwood Dec.

In its January 5, 2015 Order Preliminarily Approving Settlement and Approving Form and Manner of Notice [Doc. 591], the Court preliminarily held that the form of the proposed Class Notices and the manner in which Plaintiffs planned to disseminate such notices constituted "the best notice practicable under the circumstances and shall constitute due and sufficient notice to all persons entitled thereto." *See id*. at 5. As set forth herein and in the attached Sherwood Dec., Plaintiffs' Counsel and KCC have complied precisely with the forms and procedures set forth in the Court's Orders, and in so doing have satisfied due process and the class notice requirements of Rule 23(c)(2)(B).

## IV.    Certification of the Proposed Settlement Class is Warranted

As part of approving the Settlement, the Court must also approve and certify the proposed Settlement Class. Crucially, this Court has already made detailed findings on

27

two separate occasions that a class essentially identical to the Annuity Contracts Sub-Class meets all the requirements of Rule 23, that Plaintiffs Wiberg, Gouse, Anderson and Chandler are adequate representatives, and that Plaintiffs' Counsel should serve as class counsel. *See, e.g.*, *Haddock IV*, 262 F.R.D. at 122-25; *see also Haddock VII*, 293 F.R.D. at 284.

For the same reasons, the Court should certify the proposed Settlement Class, consisting of the two sub-classes defined in Plaintiffs' Seventh Amended Complaint, for Settlement purposes. The Annuity Contracts Sub-Class differs from the class certified by the Court in *Haddock VII* only in its extension of the class period through September 30, 2014, and the Trust Platform Sub-Class is essentially based on the same facts giving rise to the Plaintiffs' ERISA claim based on Defendants' variable annuities. Moreover, Plaintiff McKeon[17] will adequately represent the Trust Platform Sub-Class, as he has no interests antagonistic to its other members, and he is represented by the same counsel as the other Plaintiffs that the Court has previously found adequate. He therefore satisfies the adequacy requirement of Rule 23(a)(4). *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 34 (2d Cir. 2009).

In sum, the Court should again find that all requirements of Rule 23 are met, and it should certify the Class for settlement purposes, appoint Plaintiffs as its representatives and Plaintiffs' counsel as Class Counsel.

---

[17] Plaintiff McKeon, like Plaintiff Anderson, is a duly licensed Connecticut attorney and a principal of his law firm, and as such has the ability to competently represent the Trust Platform Subclass.

**V.     Conclusion**

After many years of painstaking and hard-fought litigation, all parties have reached an accord that provides ample compensation to the Class for its alleged damages. The Class is satisfied with the terms, as demonstrated by the lack of even a single objection to the Settlement from any of the tens of thousands of potential class members, and the *Grinnell* factors weigh in favor of approval.  For these and all of the foregoing reasons, Plaintiffs respectfully request that the Court approve the Stipulation.

DATED this 26th day of March, 2015.   Respectfully submitted,

_____/s/ Marc R. Stanley_____
Marc R. Stanley
Federal Bar No. ct18179
marcstanley@mac.com
Martin Woodward
Federal Bar No. ct25263
mwoodward@stanleyiola.com
STANLEY LAW GROUP
3100 Monticello Avenue, Suite 770
Dallas, TX  75205
214.443.4300
214.443.0358 (fax)

William Bloss
Federal Bar No. ct01008
bbloss@koskoff.com
Richard A. Bieder
Federal Bar No. ct04208
rbieder@koskoff.com
Antonio Ponvert, III
Federal Bar No. ct17516
aponvert@koskoff.com
KOSKOFF KOSKOFF & BIEDER, P.C.
350 Fairfield Avenue
Bridgeport, Connecticut  06604
203.336.4421
203.368.3244 (fax)

Roger L. Mandel
Federal Bar No. ct18180
rlm@lhlaw.net
LACKEY HERSHMAN, LLP
3102 Oaklawn Avenue, Suite 777
Dallas, Texas  75219
214.560.2201
214.624.7547 (fax)

*Counsel for Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 26, 2015, the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/ Marc R. Stanley
MARC R. STANLEY

# EXHIBIT A

NICHOLAS L. SAAKVITNE
A LAW CORPORATION

NICHOLAS L. SAAKVITNE
ATTORNEY, ERISA FIDUCIARY
———

STEVEN E. ROSEBAUGH
ADMINISTRATOR & BUSINESS MANAGER

532 COLORADO AVENUE, SECOND FLOOR
SANTA MONICA, CALIFORNIA 90401-2408
(310) 451-3225      FAX (310) 451-9089
E-MAIL saaklaw@aol.com
www.erisafiduciary.com

MICHELINE HIMES
ORPHAN PLANS COORDINATOR
———

SHARON L. HERITAGE
BENEFITS COORDINATOR
(877) 385-9111

ERISA FIDUCIARY SERVICES • EMPLOYEE BENEFITS LAW

February 11, 2015

*Marc R. Stanley, Esq.*
*Stanley Law Group*
*6116 N. Central Expressway*
*Suite 1500*
*Dallas, TX   75206*

> **Re:   Report of Independent Fiduciary, HADDOCK,**
> **_et al. v. NATIONWIDE, et al._**
> **Civil Case No. 3:01-cv-1552-SRU United States**
> **District Court for the District of Connecticut**
> **(the "Litigation") Approving Settlement Stipulation**
> **and Release on Behalf of the Members of the**
> **Settlement Class**

Dear Counsel:

By Fiduciary Services Agreement dated January 6, 2015, I was engaged by Plaintiffs' lead co-counsel to act as Independent Fiduciary on behalf of the Members of the Class (the "Settlement Class") as set forth in Paragraph A(13) of the Settlement Stipulation and Release (the "Settlement") to review the reasonableness of the Settlement and determine whether to approve it on behalf of the Settlement Class or to recommend that such Members object to the Settlement or file Requests for Exclusion from the Settlement (the deadline for which is March 21, 2015).

Such role constitutes:

- that of Named Fiduciary in accordance with the provisions governing plan Fiduciaries contained in the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); and

- 1 -

- that of an acknowledged plan Fiduciary on behalf of the retirement plans which comprise the Members of the Settlement Class with respect to the settlement of the referenced class action litigation, in accordance with the provisions of Prohibited Transaction Class Exemption 2003-39 as amended ("PTCE 2003-39").

I have extensive experience in serving as an ERISA Independent Fiduciary, including in connection with ERISA class action litigation. A statement of my credentials is attached to this Report.

Consistent with the requirements of PTCE 2003-39:   (1) neither I nor my law corporation has any relationship to, nor interest in, any of the parties to the Litigation (including Nationwide Life Insurance Company and Nationwide Financial Services, Inc. (collectively, "Nationwide") and the Members of the Settlement Class) that might affect the exercise of my best judgment as Independent Fiduciary; (2) the terms of the Settlement are described in a written settlement agreement; (3) I have acknowledged in writing that I am a Fiduciary with respect to the Settlement on behalf of the Members of the Settlement Class; and (4) I will maintain or cause to be maintained for a period of at least six years the records described in PTCE 2003-39. I affirm the existence of a genuine controversy involving the Members of the Settlement Class, reflected by the Litigation and the Settlement; and (as set forth herein) I confirm that the conditions of PTCE 2003-39 are satisfied with respect to the Settlement.

### *Summary of Facts*

On August 15, 2001, former named plaintiff Lou Haddock, as trustee of Flyte Tool & Die, Inc. Deferred Compensation Plan filed the Litigation, a putative class action against Nationwide in the United States District Court for the District of Connecticut on its own behalf and on behalf of a class (Settlement Class) which ultimately was certified as:

1) all current or former Trustees of retirement plans covered by ERISA which had group variable annuity contracts with Nationwide or whose participants or plans had individual variable annuity contracts with Nationwide at any time from January 1, 1996, or the first date Nationwide began receiving payments from mutual funds based on a percentage of the assets invested in the funds by Nationwide, which ever came first, to the date of September 30, 2014 (the "Annuity Contracts Sub-Class"), and

2) all current or former Trustees of retirement plans covered by ERISA which had trust, custodial, services, or program agreements and/or arrangements with Nationwide

- 2 -

Financial Services, Inc. ("NFS"), or its affiliates, between January 1, 2009 and September 30, 2014 (the "Trust Platform Sub-Class").

Currently there are five Named Plaintiffs continuing the Litigation on behalf of the Settlement Class. In the Litigation, the Plaintiffs claimed that Nationwide's contractual arrangements with mutual funds and its retention of "revenue-sharing payments" violated ERISA, and constituted prohibited transactions pursuant to ERISA. Nationwide and NFS deny any violations of ERISA, and maintain that the mutual fund payments they received benefitted the Plaintiffs, and the retirement plans and participants they represent, because the payments were used to reduce administrative fees paid by the plans and participants, and to compensate Nationwide and NFS lawfully and appropriately for their services.

The Litigation has continued for thirteen years, and has resulted in six published opinions by the Court (and a Court Docket with almost 600 numbered items at the time of this Report).

During the pendency of the case, the parties attempted twice through mediation to resolve the Litigation, ultimately obtaining the help of two of the top independent mediators in the country. The first effort, with Ret. Judge Layn R. Phillips, included an all day meeting on July 5, 2012. Though that effort proved unsuccessful, it helped lay the groundwork for a second mediation, with David Geronemus, Esq. of JAMS, taking place on October 14 and 15, 2014, and subsequently by phone. In advance of the mediation sessions, the parties prepared and submitted mediation briefs which set forth each party's positions regarding legal theories, evidence and possible damages.

These efforts are described in greater detail in the Motions and Memorandum of Law in Support of Unopposed Motion for Preliminary Approval of the Settlement, in the Notice, and in Marc R. Stanley's Declaration in Support of the Motion for Preliminary Approval.

The parties, through their respective attorneys, have reached an agreement to settle the claims and disputes in the Litigation on the terms and conditions set forth in the Settlement.

Notwithstanding the Settlement, Nationwide vigorously denies any wrongdoing and any liability based on all claims described above.

### *Terms of Settlement*

The Settlement, if finally approved by the Court:

- provides a $140,000,000.00 settlement amount ($110,000,000 for the Annuity Contracts Sub-Class, and $30,000,000 for the Trust Platform Sub-Class), paid or caused to be paid by Nationwide, to be allocated (subject to attorney's fees and expenses as described below and administration costs) among the Class Members who tender a Claim Form in accordance with a Plan of Allocation [a Case Contribution Fee Award of $25,000.00 for each of the five named Plaintiffs or a total of 125,000.00 is requested, subject to Court approval, to be paid from the settlement amount];

- provides that the settlement amount will bear the costs of notice and administration and related costs for the implementation of the economic portion of the Settlement;

- provides that Nationwide will make meaningful structural changes to its insurance and annuity contracts and business practices which will provide agreed clarity and certainty on a going-forward basis as to the propriety of its future conduct and future receipt of revenue sharing, including permitting Class Members with group variable annuity contracts or in the Trust Platform Sub-Class to be transferred to a product or Trust Platform where Mutual Fund Payments are credited to the Plan in the form of reduced asset fees in an amount equivalent to the disclosed reimbursement rate received for the Mutual Fund investment option;

- provides that for group variable annuity products and Trust Platforms, Nationwide will identify to Plan Trustees any addition of a Mutual Fund investment option to a Product Menu or Program Menu, and will not remove or substitute a Mutual Fund investment option from the Products and Program Menus without the affirmative consent of the Plan's Trustee;

- provides for meaningful disclosures by Nationwide to new and existing customers, for not less than five years, regarding revenue sharing rates, expense ratios, separate account fees, maintenance fees, and per participant fees (the "Fee and Expense Disclosure Reports");

- provides for an award of Plaintiff's attorneys fees not to exceed $49,000,000.00 (35% of the $140,000,000 settlement amount (cash

- 4 -

portion))[which amount Plaintiff's counsel has advised me is slightly over three times their time incurred and to be incurred (at their normal hourly rates)], plus an award of their expenses incurred to date not to exceed $2,000,000.00 with respect to the Litigation; and

- includes broad general releases, indemnifications, and agreements not to sue relating to claims, counterclaims, and third-party claims relating to or arising out of the matters, etc. alleged in the Litigation.

[This summary of the 41 page Settlement Stipulation and Release is of necessity a summary].

## *Independent Fiduciary Due Diligence*

In reviewing the matters set forth above and the reasonableness of the Settlement as a comprehensive settlement of the claims asserted (and any others that could be anticipated), taking into consideration the Members of the Settlement Class's likelihood of further recovery, the amount of cash and other benefits expected to be received by the Class Members, the risks and costs of litigation, the scope of the release of claims, and the value of claims foregone, I discussed the claims, their bases, potential problems with the Litigation and the specifics of the Settlement, with:

- Marc R. Stanley of Stanley Law Group and William Bloss of Koskoff Koskoff & Bieder, Class Lead Co-Counsel [including a meeting with counsel in January, 2015]; and

- Elizabeth K. Canizares of Wilmer Cutler Pickering Hale and Dorr, LLP, counsel for Defendants.

My review included without limitation the following documents:

- Court's 3/7/2006 Order Denying Defendants' Motion for Summary Judgment ("Haddock I") [266]

- Court's 9/25/2007 Order Denying Defendants' Motion to Dismiss Fifth Amended Class Action Complaint ("Haddock II") [287]

- Court's 8/11/2008 Order Granting Plaintiffs' Motion to Dismiss Defendants' Counterclaims ("Haddock III") [353]

- 5 -

- Court's 11/6/2009 Order Certifying Class ("Haddock IV") [417]

- Court's 7/23/2010 (Reconsideration Denied, 11/8/2010) Order Denying Motion to Certify Class of Counterclaim Defendants ("Haddock V") [442, 459]

- Second Circuit 2/6/2012 Vacation and Remand of Haddock IV ("Haddock VI")

- Court's 9/6/2013 Order Certifying Class ("Haddock VII") [517]

- Plaintiffs' Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment [575]

\* \* \* \* \*

- Defendants' Mediation Brief   (6/12/2012)

- Defendants' Reply Mediation Brief (6/12/2012)

- Plaintiffs' Mediation Brief and Exhibits (9/30/2014)

- Defendants' Mediation Brief (Portions Redacted) (9/30/2014)

- Plaintiffs' Expert James Scheinberg Declaration re value to Settlement Class of Nationwide's business changes required by Settlement (2/10/2015)

\* \* \* \* \*

- Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement, together with Memorandum of Law in Support, including Settlement Stipulation and Release, Plan of Allocation, Form of Notice and Summary Notice, Claim Form, and Forms of Preliminary Approval Order and Final Approval Order   [588, 588-1]

- Court Order (1/5/2015) Preliminarily Approving Settlement and Approving Form and Manner of Notice   [591]

- Plaintiffs' Seventh Amended Class Action Complaint [593]

- 6 -

- Defendants' Answer to Plaintiffs' Seventh Amended Complaint [595]

\* \* \* \* \*

Prohibited Transaction Class Exemption 2003-39 and June 15, 2010 Amendment to Class Exemption 2003-39

### *Summary of Conclusions*

**The Settlement is reasonable and provides: (1) an appropriate cash recovery, (2) valuable future reports of relevant ongoing fee and expense information (the Fee and Expense Disclosure Reports), and (3) access to a zero revenue-sharing Products Menu or Program Menu (by making available full offsetting against Plan expenses of the revenue sharing reimbursement payments) which may result in substantial savings to Members of the Settlement Class, making the Settlement very attractive in the aggregate, taking into account the substantial uncertainty whether Plaintiffs could have prevailed (including appeals) on the necessary components of the Litigation (Nationwide's's fiduciary status in the context of the revenue sharing payments and possible offsets to claimed damages), the risks and expenses of litigation generally, the likelihood of further recovery, the amount of cash and other benefits expected to be received, the value of such reports, the scope of the release of claims, and the value of claims foregone.**

Specifically:

- as to monetary damages, the $140,000,000.00 cash settlement amount is very substantial in comparison to many class action settlements [roughly an order of magnitude or more larger than other mutual fund revenue sharing settlements];

- as to the value of the Future Fee and Expense Disclosure Reports to be provided by Defendants, Plaintiffs' expert witness* has asserted that they will provide substantial value to the estimated more than 20,000 current plans in the Class;

- while it is difficult for me independently to quantify such value, I agree that the Fee and Expense Disclosure Reports add millions or tens of millions of dollars in value to the Settlement;

---

\* *James Scheinberg February 10, 2015 Declaration*

- in addition, the group variable annuity contract and Trust Platform Class Members can elect a Products Menu or Program Menu with all revenue sharing payments credited against Nationwide's fees otherwise charged the Plan fees; in many cases this option is anticipated to produce very meaningful savings to the plans and plan participants.

- in light of the monetary recovery, the Fee and Expenses Disclosure Reports, the option to have full crediting of revenue sharing against direct fees Products Menu and Program Menu and the obvious fact that in order to obtain such recovery and relief individual retirement plans, singularly or as a class, would have had to incur very substantial attorney's fees and expenses to overcome strong defenses, making such approach impracticable, the Settlement offers Class Members their only realistic access to these recoveries / resources.

- *Attorney's fees and expense awards (and Case Contribution fee awards) typically are within the purview of the Court and are subject to Court approval.* As Independent fiduciary, I believe that Plaintiffs' attorney's fees request of $49,000,000.00, comprising slightly more than three times their fees (at normal hourly rates) incurred to date and anticipated to be incurred to implement the Settlement, is reasonable notwithstanding the 35% of the cash portion of the Settlement which it would consume, in the context of: a) a thirteen year Litigation with no consideration of the time value of such services or their carrying cost (of such fees and of the substantial out of pocket expenses) over such an extended period, and b) the excellent result the Settlement represents for the Settlement Class both on the economic award and on the "non-economic" remedies, some of which in the aggregate will provide meaningful economic benefits to the Settlement Class likely totaling many millions of dollars. When these additional remedies are factored in, the percentage and the lodestar are reduced dramatically in comparison to the total benefits provided to the Settlement Class. Accordingly, the requested fee (and expense) awards do not alter my conclusion that the Settlement is reasonable and in the best interests of the Members of the Settlement Classes.

- While the requested Case Contribution fee awards are substantial, they are in the context of named Plaintiffs' participation in a multi-year litigation process which included Defendants' efforts to bring counterclaims against the named Plaintiffs.

- Finally, Kutzman Carson Consultants, the Settlement Administrator, has provided estimates of its fees and expenses to implement the Settlement,

ranging from approximately $340,000 (presuming a 25% response rate) to approximately $545,000 (presuming a 50% response rate and so a much larger number of claims to be validated and computed). In my opinion these fees and expenses which will be borne by the Settlement Fund are reasonable in light of the size of the Settlement Class.

My conclusion approving the Settlement is further supported by the absence of any objections and no requests from exclusion to the Settlement, as of the date of this Report.

### *Discussion*

The Settlement, Plaintiffs' Memoranda of Law in Support of Preliminary Approval and Final Approval, and the Notice, as well as the Haddock I-VII Court Orders, describe in detail the history of the Litigation, the underlying claims and possible defenses, the damages claimed and relief sought by Plaintiffs, the substantial contested litigation, mediation and negotiation process which culminated in the Settlement, and the remedies and releases to be provided as a part thereof.

The parties are in fundamental disagreement as to all aspects of Plaintiffs' claims, and there remains substantial question whether the Court (or the Second Circuit on appeal) would have found Nationwide to be an ERISA fiduciary either generally or in the context of the Revenue Sharing payments, and whether various offsets would have substantially reduced Plaintiffs' claimed damages.

Case law has been inconsistent with respect to the finding of ERISA fiduciary status and resulting fiduciary liability underlying Plaintiffs' claims involving life insurance service providers and revenue sharing payments ; the level of damages in such cases is difficult to determine depending on possible offsets; the Settlement represents a very meaningful percentage (more than one-third) of such possible recoveries as estimated by the parties ; and Defendants at all times mounted a strong and determined defense. All these factors suggest that the Settlement is an excellent one for Class Members.

The Fee and Expense Disclosure Reports are a substantial element of the Settlement, and valuing them is a difficult task. Whether or not Mr. Scheinberg's per plan estimate is accurate, the value of such Reports to the Members of the Settlement Classes certainly appears to be significant, adding additional value to the Settlement. Further, the group variable annuity and Trust Platform Class members' opportunity to elect a Products Menu or Program Menu option which provides an expense offset for all revenue sharing payments has the potential to be a very substantial economic benefit. It is clear that Defendants will expend substantial amounts both assembling and disseminating the required Fee and

- 9 -

Expense Disclosure Reports on an ongoing basis, and in implementing the structural changes to their contracts and business practices required by the Settlement.

In the "claims foregone" area, while the releases in the Settlement are broad, they are in the context of the specific claims made in the Litigation, and it does not appear to me that there are meaningful claims not yet asserted which the releases will block. I believe that the pending Complaint fully addresses all apparent issues and claims relating to Defendants' revenue sharing arrangements with participating retirement plans.

As to attorney's fees, Plaintiffs' counsel have informed me that their accumulated fees at their normal hourly rates total in excess of $15,000,000 (not surprising given the thirteen year legal battle resulting in six published opinions); and that they expect to incur additional fees and expenses before the matter is concluded. Given these facts (and subject to the Court's review and conclusion of course), the requested award of $49,000,000 in fees and up to $2,000,000 in expenses, though a substantial portion of the $140,000,000.00 cash settlement amount (but a much smaller portion of the total benefit to the Settlement Class), does not appear excessive to me.

Finally, the requested Case Contribution Fees award by the Court to named Plaintiffs of $25,000.00, while more than trivial in comparison to the overall $140,000,000.00 settlement fund, appear reasonable given the burdens imposed on named Plaintiffs (including subjection to counter claims) and do not alter my conclusion regarding the Settlement. As well, the Settlement administration budget appears reasonable to me.

Accordingly:

(1)     As previously stated, I affirm the existence of a genuine controversy involving the Members of the Settlement Class;

(2)     I believe that the Settlement is reasonable in light of the settlement terms, including the scope of the release of claims, the amount of cash and other benefits an disclosures anticipated to be received by the Members of the Settlement Class, the likelihood of full recovery by the Members of the Settlement Class, the amount of attorney's fees and other costs and expenses to by paid from the recovery, the risks and costs of litigation, and the value of claims foregone;

(3)     I conclude that the terms and conditions of the Settlement are not less favorable to the Members of the Settlement Class than comparable arm's-length terms and conditions that would have been agreed to by unrelated parties under similar circumstances;

- 10 -

(4)     The Settlement is not part of an agreement, arrangement or understanding designed to benefit a part in interest to any Member of the Settlement Class; and

(5)     The Settlement satisfies the conditions for the application of PTCE 2003-39.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Specifically, pursuant to Section I(5) of the Settlement Stipulation and Release, I conclude that the Settlement satisfies the conditions of Sections II and III of PTCE 2003-39 (to the extent applicable), including that the scope of the Released Conduct and Releases set forth in Section G of the Settlement is reasonable, and that Plaintiffs' Counsel Fee (up to $49,000,000) and Expense (up to $2,000,000) to be set forth in Plaintiffs' Fee and Expense Application and the anticipated administrative expenses to be charged against the Settlement Amount, each is reasonable.

*In sum, I believe that the Settlement is a reasonable and attractive settlement for the retirement plans, which comprise the Members of the Settlement Class and in the best interests of participants and beneficiaries thereof, and I hereby approve it as Independent Fiduciary acting on their behalf, and I recommend that the Class Members file claims and otherwise participate in the Settlement and do not object to it nor seek to be excluded from it.*

*Sincerely,*

*NICHOLAS L. SAAKVITNE*
*Independent Fiduciary for the*
*Members of the Settlement Class*
*[HADDOCK.*
*et al. v. NATIONWIDE et al.]*

NICHOLAS SAAKVITNE
Independent Fiduciary of
EMPLOYEE BENEFIT PLAN
532 Colorado Avenue 2ⁿᵈ Floor
Santa Monica, CA 90401-2408

Enclosure

- 11 -

NICHOLAS L. SAAKVITNE
A LAW CORPORATION

NICHOLAS L. SAAKVITNE
ATTORNEY, ERISA FIDUCIARY

STEVEN E. ROSEBAUGH
ADMINISTRATOR & BUSINESS MANAGER

532 COLORADO AVENUE, SECOND FLOOR
SANTA MONICA, CALIFORNIA 90401-2408
(310) 451-3225     FAX (310) 451-9089
E-MAIL saaklaw@aol.com
www.erisafiduciary.com

MICHELINE HIMES
ORPHAN PLANS COORDINATOR

SHARON L. HERITAGE
BENEFITS COORDINATOR
(877) 385-9111

ERISA FIDUCIARY SERVICES • EMPLOYEE BENEFITS LAW

## *Statement of Credentials of Independent Fiduciary*

Nicholas L. Saakvitne [N.Y.U. School of Law J.D. 1976, L.L.M. in Taxation 1977; Fellow, American College of Employee Benefits Counsel] has been an ERISA attorney for more than 30 years.  Since 1997, he has acted as an ERISA fiduciary for employee benefit plans, and such fiduciary service now comprises substantially all of his practice.

Serving as Trustee and Independent Fiduciary to coordinate the termination of orphan retirement plans (working closely with the EBSA division of the U.S. Department of Labor and, for defined benefit pension plans, with the Pension Benefit Guaranty Corporation), he has served as fiduciary for thousands of plans and has overseen well over $1 billion of plan benefit payments/direct rollovers.  Mr. Saakvitne has been appointed as a plan fiduciary by many Federal courts, and on occasion by California state courts.

Mr. Saakvitne has served as Trustee and Independent Fiduciary for more than 100 Employee Stock Ownership Plans over the past 15 years, on an ongoing basis for active plans, and to negotiate stock purchase or stock/asset sale transactions, or to approve settlements or review other ESOP fiduciary transactions. **ESOP fiduciary service now is the majority of his practice, and he currently serves as Trustee for more than 85 ESOPs in 14 states.**

On many occasions, Mr. Saakvitne has acted as Independent Fiduciary for retirement plans to review and approve Class Action ERISA litigation settlements and/or to revive plans for purposes of coordinating distribution of settlement proceeds, working with nationally recognized members of the plaintiff's Bar and established defense counsel.

He has also been approved as Independent Fiduciary for several Prohibited Transaction Exemptions issued by the National Office of the U.S. Department of Labor.

\* \* \* \* \*

[2014]

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LOU HADDOCK, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | No. 3:01-CV-1552(SRU) |
| | : | |
| NATIONWIDE FINANCIAL SERVICES | : | |
| INCORPORATED, et al. | : | |
| | : | |
| Defendants. | : | |

## DECLARATION OF JAMES SCHEINBERG, CIMA®, PRP, MANAGING PARTNER OF NORTH PIER FIDUCIARY MANAGEMENT, LLC February 10, 2015

I, James Scheinberg, hereby declare as follows:

1.     I am the founder and Managing Partner of North Pier Fiduciary Management, LLC (North Pier), a company dedicated to advising the fiduciaries of small, mid-sized and larger retirement plans.

2.     I began my professional career at Oppenheimer & Co., Inc. in 1989. I then spent two years in natural resource venture capital with a boutique firm, Cuchara Resources, where I was licensed with the NASD (Series 7, 63, 22 and 39). In 1992, I moved to general securities with Smith Barney Harris Upham.   In 1994, I rejoined Oppenheimer & Co., Inc. as an Associate in the Oppenheimer Consulting Group, the firm's institutional investment management consulting

department, where I worked with sponsors of ERISA retirement plans and other institutional clients.

3.      In 2001, I founded what would become the Corporate Services Group of Oppenheimer Co., Inc. (CSG), where I eventually held the position of Director and Senior Vice President.   CSG was an industry pioneer in providing conflict free, fee only investment consulting and fiduciary advocacy for institutional, participant-directed, plan sponsors.

4.      In 2008, I, along with other central members of CSG, founded North Pier Fiduciary Management, LLC.   My tenure in the industry has also included experience in hedging and monetization, corporate executive services and corporate cash management, as well as the attainment of my NASD Series 22, 63, 39 (inactive) and 65 (active).

5.      For the past 14 years, I have worked with institutional clients throughout the United States and the focus of my experience has been on providing retirement plan advisory services to the mid-sized and larger retirement plan sponsor.   These services have included fiduciary process management and analysis; investment policy design; plan cost studies and vendor renegotiations; ERISA advisor and provider search and benchmarking; committee level employee communication and education consulting; plan design (auto-enrollment/increase

2

analysis, cash balance plans, etc.); mergers and acquisition analysis and integration support; independent fiduciary review for corporate boards/ compensation committees; investment menu design and evaluation; fee review and analysis; investment monitoring and reporting; manager search services; and expert consulting and witness services for ERISA litigation.

6.    Attached as Exhibit A is a true and correct copy of my curriculum vitae, which further details my qualifications.

7.    I have been retained by counsel for the Flyte Tool & Die Company, Inc. 401-K Profit Sharing Plan, the Crown Tool & Die Co. Inc. Salary Deferral Profit Sharing Plan, the Greater Hartford Easter Seal Rehabilitation Center, Inc., Tax Sheltered Annuity Plan and the Money Accumulation Pension Plan for the Employees of Hartford Easter Seal Rehabilitation Center, Inc., Trust, the Anderson Law Firm, P.C. 401(k) Profit Sharing Plan and Trust, f/k/a the Anderson & Ferdon P.C. 401(k) Profit Sharing Plan, the Law Offices of H. Grady Chandler, P.C., 401(k) Profit Sharing Plan and Trust, and the Bershtein, Volpe & McKeon Profit Sharing Plan, f/k/a the Bershtein, Lippman, Bachman & McKeon Profit Sharing Plan, ("the Plaintiffs") to provide an opinion concerning the estimated potential value to each class member of the options, services and information to be provided by Defendant, Nationwide Life Insurance Company   ("Nationwide Life") or

3

Defendant, Nationwide Financial Services, Inc. ("NFS") (collectively "Nationwide" or "Defendants") under the Settlement Agreement.    To form my opinion, I reviewed the materials listed in Exhibit B of this declaration and engaged in a review and analysis of certain new pricing structures, and referred to my recent survey of how much consultants would charge to provide the information Defendants will now provide to current and future retirement plan customers under the Settlement Agreement.    I am qualified to provide such an estimate based on my experience detailed above because, among other things, I regularly investigate, calculate and analyze the revenue sharing payments, if any, as well as other fees being received by service providers and other entities, whether directly or indirectly, in connection with retirement plan investments.    In performing such work, I research, analyze, and calculate the amount of total investment expense, revenue sharing (which typically includes 12b-1 fees, sub-transfer agent fees) and direct expenses (including administrative service/management fees, separate account fees, flat charges, per participant fees, and individual participant transaction charges).    I am being compensated at my standard rate of $550 per hour for my consulting services in this matter.

8.    Consultants like myself are often engaged by retirement plans to review the fees charged by service providers such as Nationwide.    The general

4

purpose of such reviews is to determine how much a plan is paying for services and whether such costs are reasonable in light of the services received.   One of the key pieces of information that a consultant needs in order to perform this review is the total compensation received for the services provided by the service provider. Performing the review is often not a simple task because some service providers often do not list each of the components of their fees in a readily available format.

9.     In Section F.2(a) and Section F.4(a) of the Settlement Stipulation and Release (the "Settlement Agreement") Nationwide is now agreeing to provide this supplemental information in a readily available format for new customers and to continue its recent practice of providing it on its plan sponsor website for existing customers.   By providing this information, the task of a consultant such as myself is rendered considerably easier, which would likely result in a lower bill to the plan to perform an overall fee review.   In addition, by providing this information, Nationwide now will make it possible for a plan to easily and directly determine the level of fees being received by Nationwide without engaging a consultant such as myself.

10.     To obtain and present the information required to be disclosed by Nationwide in Section F.2(a) and Section F.4(a) of the Settlement Agreement, a

consultant such as myself would be required to review and analyze (1) the universe

of available investments; (2) the specific investment options of the plan; (3) their

expense ratios and revenue sharing amounts; (4) the service agreements and riders

for the plan; (5) the wrap fee or separate account fee and other direct expenses; and

(6) the service provider's required 408(b)(2) fee disclosures (29 CFR

§2550.408b-2).    Although obtaining such information can sometimes occur

through direct contact with a service provider and the time spent in obtaining such

information may be streamlined if the consultant has a pre-existing relationship

with the plan or the service provider, many times the process utilized in collecting

such information is complex and time consuming for the consultant.

 11. Based upon previous assignments that I have performed in this case, I

have a clear understanding of the time it would take to obtain and analyze revenue

sharing information on behalf of a retirement plan utilizing the services of

Nationwide at this time, as well as before this litigation was commenced.

 12. Based on my knowledge and experience, providing information

similar to that required by Section F of the Settlement Agreement, it would take

approximately 3 to 6 hours to obtain, review, and analyze the information that

would now be required to be made available by Nationwide and to present it to a

client.    The amount of time, of course, may vary based on a consultant's

6

familiarity with the subject plan.    The greater familiarity an advisor has with the plan, the less time it may take to analyze the expenses of the plan.

13.    My standard hourly rate and the rate that I would charge to perform the work required by Section F of the Settlement Agreement is $550 an hour for these services; the work conducted, in part, by my firm's associates is $125 - $255 an hour, and $65 an hour is the rate for administrative support.

14.    As part of a recent expert engagement, I spoke to two small-market and mid-market plan consultants and one actuarial administration firm in order to evaluate what other consultants around the country would charge to perform similar work. These consultants reported a range of $250 to $4,000 to provide these services.    The low end of the estimated range assumes that the consultant had an existing relationship with the client and vendor, as well as a high level of familiarity with the plan and the service provider.    The high end of the range assumed no familiarity with the plan documents, investments, and service providers, as well as difficulties in obtaining the relevant data from the existing documents.

15.    In an effort to validate these prior findings with recent independent data, in February 2015, North Pier consulted FRA Plan Tools, a retirement industry benchmarking service, for their experience with firms providing similar services.

7

They reported a range of $200-$2250 for the three plans for which they had segregated data, which confirmed our prior findings.

16.     In my estimation, the average amount a competent consultant would charge a plan is, on average, approximately $1,500 to obtain and report the information Nationwide will be required to provide under the terms of the Settlement Agreement.

17.     To determine the average hourly rates consultants would charge throughout the country for the expert engagement referenced above, I also consulted a then recent survey reported in the November 2009 issue of *PlanAdviser* Magazine.    These materials indicate that the typical hourly rate charged by retirement plan consultants ranged from $150 to $500 per hour. These rates are consistent with my current experience interacting with advisors around the country in connection with my work as an ERISA advisor/search consultant, as well as through my involvement with The Center for Due Diligence (www.thecfdd.com), a well-respected industry group.    In my recent experience, rates are now generally comparable to those rates determined in the 2009 survey.

18.     Based upon this fee range, and based upon my estimate of the amount of time it would take a consultant to obtain the information, I estimate that the average plan would incur consultant fees of at least between $500 and $750 to

8

obtain the information that must now be disclosed.    Again, this estimate is based on the fees of a typical consultant, and plans easily could pay more – as much as $2,500 per year – to obtain such information.    I have used $625 – the midpoint between $500 and $750 – as a reasonable estimate of the minimum fees that a plan would pay to obtain the information provided by Nationwide.

19.    To calculate the potential value of the Nationwide disclosures to the Group Annuity Settlement Class, I believe that an appropriate method is to multiply the value to each plan ($625) times the number of plans in that Settlement Class, because the potential benefit to class members exists even if any particular member would not have retained an outside consultant.    I have been informed that there are approximately 2,096 potential class members with current group annuity contracts.    Therefore, the estimated value of the information required to be disclosed under the settlement would be $1,310,000 for each year that this information is obtained by the plans.    Using a five year horizon based upon my experience in similar matters with respect to changes in practice and how long, at a minimum, they typically remain in effect and benefit the group annuity contract holders within the Annuity Contracts Sub-Class, the estimated value of this component of the settlement is between $1,310,000 (based on just the first year) and $6,550,000 (assuming that plans will fully benefit from these changes in

9

practice for at least five years). Assuming a discount rate of 6.27 percent (the trailing 10-year median performance as of December 31, 2014, for funds in the Morningstar Balanced Universe), I estimate the present value of these five years of disclosures to be $5,477,899.77.

20.     To calculate the value of the Nationwide disclosures to the Trust Settlement Class, I believe that an appropriate method is to similarly multiply the value to each plan ($625) times the number of plans in that Settlement Class.   I have been informed that there are approximately 18,755 potential class members with current trust contracts.   Therefore, the estimated value of the settlement would be $11,721,875 for each year that this information is obtained by the plans. Using a five year horizon based upon my experience in similar matters with respect to changes in practice and how long, at a minimum, they typically remain in effect and benefit the Trust Platform Sub-Class, the value of this component of the settlement is between $11,721,875 (based on just the first year) and $58,609,375 (assuming that plans will fully benefit from these changes in practice for at least five years). Assuming the same discount rate of 6.27 percent, I estimate the present value of these five years of disclosures to be $49,016,226.24.

21.     This calculation is based on conservative assumptions for several reasons.   First, as noted above, plans may be charged considerably more than

10

\$625 to gather the information that Nationwide is now providing.   Second, if

Nationwide's business continues to grow in the future, the actual number of plans

that will benefit may be significantly greater.   Plans that enter into group annuity

contract or trust program agreements in the future would also benefit from these

business changes.   While I cannot estimate the approximate value of these

business changes to future plans, it would likely be in the tens of millions of

dollars. Further, in Section F.3(a) of the Settlement Agreement, for its Individual

Variable Annuity customers, Nationwide has agreed to add language to its

disclosures that it "shall provide, upon Plan trustees' written request, its best

estimate of plan-specific, aggregate data regarding the Mutual Fund Payments

received in connection with the Plan's investments for the previous calendar year.

Though I have not been asked to calculate the value of these disclosures, due to

increased revenue transparency, I estimate that these new disclosures would be of

considerable value for those who request and utilize the data.   I also understand

that it will cost a significant amount of additional funds for Nationwide to

accomplish the other Structural Changes detailed in Section F of the parties'

Settlement Agreement in addition to the \$140 million in cash payments.

    22. The other significant and independent value contained in the Settlement

is Nationwide's agreement to now offer trustees of plans holding group variable

11

annuity contracts (Section F.2(c) of the Settlement Agreement) and trustees of plans on the Trust Platform (Section F.4(c) of the Settlement Agreement) "an opportunity to be transferred to a product where Mutual Fund Payments are credited to the Plan in the form of reduced asset fees in an amount equivalent to the disclosed reimbursement rate received for each Mutual Fund investment option." (Section F.2(c) and F.4(c) of the Settlement Agreement)    This structure is modeled consistent with the guidance provided for by the Department of Labor in their 1997 Opinion Letter No. 97-15A, the Frost Letter (*In re Frost National Bank*, DOL (May 22, 1997)).    In essence, by requiring such compliance, Plaintiffs have achieved a very significant result, as this structure ensures that Defendants cannot operate in a biased fashion by offering mutual funds on the basis of revenue sharing payments they will receive.    Further, each plan in the Class that switches to this Frost Letter compliant structure will avoid an ongoing duty to account separately for said revenue sharing payments, making it easier for them to meet their fiduciary duties to ensure that all plan costs (including all direct and indirect costs) are reasonable in light of services being received by their plan. Establishing a dollar value with respect to this structural compliance element is not easily accomplished and is beyond the scope of my assignment in this case, but is nonetheless significant and has actual value to class members.

12

23. Potentially the most significant value resulting from the Settlement is the potential cost savings that will likely be unleashed from access to this Frost Letter compliant structure.    The exercise of converting to a plan structure similar to this is likely to serve as a catalyst for a sponsor to review its all of its plan expenses and structures.    My experience teaches me that the vast majority of plans that go through this evaluation process can save thousands of dollars in terms of total annual plan operating cost.    As a result, if a significant number of plans are prompted to do so due to the settlement, they may collectively achieve tens if not hundreds of millions of dollars in additional benefits from the settlement for years to come.    In a similar case for which I have served as an expert, *Healthcare Strategies, Inc. et al. v. ING Life Ins. And Annuity Co.*, No. 3:11-cv-00282 (WGY), the settlement presented a similar opportunity for the class to achieve savings in the hundreds of millions of dollars from a total annual plan operating cost perspective.[1]    Although I have not engaged in a formal valuation with respect to this benefit in this specific case, as the potential class is larger than the approximately 18,000 members of the *Healthcare Strategies, Inc.* class, savings could be similarly meaningful for plans pursuing the new option, by which all revenue sharing payments are credited to the Plan in the form of reduced asset fees.

---

[1] Total annual plan operating cost refers to total direct and indirect charges paid by a plan and its participants, including the expense ratios of mutual funds.

13

24.    I also note that Plaintiffs and their Counsel have not only achieved
meaningful financial compensation and valuable structural changes for the plans of
the Class, but this litigation has fundamentally sparked change in the practices
surrounding Revenue Sharing in the retirement industry as a whole.    Seventeen
years after the Department of Labor laid out the path for service providers to
prudently address this topic, Plaintiffs have attained a model structure for the Class
in two key ways. Firstly, Section F.5 of the Settlement Agreement appears to fully
follow the landmark Department of Labor ("DOL") Aetna Letter (*In re Aetna
Insurance Company*, Opinion No. 97-16A, (May 22, 1997)) in regards to
Defendant's future practices regarding providing proper notice and receiving a
plan fiduciary's consent before adding, deleting, changing or replacing a plan's
investment option. Secondly, as previously mentioned, Section F.2(c) and F.4(c)
provide for a structure in which all revenue sharing will be credited against the
direct fees to the plans, as modeled from the guidance provided for by the DOL in
the Frost Letter (*In re Frost National Bank*, DOL Opinion No. 97-15A, (May 22,
1997)).    It bears noting that the settlement admirably provides for this extremely
noteworthy relief.

25.    When all of the business changes contemplated by the Settlement are
taken into account, I conservatively estimate the potential present value of the

14

these changes at $54,494,126 ($5,477,900 + $49,016,226), plus potential additional savings of several hundred million dollars to plans in the Classes due to the Frost Letter structure, enhanced individual annuity disclosures, as well as to plans that enter into group annuity contract or trust program agreements in the future. These calculations also do not include the increased return on participants' retirement assets that likely will be achieved, since such assets will remain invested in the capital markets, as opposed to being paid to Nationwide or mutual funds as fees or Revenue Sharing.

30. I reserve the right to revise the opinions expressed in this Declaration in the event that I receive additional information, documents or materials that are pertinent to the opinions expressed herein.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: February 10, 2015

James Scheinberg

15

# Exhibit A

## Curriculum Vitae

**James Scheinberg CIMA®, AIF®, PRP**
**Managing Partner, Founder and Chief Investment Officer**
**North Pier Fiduciary Management, LLC**
**Jim.Scheinberg@npier.com**
**(800) 403-7065 ext. 272**

Born and raised in the North Suburbs of Chicago, Jim Scheinberg came to Southern California in 1987 to pursue his B.A. in Political Science at University of California, Los Angeles. He formerly held the SEC Series 7, 22, 39 (Principal), 63, and 65 Licenses. Jim achieved the Certified Investment Management Analyst (CIMA) designation in 2001 from The Investment Management Consultants Association (IMCA®) in conjunction with the Wharton School of Business of the University of Pennsylvania. He has also earned the Accredited Investment Fiduciary™ (AIF®) and Accredited Investment Fiduciary Analyst™ (AIFA®) designations, awarded by the Center for Fiduciary Studies, which is associated with the Joseph M. Katz Graduate School of Business of the University of Pittsburgh. He is one of the first 100 professionals to earn the PLANSPONSOR Retirement Professional designation (PRP) from PLANSPONSOR Institute and sits on the Steering Committee of The Center for Due Diligence. He is a quoted resource to journalists, a regularly featured radio show contributor and a frequent speaker at industry conferences. He also serves as a consulting expert and expert witness for ERISA litigation.

Jim Scheinberg began his career in venture capital in 1990 moving to general securities with Smith Barney Harris Upham in 1992. He joined Oppenheimer & Co., Inc. in 1994 as an Associate in the Oppenheimer Consulting Group, the firm's institutional investment management consulting department, where he worked with sponsors of trustee-directed plans and other institutional clients. In 2001, Jim founded what would become the Corporate Services Group of Oppenheimer Co., Inc. (CSG), where he eventually held the position of Director and Senior Vice President. CSG was an industry pioneer in providing conflict free, fee-only investment consulting and fiduciary advocacy for institutional, participant- directed plan sponsors. In 2008, Jim and CSG Partner Brant Griffin, founded North Pier Fiduciary Management LLC. His tenure in the industry has also included experience in hedging and monetization, corporate executive services, and corporate cash management.

Professional Activities:

- Advising Member of the Center for Due Diligence
- Member of the Investment Management Consultants Association

Expert Witness/Consultant Cases:

- PHONES PLUS, INC. vs. HARTFORD LIFE INSURANCE COMPANY
  2008-2010: Engaged by plaintiff's counsels (Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP) and (Shepherd, Finkelman, Miller & Shah, LLP)– Consulting Expert, Expert Opinion and Fairness Opinion
- KATZIFF vs. BEVERLY ENTERPRISES, INC
  2009-2009 Engaged by plaintiff's counsel (Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP) – Consulting Expert, Expert Opinion
- CORMIER vs. RADIOSHACK CORPORATION
  2010: Engaged by plaintiff's counsel (Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP) – Consulting Expert
- HEALTHCARE STRATEGIES INC. VS. ING LIFE INSURANCE & ANNUITY CO.
  2012-present: Engaged by plaintiff's counsels (Shepherd, Finkelman, Miller & Shah, LLP) – Consulting Expert, Expert Opinion

- GOLDEN STAR, INC. V. MASS MUTUAL LIFE INSURANCE CO.
  2012-present: Engaged by plaintiff's counsels (Shepherd, Finkelman, Miller & Shah, LLP) – Consulting Expert
- CASE NAME WITHHELD – Pre Filing
  2014-present: Engaged by United States Department of Labor – Consulting Expert
- BUTLER NATIONAL CORP., C3 CAPITAL, LLC AND RIFKIND LAW GROUP V. THE UNION CENTRAL LIFE AND AMERITAS LIFE INSURANCE GROUP
  2010-present: Engaged by plaintiff's counsels (Shepherd, Finkelman, Miller & Shah, LLP) – Consulting Expert, Expert Opinion, Settlement Valuation
- LOU HADDOCK, et al.,  V. NATIONWIDE FINANCIAL SERVICES INCORPORATED, et al.
  2014-Present:   Engaged by plaintiff's counsels (Koskoff, Kosskoff & Bieder PC) – Consulting Expert, Expert Opinion, Settlement Valuation
- ABBOTT V. LOCKHEED MARTIN CORPORATION, 2014: Engaged by plaintiff's counsels (Schlichter, Bogard & Denton) – Consulting Expert


Articles & Media

- *Fishing from the Wrong PEER - Target Date Fund Analysis;* Oct. 2008: Author
- Quoted resource in several publications including H.R. Magazine, The Hedge Fund Law Report, AOL's Finance Daily, New York Daily News, DepositAccounts.com and SmartMoney.com,
- *Periodic Blog/Newsletter: THE NORTH PIERspective*; Nov. 2008 – Present; http://pierspective.wordpress.com/


Speaking Engagements:

- 2014 San Francisco Mid-Sized Retirement & Healthcare Plan Management Conference; Lecturer: "Tips Learned from Litigation." March 16, 2014 - March 19, 2014; San Francisco, CA
- Center for Due Diligence Advisor Conference; Moderator: "Mock Plan Sponsor Committee Meeting" Monday, October 7, 2013; San Antonio, TX
- Mid-Sized Retirement and Pension Plan Management Conference; Lecturer: "K.I.S.S – Keep It Specialized S… "Better Sponsor Advice for Less." October 13, 2011; Chicago, IL
- Mid-Sized Retirement and Pension Plan Management Conference; Lecturer: "Cut the Fat: Reduce Costs While Improving your Plan." October 12, 2010; Chicago, IL
- Mid-Sized Retirement and Pension Plan Management Conference; Lecturer: "Cut the Fat: Reduce Costs While Improving your Plan." May 5, 2010; Boston, MA
- Mid-Sized Retirement and Pension Plan Management Conference; Lecturer: "Cut the Fat: Reduce Costs While Improving your Plan." March 9, 2010; San Francisco, CA
- Mid-Sized Retirement and Pension Plan Management Conference; Lecturer: "Worried about Inflation and the Dollar? As a Fiduciary You Should Be." March 8, 2010; San Francisco, CA
- Center for Due Diligence Advisor Conference; Lecturer: "Can an Advisor Be A Fiduciary To The Plan & Provide Participant Advice?" October 6, 2009; Scottsdale, AZ
- Center for Due Diligence Advisor Conference; Lecturer: "Gross-To-Net Pricing Revisited: Now What?" October 5, 2009; Scottsdale, AZ
- Center for Due Diligence Advisor Conference; Lecturer: "MPT: Bruised, Broken, Misunderstood or Misapplied." October 5, 2009; Scottsdale, AZ
- Center for Due Diligence 2008 Advisor Conference; Panelist: "QDIA's — Look Before You Leap." October 13, 2008; Phoenix, AZ
- Center for Due Diligence 2008 Advisor Conference; Presenter and Panel Moderator: "Ethics & the Advisor: How to Pursue Business While Honoring Your Fiduciary Duties." October 13, 2008; Phoenix, AZ

- Berkeley Center for Executive Development's 15th Annual Mid-Sized Pension and Retirement Plan Management Conference; Lecturer and Author: "Advisors are Providers too: prudent and practical steps for benchmarking, evaluating and ensuring value." March 12, 2008; San Francisco, CA

- Berkeley Center for Executive Development's 15th Annual Mid-Sized Pension and Retirement Plan Management Conference; Lecture Co-Author and Presenter: "How to truly differentiate among Record-keepers; it's not just about bundled or unbundled anymore." March 14, 2008; San Francisco, CA

- Berkeley Center for Executive Development's 14th Annual Mid-Sized Pension and Retirement Plan Management Conference; Lecturer and Author: "Evaluating Plan Advisors: What's Optimal for Your Plan and What Should You Pay?" March 12, 2007; San Francisco, CA

- Berkeley Center for Executive Development's 14th Annual Mid-Sized Pension and Retirement Plan Management Conference; Co-Author and Presenter: "Discussions with an ERISA Plaintiff's Attorney: Potential Future Litigation and How to Protect Yourself Today." March 13, 2007; San Francisco, CA

- Center for Due Diligence 2006 Advisor Conference; Presenter and Panel Moderator: "Strengths & Weaknesses of Various Mid-Market Plan Providers." October 5, 2006; Chicago, IL

- Center for Due Diligence 2006 Advisor Conference; Panelist: "Practice Management: Maximizing the Team Effort." October 5, 2006; Chicago, IL

- Center for Due Diligence Advisor Conference; Panelist: "Should Advisors Offer Other Services" October 6, 2005; Chicago, IL

- Center for Due Diligence Advisor Conference; Lecturer: "How To Move Your Practice Upstream & Compete Effectively In The $25-100 Million Market", October 6, 2005; Chicago, IL

Live Media Appearances

- Bruce Sallan's, "A Dad's Point of View" Radio Show (KZSB AM 1290); Regular Weekly Featured Guest on "Family Financial Matters" segment: June 2010 – September 2011 & subsequent quest appearances; Santa Barbara, CA. (Nationally Syndicated)

Notable Achievements

- Nominee - 401(k) Wire's 100 Most Influential People in Defined Contribution, 2009
- Named among 401(k) Wire's 300 Most Influential Advisors, In Defined Contribution, 2010
- Named among 401(k) Wire's 500 Most Influential Advisors, In Defined Contribution, 2011

# Exhibit B

## Materials Reviewed

**Pleadings:**

- Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement – December 11, 2014
- Plaintiff's Memorandum of Law in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement– December 11, 2014

**Reports:**

- Report, Declaration and rebuttal report of James Scheinberg – September 16, 2014
- Healthcare Strategies, Inc. et al. v. ING Life Ins. And Annuity Co., No. 3:11-cv-00282; Declaration of James Scheinberg – August 24, 2014; and supporting notes.

**Miscellaneous:**

- U.S. Department of Labor Advisory Opinion 97-15A, *In re Frost National Bank* (May 22, 1997)
- U.S. Department of Labor Advisory Opinion 97-16A, *In re Aetna Insurance Company* (May 22, 1997)
- PlanAdviser Magazine, November 2009 (prior notes)
- FRA Plan Tools February 2015 benchmarking data

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

<table>
<tr><td>
LOU HADDOCK, as trustee of the Flyte Tool and<br>Die Company, Inc. 401-K Profit Sharing Plan, <i>et al.</i>,<br><br>    PLAINTIFFS,<br><br>        v.<br><br>NATIONWIDE LIFE INSURANCE CO,, and<br>NATIONWIDE FINANICAL SERVICES, Inc.<br><br>    DEFENDANTS.
</td><td>
CASE NO. 3:01-CV-1552 (SRU)<br><br>DECLARATION OF MARKHAM<br>SHERWOOD
</td></tr>
</table>

I, **MARKHAM SHERWOOD**, declare:

    1.     I am a Director, Class Action Services at Kurtzman Carson Consultants LLC ("KCC"), located at 75 Rowland Way, Suite 250, Novato, California.  I am over 21 years of age and am not a party to this action.  I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

    2.     The purpose of this declaration is to provide the Parties[1] and the Court with a summary of the results of the work performed to date by KCC related to the notice procedures for the *Haddock v. Nationwide* Litigation following the Court's entry of the Preliminary Approval Order.

    3.     KCC is a class action administrator that specializes in providing comprehensive class action services including, but not limited to, pre-settlement consulting, email and mailing campaign implementation, website design, claims administration, check and voucher disbursements, tax reporting, settlement fund escrow and reporting, class member data management, legal notification, call center support, and other related services critical to the effective administration of class actions.  KCC has developed efficient, secure, and cost-effective methods to properly handle the voluminous data and

mailings associated with the noticing, claims processing, and disbursement requirements of settlement to ensure the orderly and fair treatment of class members and all parties in interest.

4.      KCC's business is national in scope.  Since 2000, KCC (along with Rosenthal & Company, which was acquired by KCC in 2010) has been retained to administer more than 1,500 class actions.  As part of these class actions, KCC has provided noticing solutions in cases with class members that range in numbers from 22 to over 22 million, and has distributed settlement payments totaling well over two billion dollars in the aggregate.

5.      KCC was retained to, among other tasks, implement a notice program, mail the Notice and Claim Form (the "Notice Packet") to the list of identified Class Members, establish and maintain a toll-free telephone number and website, fulfill requests for Notice Packets, publish the Published Class Notice, prepare, receive and validate Claim Forms, and receive and evaluate Exclusion Requests. Copies of the Notice and Claim Form are attached hereto as Exhibits A and B respectively.

6.      On January 20, 2015, KCC caused 73,091 Notice Packets to be mailed by First Class postage.

7.      On February 24, 2015, KCC received additional Class Member data from Defendants' Counsel containing 473 records.  KCC de-duplicated the list based on name, address, and plan data.  On February 27, 2015, KCC caused 439 Notice Packets to be mailed by First Class Postage.

8.      During the period of January 20, 2015 through March 23, 2015, 14,544 Notice Packets were returned to KCC by the U.S. Postal Service without forwarding addresses.  To date, KCC has conducted address searches using credit and other public source databases to locate new addresses for 7,160 of these Class Members.  The Class Mailing List was updated with these new addresses and Notices were re-mailed to these 7,160 Class Members using the new addresses.  KCC will continue to promptly re-mail Notices to the updated addresses.

9.      On January 24, 2015, KCC caused the Published Class Notice to be published at 1/8[th] of a page in the New York Times Business Section.  A copy of the Published Class Notice is attached hereto as Exhibit C.

---

[1] Capitalized terms are to be given the meaning as defined in the Settlement Stipulation and Release, filed with the Court on December 11, 2014, unless defined separately herein.

---

Nationwide Declaration of Markham Sherwood

10.    On or before January 20, 2015, KCC caused an existing toll-free telephone number's phone script (866-894-0420) to be updated to provide information about the Settlement, fulfill requests to have Notice Packets sent to Class Members, and / or to speak to a live call center representative.  The same number was previously used for the Class Certification notice for this Litigation in 2014.  The recorded information available to Class Members was updated on or before January 20, 2015.  As of the date of this declaration, the toll-free line has received 2,436 calls.

11.    On or before January 20, 2015, KCC caused an existing website to be updated at www.nwclassaction.com.  This website was previously used for the Class Certification notice for this Litigation in 2014.  The information available on the website was updated to provide information about the Settlement, and access to relevant Court documents, allow Class Members to download copies of the Notice and Claim Form, and set forth important dates and deadlines.  As of the date of this declaration, the website has received 2,896 hits.

12.    As of the date of this declaration, KCC has received six (6) Exclusion Requests.  The Notice instructed Class Members that they must mail a written Exclusion Request to the Settlement Administrator so that it would be received no later than March 21, 2015.  A report on Exclusion Requests, along with true and correct copies of the Exclusion Requests, are attached hereto as Exhibit D.

13.    As of the date of this declaration, KCC has received zero (0) Objections to the Settlement.

14.     As of the date of this declaration, 6,823 Claim Forms have been filed by Class Members. The deadline for submitting Claim Forms is May 20, 2015; therefore, KCC expects to receive additional timely claims.  KCC is reviewing the claims received to determine whether they are reasonable, valid, and payable from the Net Settlement Fund.  KCC will work with Plaintiffs' Counsel and Defendants' Counsel to contact claimants, as necessary, to confirm information in the Claim Form or seek additional information.

I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 24th day of March, 2015 at San Francisco, California.

MARKHAM SHERWOOD

# Exhibit A

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

**A Settlement has been reached in the *Haddock v. Nationwide Life Insurance Co.* class action.**
**Your Plan may be eligible for benefits.**

**If you are a current or former trustee of a retirement plan covered by the Employee Retirement Income Security Act ("ERISA") that had (1) group or individual variable annuity contracts with Nationwide Life Insurance Company at any time between January 1, 1996 and September 30, 2014, or (2) trust, custodial, services, or program agreements and/or arrangements with Nationwide Financial Services, Inc., or its affiliates, at any time between January 1, 2009 and September 30, 2014, your plan may benefit from this class action settlement.**

*A federal court authorized this Notice.  This is not a solicitation from a lawyer.*
*Neither you nor your plan is being sued.*

- A Settlement has been reached in *Haddock v. Nationwide Life Insurance Co.*, a class action lawsuit against Nationwide Life Insurance Company ("Nationwide Life") and Nationwide Financial Services, Inc. ("NFS") (collectively, "Defendants").  The Settlement resolves claims made by trustees of retirement plans covered by the Employee Retirement Income Security Act ("ERISA").  The trustees claimed that Defendants violated ERISA when they arranged for, received, or retained payments from mutual funds ("mutual fund payments" or "revenue sharing") offered as investment options on their Annuity Contracts and Trust Platforms. Defendants deny that they engaged in any improper conduct and maintain that the mutual fund payments they received benefitted the Plaintiffs, and the retirement plans and participants they represent, because the payments were used to reduce administrative fees paid by the plans and participants, and to compensate Defendants lawfully and appropriately for its services.  Defendants have agreed to settle to avoid the expense and distraction of further continued litigation.  Both Parties agree that the Settlement provides meaningful and carefully-tailored relief to the Class that relates directly to the allegations in the Litigation.

- You have been identified as a "Class Member" in this Settlement because you are (a) a current or former trustee of a retirement plan covered by ERISA that had group or individual variable annuity contracts with Nationwide Life between January 1, 1996 and September 30, 2014; or (b) a current or former trustee of a retirement plan covered by ERISA that had trust, custodial, services, or program agreements and/or arrangements with NFS, or its affiliates, between January 1, 2009 and September 30, 2014.

- Your legal rights, and the rights of your Plans, Plan Participants, and beneficiaries, may be affected regardless of whether you take any action. Read this entire Notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT | |
|---|---|
| **SUBMIT A CLAIM FORM** | The only way for your Plan to receive money from this Settlement is to submit the enclosed Claim Form so it is received by May 20, 2015. |
| **ASK TO BE EXCLUDED** | This is the only option that allows your Plan, Plan Participants, and beneficiaries to ever be part of another lawsuit against Nationwide about the legal claims resolved by this Settlement.  If you exclude your Plan, Plan Participants and beneficiaries from this Settlement, your Plan will not receive any money from this Settlement. |
| **OBJECT** | You can object to the Settlement by writing to the Court with the reasons why you do not think it should be approved. |
| **ATTEND THE HEARING** | You can ask to speak in the Court about the fairness of the Settlement. |
| **DO NOTHING** | If you do nothing, your Plan will not receive a payment from this Settlement, and you, your Plan, and its Participants and beneficiaries will give up their right to ever be part of another lawsuit against Nationwide about the legal claims resolved by this Settlement. They will get the benefit of the new business practices that Defendants will implement. |

- These rights and options are explained in this Notice.

- The Court in charge of this case still has to decide whether to approve the Settlement.  Payments of money will be issued to Class Members who submit the Claim Form if the Court approves the Settlement and after any appeals are resolved.  Please be patient.

NHTNOT2

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** ....................................................................................................PAGE 3

1. Why did I get this Notice?

2. What is this lawsuit about?

3. What is a class action and who is involved?

4. Why is there a Settlement?

5. Who is included in the Settlement?

**THE SETTLEMENT BENEFITS – WHAT YOU CAN GET IF YOU QUALIFY** ...................................................PAGE 3

6. What does the Settlement Provide?

7. What can my Plan, Plan Participants and beneficiaries get from the Settlement?

8. What rights am I giving up in exchange for the Settlement?

9. What Claims and Causes of Action will be Released?

**HOW TO GET BENEFITS – SUBMITTING A CLAIM FORM** ...........................................................PAGE 5

10. How can I get a payment from this Settlement?

11. How and when will payments be made?

**THE LAWYERS REPRESENTING YOU** ...............................................................................PAGE 6

12. Do I have a lawyer in this case?

13. How will the lawyers be paid?

**ASKING TO BE EXCLUDED FROM THE SETTLEMENT** ...............................................................PAGE 6

14. How do I ask to be excluded?

15. If I ask to be excluded, can I still get a payment from this Settlement?

16. If I ask to be excluded, can I sue Nationwide for the same claims later?

**OBJECTING TO THE SETTLEMENT** .................................................................................PAGE 7

17. How do I object to the Settlement?

**THE COURT'S FAIRNESS HEARING** ...............................................................................PAGE 7

18. When and where will the Court decide whether to approve the Settlement?

19. Do I have to attend the Fairness Hearing?

20. May I speak at the Fairness Hearing?

**IF YOU DO NOTHING** ...............................................................................................PAGE 8

21. What happens if I do nothing at all?

**GETTING MORE INFORMATION** .....................................................................................PAGE 8

22. How can I get more information?

## BASIC INFORMATION

### 1.   Why did I get this Notice?

You are receiving this Notice because you have a right to know about the proposed Settlement of this class action lawsuit before the Court decides whether to approve the Settlement.  This Notice summarizes the lawsuit, the Settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them.

Judge Stefan R. Underhill of the United States District Court for the District of Connecticut is overseeing this class action.  The lawsuit is known as *Lou Haddock, as Trustee of the Flyte Tool & Die Company Inc. 401(k) Profit-Sharing Plan, et al., v. Nationwide Life Insurance Company*, Case No. 3:01-cv-1552 (SRU). The people who sued are called the "Plaintiffs."  The companies they sued, Nationwide Life Insurance Company and Nationwide Financial Services, Inc., are together called "Defendants."  Unless separately defined in this Notice, capitalized terms have the same meaning as they do in the Settlement Stipulation and Release, which is available at the Settlement website: www.nwclassaction.com.

### 2.   What is this lawsuit about?

The lawsuit claims that Defendants became fiduciaries (someone with the duty of utmost good faith and fair dealing) under the Employee Retirement Income Security Act ("ERISA").  It further claims that Defendants violated their duties to the Plans by arranging for, receiving, or retaining the payments made to them by the Mutual Funds they offered to the Plans as investment options instead of distributing the payments to the Plans. These allegations pertain to Defendants' receipt of mutual fund payments with regard to its Annuity Contracts and Trust Platforms, during the relevant sub-class periods.

### 3.   What is a class action and who is involved?

In a class action lawsuit, one or more people called Class Representatives (in this case Peter Wiberg, Alan Gouse, Christopher Anderson, H. Grady Chandler, and Christopher M. McKeon) sue (as trustees of their plans) on behalf of all trustees of plans that have similar claims.  Together these people are the Class, and individually are the Class Members.  The individuals who sued—and all the Class Members like them—are the Plaintiffs.  One court resolves the issues for all Class Members, except for those people who choose to exclude themselves from the Class.

### 4.   Why is there a Settlement?

The Court did not decide whether the Plaintiffs or Defendants are right.  Instead, both sides agreed to a Settlement to avoid the costs and risks of further litigation and to provide benefits to Class Members as part of a compromise.  The Settlement does not mean that a Court found that Defendants broke any laws or did anything wrong.  Defendants have agreed to settle to avoid the expense and distraction of further continued litigation. The Class Representatives and the lawyers representing them (called "Class Counsel") believe that the Settlement is in the best interests of all Class Members.  Both parties agree that the Settlement provides meaningful and carefully-tailored relief to the Class that relates directly to the allegations in Plaintiffs' case.

Class Counsel have retained an independent fiduciary to evaluate the fairness of the Settlement. The Independent Fiduciary is Nicholas L. Saakvitne, Esquire.

| 5. | Who is included in the Settlement? |
|---|---|

If you received this Notice in the mail you have been identified as a Class Member.  The Settlement includes two sub-classes:  the Annuity Contracts Sub-Class and the Trust Platform Sub-Class.

The Annuity Contracts Sub-Class is defined as all trustees of all retirement plans covered by the Employee Retirement Income Security Act of 1974 ("ERISA") which had group variable annuity contracts with Nationwide Life or whose plans or participants had individual variable annuity contracts with Nationwide Life at any time from January 1, 1996, or the first date Nationwide Life began receiving payments from mutual funds based on a percentage of the assets invested in the funds by Nationwide Life, whichever came first, to the date of September 30, 2014.

The Trust Platform Sub-Class is defined as all trustees of all retirement plans covered by ERISA which had trust, custodial, services, or program agreements and/or arrangements with NFS at any time from January 1, 2009 to the date of September 30, 2014.

## THE SETTLEMENT BENEFITS – WHAT YOU CAN GET IF YOU QUALIFY

| 6. | What does the Settlement Provide? |
|---|---|

Defendants have agreed to pay a Settlement Amount of $140,000,000 to settle Plaintiffs' Claims.  This Amount includes a Settlement Amount of $110,000,000 for the benefit of the Annuity Contracts Sub-Class, and $30,000,000 for the benefit of the Trust Platform Sub-Class.  The Settlement Amount will be used first to pay all Case Contribution Fees, all Administration Expenses, all Independent Fiduciary Fees, all Attorneys' Fees, all Attorneys' Expenses, and all Taxes and Tax-Related Costs.   The amount remaining after making these payments, called the Net Settlement Fund, will be used for the benefit of Class Members who submit a valid Claim Form.  In addition, Defendants have agreed to enhance certain business practices that allegedly relate to the mutual fund payments it receives with regard to its Annuity Contracts and Trust Platforms.

| 7. | What can my Plan, Plan Participants and beneficiaries get from the Settlement? |
|---|---|

If you submit a valid Claim Form, you will receive a portion of the Net Settlement Fund in the form of a check for the benefit of your Plan.  The amount paid to benefit each Plan will be determined by a Plan of Allocation, which has been filed with the Court and is available for review at the Settlement website: www.nwclassaction.com.  In addition, if your Plan currently has an Annuity Contract or Trust Platform with Nationwide (or if your Plan selects a Nationwide Annuity Contract or Trust Platform in the future), your Plan will benefit from the enhanced business practices that Defendants have agreed to provide.  For example, Defendants have agreed to modify their Annuity Contracts and Trust Platforms to reflect the circumstances under which investment options are added, substituted, or removed from a Plan or Product Menu.  They have also agreed to offer alternative products that do not include (or include a reduced amount) of mutual fund payments, and to provide additional disclosures about the mutual fund payments it receives in connection with its Annuity Contracts and Trust Platforms.

**8.   What rights am I giving up in exchange for the Settlement?**

Unless you exclude yourself, you will be part of the Settlement.  If the Settlement is approved and becomes Final, all of the Court's orders and judgment will apply to you and legally bind you, your Plan, and its Participants and beneficiaries.  Generally, that means you, your Plan, and its Participants and beneficiaries will not be able to sue, continue to sue, or be part of any other lawsuit against Nationwide for the claims, issues, and conduct resolved by this Settlement.  The specific rights you are giving up are Claims and Causes of Action that are "released" in this Settlement (*see* Question 9).

**9.   What Claims and Causes of Action will be released?**

The Class Members, and the Plans, Participants, and beneficiaries they represent, will "release" or give up all Claims or Causes of Action (including Unknown Claims) against Nationwide and the Released Parties that are related in any way to the subject matter of the Litigation or to the Released Conduct.  The Released Conduct includes each and every act, omission, representation or other statement or conduct by Nationwide or any other Released Party that relates in any way, directly or indirectly, to Mutual Fund Payments or other compensation from third parties, or to any alleged discretion, authority, control or responsibility respecting assets in the Annuity Contracts or Trust Platforms or the administration of an ERISA-covered plan, including, but not limited to, (a) the solicitation, negotiation, arrangement, or receipt of any Mutual Fund Payments by Nationwide in connection with any of its retirement products or platforms; (b) any fees (including alleged excessive fees), compensation, costs, expenses, or payments; (c) the alleged discretionary authority or discretionary responsibility under the Annuity Contracts or Trust Platforms, or in the administration of ERISA-covered plans; (d) disclosures or the sufficiency of information about Mutual Fund Payments or any asset management, mortality & expense, surrender, administrative, contract, or investment management fees; (e) the assembly, substitution, addition, or removal of investment options from a Product Menu, Program Menu or Plan Menu; (f) the operation of any variable or separate accounts accompanying the Annuity Contracts or Trust Platforms that purchase and sell Mutual Fund shares for the investment options selected by the Plan or Plan Participants; (g) any alleged rights, obligations, discretion or conduct by Nationwide to amend, modify, or change any terms of the Annuity Contracts or Trust Platforms; (h) any actions arising out of or related to the negotiation or drafting of the Settlement Stipulation; and (i) the Plan of Allocation and the allocation of any proceeds of the Net Settlement Fund.

Section G of the Settlement Stipulation and Release describes the claims being released in necessary legal terminology.  Please read it carefully.  A copy of the Settlement Stipulation and Release is available at www.nwclassaction.com.  You can talk to one of the lawyers listed below for free or you can, of course, talk to your own lawyer at your own expense if you have questions about the claims being released.

## HOW TO GET BENEFITS – SUBMITTING A CLAIM FORM

**10. How can I get a payment from this Settlement?**

You must complete and submit a Claim Form so it is received by May 20, 2015.  A copy of the Claim Form is enclosed with this Notice. Claim Forms are also available at www.nwclassaction.com or by calling 1-866-894-0420.

Even if you do not submit a Claim Form, you and the Plans, Participants and beneficiaries you represent will be bound by the Settlement and all its terms and conditions unless you have excluded yourself from the Settlement. If you do not submit a Claim Form, you, and the Plans, Participants and beneficiaries you represent, will not be able to participate further in the Litigation or to otherwise pursue any of the claims set forth against Nationwide. However, you will receive the benefit of Nationwide's enhanced business practices.

**11. How and when will payments be made?**

You will receive payment in the form of a check in accordance with the instructions you provide on the Claim Form. Class Members, as fiduciaries to their plans, shall be solely responsible for all fiduciary decisions related to the use of any proceeds of the Net Settlement Fund, and release and hold harmless Nationwide and any other Released Parties from any related claims. All checks must be cashed within sixty (60) days after they are issued.

# THE LAWYERS REPRESENTING YOU

**12. Do I have a lawyer in this case?**

Yes. The Court has appointed three law firms to represent you and other Class Members: the Stanley Law Group, Lackey Hershman, LLP, and Koskoff Koskoff & Bieder, PC. These lawyers are called Class Counsel; Marc Stanley of the Stanley Law Group and William Bloss of Koskoff Koskoff & Bieder, PC have been appointed as Lead Settlement Counsel. You will not be charged for the work of these lawyers. If you want to be represented by a different lawyer in this case, you may hire one at your own expense.

**13. How will the lawyers be paid?**

Class Counsel will ask the Court for an award of reasonable Attorneys' Fees, *i.e.*, 35% of the total Settlement Amount ($49,000,000), plus Attorneys' Expenses of up to $2,000,000. The Court will award Attorneys' Fees based upon the value of the Settlement, the time Class Counsel has devoted to this Litigation, and the costs and expenses they incurred. They will also ask for a Case Contribution Fee of $25,000 to be paid to each of the five Class Representatives. If approved, all of these fees, costs, and expenses will be deducted from the $140,000,000 Settlement Amount before making payments to Class Members who submit valid Claim Forms.

## ASKING TO BE EXCLUDED FROM THE SETTLEMENT

If you want to keep the right to sue or continue to sue Defendants about the legal claims resolved by this Settlement, and you do not want to receive a Settlement payment, you must take steps to exclude yourself. This is sometimes called "opting out" of the Settlement.

**14.    How do I ask to be excluded?**

To exclude yourself, your Plan, Plan Participants and beneficiaries, please personally sign and send a letter in your capacity as Plan Trustee that says you wish to be excluded from the Class in the case of *Lou Haddock v. Nationwide Life Insurance Company*. Please include your full name, address, the name of your ERISA-covered plan and your signature. Mail your exclusion request so it is postmarked by March 21, 2015 to *Haddock v. Nationwide* Class Action Administrator, P.O. Box 43247, Providence, RI 02940-3247.

**15.    If I ask to be excluded, can I still get a payment from this Settlement?**

No. If you exclude yourself you are telling the Court that you and your Plan, Participants, and beneficiaries, do not want to be part of the Settlement. You can only get a payment if you stay in the Settlement and submit a valid Claim Form.

| 16. | If I ask to be excluded, can I sue Nationwide for the same claims later? |
|---|---|

Yes.  You must exclude yourself from *this* Settlement to start or continue with your own lawsuit or be part of any other lawsuit.  Unless you exclude yourself, you, your Plan and its Plan Participants and beneficiaries are giving up the right to sue Nationwide and the other Released Parties for the claims that this Settlement resolves and releases (*see* Question 9).

## OBJECTING TO THE SETTLEMENT

If you do not like the Settlement or some aspect of it, you can tell the Court by objecting to the Settlement. The Court will consider your views before making a decision.  Members of both the Annuity Contract and Trust Platform Sub-Classes may object to the Settlement.

| 17. How do I object to the Settlement? |
|---|

You may object to the Settlement by personally signing and filing an objection in writing.  Your objection must be received by March 21, 2015, and must include:  (1) your name; (2) your plan's name, address, and telephone number; (3) if applicable, the name, address, and telephone number of your attorney; and (4) any supporting papers or briefs you intend to submit in support of your objection.  Your objection must be mailed to the Court, Lead Counsel, and Defendants' Counsel at the addresses listed below so it is received by each by March 21, 2015.

| **Clerk of the Court** | **Lead Counsel** | **Defendants' Counsel** |
|---|---|---|
| U.S. District Court for the District of Connecticut Clerk of Court Brien McMahon Federal Building, 915 Lafayette Boulevard Bridgeport, CT 06604 | Marc R. Stanley Stanley Law Group 6116 North Central Expressway Suite 1500 Dallas, TX  75206  William Bloss Koskoff Koskoff & Bieder, PC 350 Fairfield Avenue Bridgeport, CT 06604 | Charles Platt WilmerHale 7 World Trade Center 250 Greenwich Street New York, NY 10007 |

If you or your attorney would like to attend and speak at the Fairness Hearing about your objection, you must file a notice of intent to appear with your objection (*see* Question 20).  You cannot object, or attend and speak at the Fairness Hearing, if you have asked to be excluded from the Settlement.

## THE COURT'S FAIRNESS HEARING

| 18. When and where will the Court decide whether to approve the Settlement? |
|---|

The Court will hold a Fairness Hearing on March 31, 2015, at 4:00 p.m., in Courtroom One of the United States District Court for the District of Connecticut, Brien McMahon Federal Building, 915 Lafayette Boulevard, Bridgeport, CT 06604.  At the hearing, the Court will determine whether the proposed Settlement is fair, reasonable, and adequate, and whether it should be approved.  The date and time of the hearing may be changed or continued by the Court without further notice.

**19.  Do I have to attend the Fairness Hearing?**

No.  However, you are welcome to attend at your own expense.  If you file an objection to the Settlement, you do not have to go to Court to talk about it.  As long as your objection includes all of the information listed in Question 17, above, and is received by March 21, 2015, the Court will consider it.

**20.  May I speak at the Fairness Hearing?**

You may ask the Court for permission to speak at the hearing.  To do so you must include a notice of intent to appear with your objection.  Your notice of intent to appear must include: (1) the names and contact information for those individuals who plan to appear; (2) a statement of membership in the Class; (3) a description of the specific grounds for your objection; and (4) all papers you intend to present to the Court in opposition to the Settlement Stipulation and Release.

### IF YOU DO NOTHING

**21.  What happens if I do nothing at all?**

If you do nothing and the Court approves the Settlement, you will not receive a Settlement payment and you will be bound by the Released Claims listed in Question 9.  Generally, you and your Plan, Participants, and beneficiaries will give up your right to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against Nationwide and the Released Parties about the legal issues or claims resolved and released by this Settlement.

### GETTING MORE INFORMATION

**22.  How can I get more information?**

Visit the website, www.nwclassaction.com where you will find the Settlement Stipulation and Release and several court filings and orders that provide significant additional information.  You may also call 1-866-894-0420 or write to *Haddock v. Nationwide* Class Action Administrator, P.O. Box 43247, Providence, RI 02940-3247.

DATED: **January 20, 2015**

### THIS NOTICE HAS BEEN SENT TO YOU BY ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

# Exhibit B

*Haddock v. Nationwide* **Class Action Administrator**
P.O. Box 43247
Providence, RI  02940-3247

# NHT

**«ScanString»**

Claim#: NHT-«AccountID»-«NoticeID»
«FirstName» «LastName»
«Attention»
«Address1»
«Address2»
«City», «StateCd» «Zip»
«CountryCd»

| Name/Address Changes (if any): |
|---|
| First Name _____ Last Name _____ |
| Address _____ |
| City _____ , State ____ Zip ____ |
| (____) _____ |
| Telephone |
| Email _____ |

## **CLAIM FORM**

In order to receive a distribution from the Settlement, the Trustee(s) of the Plan ("Plan Trustee") must complete this form and return it to the following address on or before May 20, 2015:

*Haddock v. Nationwide* **Class Action Administrator**
P.O. Box 43247
Providence, RI  02940-3247

**I.     Information About the Plan**

Name of the Plan: _____

Plan Tax ID Number: _____

Group Number: _____

Name of Plan Trustee(s): _____

Mailing Address: _____

City, State Zip: _____

**II.    Questions About the Plan and Directions Regarding the Claim Proceeds**

**Question 1:** Is the Plan currently in existence?  (Check One)     Yes  ☐     No  ☐

If your answer is "Yes," please continue to Question 2.

If your answer to this Question 1 is "No," please skip to Question 3.

**Question 2:** Did the Plan have a group variable annuity contract or individual variable annuity contract(s) with Nationwide Life Insurance Company ("Nationwide Life") between January 1, 1996 and September 30, 2014, or a trust, custodial, services, or program agreement and/or arrangement with Nationwide Financial Services, Inc. or its affiliates ("NFS"), between January 1, 2009 and September 30, 2014?  (If Yes, check the box next to the type below.  If No, check "None")

A.  Group  ☐          B.  Individual  ☐          C.  Trust  ☐          D.  None  ☐

If you submit this Claim Form in connection with the Plan's group or individual variable annuity contract(s) with Nationwide Life, or its trust, custodial, services, or program agreement and/or arrangement with NFS, you hereby instruct, on behalf of the Plan and the Participants, that the Settlement Administrator distribute any Settlement proceeds by issuing a check payable to the Plan Trustee(s).

The check should be made payable to:  Plan Trustee(s) Name(s): _____

and mailed to the following address: Street Address: _____

City, State Zip: _____

[1]  If you have questions about how to fill out this form, please contact the Settlement Administrator at 1-866-894-0420.

 NHTPOC1 

By giving this instruction, you hereby represent that the proceeds will be used by the Plan and the Plan Trustee(s) to pay for or defray reasonable Plan expenses, or alternatively be used in full compliance with ERISA law and regulations and will only be used for a purpose that fully complies with ERISA law and regulations.  Please consult your legal advisor or Class Counsel if you have questions about how the proceeds may be used.

**Question 3:**  If the Plan is no longer in existence, did the former Plan have a group or individual variable annuity contract(s) with Nationwide Life Insurance Company ("Nationwide Life") between January 1, 1996 and September 30, 2014, or a trust, custodial, services, or program agreement and/or arrangement with Nationwide Financial Services, Inc. or its affiliates ("NFS") between January 1, 2009 and September 30, 2014?   (If Yes, check the box next to the type below.  If No, check "None")

A. Group ☐     B. Individual ☐     C. Trust ☐     D. None ☐

If you submit this Claim Form in connection with the former Plan's group or individual variable annuity contract(s) with Nationwide Life, or its trust, custodial, services, or program agreement and/or arrangement with NFS, you hereby instruct, on behalf of the Plan and the Participants, that the Settlement Administrator distribute any Settlement proceeds by issuing a check payable to the Plan Trustee(s).

The check should be made payable to:  Plan Trustee(s) Name(s): _____

and mailed to the following address: Street Address: _____

City, State Zip: _____

By giving this instruction, you hereby represent that the proceeds will be used by the former Plan and its Plan Trustee(s) in full compliance with ERISA law and regulations, and will only be used for a purpose that fully complies with ERISA law and regulations.  Please consult your legal advisor or Class Counsel if you have questions about how the proceeds may be used.

**III.   Certification**

By signing and submitting this Claim Form, you hereby certify and represent as follows, under penalty of perjury:

1.  I am/We are or were the Plan Trustee(s) of a retirement plan covered by ERISA that had a group variable annuity contract, or whose Participants had individual variable annuity contract(s), issued by Nationwide Life, at any time from January 1, 1996 to September 30, 2014; or that had a trust, custodial, services, or program agreement and/or arrangement issued by NFS at any time from January 1, 2009 to September 30, 2014.

2.  I/We have read and understood the questions raised above, and the answers provided in response to those questions are true to the best of my/our knowledge.

3.  I/We have consulted with all the legal, financial, and other advisors necessary to make a final decision with respect to this Settlement and its consequences, and acknowledge and agree that I am/we are making the final decision and not relying on any advice from Nationwide Life or NFS, or their representatives, or being influenced in any way by Nationwide Life, NFS, or their representatives.

4.  I/We have reviewed the Settlement and have determined that (a) the Settlement's terms, including the scope of the release of claims, the amount of cash and the value of any non-cash assets received by the Plan, and the amount of Attorneys' Fees and Attorneys' Expenses, and other sums to be paid from the recovery, are reasonable in light of the Plan's likelihood of full recovery, the risks and costs of litigation, and the value of claims foregone; (b) the terms and conditions of the Settlement are no less favorable to the Plan than comparable arms-length terms and conditions that would have been agreed to by unrelated parties under similar circumstances; and (c) the Settlement is not part of an agreement, arrangement, or understanding designed to benefit a party in interest.

5.  I/We have the authority to act on behalf of the current or former Plan and its Participants;

6.  I/We have fully informed the Participants of the current or former Plan of all the terms of the Settlement, and have obtained their knowing and voluntary approval to enter into this Settlement, to dismiss the Litigation with prejudice, and to provide the Release to Nationwide set forth in the Settlement Stipulation and Release on behalf of the Plan and Participants;

7.  Pursuant to my/our responsibility to act on behalf of the current or former Plans and its Participants, I/we will distribute the funds received under this Settlement in the best interests of the current or former Plan and the Plan Participants, in accordance with ERISA, as described in Section II above, and in compliance with the Settlement Stipulation and Release. I/We will not bring any lawsuit, or otherwise hold Nationwide Life, NFS, and the Released Parties accountable, for any issues relating to the allocation or distribution of the settlement proceeds;

8.  I/We acknowledge and agree that any monies paid pursuant to this Claim Form do not constitute plan assets or retirement savings prior to the receipt and acceptance of the monies by the undersigned or a duly authorized designee;

9.  I/We acknowledge and agree to the Release of Nationwide Life, NFS, and the Released Parties that is set forth in the Settlement Stipulation and Release on behalf of the current or former Plan and its Participants.

10.  I/We acknowledge and accept the solicitation, negotiation, arrangement, receipt, or retention of any Mutual Fund Payments by Nationwide Life, NFS, and the Released Parties presently and in the future, and agree not to bring a lawsuit on the basis of any such solicitation, negotiation, arrangement, receipt, retention, or other conduct with regard to Mutual Fund Payments in the future.

Signature(s) of Authorized Plan Trustee(s):

| Print Name | Signature | Date (mm/dd/yyyy) |
| --- | --- | --- |
| Print Name | Signature | Date (mm/dd/yyyy) |
| Print Name | Signature | Date (mm/dd/yyyy) |





# Exhibit C

# PERSONAL BUSINESS

## *Sometimes Golden Oldies Means the Band, Not the Music*

**By ROBERT STRAUSS**

A 4-YEAR-OLD GIRL twirled and jumped in what is normally a parking lot to the music of Monko, telling her mother it was her favorite band.

Monko, named after its singer-songwriter-guitarist Kevin Monko, was playing under an awning at the east end of the weekend Collingswood Farmers Market, hard by the elevated tracks of the commuter train from the New Jersey town of Collingswood to Philadelphia, about six miles away.

Mr. Monko, 58, is a commercial photographer who just happens to love putting bands together. This one has a bass player, a mandolin man, a drummer and himself.

"When I am playing music, I can't get much happier," Mr. Monko said. "All of the people who play with me are better than me. I am lucky enough to get people to play with me in a variety of bands and we go play in different places, make a little money, and just have a lot of fun."

Mr. Monko is just one of many baby boomers who, near or at retirement age, are trying to recapture their musical youth; if not exactly expecting Taylor Swiftian riches, they are at least hoping for modest remuneration and a place in the lights.

"Boomers have been imagining life stages since they were born," said Emilio Pardo, president of an AARP division called Life Reimagined. "They always want to rehearse what they feel is their calling. It is no surprise that as they have gotten older, they have reached out to their musical pasts."

There was a time, in his 20s, when Mr. Monko worked a variable schedule in restaurants, when he thought he might be lucky enough to not just make a little side cash, as he does now, but maybe make a real living playing music. Then life, as it so often does, intruded, and he started on a different career path, married, had a couple of children and moved to the suburbs and away from the music scene.

It did not quite gnaw at him, but the thought of playing remained with him. Little by little, mandolin players and trombonists came into his life again, if more in his spare time than before. Since then, he has released a CD of his quirky semi-rock music, and he plays at farmers' markets and coffeehouses and the occasional party.

Paul Stiegler, 63, was an enthusiastic member of a campus a cappella group at Carleton College in Minnesota in the early 1970s, and he once even competed in a hollering contest in the Great Smoky Mountains. He never really thought of basing a career on his vocal prowess, though, and became an emergency room doctor and medical clinic owner.

He took some vocal lessons in the 1990s and played parts in community musical theater, but in 2007, Craig Kaemmer, an old friend from Carleton, sent him a CD he had made. "I talked to him on the phone for two hours and got hooked," said Mr. Stiegler, who then took time off work to go to Nashville to take songwriting classes.

By 2013, he had a CD of his own, a cross between country and soft rock. He performs when he can, mostly around Madison, Wis., where he now lives, and gets support from a songwriting association he found online and from a Nashville-based mentor.

"That is another difference between the generation before and now, in regards to music or anything like that," Mr. Pardo of AARP said. "You can go online and find someone who has done it, or is trying to do it. There is a support in social media, at the least, and you can connect with others in a way your parents couldn't."

Tom Moon didn't have any trouble with connections. For more than two decades, he was the rock music critic for, first, The Miami Herald and then The Philadelphia Inquirer, often contributing work to NPR and major magazines. While at the University of Miami, and just after, he played saxophone in a number of salsa bands — often for only $50 a night — so when the writing gigs started, he went all in. When he got to Philadelphia in the late 1980s, in fact, he signed an agreement that he would not play music professionally, so as not to compromise his reviewing.

In 2004, though, he took a buyout to write a book, and when he finished the book in 2008, he felt a little lost trying to return to his journalistic career.

"I found myself picking up my horn and that is when I started to play," Mr. Moon said. "I became convinced I had sold myself short as a musician. I was not a great talent, but I could play."

He began to go to jam sessions in Philadelphia and found that what he called "young and vastly talented" people from local universities wanted to play with "the old guy." Now 54, he plays several times a week in the better Philadelphia jazz clubs, sometimes still making $50 a gig, but often earning several hundred dollars a show.

"These young guys threw me a lifeline," Mr. Moon said. "The odds against anyone, not just someone old, making it are great, but to play something beautiful, there is a value in that. I can appreciate it all the more having had the long-term perspective."

Jack Scott, 67, practiced law for 37 years in Wallingford, roughly 15 miles from Philadelphia, but for the last 12 years he has been playing the guitar he put down as a teenager. He performs at least once a week in a bluegrass club. He also teams with a fiddle player, charging $300 for gigs, "though sometimes, of course, we have to take a little less." It is hardly what he made practicing insurance law, but for now it is at least as satisfying.

"I don't want to be some guy with a guitar at an open mike," said Mr. Scott, who also writes his own bluegrass songs and sometimes teaches a class in songwriting at Temple University. "It's funny when someone hires us, they say the audience is going to want covers of songs. We 'yes' them to death, but when we get to the gig, we play my original songs, because they work. People come up to us afterwards and say, 'Where do these songs come from?' We know our act works and it is wonderful when it does."

Sometimes the return to music later in life is fortuitous. Soon after Roberta Foster, 60, of Whippany, N.J., retired from teaching four years ago, her husband, Allen, also 60, bought her a ukulele for Valentine's Day.

"I said, 'Where is my jewelry? Where is my chocolate?'" Ms. Foster said. Her husband was a good amateur guitarist and he bought a ukulele, which is a little smaller and easier to pluck, would be a good starter instrument for her retirement.

Ms. Foster gave it a try and ended up loving it. She found there was a ukulele jam in nearby Morristown the first Wednesday of every month. Now the couple play as a ukulele-guitar duo at nearby clubs, nursing homes and parties as the Long and Short of It, since he is 6-foot-4 and she is 5-foot-4. She has also done some recording.

"One day I was an elementary schoolteacher and now I am a professional musician," she said. "All because my husband was smart enough to give me this crazy ukulele."

Mr. Pardo of AARP said that since music gives joy — even when it is not the Beatles or Beyoncé — it is a perfect baby boomer later-in-life vocation.

"It is wonderful to embrace your calling," he said. "Boomers are ripe for this and it's just a case of being unafraid to give it a shot."



DAVID CIEMNA

Kevin Monko, performing with his glam rock band Candy Volcano. He's a commercial photographer, but says, "When I am playing music, I can't get much happier."

---

# 700,000 Homeowners Could Still Benefit From U.S. HARP Refinancing

**By ANN CARRNS**

ALTHOUGH the housing market is increasingly on the mend, hundreds of thousands of homeowners still have little or no equity in their homes and could benefit from a federal mortgage refinancing program that is scheduled to end this year.

The Home Affordable Refinance Program, or HARP, was created in 2009 to help ease the pain of the real estate downturn. It is aimed at helping borrowers who are current on their payments but can't qualify for a traditional refinancing to a more affordable rate because they are underwater on their mortgage — they owe more than their property is worth, because of a drop in their home's value.

Nearly 3.3 million homeowners have refinanced their mortgages through the program as of November, according to the Federal Housing Finance Agency. However, the volume of refinancings under HARP has been slowing — partly because multiple extensions of the program's deadline may have caused some confusion.

"There are still folks out there who don't know help is available," said Marietta Rodriguez, vice president for national homeownership programs at NeighborWorks America, a nonprofit housing and community development organization.

Often, by the time homeowners seek help from a foreclosure counselor, they are already seriously delinquent and ineligible for HARP. Some counselors, however, say they have had clients who considered HARP but encountered difficulty finding competitive rates and fees.

Still, about 700,000 borrowers remain eligible and are considered "in the money," according to the F.H.F.A. — that is, they would benefit financially from the program. (Typically, those who may benefit have a mortgage balance of at least $50,000, with 10 years

> A program aimed at reliable payers who are underwater on their mortgages.

or more left on the loan, and an interest rate above current market rates.) On average, the program saves borrowers about $200 a month, the housing finance agency says.

One problem is that some borrowers are skeptical or fear that an offer of a lower mortgage rate is a scam, even when their own lenders initiate contact, said Guy Cecala, publisher of Inside Mortgage Finance, an industry publication.

Others may have had a frustrating experience when trying to use the program in its early years. For instance, the program initially put a cap on the loan-to-value ratio for eligible loans.

(Loan-to-value is a measure of how much the borrower owes, relative to the home's value; the "L.T.V." is obtained by dividing the amount of the mortgage by the value of the home.) But that cap was later removed, and now there is no maximum, if borrowers are financing into a fixed-rate mortgage. (In November, 9 percent of HARP loans had a loan-to-value ratio greater than 125 percent; and for the full year through November, more than a quarter had L.T.V.s greater than 105 percent, the government said.)

"If you were told 'no' in the past, consider reaching out to see if you might qualify now," said Bill Banfield, vice president of Quicken Loans, which is active in HARP.

Who qualifies? In addition to a good repayment history — no late payments in the previous six months, and no more than one in the last year — the borrower must have taken out the loan before June 1, 2009, and it must be owned by Fannie Mae or Freddie Mac, the two government-sponsored mortgage finance companies. (You can search ownership using the "loan look up" tools on the HARP website; make sure you search by both Fannie and Freddie.)

One potential bright spot is that mortgage rates fell this week, potentially making refinancings more attractive: The average rate for a traditional 30-year fixed-rate mortgage was 3.63 percent, the lowest level since May 2013, according to Freddie Mac. Before 2009, mortgage rates hovered near 6 percent, or higher.

To start, you should contact the company that services your loan and ask if it participates in HARP. If your lender does not participate, you can apply at one that does. (Some lenders offer HARP only to existing loan customers.) You can find lists of participating lenders on Freddie Mac's and Fannie's websites.

Here are some questions about the HARP refinance program:

**■** *If I have previously refinanced my home under HARP, can I do it again?*

No. You can refinance just once under HARP.

**■** *If I am delinquent on my mortgage, can I qualify for HARP?*

No — but you may be eligible for other federal programs, like the Home Affordable Modification Program, which is aimed at helping borrowers who already have fallen behind on their payments by making changes to their existing loans.

**■** *How can I find help figuring out what program I'm eligible for?*

Ms. Rodriguez of NeighborWorks advises finding a federally approved housing counseling agency. You can search for one in your ZIP code.

*Email: yourmoneyadviser@nytimes.com*

---

**Legal Notice**

**If you are a current or former trustee of a retirement plan covered by the Employee Retirement Income Security Act ("ERISA") that had (1) group or individual variable annuity contracts with Nationwide Life Insurance Company at any time between January 1, 1996 and September 30, 2014, or (2) trust, custodial, services, or program agreements and/or arrangements with Nationwide Financial Services, Inc., or its affiliates, at any time between January 1, 2009 and September 30, 2014, your plan may benefit from this class action settlement.**

*This is a summary. See below for more information.*

**What is this about?**
A Settlement has been reached in *Haddock v. Nationwide Life Insurance Co.*, a class action lawsuit against Nationwide Life Insurance Company ("Nationwide Life") and Nationwide Financial Services, Inc. ("NFS") (collectively, "Defendants"). The Settlement resolves claims made by trustees of retirement plans covered by the Employee Retirement Income Security Act ("ERISA"). The trustees claimed that Defendants violated ERISA when they arranged for, received or retained payments from mutual funds ("mutual fund payments" or "revenue sharing") offered as investment options on their Annuity Contracts and Trust Platforms. Defendants deny that they engaged in any improper conduct and maintain that the mutual fund payments they received benefited the Plaintiffs, and the retirement plans and participants they represent, because the payments were used to reduce administrative fees paid by the plans and participants, and to compensate Defendants lawfully and appropriately for its services. Defendants have agreed to settle to avoid the expense and distraction of further continued litigation. Both Parties agree that the Settlement provides meaningful and carefully-tailored relief to the Class that relates directly to the allegations in Plaintiffs' case.

**What does the Settlement provide?**
A Settlement Fund of $110,000,000 has been created for the benefit of trustees of plans that held Annuity Contracts with Nationwide Life between January 1, 1996 and September 30, 2014, and that are subject to ERISA. A Settlement Fund of $30,000,000 has been created for the benefit of trustees of plans that held Trust Platforms with NFS between January 1, 2009 and September 30, 2014, and that are subject to ERISA. Defendants have also agreed to enhance certain business practices that allegedly relate to the mutual fund payments it receives.

**Who represents me?**
The Court has appointed three law firms to represent you and other Class Members: the Stanley Law Group, Lackey Hershman, LLP, and Koskoff Koskoff & Bieder, PC. These lawyers are called Class Counsel. Marc R. Stanley of the Stanley Law Group and William Bloss of Koskoff Koskoff & Bieder, PC have been appointed as Lead Settlement Counsel. You will not be charged for the work of these lawyers. If you want to be represented by a different lawyer in this case, you may hire one at your own expense.

**What are my rights?**
• To receive a payment, your Plan must submit a completed Claim Form by **May 20, 2015**. If you do nothing, you will remain in the Class but receive no money. You do not need to do anything to get the benefit of new business practices.
• You may exclude yourself from the Settlement by sending a letter to the address below postmarked no later than **March 21, 2015**. Your Plan cannot get any money from this Settlement if you do so.
• You may object to the Settlement by filing an objection with the Court by no later than **March 21, 2015**.
• If the Settlement is approved by the Court, Class Members who do not exclude themselves from the Class will give up any claims covered by the Settlement and will be bound by the Court's orders and judgment in the case.

The Court will hold a hearing on March 31, 2015 at 4:00 p.m. to consider whether the Settlement is fair, reasonable, and adequate, and to consider the motion for attorneys' fees and expenses.

**To request a copy of the full Class Notice or a Claim Form, or for further information:**
Call: 1-866-894-0420
Visit: www.nwclassaction.com
Write: Haddock v. Nationwide Class Action Administrator
P.O. Box 43247, Providence, RI 02940-3247

# Exhibit D

| KCCID | Plan Name | Case Number/Group Number |
|---|---|---|
| 68535 and 11268 | Basic Business Products, Inc. Profit Sharing 401(k) Plan | 240-00053 and 240-80053 |
| 13484 | SB General Contracting Pension Plan | 376-80141 |
| 44509 | Hair Co Trustees Pro Sh Plan | LFS7 0107STB0HAIR |
| 64418 | O'Neill Ins Agy PSP | 961-00540 |
| 10978 | Rapid Protoyping & Engineering Inc Employees 401(k) Plan | 363-80139 |
| 10084 | SMS Assist LLC 401(k) Plan | 063-83587 |

BASIC BUSINESS PRODUCTS, INC.
8009 DARNELL LN.
LENEXA, KS 66215

March 10, 2015

TO:     Lou Haddock v. Nationwide Class Action Administrator
        P.O. Box 43247
        Providence, R.I. 02940-3247

FR:     Steven Farabi and James T. Gibson, Trustees
        8009 Darnell Ln
        Lenexa, KS 66215

RE:     Basic Business Products, Inc. Profit Sharing 401(k) Plan
        Group #240-00053  and Group #240-80053

Please be advised that we, the Trustees on behalf of the above-referenced Erisa-covered plan, wish to be excluded from the Class (Annuity Contracts Subclass and Trust Platform Subclass) in the case of Lou Haddock v. Nationwide Life Insurance Company.

We may be contacted at the above address if you have any questions.

Date. 03/11/2015
Steven Farabi
Trustee

Date: 03/17/2015
James T. Gibson
Trustee

# S B GENERAL CONTRACTING PENSION PLAN

Tuesday, March 10, 2015

Haddock v. Nationwide Class Action Administrator
P O Box 43247
Providence, RI 02940-3247

Kevin Saccone, Plan Administrator
SB General Contracting Pension Plan
14 Renmar Ave.
Walpole, Ma 02081

Re: Exclusion from Class in the case of Lou Haddock v. Nationwide Life Insurance Company

Please exclude the SB General Contracting Pension Plan from the above titled class action suit.

Kevin Saccone
Plan Administrator

# The Hair Company
410 W. Russell Road
Sidney, Ohio  45365

Phone (937) 492-7666                    Fax (937) 492-9183

January 27, 2015

Haddock v. Nationwide
Class Action Administrator
P.O. Box 43247
Providence, RI  02940-3247

Dear Class Action Administrator:

I wish to be excluded from the Class in the case of Lou Haddock v Nationwide Life Insurance Company.

Plan name is The Hair Company Profit Sharing Plan, Plan No 001.  Plan Administrator Judy A. Behr, 410 W. Russell Road, Sidney, OH 45365.  Copy of Class Action notification included.

Very truly yours,

Judy A. Behr
Plan Administrator

*Mr. James O'Neill*

1/30/15

Please grab my
Plan # 961-0540
From the Class of [illegible]
Holdback v. [illegible]
Co.

JAMES R. O'NEILL
James R O'Neill
1183 Rockwater Dr.
Zelienople PA 16063
O'Neill's Ins Agency [illegible]
James R O'Neill
Plan Trustee

*"In the truest sense, freedom cannot be bestowed; it must be achieved."*

– Franklin D. Roosevelt



*Rapid Prototyping & Engineering, Inc.*
*3340 W. Presidential Way*
*Edinburgh, IN 46124*
*Tel: (812) 526-9207*
*Fax: (812) 526-9208*

January 28, 2015

Haddock v. Nationwide Class Action Administrator
P. O. Box 43247
Providence, RI 02940-3247

RE: Claim #: NHT-00010978-10978

Dear Administrator:

We wish to be excluded from the Class in the case of Lou Haddock v. Nationwide Life Insurance Company.

Sincerely,

William B. Harvey
Rapid Prototyping & Engineering Inc.
Employees' 401 (K) Plan



**SMS ASSIST**
REVOLUTIONIZING FACILITY SERVICES

January 30, 2015

<u>VIA US MAIL</u>

*Haddock v. Nationwide* Class Action Administrator
P.O. Box 43247
Providence, RI 02940-3247

***Re: Lou Haddock v. Nationwide Life Insurance Company Settlement Exclusion***

Dear Class Action Administrator:

  As trustees for SMS ASSIST LLC 401(K) PLAN, we request that we be excluded from the Class in the case of *Lou Haddock v. Nationwide Life Insurance Company*. Per the information provided with the Claim Form sent to us, we trust that the information provide below is sufficient for exclusion:

   Name of ERISA-Covered Plan: SMS ASSIST LLC 401(K) PLAN
   Trustees: Marc Shiffman, Jason Moos
   Address: 875 N. Michigan Ave., Ste 2800, Chicago, IL 60611-1819

In the event that there are any deficiencies, please contact us immediately in order to rectify such issues.

Regards,

Marc Shiffman

Trustee

Jason Moos

Trustee

Brent Jacobs

Privacy Officer

**875 N. Michigan Avenue, Suite 2800, Chicago, IL 60611-1819**